IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SYED HARIS AHMED,<br><br>Defendant. | 1:06-cr-0147-WSD-GGB<br><br>UNDER SEAL |

## SPECIFIC FINDINGS OF FACT PURSUANT TO FED. R. CRIM. P. 23(c)

Defendant Syed Haris Ahmed ("Defendant") is charged in Count One of the Second Superseding Criminal Indictment (the "Second Superseding Indictment"), returned by the Grand Jury on December 9, 2008, with a "Conspiracy to Provide Material Support to Terrorists." Count One of the Second Superseding Indictment charges, in substance, that Defendant did knowingly and unlawfully combine, conspire, and agree to provide material support and resources, and conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956 (conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country) and Section 2332b (acts of terrorism transcending

510

national boundaries), in violation of Title 18, United States Code, Section 2339A. On May 19, 2009, Defendant waived, in writing and in accordance with Rule 23(a) of the Federal Rules of Criminal Procedure, his right to a jury trial and the case was tried by the Court, without a jury, beginning on June 1, 2009. The Court commenced its deliberations on June 5, 2009 and having this 10th day of June, 2009 found the Defendant guilty of Count One of the Second Superseding Indictment, enters the following Specific Findings of Fact, pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure.

I.  **FINDINGS OF FACT**

   A.  **Existence of a Conspiracy**

In or before the fall of 2004, Defendant engaged in various communications, over the internet and in person, with Ehsanul Sadequee ("Sadequee"), Zubair Ahmed ("Z. Ahmed"), Safiullah Hussaini ("Hussaini"), and Asad Khan ("A. Khan"). In these communications Defendant and those with whom he communicated expressed their desire to engage in jihad, or holy war, on behalf of their Muslim faith. They exchanged writings and treatises about violent jihad and exchanged information about websites and publications that promoted jihad. Defendant and those with whom he communicated exchanged e-mail messages in which they discussed what they called a three-step plan, the third level of which

called for engaging in violent jihad. The evidence in this case shows that violent jihad includes acts of physical violence, including the use of deadly force, against those who Defendant and those with whom he conspired believed oppressed Islam or its influence. Defendant, Sadequee, Z. Ahmed, Hussaini, and A. Khan developed a plan to work through the three stages to advance to the third stage of violent jihad. The plan included self-styled paramilitary training, including training with paintball guns in the north Georgia mountains. Defendant admitted during an interview with federal law enforcement agents that the purpose of the paintball activities was to prepare for taking part in violent jihad. Z. Ahmed, who became part of the ongoing conspiracy, undertook to purchase a firearm and receive firearm training.

Defendant's, Sadequee's, Z. Ahmed's, and Hussaini's internet and personal discussions about training for violent jihad resulted in a plan by Defendant and Sadequee to meet in Toronto, Canada with supporters of violent jihad whom Defendant and Sadequee had met online. Pursuant to their agreement to meet, on February 26, 2005, Defendant and Sadequee purchased bus tickets to Toronto, Canada, departing on March 6, 2005 and returning on March 13, 2005. While in Canada, Defendant and Sadequee met with Azdee Omani ("Omani"), Fahim Ahmed or "James" ("F. Ahmed"), and an individual known as "Jamal."

3

Defendant, Sadequee, Omani, F. Ahmed, and Jamal discussed how to participate in and further violent jihad activities abroad and in the United States. Specifically, they discussed and agreed upon a plan for members of the group to travel to Pakistan to obtain paramilitary training, including the entry into jihadist training camps to train for and then to engage in violent jihad with one or more unidentified groups known to engage in attacks to cause serious injury or death to others. The conspirators who met in Toronto agreed that one of them should go to Pakistan, before the arrival of the remaining conspirators, to prepare for their enrollment in a training camp to engage in jihad. The men discussed strategic locations in the United States that could be potential targets for terrorist attacks, such as military bases, oil storage facilities, and refineries. They also discussed how they might disrupt the world-wide Global Positioning System (GPS). Defendant and Sadequee, upon their return to Georgia, identified Dobbins Air Reserve Base in Marietta, Georgia as the kind of installation that might be targeted in the United States.

B. **Specific Conduct to Further the Conspiracy**

After returning from Canada, Defendant began working with his co-conspirators to implement the plan to participate in and further violent jihad abroad and in the United States. Defendant looked into ways to fund travel abroad,

including a loan scheme in which loans would be taken out to obtain their proceeds without any intention of repaying the loan. He reconsidered this scheme after learning that a loan taken out under such circumstances could prevent a martyr from advancing to the afterlife. As for gaining entry into a paramilitary training camp, Defendant and his co-conspirators recognized they had to establish credibility with supporters of violent jihad before they would be admitted into such a camp. Defendant conceived of a plan to go to Washington, D.C. and create surveillance videos of symbolic landmarks in the Washington, D.C. area. The videos would assist in establishing their willingness to provide support to terrorist organizations in the United States, to identify actual targets, and to show their ability to provide information to overseas terrorist organizations without being detected.

Defendant put his Washington, D.C. casing video plan into effect by first agreeing with Sadequee to drive to Washington, D.C. to create the videos. Defendant and Sadequee departed Georgia, in Defendant's vehicle, on or about April 10, 2005. They spent two days in Washington, D.C., during which time they produced 62 videos of major landmarks and infrastructure targets, including the United States Capitol; the World Bank; the Masonic Temple in Alexandria, Virginia; and a group of fuel storage tanks in Newington, Virginia. That the

videos were to advance and provide support for terrorism is demonstrated by Sadequee's narration during the dusk videotaping of the Pentagon, when, referring to the Pentagon, Sadequee stated: "this is where our brothers attacked." During videotaping of another Washington, D.C. location, Defendant is heard commenting to Sadequee to "be careful" not to be seen taking the video shots. The trip to Washington was calculated to avoid detection of the trip, including by Defendant and Sadequee sleeping in Defendant's vehicle thus avoiding a record of their stay in a lodging facility. Defendant admitted to federal law enforcement agents that he knew Sadequee intended to send the videos to Islamic extremists abroad. Upon returning to Atlanta, Defendant gave the videos to Sadequee.

After the trip to Washington, D.C., Sadequee and Omani, as well as Aabid Hussein Khan ("Khan) who joined the agreement for Defendant and his co-conspirators to enter a jihadist training camp, discussed Defendant being designated the leader of the group. Defendant and his co-conspirators also engaged in a number of instant messaging "chats" during which they planned their travel to Pakistan. In these discussions, Defendant announced his plan to go first to Pakistan and study in a religious school until the others joined him. They discussed a further plan to rent an apartment in Toronto for the others to gather before departing overseas.

On April 20, 2005, Defendant disseminated an e-mail to his co-conspirators spelling out the details of the plan to go to Pakistan to obtain paramilitary military training and ultimately to engage in violent jihad. In this e-mail he acknowledged he was coordinating with co-conspirator Aabid Hussein Khan to enter a training camp in Pakistan. Defendant used code words such as "mother's day celebration," "curry place restaurant," "Towers restaurant," "mountain hills national park," and "rivers front" to disguise the content of the e-mail. He admitted to federal law enforcement agents the meaning of these code words and admitted that the plan was for the co-conspirators to travel to Pakistan, to join up, and then to enroll in a training camp to train for and engage in violent jihad. In internet discussions with his co-conspirators, Defendant discussed the status of his co-conspirators' passports and visas to travel to Pakistan and cautioned them against traveling in a group. Defendant concluded that if for any reason one of the co-conspirators could not make it into Pakistan, that person should enter through another country, such as Iraq.

Following Defendant's encoded message, the online discussions regarding the trip to Pakistan became more specific. Defendant and his co-conspirators discussed which terrorist group they would join in Pakistan, referring specifically to Lashkar-e-Tayyiba ("LeT") and Jaish-e-Mohammed ("JeM") as organizations

that would provide the jihadist training they were seeking. LeT is an organization based in Pakistan that commits violent attacks in India to further its goal of removing control of Kashmir from non-Muslims. LeT also has joined in attacks on United States soldiers in Afghanistan. The United States Secretary of State has designated LeT as a foreign terrorist organization. JeM is an Islamic extremist group based in Pakistan whose aim is to unite Kashmir with Pakistan. JeM is responsible for suicide and other violent attacks in Kashmir and elsewhere. Defendant assured the others that the decision of which terrorist group to join "will be decided on the ground." Sadequee stated they should join with LeT and that their main goal was to join "the Students," or the Taliban. Defendant admitted to federal law enforcement agents that he had hoped to join LeT after he obtained jihadist training.

Defendant's most direct communication of his intention to join a paramilitary training camp and engage in violent jihad is an April 22, 2005 instant messaging "chat" with co-conspirator Aabid Hussein Khan, in which Defendant asked him about the costs associated with traveling to Pakistan, paramilitary training, and "J land" (fighting jihad). Defendant noted he understood that when he participated in jihad he could collect "loot" from jihadist attacks. Khan responded that participating in violent jihad does not cost much, if anything, and

that the "loot" from the "battles" such as radios and guns and "even sometimes money itself" from the "killed enemy," helps to pay for the costs.

Just a few days later, on April 26, 2005, Sadequee was in communication with Aabid Hussein Khan. In that communication, Sadequee transmitted two of the videos from the Washington, D.C. trip under the code names "jimmy's 13th birthday" and "volleyball [c]ontest," along with a link to a video of Old Town Alexandria in Virginia. The "jimmy's 13th birthday" video was footage of the Masonic Temple in Alexandria, Virginia. The "volleyball [c]ontest" video was footage of the World Bank in Washington, D.C. After Sadequee covertly sent the videos, Khan stated that he "love[d] reading this type of material." Sadequee responded that if Khan thought the videos would "raise morale and incite the football team," he should show the videos to them. When Khan was arrested over a year later in June 2006, these two videos were found on his computer in a folder entitled "Intelligance [sic]," along with files containing directions to the World Bank and a walking tour of Old Town Alexandria. The evidence from Khan's computer also revealed that he had been in contact with LeT and JeM. Sadequee's comment and the evidence discovered on Khan's computer corroborates that one of the purposes of transmitting the Washington, D.C. videos to Khan was to assist in planning attacks in the United States.

In May and June 2005, Defendant looked into admission into religious schools in Pakistan consistent with his plan to enroll in a school until the other co-conspirators arrived to join a training camp. Defendant told Zubair Ahmed that he was going to Pakistan to "get some business done," which Zubair Ahmed testified meant pursuing violent jihad.

On July 17, 2005, Defendant departed for Pakistan on a one-way ticket. To further his goal of arranging for him and his co-conspirators to engage in violent jihad, Defendant met with co-conspirator Aabid Hussein Khan, a recruiter for JeT and other terrorist organizations, and who was assisting Defendant and his co-conspirators to enter a jihadist training camp in Pakistan. Khan told Defendant that when he was ready, Khan would arrange for his entry into a camp. Defendant admitted to federal law enforcement agents that, at the time, he was prepared to be a martyr for the cause of violent jihad wherever he was needed, be it Kashmir or the United States.

Sadequee departed for Bangladesh on August 18, 2005. In a search of Sadequee's luggage at JFK Airport in New York, federal law enforcement agents found, hidden in the luggage lining, maps of the Washington, D.C. area and Fairfax County, Virginia, an address book, and two CD-ROMs. When Sadequee

was interviewed by federal agents on his way to Bangladesh, he falsely stated that he had traveled alone to Canada in early 2005.

Defendant returned to the United States from Pakistan on August 19, 2005. Federal law enforcement agents interviewed Defendant upon his arrival into the United States and questioned him about the purpose of his trip to Pakistan and his previous travel, including to Canada in early 2005. Defendant made false and misleading statements about his travel to Pakistan and his 2005 Canadian trip. Defendant did not disclose his plan to obtain paramilitary training and engage in violent jihad, stating only that he went to Pakistan to attend a religious school and to visit family. He explained that he was returning to the United States because he was not admitted into a religious institution. When asked about his trip to Canada, he falsely stated that he went to visit friends and family members, claiming, falsely, that Azdee Omani was his uncle.

After his return to the United States from Pakistan, Defendant engaged in further internet communications with his co-conspirators, including Zubair Ahmed. In one communication he stated that he left Pakistan before entering a training camp because he had been told by individuals in Pakistan that jihad was not mandatory. Zubair Ahmed responded by telling Defendant that violent jihad was in fact mandatory. Defendant expressed deep regret that he had "turned back on

[his] heels" by not following through on his plan to engage in jihadist training. He then resumed his activities in support of violent jihad by continuing his communications with his co-conspirators and by conducting online research regarding explosives, methods to defeat SWAT teams and special operations groups, and how to encrypt messages.

Sadequee also continued his activities in support of violent jihad while he was in Bangladesh. In September 2005, Sadequee communicated with another co-conspirator, Younis Tsouli ("Tsouli"), using internet instant messaging "chats." Sadequee expressed his desire to get the "Pharoah" (Washington, D.C. casing) videos in the news and Tsouli replied, "upload them" and "send them over." Sadequee indicated that he wanted to get videos in the news to gain legitimacy so he could obtain funding. Sadequee further noted that he planned to release a video named "Aqua (Al Qaeda) in the land of the Two Towers (United States)" to encourage and promote violent jihad.

In October 2005, Sadequee revealed that Younis Tsouli would be releasing clips from the Washington, D.C. videos, consisting of "random buildings in the area." Sadequee commented to Azdee Omani that the "good thing about it is nothing…is going to happen there [the United States] for at least another good year" because after the video publication and the expected increase in security that

will result, people will "become accustmed [sic]" to increased "security" and "high alrts [sic]," and thus be less on guard when an attack takes place.

Younis Tsouli's plan to disperse the videos was interrupted when the Counterterrorism Command at New Scotland Yard conducted a search of his flat in London, England on October 21, 2005. The police officers discovered six of Defendant's and Sadequee's Washington, D.C. videos on Tsouli's computer, along with other materials relating to violent jihad, including videos about explosives, hostage beheadings, improvised explosive device and suicide attacks, the construction of explosive devices, and a variety of media productions from Al Qaeda. The software on Tsouli's computer indicated that he was involved in making and editing videos and was working directly with Al Qaeda in Iraq. Tsouli was the administrator of the Al-Ansar forum, which was a private online forum dedicated to the cause of violent jihad and of which Sadequee was a forum member. Tsouli not only released videos on his forum for Al Qaeda in Iraq, but he used the forum to identify potential suicide bombers and to put them in contact with Al Qaeda recruiters.

In late 2005, Defendant's communications with co-conspirator Zubair Ahmed began to focus on the goal of returning abroad to train for and engage in violent jihad. They agreed that the only thing precluding them from achieving

13

their goal of jihad was the lack of a good connection into a terrorist organization. During this time, Defendant was aware that law enforcement was monitoring him, stating that a "dog" was on his "trail," as he described it. Defendant warned his co-conspirators of the potential surveillance of their activities and advised them to take specific precautions. For example, Defendant encouraged Zubair Ahmed to read the federal terrorism indictment against Jose Padilla, claiming that the indictment provided insight into how law enforcement gains intelligence. Throughout the course of the conspiracy, consistent with the cited evidence of Defendant's and his co-conspirators' efforts to conceal the conspiracy, Defendant and his co-conspirators, among other things, warned each other to be careful about how much information they revealed in their internet discussions and communications and to discard phones when it was believed usage of a phone might be used to detect conversations.

On January 9, 2006, Defendant removed one of the major obstacles preventing him from returning abroad to engage in violent jihad – he received his mother's permission. In a phone conversation with his mother, he told her that although he had "tried once and [failed]," it did not mean he could not try again. His mother acknowledged Defendant's belief that jihad was more important than the Muslim pilgrimage to Mecca. Later that same day Defendant told Zubair

Ahmed that his mother gave him "permission" to engage in jihad. He told Zubair Ahmed that in his discussions with his mother she had shown him an article about a suicide bomber which either showed she was concerned about the deadly consequences of his objective, or endorsed it.

In March 2006, Defendant was approached by agents of the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force and consented to submit to a series of interviews with them. On March 10, 11, 15, 17, and 18, 2006, federal law enforcement agents interviewed Defendant about his trips to Canada, Washington, D.C., and Pakistan. At the end of three of the interviews, agents prepared written statements based on the interviews, which Defendant reviewed, revised if necessary, and signed. Following the interviews, Defendant immediately called Sadequee in Bangladesh to determine if Sadequee had been arrested. Defendant used a pay phone at a gas station rather than a phone to which he could be connected. On March 21, 2006, Defendant e-mailed Sadequee from an e-mail account that he had not revealed to the FBI and that he believed could not be detected or traced. He informed Sadequee that law enforcement had interviewed him, that they knew about both of their trips, and that he admitted the Washington, D.C. videos were his idea. Defendant used the code words associated with their plan to travel to Pakistan to engage in violent jihad – "mother's day," "picnic," and

"curry place" – to explain to Sadequee what he had told law enforcement. He also advised Sadequee not to return to the United States. Sadequee responded that he wanted a "detailed account" of what Defendant was asked, how Defendant answered, and how much was known about him. He also provided instructions on how to encrypt a word document so Defendant could send his response as a secure file.

In reaching these factual findings the Court has considered and evaluated the credibility of the witnesses, including what each witness had to say, the importance of their testimony, whether the witness impressed the Court as telling the truth, whether they had a personal interest in the outcome of the case, including Zubair Ahmed's interest in the benefit he may receive for his cooperation, the witness's opportunity and ability to observe things accurately, the manner in which each witness testified and their responsiveness to questions asked, and the comparison of each witness's testimony to the testimony of other witnesses and the evidence in the case. The Court also considered those few instances where a witness was impeached, specifically considering the matter on which a witness was impeached and whether it was an important matter or an unimportant detail.

The Court specifically has considered Dr. Richard F. Oshe's testimony regarding whether or not the circumstances of the interviews conducted of

Defendant by law enforcement officials in this investigation created the possibility that Defendant gave a false confession or made exaggerated statements to the agents who interviewed him. The Court notes that Dr. Oshe acknowledged he did not have the benefit of the evidence in the case or what was presented at trial, including the testimony of any of the trial witnesses, to determine the extent to which Defendant's confessions or statements were or were not false or exaggerated, matters that Dr. Ofshe stated were material to determining the weight to be given to the confessions or statements Defendant made. The Court had the benefit of the review of all the evidence in the case, including the Court's independent review of all of the sessions of the interviews of Defendant. The Court also has had the opportunity to hear all of the evidence presented at trial and has reviewed all of the evidence admitted in the case, including evidence that was not published during the trial proceedings. The Court's review of the evidence in this case substantially and on all material matters corroborates the admissions Defendant made during his interviews. The Court considers the admissions Defendant made during his interview sessions reliable and credible. The Court further notes it had the benefit of reviewing communications between the co-conspirators themselves. In these communications, which the co-conspirators believed were private and undetected, the Court had available candid, unfiltered

17

expressions of Defendant's and his co-conspirators' plans and intentions to engage in violent jihad. These communications were most important to the Court in making its findings and in reaching its conclusions in this case.

## II. FINDINGS REGARDING PROOF ON THE ELEMENTS OF COUNT ONE

Based upon the factual findings, the Court has determined that the Government proved beyond a reasonable doubt all of the elements of Count One of the Second Superseding Indictment, and the Court has found the Defendant GUILTY of the charge.

**SO ORDERED** this 10th day of June, 2009.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE