1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3   UNITED STATES OF AMERICA        )
                                    )
4              Plaintiff,           )    CRIMINAL ACTION FILE
                                    )    NO. 1:06-CR-147-WSD-1
5   v.                              )
                                    )    ATLANTA, GEORGIA
6   SYED HARIS AHMED (1)            )
                                    )
7              Defendant.           )
   _____)

8
                   TRANSCRIPT OF PROCEEDINGS
9       BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
                 UNITED STATES DISTRICT JUDGE
10
                        VOLUME 1
11                 Monday, June 1, 2009

12


13
   APPEARANCES OF COUNSEL:
14
   For the Plaintiff:           OFFICE OF THE U.S. ATTORNEY
15                              (By:  David E. Nahmias
                                      Robert C. McBurney
16                                    Christopher Bly)

17                              DEPARTMENT OF JUSTICE
                                (By:  Alexis L. Collins)
18
   For Defendant Ahmed (1):     MARTIN BROTHERS
19                              (By:  John Richard Martin)

20


21
            *Proceedings recorded by mechanical stenography*
22          *and computer-aided transcript produced by*
                NICHOLAS A. MARRONE, RMR, CRR
23               1714 U. S. Courthouse
                 75 Spring Street, S.W.
24               Atlanta, GA  30303
                   (404) 215-1486
25

1                        I N D E X

2   *Witness*                                    *Page*

3           *Opening by Mr. McBurney*              *12*
            *Opening by Mr. Martin*                *29*
4
    MARK RICHARDS
5           Direct (By Mr. McBurney)               50
            Cross (By Mr. Martin)                  155
6           Redirect (By Mr. McBurney)             206
            Recross (By Mr. Martin)                209
7
    TIMOTHY ALEXANDRE
8           Direct (By Ms. Collins)                211
            Cross (By Mr. Martin)                  234
9
    NEIL RABINOWITZ
10          Direct (By Mr. Bly)                    243

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    Monday Morning Session

2                       June 1, 2009

3                        9:36 a.m.

4                       -- -- --

5               P R O C E E D I N G S

6                       -- -- --

7                   (In open court:)

8          THE COURT:  Good morning, everybody.  This is the

9    trial of the United States v. Syed Haris Ahmed, which is

10   Criminal Action No. 06-CR-147.

11         Would counsel please announce their appearances?

12         MR. McBURNEY:  Robert McBurney with Alexis Collins

13   and Chris Bly for the United States of America.

14         THE COURT:  Good morning.

15         MR. McBURNEY:  Good morning, Judge.

16         MR. MARTIN:  Jack Martin on behalf of Mr. Ahmed.

17         THE COURT:  Good morning, Mr. Martin, and good

18   morning, Mr. Ahmed.

19         This is a trial before the Court without a

20   jury.  There are a couple of preliminary matters.

21         One is a motion that was filed by the Atlanta

22   Journal-Constitution, the Associated Press, the Canadian

23   Broadcasting Corporation, CNN and WBS-TV for access to

24   certain audio and video recordings.

25         To refresh everybody's memory about those, there
```

was a suppression hearing at which the interviews conducted

by the FBI of Mr. Ahmed were played, and there was also what

has been referred to by counsel as a casing video, which is a

video of certain places in Washington, D.C.

While that was at a suppression hearing, they were

in fact played in a public proceeding, and thus were

published to those who attended the proceeding.  And the news

organizations have asked in this motion pursuant to the

First Amendment for access to the tapes and video in the form

of a copy.

Before I rule on that, let me hear the government's

position, and your position, Mr. Martin.

MR. McBURNEY:  Your Honor, the government doesn't

oppose the motion.  I know we have had discussions with the

Court before on this very issue, and the government at that

time indicated that there is clearly a First Amendment right

of access to it to be balanced with concerns about

prejudicing a potential jury, which we don't have right

now.

It may well be that counsel for Defendant Sadequee

has a perspective on it stronger than the government's or

Mr. Martin's.  But at this point we don't see a reason to

oppose the motion as filed insofar as it deals with what you

just described.

There was some confusion as to whether it dealt

with realtime access to exhibits in this trial.  The Court
has clarified that.

THE COURT:  That's going to be a separate issue,
because I have had another communication, albeit more
informal, from the press about access to exhibits, which
presents an interesting issue.  But let's get to that in a
second.

Mr. Martin?

MR. MARTIN:  Your Honor, if the Court would permit
me, could I just not have a position on this?

THE COURT:  You are always welcome not to have a
position.  So your nonposition is noted.

I think that considering at least my review of the
law, that the question is whether or not evidence has in fact
been published after having been admitted at a proceeding,
whether it's at a trial -- although I couldn't find any that
necessarily dealt with suppression hearings.  It's clear that
anybody who was at that hearing would have had a chance to
listen to and view the videotape, and I'm going to grant the
motion.

I'm going to ask the government to make one copy of
the interview tapes and also the casing video, and then I
will leave it up to the media organizations to cooperate in
making sure that they share that information, or otherwise
make arrangements with the government to make more than one

copy.

But the resources of the Court and the U.S. Attorney's Office I think ought to be limited to providing one copy to the organizations.

MR. McBURNEY:  One point of clarification, Your Honor.  We will do that, audio-video.

I was also under the impression that the media was seeking a copy of the transcript, not of the hearing itself, but the government tendered as an exhibit at that hearing the transcript that was generated that ran along the screen as the audio was played.

We will provide that, if you are including that. I didn't hear you say that.

THE COURT:  No, the motion really talks about their need to have the audio.

MR. McBURNEY:  Okay.

THE COURT:  Because the transcript can't communicate the inflection and manner in which the questioning was conducted.

So I read the motion as that they wanted a transcript -- that they wanted the actual recordings, and that's what I'm ordering at their request to be produced.

MR. McBURNEY:  Audio and then the videos, understood.

THE COURT:  Thank you.

There has been -- we entered a docket entry last week saying that we were not going to make available exhibits until after the trial was over. One of the media organizations has said that -- I think they cited to a Fourth Circuit case that would stand for the proposition that the exhibits, once admitted and published, should be made available.

Of course, this is not a jury trial, and it's hard to say when publication occurs. I guess it occurs when I happen to look at the exhibits if they are not actually played in court.

But they have asked for me to revisit that issue, and I wanted to hear from the government and from Mr. Martin on that issue.

MR. McBURNEY: The government's primary concern, Your Honor, would be logistics. You already touched on that. I don't want the end of each day becoming a project for the government to make sure all these exhibits are made available to the press. We will have other things we are dealing with, obviously.

That's not necessarily a bar; that's our concern. In terms of their right of access to it, they will have seen it in here. They obviously can't record it while it's in here.

But Your Honor will be the one considering the

facts.  We don't run the same risk that a juror would go home

and, well, I didn't really see this spin on it and now it's

in the newspaper.  It's a logistical concern.

THE COURT:  None of the cases say that a copy has

to be given to them at the end of the day.

I would note that all of these press issues, even

though this case has been scheduled for a long time, were

raised to the Court at the end of last week.  So we are doing

our best to accommodate the press and their request, even

though it's caused us to have to look at the issue over the

weekend.

Mr. Martin?

MR. MARTIN:  Your Honor, if it's going to cause the

government more trouble, I would have no problem with

it.  They apparently have sufficient staff to handle this

compared to what I have over here.

But, you know, I have no big problem.  But I will

let the Court use its discretion.

THE COURT:  The first order would be that I relieve

Mr. Martin of any responsibility for producing -- copying and

producing the exhibits.

And I'm going to leave it up to the government to

determine -- I'm going to order that they be made available,

but they are not required to be made available each day.  I

know you are working to try the case.

1       So considering what the resources are of the United

2  States Attorney's Office, I would ask that you get to them

3  promptly, but there is no requirement that you immediately

4  copy and provide them at the end of each trial day.  In fact,

5  it could be you have to produce it to them sometime during

6  the course of the subsequent trial day.

7       But I would instruct you to do that promptly, if

8  you would, please.

9       MR. McBURNEY:  Understood.

10      THE COURT:  All right.  I think that covers all of

11 the matters that the media has brought to my attention, but

12 if there is a representative of the media that wants to raise

13 another issue?

14      MR. CLYDE:  Your Honor, I'm Tom Clyde here on

15 behalf of the media concerns that have filed the motion

16 late.

17      THE COURT:  Yes, I'm holding you personally

18 responsible for that.

19      MR. CLYDE:  I apologize for the lateness of it, but

20 I believe the Court has dealt with all of the issues that we

21 have raised with the Court.

22      We are also available to try to help out with any

23 logistical things that come up during the course of the

24 trial.  But I appreciate the Court picking it up on such a

25 quick basis.

1          THE COURT:  All right.  Thank you.

2          MR. CLYDE:  Thank you.

3          THE COURT:  All right.  Is there anything else that

4    we need to bring up before we begin the trial?

5          MR. McBURNEY:  Nothing from the government.

6          THE COURT:  Mr. Martin?

7          MR. MARTIN:  I think we are ready to begin,

8    Your Honor.

9          THE COURT:  Just for those that are present,

10   because this is a bench trial, it doesn't mean that the

11   process will be any different than if it was a jury trial.

12          Traditionally the order is that opening statements

13   are made by the lawyers.

14          After the opening statements are presented, the

15   government presents its evidence and its witnesses in what we

16   call its case in chief.

17          After its case in chief, it is the prerogative of

18   the defendant to present any evidence that the defendant

19   might want, although not required to present any evidence at

20   all, because the burden is always on the government to prove

21   each and every element of the offense at issue in this trial

22   beyond a reasonable doubt, and that is never the burden of

23   the defendant.

24          But should the defendant present evidence, then I

25   would determine whether or not rebuttal evidence or that

evidence which would be directly responsive to new matters
that were set forth in the defense case, whether I would
allow that.

After the rebuttal evidence, if any, assuming that
there is a defense case -- and there may not be, as I said,
that's completely within the prerogative and the rights of
the defendant -- that thereafter, we would have closing
statements.

After the closing statements, or summations as we
call them sometimes, then the Court would deliberate.

It is my intention that I will in fact conduct
deliberations and that I will issue my findings, in this
case the determination on guilt or innocence, in a written
order which will be released when my deliberations are
concluded.

And I don't know how long that's going to take.  I
don't know how long those will be.  But it is my belief in a
case such as this that I should carefully articulate my
factual findings, and I intend to do that, and I intend to do
that in writing.  I just can't give you the timetable.

But you should be used to that because if it was a
jury trial, you wouldn't know how long the jury would be out
either.  So that would be the process.

We then begin with the opening statements,
beginning with the government.

MR. McBURNEY:  Thank you, Judge.

You are going to hear about a case about supporting terrorists and supporting terrorism, more specifically, a conspiracy to do so.

This case is one step removed from the bomb-thowers, the shooters, the improvised explosive devices.  It's about people who have entered into an agreement, this defendant and others, to support terrorism conspiracies, to support the organizations that commit the types of acts I just described.

It's a case about how Defendant Ahmed conspired with others, to include Ehsanul Sadequee charged in a related case, individuals in Canada, individuals based in the United Kingdom, individuals in Pakistan, how he conspired -- how Defendant Ahmed conspired to provide personnel in the form of himself and other members of this agreement to terrorist conspiracies as well as property in the form of videos, these videos that were made in Washington, D.C.  And I will talk about them a little bit more in a moment.

It's also about how the defendant and Mr. Sadequee and those they met in Canada when they traveled there in March of 2005 entered into an agreement and began to plan the possibility of attacks in the United States.  This is the least developed form of the conspiracy that the defendant entered into, but it's one that was entered into

nonetheless.

That's the charge of the case, that the defendant entered into a conspiracy to plan with others to support conspiracy to murder or kidnap persons in a foreign country, and/or that he entered into a conspiracy to support a terrorist act occurring in the United States that transcends national boundaries. Some part of the planning of the event occurred outside the United States. That's how this case is charged and that's what the evidence supports.

Again, not that Defendant Ahmed was part of the conspiracy to kidnap or murder persons overseas, not that he made it into the training camp or picked up that rifle or went to Kashmir, nor that he was directly a part of the final planning for some attack here in the United States, some part of which was coordinated overseas. You won't hear evidence that those final steps were taken. That's not the government's burden. That's not what is charged in this case.

Defendant Ahmed need not have known everyone in the conspiracy. He need not have known every step that everyone was going to take. It needs to be something that was reasonably foreseeable to him. It's the agreement that is the gravamen of the charge.

The evidence will show that the government can prove its case in several ways. I'm going to start with the

personnel.  That is the simplest and the strongest of the

government's conspiracies that are charged against

Defendant Ahmed.

The defendant agreed with others, as I said, to

provide himself and others to support a conspiracy overseas

to kidnap or murder, or both, individuals abroad.  And the

facts that support that are these.

Defendant Ahmed met Defendant Sadequee at some

point in the winter of 2004.  They began to discuss their

shared interest, their interest in engaging in violent

jihad.

The evidence will show they even began to do some

very rudimentary training, running around in the north

Georgia mountains with paintball guns.

Defendant Ahmed in his interviews -- and you will

hear pieces of the interviews in this presentation.  The

government is not intending on playing all 14 hours; the

Court has already heard these interviews.  But we will play

relevant pieces and the agents will refer to admissions that

Defendant Ahmed made in these interviews.

But in the interviews with the FBI, Defendant Ahmed

acknowledged that this paintballing that you or I or someone

else might engage in as a form of organized sports activity

had an ulterior motive, a higher purpose for him.  That it

was in his mind the initial step beginning to prepare for

some day being in the mountains of Kashmir and

fighting.  This is further back in the causal wedge.

Defendant Sadequee, Defendant Ahmed, then took the

critical step of deciding sometime before early March 2005 to

buy bus tickets on Greyhound and travel all the way to

Toronto, where they met with at least three individuals.  And

you will hear about all three of them.  One goes by the name

of Azdee Omani, there was a James, and a Jamal.

You will see correspondence between

Defendant Ahmed, Defendant Sadequee, and at least two of

these individuals.  And what you will hear is that while in

Canada, the conspiracy was formed.  The agreement was entered

into that Defendant Ahmed, Sadequee, Azdee Omani, James,

others, to include Mr. Khan that you will hear more about,

agreed to travel to Pakistan to get into training camps so

they could pursue violent jihad.  In other words, so that

they could support conspiracies abroad to kidnap and/or

murder individuals abroad.

At that point the crime was complete, the agreement

was entered into.  And in this conspiracy, this material

support conspiracy that's charged, the government need not

prove any overt acts, need not show that a concrete step was

taken to further that agreement.

But there is much more than going to Canada and

agreeing, We are all in, let's go to Pakistan, let's get into

a training camp.

Soon after Defendant Ahmed and Mr. Sadequee returned to Atlanta, they were online, they were chatting. You will see some of these saved chats.

Mr. Khan archived many of his communications. Mr. Khan was arrested in June of 2006 in the United Kingdom, and you will hear that on some of his digital media were saved a series of instant messaging or chat communications involving Defendant Ahmed, Mr. Sadequee, this Azdee Omani I mentioned, and James, another participant of this conspiracy, this agreement that was entered into in Canada in March of 2005.

What these chats show involving Defendant Ahmed is that steps were taken beyond the agreement. People began to figure out how to raise money so they could afford to travel to Pakistan. People discussed renting a basement apartment somewhere in Toronto so that Defendant Ahmed and Mr. Sadequee could return, that would become the base camp, if you will, until everyone had earned enough money that they could get to Pakistan.

You will hear that among all the individuals I mentioned, Defendant Ahmed was elected, was named the ameer, the leader of this conspiracy. So the child's play that I suspect you will hear about from Mr. Martin involved a leader. Defendant Ahmed was elected the leader of this

1    organization.

2         They discussed specific destinations.  You will see

3    a saved chat communication between Mr. Khan, Defendant Ahmed,

4    Mr. Sadequee, about an LeT camp being a likely destination,

5    because LeT had a relatively low profile in Pakistan.  You

6    have to attempt to get into a Lashkar-e-Tayyiba training camp

7    without arousing suspicion or concern or opposition of

8    Pakistani authorities.

9         You will see that there was mention made of

10   Jaish-e-Mohammed camps as another possible destination, and

11   even a goal of fighting with the Taliban.  You will see

12   Mr. Sadequee's own words:  Remember, the ultimate goal is to

13   join the students, join the students, students meaning

14   Taliban.

15        All of these organizations, LeT, JeM, the Taliban,

16   are themselves conspiracies to kidnap and/or murder

17   individuals overseas.  Any support to any of those

18   organizations would be material support under the law.

19        You will hear that ultimately the defendant

20   traveled alone, continued planning, and indicated, I'm going

21   to get to Pakistan first, I'm going to get to Pakistan, I may

22   establish a beachhead.  And that in July of 2005,

23   Defendant Ahmed on a one-way ticket traveled to Pakistan with

24   the goal of figuring out how to get into a training camp and

25   pursuing violent jihad.

1    You will undoubtedly see that there were other

2  purposes for his trip.  The government concedes that.

3    Defendant Ahmed also sought to gain further Islamic

4  studies training, get into a madrassa and getting more ilm,

5  i-l-m, knowledge, learning.

6    While he was in Pakistan, he also engaged in some

7  real estate transactions on behalf of his father.  The

8  government doesn't dispute that.

9    But the ultimate purpose was to get into a training

10  camp and continue to pursue his goal of engaging in violent

11  jihad.

12    To that end, you will hear evidence that while in

13  Karachi, Pakistan, he met with Mr. Khan, the facilitator, the

14  individual who had on his hard drive these saved chats, who

15  had on his hard drive two of the casing videos that Ahmed and

16  Sadequee made in Washington, D.C., in April of 2005.

17    While Defendant Ahmed was ultimately unsuccessful

18  in that particular attempt to get into a training camp, you

19  will see that within two days of returning to Atlanta in

20  August of 2005, he was back online and he was expressing his

21  remorse, his regret about his lack of resolve in his decision

22  to, in his words, turn back on his heels, expressing this to

23  Zubair Ahmed, a convicted terrorist who will be testifying in

24  this case and will be sharing with the Court the discussions

25  he had with Defendant Ahmed about pursuing third, a code word

that Defendant Ahmed and Zubair Ahmed -- no relation -- used to describe pursuing jihad.

First was ideological support of jihad, second was supporting jihad in some way, and third was actually engaging, getting into the camp and going to fight, whether it be in Kashmir, Afghanistan or Iraq.

You will hear that upon Defendant Ahmed's return from this unsuccessful trip to Pakistan in 2005, he did online research about how to defeat government surveillance, he kept in contact with Defendant Sadequee through a channel of communication he declined to reveal despite repeated questioning throughout 14 hours of interviews with the FBI, and he went so far as ultimately to obtain his mother's permission to try again to go back to Pakistan and attempt to get into a camp and pursue violent jihad.

There will be much discussion with Zubair Ahmed about the parental issue, that there is an obligation to, if you are the oldest son or the only son, to make sure that your family is in order before you make the migration and engage in jihad. And you will see communications between Defendant Ahmed and Zubair Ahmed about this very issue.

And two months before the defendant was arrested, he was having this conversation with his mother, seeking her permission to remove that last obstacle that he perceived to getting back to Pakistan and pursuing violent jihad. And

within hours of his conversation with his mother, he was back online with Zubair Ahmed explaining that he got it, he got the permission, and third was back within reach.

So, Your Honor, that is the first way the government will show that the defendant conspired with others to provide material support, that he sought to provide himself and others, the Canadians, Mr. Sadequee, et cetera, as personnel for a conspiracy to kidnap and/or murder individuals abroad.

The videos represent the second and third way. The videos were made in April of 2005. Defendant Ahmed and Mr. Sadequee traveled to Washington, D.C., in the defendant's pickup truck. They chose not to stay in a hotel. They left no paper trail, or so they thought. There were no receipts, no credit card transactions, no way to track the fact, or so they thought, that they went to Washington, D.C.

Ultimately the FBI was able to recover cell phone records that showed some roaming charges in the Washington, D.C., area on or about the day these videos were made. Not enough to build a bridge between Defendant Ahmed and these videos, but there was more to come.

I want to talk briefly about the videos. Defendant and Mr. Sadequee made just over sixty videos of different locations in the Washington, D.C., area. These are not your average tourist videos. You will not see a shot of the

Washington Monument.  You will not see a video of the
White House.

There will be videos of the Capitol, but not the
front, not the dome, but of security stations and guards and
vehicles passing by, a HAZMAT truck passing by.

There is a video of the Department of Energy, which
is not typically on people's destinations when they are
touring Washington, D.C.  The World Bank.

There is a Masonic Temple within view of the King
Street Metro Station.  That featured prominently in one of
the videos and actually made it to the overseas brothers that
I will talk about in a minute.

Several videos of the Pentagon, one of which you
will hear was narrated by Mr. Sadequee.  He identified it as,
The place where our brothers attacked.  Not this is where the
Department of Defense is, but where our brothers attacked.

And finally, videos of a fuel tank farm.  Not a
tourist destination at all, a fuel tank farm just outside
downtown Washington, D.C.

The purpose of these videos was two-fold.  And you
will hear this from the defendant's own admissions as well as
other evidence presented in the case.

One purpose was to send them to the, quote, jihadi
brothers overseas, people who Mr. Sadequee knew and about
whom Defendant Ahmed knew, for their use in whatever way, in

1  particular in making videos.

2          And you will hear an excerpt from Defendant Ahmed's

3  interviews where he acknowledges that the people who were

4  going to get these videos from Mr. Sadequee -- and it's

5  Mr. Sadequee who sent them overseas, no contention that

6  Defendant Ahmed sent them.  He knew where they were going, to

7  the jihadi brothers overseas, he knew Sadequee was sending

8  them, but it's Sadequee who sent them.

9          He was aware that the people with whom Sadequee had

10  contact were people who made and posted videos on jihadist

11  websites, through Younis Tsouli.  He also was aware that

12  Mr. Khan might get these videos and that Mr. Khan was the

13  facilitator, he got people into camps at LeT and et cetera.

14          But there was a second purpose for the videos,

15  another thing that Defendant Ahmed admitted to, and that's

16  that they helped demonstrate the *bona fides*, the resolve of

17  the defendants, that they were willing to go into the

18  nation's capital, get up close, and take videos of possible

19  locations of interest.

20          And the evidence you will hear is that these videos

21  did end up in unsavory hands.  Younis Tsouli, Irhabi 007,

22  with connections with al-Qaeda in Iraq, he received six of

23  the videos.  You will see communications during this trial in

24  which Younis Tsouli is referred to by the name of Bond, one

25  of his known monikers, in which Defendant Ahmed is a part,

where Defendant Sadequee says, I'm going to go get Bond and then we will all convene in Pakistan, part of this conspiracy to get to Pakistan to get into a training camp.

Sadequee says, Let me go to Urabaa -- Arabic for Europe -- where Bond is, actually in the U.K.  I will get him and then we will all meet with you, Mr. Ahmed, in Pakistan.

And as I mentioned, Mr. Khan, Aba Umar, he ended up with two of the videos as well, and he is someone you will see in one of the saved chats counseled Defendant Ahmed about the very practicalities of life in a camp and getting from a camp to the actual battlefield.  What it costs, what you should expect to pay, how long it would take, et cetera.  The nuts and bolts of joining a conspiracy to kidnap and/or murder abroad.

Finally, beyond the videos -- and I mentioned this briefly -- there is a final way in which Defendant Ahmed and others conspired to provide material support, not for the conspiracy to murder or maim abroad, murder or kidnap abroad, but these attacks in the United States that transcend national boundaries.

Admittedly this is the least developed of the conspiracies, but you will hear the defendant's own words that while in Canada, he and the others who planned to go to Pakistan also discussed the possibility of attacks on U.S. oil installations, perhaps a fuel tank farm outside of

Washington, D.C., refineries, fuel storage locations.

You will hear they discuss the possibility of attacking military bases.  No specifics, no specifics, not how they do it, but the agreement began, the agreement was entered into, and it was discussed.  There will not be evidence that it was followed up on, but the point is that that again is a conspiracy.

And finally in that vein, you will hear that one of the Canadians present talked about the possibility of attacking some GPS location in the United States.

But the evidence that will be presented to you will consist of the following.  You will hear from agents who will talk about communications they obtained through search warrants, through grand jury subpoenas, through any number of hard drives that were seized literally all around the world.

We will play some of the defendant's admissions from the interviews.  You will hear the testimony of a co-conspirator, Zubair Ahmed, who I mentioned, the gentleman who has pled guilty to material support in the Northern District of Ohio, expert testimony from Mr. Kohlmann who will help provide some context and names and locations as well as some linkages between Irhabi 007, Younis Tsouli, and Al-Qaeda in Iraq and Mr. Khan's activities.  And a few lay witnesses and some physical evidence.  The camera that was used to make

the videos in Washington, D.C.

I expect you will also hear somewhat about how the defendant's conduct was child's play, it was childish, it was just ideas, there were not concrete steps taken.

The defendant and his co-conspirators were very serious. They sought financing, they made plans, they looked for apartments where people could live, they discussed how one gets into Pakistan without drawing attention, how to get a visa. They took concrete steps, and there was nothing laughing about this. It's a serious case, it's a serious matter. The fact that the defendant is younger than I am, is younger than Your Honor, doesn't detract from his criminal conduct.

These defendants, these co-conspirators took extreme precaution to protect their plan. They spoke in code, they used encrypted communications, they changed e-mails.

You will see repeated references: Is it safe to talk about this in MSN? We need to talk in person. I need to tell you the plan, but I can only tell you in person.

You will hear that the channel that Defendant Ahmed used to communicate with Mr. Sadequee that he refused to identify to -- he declined to identify to the FBI agents during the interviews was a Yahoo! France e-mail account, no identifiers at all.

These defendants, these conspirators took extreme measures to protect what they were doing from the eyes of the government.  This is the consciousness of guilt.  It's not child's play.  They were aware what they were doing was serious.

When they sent the videos, when Mr. Sadequee sent the videos to Mr. Khan, he didn't say, Here is a video of the Masonic Temple.  He sent a file called Jimmy's 13th birthday, and they spoke in code about how you don't see any alligators around the lake, there are no security barriers around this building.

The other video he sent was called volleyball practice.  It didn't say here is another video of Washington, D.C.

The videos have been described at times as amateur and why is the government calling these casing videos.  I want to be very clear on the government's position on this.

There is no contention that these are professional videos, that these videos could be used to gain clandestine access to the Department of Energy or the Masonic Temple.  Their purpose was very different.

They are short, they are choppy, they are very clearly handmade.  If the defendants were interested in getting a high-resolution professional video of any major monument in Washington, D.C., or anywhere in the world, you

can go online and get that.  Al-Qaeda in Iraq could get

that.  LeT could get that.  Mr. Tsouli could get that.

What they can't get is evidence that we are in your

backyard, we are able to get right in front of the

Capitol.  We are able to film the Department of Energy.  We

can drive by the fuel tank farm.  We can drive by the

Pentagon so you can see doors on the Pentagon, that's how

close we can get.

That's the value of these videos.  Not that one

would be able to determine a latitude and longitude of a

particular door on a particular building.  I want that to be

clear as the Court is looking at the videos.

They won't overwhelm you in terms of their

high-gloss finish.  That wasn't the purpose of the

videos.  These were videos that were designed to be

incorporated in other videos, put online on jihadi websites,

or to improve the defendant's stature in the jihadi community

online or on the ground when he gets to a camp.

Who are you, why should we let you in?

Look what I can do for you.  I can get right up

next to the Capitol.  You can't.  You can't even get into the

United States.

Your Honor, there will be no bombs in this case,

there will be no evidence that Defendant Ahmed was running

around with anything more than a paintball gun at any

point.  This is a case about conspiracy to support
terrorism, not to actually pull the trigger, not to drop the
bomb.

The defendant is a part of that agreement, and
that's why the Court should find him guilty.

It is not a prosecution of a would be -- of a
Muslim who happens to support violent jihad.  The government
is not seeking to punish thoughts or beliefs or a world
view.  The government is pursuing this case because of
actions the defendant took.

His motive, whatever it may have been -- and there
will be evidence of it in these documents -- is not at
issue.  His beliefs did not justify what he did, his
beliefs did not motivate this case.  The facts motivated this
case.

The government believes at the close of evidence,
at the close of argument, that this Court will find that the
facts show beyond a reasonable doubt that Defendant Ahmed is
guilty of providing material support, conspiring to provide
material support to a conspiracy to murder or kidnap overseas
as well as to conduct a terrorist act within the
United States that transcends national boundaries.

Thank you for your time.

THE COURT:  All right.  Thank you, Mr. McBurney.

Mr. Martin?

MR. MARTIN:  May it please the Court.

There is nothing unusual about a case being conflicting narratives.  As you just heard from Mr. McBurney, the government believes there is a narrative from the evidence which shows that my client willingly, knowingly, intentionally involved himself in a conspiracy to support terrorism abroad and at home.

I agree with him that the issue in this case is whether or not there ever was such an agreement.

A conspiracy charge is essentially a conspiracy to do violent acts in the United States.  Mr. McBurney concedes in his opening statement their evidence is weak on that.

There is also a conspiracy to do violence abroad.  He claims his evidence is stronger on that.

But the ultimate issue is whether or not this gentleman here actually entered into an agreement.

I understand that a conspiracy doesn't have to be written, it doesn't have to be expressed.  It can be proved through circumstantial evidence.  It can be implied.  But nevertheless, you will have to find beyond a reasonable doubt that Mr. Ahmed knowingly and deliberately arrived at an agreement or an understanding to provide material support as charged in the indictment.  It's got to be a conscious understanding and a deliberate agreement by him.

A conspiracy is not a mere notion, not about a

possibility.  It's not about a random or momentary

thought.  What we might call childish, immature, playing at

being a conspirator, that's not a conspiracy.  Talking big

talk, boasting is not a conspiracy.  You have got to show

that there was an actual and intentional agreement.

I'm not naive.  This is going to be a close

case.  The government has outlined its evidence, and there is

a lot of talk, a lot of action, a lot of talk about things to

do and things to do.

But you have to look at it in context and you have

to look at it based on who Mr. Ahmed is.  And ultimately I

believe, despite the conflicting evidence, what will help the

Court resolve this case is the burden of proof:  Will you be

satisfied beyond a reasonable doubt that he intentionally,

knowingly entered into the conspiracy that the government

charges.

In making that decision, I think you will have to

sort of walk in his shoes a little bit.  And we will be

presenting evidence as to who he is and his background.

I think the story begins actually with his father,

Syed Riaz Ahmed.  There are a lot of Ahmeds in this case,

Zubair Ahmed, Mohammed Ahmed.  I will sometimes refer to him

as Haris just so you will keep it straight.

His father, Riaz Ahmed, was born in Karachi,

Pakistan.  He studied engineering at the Karachi University.

He wanted -- he yearned, as many people in foreign countries, to come to one of the grand universities here in the United States to further his education.

He was able to go to the University of Evansville in Indiana where he got an M.S. in Computer Science.  He returns to Pakistan, and he dreams to come back to the United States.

He enters the lottery.  There was a lottery back in the '90s whereby -- it was called the diversity visa whereby if you won the lottery, you would get a visa to come to the United States to work.  He won the lottery finally after several times, and in 1997 he comes to the United States.

He comes to Georgia because he has cousins here, and they are going to help him establish himself.  There was one time he thought about going to Florida, but he comes to Georgia.

At the time he comes to the United States, he has been married, and he has four children.  His oldest daughter Mariam, she's 16 at the time, Haris is twelve, Samia is nine, and the youngest Tamima is five.

And they go to Marietta, and he rents an apartment in Marietta and tries to get work.  He thinks first of all maybe I could get a job in the commercial, in the computer business.  But since he had been teaching in Pakistan, he

decides maybe I can get a job teaching.

And he gets a job first at Kennesaw State University part-time teaching, and then later he teaches at North Georgia College where he's a full-time professor, and still is today.

During that time -- and this is -- you have to understand the psyche and the mind of Mr. Haris Ahmed. He's in a high school, he's in Centennial High School in Cobb County, Roswell. And he is not picked upon, but he's isolated. He's different.

One of the things this Court and all of us in this courtroom have to struggle with is to not look at him as the other, as something unusual, something foreign. He's a United States citizen and, as you well know, deserves to be treated as such with all the presumptions of innocence and with the requirement that his guilt be proven beyond a reasonable doubt.

But you have to understand his experience. He is not someone who is open and gregarious. He's shy. We will have testimony about that. He speaks real fast, it's hard to understand him, with a slight lisp and a slight accent. He has struggled when he speaks when in Court to slow down so the Court can understand him. And that created him a certain isolation from others in the community.

When his father moves to the Dawsonville area, the

home of Bill Elliott that we all know from the south, he is
even more isolated.  He's going to school there, he's a very
good student, no discipline problem, very good, very
well-to-do student in math and science, but he's -- it's hard
to make friends and hard to understand his identity as a
Muslim.

When he's in Dawsonville he's even further
removed.  It's 30 miles to any mosque, there are no people,
contemporaries that he can understand his religious with.  He
talks too fast.  He's polite, not disruptive, no problem, but
isolated.

His father, a good man, is teaching at North
Georgia College, comes to the United States to live the
American dream, but he is not a particularly religious
person.  He's more secular.

And Haris is left alone, he's left alone to find
his religion.  And unfortunately what happens is the only
place he can turn is to the internet.  His father has a
Quran, some of the Hadith in the house, but not a lot of
religious books and is not there to guide him.  Nor does he
have any contemporaries, other family members there to guide
him.

So he gets on the internet, and there he gets his
religion, he finds his identity.  He starts to get on chat
rooms where he can describe exactly -- he can speak, he can

be heard.  Not that shy person who speaks too fast and people don't really understand, but he can be heard, he could be understood, he's someone who has stature and identity.

This is all very important to understand how later in his life when he's not that much older -- all this begins when he's 19 years old.  He's an immature person, without guidance, trying to learn his religion on the internet.

How would you and I learn our religion without pastors, priests, rabbis, on the internet?  It might be good, it might not.

Unfortunately in this era where there is so many propaganda and hateful stuff on the internet, he could fall prey to them without any other help in understanding his religion and identity.

And also he sees on the internet, a young man, a young teenager, what he perceives to be in on these internet sites -- and you will see it as evidence comes in here -- the suffering of people in Muslim lands.

You know, he's not here to determine right or wrong about any of that, but there is no doubt that there is terrific suffering.  Who is at fault for the Palestinian problems and the Israeli responses to terrorism, but there is no doubt that innocent people have suffered.

Who is responsible for the innocent people who died in Fallujah in Iraq when it was necessary to take that town

over with bombardment, but there is no doubt that innocent
children and women and others died.

Who is at fault in Afghanistan when a drone
misfires or whatever? We are not here to decide that, but
there is no doubt that innocents died.

And that can cause anger and that, in a young man,
can make you think, I need to do something about that.

Full of images of burning children, full of images
of horrible things, he's lost. He's wondering, What is my
role, what should I do, what does my faith command me to do,
what is my responsibility as a young man?

That I think is what we have to understand in this
case. Is everything that you will hear from the witness
stand and from his -- from the e-mails and from his
interrogations evidence of a person who deliberately and
intentionally conspired and agreed to commit criminal acts in
the United States and elsewhere, or is there someone
searching, searching for my identity, searching for my
responsibility, searching for what I should do, and I don't
really know what I should do? Confused, isolated,
searching.

So what happens? In some of the e-mails which I
will present in our exhibits, I think some of the exhibits
are Defendant's Exhibit 6 through 26, are some of the e-mails
that describe Mr. Ahmed communicating with others, family

members often, most often, about his concerns about what's
going on overseas, what I should do, what is my
responsibility.

He first goes to North Georgia College.  As I
mentioned before, his senior year in Dawsonville, he actually
takes courses at North Georgia College because he's such a
smart student.  And while he's there, he starts to -- well,
first of all, when he graduates from Dawsonville High School,
he really never attended Dawsonville High School.  He got all
of his last senior year of work at North Georgia College
where his father taught.

He starts out at North Georgia College with a
Hope Scholarship, he was a very good student, and after a
while he transfers to Georgia Tech.

And at Georgia Tech, he continues to be a good
student.  We will have his transcript in evidence, and he
makes a 4.0 on calculus.  We all know how hard that is at
Georgia Tech.  He's a good student.

And he starts to associate with other people,
Muslim people at that time.  He has more contact.  He meets
up with a fellow named Ehsanul Sadequee, who he calls Shifa,
and they start talking.

He's on the internet a lot, he's now even isolated
from his family, and he's emotional, concerned about what's
going on overseas.  His daughter -- not his daughter, his

sister will testify that she remembers a time when he was at the house and something came on the TV of violence against Muslims overseas, and he literally broke down into tears and ran upstairs. He's a highly emotional person.

And he thinks, What should I do, and why am I here at Georgia Tech studying, like a lot of young people after several years, hard work at Georgia Tech, but do I really want a nine-to-five job as an engineer, or should I have other responsibilities, what is my identity? Let me find myself.

So he in searching to find himself, he starts talking to people in these internet sites, and there is a lot of talk about the responsibility to go to jihad.

There is no doubt that there is a lot of talk about the responsibility to go to jihad, to protect Muslims, to protect others. There is no doubt about it.

Whether that ultimately became a specific, hard, understandable conspiracy agreement to do something, we will have to let the evidence speak for itself. But I will tell you what I see in the evidence.

First of all, he goes -- he's on these chat rooms, and he's talking, and it's a little bit like people boasting, college kids boasting about their experiences and adventures.

And he wants to go to Toronto because there are

several people up there who are on this internet site with

him, and he goes there to see him and to meet with

them.  Azdee Omani, Fahim Ahmed, Jamal, James, they are all

listed either in the indictment or in filings by the

government.

And while he's there for a week -- he takes a bus

all the way to Toronto.  Sadequee has some family there, but

that really wasn't the purpose of the trip.  The purpose was

to meet these people.

And they talk, boast.  We should take down the GPS

system.  No practical ability to take down the GPS system.

How are we going to do it?  Oh, we are going to do it with

lasers.  Where are they going to get the lasers, at

Radio Shack?

They talk about, What should you do in the

United States?

Mr. Ahmed says, Well, maybe we should blow up an

oil refinery, because isn't that what they are stealing, they

are stealing the Muslim's oil?

In his interrogation when he's pressed about that,

did you -- tell us about what you were going to do with these

oil refineries, he says, Well, aren't they in Texas?  That is

as formed as any understanding or agreement to commit any

violent act.

Similarly, you know, there is talk about an attack

on Dobbins Air Force Base. That didn't even come up in Toronto. What happens there is that Mr. Ahmed and Shifa, Mr. Sadequee, are riding down what we used to call 41 there, Cobb Boulevard I gets it's called, and they go by Dobbins Air Force Base they say, Oh, maybe we should attack that sometime. That was as formed a conspiracy agreement that ever occurred. Where are they going to attack, the visitors center?

Sami Ayoub is someone that Mr. Ahmed worked with, had his business in that area, and that's why they would be driving by.

That's the hard part of this case, Your Honor. Are these real agreements to attack oil refineries, GPS systems, Dobbins Air Force? Or are these passing random thoughts, are these momentary ideas, are these childish fantasies, are these people searching for maybe something we ought to do, unformed, inchoate notions?

Let's talk a little bit about the video. Again, we know and the evidence will show that Mr. Ahmed was on certain chat rooms and that he wanted to have certain stature with other people on these chat rooms. Tibyan, Jihad Unspun, Clear Guidance, you will hear all about them.

The idea of the video -- again, a very freaky and unformed idea -- let's go there and take this video, and maybe that will give us status, maybe we will see bigger

people.

I don't want to minimize the video, but let's not overstate it either.

Come on, Mr. McBurney, is that evidence that I can walk up to look at the Capitol?  I mean, come on.  I have to show a video that shows I can drive down I-95 and see an oil refinery, oil tanks on the side of the road?  Come on.

This is a silly video, an amateurish video.  Where they are going to the World Bank, they are walking down the street, and it's going up and down as if somebody was hopping.  This is going to be a serious video?   It was nothing more than a childish action to try to earn an achieved status with people abroad.

Now, does that form into a conspiracy, that supports a conspiracy to actually create violent acts abroad?  That is the property that they are alleging, that that video was going to be somehow or another a useful item for terrorist actions in the United States.  I don't think it satisfies beyond a reasonable doubt.

Paintballs, no doubt he and others ran around the woods shooting paintballs at each other as some sort of notion that maybe we should prepare ourselves for something unformed, unclear, uncertain.

I don't mean to say that there is not plenty of talk on all these e-mails and otherwise about going to the

third, the third which means the third level of jihad.

Now, of course, so the Court understands, jihad is not a word that necessarily means violent action.  Jihad literally means struggle.  It can be a struggle against desires, a struggle against temptation, a struggle to find your faith.  But it also can mean a military action.

Sometimes it's talked about that the first is ideological preparation, second is logistical preparation, the third is battlefield.  Sometimes it's talked about the first is spiritual preparation, the second is physical preparation, the third is fighting.

That's, you know, talked about.  But when we look at the totality of the evidence, was there ever a specific understandable agreement to actually go to the third in the sense of actually creating and committing acts to murder, maim and otherwise overseas?

Let me talk a little bit about Pakistan.  And in 2004, Mr. Ahmed goes to Pakistan for his oldest sister Mariam's marriage.  She's married to a person -- a financial person with Procter & Gamble there.  They have numerous aunts, cousins and uncles there.  A trip totally for family purposes.

In 2005, there is no doubt that he was talking about going there to be with family and to look into religious education and maybe a training camp, maybe.  He's

there going to find himself, and the e-mails I will present
to the Court will show that.

Let's walk in his shoes.  He says, Maybe my goal is
to get education, maybe my goal is to finish my education,
maybe my goal is to go to a training camp.  I don't know.

There are a number of e-mails there talking about
schools.  There is one from a guy named Faraz where he was
talking about how do I get into this school, what are the
admission requirements, a clear indication of him wanting to
go to a school.

Some of the schools I mentioned, Dar ul-Hadith is
one of the schools, the Dar ul-Uloom.  Dar means house of or
school of, of various different people that the schools are
named after.

In March, April, May and June, the e-mails I will
present shows him worrying about how do I get in these
schools, what am I going to do at these schools, and the
school is going to be a number of years before he would
complete this education.

He's also there seeing family.  We will have
witnesses from the family who will say, Yes -- his sister,
for example, will be here to tell the Court, Yes, he visited
with me, other family members.

He was looking for plots of land for his father,
and Mr. McBurney mentioned this.  He had what was called the

Engineering Cooperative Society which had him have a right to a certain piece of land, and he was working for his father to see if he could arrange to buy land for investment purposes in Pakistan.

There is no doubt that while there he met with Abu Umar, who was someone who Mr. Kohlmann will say and is probably someone who could have helped him join a training camp. There is some e-mails about that.

In the e-mails, some of it which I will put into evidence, will indicate that there was talk about this, and maybe the possibility of joining LeT. But you have to keep this clear about the e-mails. Mr. Ahmed says in the e-mails, We will decide that on the ground.

He never commits to LeT in any of these e-mails. He says, I will decide that when I get there. Is that a clear agreement to join? He says, I think that would be decided on the ground.

So he meets with him one afternoon, and he says, as far as we can tell, this is how you would join if you want -- if you want to join.

And he goes back, and he talks to his family, and he talks to scholars, and he is searching for his identiy, searching for his responsibility with his faith, and he says no, he turns back.

Now, Mr. McBurney may describe that as, well, he

regretted it.  But that's an important circumstantial
fact.  He had the possibility, the opportunity to do it, and
he said no.  He said no, and he turned back.

And he comes back to the United States, his father
helps him get back into school, his grades go up at
Georgia Tech.  But he's still searching, and he starts
talking with Zubair Ahmed, and they talk about maybe I made
the wrong decision, maybe I should have done more, and he
talks to his mother about it.

There is an emotional heart-rending conversation
that will be recorded, you will hear, when his mother is
fussing at him about not taking enough courses.  And it is a
conversation that every mother and adult young son, young
adult son probably had at some time, her fussing at him, and
him saying, Well, if you are going to do that to me, I'll
just go back to Pakistan.  And that's the government's
evidence of a clear intention to go back, an emotional
conversation with his mother.

I know there is a lot in the interrogation, and we
have already presented evidence to the Court of how you need
to be careful about what happens in the interrogation.  And I
will try to present to the Court during that interrogation --
I know the Court has found it to be admissible, I know the
Court has found that toward the end of the interrogation
Mr. Ahmed had every reason to believe he might be arrested,

but you can't divorce that from what happened earlier on in the interrogation where he had been promised he would be left alone if he just tells them everything.

And during that process, he admits a lot of stuff just to get them -- because he thinks that's what they want him to say, and I think you will fairly say, for example, about the refineries, they press him and press him, What were you going to do, what were you going to do, was it going to be a refinery, where is that refinery, to get him to make that admission.

He said, Okay, maybe there's a refinary in Texas. That has to be taken in the context of the threats and promises that were made and in the bait-and-switch that Mr. -- Dr. Ofshe told you about.

He was pressed to say something, he was pressed to name a group, pressed and pressed and pressed, until he finally says LeT, because he thinks that will make them go away.

I won't have much time to talk about Mr. Zubair. He will testify. They only met once. They communicated a lot. There was a lot of bragging back and forth.

Mr. Zubair himself was searching for identity, searching for something. Goes to Egypt with his cousin supposedly to join a terrorist camp. They take with them

their Gameboy because they think they might get bored.
That's a piece of evidence that shows the reality of the
immature, fanciful notion of what's going on here.  Not that
Mr. Ahmed was in any way involved with the antics of
Mr. Zubair, but we will talk about him when I have an
opportunity to cross-examine him.

Tsouli, you know, here is a guy who goes by
Irhabi 007.  What's that tell you, that sort of boastful sort
of notion of fantasy, of being someone, a big shot?

Your Honor, I know I only have a short amount of
time left, but there is an important thing, and I think it
may be one of the most important pieces of evidence in this
case.

After Mr. Ahmed was told that, Well, we will get
back to you, maybe you just call us from time to time, in
that last interview, after he was sort of led to believe that
maybe, since he told them everything he did -- and he told
them everything; most of the government's evidence comes from
his own mouth -- he sends an e-mail which the Court knows was
sent in a fashion that he believed that no one would be able
to monitor it.

And he says in there, talking about what he has
done:  I told them, which is true, to the best of my
knowledge, that we were kids who just got excited.

I told them -- he doesn't have to add that "which

is true" if he merely was trying to tell him what he told

them, if he merely had to tell him, Listen, this is what I

told them, so you tell them the same thing.

I told them, which is true, that we were just kids

who got excited.

One piece of circumstantial evidence along with the

other circumstantial evidence, including the fact that he

turned away from this, turned away from it completely when he

had the opportunity to deny -- which is evidence, strong

evidence, circumstantial evidence, that the Court should not

find beyond a reasonable doubt that there was a clear

understanding and agreement to commit terrorist acts.

You have to walk in his shoes. He's shy, speaks

too fast, he finds an identity on the internet, he boasts, he

talks about childhood fantasies. He's confused, he's

exploring, he doesn't know what his faith's responsibility

is, he's without the guidance he needs. He does some silly

things, he takes a silly video, runs around the woods

shooting paintballs, he talked to a recruiter.

You know, it's a little bit like someone saying

there is a conspiracy to join the Army, that if you -- or the

military, that if you get so upset about what happened at

9/11 and you go talk to a recruiter about the possibility of

joining the military with your friend, Hey, maybe we should

do something, and we go down and talk to a recruiter, they

say, okay, we will get back to you, is that a conspiracy to join the U.S. Army or whatever military group the recruiter has?

And here we have a five-year plan.  Is it a conspiracy when two 13-year-olds say, you know, when we turn 18, maybe we should join the Army after we finish school, yeah, let's make plans to do that, let's prepare ourselves physically, is that a conspiracy?  That's a long shot.

I don't mean to minimize the government's evidence.  They have a substantial amount of evidence.  There was a terrific amount of effort put into this investigation.  And I don't question the government's good faith in doing that investigation, because they have an important responsibility to protect this country.

But we have an equally important responsibility to sort out those who are real terrorists, those who are really conspiring to commit a terrorist act, and those who were childish, those who were searching, those who were looking for a solution, those who never formed an intentional agreement.

And the Court is the -- this is how we are going to resolve this, the competing narratives.  The Court is going to have to do that.  And I suggest to you that you have something that can help you in this a very close case, and that is proof beyond a reasonable doubt.

Because the sum of the evidence I think will leave you with that type of doubt which will cause you to believe that the right decision, the decision under the law, the decision that is appropriate in this case, is a not guilty verdict.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Martin.

The government can call its first witness.

MR. McBURNEY:  Government calls Agent Richards.

(The oath is given by the Clerk.)

MR. McBURNEY:  Judge, before we start with Agent Richards, I think with the agreement of defense, I'm going to tender Government's Exhibit 3, which is a glossary of names, places, terms, et cetera, that should help the Court orient itself with things that it might not necessarily be familiar with.

I don't know that the parties are agreeing to its evidentiary value, but it's a glossary to help orient --

MR. MARTIN:  I would surely allow that to be admitted for the Court's assistance.  We may question some of the subtleties of some of the definitions there as we go along.  But as a general matter, we have no problem with the Court having it.

THE COURT:  Then Exhibit 3 is admitted.

MR. McBURNEY:  And similarly Government's Exhibit

22, which is an alphabetical collection of monikers, online
monikers and their users.

Just as an example, Aboo Turaab would equal
Syed Haris Ahmed, again for the Court and the witnesses'
consideration as we march through some of these
communications.

THE COURT:  Any objection to Exhibit 22,
Mr. Martin?

MR. MARTIN:  No, Your Honor.

THE COURT:  It's admitted.

-- -- --

MARK RICHARDS

being first duly sworn by the Courtroom Deputy, testifies and
says as follows:

-- -- --

DIRECT EXAMINATION

BY MR. McBURNEY:

Q.   Agent Richards, where do you work?

A.   I work at the FBI.

Q.   How long have you been -- are you a special agent?

A.   Yes.

Q.   How long have you been a special agent with the FBI?

A.   Twelve years.

Q.   Are you based here in Atlanta?

A.   Yes, I am.

Q.   What is your role in terms of the FBI's investigation

into the Defendant Syed Haris Ahmed?

A.   I am one of the case agents.

Q.   You say one of the case agents.  How many case agents

were ultimately assigned to the Defendant Ahmed part of the

case?

A.   We have two.

Q.   During the course of your investigation, did you ever

see Defendant Ahmed, see pictures of him, get to know what he

looks like?

A.   Yes, I did.

Q.   Do you see him in court today?

A.   Yes, I do.

Q.   Would you describe what he's wearing?

A.   He's wearing a cap, and he's sitting next to

Mr. Martin.

Q.   Agent Richards, when did the FBI's investigation into

Defendant Ahmed begin, roughly, month, year?

A.   Began in August of 2005.

Q.   Tell the Court how the investigation began?  What type

of information did the FBI come across that prompted the

case?

A.   Well, there was a foreign government that had a

terrorist investigation, and they had obtained a

communication between the individual that they were

1   investigating and an e-mail address, which is

2   almuwahhid@hotmail.com.

3   Q.   Almuwahhid is A-l-m-u-w-a-h-h-i-d?

4   A.   That's correct.

5   Q.   No hyphen or any punctuation?

6   A.   Correct.

7   Q.   @hotmail.com?

8   A.   That's right.

9   Q.   That's the information that was passed to the FBI, this

10  e-mail address?

11  A.   Yes.

12  Q.   Okay.  Did the FBI take any steps to determine who was

13  connected with the e-mail address?

14  A.   Yes, it did.  It legally obtained the subscriber

15  information during our investigation.  It legally obtained

16  the subscriber information, IP log-in information activity,

17  and some of the header activity.

18  Q.   When you say header activity or header information, what

19  do you mean by that?

20  A.   That's usually the to, from and date line of an e-mail.

21  Q.   Not the content, but just someone sent an e-mail to

22  Almuwahhid or Almuwahhid sent an e-mail to someone?

23  A.   Correct.

24  Q.   The IP address information, did that enable the FBI to

25  determine who the owner of the internet account was where

1   Almuwahhid was logging on?

2   A.   Yes.  The IP information showed multiple log-ons.  The

3   majority of the log-ons were at the address of 4204 Nowata

4   Drive, Roswell, Georgia.

5   Q.   The Nowata address on Nowata Drive in Roswell at that

6   time was connected with what individual who is part of this

7   investigation?

8   A.   Ehsanul Islam Sadequee.

9   Q.   Was the account in his name, meaning the internet

10  service provider, Comcast, BellSouth, whatever it was, was it

11  in his name or someone else's?

12  A.   No, it was in the name of his brother, Amimul Sadequee.

13  Q.   Did your, the FBI's analysis of the header information,

14  the tos and froms for the Almuwahhid account yield another

15  e-mail account of interest?

16  A.   Yeah.  There was frequent contact with the e-mail

17  address al-muwahid@hotmail.com.

18  Q.   Similar, the only difference being a hyphen between al

19  and muwahhid?

20  A.   Correct.

21  Q.   Did you do the same type of investigation to figure out

22  IP addresses where al-Muwahhid was being accessed?

23  A.   Yes, we did.

24  Q.   What did that show?

25  A.   It showed log-in activity, the majority of it at the

1  address of I believe it is 236 Brynbrooke Drive in

2  Dawsonville, Georgia.

3  Q.   Regardless of the street address, but Brynbrooke Drive,

4  that address is associated with whom?

5  A.   It's the family of the defendant.

6  Q.   The internet service account was in who's name?

7  A.   Syed Riaz Ahmed, which is the father of the defendant.

8  Q.   Did your investigation subsequently reveal which of the

9  family members in the Sadequee household was the actual user

10  of the Almuwahhid, no hyphen, account?

11  A.   Yes, the investigation showed it was Ehsanul Islam

12  Sadequee.

13  Q.   And as to the al-Muwahhid account, who did you determine

14  was the user of that account?

15  A.   Ultimately we determined the user was Syed Haris Ahmed,

16  the defendant.

17  Q.   Based on that information, that Syed Haris Ahmed was

18  someone regularly communicating with the Ehsanul Islam

19  Sadequee, the user of the Almuwahhid, no hyphen, what did the

20  FBI learn about Defendant Ahmed's whereabouts in midAugust of

21  2005?

22  A.   We learned that he was located in Pakistan.

23  Q.   At some point did you learn that he was destined to

24  return to the United States?

25  A.   Eventually we did, yes.

1   Q.   Okay.   What happened when he returned to the U.S.?

2   A.   When he -- he returned to U.S. on August 19, 2005, and

3   upon his return he was interviewed by Customs and Border

4   Patrol agents.

5   Q.   Was the FBI aware that Defendant Ahmed was going to be

6   interviewed?

7   A.   Yes, we were.

8   Q.   Had you requested -- did the FBI request that he be

9   interviewed?

10  A.   Yes.

11  Q.   Did the FBI participate in the interview of

12  Defendant Ahmed?

13  A.   Yes.

14  Q.   Was he asked in that interview why he went to Pakistan?

15  A.   Yes, he did -- he was.

16  Q.   What was his answer?

17  A.   He went to visit family and to -- I believe his phrase

18  was to get Islamic studies.

19  Q.   Were you part of that interview?

20  A.   No, I was not.

21  Q.   Upon Defendant Ahmed's return to the Atlanta area, was

22  he subject to physical surveillance by the FBI?

23  A.   Yes, he was.

24  Q.   What did he do when he got back?   Did he go take a job,

25  was he a student?   What was his main activity as best you

1   could tell?

2   A.   He was a student at Georgia Tech.

3   Q.   Now, Mr. Sadequee you mentioned, the user of Almuwahhid,

4   no hyphen, where was he when Defendant Ahmed returned to the

5   U.S.?

6   A.   He was -- I believe he was traveling to Bangladesh.

7   Q.   When did he depart to Bangladesh in relation to

8   Defendant Ahmed's return to the U.S.?

9   A.   The day before.

10  Q.   Now, this work that was done, interviewing

11  Defendant Ahmed at the airport and then instituting some form

12  of physical surveillance, determining he was a student at

13  Georgia Tech, how far were you into the investigation at this

14  time?

15  A.   Just a few weeks.

16  Q.   Did the investigation continue, or once you learned he

17  was a student that was it?

18  A.   No.  We continued the investigation.

19  Q.   Did the FBI end up acquiring computer evidence, meaning

20  hard drives, digital media, during its investigation?

21  A.   Yes, we did.

22  Q.   Any of that type of information from the

23  United Kingdom?

24  A.   Yes, we obtained some hard drives from the

25  United Kingdom.

Q.   When I say I'm going to ask a series of questions about
evidence coming from overseas, is this something the FBI went
and grabbed, or local or as in foreign law enforcement had
obtained it and they shared it with the FBI?

A.   Law enforcement in that specific country had obtained
the evidence.

Q.   So digital media, for shorthand, from the
United Kingdom?

A.   Yes.

Q.   Bosnia?

A.   Yes.

Q.   Denmark?

A.   Yes.

Q.   Sweden?

A.   Yes.

Q.   Canada?

A.   Yes.

Q.   Australia?

A.   Yes.

Q.   Some of these hard drives we are talking about, were
they more relevant to the case against Mr. Sadequee than
Defendant Ahmed?

A.   Some of them.

Q.   Did the FBI acquire a copy, make images of hard drives
from Defendant Ahmed's family home, the Brynbrooke address

1    you mentioned?

2    A.   Yes, we did ultimately.

3    Q.   Did the FBI make an image, get a copy of the hard drive

4    or computer data material from the Nowata Drive address

5    associated with Defendant Sadequee?

6    A.   I believe we did, yes.

7    Q.   Did the FBI get any digital evidence from Mr. Sadequee's

8    place of work, Raksha?

9    A.   Yes.

10   Q.   Will we during your testimony and subsequent testimony

11   of other agents see evidence that was derived from these

12   various hard drives?

13   A.   Yes, we will.

14   Q.   Saved e-mails?

15   A.   Yes.

16   Q.   Saved chats?

17   A.   Yes.

18   Q.   Things like that?

19        At some point during the investigation, did the FBI

20   decide to approach Defendant Ahmed in an effort to interview

21   him?

22   A.   Yes, we did.

23   Q.   Were you involved in that?

24   A.   Yes, I was.  We interviewed him for the first time on

25   March 10, 2005.

1    Q.    What was the purpose of the approach to

2    Defendant Ahmed?  What was it that the FBI was hoping to do

3    by interviewing him?

4    A.    Initially we are trying to obtain more information about

5    their activity when they went to Canada and --

6    Q.    I'm going to stop you for a second.  You said their

7    activity.  Who do you mean?

8    A.    Mr. Ahmed, the defendant's, and Mr. Sadequee.

9    Q.    Okay.  So he wanted to learn about Canada.  We will talk

10    about Canada in a minute.  You are getting a little ahead of

11    us.

12        What else were you trying to get?  What was the purpose

13    of the interview?

14    A.    To get, well, his cooperation regarding that trip, as

15    well as his trip to Pakistan, learning more about that, and

16    learning more about their trip up to Washington, D.C.

17    Q.    Okay.  Any other purpose to the approach?

18    A.    Possibly even getting cooperation with other terrorism

19    investigations.

20    Q.    You just mentioned that the first interview was on March

21    10th, 2006.  You were involved in that one?

22    A.    Yes, I was.

23    Q.    Where did that interview occur?

24    A.    That occurred at his residence, his college residence on

25    Ethel Street in downtown Atlanta.

1   Q.   Near Georgia Tech?

2   A.   That's correct.

3   Q.   In sum, how many interviews were there with

4   Defendant Ahmed?

5   A.   There are five, I believe.

6   Q.   And they span how many days?   What was the date of the

7   fifth and final interview?

8   A.   The last interview was conducted on March 18, 2005 --

9   2006, I'm sorry.

10  Q.   Real briefly on the nature and setting of these

11  interviews, was Defendant Ahmed in custody in any of these

12  interviews?

13  A.   No, he was not.

14  Q.   Never handcuffed?

15  A.   No.

16  Q.   Never told he couldn't leave?

17  A.   No.

18  Q.   You mentioned the first one was at his home, his school

19  home.   Where did the second one occur?

20  A.   The second one occurred at a hotel in the northern

21  metropolitan Atlanta area.

22  Q.   And the remaining three?

23  A.   They were all at the FBI Atlanta field office.

24  Q.   In one of those small interrogation rooms with the

25  two-way mirror -- the one-way mirror or however you call it?

1  A.   No, we don't have those.  It was just a supervisor's

2  office.

3  Q.   Was Mr. Ahmed, the defendant, able to break for prayer,

4  use the restroom, a meal, during these interviews?

5  A.   Of course.

6  Q.   Did that in fact happen?

7  A.   Yes.  We broke several times for many different reasons.

8  Q.   Did you tell him, You need to come to us at this time on

9  this day, or did you work with him to set the dates and the

10  times of the interviews, obviously not the first one, but the

11  subsequent ones?

12  A.   We worked around his schedule.

13  Q.   Did Defendant Ahmed have access to friends, family, a

14  lawyer if he wanted a lawyer, in between the interviews?

15  A.   Yes, he did.

16  Q.   At any point during any of the interviews, did

17  Defendant Ahmed tell you, I am done, I want to leave, or

18  I want to end this, and that request was not honored?

19  A.   No, he never said that.  In fact, during one of the

20  interviews we wanted to stop, and he said he wanted to

21  continue.

22  Q.   At the end of any of the interviews, did Defendant Ahmed

23  sign a written summary of what had been discussed during that

24  interview?

25  A.   Yes, during three interviews that occurred.

1    Q.   So ultimately three written statements?

2    A.   Correct.

3    Q.   Did he write those, or did an agent write them and he

4    reviewed them?

5    A.   No, an agent wrote them.  I wrote two of them, and

6    another agent wrote the third.

7    Q.   Who was that?

8    A.   Special Agent James Allen.

9    Q.   Were you present for that last one?

10   A.   I was not.

11   Q.   For the two that you were involved with, did you give

12   Defendant Ahmed an opportunity to review the written

13   statements?

14   A.   Yes, I did.

15   Q.   If he objected to any of the terminology, the phrasing,

16   the statements, was he allowed to edit it?

17   A.   Yes, of course.

18   Q.   Did he in fact tell you to change certain things in one

19   or both of the written statements you were involved with?

20   A.   He did tell us, and we made those edits.

21   Q.   These interviews that we just described, five interviews

22   across eight or nine days, were they recorded?

23   A.   They were.

24   Q.   Did Defendant Ahmed know they were recorded?

25   A.   I don't think he knew, no.

Q.   The work on the statements, when you presented them to
the defendant and he was allowed to edit them, would that
also be on tape?

A.   Yes.

Q.   So if there was an instance that you said I'm not going
to change this, that would be in the recordings?

A.   It would be, yes.

Q.   Or if he requested I want to end this and you said no,
that would be in the recordings?

A.   Correct.

Q.   Have you reviewed the audio, the actual recordings for
all the interviews?

A.   Yes, I have.

Q.   Have you reviewed the transcripts for the interviews?

A.   I have.

          MR. McBURNEY:  Judge, we are going to tender a
number of exhibits right now concerning that.  I need to
approach the witness to sort through all that.

          Mr. Marrone, let me know if you can't hear me.

BY MR. McBURNEY:

Q.   Mr. Richards, I'm showing you Government's Exhibit 504
through 509, the actual recordings of the interviews.  Do you
recognize those?

A.   Yes, I do.

Q.   And are those, to the best of your knowledge, accurate

1    recordings of the interviews from March 10th on through March

2    18th?

3    A.   Yes, they are.

4    Q.   Agent, there are actually six disks here, and you have

5    described five interviews.  Can you explain why there would

6    be six disks and we will see in a minute six transcripts?

7    A.   There are two disks from the March 15th, 2006,

8    interview.  We had an extensive interview with Mr. Ahmed and

9    we took a long break, and then continued the interview for

10   approximately twenty minutes at the end of that break.

11   Q.   And that ended up being two different recordings?

12   A.   Correct.

13   Q.   And two different transcripts?

14   A.   That's right.

15              MR. McBURNEY:  Judge, at this time the government

16   tenders Exhibits 504 through 509.

17              THE COURT:  Any objection?

18              MR. MARTIN:  No objection other than our

19   previously-filed motions of course.

20              THE COURT:  They are admitted.

21   BY MR. McBURNEY:

22   Q.   Before we get to the transcripts, a quick question.

23        Let's do the transcripts, then I will ask the

24   question.

25        If you look at 504-A and 509-A -- and they should be

1   stacked in front of you, the thick documents there.  If you

2   would get 504-A through 509-A, are those the transcripts that

3   correspond with the six disks, 504 through 509?

4   A.   Yes, they are.

5   Q.   Prior to today, have you had a chance to review the

6   transcripts?

7   A.   Yes, I have.

8   Q.   And to the best of your knowledge, are those fair and

9   accurate recordations of what is on the audio?

10  A.   Yes, they are.

11  Q.   A quick question about that.  Did you take breaks from

12  time to time in the interviews with the defendant so that you

13  could use the restroom or he could use the restroom?

14  A.   Yes.

15  Q.   Was the tape still running?

16  A.   Yes, it was.

17  Q.   Were those breaks then pulled out of the transcript?

18  A.   I believe they were in this version.

19          MR. McBURNEY:  At this time the government tenders

20  504-A through 509-A, the corresponding transcripts.

21          THE COURT:  Any objection?

22          MR. MARTIN:  No objection other than the motions to

23  suppress.

24          THE COURT:  They are admitted.

25  BY MR. McBURNEY:

1    Q.    Next, if you would look at Government's Exhibits 4, 5

2    and 7?

3          Do you see them all there?

4    A.    Yes.

5    Q.    Do you recognize 4, 5 and 7?

6    A.    I do.

7    Q.    What are those?

8    A.    These are written statements that were signed by the

9    defendant and myself.

10   Q.    What about 7?

11   A.    7 was signed by the defendant and Special Agent Allen.

12   Q.    But you have seen that before?

13   A.    I have seen this.

14   Q.    These are the actual statements, not copies thereof?

15   A.    Correct, they are originals.

16   Q.    The statements you described, the summaries of the

17   content of the first, the third and the fifth interviews?

18   A.    That's correct.

19          MR. McBURNEY:  At this time the government tenders

20   4, 5 and 7.

21          THE COURT:  Any objection?

22          MR. MARTIN:  No additional objection other than the

23   motion to suppress.

24          THE COURT:  They are admitted.

25          MR. McBURNEY:  Judge, at this time, with prior

agreement with Mr. Martin, we are also tendering just for the

purposes of your consideration and the record Government's

Exhibits 8 through 11, which are the transcripts from the

suppression hearing, which would include the playing of the

tapes, but also the questioning and answering by government

counsel and defense counsel of all the agents who were

involved in the actual interviews.

The parties agree that this is an appropriate

counter -- appropriate piece, as you have Dr. Ofshe's

testimony as well.

MR. MARTIN:  That's our agreement.

THE COURT:  They are admitted.

MR. McBURNEY:  So you can move 8 through 11 out of

your way as well.

BY MR. McBURNEY:

Q.   Agent Richards, we will not be playing all 13 some odd

hours of the interviews through you or through anyone, but I

would like to have you respond to a couple summary questions

based on what you learned from the interviews at this time.

The defendant is charged with conspiring to provide

material support to conspiracy to murder and kidnap abroad or

attacks here in the U.S.

Did you question Defendant Ahmed during the interviews

about whether at some point he had established contacts with

other individuals online, other supporters of violent jihad

1   online, or met with them in person?

2   A.   Yes, we did.

3   Q.   Did he admit to doing that during the course of the

4   interviews?

5   A.   Yes.

6   Q.   Now, when you say admit to doing that, would you

7   describe briefly -- I know the Court has heard these

8   before -- but the process, the to and fro?  Would you ask a

9   question of Defendant Ahmed and he would speak in paragraph,

10   multiple-paragraph answers?

11   A.   No.  No, he did not.  Usually we would ask a question,

12   and then we would get, in short, a gradual

13   admission.  Initially maybe we were provided with false

14   information or a half truth, and it would take some time,

15   maybe several interviews or several hours of interviews

16   before we maybe think that we would get an accurate answer to

17   our question.

18   Q.   You mentioned that sometimes you were provided a false

19   answer.  There were times when Defendant Ahmed answered a

20   question and you knew the answer was false?

21   A.   Yes.

22   Q.   Were there times when he would provide an answer to

23   which you didn't know if it was true or false, but

24   subsequently Defendant Ahmed would change his story?

25   A.   Yes.

1   Q.   What's an example of that?

2   A.   Where he knew -- where we knew the answer to the

3   question?

4   Q.   No, sir.  That he would tell you the answer is X, you

5   would take that as his truthful answer, and then later on he

6   would tell you something else?  Something material, not that

7   he thought it was June 14th and it was June 15th, if you

8   could think of any?

9   A.   I can't remember at this point.

10  Q.   I suspect we will come across one in a minute.

11       Did you ask Defendant Ahmed about whether he ever

12  engaged in any rudimentary physical training here in the

13  United States?

14  A.   Yes, we did.

15  Q.   What activity did he describe?

16  A.   He spoke about getting paintball guns and going up to

17  the north Georgia mountains and shooting paintball guns with

18  his friend.

19  Q.   Did he admit in the interviews that the purpose for that

20  was to provide some basic -- lower case B basic --

21  rudimentary training for an eventual going abroad to fight

22  jihad?

23  A.   Yes, he did.  It was the purpose of the paintball

24  activities were to take part or prepare for some type of

25  violent jihad.

Q.   It's alleged that Defendant Ahmed traveled to Canada
with Defendant Sadequee to meet with other like-minded
pro-violent jihadi individuals.  Did he admit to that in the
interviews?

A.   Yes, he did.

Q.   Did he admit that they discussed possible locations for
attacks, whatever -- however well-formed those ideas were,
here in the U.S.?

A.   Yes.

Q.   Did he admit that they discussed traveling to Pakistan?

A.   Yes.

Q.   What was the purpose according to the defendant of the
plan, the conspiracy to travel to Pakistan?

A.   The purpose of that plan was for them to meet in
Pakistan and somehow ultimately obtain some type of terrorist
training for jihad.

Q.   Did the defendant talk with you about going to
Washington, D.C.?

A.   Yes, he did.

Q.   What did he tell you the purpose was of the travel to
Washington, D.C.?

A.   Ultimately the purpose that he provided was to prove
themselves to the jihadi brothers.

Q.   In what way?

A.   To show that they could be spies.

Q.   And what things did Defendant Ahmed say he did in
Washington that constituted spying?

A.   They took videos of national landmarks, several of
them.

Q.   Did Defendant Ahmed tell you whether he knew if these
videos were going to be supplied to anyone?

A.   Ultimately he believed that his friend, Mr. Sadequee,
had supplied them to the jihadi brothers.

Q.   Initially when you asked Defendant Ahmed whose idea it
was to go to Washington, D.C., to make these videos, who did
he say was the generator of the idea?

A.   He said it was Sadequee's idea.

Q.   Did you have any reason to doubt that answer at that
time?

A.   No.

Q.   In a subsequent interview did that answer change?

A.   Yes, it did.

Q.   What did he tell you?

A.   He ultimately I believe about seven hours into the
interviewing process, two interviews later he admitted that
it was his camera that was used and I believe it was his idea
to go to Washington, D.C., and take videos.

Q.   Prior to that point, whose camera had he said was used
to make the videos?

A.   He said the owner of the camera was Mr. Sadequee.

1    Q.    Okay.  Just so we are clear, you said seven hours into

2    the interviews.  Was there any one interview that was that

3    long?

4    A.    No, no.

5    Q.    That's if you are running them back-to-back seven hours

6    in?

7    A.    Correct.

8    Q.    Did you talk to Defendant Ahmed about traveling to

9    Pakistan in July of 2005?

10   A.    Yes, we did.

11   Q.    What purpose for that trip did Defendant Ahmed give you

12   in the interviews, or purposes if he gave more than one?

13   A.    He advised us the same as before with the previous

14   interview with Customs and Border Patrol, that it was for the

15   purpose of visiting his family and getting Islamic -- some

16   type of Islamic studies.

17   Q.    You should have in front of you, Agent Richards,

18   Government's Exhibit 12 through 18, if you could find those,

19   and 21?

20        Do you see 12 through 18 and 21?  I'm going to move some

21   of these transcripts out of your way so you have --

22   A.    I do.

23   Q.    Do you recognize 12 through 18 and 21?

24   A.    Yes, I do.

25   Q.    Without going into their content, what are these

1 things?

2 A.   It appears they are e-mails.  I believe we obtained

3 these from his hard drive at Brynbrooke.

4 Q.   So they are e-mails, and you say his hard drive.  Whose

5 hard drive?

6 A.   I'm sorry, the defendant's hard drive.

7 Q.   Okay.

8 A.   Or the defendant's family's hard drive.

9 Q.   The Brynbrooke hard drive?

10 A.   Correct.

11 Q.   So they are e-mails between the defendant and someone?

12 A.   Yes.

13 Q.   All right.  We will get into content in a minute.

14        MR. McBURNEY:  At this time, the government tenders

15 Exhibits 12 through 18 and 21.

16        THE COURT:  Any objection?

17        MR. MARTIN:  No objection.

18        THE COURT:  They are admitted.

19 BY MR. McBURNEY:

20 Q.   We are starting far back in time.  If you would look at

21 Government's Exhibit 12 --

22        MR. McBURNEY:  I guess we can now -- I don't know

23 if this constitutes publishing, Your Honor, but we are

24 putting it up on the screen now.  It's been admitted.

25        Can we zoom in a little?  Do you have the power to

1    zoom?   Just the header on top.

2    BY MR. McBURNEY:

3    Q.   Okay.  This is the top of Government's Exhibit 12.

4    Agent Richards, what's the date of this e-mail?

5    A.   September 7, 2004.

6    Q.   And it's an e-mail from?

7    A.   From Zubair Ahmed.

8    Q.   To?

9    A.   Thandymazaq@hotmail.com.

10   Q.   Thandymazaq@hotmail.com, is that an e-mail address you

11   were familiar with through your investigation?

12   A.   Yes, it is.

13   Q.   Whose e-mail address is that?

14   A.   It's the defendant's e-mail address.

15   Q.   Did he acknowledge that it was his during the

16   interviews?

17   A.   Yes, he did.

18   Q.   Government's Exhibit 12 is actually 14 pages long.  Is

19   it a chain of e-mails?

20   A.   Yes, it is.

21   Q.   All between who and whom?

22   A.   Between Zubair Ahmed and the defendant.

23   Q.   Let's start with the beginning of the chain and jump to

24   page two.  And if you could highlight the bottom -- there you

25   go.  That's great.

Okay.  So the first e-mail in the chain starts at the bottom of what's on the screen right now.  It's an e-mail from who to whom?

A.    It's from Haris Ahmed to Shafaat Mehboob Ali Khan.

Q.    Is that anyone you know from the investigation?

A.    I don't recall.

Q.    Okay.

A.    The second person on the to address line was Zubair Ahmed.

Q.    And then finally?

A.    And finally the third person is Safiullah Hussaini.

Q.    Now, Zubair Ahmed, who is he?

A.    He is an associate of the defendants and he is in Chicago.

Q.    All right.  What is his status these days?

A.    He is -- he has pled to a count of violating a terrorism statute, I believe, and he's out on bond.

Q.    Mr. Hussaini, who is Safiullah Hussaini?

A.    He's an associate of the defendant's in Pakistan.

Q.    The date is August 28, 2004, and what is it that Mr. Ahmed, the center of this first e-mail in the chain, says at the bottom?

A.    It says, I found this article pretty cool, worth a read.

Q.    What is the article about?  Have you read it?

A.    Yes, I skimmed through it.

Q.   The article that Defendant Ahmed sent to these three
people was about what?

A.   It's written by some military officers, United States
military officers, and it discusses the evolution of
warfare.  It uses the terms first generation through fourth
generation of warfare, the first being, for example, less
sophisticated tactics and weaponry, something that might have
been used during the Revolutionary War.

Then maybe if you look at the third generation of
warfare, that would have been tactics and weapons used during
the 1900s, for example, during World War II, a little bit
more sophisticated military-against-military.

Q.   The article focuses on what?

A.   The next generation, the fourth generation of warfare,
which the author describes as coming into fruition in modern
times, and it describes the fourth generation of warfare as
being -- having a dispersed battlefield using cyberwarfare
techniques, psychological warfare, media manipulation.

It also describes elements of terrorism as being part of
the fourth generation of warfare where terrorism would target
the enemy's society as a whole, not just the military, the
enemy's military, and it would also describe terrorism as
targeting -- bypassing the military and targeting civilian
populations.

Q.   Okay.  Let's jump back to page one of the e-mail and

look a little bit at the third e-mail in the chain.  Could we

just highlight the block there?  Thank you.

Now we are on September 4, 2004.  The group of

communicants has shrunk a bit.  This is from whom to whom?

A.    From Haris Ahmed to Zubair Ahmed.

Q.    Okay.  Go down to there is a paragraph or a line that

starts with, In Russia and French.  What does the defendant

say to Zubair?

A.    In Russia and French, I see the total war on Islam

starting to forment exactly as prophesied by the Rasul, SAAW.

Q.    I want to stop you for one second.  The italicized text

in blue, is that something that a translator has inserted as

opposed to what was in the actual e-mail?

A.    That's correct.

Q.    Okay.

A.    A translator from the government.

Q.    Okay.  Keep going.  It says prophesied by the Rasul.

A.    And here our families are in the middle of kafir, land.

I just hope we survive to safely get back to Islam lands when

the full-fledged war starts, insha'Allah.

Q.    And at the bottom, the defendant says, Besides what?

A.    I don't want to miss the opportunity of the lifetime as

you know that the shaheeds in the final war of Islam --

Q.    You don't need to see it on the screen.  What does he

say at the top of the next page?

A.   -- that the shaheeds in the final war of Islam will be the best shaheeds in the eyes of Allah, and may Allah guide us to the true path to achieve that.  And, buddy, I want to learn Arabic.

Q.   Okay, that's fine.  The shaheeds is defined as what on that second page?

A.   Martyrs.

Q.   Okay.  September 4, 2004.

Let's look at Government's Exhibit 13, and page two of that.

MR. MARTIN:  Are we on the same one?

MR. McBURNEY:  No, we are now on Government's Exhibit 13.

MR. MARTIN:  Which is --

MR. McBURNEY:  Which is an e-mail dated October 18, 2004, from Zubair to Haris and others, Mr. Ahmed and others.

THE COURT:  Mr. McBurney, sometime in the next ten minutes or so, I would like to find a good stopping point so we can take a break.

MR. McBURNEY:  Okay.  We can finish this one and then it would be a great time.

BY MR. McBURNEY:

Q.   So we are on Government's Exhibit 13, second page.  Just highlight the whole text.  Great.  All right.

The date of this e-mail, Monday, October 18, 2004, from

1  Thandymazaq, Defendant Ahmed, to whom?

2  A.   To Safiullah Hussaini, Zubair Ahmed, and Assad Khan.

3  Q.   You have mentioned who Mr. Husaini and Zubair Ahmed are.

4  Who is Assad Khan?

5  A.   Assad Khan is also an associate, maybe a distant

6  relative of the defendant.

7  Q.   Now, Mr. Hussaini, you said, was based where?

8  A.   He was in Pakistan.

9  Q.   And Mr. Khan?

10 A.   He's also in Pakistan.

11 Q.   Okay.  So Defendant Ahmed is writing, and he tells us in

12 the second large paragraph after "anyways" what it is he

13 wants to talk about.  What does he say?

14 A.   What I wanted to talk about was about for us to search

15 and look into our hearts and see where do we really stand in

16 terms of our commitment to the three-step plan.

17 Q.   The three-step plan.  Is that something that

18 Defendant Ahmed explained to you the meaning of during the

19 interviews?

20 A.   Not quite.

21 Q.   What do you mean by not quite?

22 A.   Well, we would ask him about what the third meant and

23 what the first two steps would mean, and he would give us

24 again the gradual admissions and half answers and half

25 truths.

1    Q.   Let me ask the question a different way.  Three-step

2    plan, based on your interviews with Defendant Ahmed, is code

3    for what?

4    A.   It's code for the levels of jihad preparation.

5    Q.   And the third step being?

6    A.   Actually fighting violent jihad.

7    Q.   Part way through that paragraph, Defendant Ahmed refers

8    to the month of Ramadan.  What does he say?  He says I see

9    this month of Ramadan --

10   A.   I see this month of Ramadan to be a good opportunity to

11   explore ourselves and see if we really are committed to what

12   we planned for, even if the eventual graduation to the third

13   is far off but, insha'Allah, the commitment should be there.

14   Q.   And the third, this is the same thing as the three-point

15   plan?

16   A.   That's correct.

17   Q.   Okay.  October 2004, this is how many years before you

18   are interviewing him and asking him about what was going on?

19   A.   Approximately a year and a half before.

20   Q.   Okay.

21        MR. McBURNEY:  We can stop there, Judge.

22        THE COURT:  All right.  Let's take a 15-minute

23   break.  We will be back in session at twenty till twelve.  We

24   will be in recess for fifteen minutes.

25        (A recess is taken at 11:22 a.m.)

1                          --   --   --

2                   (In open court at 11:42 a.m.:)

3                   THE COURT:  Mr. McBurney, please continue.

4                   MR. McBURNEY:  Thank you, Judge.

5    BY MR. McBURNEY:

6    Q.   Agent Richards, if you would please look at Exhibits 14

7    through 16?  If we could put 14 up, please?

8         Are 14 through 16 similar in format and content?

9    A.   Yes.

10   Q.   We are looking at 14 on the screen right now.  It's an

11   e-mail from whom?

12   A.   From Aboo Khubayb al-Muwahhid, which is the moniker for

13   Ehsanul Sadequee.

14   Q.   And it's to?

15   A.   To piddikashorba@yahoo.com, which is one of the e-mail

16   addresses for the defendant.

17   Q.   Okay.  We have seen Thandymazaq before.  This is a

18   different one.  Did Defendant Ahmed admit in his interviews

19   with you that he also used piddikashorba@yahoo.com?

20   A.   Yes, he did.

21   Q.   So from Mr. Sadequee to Defendant Ahmed.  What's the

22   date?

23   A.   November 15, 2004.

24   Q.   What's the title or the subject?

25   A.   Subject is, Forward Tibyan and Millat.

1   Q.   Tibyan is what in terms of what you learned during the

2   course of your investigation?

3   A.   It's a jihadist type of website.

4   Q.   And Government's Exhibit 14-A?

5        Do you see 14-A?

6   A.   Yes.

7   Q.   Did Government's Exhibit 14, the e-mail from Sadequee to

8   Defendant Ahmed, have an attachment?

9   A.   Yes, it did.

10  Q.   Is that what 14-A is?

11  A.   14-A is the attachment for this e-mail.

12  Q.   It's a 238-page document.  What's the title of the

13  document?

14  A.   Millat Ibrahim, which is the Religion of Ibrahim.

15  Q.   Government's Exhibit 15?

16       And while it's going up, who is the sender of 15?

17  A.   The sender is again Aboo Khubayb al-Muwahhid.

18  Q.   It's again to Piddikashorba?

19  A.   Yes, it is.

20  Q.   And when was that sent?

21  A.   November 15, 2004.

22  Q.   A few minutes after 14?

23  A.   Yes.

24  Q.   Did this e-mail have attachments?

25  A.   It does.

1   Q.   Government's Exhibit 15-A?

2        Was that the attachment?

3   A.   Yes, it is.

4   Q.   What's the title of the attachment?

5   A.   The translated title is Essay Regarding the Basic Rule

6   of the Blood, Wealth and Honor of the Disbelievers.

7   Q.   It's a publication according to the cover page from

8   what?

9   A.   Tibyan.

10  Q.   Government's Exhibit 16?

11       Another e-mail from Aboo Khubayb, who you said is

12  Mr. Sadequee, to Piddikashorba also on November 15th.  Are

13  there attachments to this e-mail?

14  A.   Yes.

15  Q.   There is actually some text to the e-mail as

16  well.  What's the text of the e-mail from Mr. Sadequee?

17  A.   The text is, Fundamental concepts of G-Had -- spelled

18  G-H-a-d -- and number two, about the shaykh who wrote it.

19  Q.   So if I were searching a collection of e-mails I have

20  obtained from someone's hard drive and I used the search term

21  "jihad" as it's typically spelled, j-i-h-a-d, would it catch

22  this e-mail?

23  A.   Probably not.

24  Q.   Government's Exhibit 16-A?

25       Is that one of the attachments to the e-mail from

1  Sadequee to defendant?

2  A.   Yes.

3  Q.   And this appears to be the Fundamental Concepts

4  regarding jihad?

5  A.   That's correct.

6  Q.   The publisher?

7  A.   The publisher is Tibyan.

8  Q.   And 16-B, the second attachment?

9  A.   Yes, that is the second attachment.

10  Q.   It is what?

11  A.   It is a Brief Introduction to the Virtuous Scholar,

12  Ash-Shaykh Abdul-Qadir Ibn Abdul Aziz.

13  Q.   Is that the author of the text about jihad?

14  A.   Yes, it is.

15  Q.   And all these items we just talked about, 14 through 16

16  including attachments, these were found on whose hard drive?

17  A.   On the Brynbrooke hard drive.

18  Q.   So it's clear for the record and for the Court, when did

19  the FBI obtain the Brynbrooke hard drive?

20  A.   During March of 2006.

21  Q.   March of 2006, before or after the defendant was in

22  custody?

23  A.   I believe it was after, just after.

24  Q.   Okay.  Government's Exhibit 17?

25       Another chain of e-mails.  Let's start with the

1   originating e-mail which is at the bottom of the first

2   page.  Who are the to and froms?

3   A.   It is from Syed Ahmed, thandymazaq@hotmail.com, it is to

4   ibnahmed460@hotmail.com, and also it is to

5   safiullahhussaini@hotmail.com.

6   Q.   Safiullah Hussaini is identifiable by his e-mail

7   address.

8        Who is Ibnahmed460?

9   A.   That's the e-mail address used by Zubair Ahmed.

10  Q.   Okay.  So the defendant is writing to the two of them on

11  November 16, 2004, talks about watching TV and the

12  carnage.  He references Fallujah.

13       What is Fallujah?

14  A.   Fallujah is a city in Iraq where there was a significant

15  battle at that period of time, I believe.

16  Q.   Okay.  And the defendant says what about Fallujah?

17  I doubt it will --

18  A.   I doubt it will be the last of the Muslim cities seeing

19  the horrible vengence of a blood-thirty dragon.

20  Q.   What does he say has happened to him as a result of

21  seeing this vengeance?

22  A.   The next sentence says, I have lost all interest in

23  studies and see no purpose in this pathetic life.  Studying

24  for what?   For whose sake are we spending blessed nights of

25  Ramadan, not worshiping, but reading on maths and science?

1    Q.   Now, down at the bottom, the defendant describes --

2    names something he's reading.  I am reading the -- what is it

3    that he says?

4    A.   I'm reading the classic Ilhaq bil Qaafilah by

5    Shaykh Abdullah Azzam, Join the Caravan, and his words bring

6    tears to hearts.  They shake my heart to the point that I say

7    am I even Muslim.

8    Q.   Shaykh Azam, are you familiar with who that person is?

9    A.   Yes, a bit.

10   Q.   Would consulting the glossary help refresh your

11   recollection?

12   A.   Sure.

13   Q.   The glossary is in evidence.

14        Is Shaykh Azzam in the glossary at 29?

15   A.   I believe he's a mentor of Osama Bin Laden.  We can read

16   29 if you like?

17   Q.   Please do.

18   A.   A Palestinian who served as the intellectual mentor to

19   Osama Bin Laden and was leader of the Mujahideen who traveled

20   to Afghanistan in order to fight the Soviet Union in the

21   1980s.  He wrote Ilhaq bil Qaafilah, Join the Caravan, a

22   document explaining the methodology and philosophy of the

23   Arab-Afghan Mujahideen movement.  Azzam was killed in 1989.

24   Q.   Is that the same text that the defendant says he's

25   reading back in November 16, 2004?

A.   Yes, it is.

Q.   Looking at page two, a continuation of this e-mail that the defendant is writing on November 16th.  First full -- well, it's not the -- what does the defendant say at, Frankly?

A.   Frankly we need to reassess our priorities.  Can we afford to delay our goal of third when we know that a man who joins an army that is losing is better than the man who joins an army while it's winning?

Q.   And again third, what is third a code for or reference to?

A.   It's code for violent jihad.

Q.   Let's move forward into 2005, Government's Exhibit 18.  And if you could highlight the header portion?

     So February 2005.  At this point had Defendant Ahmed gone to Canada?

A.   No, he had not.

Q.   PreCanada.

     It's an e-mail exchange, series of e-mails between whom?

A.   From Safiullah Hussaini -- or an exchange between Safiullah Hussaini and thandymazaq@hotmail.com, an e-mail from the defendant.

Q.   Okay.  If we could see the middle e-mail on the page, February 4th, 2005.

So the author of this one is the defendant?

A.    It is from the defendant.

Q.    He warns Safiullah of something part way -- about something about halfway through the paragraph.  What does he warn Safiullah about, Mr. Hussaini?

A.    But let me again warn you the dog sniffed my friend who was with me when you called.  Repeat -- then he capitals -- the dog sniffed him.  We are trying to wash our hands for now because it is hard to pray with dog saliva, as you know.  May Allah make it easy for us.  Do you understand my position now?

Q.    During the course of your investigation, did you encounter repeated references to the dog, people's encounters with the dog?

A.    Yes.

Q.    What did that mean?

A.    We assessed it to mean law enforcement.

Q.    What is Mr. Hussaini's response?  If we could magnify the top e-mail?

A.    He states, Damn, man, I told you to stay low.  What are you up to?  I told you to keep up with the daily routine.  Tell me something, what good are you for if you get tainted?   I'll kill you myself if you don't stop all this. You are in no position to do anything.

        Do you think I don't get the urges to scream and be

heard and do something?  I don't do something like that cuz

I'm not in a decisive position.  Look, bro, I know you are

desperate like I am, but this way we won't achieve

anything.  We need a collective, not individual efforts,

running on unchecked and unwarranted zeal.  Come on --

Q.   Okay, that's great.  Thank you.

     Government's Exhibit 21.  This is an e-mail from what?

A.   It's an e-mail from At-Tibyan Publications Forums.

Q.   To?

A.   To thandymazaq@hotmail.com, an e-mail to the defendant.

Q.   What's the gist of the e-mail?

A.   He advises the defendant that, Your password has now

been reset, your new details are as follows.

Q.   You don't need to read it all.

     So it's about some transaction he had with At-Tibyan

website?

A.   Correct.

Q.   What is his user name there?

A.   Abu Turab.

Q.   Is Turab a moniker you encountered in other

communications involving Defendant Ahmed?

A.   Yes, it is.

          MR. MARTIN:  What exhibit number is that?

          MR. McBURNEY:  21.

          MR. MARTIN:  Thank you.

1    BY MR. McBURNEY:

2    Q.   All right.  Before we get to Canada, if we could have

3    Exhibit 7 up?  And go to page two, the bottom of page two.

4        Exhibit 7 is what, Agent Richards?

5    A.   It is the written statement that he signed on --

6    the defendant signed on March 18, 2006, written by

7    Special Agent Allen.

8    Q.   Okay.  If you could magnify the bottom partial

9    paragraph?

10       You mentioned before when I asked the question about the

11    defendant using paintball guns, et cetera, that he talked

12    about at the interviews.  What is set forth in the written

13    statement as adopted by Defendant Ahmed concerning this

14    rudimentary training?

15    A.   It states, I went to the north Georgia mountains near

16    Dawsonville with Shifa on two occasions to shoot paintballs.

17    One of these trips Omer Kamel came with us to shoot

18    paintballs.

19    Q.   Okay.  And if we could see the top of page three?

20       While that's coming up, Omer Kamel, is that someone you

21    encountered during the investigation?

22    A.   Yes, it is.

23    Q.   Who is he?

24    A.   He was an associate or a friend of theirs during this

25    time frame.

1    Q.    When you say theirs?

2    A.    Theirs meaning the defendant and Mr. Sadequee.

3    Q.    Okay.  And the statement about what was going on in the

4    north Georgia mountains continues on to page three.  What is

5    the statement to which Defendant Ahmed subscribed by signing

6    this written statement?

7    A.    It states, While we were shooting paintballs, I was

8    preparing myself for the next phase of jihad training.

9    Q.    Okay.  Let's shift to Canada.  I want to show you

10   Government's Exhibits 23 through 26.

11        23 through 26, do you see them?  They should be in the

12   pile that's on top of -- 23 through 26 should be here?

13   A.    This is 28.

14   Q.    Sorry for the delay, Agent, Your Honor.

15        There are 23 through 26 there in that stack.  Do you

16   recognize those?

17   A.    Yes, I do.

18   Q.    Are they all documents obtained during the course of the

19   investigation?

20   A.    Yes, they are.

21   Q.    They relate to travel to Canada?

22   A.    Yes.

23   Q.    In one way or another?

24   A.    Correct.

25            MR. McBURNEY:  At this time, the government tenders

1    23 through 26.

2           THE COURT:  Any objection?

3           MR. MARTIN:  No objection.

4           THE COURT:  They are admitted.

5 BY MR. McBURNEY:

6 Q.  Let's start with Government's Exhibit 23, an e-mail.  If

7 you could highlight or magnify the header, please?

8    It's an e-mail from where?

9 A.  From e-ticket@greyhound.com.

10 Q.  To?

11 A.  Thandymazaq@hotmail.com, the defendant's e-mail address.

12 Q.  And the date is February?

13 A.  February 26, 2005.

14 Q.  If you would highlight the passenger section or magnify

15 the passenger section?

16    Who are the passengers for this itinerary?  We will see

17 the itinerary in a minute.

18 A.  The passengers are Ehsanul Sadequee and Mr. Syed Ahmed.

19 Q.  Both paying adult fare?

20 A.  Correct.

21 Q.  And the billing address for it is what?

22 A.  4204 Nowata Drive, Roswell, Georgia.

23 Q.  Which is what?

24 A.  It's the home address of Mr. Ehsanul Sadequee.

25 Q.  Okay.  Now if we could see page two, please, and magnify

the itinerary portion of that?

Now, this e-mail that was just up -- but you can look at the hard copy in front of you -- was sent to Defendant Ahmed on what day?

A.   February 26, 2005.

Q.   That's not a trick question.  What's the date of the e-mail?

A.   February 26, 2005.

Q.   For travel on what day?

A.   For travel from Atlanta to Toronto on March 6, 2005.

Q.   So the trip to Canada was planned at least as far in advance as what date?

A.   A week or two in advance.

Q.   Okay.  The itinerary takes Sadequee and Defendant Ahmed where?

A.   It takes them to Toronto.

Q.   On what date?

A.   On March 7, 2005.

Q.   Leaving Atlanta on what date?

A.   Leaving Atlanta March 6, 2005.

Q.   Okay.  And returning back to Atlanta when?

A.   Departing Toronto on March 12, 2005, and returning to Atlanta the next day, on March 13, 2005.

Q.   Okay.  Government's Exhibit 24, I'm not sure how this will come up on the screen.  Oh, it doesn't.  Okay.

1      What is Government's Exhibit 24?

2         MR. McBURNEY:  And, Your Honor, it won't appear on

3  the screen.  It's a still photo.

4  A.   It's a copy of an itinerary for the passengers

5  Ehsanul Sadequee and Syed Haris Ahmed, billing address

6  4204 Nowata Drive, Roswell, Georgia, for the trip from

7  Atlanta to Toronto and also the return trip from Toronto to

8  Atlanta.

9  Q.   Same itinerary we just saw in an e-mail to

10  Defendant Ahmed?

11  A.   That's correct.

12  Q.   Where was this itinerary found?

13  A.   This is found in a search warrant executed at the

14  address of 4204 Nowata Drive.

15  Q.   Was the actual itinerary taken from the house, or simply

16  a picture was taken of the itinerary while agents were in the

17  house?

18  A.   No, a copy of the itinerary was made, which is this.

19  Q.   Okay.  Was the itinerary photographed during the search,

20  or was the itinerary taken?

21  A.   It was photographed.  Nothing was seized.

22  Q.   Okay.  Exhibit 25, if you would magnify -- that's

23  plenty.

24      It's a series of entries concerning the travel of whom?

25  A.   Syed Ahmed.  Syed Haris Ahmed.

Q.   Which is?

A.   Which is the defendant.

Q.   The second entry indicates -- first, this shows entry
into the United States, each of these line items?

A.   That's correct.

Q.   Okay.  The second entry shows Defendant Ahmed entering
the United States where and when?

A.   In Buffalo at the Peace Bridge on March 12, 2005, at
10:36 a.m.

Q.   And was Buffalo one of the stops on the itinerary we
just looked at?

A.   Yes, it was.

Q.   Exhibit 26, similar data, but for whom?

A.   This data is for Ehsanul Sadequee.

Q.   And he entered the United States where?

A.   At the Peace Bridge in Buffalo, New York, on March 12,
2005, at 10:34 a.m., approximately two minutes -- two minutes
before the defendant.

Q.   Did Defendant Ahmed in his interview with Customs and
Border Patrol when he came back from Pakistan in August of
2005 admit to traveling to Canada?

A.   Yes, he did.

Q.   Did he say he traveled alone or with Mr. Sadequee?

A.   He said he traveled with Mr. Sadequee.

Q.   Do you know if Mr. Sadequee was interviewed at any point

1    about his travel to Canada?

2    A.    Yes, he was.

3    Q.    And did he say he traveled alone --

4          MR. MARTIN:  Your Honor, I would object.  That

5    seems to be hearsay.

6          THE COURT:  Why is that not hearsay?

7          MR. McBURNEY:  It's a co-conspirator statement.

8    None of these are custodial interviews.  And I can put it in

9    time, but this interview with Defendant Sadequee was in

10   August of 2005 while the conspiracy was very much alive.  The

11   defendants were still in contact.

12         And so the answer might shed some light on whether

13   Mr. Sadequee was being fully candid as a co-conspirator,

14   whether something was still afoot.  So I believe it's a

15   co-conspirator statement.

16         THE COURT:  I think you have an obligation, though,

17   first to show the conspiracy before co-conspirator statements

18   are entered.  So I'm not sure there is a proper

19   foundation.  I will sustain the objection.

20         MR. McBURNEY:  Okay.

21   BY MR. McBURNEY:

22   Q.    Had Defendant Ahmed -- did Defendant Ahmed tell you

23   during the course of the interviews with whom he traveled --

24   the interviews with the FBI in March of 2005 -- March of

25   2006, with whom he traveled to Canada?

A.    Yes.  During the interviews in March of 2006, he advised

us he had traveled to Canada with Shifa, which is

Ehsanul Islam Sadequee.

Q.    Okay.  And did he tell you if Defendant Sadequee was

part of the planning and conspiring that went on in Canada?

A.    Yes, he did.

Q.    Did he tell you that the discussions about plans to go

to Pakistan, if they included Sadequee?

A.    Yes, they did.

Q.    The discussions of possible locations in the

United States that could be attacked, oil refineries,

military bases, did those discussions include

Defendant Sadequee?

A.    They did.

Q.    Was there any part of the conspiracy that began in

Canada that Defendant Ahmed told you Defendant Sadequee was

not a part of?

A.    No, there was no part of that.

        MR. McBURNEY:  Your Honor, I would like to pose the

same question again.

        The question I am asking Agent Richards is focused

only on Defendant Sadequee's response to a question about did

you go to Canada and with whom did you go.  In other words,

reference to this conspiracy that I had Agent Richards just

talk about is really the focus of the case.

```
 1              THE COURT:  But was he there when the statement was
 2     made?
 3              MR. McBURNEY:  Was Agent Richards there?
 4              THE COURT:  Right.
 5              MR. McBURNEY:  No, he wasn't there.  There is no
 6     question that it's hearsay.
 7              It's a co-conspirator statement.  I think it should
 8     come in because it's something that a co-conspirator --
 9              THE COURT:  I know, but don't you have to show an
10     exception to the hearsay rule for it -- my understanding is
11     that Mr. Sadequee was --
12              MR. McBURNEY:  I see your point.
13              THE COURT:  I mean, Mr. Sadequee was interviewed by
14     another agent, so you are trying get this agent to testify as
15     to what some other agent says.
16              MR. McBURNEY:  Fair point, we will have
17     Agent Scherck talk about that.  I will move on.
18     BY MR. McBURNEY:
19     Q.   During your interviews with Defendant Ahmed in March of
20     2006, did he tell you with whom he and Defendant Sadequee met
21     in Canada?
22     A.   Eventually and gradually he told us that there were
23     three individuals at least that he met with.
24     Q.   What names, if any, was he able to provide?
25     A.   Initially it was Azdee, and then the next name I believe
```

1   was James.

2   Q.   Any other names?

3   A.   I don't recall the third name.

4   Q.   Okay.  Do you recall that he did describe a third

5   person?

6   A.   Yes.  I believe it was Jamal, but I'm not positive.

7   Q.   You are certain about Azdee and James?

8   A.   Correct.

9   Q.   In the end of the interviews, did you -- did

10  agents provide a summary of Defendant Ahmed's statements as

11  to what happened in Canada, why he went, who was there,

12  et cetera?

13  A.   Yes.

14  Q.   It's part of one of the written statements we have

15  talked about?

16  A.   That's correct.

17  Q.   If we could put Exhibit 7 up again, and the partial

18  paragraph at the bottom of the page?

19       You can't quite see it, but you have it in front of

20  you.  Do you have a hard copy in front of you?

21       There are initials off to the side of every

22  paragraph.  Whose initials are those?

23  A.   They are SA, Syed Ahmed.

24  Q.   Okay.  And what does that paragraph read?

25  A.   It reads:  In March of 2005, I went to Canada with Shifa

to meet Canadian brothers that Shifa had met online.  I met
with Azdee and James and another brother known as Jamal while
meeting with Azdee and James.

Q.   Okay.  If we could have page two?

A.   At the mosque I mentioned --

Q.   Hold on, it's going to come up on the screen.  And do
about half of the paragraph and then we will do the second
half.

     Before we go on, so the three names of individuals that
Defendant Ahmed ultimately revealed by the end of the fifth
interview were?

A.   Azdee, James and Jamal.

Q.   Then he says -- well, the statement says, While meeting
with Azdee and James -- and then continue?

A.   -- at the mosque, I mentioned that we should attack oil
storage facilities and refineries.  I wanted to attack these
places because the oil is being stolen from the Muslims, and
an attack would cause the price of oil to increase and make
more money for the Muslims.

     I also mentioned to Azdee, James and Shifa that we
should attack a military base.  At the time I did not say
which base, but on another occasion Shifa and I discussed
attacking Dobbins Air Force Base.

Q.   All right, stop for a second.

     That reference to Dobbins Air Force Base at another

time, did Defendant Ahmed tell you all in the interviews if

that was while in Canada or a later date not in Canada that

he and Shifa, meaning Sadequee, talked about Dobbins Air

Force Base?

A.    I believe it was at another later date.

Q.    Okay.  So if you would keep reading.  While Shifa and I?

A.    While Shifa and I were with Azdee and James, either

Azdee or James mentioned that we should attack the satellite

system that controls the global positioning system, GPS.  We

discussed either using lasers or jammers to disrupt the

GPS.  This attack would cause confusion for everyone,

including the military.

    While with Shifa, Azdee and James, we also discussed how

difficult it was to obtain weapons legally in Canada and how

easy it was in the United States.

    The main conversations in Canada were related to going

to Pakistan to obtain military-style jihad training.  We

discussed that one brother should go ahead and set up housing

and make arrangements, and then the others could come over.

Q.    Okay.  That was a long paragraph.  Does it accurately

reflect what was eventually admitted to by Defendant Ahmed

over the course of the five days of interviews?

    MR. MARTIN:  Your Honor, I have let this go

on.  I mean the recording itself is the best evidence of what

was actually said.

1    I mean, I could go through this and he did sign

2    this, but for this agent now to give his opinion whether or

3    not this accurately describes what was in the recording seems

4    to be beyond -- not admissible evidence.  It's not the best

5    evidence.  We have got the primary evidence in evidence, and

6    that speaks for itself.

7         THE COURT:  Well, I have, of course, listened to

8    the 13 hours of the interviews, so it is easy for me to

9    compare the content of the interviews as they were conducted

10   with the summaries to evaluate how the summaries relate to

11   the discussion at the interviews.

12        MR. McBURNEY:  I appreciate that.  And the point of

13   the question was solely to not have to play chunks of the

14   interview that might support it.  I will withdraw the

15   question.

16        But so the Court is clear, I'm not seeking this

17   witness's imprimatur on this saying this is exactly

18   correct.  You have heard the interviews and you --

19        THE COURT:  His imprimatur, is that --

20        MR. McBURNEY:  That's what I was trying to say.

21   BY MR. McBURNEY:

22   Q.   All right.  Let's move one.  Government's Exhibits 28

23   and 29 should be in front of you.

24        Do you have 28 and 29 in front of you?

25   A.   I do.

1   Q.   Do you recognize those?

2   A.   I do.

3   Q.   They are?

4   A.   Well --

5   Q.   Without going into content, what are they?

6   A.   They are e-mails from a hard drive.  I believe it's

7   Brynbrooke.

8   Q.   The Brynbrooke hard drive from the defendant's home?

9   A.   Correct.

10  Q.   You have reviewed these before?

11  A.   Yes.

12          MR. McBURNEY:  Government tenders Government's

13  Exhibit 28 and 29.

14          MR. MARTIN:  No objection.

15          THE COURT:  They are admitted.

16  BY MR. McBURNEY:

17  Q.   Let's start with 28.  This is an extended e-mail chain

18  between what two individuals?

19  A.   Zubair Ahmed and the defendant using

20  thandymazaq@hotmail.com.

21  Q.   Start on page two at the bottom, the e-mail from

22  Defendant Ahmed dated Sunday, March 13th.

23      Before we get into the content of that e-mail, Sunday,

24  March 13, is where on the calendar in relation to the trip to

25  Canada?

1  A.   It's the day after they returned from Canada.

2  Q.   So the defendant is back in Atlanta?

3  A.   Correct.

4  Q.   Okay.  The defendant says what in the sentence that

5  starts with, Man?

6  A.   Man, things have changed, insha'Allah, now.  Went to

7  some place don't want to mention online and hooked up with

8  PPL.  Just come anytime, I am free.  College or C-o-l-g is no

9  problem.  I am broke too.

10 Q.   That's fine as far as this goes.

11     Zubair Ahmed responds later that day, and then if we

12 could highlight the brief e-mail from the defendant or

13 magnify it right there, great.

14     So that same day now at seven p.m., Defendant Ahmed

15 writes to Zubair what?

16 A.   Hey, man, you mentioned a long time ago that we can take

17 loans and then run away from these banks.  Update me on that.

18 Q.   Go back to page one.  We are moving forward in time with

19 this e-mail exchange.

20     Zubair Ahmed responded to the question about financing

21 with this e-mail here from Defendant Ahmed.  What does he

22 say?

23 A.   Because I have heard that brothers in U.K. do this

24 scheme and they have ulamas who have called it legitimate.

25 Q.   Let me stop you for a second.  In the context of this

e-mail chain, this scheme is what?

A.   The scheme is obtaining loans and defaulting and taking the money and running.

Q.   Okay, so who have called it legitimate.  Keep going.

A.   Wallah o Alam, especially if it helps us make hijrah.  I am working on my family, but if they remain hesitant I will still make hijrah.

Q.   That's fine.  In the context of the correspondence you have reviewed between Defendant Ahmed and Zubair Ahmed and the interviews with Defendant Ahmed, this migration or exodus is to where?

A.   To Pakistan.

Q.   For what purpose?

A.   To get some type of training, violent jihad training.

THE COURT:  Can I ask one clarifying question?

On these blue-bracketed phrases and words, it's my understanding that these are the e-mails that were printed out from the hard drive, but that somebody for the purpose of making them more understandable to the Court have inserted these interpretations.

But absent that, these are the e-mails as they appeared on the hard drives.  Is that a fair understanding?

MR. McBURNEY:  With one qualification.  They have also been reformatted a little bit for legibility.  As printed out originally, they are sometimes hard to read.

1          THE COURT:  Okay.

2          MR. McBURNEY:  No content whatsoever was changed.

3  No content has been removed.

4          The blue-bracketed italicized text is, as I tried

5  to make clear before, inserted by a government translator

6  where the government deemed it was appropriate to help define

7  terms that also may be in the glossary, but just to improve

8  the Court's understanding of these items.

9          THE COURT:  All right.  Thank you.

10  BY MR. McBURNEY:

11  Q.   Exhibit 29, if we could magnify maybe the whole thing?

12       An e-mail exchange, two e-mails between whom?

13  A.   Between Safiullah Hussaini and thandymazaq@hotmail.com,

14  the e-mail used by the defendant.

15  Q.   The first in the chain was written on March 22nd and

16  it's from the defendant.  What does he say?

17  A.   Parents.  Man, your parents are more into deen than

18  mine.  They should understand more than mine.  My mom is cool

19  with it.  My dad does not know officially that I am going,

20  but he has some idea that I have stopped going to school.

21  Q.   Skip down then to the reference to the exam.

22  A.   Anyhow, the exam can't be passed here.  It has to be

23  passed in official testing location.  One of them is close to

24  your home, so I gotta test there, insha'Allah.

25  Q.   The exam and this third exam is a reference to what?

A.   Maybe an admissions exam to get into a terrorist

training camp.

Q.   Your home, Safiullah is in what country?

A.   Safiullah is in Pakistan.

Q.   What does Safiullah say in response, the e-mail at the

top of Government's Exhibit 29, March 25?

A.   He states, Man, my parents might be pious and all, but

if I pack my bags and go, they will kill me.  Okay, that

might be exaggerating a bit, but it will definitely hurt

them, and they might unconsciously taint me with a bud'dua,

which if gets accepted would mean oblivion for me, even if I

die of martyrdom.

Q.   We will cover some of them with you and with other

witnesses, but in your review of other communications from

the defendant, received by the defendant, e-mails, chats,

et cetera, was this topic of the parents and getting their

approval or the parents being okay I think was the term, cool

with it is what Defendant Ahmed said, is that a recurring

theme?

A.   Yes, it is.  It's a concern of theirs to get approval

from parents.

Q.   Let's move to Washington, D.C., and the trip to

Washington, D.C.

     But before that I want to jump ahead to October 2005.

Are you familiar with Younis Tsouli?

1   A.   Yes, I am.

2   Q.   Who is he?

3   A.   He is a subject of a United Kingdom law enforcement

4   investigation.  He was convicted on terrorism charges and is

5   now serving time in jail in the United Kingdom.

6   Q.   A British investigation?

7   A.   Correct.

8   Q.   He was arrested when, month, year?

9   A.   During October of 2005.

10   Q.   When he was arrested, was property seized from -- he was

11   arrested where?

12   A.   In the United Kingdom.

13   Q.   Okay.  At his home?

14   A.   I believe so, yes.

15   Q.   Was property seized from his home?

16   A.   Yes.  They seized electronic media, such as hard drives,

17   memory sticks.

18   Q.   CD-ROMs?

19   A.   Electronic media, correct.

20   Q.   Okay.  On this digital media, were there any saved

21   chats, instant messaging sessions, that Tsouli had had with

22   Ehsanul Sadequee?

23   A.   There were several.

24   Q.   Were there any video files, as in videos, found on

25   Defendant Tsouli's digital media that ultimately connected

1    him in some way with the actions of Defendant Ahmed?

2    A.    Yes, there were.

3    Q.    How many?

4    A.    I believe six.

5    Q.    And these videos were generically or generally of what?

6    A.    They were videos of national landmarks in Washington,

7    D.C.

8    Q.    At the time the videos were found by the British

9    authority, were they shared with the FBI here in the U.S.?

10   A.    Yes, since they were videos of Washington, D.C., found

11   on a terrorist's computer, they did provide that information

12   to the United States government.

13   Q.    Okay.  What kind of steps generally does the FBI take

14   when an incident like that occurs?

15   A.    They analyze the videotapes or the videos that were

16   taken and try to determine who took it, what was the purpose,

17   and where those people that took it may be located, and what

18   was their intent to do, you know, what was their intent to

19   use those videos for.

20   Q.    Does the FBI -- if the videos were of the Space Needle

21   of Seattle, would management for the Space Needle in Seattle

22   be notified that something had happened, that they had been

23   filmed?

24   A.    Yes.

25   Q.    Did that occur, though, in D.C. for the locations that

1    were in the six videos?

2    A.    Yes.

3    Q.    Through reviewing the videos, whatever techniques were

4    used, was the FBI able to determine the date on which the

5    videos were made?

6    A.    Yes.

7    Q.    Briefly describe for the Court some of the clues or cues

8    found in the six videos on Defendant Tsouli's digital media

9    that aided the FBI in determining what day the videos were

10   made?

11   A.    During -- within one or two of the videos, there is

12   footage of emergency responders responding to a crisis in

13   Washington, D.C., around the Capitol Building.  Footage is

14   taken of security guards, of HAZMAT trucks.

15        And ultimately we determined that that day was April

16   11th, and there was a bomb threat at the U.S. Capitol.

17   Q.    Unassociated with Defendant Ahmed or Mr. Sadequee?

18   A.    Correct.

19   Q.    Okay.  So April 11, 2005, was the date pinpointed for

20   the videos?

21   A.    That's correct.

22   Q.    What evidence, if any, short of Defendant Ahmed's

23   admissions during the course of the interviews in March of

24   2006 did the FBI acquire that provided a link between those

25   six videos made on April 11, 2005, and Defendant Ahmed?

1    A.    Well, one of the pieces of evidence we obtained were

2    from his cell phone telephone records, which reflected that

3    there were roaming charges in the Washington, D.C., area on

4    I believe March -- April 11.

5    Q.    Let me show you Government's Exhibit 30.  You have

6    Government's Exhibit 30 in front of you.  What is

7    Government's Exhibit 30?

8    A.    Cingular wireless telephone records for the cell phone

9    of the defendant.

10            MR. McBURNEY:  The government moves to admit

11   Government's Exhibit 30.

12            THE COURT:  Any objection?

13            MR. MARTIN:  No objection.

14            THE COURT:  It's admitted.

15   BY MR. McBURNEY:

16   Q.    If we could put up the final page six and magnify as

17   best as possible this.  Okay.

18        Roaming charges, the second entry in the roaming charges

19   says charges incurred while roaming where?

20   A.    Washington slash Baltimore, Maryland.

21   Q.    And the date for those roaming charges?

22   A.    April 11.

23   Q.    Now, I noticed the phone bill, the user name is actually

24   Syed R. Ahmed.  That's the defendant's father?

25   A.    Correct.  I think the account was in the defendant's

1   father's name.

2   Q.   Did the defendant during the interviews with the FBI

3   confirm that this was his phone?

4   A.   Yes, he did.

5   Q.   Did you ask him whether he ever lent it to family

6   members or anyone else?

7   A.   I did.

8   Q.   What was his answer?

9   A.   He advised during this time frame he did not lend it to

10  any friends or family members.  He had lent it to his

11  roommate a few weeks before the interview, but that was the

12  only time.

13  Q.   So when you say during this time frame, the April 2005

14  time frame, he had not lent it to anyone?

15  A.   Correct.

16  Q.   Defendant Sadequee had his luggage searched as he left

17  the United States in August of 2005.  Was there anything

18  found in his luggage that connected the pair, meaning

19  Defendant Ahmed and Mr. Sadequee, to the Washington, D.C.,

20  area?

21  A.   There was a tourist map of the Washington, D.C., area.

22  Q.   Government's Exhibit 114, is that in front of you?

23  A.   Yes.

24  Q.   Describe what Government's Exhibit 114 is?

25  A.   It's an e-mail from Ibn as-Sadequee to

1  almuwahhid@hotmail.com.

2  Q.   I don't want to go into content.  It's an e-mail.  Is it

3  an e-mail with an attachment?

4  A.   Yes, the e-mail contains an attachment of an instant

5  messaging session.

6  Q.   Okay.  This is something obtained during the course of

7  the investigation?

8  A.   Correct.

9  Q.   Is Defendant Ahmed either the sender or the recipient of

10  the e-mail?

11  A.   Looks like Defendant Ahmed is the recipient.

12          MR. McBURNEY:  Government tenders Exhibit 114.

13          THE COURT:  Any objection?

14          MR. MARTIN:  No, sir.

15          THE COURT:  It's admitted.

16  BY MR. McBURNEY:

17  Q.   We can put up the first page of 114.

18      All right.  We are going to use different technology for

19  this one.  Describe -- you can now talk about the

20  content.  114, the first page is what?

21  A.   The first page is a -- is the header information.  It

22  shows that it's from Ibn as-Sadequee, the e-mail address is

23  almuwahhid@hotmail.com, and it's to al-muwahhid@hotmail.com.

24      It does contain a subject information.  It states the

25  subject is emergency.  That's not header information; that's

1  content.  And the date is March 31, 2005.

2  Q.   Okay.  What is it that Sadequee writes to

3  Defendant Ahmed?

4  A.   Read this all urgently.

5  Q.   Now, what's attached to this e-mail?

6  A.   Attached again is an instant messaging session between

7  three individuals.

8  Q.   Let's look at the first page of that instant messaging

9  session.  There are three individuals in the chat.

10     I will start with the bottom one that's highlighted.

11 Who is that?

12 A.   That's Aboo Khubayb al-Muwahhid.  It is Mr. Ehsanul

13 Sadequee.

14 Q.   Okay.  Deenin@gawab?

15 A.   Deenin is I believe --

16 Q.   If you don't know, there is a moniker list that's in

17 evidence.

18 A.   Fahim Ahmed.

19 Q.   Who is also known as?

20 A.   James, I believe.

21 Q.   Okay.  Is that one of the individuals, James, that

22 Defendant Ahmed acknowledged he met with in Canada?

23 A.   Yes, it is.

24 Q.   And finally the participant in the chat who I'm going to

25 call it J, it has all sorts of marks around it, but J?

A.   J is Azdee.

Q.   Also one of the people that Ahmed and Sadequee met with in Canada?

A.   Yes, it is.

Q.   All right.  Let's look at page three.  This e-mail is sent to Defendant Ahmed on March 31, 2005.  Is that before or after they have been to Canada?

A.   It's after they went to Canada.

Q.   All right.  Let's jump to -- there is Aboo Khubayb, who you say is Shifa, describes something at the bottom of page three that spills over into page four, and I will put page four up right here at the top.

There is an entry there at 9:11 p.m., and then Aboo Khubayb says what?

A.   And me, Turab, were in the front, and a few brothers were in the back of the truck.

Q.   Turab is who?

A.   Turab is a moniker for the defendant.

Q.   Jump to page eight.  Mr. Sadequee, Aboo Khubayb, in the middle of page eight says what to James and Azdee, two of the people they met with in Canada?

A.   Also Ikhwaan Turab is geneous.  He gave an idea which blows away everything.  It's kind of like Badr.

Q.   And what does J, Azdee, say in response?

A.   J responds, Turab should be ameer, cuz that dude has mad

1    ideas.

2    Q.    Page eleven -- it's double-sided -- page eleven at the

3    bottom, Deenin brings up this topic again.  Deenin says

4    what?

5    A.    What was Turab's idea?   Or MSN is not cool?

6    Q.    MSN is a reference to what?

7    A.    Online communication.

8    Q.    What does J say?

9    A.    Dude, don't talk about it.

10   Q.    Page 12 at the top, in response Sadequee says?

11   A.    We'll tell you, but, akhee, it was like flawless, with

12   the permission of Allah, for the birthday I mean.

13   Q.    Finally on page 15, Defendant Mr. Sadequee reveals the

14   plan.  What does he say in that paragraph there?

15   A.    Ikhwaan, me and Turab will probably drive up to

16   Virgin Mary by ourselves, insha'Allah, and scoop the place

17   and then return back, and then later I will come when I get

18   my PP.

19   Q.    Had they been discussing in this chat traveling

20   somewhere and that PP reference?

21   A.    Yes.

22   Q.    Traveling to where?

23   A.    Washington, D.C.

24   Q.    But the three participants in this chat --

25   A.    Oh, I'm sorry.  With the passport reference, which is

1    what PP is, they were discussing traveling overseas to

2    Pakistan.

3    Q.   Okay.  And finally, on the final page, 19, Sadequee

4    tells J -- Deenin has already signed off.  Sadequee tells J

5    at the top there he will do what with this chat?

6    A.   I will send this conversation to Turab.

7    Q.   And then J in response says?

8    A.   K, I think I figured a plan to get into Pak land without

9    being suspected, if Sinaan can work it out.

10   Q.   Pak land being?

11   A.   Pakistan.

12   Q.   Sadequee says in response?

13   A.   Is it okay to say over the MSN?

14   Q.   J's reply?

15   A.   Yeah, marriage is the only way I see as a way to get in

16   there.

17   Q.   And this e-mail was sent as promised in the chat to

18   Turab, Defendant Ahmed, on March 31, 2005.  How many days

19   later did Defendant Ahmed and Mr. Sadequee go up to the

20   Virginia, Maryland, area?

21   A.   Approximately ten days later.

22   Q.   In the interviews with Defendant Ahmed in March of 2006,

23   did he confirm that he and Sadequee went to Washington,

24   D.C.?

25   A.   Yes, he did.

1    Q.   How did they get there?

2    A.   They drove the defendant's truck.

3    Q.   Were they there overnight or just during a single day?

4    A.   No.  They drove up on April 10th, and they stayed

5    overnight and they returned later on April 11th.

6    Q.   Did they stay in a hotel?

7    A.   No, they did not.

8    Q.   Where did they sleep?

9    A.   They slept in the truck.

10   Q.   The defendant during the interviews, did he tell you why

11   they made the casing videos?

12   A.   He said they wanted to prove themselves to the brothers.

13   Q.   Brothers?

14   A.   Jihadi brothers.

15   Q.   Did he talk about spying for them?

16   A.   Yes, he did.

17   Q.   You have testified about this before.  Ultimately it was

18   Defendant Ahmed's admission that who came up with the idea to

19   go to the Virginia, Maryland, area and scoop it?

20   A.   That it was the defendant's idea.

21          MR. McBURNEY:  One second.

22   BY MR. McBURNEY:

23   Q.   Do you have Exhibit 6 in front of you?  It's a disk.

24   A.   Yes, I do.

25   Q.   Exhibit 6.  Explain to the Court what Exhibit 6 is, if

1    you recognize it?

2    A.    Exhibit 6 is a CD containing six videos that were

3    obtained from the Younis Tsouli hard drive.

4    Q.    The six you have already talked about?

5    A.    Correct.

6    Q.    Okay.

7    A.    And during the March 15, 2006, interview of the

8    defendant, we showed him the videos contained on this

9    disk.  We asked him if these were the videos that he and

10   Mr. Sadequee had taken during their trip to Washington, D.C.,

11   during April 11, 2005.

12        And after viewing these videos, the defendant confirmed

13   that these were the videos that he and Mr. Sadequee took

14   during their trip to Washington, D.C.  He also signed it with

15   the initials SA.

16   Q.    In your presence?

17   A.    In my presence during the interview.

18             MR. McBURNEY:  Government tenders Exhibit 6.

19             THE COURT:  Any objection?

20             MR. MARTIN:  No objection.

21             THE COURT:  It's admitted.

22             MR. McBURNEY:  Judge, the next thing we are going

23   to do with Agent Richards is play a few excerpts from the

24   interview.  It would take a few minutes to get that set

25   up.  I don't know if this is a good time to break for lunch

1    so we can do that while you are eating.

2            THE COURT:  Give me an estimate how much longer on

3    direct you have of Agent Richards.

4            MR. McBURNEY:  Thirty, forty-five minutes.

5            THE COURT:  All right.  Then let's take our lunch

6    break.  We will be in recess until 1:40, and we will continue

7    with Agent Richards' testimony.

8            Agent Richards, please do not discuss your

9    testimony with anyone.  Since you are on the witness stand,

10   it would be improper to discuss it.

11           We will be in recess.

12           (A recess is taken at 12:41 p.m.)

13                              --  --  --

14

15

16

17

18

19

20

21

22

23

24

25

1        Monday Afternoon Session

2            June 1, 2009

3             1:44 p.m.

4              -- -- --

5        (In open court:)

6        THE COURT:  I hope everybody had a good lunch.

7        Mr. McBurney, you may continue.

8        MR. McBURNEY:  Okay.  Thank you, Judge.

9        The first thing I want to do, I may have neglected

10   to tender Government's Exhibits 14-A, 15-A and 16-A and B,

11   which were attachments to e-mails between Defendant Sadequee

12   and Defendant Ahmed.  I entered them as a group, but

13   I probably didn't list the letters as well.

14        So I tender 14-A, 15-A and 16-A and 16-B.

15        THE COURT:  Any objection, Mr. Martin?

16        MR. MARTIN:  No, Your Honor.

17        THE COURT:  They are admitted.

18   BY MR. McBURNEY:

19   Q.   Agent Richards, you are still under oath.  We are going

20   to listen to a few excerpts I hope from the interviews that

21   you conducted with Defendant Ahmed concerning the videos.

22        If we could call up Government's Exhibit 504, and I

23   would like to listen from the 56:30 mark for about 30 seconds

24   or so.

25        Before you play this, this interview, which is March 10,

1  2006, is happening where?

2  A.   This is happening --

3  Q.   You have to lean into the microphone.

4  A.   Sorry.  This is at his college residence.

5  Q.   Ethel Street?

6  A.   On Ethel Street in downtown Atlanta.

7  Q.   And involved in the interview besides the defendant and

8  yourself?

9  A.   Detective Sediqi of the DeKalb County Police.  He's also

10  on the Joint Terrorism Task Force.

11  Q.   No relation to Defendant Sadequee?

12  A.   No relation.

13  Q.   Okay.

14      (By audio:)*

15               MR:  OK, why . . . why would he say . . .

16          like what . . . for what reason?

17               SHA:  You know that, right?  I mean . . .

18               MR.  Now you guys walk . . . you guys drive

19          up there . . . you're . . .

20               KS:  I need to hear it . . . I need to hear

21          it from you, Haris.  I know it, but I need to hear

22          it from you.  Tell me why he said . . . what was he

23          gonna do with the videos?

24
_____
25  * Appears here as transcribed in the exhibit.

1          SHE:  He was going to send it to the people

2     over there.

3          KS:  Now tell me who those the people over

4     there are?  People in Georgia?

5          SHA:  No, the online . . .

6          KS:  People in Alabama?

7          SHA:  . . . the online people.  That's the

8     issue.  Everything you talk about Islam, the whole

9     community was like, you know, jihadi, whatever,

10    online.  You know I [UI] . . .

11         KS:  Is that what he said?  I'm gonna

12    send . . . what did he say?  I'm gonna send the

13    videos to the jihadi brothers online or . . .

14         SHA:  He just said, "Brothers."  I . . . I'm

15    not sure what, like, maybe jihadi, maybe . . . or

16    most like jihadi, 'cause use [UI] the [UI] phone.

17         MR:  Hmm.

18         SHA:  The video phone in the online . . . on

19    the computer.

20         MR:  Hmm.  Like bad jihadi or good jihadi?

21    Bad jihadi?

22         KS:  I'm thinking . . .

23         MR:  Bad jihadi or good jihadi?

24         KS:  I'm thinking these jihadis are probably

25    the bad jihadis.

1          SHA:  Yeah . . .

2          MR:  The extremists?

3      (Audio ends.)

4  BY MR. McBURNEY:

5  Q.   Agent Richards, you already explained where you were

6  with the defendant.  What was it that you and

7  Detective Sediqi were asking the defendant about these

8  videos?

9  A.   We were asking him where he -- or where Mr. Sadequee had

10  sent the videos and to whom he sent the videos.

11  Q.   And when you say videos, what are you referring to?

12  A.   Videos that were taken in Washington, D.C., by them on

13  April 11th.

14  Q.   So by this point in the interview, 56 minutes into the

15  interview, had Defendant Ahmed admitted that he and

16  Defendant Sadequee went to D.C. and made these videos that

17  were found in Defendant Tsouli's -- Mr. Tsouli's computer?

18  A.   Yes, he had.

19  Q.   Okay.  If we could jump to Government's Exhibit 508, the

20  audio for the interview on March 17th.

21      That interview occurred where?

22  A.   The March 17th interview occurred in the FBI office.

23  Q.   All right.  Defendant Ahmed was obviously present.  Were

24  you there for the one on March 17th?

25  A.   Yes, I was.

1    Q.    Who else?

2    A.    Special Agent Mike Scherck, Detective Sediqi, and for

3    some of it Special Agent Jimmy Allen -- James Allen.

4    Q.    All right.  If we could play at the four -- as close as

5    you could get to the four minute mark up through the six

6    minute mark?

7              (By audio:)

8                   KS:  You think . . . you think Shifa belongs

9              to Banglabi [PH]?

10                  SHA:  I don't know anything, but before that

11             he never talked about it.

12                  KS:  [UI]

13                  SHA:  But after that . . . after that thing

14             he saw, "Well that's [UI]"

15                  KS:  But the video itself . . . when

16             you . . . and you guys came up with the idea,

17             "Let's get this video . . .

18                  SHA:  Yeah.

19                  KS:  . . . and send it" . . . who were you

20             wanting to send it to?

21                  SHA:  Actually, he had friends.  I said,

22             "Let's send it to your friends.  Maybe they are

23             connected with some [UI]."

24                  KS:  His friends, what group did you think

25             he was connected to?

1    SHA:  I don't think he was connected to any

2    group.  Just online from interview.

3    KS:  Well, but you know where it was gonna

4    go to.  You said the other day it was probably

5    gonna get sent for a terrorist act, but which . . .

6    SHA:  Since I'm not . . . I don't know the

7    group.  I have no idea what group.

8    KS:  You don't know the group?

9    MR:  Yeah, but did you know who a

10   group . . . who . . . whose computer it was found

11   on, right?  The people . . .

12   SHA:  I know the name, but I don't know the

13   people . . .

14   KS:  But you know it was in London, right?

15   SHA:  London, yeah.

16   KS:  And the cell . . . the group there was

17   planning on something.

18   SHA:  OK.

19   KS:  Now what did you think, uh, when you

20   guys took the video . . . what kind of . . . what

21   kind of . . . I know you said it was for targeting,

22   for scoping out . . . what kind of attack do you

23   think they were thinking about planning?

24   SHA:  They did not tell us to do anything.

25   I did . . . it was my idea just to go and to show

1   that, "Oh, you know, we can go make a video."

2               KS:  Right.

3               SHA:  Right.

4               MR:  Did you go . . . are you tryin' to

5   prove yourself . . .

6               SHA:  Yeah.

7               MR:  . . . to be kinda like a spy or . . .

8               SHA:  Like . . . just to . . . like . . .

9   they don't. . . like they don't trust people that,

10  you know . . .

11              KS:  Right.

12              SHA:  . . . or most people . . .

13              KS:  Right.

14              SHA:  . . . but you have to prove to

15  your . . . to themselves that, you know, I'm

16  willing to take some risk.

17              KS:  Sure.

18              SHA:  So . . . that's what . . .

19              MR:  And so what . . . why did you wanna

20  prove yourself?  I mean, did . . . would . . . did

21  that get . . . did that kinda lead into you trying

22  to get into a, uh, a school or a camp, you . . .

23  over in Pakistan or . . .

24              SHA:  It's kind of . . . yeah, it was

25  like . . . if . . . oh, you know, it's . . . they

1     were . . . they were happy with me.  They could

2     tell their people if they have some people in any

3     camp or whatever.  They, "Oh, he's coming."

4           MR:  Who's "they" when you say "they"?

5           SHA:  That means "brothers" . . . like,

6     Shifa . . . whoever Shifa sends to, if they were

7     happy.  All right?  And if they were connected,

8     they would tell, "No, go to this town or go to that

9     camp."  Then you would . . .

10           KS:  All the . . .

11           SHA:  All the brothers would trust you over

12     there.

13           KS:  So they're tryin' to almost kinda like

14     qualify yourselves to do this kind of thing.

15           SHA:  Yeah.

16           KS:  So these brothers that are, like, over

17     there, do you think they had connections to these

18     Pakistan camps?

19           SHA:  I had . . . I had no idea whom he was

20     sending to . . . But I was thinking, of course, you

21     know, this could be the . . . maybe in two step

22     connection.  Maybe one step to connection.  But it

23     could be those.

24           KS:  Right.

25           SHA:  You know, I had no idea.

1          KS:  If . . . if you had your preference --

2          (Audio ends.)

3    BY MR. McBURNEY:

4    Q.   Agent Richards, you and Detective Sediqi were talking to

5    Defendant Ahmed about these same videos?

6    A.   Yes.

7    Q.   And Defendant Ahmed was describing them as a possible

8    ticket to what type of camp?

9    A.   Terrorist type of training camp.

10   Q.   If we could play from this same audio, March 17th, at

11   the 8:43 mark for about 30 seconds.

12          (By audio:)

13          SHA:  I don't think Shifa was connected to

14          al-Qaeda because they thought it was pretty

15          childish for him to be . . .

16          MS:  But the people that Shifa was sending

17          the videos to, do you believe that the people who

18          received the videos, were they connected to

19          al-Qaeda?

20          SHA:  Uh, I don't know.  I don't think so.

21          MS:  Could . . . you think they were

22          connected to some other terrorist organization?

23          SHA:  I . . . I . . . I have no idea of any

24          group or anything like that, but I knew that they

25          were online and they were very active online.

1          KS:  What part of active . . . what do you

2     mean by "active online"?

3          SHA:  Like making websites, you know.

4          MS:  What kind of websites?

5          SHA:  Like all the one that they went to,

6     like, on the web forum and stuff like that.

7          KS:  The extremists websites?

8          SHA:  Yeah, and posting videos.  I knew

9     that . . . that Shifa was in touch with people who

10    posted videos.

11         KS:  Right.

12         SHA:  OK?

13     (Audio ends.)

14 BY MR. McBURNEY:

15 Q.   Defendant Ahmed says he is not quite sure where

16 Defendant Sadequee is going to send the videos, but he

17 indicated that Defendant Sadequee is definitely in contact

18 with people who were doing what online?

19 A.   Posting videos online.

20 Q.   Finally from this same audio at 23:27 if we could play

21 to about 24:50?

22     (By audio:)

23         MR:  Well we're . . . we're still . . .

24     we're not really quite sure about how this video

25     get . . .

1      KS:  Yeah.

2      MR:  . . . got to those guys.  Do you know

3  any . . . what . . . do you know anything concrete

4  that could tell us that this is the way the video

5  got to the United Kingdom guys that got arrested?

6      KS:  Did Shifa . . .

7      SHA:  Concrete, man?

8      MR:  Yeah, do you know what . . . I mean

9  Shifa didn't . . . OK, let me ask you this, OK?

10  Once you got back the, um, the scan disk from your

11  camera that you took the videos on -- Shifa gave it

12  back to you, right?

13      SHA:  Uh hmm.

14      MR:  That's how you have it now.  That's how

15  you got it for us the other day when you cooperated

16  with us.  That was good.  Now, um, what did Shifa

17  say when he handed you back that scan disk?

18      SHA:  Nothing.

19      MR:  He did . . . he just said here it is?

20      SHA:  No, he gave me the whole camera.

21      MR:  OK.  What did he say?  Did he say

22  how . . . what he did with it?

23      SHA:  Yeah.

24      MR:  When he had it?

25      SHA:  I mean he didn't say anything, but I

1        spoke a [UI]

2             KS:  Come on . . . come on . . . come on,

3        Haris.

4             SHA:  What do you mean?

5             KS:  We're tryin' to be honest with you.

6        Come on, man.  If . . . if me and you go into

7        Washington, D.C., and make a video, I would be

8        excited to know "Hey, where did these things go?

9        Where are the . . . which brothers got this?"

10           SHA:  Because I knew that he sent it.  I

11       know I did.

12           KS:  You knew, but you didn't know who?

13           SHA:  No.

14           MR:  How did you know he sent it?

15           SHA:  Because he said, "I'm gonna send it."

16        That . . . he just said, "Give me the camera.  I'll

17       send it."

18           KS:  So . . .

19           SHA:  Then he carried it back.

20           KS:  You guys didn't talk about . . . this

21       is gonna go to . . .

22           SHA:  He . . . again, I don't ask about

23       things that he would not tell me. . . he, you know,

24       why do I need to know about someone who's . . .

25       whom he's talking to?  Because . . .

1          KS:  Well, he just said it's gonna . . . he

2          said they would be sent overseas for . . . to help

3          the brothers?

4          SHA:  To the brothers . . . to prove that,

5          you know, that we are something.

6          MR:  But earlier. . . last time --

7          (Audio ends.)

8          MR. McBURNEY:  Okay.  That's great.

9    BY MR. McBURNEY:

10   Q.   Still talking about the same videos?

11   A.   Yes.

12   Q.   Is this exchange you are having with Defendant Ahmed in

13   the three excerpts we just played from the March 17th

14   interview fairly typical of the types of exchanges you were

15   describing to the Court?

16   A.   Yes, it was.

17   Q.   It wasn't limited to a single agent who would be posing

18   questions and the rest are note takers, but you all were

19   participating?

20   A.   Correct.  We were all trying to get the truth of what he

21   and Mr. Sadequee were involved in.

22   Q.   Now, at this point Defendant Ahmed is giving you some

23   detail.  They went here, I know Shifa has friends who put

24   together websites, post videos.  Does that contrast with the

25   level of candor you were getting back on March 10 in the

first interview?

A.    Yes, there was a little bit more of an admission during this interview than there was during the first interview.

Q.    Finally if you would go back on this one, the March 17th, and play from 20:14 to 21:12.

(By audio:)

            SHA:  Yeah.  But I think Lashkar-e-Tayyiba was . . . [UI] they would not fight against anyone in Kashmir.  Cause that's what the Pakistani government told us.

            KS:  Right.

            MR:  But still, when I . . . let's reverse a little bit, Haris, because what I don't understand is . . . it's not that you were tryin' to get into a . . . like a more military type of organization, and . . . but . . . how does taking videos in Washington, D.C., kinda get you into a more . . . like a . . . that type of training?

            SHA:  It only proved that I . . . I . . . I can take risks.  That's . . . that's all I could sorta see that . . .

            MR:  OK.

            SHA:  And at that time, I was like, you know, I've been proving to myself that, "Oh, I can do this."

1              MR:  Right.  But . . . but don't . . . but

2              you didn't get . . . did you give those videos, uh,

3              to Abu Umar to prove that you had . . . you could

4              take that risk?

5              SHA:  Actually, Shifa gave to the people

6              online, and I think Shifa talked to Abu Umar about

7              those videos too.

8              MR:  OK  So, uh, Shifa probably talk . . .

9              sent . . . do you think Shifa sent them to Abu

10             Umar?

11             SHA:   He didn't ment . . . mention that he

12             had the videos or I don't think he'd send them.

13             Maybe he knew, or, maybe . . . I . . . I have no

14             idea if he saw it, but . . .

15             KS:   But someone had to qualify you in

16             order for you to meet Abu Umar, right?

17           (Audio ends.)

18  BY MR. McBURNEY:

19  Q.   Abu Umar is who?

20  A.   Abu Umar is Aabid Hussein Khan.

21  Q.   Was his property, his digital media one of the places

22  where some of the casing videos were found?

23  A.   Yes, he was the individual arrested during October of --

24  was it October 2005?   I'm getting my dates --

25  Q.   Well, you mentioned that Younis Tsouli was arrested in

1   October 2005.

2   A.   I'm sorry, June 2006 Mr. Khan was arrested in London as

3   well.

4   Q.   That's the Abu Umar referenced here?

5   A.   That's correct.

6   Q.   And what Defendant Ahmed was saying is I'm not sure that

7   Abu Umar got them, but he was aware of them?  Is that --

8   A.   Pretty much.

9   Q.   The videos were taken with what type of camera, by which

10  I mean a large movie production camera or --

11  A.   No, it's just a small digital camera.

12  Q.   And at first the defendant told you what about the

13  ownership of the camera?

14  A.   At first he told me that -- on March 10th he told me

15  that the camera was -- belonged to Shifa.

16  Q.   Was he asked just one time or multiple times as to who

17  had the camera, whose camera it was?

18  A.   We asked him many times.

19  Q.   And his answers up until I think you said earlier the

20  seventh hour or eighth hour of the interviews was what?

21  A.   That it was not his camera.

22  Q.   At some point well into the interview on March 15th he

23  changed his story.  What did he tell you?

24  A.   Yes.  Towards the end of the interview on March 15th,

25  I think I said around the seventh hour of total interviews,

he finally changed his story and advised us that the camera

belonged to his father, I think.

Q.   Did you ask him if the camera was still in the

possession of his family?

A.   Yes.  And it was located in his family's house on

Brynbrooke Drive, and his father did still have it.

Q.   What did you do -- you, the agents involved in the

interview -- when you learned that the camera that took these

videos might still be at Brynbrooke Drive?

A.   We stopped the interview.  We asked him to provide us

the camera.  And he agreed, cooperated at that point.  And

agents drove with him up to his residence, his family

residence on Brynbrooke Drive in Dawsonville, and he provided

the camera to them.

Q.   Now, the camera records the images, still or video

images on what?

A.   On a memory disk.

Q.   Were you able to recover the memory disk that was used

in the camera at the time the Washington, D.C., videos were

taken?

A.   We recovered a memory disk, and I believe he did tell us

that was the memory disk that he used to take the photos and

videos.

Q.   So you retrieved from the house at Brynbrooke a camera

and a memory disk?

1    A.   Correct.

2    Q.   According to the defendant it was the memory disk?

3    A.   Correct.

4    Q.   Was the memory disk searched?

5    A.   Yes, it was.

6    Q.   Were there any videos from Washington on that?

7    A.   No, there were not.

8    Q.   If you would look at Government's Exhibit 31 and 31-A?

9    Are those in front of you?

10   A.   Yes, they are.

11   Q.   Do you recognize those?

12   A.   31 is the camera that he provided us that day we just

13   discussed, and --

14   Q.   It's in the bag that has writing on it.  Is that writing

15   just related to case numbers, identification?

16   A.   That's correct.

17   Q.   Okay.  31-A?

18   A.   31-A is the Scan Disk media memory device -- memory

19   disk, rather, that he provided us that day as well.

20   Q.   That fits in the camera somehow?

21   A.   Correct.

22        MR. McBURNEY:  Your Honor, the government seeks to

23   admit Exhibit 31 and 31-A.

24        THE COURT:  Any objection?

25        MR. MARTIN:  That was the --

          MR. McBURNEY:  Camera and the disk.

          MR. MARTIN:  No problem.

          THE COURT:  I guess that's no objection.

          MR. MARTIN:  No objection.

          THE COURT:  No problem, no objection means the same

thing?

          MR. MARTIN:  Well, for that purpose, yes.

          THE COURT:  It's admitted.

BY MR. McBURNEY:

Q.   Was the camera submitted to the FBI forensic lab?

A.   Yes, it was.

Q.   Was there any linkage made between the videos from the

Tsouli hard drive and the camera?

A.   Yes, there was a connection made.

Q.   Not a definitive link this is the camera that did it,

but this is of the sets of cameras that could have done it?

A.   Right.  The link was not that it was the camera that

made it.  It was the type of camera that made those videos.

Q.   Okay.  At any point in any of the five interviews across

13, 14 hours, did Defendant Ahmed tell you that you might be

able to find the videos anywhere else besides Younis Tsouli's

hard drive?

A.   No, he did not.

Q.   There was an allusion I guess in the interview that

maybe Abu Umar might have had them.  Now, the interview was

1  March 2006?

2  A.  Yes.

3  Q.  When was Abu Umar, Aabid Hussein Khan, taken into

4  custody?  You just mentioned this?

5  A.  That was June 2006.

6  Q.  So when was it discovered that on his hard drive, his

7  digital media, he had two of the Washington videos that the

8  defendant made?

9  A.  Shortly after his arrest.

10  Q.  June 2006?

11  A.  Yes.

12  Q.  After the interviews when the defendant mentioned

13  something about Abu Umar?

14  A.  That's correct.

15  Q.  So at the time that question was asked, those questions

16  were asked about Abu Umar, did the FBI know that in fact

17  Abu Umar, Aabid Hussein Khan, had received at least two of

18  the videos?

19  A.  No.

20  Q.  I want to show you -- you should have in front of you

21  Government's Exhibit 80.

22      You do not have 80?  Okay, 80 is coming.

23      Do you recognize Government's Exhibit 80?

24  A.  Yes, it is an instant message between Aboo Khubayb

25  al-Muwahhid, which is Mr. Sadequee, and Abu Umar, which is

1    Mr. Khan.

2    Q.   When Mr. Khan was arrested in the United Kingdom in June

3    2006, he had a computer, hard drive, whatever on him, did law

4    enforcement in the United Kingdom find saved chats between

5    Mr. Khan and Defendant Ahmed on that hard drive?

6    A.   Yes, they did.

7    Q.   Did they find saved chats between -- meaning instant

8    messages between Mr. Khan and Defendant Sadequee?

9    A.   Yes.

10   Q.   And some -- were all three participating in the instant

11   messaging session?

12   A.   Yes.

13   Q.   Those were all provided from the U.K. authorities to the

14   FBI?

15   A.   That's correct.

16   Q.   Exhibit 80, is that one of the chats from Mr. Khan's

17   hard drive?

18   A.   Yes, it is.

19   Q.   Okay.  And I interrupted you.  It's a chat between who

20   and whom?

21   A.   Mr. Sadequee and Mr. Khan.

22   Q.   Okay.  Abu Umar is Mr. Khan?

23   A.   Yes, it is.

24            MR. McBURNEY:  Government tenders Exhibit 80.

25            THE COURT:  Any objection?

         MR. MARTIN:  This would be hearsay.  I mean, it's a
chat between Abu Umar and Mr. Sadequee, not Mr. -- not
with -- Mr. Ahmed was not involved.

         I think -- I don't know how the government intends
to offer it.  They may have a theory.

         MR. McBURNEY:  Unlike last time, Your Honor, I
believe this is co-conspirator statements.  We don't have
something that Sadequee or Khan said to another law
enforcement agent.  This is a communication between two of
the conspirators.

         We have already shared with the Court that
Agent Richards can testify about it extensively.  The topic,
without getting into the content, involves the videos.  So
this is all part of the conspiracy for which I believe we
have already laid the groundwork.

         It doesn't stray into some area unconnected to this
conspiracy in which Defendant Ahmed is involved.

         THE COURT:  Well, isn't the rule, though -- I know
that you -- the theory of the government's case is the
conspiracy, and that's the charge in Count One.  But still
before you can get in a statement of a co-conspirator, you
have to prove by a preponderance of the evidence the
existence of the conspiracy.

         I'm not saying ultimately that that can't be done,
but I don't know if there is enough evidence to date to

establish by a preponderance the existence of the conspiracy

so as to get in the statements of co-conspirators.

MR. McBURNEY: I could ask the Court to accept this

now subject to our tying it up. I'm quite confident that

additional communications between the two individuals in this

chat and the defendant himself that we will be presenting

with another agent will push us well past the preponderance

standard, and I could enter this through the other agent as

well. It fits more naturally for the Court's consideration

with the videos which is where we are right now.

I am willing to follow the Court's instruction, of

course, and put this in through a different agent. I'm quite

confident we will tie this up within two witnesses.

THE COURT: Okay. Mr. Martin, I could do that.

MR. MARTIN: I think you can do that. Since this

is nonjury I'm not going to fuss about it right now.

THE COURT: I'm going to be sensitive, as I have

been now twice this morning, that there has to be a

fundamental showing by a preponderance of the existence of a

conspiracy, which I think is the law, although -- and I think

it's in the rule.

But let's admit it -- I will provisionally admit it

with the understanding that ultimately I will have to look

and hear from you what your evidence is as to the conspiracy

and make the finding and be satisfied myself that by a

1  preponderance the conspiracy has been shown to allow this to

2  be admitted and this considered by me in the proceeding.

3              MR. McBURNEY:  Understood.

4  BY MR. McBURNEY:

5  Q.   With those provisos, Agent Richards, Government's

6  Exhibit 80 you've already described is a chat between those

7  two individuals.  We could put 80 up on the screen.

8       First, just one formatting thing.  There is text that is

9  italicized in brackets.  It appears to be translations.  Is

10 that added by a government translator?

11 A.   Yes, it is.

12 Q.   Everything else is the original content of the chats as

13 they were found on Mr. Khan's hard drive?

14 A.   Yes.

15 Q.   What's the date of this chat between Sadequee and Khan?

16 A.   The date is April 26, 2005.

17 Q.   At this point have Sadequee and Defendant Ahmed gone to

18 Canada?

19 A.   Yes, they have.

20 Q.   And Washington, D.C.?

21 A.   Yes.

22 Q.   Okay.  At the bottom of this first page Sadequee at

23 18:32:35 says what to Khan?

24 A.   I would like to send you a birthday video, insha'Allah.

25 Q.   And Khan says in response at 18:32:56?

A.    Does it have music?  I hate music.

Q.    Sadequee's reply?

A.    It does kind of, but it's really sexy.

Q.    First Sadequee sends a link at 18:35:49 before he sends a file.  This link here, have you -- what does this link connect to if you were to enter it on the internet?

A.    I believe it's a sightseeing video of Alexandria, Virginia, Old Town, Virginia.  Old Town Alexandria, Virginia.

Q.    Let's flip to page three, and there is an entry near the very bottom where there is no communication, the color is slightly different, at 18:40:01.  What does that say?

A.    Aboo Khubayb al-Muwahhid, a male's name, sends Jimmy's 13th birthday.rar.

Q.    Was there a file found on Mr. Khan's computer material with that name, Jimmy's 13th birthday?

A.    Yes, there was.

Q.    Was that one of the videos Defendant Ahmed made?

A.    It is one of the videos.

Q.    Which one, if you recall?

A.    I believe it was either the World Bank video or the -- I can't remember at this point.

Q.    Page four.

      But so we are clear, is there any question in your mind that it was one of the casing videos, despite the inability to remember which one?

A.   It was definitely one of the two videos that were on his
computer he had.

Q.   18:41:21, Sadequee tells Khan he is where?

A.   I am at work, akhee, so please just download this.

Q.   All right.  Page six, at 18:49:07, Khan in reference to
the video he just got says?

A.   I love reading this type of material.

Q.   What does Sadequee say in response?

A.   If you think it will raise the morale and incite the
football team, then show it to them.

Q.   All right.  Could we go one line beyond that.  You don't
need to magnify it, that's fine.  18:51:04 Sadequee tells
Khan what?

A.   I'm sorry, which line is that?

Q.   18:51:04.

A.   If my boss comes, I will have to log off.

Q.   Where was Defendant Sadequee working in April of 2005?

A.   He was working at Raksha.

Q.   Was there -- were computers imaged, copied, pursuant to
a legal process, a grand jury subpoena, from Raksha?

A.   Yes, they were.

Q.   Was there any evidence found on the Raksha computers
that the D.C. videos were ever present on that hard drive?

A.   I believe they were able -- they, meaning FBI computer
forensics examiners, were able to recover at least a file

1  path name of at least one or two of the videos that were

2  taken in Washington, D.C., on April 11th.

3  Q.   Let's jump to page nine.  There is a link provided at

4  19:10:26 -- you don't need to magnify it -- by Sadequee to

5  Khan for a file named volleyball -- it says ontest,

6  volleyball ontest.  Was there a file found on Mr. Khan's

7  computer named volleyball contest?

8  A.   Yes, there was.

9  Q.   Was that one of the videos made in Washington, D.C., by

10  Defendants Sadequee and Ahmed?

11  A.   Yes, this was one of the videos.  I believe this was the

12  World Bank video.  I think the other one, Jimmy's birthday,

13  was the Free Masons video.

14  Q.   When you say Free Masons video, what do you mean by

15  that?

16  A.   There was a video of a Masonic Temple in Washington,

17  D.C., with a close up of the King Street Metro Line Station

18  sign.

19  Q.   If we could bounce back to page two and magnify that web

20  site again.  The video of the Masonic Temple was taken, based

21  on the video that you saw, was taken from you said the King

22  Street Metro Station?

23  A.   Around it, yes.

24  Q.   Okay.  And the link that Sadequee provided Khan at

25  18:35:49 includes in the text of it -- I don't care what you

1    get you when you go to the site -- what?

2    A.   Sightseeing at Old Town.

3    Q.   And?

4    A.   King Street.

5    Q.   Did Mr. Khan also have stored with these videos on his

6    computer other maps of Washington, D.C.?

7    A.   I believe he did.

8    Q.   The Brynbrooke hard drive, the computer seized from the

9    defendant's family home, had how many of the D.C. videos on

10   it?

11   A.   62.

12   Q.   At this time I would like you to look at Exhibits --

13   basically all those disks in front of you.  It should be, to

14   make sure they are all there, Exhibits 32, 33 and 34.  Let's

15   start with those.  You can take the rubber band off of it.

16        What is Exhibit 32?

17   A.   Videos found on Tsouli's computer.

18   Q.   Those are the six videos?

19   A.   Yes.

20   Q.   Exhibit 33?

21   A.   Videos found on Khan's computer.

22   Q.   And Exhibit 34?

23   A.   Videos found on defendant's computer.

24   Q.   The Brynbrooke hard drive?

25   A.   Correct.

1   Q.   Are some of the videos that were found on

2   Younis Tsouli's computer also on the Brynbrooke hard drive?

3   A.   I believe they are all on the Brynbrooke hard drive.

4   Q.   So the full universe is Brynbrooke; some of those ended

5   up with Khan and Tsouli?

6   A.   That's correct.

7   Q.   All right.

8          MR. McBURNEY:   The government tenders 32, 33 and

9   34.

10          THE COURT:   Any objection?

11          MR. MARTIN:   No objection.

12          THE COURT:   They are admitted.

13   BY MR. McBURNEY:

14   Q.   Now, for ease of identification when you are testifying

15   and the next witness is testifying, there are a series of

16   disks in front of you that have individual videos, one from

17   Brynbrooke or one from Tsouli on them.   Those are exhibits

18   35, 36, 54 -- well, you can look at the numbers.   I will call

19   them out in a minute.   You can take the rubber band off.

20          Do you see those in front of you?   Are they all labeled

21   video from -- it's the actual file number, MDI0068,

22   et cetera?

23   A.   That's correct.

24   Q.   And all those to include the next set of rubberbanded

25   ones, are those all individual videos that Defendant Ahmed

1    and Sadequee made in Washington, D.C.?

2    A.   Yes, they are.

3    Q.   That should be Exhibits 35 and 36 and then 52 through

4    70.

5    A.   And I have here 37.

6    Q.   And 37, all right.  So 35 through 37 and then 52 through

7    70, each one an individual video.

8    A.   Yes.

9         MR. McBURNEY:  At this time the government tenders

10   those as well.

11        MR. MARTIN:  No objection.

12        THE COURT:  They are admitted.

13   BY MR. McBURNEY:

14   Q.   As I mentioned, the next witness will talk in much more

15   detail about the videos in Washington, D.C., and what's

16   depicted, et cetera.

17        Were there any videos recovered by the FBI on any of

18   these three computers that aided you once they were recovered

19   in identifying who was involved in making the videos because

20   of voices or faces or anything like that?

21   A.   Yes, there were.  There were a few videos where there

22   were faces of one of the conspirators or Mr. Sadequee was in

23   one of them or two of them.

24   Q.   Well, let's be clear.  There was one video with

25   someone's face.  Whose face was on it?

1    A.    Mr. Sadequee's.

2    Q.    Was that one of the videos that was discovered on

3    Tsouli's hard drive?

4    A.    I believe so, but I can't remember.

5    Q.    Okay.  Well, let's think about it this way.  The six

6    videos from Tsouli's computer, did they -- you described

7    already to the Court the clues that were looked for, the

8    HAZMAT truck went by, certain guards that were in place.

9         Do you recall if any of the six videos on Tsouli's

10   computer had a clue of one of the defendants' face in the

11   middle of it?

12   A.    I believe, yes.  I think so, yes, Mr. Sadequee.

13   Q.    Okay.  There were other identifiers.  What else was

14   found on any of the videos that at some point was helpful in

15   determining that either Ahmed or Sadequee was involved in

16   making the videos?

17   A.    During several of the videos you could hear them

18   speaking, and you could hear Mr. Ahmed's voice, which is very

19   recognizable to me.

20        Also there was a video taken at one point where

21   Mr. Sadequee was taking the video, and he took a video of a

22   rear-view mirror in the car, and you could see his face very

23   momentarily in the video as well.

24   Q.    Okay.  I would like to play for the Court, and you can

25   narrate at the end when it's over -- I will ask you a couple

of questions.

First Exhibit 37.  I don't know if we want to turn the lights down just a little bit so we can see it.

THE COURT:  Can we clarify whose face was in the rear-view mirror?

MR. McBURNEY:  Sure.  It's going to be one of the videos, and I will ask him when you see that.

BY MR. McBURNEY:

Q.   Before we start the video, who is shown in this video, Agent Richards?

A.   That is Ehsanul Islam Sadequee, also known as Shifa.

Q.   Okay.

(A video file is played.)

BY MR. McBURNEY:

Q.   Whose voice was that?

A.   That's the defendant's voice, Mr. Ahmed.

Q.   All right.  And the building in the background?

A.   That's the Capitol Building in Washington, D.C.

Q.   If we could play 35?  And again if you just put it up first, the still, and allow me a couple questions.

Okay.  What is this going to be a video of?

A.   I believe it's a video of them driving on a road and taking a video of the Pentagon.

Q.   Who is the driver?

A.   The defendant, Mr. Ahmed.

1    Q.    The vehicle they took to D.C. was?

2    A.    A truck.

3    Q.    Whose truck?

4    A.    Mr. Ahmed's.

5    Q.    Okay.  So Ahmed is driving.  Who is holding the camera?

6    A.    Mr. Sadequee.

7    Q.    Okay.  Let's play 35, please.

8          (A video file is played.)

9    BY MR. McBURNEY:

10   Q.    The person who was saying, Be careful, Be careful, at

11   the very end, Make sure nobody sees you, whose voice is

12   that?

13   A.    That's the defendant, Mr. Ahmed.

14   Q.    And there was someone who was saying Allahu Akbar,

15   Allahu Akbar, and holding the camera, who was that?

16   A.    I believe that was Mr. Sadequee.

17   Q.    You say you believe.  Do you know it was

18   Defendant Sadequee or are you guessing?

19   A.    I'm not guessing.  I was told by another agent that has

20   heard his voice that it was Mr. Sadequee.

21   Q.    Great, but I don't want you to rely on that.  There was

22   also some video of the person who was in the side-view

23   mirror.  You could see in the side-view mirror the person

24   holding the camera, who was that?

25   A.    That's Mr. Sadequee.

Q.   Were you aware of anyone else who traveled to

Washington, D.C., with Defendant Ahmed and Mr. Sadequee?

A.   No, I am not.

Q.   All right.  Let's look at 36.

     Oh, before we play that, there was a large building

filmed in Government's Exhibit 35.  What was that?

A.   And 35 was the previous one?

Q.   The one we just watched.

A.   That was the Pentagon.

Q.   Okay.  What are we going to see here, what building is

being filmed?

A.   I'm not sure until I see it.

Q.   I'm only asking you to talk about three videos.  Do you

recall what building is going to be presented here, or should

we watch it?

A.   We need to watch it.

Q.   Okay.

          (A video file is played.)

BY MR. McBURNEY:

Q.   So what building were they filming?

A.   The Pentagon.

Q.   All right.

          MR. McBURNEY:  If I could have one second,

Your Honor?

          All right.  Agent Richards, that's all I have.

1    Thank you.

2              THE COURT:  Mr. Martin?

3                   --  --  --

4                   CROSS-EXAMINATION

5    BY MR. MARTIN:

6    Q.    Agent Richards, you mentioned a video of the World Bank?

7    A.    Yes.

8    Q.    Do you have that up there with you?

9    A.    I believe it's somewhere in this stack.

10             MR. MARTIN:  Would someone put that one up?

11             MR. McBURNEY:  We have a whole bunch of the World

12   Bank.

13             MR. MARTIN:  The one that goes up and down.

14   BY MR. MARTIN:

15   Q.    While she's looking for it, let me ask you a couple of

16   questions.  These video clips that the government now has,

17   you found some on Mr. Tsouli's computer; correct?

18   A.    Correct.

19   Q.    You found some on Mr. Khan's computer; correct?

20   A.    Correct.

21   Q.    And you found some on the computer at Brynbrooke at

22   Mr. Ahmed's family home; correct?

23   A.    That's correct.

24   Q.    And when you were able to retrieve these from the

25   computer at Brynbrooke, if Mr. Ahmed had deleted them --

where you and I would delete something, just push delete, you

could still recover those with -- your FBI technicians can do

that; is that correct?

A.   It's very possible.  I'm not sure exactly.

Q.   Do you know, sir, as an agent in this case whether those

that were recovered from Mr. Ahmed's computer had actually

been deleted by him but you all could nevertheless recover

them from the hard drive?

A.   I don't recall if they were deleted or not deleted.

Q.   All right.

A.   I believe they were in the playlist of Windows Media,

but I think the computer media people would be able to tell

you definitively.

Q.   So if he said that I don't have those anymore and he

thought they had been deleted from his computer, correct, but

in fact they could be retrieved if somebody was

sophisticated, like the FBI technicians can be; correct?

A.   That's one way to do it, yes.

Q.   I'm just sort of dealing with your comment that he said

he no longer had them on his computer.  He may have thought

he no longer had them on the computer, because most of us

think when we delete something it's gone forever when in fact

it's really not?

A.   Sometimes, correct.

          MR. MARTIN:  Were you able to find it?

        1           MR. McBURNEY:  We have two.

        2           MR. MARTIN:  Two of them.

        3           MR. McBURNEY:  65 and 68.

        4           MR. MARTIN:  Could you play 65 for us?

        5           (A video file is played.)

        6           MR. MARTIN:  Is that all there is on 65?   Okay.

        7      Can you play 68?

        8           (A video file is played.)

        9  BY MR. MARTIN:

       10  Q.   You would agree with me that that's a fairly amateurish

       11  video, would you not?

       12  A.   I would agree.

       13  Q.   It's jumping up and down as if somebody is walking?

       14  A.   Yes.

       15  Q.   So if a terrorist was attacking on a pogo stick, that

       16  might be useful to them; correct?

       17  A.   Or if they wanted to see the security barrier.

       18  Q.   Oh, that security barrier.  And you think these videos

       19  would have been useful for that purpose?  Is that your point?

       20  A.   Possibly.

       21  Q.   Mr. Ahmed said repeatedly during his interviews and as

       22  confirmed by the e-mails with Abu Umar that the thought about

       23  these e-mails or, excuse me, these videos was that maybe this

       24  would give us some standing, some credibility with people

       25  overseas; is that correct?

1    A.    That's correct.

2    Q.    Online people with these jihadist-type websites;

3    correct?

4    A.    Correct.

5    Q.    You described Tibyan, Clear Guidance, Jihad Unspun as

6    examples of what you would call jihadist websites?

7    A.    There are several, correct, yes.

8    Q.    And these are websites that you could click on to

9    Jihad Unspun right today if you wanted to; correct?

10   A.    I haven't done it recently, but possibly, yes.

11   Q.    That have a collection of articles, some of the articles

12   like the ones that you described today; correct?

13   A.    Yes.

14   Q.    And sometimes videos; correct?

15   A.    Yes.

16   Q.    Videos perhaps of events such as attacks that maybe have

17   been made upon Muslims that would be something that would be

18   infuriating to someone who looked at it; correct?

19   A.    Yes.  There are all kinds of videos and articles on

20   them.

21   Q.    And there is awful videos, like beheading videos and

22   stuff like that sometimes you see on those?

23   A.    Correct.

24   Q.    And someone who was searching, looking for some

25   information about jihad or Islam might go to these websites

1  to see what was going on; correct?

2  A.   That's correct.

3  Q.   Indeed, you said that you actually were not present when

4  Mr. Ahmed was interviewed at the Atlanta --

5  Hartsfield-Jackson Airport.  Is that not correct?

6  A.   You are right, I was not present during that interview.

7  Q.   But you mentioned that he said something there about

8  having gone to Pakistan in part to get religious studies;

9  correct?

10  A.   I believe I remember reading that in that report I

11  believe you have right there.

12  Q.   Just showing this to see if it refreshes your

13  recollection, does it not say that he was searching to learn

14  about Islam?

15  A.   Yes, it does.

16  Q.   And did he not describe a number of schools that he had

17  actually gone to or contacted in Pakistan about religious

18  training, if you recall?

19  A.   Yes.  In that next paragraph I believe he talked about

20  two to three religious schools.

21  Q.   Agent Melissa Harper was actually present, was she not?

22  A.   Yes, she was.

23  Q.   So if she testifies, she could give us more specifics

24  about that interview; is that correct?

25  A.   That's correct.

1    Q.   The house in Brynbrooke up in Dawsonville is a typical

2    residential house in a little community there, is it not?

3    A.   I believe so.

4    Q.   Any type of middle-class type of subdivision, especially

5    outside the perimeter, typical type of house; is that

6    correct?

7    A.   I have not been there.   I have heard descriptions of it

8    and I have seen photographs.

9    Q.   I thought you had actually been there.

10        The search of the house which you described was agreed

11   to by Mr. Ahmed's father, was it not?

12   A.   I believe, yes, it was.

13   Q.   He freely said, Come on in, look at the computer, take

14   the hard drive, do whatever; correct?

15   A.   Yes, they gave consent.

16             MR. MARTIN:   If I may approach, Your Honor?

17             THE COURT:   You may.

18   BY MR. MARTIN:

19   Q.   Calling your attention to Government's Exhibit No. 17,

20   that is an e-mail involving Safiullah Hussaini; right?

21   A.   Yes, it is.

22   Q.   He lives in Pakistan, does he not?

23   A.   He does.

24   Q.   He is a relative of Mr. Ahmed, is he not?

25   A.   I believe, yes.

1    Q.   He's a cousin?

2    A.   Okay, yes.

3    Q.   And during your investigation of this case, he had a lot

4    of communications with his cousin; correct?

5    A.   Yes, he did.

6    Q.   Talking about what he was thinking about at certain

7    times and what his intentions were and so forth; is that

8    correct?

9    A.   Yes.

10   Q.   And they actually shared back and forth thoughts and

11   references to certain sites that might give him -- or certain

12   texts they might find interesting regarding Islam; correct?

13   A.   That's correct.

14   Q.   Could you put up Government's Exhibit 17, please, and

15   could you blow up this bottom part for me?

16       You mentioned Fallujah.  This was an e-mail in November

17   of 2004; correct?  This is the early days of the charged

18   conspiracy; is that correct?

19   A.   Yes.

20   Q.   And he is talking about the unstoppable carnage that is

21   befalling our brothers and sisters and mothers in Fallujah

22   has seen the likes of which probably no other city has seen;

23   correct?

24   A.   That's correct.

25   Q.   You see a number of e-mails by Mr. Ahmed throughout your

1  investigation talking about his concerns and emotional

2  reactions to what he perceived to be innocents, mothers and

3  sisters, being killed in various combat areas in Iraq and

4  Afghanistan and even in Palestine; correct?

5  A.   Yes.

6  Q.   Then he says, I doubt it will be the last of the Muslim

7  cities to see the horrible vengeance of a blood-thirsty

8  dragon.  Is that correct?

9  A.   That's correct.

10  Q.   And there is no doubt that in these e-mails there is

11  expressed a very emotional reaction to what he sees that

12  maybe the American government is responsible for innocents

13  being killed; correct?

14  A.   Yes.

15  Q.   I have lost all interest in studies and see no purpose

16  in this pathetic life; correct?

17  A.   That's correct.

18  Q.   And he is looking -- he says, for whose sake we are

19  spending blessed nights of Ramadan?

20      Ramadan is an important spiritual time in the Islamic

21  faith, is it not?

22  A.   It is.

23  Q.   And this is in November, so that year Ramadan occurred

24  in November?

25  A.   I believe it did, yes.

Q.   And not worshiping, but reading up on math and science,

wasting away the last ten days because we have ten tests the

next day.  Frankly, I'm sick, and I don't think it's just

emotional crap.  Correct?

Did you go to college?

A.   I did.

Q.   Were there times when you felt like it was just too much

for you, especially exam periods?  Come on.

A.   Were there times when exams were too much for me?

Q.   Yeah, you got tired of school.

A.   At times there were things I would rather be doing than

studying.

Q.   Right.

I thought over these issues a very long time, and it's

lost its charm.  The big corporations, the nice office, the

charm of a suit and tie, even good grades on tests seem

pointless.  I'm reading the classic -- this I can't

pronounce, you did a very good job, Join the Caravan is a

text about Islam -- and the words bring tears to the hearts;

correct?

A.   The text written by the mentor of Osama Bin Laden.

Q.   Right.  This is somebody that had died in what, 1988?

A.   '89, I think.

Q.   '89, long before 2004.  But he was a scholar, considered

to be a scholar is Islam; correct?  Maybe had a radical point

1    of view, but was considered a scholar?

2    A.    I'm not sure if he was considered a scholar in Islam.

3    He may have been considered a scholar in Mujahideen.

4    Q.    And you talked about Mujahideen.  It's well known the

5    Mujahideen -- I can't say the word.  You say it?

6    A.    Mujahideen.

7    Q.    -- Mujahideen had been supported by the CIA and others

8    in the war against the Russians in Afghanistan; is that

9    correct?

10   A.    I have heard that, yes.

11   Q.    Move the memo up a little bit, if you can?  Can you go

12   again to the last -- the next page I guess, and blow this

13   part up.  Thank you.

14        It talks about when your sisters and brothers are raped

15   and killed, what use is money when your fathers cannot get

16   access to basic healthcare because the hospital is under

17   enemy control?  We must reassess our priorities.

18        Then he goes on:  Can we afford to delay our goal of

19   third when we know that a man that joins an Army that is

20   losing is better than the man who joins an Army while it is

21   winning?  Correct?

22   A.    That's what he wrote yes.

23   Q.    And you interpreted that to mean the fight because of

24   these things he's seen?

25   A.    Correct.

```
1    Q.   For even hypocrites join the winning side.

2         Hypocrites is a word often used in Islam, is it not?

3    A.   I'm not sure about that.

4    Q.   Are you sure -- do you know about the people from Mecca

5    whom Mohammed rebelled against were often called hypocrites?

6    A.   I don't think I have ever heard that.

7    Q.   Okay.  What use will it all be when we will be in the

8    same rank as hypocrites for we would have joined when the

9    brothers were winning.

10        You would agree with me that that shows a very emotional

11   reaction to what he's seen happening in Fallujah, would you

12   not?

13   A.   Yes, it does.

14   Q.   You mentioned one time that you used the word G-H-a-d,

15   G-Had?

16   A.   I believe it was written in an e-mail.

17   Q.   And are you someone who uses a lot of e-mail shorthand?

18   A.   Sometimes.

19   Q.   You are familiar with it, are you not?

20   A.   I understand, yes.

21   Q.   There is no doubt that in many of these e-mails, it

22   talks about the third, talks about we need to join the fight

23   against the hypocrites and so forth, that he's openly talking

24   about the need to do something in response to what's

25   happening in Fallujah and other occasions; correct?
```

1    A.    That's correct.

2    Q.    So there is no reason to hide the word jihad by saying

3    G-H-a-d?  That's just sort of computer shorthand, is it not?

4    A.    Well, unless he's talking about violent jihad and

5    supporting terrorists that may hurt innocent civilians.

6    Q.    That's the way you interpret it; correct?

7    A.    That's correct.

8    Q.    You mentioned that Mr. Tsouli was convicted of terrorism

9    charges in the United Kingdom.  Do you know the precise

10   nature of the charges he was convicted of?

11   A.    No, I'm not familiar with the laws of the

12   United Kingdom, and I don't recall the laws that he was

13   charged --

14   Q.    Well, you used the shorthand word terrorism.  Was he not

15   convicted simply of keeping a website that included

16   terroristic types of materials on it and disseminating that

17   material?

18   A.    Yeah.  But I believe his case involves supporting

19   terrorist organizations through media operations.

20   Q.    Right.  But Mr. Tsouli essentially was sort of a

21   clearinghouse for people who want to send him stuff, and he

22   would keep it and sometimes distribute it; correct?

23   A.    Yes.

24   Q.    So if Mr. Sadequee sends him a video, albeit something

25   that might not be useful for any type of attack, he might

1    keep it and use it sometime?

2    A.    He might.

3    Q.    Let me ask you a few questions about a couple of the

4    written statements, and let's -- if I may, Defendant's

5    Exhibit 4 -- Government's Exhibit, excuse me, I misspoke,

6    Government's Exhibits -- actually I think they have been

7    renumbered.

8           Government's Exhibit 5 is the original; is that

9    correct?

10   A.    That's correct.

11   Q.    And Government's Exhibit 4 is the original of the first

12   signed statement, and Government's Exhibit 7 is the summary

13   of the -- the last summary; is that correct?

14   A.    That is.

15   Q.    Now, you would agree with me, would you not, that

16   those -- each one of those documents was completed at the

17   very end of a long interview session?

18   A.    Yes.

19   Q.    Many times the interview session would cover over

20   several hours; correct?

21   A.    The longest one on the 15th was I think three hours and

22   fifteen minutes.

23   Q.    And the written statements are merely a summary of what

24   was said during those interviews; is that correct?

25   A.    That is correct.

Q.    And we would agree, there are only a total of about five

pages; correct?

A.    Yes.

Q.    And you also would agree with me that the actual

recording is probably the best evidence of precisely what he

said.  Is that not correct?

A.    Yes.

Q.    For example, if I may approach again -- I thought I had

it -- with Government's Exhibit 7?  Can you put up

Government's Exhibit 7 for me, please, and let's go to the

bottom there, this part right here.

He says he went to Canada and met with Azdee, James and

other brothers known as Jamal.  While meeting with Azdee and

James -- let's go to the next page, if we can -- at the

mosque, I mentioned that we should attack oil storage

facilities and refineries.  I wanted to attack these places

because the oil is being stolen from the Muslims and an

attack would cause the price of oil to increase and make more

money for the Muslims.  I also mentioned to Azdee, James and

Shifa that we should attack a military base.

Go on up, please, ma'am.

At the time I did not say which base, but on another

occasion Shifa and I discussed attacking Dobbins Air Force

Base.

And then he goes on to talk about attack a satellite

system that controls the global positioning system, using
lasers and jammers.  This attack would cause confusion with
the military.

Let's go ahead and finish that paragraph.

And while with Shifa, Azdee and James, we also discussed
how difficult it was to obtain weapons legally.  And then
their main conversations were about going to Pakistan to
obtain military-style jihad training.

Now, that's a summary of a very, very lengthy
interchange between you and the other agents and Mr. Ahmed;
is that not correct?

A.   Well, this is a summary of the agents present for the
March 18th, 2006, interview of Mr. Ahmed.  I was not present
during this interview.

Q.   But you would agree with me that during those interview
sessions, interrogation sessions, that Mr. Ahmed repeatedly
said that the discussions in Canada were random thoughts,
childish thoughts?

A.   Ideas they had.

Q.   Random ideas, momentary ideas, we were just talking and
shooting off our mouth; correct?

A.   That's correct.

Q.   And he also said during the actual interview when he
talked about oil refineries, you pressed him:  What oil
refineries are you talking about?  Correct?

1    A.    That's right.

2    Q.    And he said, Aren't they in Texas?

3    A.    I don't remember specifically that time.

4    Q.    He never identified -- excuse me, I didn't mean to

5    interrupt you.

6          Go ahead.  Are you finished?

7    A.    Yes, I am, sorry.

8    Q.    He never identified any particular oil refinery or any

9    particular plan about any particular oil refinery.  He even

10   wondered where exactly these oil refineries might be?

11   A.    That's correct.

12   Q.    And with regards to Dobbins Air Force Base, did he not

13   say in the actual interrogations, Well, you know, Shifa and

14   I were driving by there one time -- back up.

15         Do you know who Sami Ayoub is?

16   A.    Yes.

17   Q.    Sami Ayoub is a person who owns a perfume and lotion,

18   other types of items, shop up near -- off of Cobb Boulevard;

19   is that right?

20   A.    That's correct.

21   Q.    And Mr. Ahmed would work at that shop from time to

22   time?

23   A.    Yes, he would.

24   Q.    And did he not say in the actual interviews, Shifa and

25   I were driving by Dobbins Air Force Base and he said, Well,

1    hey, that would be a good place to attack; correct?

2    A.   I believe so.  I don't remember exactly that discussion.

3    Q.   So what might have been a momentary, random childish

4    thought, in Government's Exhibit 7 becomes a specific plan to

5    attack Dobbins Air Force Base; correct?

6    A.   Well, I'm not sure if they are talking -- if you are

7    meaning that this summary is a specific plan, I'm not sure if

8    there is a specific plan here.  This is still ideas that they

9    were discussing.

10   Q.   The fact is you never learned of any specific plan to

11   commit any type of violent action in the United States?

12   A.   Yeah, that's correct.

13   Q.   Do you have copies of these transcripts up there with

14   you, the transcripts of the interrogations?  There they are.

15        Just to make this move more quickly, can you turn to the

16   Government's Exhibit 505-A, 23:35 on the time schedule on the

17   left-hand -- 23 minutes and 55 seconds.

18   A.   Page 27?

19   Q.   Actually it begins on page 26 at line 20.  Do you see

20   that?

21   A.   I'm sorry, what's the time stamp again?

22   Q.   23:35?

23   A.   23:35 on page 26, yes.

24   Q.   KS is Khalid Sediqi; right?

25   A.   Yes, sir.

1  Q.   And he is an agent with the -- a detective at that time

2  with the DeKalb County Police Department?

3  A.   Assigned to the Joint Terrorism Task Force.

4  Q.   Assigned to the task force?

5  A.   Correct.

6  Q.   So he was a part of the task force, the Joint Terrorism

7  Task Force team that was conducting this interview.

8       By the way, he is Muslim?

9  A.   He has Muslim background, yes.

10 Q.   Right.  And he was brought in in part because he might

11 be somebody who would have a connection with Mr. Ahmed.  Is

12 that not correct?

13 A.   Yes.

14 Q.   And if something came up that you needed somebody who

15 had the knowledge of that -- of Islam, he would be there to

16 be able to bring that to the interrogation; correct?

17 A.   He was there to help out with the questioning regarding

18 Islamic information.

19 Q.   And SHA of course is Mr. Ahmed.

20      Does it not -- did this not occur during the

21 interrogation?

22              Mr. Sediqi or Detective Sediqi:  And Shifa

23         might be a good person and he might just be having

24         some --

25              And Mr. Ahmed responds:  I know he's

 1     childish.  That's what I'm telling you.

 2              Well --

 3              He gets -- Mr. Ahmed:  He gets excited

 4     easily and he like thinks that he is doing

 5     something really cool for Islam, and that's why

 6     he --

 7              Sure.

 8              -- he's is going -- unintelligible -- he's

 9     trying.

10              And that's the part you say you admire about

11     him, and some of the stuff he's doing is immature.

12              Yeah.

13              And he could be talking a big game and not

14     do anything.

15              Mr. Ahmed:  That's -- yeah.  He did all of

16     it.  Like he would tell me, Oh, you know, get

17     ready, something happen, and then --

18              Mr. Sediqi:  Nothing happens; right?

19              Mr. Ahmed:  -- it was just -- he's just

20     childish and he -- so that's why I just want to get

21     away from him.

22              And then Mr. Sediqi:  And see, that's what

23     we need to know.  We need to know if this guy is

24     just immature; he's just a kid; he's just acting

25     like he's a big shot behind the keyboard.  Dude, we

1          need to know that so we can move on and forget

2          about Shifa and forget about you and you can go on

3          with your life.

4     Did that not happen?

5  A.   Yes, it did.

6  Q.   Throughout the interviews, as you testified earlier,

7  Mr. Ahmed described the actions of him and Shifa, which is

8  Mr. Sadequee, as immature, childish.  Is that not correct?

9  A.   Yes.  I believe he was either downplaying his

10 involvement in supporting any type of terrorist activity, or

11 in fact he was probably correct to a degree, because taking

12 part in supporting some type of violent act or terrorism in

13 effect, (A), doesn't work, and (B), it is childish.

14 Survivors of a terrorist act are usually a little bit angered

15 by that activity.

16 Q.   Let's go on to another place in the transcript.  Let's

17 go to two hours and four minutes and 19 seconds in the same

18 transcript.  Let's go actually to two hours and four minutes

19 and 57 seconds on page 157.

20          Mr. Sediqi -- the Detective Sediqi to make

21          it clearer:  Why did you not go with him?

22          Answer:  When I went to Pakistan, I saw the

23          scholars over there and they, you know, they put

24          some sense into me or whatever.  But, you know --

25     Did he not repeatedly say often throughout here that the

1  scholars -- when he was in Pakistan, that he talked to

2  scholars who put some sense into him, and that's the reason

3  he came -- one of the reasons he came back home?

4  A.   He said that.  I'm not sure if he was downplaying or not

5  providing accurate information.

6  Q.   I understand.  You have relied a lot on what he said

7  today as accurate information about him going to D.C.,

8  meeting with people in Canada, going to Pakistan, shooting

9  paintballs.  You relied upon all that, did you not?

10  A.   Yes.  We also verified it.

11  Q.   But Shifa -- go on if you would.  I'm sorry.

12  A.   I'm sorry?

13  Q.   Let me just finish that part.  Two hours five minutes

14  and three seconds on page 158.

15       Detective Sediqi:  But Shifa still wants to go, you

16  think?

17       At this point Shifa or Mr. Sadequee, co-defendant

18  Sadequee, alleged co-conspirator Sadequee, was in Bangladesh;

19  is that correct?

20  A.   Yes, he was.

21  Q.                   Answer:  Probably, from Mr. Ahmed.

22                       Are you glad you didn't go?

23                       I mean, yeah, because I talked to those

24           scholars over there.  That's why I came back,

25           because they like, Don't be stupid, don't, you

1  know, stop your studies, and because over there, a

2  lot of students are there.

3  Sure.

4  And if I go to a madrassa, probably someone

5  could take you over.

6  Recruit you, yeah.

7  Recruit me, probably.

8  Yeah, I believe you.

9  And I am a little simple person, I would

10  say.  I believe easily.

11  Did he not say that repeatedly throughout this, that

12  he's a simple person, easily influenced?

13  A.  Yes.

14  Q.  Throughout these interviews?

15  A.  Yes, he did.  He was -- it appeared he was downplaying

16  his involvement.

17  Q.  Let's go to the March 15, '09, which I think is

18  Government's Exhibit 506-A.  And if you would turn to

19  1:51:16 -- just a second.  Let me find exactly what I was

20  looking for.

21  Just to speed this up, go to 1:54:22.

22  MR. MARTIN:  Your Honor, one of the problems here,

23  I had originally done some timings, but they changed the code

24  here, so I'm having to move around a little bit.

25  BY MR. MARTIN:

Q.    1:54:22 on page 127.  We are talking about the videos

here.  You remember, you said at some point he was like we

are going to be spies, he used that word?

A.    Yes.

Q.              Mr. Ahmed:  We could be spies for the people

             over there.

                  And that's you:  Okay.

                  You know, over there.

                  And do what as being spies?

                  Being spies, you don't do anything.  You just

             spies, take video, that's it.

                  Okay.

                  You know, we are childish.  We did -- we said

             we did stupid things and --

                  Right.

                  -- and you have evidence of the video.  It's

             stupid.  It does not hurt anyone; all right?  It is

             not to be used to do anything; right?  And the

             Chinese incident was just some random thing that

             happened that day or whatever.

         First of all, when we talk about the Chinese incident,

there was an occasion that -- one way you all were able to

date this video is there was an incident at the Capitol where

a person who was of Chinese origin was doing some sort of

protest, and that was something to do with the HAZMAT trucks

1   that came out; correct?

2   A.   Correct.  I mentioned earlier, that was the bomb

3   threat -- I saw it described at one point as a bomb threat.

4   And the individual making that threat was a Chinese

5   individual, and that's why it was described as a Chinese

6   incident here in this transcript.

7   Q.   Let's go to 2:05:29.

8        Well, I think maybe -- let's actually go to -- this is

9   March 15, 2006.  Let's start at line 16 on page

10  140.  Mr. Sediqi says --

11  A.   I'm sorry, line?

12  Q.   16.

13                  I tell you why you want to go back to

14          Pakistan.

15                  Uh-huh.

16                  Detective Sediqi:  Because it's easier to go

17          to madrassa and it's easier to get trained for

18          fighting for becoming strong to be able to get to

19          the jihad, to be able to get to level one and two.

20          That's why you went to Pakistan.  I don't think you

21          were going to go through with it, but that's why

22          you went to Pakistan.

23                  Mr. Ahmed:  I want to go to madrassa, yeah.

24       Madrassa is Islamic school, a type of Islamic school; is

25  that correct?

1    A.    Yes.

2    Q.                And after Madrassa, if somebody was going to

3                recruit, you were going to go.  It's -- let me put

4                it this way.  Tell me if you agree with me here.

5                    Uh-huh.

6                    Go to the masjid at Al Farouq and try to go

7                to learn to become a soldier.  Possible?

8                    No.

9                    Go to madreassa in Pakistan and try to become

10               a soldier.  Possible?

11                   Possible.

12                   Lots of possible.  Not even possible?

13               Probable?

14        Throughout these interviews he talked about there was a

15   possibility, possibility is the word he used, to maybe join

16   up with a camp, maybe in Pakistan, possibly; correct?

17   A.   Yes, downplaying his involvement with law enforcement.

18   Q.   Look at page 194 at page -- at line eight.

19        First of all, Detective Sediqi says:

20                   When you were in Pakistan, you sent an

21               e-mail.  I don't -- I don't know who sent this

22               e-mail.  Maybe you can tell me.  It said:

23               Asalam o alykum --

24        That's a greeting that Muslim people use with each

25   other?

A.    Correct.

Q.         -- I'm doing fine, man.  I'm waiting to join the
           third.  I was doing some real estate investment in
           Karachi.  Prices are good now in developing areas,
           with the potential of lots of road construction
           going on around those areas.  Is that you?  Did you
           send that e-mail?

           I don't think it sounds like me.

           Did you -- were you doing real estate
           investment in Karachi?

           I looked on land, but --

    Do you remember seeing e-mails between the defendant and
his father about the possibility of purchasing property in
Pakistan during the summer of 2005 when the indictment
alleges he was looking to become a part of a jihadi training
camp?

A.    I believe that was something I had seen.

Q.    And in fact there was some indication there he was
looking at schools, he was looking at land, those are two
things he was doing over there; correct?

A.    Those are two of the things he was doing over there.

Q.    He was with family?

A.    Correct, yes.

Q.    Look at page 196 at line ten -- excuse me, line six.
      And you were pressing him, both you and Agent --

1   Detective Sediqi were pressing him as to what his real

2   intentions were.  You wanted to get him to state a clear

3   intention when he was in Pakistan, a clear intention that he

4   was going to join a terrorist camp; is that correct?  Not a

5   possibility, but a clear intention; correct?

6   A.   That's correct.

7   Q.   And Detective Sediqi -- let's start at the top of the

8   page at 55:28.

9                  Detective Sediqi:  I think you had the

10                 intention in your heart.  I think you can --

11                 mentally you could do it, but I don't know

12                 physically.

13                 Mr. Ahmed:  No.

14                 You don't have --

15                 Not --

16                 Okay.  But your intention was to go.

17                 Mr. Ahmed:  Maybe, maybe, yeah.  I told you

18                 to study first and then later on, wherever, go --

19                 Study first and later on go to the camps,

20                 okay.

21                 Yeah.

22                 So you never went to the camps.  So you

23                 never really -- you never, phase one, physically

24                 get ready, phase two, go to training camp, phase

25                 three, implement jihad?

1          Uh-huh.

2          So you're waiting to join the third phase.

3     This e-mail to me sounds like you're ready to go,

4     do violent jihad on people.  You're just waiting to

5     join.  But you're saying you never went to the

6     training camp though; right?

7          No.

8          You never, never -- you never -- you never

9     completed phase two?

10         Never.

11         All right.  I just want to clarify that.

12   Is that not what he said?

13   A.   I believe this is what he said, but not with the

14   certainty in your voice --

15   Q.   We can play it if you want to.

16   Let me ask while you mention that.  You can hear it from

17   the recordings that we talked about.  Mr. Ahmed speaks in a

18   soft voice and very rapidly, does he not?

19   A.   Yes.

20   Q.   And it took a while for you and the other agents to sort

21   of get used to his rhythms and listening to him, did you not?

22   A.   I didn't have much time to get used to it, but we got

23   used to it.

24   Q.   You got used to it.  I mean, it was like 11, 13 hours,

25   I forget exactly how many hours it was?

A.   When he decides to speak clearly, you can understand

him.

Q.   But often when he's just giving a quick response, it's

very fast and very soft.  Is that not correct?

A.   Yeah, or sometimes when he's trying to think about what

we are trying to ask him about, it's very --

Q.   That's your assumption.

And sometimes he sort of swallows his words; correct?

A.   Yes.

Q.   Let's stay with this date for a second.

Let's go to March 17.  Maybe this is what I wanted.

MR. MARTIN:  Your Honor, I apologize.  I had the

wrong transcript.  Yeah, 508-A, March 17.  We are getting

toward the end of the interrogations.

BY MR. MARTIN:

Q.   One of the allegations in the indictment is that the

defendant had a specific intent to join Lashkar-e-Tayyiba;

correct?

A.   Yes.

Q.   There was an interchange about Lashkar-e-Tayyiba in the

interviews.  Is that not correct?

A.   Yes, there was.

Q.   And you and the other agents were pressing him to name a

specific terrorist group that he wanted to join; correct?

A.   Yes.  We were asking him what training camp, if there

1  was one, he wanted to get training from or join.

2  Q.   And the name Lashkar-e-Tayyiba came up, did it not?

3  A.   He provided us with that name, yes.

4  Q.   Looking at the interchange in that regard at page seven

5  on 508-A, again it begins at line 8, Mr. Ahmed -- well,

6  actually it begins:

7              If you had your preference when you went to

8          the camps, which camp would you --

9              This is his response:  I didn't go to

10         camp.

11             Detective Sediqi:  I know, I know, I know

12         you didn't go to camp.  But who would you -- which

13         camp would you want to go to?  Is there one that

14         you liked?

15             I didn't go to any camps or whatever that

16         means.

17             I know, but which group would you want to go

18         with afterwards?

19             Answer:  In Kashmir there was a group

20         Lashkar-e-Tayyiba.

21             It says L-J-T but usually it's L-E-T,

22         Lashkar-e-Tayyiba L-T?

23             L-T.

24             In Kashmir.  Well, let's just say you went

25         to Afghanistan, which group would you want to fight

1    with?

2         I don't know about the Muslim groups.  But

3    I heard -- the Taliban I knew, but --

4         Sediqi:  The Taliban is not really a group,

5    though.  They're a government, so it wouldn't be --

6    how about if -- say you stayed in Pakistan, would

7    you want to stay in Pakistan and fight?  Like --

8         No.

9         This is Sediqi:  Where would you -- you'd

10   rather go outside?

11        Mr. Ahmed:  I don't know because --

12        I'm not saying you did.  I'm just saying

13   which -- I'm just trying to figure out where you'd

14   want to go.  A personal question.

15        Mr. Ahmed:  Yeah.

16        Once you went to camp --

17        Uh-huh.

18        -- you got trained and they say, Haris --

19        Haris:  I saw -- I met someone from

20   Lashkar-e-Tayyiba at masjid just once.

21   Masjid is an Arabic word for -- same as a mosque; is

22   that not true?

23   A.   Yes, that's correct.

24   Q.        Lashkar-e-Tayyiba?

25        Yeah.

1    Over here or over there?

2    In Pakistan.  So, and he --

3    How did you know that he was in that group?

4    He told me that.

5    Oh, he told you.

6    Now, this guy with L-T that -- was it Abu

7    Umar, was he L-T?  The guy?

8    No.

9    What did he belong to?

10    I don't know, but the guy in Pakistan, I saw

11    him for two summers.

12    Is that two summers ago 2004 is he talking about, do you

13    know?

14    A.   I believe -- he wasn't real clear, I don't think.  But

15    I think he met somebody in '04 and '05.  But I'm not sure.

16    Q.            Okay.

17    Mr. Ahmed:  Like last summer -- the last

18    summer before that I went there.

19    What's his name?

20    He told me his moniker.  Like Sosiana,

21    I think.

22    Sosiana?

23    Is it not true that the only statement that Mr. Ahmed

24    made that he wanted to join LeT as opposed to any other group

25    as a possibility was that he met somebody at masjid one time,

1   and at the masjid, that person had mentioned LeT?

2   A.   That is what was said here and even possibly during the

3   next day's interview.

4   Q.   From that point on, it was -- including the written

5   statement, from that point on, after he mentioned meeting

6   somebody from LeT at masjid once two summers before or a

7   summer before, from that point on, every written statement,

8   every question assumes it's LeT that he wants to join.  Is

9   that not true?

10  A.   Well, that's because that's what he told us.  Yes, sir.

11  Q.   Now, are you familiar with some of the e-mails between

12  Mr. Ahmed and Mr. Khan or Abu Umar?

13       Let's make sure the Court understands, Abu Umar and

14  Mr. Khan are the same person, are they not?

15  A.   Yes, that's correct.

16  Q.   Referring to page didn't 26, page 57?

17            MR. McBURNEY:  I'm sorry, Judge.

18            Are you going to tender this exhibit?

19            MR. MARTIN:  I can.  I was going to clean it up

20  before I tendered it.  I was just going to ask him -- I can

21  tender it.

22            MR. McBURNEY:  Why don't you tender it.  You can

23  provide a cleaned up copy later.  We would object to him

24  reading anything from it if it's not in evidence.

25            THE COURT:  Unless he's using it to refresh his

1  recollection.

2         MR. McBURNEY:  Correct, which is not the posture I

3  see us in right now.

4         THE COURT:  I'm not sure what posture we are in

5  right now.

6  BY MR. MARTIN:

7  Q.   Looking at page 57, the interchange at the top between

8  Mr. Abu Umar -- well, just read it to yourself and see if it

9  refreshes your recollection about what, if anything, was

10 being said long before your interrogations about specifically

11 joining LeT?

12        MR. McBURNEY:  New objection.  There has been no

13 question posed to which Agent Richards said I don't know the

14 answer to this or I don't remember.  He's been given a script

15 to read now and --

16        MR. MARTIN:  All right, good point, fair enough.

17 BY MR. MARTIN:

18 Q.   Do you remember, first of all, Agent  -- you can stop

19 reading.

20      Do you remember independently what was discussed between

21 Mr. Ahmed and Mr. Abu Umar, Khan, prior to him going to

22 Pakistan in e-mail types of communications?

23 A.   I do not.

24 Q.   All right.  Looking at that document, does it refresh

25 your recollection at all about what was said?

A.   I don't believe I have seen this document.

Q.   Okay.  You are the case agent and you have never seen this document?

A.   No.  There are thousands, maybe tens of thousands of e-mails we went through with a team of FBI investigators.

MR. MARTIN:  Well, I will then offer Defendant's Exhibit 26.

MR. McBURNEY:  No objection.

THE COURT:  It's admitted.

BY MR. McBURNEY:

Q.   Looking at that, does it not say that Mr. -- Mr. Ahmed when they are talking about LeT says that's something I will decide on the ground?

A.   He says I think that would be decided on the ground, correct.

Q.   So there is no specific intent for him to join any particular group when he's discussing it with Mr. Khan long before he goes to Pakistan?

A.   Right.  That's eleven months before we interviewed him as well.

Q.   Right.  Well, let's keep that straight.  Eleven months before you interviewed him.  He's in Pakistan in July, goes there July 17 of 2005; correct?

A.   That's correct.

Q.   He stays there until August of 2005.  He's there a few

1  weeks?

2  A.    Correct.

3  Q.    While there, he sees Mr. -- you have testified Mr. -- he

4  told you he saw Mr. Abu Umar, Mr. Khan, while he's there?

5  A.    Correct.

6  Q.    And that's the person who is supposed to be a recruiter

7  for these terrorist camps; correct?

8  A.    That's right.

9  Q.    And in April of 21 before he goes -- April 21 of 2005,

10 before he goes to Pakistan, his communications with Khan are,

11 Listen, I will decide on the ground when we get there who I'm

12 going to join, if anybody?

13 A.    Did you say his communication with Khan?

14 Q.    Yes.  Do you see the date --

15 A.    I'm sorry, let me see.

16       That is a discussion between Abu Umar and Aboo Khubayb

17 al-Muwahhid, which is Sadequee and Mr. Khan; right?

18 Q.    But later here?

19 A.    Al-Muwahhid, okay.

20 Q.    That's Mr. Ahmed, al-Muwahhid?

21 A.    Yes.

22 Q.    And that's, to make sure I get the date right, April 21,

23 2005?

24 A.    That's correct?

25 Q.    So before he goes he is saying I will decide that when

1    I get there; right?

2    A.    That's what appears in that exchange.

3    Q.    During the interview process, he is saying LeT because

4    of how you all -- well, I'm not going to say it.  He's saying

5    LeT based on what we see in the actual transcript?

6    A.    Correct.

7    Q.    Because he said he met somebody at masjid once;

8    correct?

9    A.    Well, I don't know why he said LeT other than the fact

10   that we asked him the question of what group he intended to

11   join or get training from.

12   Q.    Staying with March 17, are you familiar with a person

13   named Zubair Ahmed?

14   A.    Yes, I am.

15   Q.    Indeed you identified a number of messages or

16   communications between him and Mr. Ahmed; correct?

17   A.    Correct.

18   Q.    Mr. Haris Ahmed.

19         Are you familiar that there was discussion about a group

20   called OM?

21   A.    I don't recall that, no.

22   Q.    Operation Mayhem?

23   A.    Okay, yes, I have heard Operation Mayhem.

24   Q.    Did you ever see the movie *Fight Club*?

25   A.    I did not see that movie.

1  Q.    Do you know whether or not the name Operation Mayhem

2  comes from that movie, *Fight Club*?

3  A.    I have only heard that from Zubair Ahmed.

4  Q.    Okay.  And that was a suggestion by Mr. Ahmed, Mr. Haris

5  Ahmed, if you recall, that we will form a group when I get

6  back, after he comes back from Pakistan, long after he's come

7  back from Pakistan, we will form this group called Operation

8  Mayhem and we will discuss issues; correct?

9  A.    Correct.

10  Q.    Do you remember him being pressed about whether that was

11  anything that was intended to be violent acts against the

12  United States?

13  A.    In regards to Operation Mayhem?

14  Q.    Yes, sir.

15  A.    No, I don't remember.

16  Q.    Look at page 38 on Government's Exhibit 508-A.  Does it

17  not begin -- let's begin at line five.

18              Detective Sediqi:  I want to know

19         specifically what you were planning, because that

20         movie was about blowing themselves up in

21         America.  And if you were planning that, tell me

22         now, so when I ask Shifa, when I ask your dad, when

23         I go to Pakistan, when we go talk to Canadians,

24         they tell me the same thing, that you did not.

25         Then guess who is the only person left?

I assume the only person left is Mr. Ahmed; correct?
And then you chime in:

       And the other people involved in this
    communication, you know, the people whether they
    are in Canada or the U.K., wherever they are.  So a
    lot of those people we've already talked to.  So
    now it's your turn to get your side of the story on
    the table so we can know what your intentions
    were.  Because when we talked to other people --
       Okay, he's answering.
       Then you say:  We want to know what Haris
    said, we want to know your side of the story, we
    want to get it.  It's your opportunity to talk.
       Haris, it sounds like you were about to tell
    us --
       And Sediqi:  Go ahead.
       -- what was going on.
       Go ahead, Haris.  Tell us.
       Nothing -- his answer:  Nothing.  Look, man,
    it was nothing.  It was just childish talk and
    stuff like that.
       That's what --
       And Detective Sediqi:  Childish talk about
    what?
       Well, we need to know.  We need to know

1          about it so that when we tell our bosses, they are

2          like, okay, it was just a childish thing.

3     When we refer to talk to your bosses, you meant higher

4  up in the FBI as to make decisions as to whether he's going

5  to be prosecuted?   Is that what you meant when you said talk

6  to our bosses?

7  A.   I just needed to give them briefs on how this interview

8  was going for operational purposes, whether or not we were

9  going to interview other witnesses or hold off and try to get

10  Mr. Ahmed to cooperate at that point in time.

11  Q.   Just to skip down to the line 17:

12          You're the only one that didn't say what you

13          were planning --

14          Uh-huh

15          -- then you're the one that's more

16          responsible.

17          Mr. Ahmed:  I was not planning anything.

18     Is that what he said?  This is toward the end of the

19  interviews, isn't it, March 17, 2006?

20  A.   Yes, that's what he said.

21  Q.   You mentioned the Free Masons' Masonic Monument in --

22  I think it's in Alexandria, Virginia, that was in one of the

23  videos?

24  A.   Yes.

25  Q.   And in that video, you can see a sign that says King

1   Street, does it not?

2   A.   Yes.

3   Q.   And King Street is a stop on the Metro line, is it not?

4   A.   That's correct.

5   Q.   Just to clarify, when Mr. Ahmed and Mr. Sadequee went to

6   D.C. to take the video, they drove in Haris's truck; correct?

7   A.   That's correct?

8   Q.   A little tiny pickup truck; correct?

9   A.   Yes.

10   Q.   Spent the night in the truck?

11   A.   We believe so, yes.

12   Q.   I mean, college kids.  Spent in the night in the

13   truck.

14        Did you ever spend a night in a car when you were in

15   college?

16   A.   Yes.

17   Q.   Okay, good.

18        Then the first night you will see from some of the

19   videos, including the one of the Pentagon, and there is

20   another video of the Capitol, it's clearly at night;

21   correct?

22   A.   Correct.

23   Q.   I mean, you could see lights in the background, and it's

24   actually a rather nice picture of the Capitol with the

25   lighting of the sunset on it?

1    A.    It is.

2    Q.    So it appears that they drove in, and actually it's

3    described by Mr. Haris in his interview, they go in the first

4    day, take a few shots, drive out of town and sleep in the

5    car, and then get on the Metro to do the other shots?  Is

6    that correct?

7    A.    I don't know if they got on the Metro, but that sounds

8    logical.

9    Q.    And the King Street shot, you are right there at the

10   King Street -- have you been to that location, and you can

11   see the monument right there from that location?

12   A.    I believe I have at that point.  It looks like they were

13   at the station at least when they took that video.

14   Q.    So they are on the Metro and go into town to take this

15   video.  There is the Masonic Temple, hey, let's take a shot

16   of it; correct?

17   A.    Correct.

18   Q.    And he described that in his interviews that -- look at

19   page 58, March 17, 2006, Government's Exhibit 508-A -- there

20   was some talk in Canada about attacking the Free Masons,

21   correct, in the random discussion in Canada, if you recall?

22   A.    Yes, during the interview, he provided some of that

23   information.

24   Q.    In looking -- actually go up to line three.  JA, now,

25   that's a different agent, that's Agent Allen; is that

1  correct?

2  A.   That's correct.

3  Q.           So when you were there, you talked about an

4           attack on the Free Masons.

5       Let's back up.  Agent Allen's point of emphasis was the

6  Canadian connection; correct?

7  A.   Correct.

8  Q.           So when you were there, you talked about an

9           attack on the Free Masons.

10           You say:  How would --

11           You said --

12           -- you attack the Free Masons?

13           And then Mr. Ahmed's answer is:  Again, there

14           was nothing specific about how we would do

15           it.  Just, oh, let's attack the Free Masons.  Or

16           video.

17       Do you remember what the video was about?  Well let me

18  go on.  He says -- you say:

19           You were just there and you took that

20           video.

21           Yeah.

22           And that would be good.  So you talked to

23           Shifa about it?

24           I would say, yeah.

25       Is that what he says about that picture of the Free

1    Masons place?  It was there, it was at the stop, let's take a

2    picture of it?

3    A.   That's what he says right here in this transcript.

4    Q.   Talking about the Canada -- let's turn to page 80.  In

5    the written statement you talk about there being a plan to

6    take down the GPS system with lasers.  There is some

7    discussion about that, those discussions in -- you asked

8    Mr. Ahmed about those in the interrogation on March 17, 2006,

9    at line ten -- no, excuse me, at line 18.

10                   Mr. Ahmed:  I remember one idea about

11             satellites, but they tell me, like, they say, What

12             satellite?  I was like --

13             MR. McBURNEY:  Objection.  The best evidence,

14   Judge, is the actual tape, and I have let Mr. Martin inject

15   his own tone and emphasis on words.

16             We are willing and able to play the transcripts.  I

17   am asking that he be required to play what Mr. Ahmed said so

18   that we don't have him sounding certain on the high points

19   for the defense and weak on the high points for the

20   government.

21             We are ready, willing and able to play them.

22             THE COURT:  Well, Mr. Martin, I will admit, I have

23   listened to the tapes, and the way that you are reading the

24   testimony is not consistent with my recollection of his

25   statments in the transcripts.

1        MR. MARTIN:  Well, I was really trying to just get

2    through this.  But, all right, we will look at that.  Let's

3    go to --

4        MR. McBURNEY:  If he wants to read them without

5    inflection --

6        THE COURT:  I think the problem is the drama and

7    the tapes.  But if you want to read the statements to get the

8    text of what was said during the interviews, I think that's

9    okay.

10   BY MR. MARTIN:

11   Q.   Without characterization, he stated right there and then

12   on page 80 that it was stupid, did he not?

13   A.   Of course, yes.  Again, in my opinion, from what

14   I observed and my experience, he was downplaying his ideas

15   and his activity.

16   Q.   But you agree he said it was stupid; correct?

17   A.   He said it, it was recorded, and written in this

18   transcript, I believe.

19   Q.   Talking about the paintballs.  Without any drama, page

20   97 at line ten, 1:32:43, talking about the paintballs:

21                  Why did you do that, though?   Were you

22              playing or were you training for jihad?

23                  We were playing.

24        Does he not say that?

25   A.   He said that here initially when we asked him.  If you

1   continue down, you might see a different answer later on.

2   Q.   You can be asked that on redirect.

3        He also talks about firecrackers, does he not?  He was

4   fascinated with firecrackers?

5   A.   Yes.

6   Q.   You all talk about firecrackers as something he always

7   had fun with; correct?

8   A.   Yes, I believe he said he liked -- at some point he

9   liked firecrackers.

10  Q.   And slingshots?

11  A.   No.  I just asked him about slingshots, and he didn't

12  know what that was.

13  Q.   There were discussions also during his interviews in

14  which you were talking about him wanting to possibly join up

15  with a training camp about him saying, you know, at one time

16  I wanted to join the Pakistani Army?

17  A.   I believe I asked him if he wanted to join an army,

18  specifically maybe the Pakistani Army.

19       And he told me, no, that was not what he ever planned on

20  doing, if my memory is correct.

21  Q.   Look at page 104 at line 6.

22                 He says:  That's why I want to join Pakistan

23             Army.  I have no -- like I don't -- I do not care

24             about the whole world.  I just want to play with

25             guns.

Haris, you -- now you're telling me you
wanted to join the Pakistan Army.

No, in the beginning.

Okay.

Long time ago.  But then I thought, I
remember, oh, I don't want to go to Army.

So wasn't he originally -- he originally said at one point he thought about joining the Pakistani Army, and then he changed his mind?

A.   This is not the part of the interview I was thinking of when I gave my previous answer.  I believe I asked him about the Pakistani Army earlier and he give me a different answer.

Q.   Well, we can look at that, we can find that.

Let's look at the last interview on March 18.

The business about the satellites, line -- page 20 line five -- well, before I get there.

Let me ask you about the Masonic Temple, page 18 at line 22, he says he had been told that the Masons worshipped the devil or whatever.  Do you remember him saying that?

A.   Again, I was not present during this interview, but --

Q.   That's what it says.  And he says about the Masonic Temple or of the Masonic Monument in Washington that he didn't even know it existed, do you remember that?

Did you review this transcript as the case agent?

A.   I reviewed it a year and a half ago, and I have skimmed

1  through this one recently.  But I don't remember this part.

2  Q.   He does say that he was at King Street when he saw the

3  Masonic Temple and said, hey, let's take a picture of it in

4  essence; correct?

5  A.   Correct.

6  Q.   With regards to the satellites, on line five, he

7  describes a discussion, We started to have fun.  Look at line

8  five on page 20, talking about satellites and taking them

9  down by laser.  He describes it as having fun, does he not?

10  A.   Yes, or he was describing -- again I wasn't there, but

11  he was describing having fun discussing how to -- well, how

12  to do satellites.

13  Q.   Page 21 at line 10, again, talking about the refineries,

14  I know there are refineries in Texas, but I don't even --

15  I don't even know the names or any locations or specific

16  things, just random, general.

17       Did he not describe the thoughts about the Texas

18  refineries as a random, general thought that was thrown out

19  during the meeting in Canada?

20  A.   Yes.  The beginning of any planning session is coming up

21  with ideas.

22  Q.   Right.  On page 22 -- and none of these ideas ever went

23  anywhere; right?

24  A.   That's correct.

25  Q.   Line 17 about Dobbins Air Force Base, he again says:

I said Dobbins like, yeah, or whatever.

Does he not describe his decision about Dobbins being like whatever?

A.   He describes a lot of things as being like whatever, but that's accurate what you just said.

Q.   Again talking about the training camps and the statement in the written statement that he particularly wanted to join LeT, look at page 29 at line eleven:

A training camp, probably, I mean --

A training camp.  And did you have a particular training camp in mind?

Mr. Ahmed:  I don't know any training camps, so I don't have one in mind.

Did he not say that?

A.   Yes, he did.  It's a little different from what he said a day earlier.

Q.   Finally looking at line 27, this is toward the very end of all these interviews:

Okay.  Why did you make it into the camp that you wanted to -- why did you never make it into the camp that you wanted to get into?

His answer is:  Actually, my -- I talked to -- it says sigh, like getting his breath -- my cousins and they, like, put some sense into me.  Well, you know, you're stupid, you were

1      basically brainwashed or whatever.  And that was a

2      really big thing to -- it destroyed my whole

3      foundation.  Like I was like, oh, my God, I came,

4      you know, drop my college, gave pain to my family.

5      You know what?  I'm leaving.  Whatever.  And now my

6      whole foundation is disrupted.  It was just that

7      what you believe is that, oh, everyone has to go

8      and fight jihad.  Actually this is not.  This is

9      false.  This is like, uh, what did he say?  This is

10     a misinterpretation, so -- and then I went and

11     talked to some people at the school I went to, like

12     the Islamic school, and I --

13             In Pakistan?

14             Yeah.  And I mentioned my -- I said, Is that

15     true?  And they said, No, not really.  You know, no

16     one is -- there is no obligation for everyone to

17     go.  So it destroyed my whole foundation, the why

18     I went there.

19   That's what he says towards the end of the very last

20 interview; is that not correct?

21 A.   That's correct.

22 Q.   Let me just ask a few more questions about some other

23 related subjects.

24   You did already say he described -- no, I already asked

25 you that one.  I won't go over it again.

```
 1        Translations.  Mr. Ahmed speaks English and Urdu; is
 2   that not correct?
 3   A.   That's correct.
 4   Q.   And in your investigation, some of the e-mails and
 5   correspondence or messages that are -- that you observed
 6   during your investigation had to do with him being able to
 7   translate certain documents into English or to Urdu.  Is that
 8   not correct?
 9   A.   I believe so, yes.
10   Q.   That's one of the things he could contribute to this
11   online community of people studying Islam and jihad and other
12   issues; correct?
13   A.   Correct.
14   Q.   And Shifa as well.  Shifa had abilities to translate as
15   well, did he not?
16   A.   Into Arabic, I think.
17   Q.   Arabic.  And that would also be something very valuable,
18   because a number of these texts from scholars are in Arabic.
19   So if you don't know Arabic, it would have to be translated
20   into English or Urdu or whatever language?
21   A.   Correct.
22        MR. MARTIN:  Just one second, Your Honor.
23        Your Honor, that's all we have.
24        THE COURT:  How long is your redirect?
25        MR. McBURNEY:  Five minutes.
```

1    THE COURT:  All right.

2                    -- -- --

3              REDIRECT EXAMINATION

4    BY MR. McBURNEY:

5    Q.   Agent Richards, at any point in any of the interviews

6    with Defendant Ahmed in March of 2006, did you or anyone else

7    in your presence suggest Lashkar-e-Tayyiba as a possible

8    object of the defendant's conspiracy?

9    A.   No, we did not suggest it.

10   Q.   Who brought it up?

11   A.   He did.

12   Q.   The idea of attacking oil refineries and oil

13   installations in the United States, was that an idea that you

14   or another agent brought up?

15   A.   No.

16   Q.   Who brought that up?

17   A.   He did.

18   Q.   Attacking military bases, whether it be Dobbins Air

19   Reserve Base in Marietta or any other military installation

20   in the United States, was that an idea that the agents

21   brought up?

22   A.   No, it was an idea that he brought up.

23   Q.   He being the defendant?

24   A.   Yes.

25   Q.   You have pored over the transcripts from all five

interviews.  The Court has listened to the audio more than

once.  Is it safe to say that for every point that Mr. Martin

just shared with you where Defendant Ahmed said A, if you

spent enough time in those transcripts, you might be able to

find him saying not A?

A.    Correct.

        MR. MARTIN:  Your Honor, I think that's too vague a

question.  If he wants to make it specific as to particular

things that he could point to in the transcript, fine.  But

to say as a case agent in the case I think there is a

contradiction for every question I asked, I think that's too

broad a question, it's a compound question, and it's

improper.

        THE COURT:  I think that's a fair objection.

        MR. McBURNEY:  Okay, I will narrow it.

BY MR. McBURNEY:

Q.    Did you experience Defendant Ahmed changing his answers

over time as you asked the same question again?

A.    Yes, I did, especially during pertinent questions to our

investigation.

Q.    What do you mean by that?

A.    I can give you examples.  If my memory serves me, that,

for example, was it your camera that you used to take the

videos in Washington, D.C.  Initially no, later on, yes.

        I think even in Mr. Martin's cross-examination we went

over references to whether or not -- what camp would you like

to go to.  On the 17th with myself and Detective Sediqi he

advised -- he brought up the Lashkar-e-Tayyiba, and on the

18th with Special Agent Allen he advised there was no camp.

And there are several examples of that throughout 12 or

13 hours of interview.

Q.   Mr. Martin focused a great deal on this notion of

childishness and stupidity, that these were childish things

and stupid things, and pointed to many instances where you or

Detective Sediqi were saying, well, that was just childish,

wasn't it?  Do you recall those questions?

A.   Yes.

Q.   As part of your effort to connect with an interviewee

and elicit information from him or her, do you attempt to

empathize with them?

A.   Yes, we do.

Q.   Find connections?

A.   Yes.

Q.   Was this idea of childishness something that you used?

A.   Yes, it was.

Q.   Did you at any point think that the types of things you

suspected Defendant Ahmed was involved with were childish?

A.   Not at any point.

Q.   Stupid?

A.   No.

Q.   Unworthy of Federal Bureau of Investigation work?

A.   No.

Q.   Finally, Agent Richards, at any point in your work on this case and your contact with Defendant Ahmed, did he come forward to you and attempt to withdraw from any conspiracy, come to you unannounced and say, hey, I was doing this thing with Sadequee, as in Ehsanul Sadequee, with Khan, with Azdee Omani and others, and I want to report it because I want out of the conspiracy?

A.   No, he never came forward.

Q.   Were you aware of that happening with Defendant Ahmed with any law enforcement in the United States?

A.   No.

          MR. McBURNEY:  Thank you.

          MR. MARTIN:  I just want to ask, you mean prior to your interrogations, was that the context of that question, prior to his being arrested?

          MR. McBURNEY:  At any point.

A.   At any time, no.

Q.   He certainly didn't do that in the interviews, did he?

A.   No.

                    --  -- --

                RECROSS-EXAMINATION

BY MR. MARTIN:

Q.   Well, does he not say in the interviews several times

that was stupid, I came back, I didn't want to do that
anymore, those types of words, whether you characterize that
as withdrawing from the conspiracy or not?

A.   He does say that, yes.

MR. MARTIN:  Okay.  That's all I have.

THE COURT:  All right.  Does anybody want the agent
subject to recall?

MR. MARTIN:  Yeah, he should be subject to recall.
I don't mind him staying in the courtroom.

THE COURT:  I guess that means that we are going to
make a subject-to-recall exception.  You are subject to
recall, which means that somebody might call you back, but
apparently the defendant does not object to you being in the
courtroom.  So if you find a need to be here, you may do
so.

You are excused, and thank you for being with us.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  We are going to take our midafternoon
break.  We will break until a little bit after 4:00, and we
will be in recess until then.

(A recess is taken at 3:47 p.m.)

--  --  --

(In open court at 4:07 p.m.:)

THE COURT:  Please call your next witness.

MS. COLLINS:  Your Honor, our next witness is

1    Timothy Alexandre.

2                        --  --  --

3                    TIMOTHY ALEXANDRE

4    being first duly sworn by the Courtroom Deputy, testifies and

5                    says as follows:

6                        --  --  --

7                    DIRECT EXAMINATION

8    BY MS. COLLINS:

9    Q.    Good afternoon, Mr. Alexandre.

10   A.    Good afternoon.

11   Q.    Where do you work?

12   A.    U.S. State Department, Bureau of Diplomat Security.

13   Q.    What branch of the -- what bureau is the Diplomatic

14   Security Service with?

15   A.    It's actually its own bureau within the U.S. Department

16   of State.

17   Q.    Now, what is the function of the Diplomatic Security

18   Service?

19   A.    We provide the law enforcement and security function for

20   U.S. Department of State.  Basically we provide a safe

21   environment for the conduct of U.S. foreign policy.

22   Q.    Can you move the microphone a little closer?

23   A.    How are we now?

24   Q.    That's better.  Thank you.

25          What is your job title?

1    A.    I'm a special agent.

2    Q.    And what are your current duties and responsibilities

3    with the DSS?

4    A.    My current duties is I'm the lead instructor for the

5    passport fraud investigation branch at the Diplomatic

6    Security Service Training Center.

7    Q.    And what types of things do you teach there?

8    A.    Basic criminal investigations, basic criminal

9    investigation techniques.

10    Q.    How long have you been with the Diplomatic Security

11    Service?

12    A.    About twelve years.

13    Q.    And what were some of your other responsibilities during

14    your time with that agency?

15    A.    Prior -- just prior to coming to the training center, I

16    was with the High-Intensity Drug-Trafficking Task Force in

17    northern Virginia.  Prior to that, I was with the FBI's Joint

18    Terrorism Task Force in Washington, D.C.  I did that for

19    about three years.

20    Q.    What is the Joint Terrorism Task Force?

21    A.    It's a group of federal agencies in Washington,

22    D.C.  It's about 30 agencies strong.  It's actually federal,

23    state and local, they are to investigate or detect and deter

24    terrorist acts.

25    Q.    Were you affiliated with the Joint Terrorism Task Force

1  or JTTF during 2005?

2  A.   Yes, ma'am.

3  Q.   And while -- what was your function on the JTTF?

4  A.   I was with a squad that predominantly investigated

5  suspicious activity with a potential nexus to terrorism.

6  Q.   What field office were you working in?

7  A.   The Washington field office.

8  Q.   Is that the FBI field office?

9  A.   Yes, ma'am.

10  Q.   And in 2005 while you were on the JTTF, were you asked

11  to do anything by the FBI Atlanta office?

12  A.   Yes, I was.  I was sent a series of videos, and I was

13  asked to figure out where they were taken -- what they were

14  of, where they were taken, and if I could determine a date

15  and time when those videos were taken.

16  Q.   How many videos were you sent?

17  A.   Approximately seven.

18  Q.   And when in 2005 did this happen, were you sent these

19  videos?

20  A.   Probably about May maybe, or early --

21  Q.   Was it in the fall or the spring?

22  A.   I was sent them in the spring of 2005.

23  Q.   Now, you said that you were asked to locate where these

24  videos were shot; is that correct?

25  A.   Yes, ma'am, uh-huh.

Q.   How did you go about doing that?  What approach did you
take?

A.   Well, I viewed the videos, and I was looking -- as
I watched the videos, I looked for a spot that gave me three
points of reference that wouldn't move.  Like, for example, a
permanent stop sign or a permanent traffic light or the edge
of a building.

     And when I could see three points, I went ahead and
pressed the pause button and printed the screen out to each
site.  Then I drove to where I believe the site was, and
I lined myself up with those three points, so I could see in
effect what I believe the photographer was seeing when he
took that portion of the video.

Q.   Now, when you watched these videos, did you determine
the general part of the country, the general area that they
were taken in?

A.   They all appeared to be taken in the greater Washington,
D.C., area.

Q.   Now, I would like you to take a look on your table, you
should have an Exhibit 51 with a number of pages attached to
it.

     Exhibit 51 --

A.   It's here?

Q.   I believe it's underneath the exhibits you just picked
up.

1   A.    Okay.

2   Q.    Do you recognize that?

3   A.    That's a map of the greater Washington, D.C. area.

4   Q.    And there are a number of pages attached to that

5   exhibit.  Do you recognize those pages?

6   A.    Yeah, they are a variety of maps of the Washington, D.C.

7   area.

8   Q.    And are they fair and accurate depictions of the areas

9   that they show?

10  A.    Yes, ma'am.

11        MS. COLLINS:  At this time we would like to admit

12  Exhibit 51.

13        MR. MARTIN:  No objection.

14        THE COURT:  They are admitted.

15        MS. COLLINS:  We would like to put up on the screen

16  Exhibit 51, page one.

17  BY MS. COLLINS:

18  Q.    Can you orient us, which way is north on this map?

19  A.    Up to the top of the screen is north.

20  Q.    Okay.  And what area does this map show?

21  A.    The greater Washington, D.C. area.  The roadway that

22  looks like the circle is 495, which we call the Washington

23  beltway.

24  Q.    And where is central Washington on this map?

25  A.    It's going to be -- dead center of that circle I just

1   described is going to be Washington, D.C.

2   Q.   Actually there is a laser pointer sitting to the left of

3   that that you can use if that helps.

4        What is the body of water that's pulling up the middle

5   there?

6   A.   That's the Potomac River that separates Virginia from

7   Washington, D.C.

8   Q.   Are you familiar with an area called Alexandria?

9   A.   Yes, ma'am.

10  Q.   What state is that in?

11  A.   It's in Virginia just across the Potomac River.

12  Q.   Can you point out with the laser pointer where the

13  general area of Alexandria is?

14  A.   It's going to be in that area somewhere.

15  Q.   Okay.  I would also like you to take a look at

16  Exhibits -- some of the other exhibits that are sitting there

17  on your table.  You should have Exhibit 35-A, 35-B, 54-A,

18  57-A, 57-B, 59-A, 64-A, 68-A and 69-A?

19  A.   Yes.

20  Q.   And have you looked at those before?  Do you recognize

21  those?

22  A.   Yes, ma'am.

23  Q.   And what are they?

24  A.   They are pictures from video clips.

25  Q.   Without showing them.

1    A.    I'm sorry.

2    Q.    That's okay.  Are they fair and accurate depictions of

3    the shots of the parts of the video that they show?

4    A.    Yes, ma'am.

5          MS. COLLINS:  At this time we would like to admit

6    Exhibits 35-A, 35-B, 54-A, 57-A, 57-B, 59-A, 64-A, 68-A and

7    69-A.

8          MR. MARTIN:  No objection.

9          THE COURT:  They are admitted.

10   BY MS. COLLINS:

11   Q.    You mentioned earlier that you were sent six or seven

12   videos to review.  I would like to start by playing one of

13   those videos.

14        We are going to look at Exhibit 54 which is already in

15   evidence.

16          (A video file is played.)

17   BY MS. COLLINS:

18   Q.    What are we looking at here?  What is this?

19   A.    You are looking at the U.S. Capitol across the Capitol

20   Reflecting Pool in Washington, D.C.

21   Q.    Can we go back to Exhibit 51 and show page four?

22        Can you use your laser pointer to point out -- number

23   one, is the Capitol located somewhere on this map?

24   A.    Yes, ma'am.

25   Q.    Can you use your laser pointer to point out where that

1    is.

2    A.   About right in there.

3    Q.   So you are pointing at the right part of the screen in

4    the middle?

5    A.   Yes, ma'am, in the right section of the screen right

6    here between Route 50 and Independence.  You can actually see

7    a blue spot on the map there which is the Reflecting Pool

8    that you are across.

9    Q.   That was the pool that whoever shot the video was

10   standing in front of; is that correct?

11   A.   Correct.

12   Q.   Okay.  Let's move on to Exhibit 57.

13             (A video file is played.)

14   BY MS. COLLINS:

15   Q.   Where was this video is shot?

16   A.   You are still at the U.S. Capitol, and this is at the

17   Garfield Circle area of the U.S. Capitol.

18   Q.   And can we put up Exhibit 54-A, please?

19             Where in relation to where this photo is taken was the

20   video shot?

21   A.   As I'm looking at the screen, the video would be to my

22   right.  So it's off the screen to the right is where the next

23   video is going to be taken from.

24   Q.   Now, how do you know that -- how did you know that the

25   video was taken on the Garfield Circle part of the Capitol

1  grounds?

2  A.   When you look at the other video that shows the Garfield

3  Circle area, the photographer actually pans to the left where

4  you are able to see the Capitol dome.  So you know that he's

5  looking across with the dome on his left, so that puts it on

6  the right side.

7      When you go to that area, you can identify some features

8  in there, such as the white security tent you see, a delta

9  barrier pops up from the ground with the word stop on it, you

10 can see that, and then there are a couple other smaller

11 features that you can see that shows you exactly where you

12 are at.

13 Q.   Could you show Exhibit 57-B, please?

14     You just referred to a security feature.  Is this the

15 security feature you were referring to?

16 A.   Yes, ma'am.

17 Q.   What is this?

18 A.   That is a tent that was used for visitor control --

19 Q.   And what do you mean by visitor control?

20 A.   -- at the Capitol.

21     They could bring visitors in, it's a staging area, and

22 they could issue ID cards, depending on what's going on,

23 search or things of that nature.  But it's a way to stage

24 visitors to control the movement before you give them their

25 passes and take them on tours.

Q.   Back in 2005, was this the only structure of its type on the Capitol grounds or were there more?

A.   That was the only structure of that type.

Q.   And you referred to something called the delta barrier?

A.   Yes, ma'am.

Q.   What is that?

A.   Well, you can see -- you see what looks like a railroad crossing arm right there?  Right below that is an apparatus that pops up and down that's made out of metal, and it's used to control vehicle access.

Q.   Now, when you were originally reviewing this video, was there anything in the video that you saw that gave you a clue as to when the video might have been filmed?

A.   Well, the flowers were in bloom, specifically the cherry blossom trees appeared to be in bloom.

Q.   What is the significance of cherry blossoms?

A.   In the Washington, D.C., area, cherry blossoms are kind of a big event.  There is a festival that comes around every time the cherry blossoms bloom, Cherry Blossom Festival, there is a marathon.

      So it's a significant event, and I know that it's recorded by the Capitol when they bloom, the Capitol Guide Service makes a notation when they bloom every year.

Q.   And during your investigation, did you determine when they bloomed in 2005?

A.   Yes, I did.  They bloomed between April 1st and April
11th.

Q.   Now, if this video was shot between April 1st sometime
and April 11th, 2005, then when would you have received it?
Did you receive it in the spring during the Cherry Blossom
Festival?

A.   Of '05, no.  I would have received it later, around the
Thanksgiving time frame, I believe.

Q.   So more like the fall of 2005?

A.   Fall of 2005, yes.

Q.   Now, you mentioned a range when the cherry blossoms
bloomed, when they would be able to be visible in the video.

A.   Right.

Q.   Was there anything else in this video that allowed you
to narrow it down to a specific date?

A.   Yes, ma'am.  In the video you see two people wearing red
shirts.  They are U.S. Capitol Guide Service employees.  And
a review of the records showed that those two employees only
worked together on two days throughout the course of their
employment.  One was April 1st of that year, 2005, one was
April 11th.  And the cherry blossoms had not bloomed yet on
April 1st.

     So we are able to tell that picture must have been taken
on the 11th.

Q.   Can we show Exhibit 57-A, please?

1          THE COURT:  Can I interrupt for just a second.  Is

2     there much of a factual dispute about the videos and when

3     they were taken?

4          MS. COLLINS:  I was just trying to prove our case,

5     Your Honor.  I'm not sure -- I don't know if there is or

6     not.

7          THE COURT:  I'm actually directing this to

8     Mr. Martin.

9          MR. MARTIN:  No, sir, there is not.

10          THE COURT:  Can we stipulate that the videos were

11     taken by the defendant and Mr. Sadequee on or around April

12     11, 2005?

13          MR. MARTIN:  Yes, sir.

14          THE COURT:  Since I spent my high school years in

15     northern Virginia and spent a lot of time in the capital

16     area, I find this very reminiscent of my old days up there,

17     but I'm just trying to move us along.

18          MS. COLLINS:  Yes, Your Honor, we will move along.

19          MR. McBURNEY:  Can we confer for one second,

20     Judge?

21     BY MS. COLLINS:

22     Q.   We will move on.  I would like to play --

23          THE COURT:  I would like for the record to be

24     clear.  You probably should identify each of the videos that

25     you intended to go over and what their exhibit numbers are

1　and then ask whether Mr. Martin would stipulate that those

2　videos were taken by the defendant and Mr. Sadequee on or

3　about April 11th of 2005 --

4　　　　　　　MS. COLLINS:  Sure, Your Honor.

5　　　　　　　THE COURT:  -- so the record is clear.

6　　　　　　　MS. COLLINS:  There may be some additional

7　questions I would like to ask about the setting of the video.

8　　　　　　　THE COURT:  That's fine.

9　　　　　　　MS. COLLINS:  Thank you, Your Honor.

10　　　　　　　We will move on to Exhibit 59.

11　　　　　　　(A video file is played.)

12　　　　　　　MS. COLLINS:  You Honor, I won't ask about how the

13　HAZMAT truck played into your determination of the date, but

14　I will ask is it ordinary -- well, not ordinary.  Withdrawn.

15　　　　　　　Is the defense stipulating to the date --

16　　　　　　　MR. MARTIN:  I have agreed.  I think there was a

17　general statement there was some sort of incident that

18　occurred on or about that time and that was the reason the

19　HAZMAT truck was going, sort of a Chinese person who was

20　protesting in some respect.

21　　　　　　　THE COURT:  Or some bomb threat of some sort I

22　guess.

23　　　　　　　MR. MARTIN:  Yes, sir, I think it was.

24　　　　　　　MS. COLLINS:  Thank you, Your Honor.

25　　　　　　　I would like to go on to Exhibit 55.

1          (A video file is played.).

2   BY MS. COLLINS:

3   Q.   Where was this video filmed?

4   A.   That's filmed in Alexandria, Virginia, from the King

5   Street Metro stop platform, and that's of the Masonic Temple

6   in Alexandria.

7   Q.   Is there any significance to that temple to the

8   surrounding area?

9   A.   It's a dominant feature.  You can use it pretty much to

10  guide yourself.  If you are a little bit lost in Alexandria,

11  you can orient yourself based on that, that's how significant

12  it is in the landscape.

13  Q.   I think we have already reviewed Exhibit 68, so I would

14  like to look at Exhibit 69.

15          (A video file is played.)

16  BY MS. COLLINS:

17  Q.   Where are we on this video?

18  A.   We are southbound Interstate 95, and the white

19  structures to your left there or to the photographer's left

20  is what we call Newington Tank Farm.  Those are tanks filled

21  with various types of combustible fuels.

22  Q.   And where is this -- where is this tank farm located?

23  A.   In Newington, Virginia.

24  Q.   Where is that in relation to some -- the beltway, for

25  example?

A.    There you are probably about -- if you were driving from

D.C., you would probably hit that at about the 20 minute mark

or so.

Q.    Is that a highway that's right in front of what we are

looking at?

A.    Correct.  You are southbound Interstate 95.  The

photographer is southbound Interstate 95, he's looking across

the carpool lane and across the northbound lane of 95 and

looking into what is known as the Newington Tank Farm, and

that's because you are approaching Newington Avenue or you

are going to Newington.

          THE COURT:  Could you pull that up on the map and

show me where that is?

BY MS. COLLINS:

Q.    Sure, let's go to Exhibit 51, page one.  Actually let's

look at page two.

A.    Right.

Q.    Now, where is Interstate 95?

A.    This is Interstate 95 right here which leads you right

into the beltway, and if you continue up in there you are

right in the heart of D.C.

Q.    Now, you said that they were traveling on Interstate 95

southbound?

A.    Southbound 95, and you can see right here on the map it

says Lorton.  You can actually see that sign, the Lorton sign

1    in the video.

2    Q.   You see the sign in what fashion, what do you mean by

3    that?

4    A.   The driver can see -- the driver/photographer can see a

5    sign for Lorton.

6    Q.   Is that sign in a distance ahead of them?

7    A.   Yes.

8            MS. COLLINS:  With Your Honor's indulgence, we

9    would like to play a couple more videos with this witness

10   starting with --

11           THE COURT:  I'm not trying to prohibit you from

12   showing the videos, but I thought we would take an awful long

13   time establishing the date.  I thought we were next going to

14   go to the uniform change and that's how we could -- so

15   I wanted to nail down the date.  The videos being shown are

16   fine.

17           MS. COLLINS:  Thank you, Your Honor.

18   BY MS. COLLINS:

19   Q.   Now, at some point, just to be clear, the videos we just

20   watched, are those the ones you first received --

21   A.   Yes.

22   Q.   -- back in the fall of 2005?

23   A.   Yes, ma'am, they are.

24   Q.   And at some point years later, did you receive other

25   videos or did you review other videos?

1    A.   Yes, ma'am, I did.

2    Q.   That were of a similar character?

3    A.   Yes.

4    Q.   And approximately how many did you review?

5    A.   Approximately 30, I believe.

6    Q.   And when you reviewed them, did you recognize any sights

7    in the general Washington area --

8    A.   Yes, I did.

9    Q.   -- using these videos?

10   A.   Yes, ma'am.

11   Q.   And did you recognize all of them immediately when you

12   first reviewed them?

13   A.   No, some of them I had to use the same process I used on

14   the set that I originally received to go out and recognize

15   them.

16   Q.   But you did go out and determine where they were

17   located, where the videos were shot?

18   A.   Yes, ma'am.

19   Q.   I would like to play Exhibit 58.

20           (A video file is played.)

21   BY MS. COLLINS:

22   Q.   Now, where is this video taken?

23   A.   You are back at the Garfield Circle area of the U.S.

24   Capitol.

25   Q.   And is that the same visitor control center, the white

1  tent we saw in one of the earlier videos that you first

2  received?

3  A.   Yes, ma'am.

4  Q.   Looking at Exhibit 60.

5        (A video file is played.)

6  BY MS. COLLINS:

7  Q.   What's depicted in that video?

8  A.   You are in the same area of the Capitol, and you are

9  looking at an emergency response vehicle.

10 Q.   Just -- I would like to play just a few more of the

11 Capitol.

12      Exhibit 62, please.

13        (A video file is played.)

14 BY MS. COLLINS:

15 Q.   Now, what point of the Capitol are we right now?

16 A.   You are right in front, smack dab in the middle of

17 it.  You are pretty close to where the video with the

18 Reflecting Pool was taken from, the same general area.

19 Q.   And what were the trucks that were being shown in the

20 beginning of that video?

21 A.   Most of those look like media trucks and looked like

22 there was some command post type vehicles as well.

23 Q.   Now, when you received these new videos, were you -- did

24 you -- were there other videos of the Capitol that we haven't

25 shown today?

1  A.   Yes.

2  Q.   And were they similar in character to these?

3  A.   Yes, ma'am.

4  Q.   I would like to go into Exhibit 52.

5           (A video file is played.)

6  BY MS. COLLINS:

7  Q.   If we can pause the video at second 14, please?

8       Where was this video being shot?

9  A.   You are in Virginia across the Potomac River from D.C.

10  Q.   And what is the photographer looking out on during this

11  video?

12  A.   You could see the Lincoln Memorial and the -- I believe

13  you get a quick shot of the Memorial Bridge there.

14  Q.   Let's restart it, because I think you might be little

15  ahead of us.

16           (A video file is played.)

17  BY MS. COLLINS:

18  Q.   What is the grassy area that we see directly in front of

19  the camera?

20  A.   Looks like -- it's a park area adjacent to the road

21  between the river.

22  Q.   And what road are they on?

23  A.   What road are they on?   I believe they are on the

24  Washington Parkway.

25  Q.   Okay.  Continue.

1            (A video file is played.)

2    BY MS. COLLINS:

3    Q.   Can we put up Exhibit 51, page 4, please?

4         Can you point out to us where the route that this video

5    was shot?

6    A.   You go along here and you get on the Memorial Bridge

7    here crossing into D.C.

8    Q.   And the building that's right in front of you when you

9    are going down the bridge?

10   A.   That's the Lincoln Memorial.

11   Q.   Now we would like to play Exhibit 53.

12            (A video file is played.)

13   BY MS. COLLINS:

14   Q.   Were you able to determine the location of this video?

15   A.   That's the U.S. Department of Commerce located in the

16   1400 block of Constitution Avenue.

17   Q.   Going back to Exhibit 51, page four, where is this

18   located on this map?

19   A.   Right about in here.

20   Q.   You say that's the Department of Commerce.  What -- how

21   far -- let me ask you this.  Between the Capitol and -- where

22   is the Lincoln Memorial on this map?

23   A.   Right about there.

24   Q.   Between the Capitol and the Lincoln Memorial, what is

25   that?

A.   Well, you have got the Lincoln Memorial, Reflecting

Pool, you have the Washington Monument.  That whole area is

called the mall area, the Federal Mall area.  It has several

monuments and memorials in that area.

Q.   And how far is that area from the White House?

A.   The White House is going to be just above it a couple

blocks in this area.

Q.   So where is the Department of Commerce in relation to

that National Mall area?

A.   Well, Constitution Avenue is the top of the mall,

Independence is the bottom of the mall, and the Department of

Commerce is actually right on Constitution at 14th.  I can't

quite read the map, but I believe that's 14th there.

Q.   Now, I would like to take a look at Exhibit 63.

          (A video file is played.)

BY MS. COLLINS:

Q.   It's hard to show, but what is this video of?

A.   The James Forrestal Building which houses the Department

of Energy.

Q.   Where is that located?

A.   It's on approximately the one thousand block of

Independence Avenue, which Independence Avenue is the street

that borders the side of the mall opposite Constitution.

Q.   Now, do we see more of this building in another clip,

another video?

1   A.   Yes, you do.

2   Q.   Okay.  Let's play Exhibit 64.

3              (A video file is played.)

4   BY MS. COLLINS:

5   Q.   Now, taking a look back at Exhibit 51, page four, where

6   is the Department of Energy on this map?

7   A.   Back in this area.

8   Q.   What was the street address that you mentioned for the

9   Department of Energy?

10  A.   An Independence Avenue address.

11  Q.   Okay.  Is it -- where is it in relation to the National

12  Mall?

13  A.   Just east of it.

14  Q.   Okay.  Now, did you also review videos of the World

15  Bank?

16  A.   Yes, I did.

17  Q.   And where is the World Bank on this map?

18  A.   The World Bank is at 18th and Pennsylvania.  Again, I am

19  having trouble reading this screen, but there is Pennsylvania

20  Avenue there.  So it's H, 18th and Penn is where the World

21  Bank is located.

22  Q.   So is it fair to say that the videos you reviewed were

23  taken in areas surrounding the National Mall?

24  A.   Yes, ma'am.

25  Q.   And did you -- did you describe on the National Mall

what is there, what is there on the mall?

A.    The Lincoln Memorial, the Washington Monument, the U.S.

Capitol.

Q.    Are there museums?

A.    There are several museums, Natural History, Air and

Space, several.

Q.    Did you review any pictures focusing on any of those

monuments or museums other than the shots of the Lincoln

Memorial we saw in one exhibit or the Capitol?

A.    No, I did not.

        MS. COLLINS:  May I have a minute, Your Honor?

        THE COURT:  Before you do, I'm a little confused

about what's in evidence and what is not in evidence.

        I think that this witness said that there were

originally seven videos that were sent to him, and then we --

you introduced Exhibit 51, which was the map.

        And then I wrote down there were eight additional

exhibits, 35-A, 35-B, 54-A, 57-A, 57-B, 64-A, 68-A and 69,

but then I don't have any other exhibit numbers.

        And it's not clear to me what -- because you have

been referring to Exhibit 60 and some others that are not on

the list.  I just want to make sure that the record is

clear.

        MS. COLLINS:  Your Honor, those were admitted

through Agent Richards.  Agent Richards admitted Exhibits 52

1   through 70, which were the original video clips.

2           THE COURT:  Then what were these, 35-A, 35-B --

3           MS. COLLINS:  Those were stills, Your Honor, from

4   these videos that we would have used to show the time that

5   they were -- his determination of the time they were taken.

6           THE COURT:  All right.  Thank you.

7           MS. COLLINS:  That's all, Your Honor.

8           THE COURT:  Mr. Martin?

9                           -- -- --

10                      CROSS-EXAMINATION

11  BY MR. MARTIN:

12  Q.  Just few questions, Mr. Alexandre.

13      There is no way you can tell us the order of when those

14  videos were taken, is there?

15  A.  No, sir.

16  Q.  And there appear to be two of the videos, one of the

17  videos shown was the Capitol and it appeared to be at

18  sunset.  Did you see that one earlier?

19  A.  Correct.

20  Q.  Did you see the sun reflecting off the Capitol Building

21  onto the pond there in front?

22  A.  Yes, sir.

23  Q.  The King Street Metro station in Alexandria?

24  A.  Yes, sir.

25  Q.  Is that monument sometimes called the Washington

1  Monument by the -- not the -- I know the big Washington

2  Monument downtown, but sometimes -- didn't the Masons build

3  that as a monument to Washington at one time, if you recall?

4  You don't recall --

5  A.   I never referred to it as that.

6  Q.   But it's clearly Masonic because there is a big Masonic

7  symbol in front?

8  A.   Yes.

9  Q.   At that King Street station, is that a place you can

10 park and then take the Metro into town, if you know?

11 A.   I don't know if there is parking or if it's a kiss and

12 ride, if it's a park and ride.  I don't recall.

13 Q.   You don't know, okay, fair enough.

14      With regards to the World Bank, do you know whether or

15 not that is close to a Metro station?

16 A.   There would be some within walking distance, but

17 I couldn't tell you.

18 Q.   You don't know.  Do you not regularly take the Metro?

19 A.   No, sir.

20 Q.   Okay, fair enough.  You were given seven videos to

21 review originally.  Was there some period of time before you

22 got additional videos to look at?

23 A.   Yes, sir.

24 Q.   Was this -- do you know when you were first shown the

25 seven videos?

A.    Sometime in the fall of 2005.

Q.    The fall of 2005?

A.    Right.

Q.    Okay.  And one final thing.  You said that in April,
during that period of time, the cherry blossoms is a very --
lots of people come to Washington to see the cherry blossoms.
Is that not true?

A.    That's my understanding, yes.

Q.    Well, you live there, don't you?

A.    I do now.  I'm a transplant, but, yeah.

Q.    And there appear to be a number of people in the videos
there at the scene where you see the emergency trucks and
everybody go by and the media trucks; right?

A.    Yes, sir.

Q.    And there's nothing unusual about a lot of people being
in that area at that time of year, is there?

A.    Well, there is not something unusual about people being
in the area, but the way they were in the video was somewhat
unique.

Q.    It looks like they were watching what was going on?

A.    Yeah.  The way they are positioned tells me that there
was something going on.  There was an event or something
happening at the Capitol.  That's not normal foot traffic
that you would see.

Q.    And that entry into the Capitol that you were talking

about where there was a place you stop the vehicles, there

are other entries to the Capitol, public entries to the

Capitol other than that location, are there not?

A.    Sure, yes.

Q.    I mean, I guess on the south side of the Capitol there

is where there is a lot of parking lots of stuff, there is

entry through there.   You don't have to go through that tent

to get into the Capitol, do you?

A.    No.

MR. MARTIN:  Okay.  That's all.

THE COURT:  Mr. Martin, just because I want to make

sure I didn't confuse the record, we showed the original, we

showed parts of the first seven, and then there were these

additional 30.

Will the defendant agree all of the ones that were

shown here in court today were taken by the defendant,

Mr. Sadequee, on or about April 11th?

MR. MARTIN:  Yeah, let me clarify one thing.

BY MR. MARTIN:

Q.    You don't know whether they were taken over a one-day or

two-day period?  You have no idea what order they were taken.

A.    You are talking about all of them together?

Q.    Yes, sir.

A.    No, I don't.

MR. MARTIN:  Your Honor, I want to be clear,

1 I believe it was over a two-day period. Coming in at night,

2 an afternoon and night, and then there were some more taken

3 the next day. That's my opinion. I mean, that's what

4 I understood, if you all would agree with that?

5        MR. McBURNEY: That's our understanding, the

6 nighttime Pentagon video, the sunset at the Capitol would

7 have been the evening of the 10th, the day of the 11th was

8 the HAZMAT truck and the incident with the gentleman with the

9 suitcases.

10 BY MR. MARTIN:

11 Q. I want to ask one thing, did you listen to the voices in

12 the videos when you were looking at them at all?

13 A. Which set of videos are you talking about?

14 Q. The commerce building, Commerce Department

15 building. Did you hear somebody say is there a place to park

16 here or something like?

17 A. Yeah, is there parking.

18 Q. Parking. There is street parking in that area, is there

19 not?

20 A. Correct, there is.

21 Q. But there is also public parking for people to visit in

22 the mall area, is there not?

23 A. Yes. It's not immediately in that area, but --

24 Q. Yeah. But there would be street parking around the

25 commerce building; correct?

A.   Right.

MR. MARTIN:  That's all.

THE COURT:  I'm still -- I want to tie down this stipulation.

The stipulation here would be between the government and the defendant that the videos that have been shown here in court in connection with Agent Alexandre's testimony were taken on either April 10th in the evening or April 11th during the day.  Do we agree to that stipulation?

MS. COLLINS:  I think the stipulation is all of the videos that were filmed in D.C. were taken either on the 10th or the 11th.

THE COURT:  Which is why I wanted you to go back and specify the exhibit numbers that constitute the video so that the record is clear as to what exhibits the stipulations attach to.

MR. MARTIN:  Just one second, Your Honor.  Could you just wait one second?

MS. COLLINS:  I believe the stipulation is to Exhibits 32, 33 and 34, which are the entire universe of videos that were taken.

The individual videos that we have shown, they are marked as separate exhibits, but they are all encompassed on 32, 33 and 34.

THE COURT:  Okay.  So the stipulation would be that

for Exhibits 32, 33 and 34, they were taken either the evening of April 10th, 2005, or during the day on April 11th, 2005.

MR. MARTIN:  I don't want to unnecessarily complicate a small point, but as you can tell from the videos, there are some videos that appear to be taken, like the commerce building, like they are driving, and there are other videos where they are obviously on foot.

So just I think -- I mean, this is the fact.  They get there in the evening -- in the late afternoon, look for parking, they take the evening shots, and then the next day they are on foot primarily after getting at the King Street Metro station.

That's my understanding.  That's what we would agree to.  I don't think it makes a hill of beans of difference, but --

THE COURT:  Well, you are just adding some additional detail.

MR. MARTIN:  Yes.

THE COURT:  For Exhibits 32, 33 and 34, those that were taken in the evening are those that were taken while driving taken on April 10th, 2005, and those that were taken on foot you would stipulate were taken on April 11th of 2005.

MR. MARTIN:  That's correct.

MS. COLLINS:  That's fine, Your Honor.

1          THE COURT:  Okay.  Then the parties have agreed to

2    that stipulation, which now is a stipulation as to when all

3    of the videos that are at issue in the case were taken.

4          Who is your -- anything else for the agent?

5          MS. COLLINS:  Not from the government, Your Honor.

6          THE COURT:  Does anybody want him subject to

7    recall?

8          MR. MARTIN:  He can go.

9          THE COURT:  All right.  Thank you very much for

10   being with us.  You shouldn't discuss your testimony with

11   anybody until you hear the case is over.  We appreciate you

12   being with us.

13         THE WITNESS:  Yes, sir.  Thank you.

14         THE COURT:  And I know that Mr. Martin is being

15   accommodating, but generally if somebody is subject to

16   recall, because we are sequestering witnesses, he should not

17   come back into the courtroom, and then we get confused

18   about -- and I know he sat in here during this testimony.

19         But if he's subject to recall, he shouldn't be

20   listening to the testimony of other witnesses.  And although

21   I know that Mr. Martin is accommodating, it's my rule that he

22   wouldn't be here.

23         MR. McBURNEY:  You are referring to

24   Agent Richards?

25         THE COURT:  Yes.

1        MR. McBURNEY:  We thought he could be here because

2   he's the case agent.  Your rules are the rules.

3        THE COURT:  Well, how many case agents do we have

4   here?

5        MR. McBURNEY:  Two, he testified as to

6   Agent Richards and Agent Wilz.

7        So I appreciated the accommodation.  Had he

8   objected, I would have asked that he be able to stay here

9   because he's the case agent.

10        THE COURT:  Who are the case agents, nobody has

11   told me, that you intend to represent the government?

12        MR. McBURNEY:  For this trial, Agent Wilz, seated

13   at counsel table, and Agent Richards, who you now know

14   through his testimony.

15        THE COURT:  I wasn't aware that they were going to

16   designate Agent Richards as the case agent.  Mr. Martin, are

17   you still willing --

18        MR. MARTIN:  I'm not going to fuss about that.

19        THE COURT:  All right.  Then that's fine.

20        Who is your next witness, and how long will they

21   take on direct?

22        MR. McBURNEY:  Agent Allen, and maybe an hour on

23   direct.

24        THE COURT:  Do you have a short witness that we

25   could fit in before the end of the day?

 1          MR. McBURNEY:  We do.  I believe Agent Rabinowitz.

 2    We have two short witnesses in terms of duration for the

 3    record.

 4          THE COURT:  Thank you.

 5                    --  --  --

 6                    NEIL RABINOWITZ

 7    being first duly sworn by the Courtroom Deputy, testifies and

 8                    says as follows:

 9                    --  --  --

10                  DIRECT EXAMINATION

11    BY MR. BLY:

12    Q.   Good afternoon, Agent Rabinowitz.

13    A.   Good afternoon.

14    Q.   How are you employed, sir?

15    A.   I'm a special agent with the FBI here in Atlanta.

16    Q.   How long have you been an FBI agent?

17    A.   It will be eleven years this August.

18    Q.   Where are you currently stationed?

19    A.   My actual physical office is at Hartsfield-Jackson

20    International Airport.

21    Q.   How long have you been there?

22    A.   Approximately five years.

23    Q.   Are you with a particular group or squad at Hartsfield?

24    A.   We are assigned to the Joint Terrorism Task Force.

25    Q.   And have you been at the Joint Terrorism Task Force for

1  those whole five years?

2  A.    Yes, sir.

3  Q.    Sir, I would like to direct your attention to August 18

4  of 2005.  Were you working on that day?

5  A.    I was.

6  Q.    And did you have a particular task that day?

7  A.    Yes.

8  Q.    What was that?

9  A.    We were asked to search a piece of outbound luggage.

10  Q.    Who asked you to do that?

11  A.    My supervisor, Special Agent Mark Giuliano at the time.

12  Q.    Did they give you the name of the particular passenger

13  that the luggage belonged to?

14  A.    Yes.

15  Q.    Who was that?

16  A.    Mr. Haris.

17  Q.    I'm sorry, what was --

18  A.    Mr. Ahmed, Haris.

19  Q.    Are you sure about that, sir?

20  A.    I apologize, Mr. Sadequee.  Sorry.

21  Q.    Okay.  Are you familiar with what Mr. Sadequee's travel

22  plans were on that day?

23  A.    Yes, I was.

24  Q.    And what were those travel plans?

25  A.    He was departing Hartsfield-Jackson Airport en route to

1  JFK Airport in New York, connecting to a flight to Dubai, and
2  then on to Bangladesh.
3  Q.   And you were asked to search any luggage that he might
4  have checked in Atlanta prior to leaving on that trip; is
5  that right?
6  A.   Correct.
7  Q.   Did you in fact identify a bag that day belonging to
8  Mr. Sadequee?
9  A.   We did.
10  Q.   And how did you identify that bag?
11  A.   We obtained the bag tag number.  Once the bag was
12  checked in, it's assigned a number.  And we obtained that
13  number and matched it up to the piece of luggage.
14  Q.   How many pieces of luggage did Mr. Sadequee check?
15  A.   There was one piece.
16  Q.   Did you ever actually have any contact with Mr. Sadequee
17  on August 18th?
18  A.   No, I did not.
19  Q.   Where were you when you first saw the bag that
20  Mr. Sadequee checked?
21  A.   We went downstairs with a representative from Delta in
22  the bag sorting room.  Once the bag is checked in at the
23  ticket counter, it's put on the conveyor belt and heads down
24  to the bag sorting room.  So we went down there.
25  Q.   You say downstairs.  Is that like below what we would

1  know as the main terminal or the main check-in area of

2  Hartsfield?

3  A.   Correct.

4  Q.   Roughly what time of the day was it when you first found

5  that bag?

6  A.   I believe it was late morning or early afternoon.

7  Q.   Were you working with anybody that day?

8  A.   I was.

9  Q.   Who were you working with?

10  A.   Special Agent Kevin Heerlein with ICE.

11  Q.   And what did you and Agent Heerlein do once you found

12  the bag?

13  A.   We obtained the bag, we stayed in the bag sorting room

14  down there, and we just looked for a flat place to put the

15  luggage, which we did, sat it down and opened it up.

16  Q.   What did you do after you opened it?

17  A.   Opened the luggage, and started going through the items

18  that were in there.

19  Q.   And what did you find?

20  A.   Essentially at first, once we opened it, we found just

21  some miscellaneous paperwork and ordinary clothes, just like

22  you find in any checked bag.

23  Q.   What part of the suitcase or luggage were these items

24  in?

25  A.   Those were in the main compartment.  When you first open

the bag, just the main packing compartment.

Q.   Did you find anything else in the bag?

A.   We did.

Q.   What else did you find?

A.   Underneath there is a lining in the suitcase that was secured by a zipper.  Underneath we unzipped it, and we found some items hidden underneath that lining.

Q.   Let's talk a little bit more about where exactly this compartment that you described is in the bag.  You indicated that you had to open a zipper to get to it.  Is that right?

A.   That's correct.

Q.   Once you opened the zipper, orient me where in the bag we are after you opened the zipper?

A.   Once you open the zipper, you are actually -- it's not -- it's as if -- the zipper is if you want to take the lining out to clean it.

So it's not an actual compartment to pack anything in.  There is no reason that you would put anything in there other than to hide it.

Q.   So in this area, I understand from what you are saying that one side of it would be the actual lining of the suitcase.  What would the other side of that area or compartment be?

A.   It would actually be the outside of the suitcase.

Q.   And is there anything in there?  Is there a pocket or

anything to secure items, or is it just an open area?

A.    Just an open area.

Q.    What did you find in that open area?

A.    We found an address book, we found two compact disks, as well as a map of the Washington, D.C., area.

Q.    Have you conducted bag searches before, Agent Rabinowitz?

A.    Yes, sir.

Q.    How many do you think roughly over the course of your career?

A.    Between fifty and a hundred at least.

Q.    Did the location of these items in this area between the lining and the side of the bag, did that raise any red flags for you?

A.    Yes, sir.

Q.    What kind, in what way?

A.    That is an area that I always check in bag searches just to see if anybody is trying to hide anything there.  In my opinion and experience, there is no reason to put anything under that lining other than to hide it.

Q.    What did you do with the items -- well, let's break it down.

     You indicated there were some items in the main part of the suitcase, clothes and that sort of thing.  What, if anything, did you do with those items?

1  A.   We just set those aside.

2  Q.   Okay.  You also described some items you found in the

3  zipper lining area?

4  A.   Correct.

5  Q.   What, if anything, did you do with those items?

6  A.   The address book and the map of Washington, D.C., I took

7  a photocopy in a Delta office where we -- the nearest office

8  where there was a photocopy machine.

9  Q.   Did you keep the originals?

10  A.   No.  Those were placed back into the suitcase.

11  Q.   Did you keep anything out of that suitcase other than

12  the copies you described?

13  A.   The disks were maintained.  We didn't have the proper

14  equipment.  We weren't sure if we had the proper equipment to

15  copy them there on the scene.  So we had them transported up

16  to the main FBI office where they could be copied.

17  Q.   And were they in fact copied at the main FBI office?

18  A.   That's my understanding, yes.

19  Q.   Were the originals returned to you?

20  A.   Yes, they were then brought back.

21  Q.   And what did you do with those?

22  A.   Those were placed back in the same place that we found

23  them in the suitcase.

24  Q.   So was everything in that suitcase when you found it

25  originally placed back in there before the suitcase was sent

1   on its way?

2   A.   Yes, sir.

3   Q.   We have several documents in front of you.  They should

4   be numbered 88, 90 and 91.  Government's Exhibit 88, 90 and

5   91.

6       I would like you to look first at what's been marked as

7   Government's Exhibit 88.

8   A.   Okay.

9   Q.   I'd ask if you recognize that?

10  A.   I do.

11  Q.   How do you recognize that?

12  A.   This is one of the -- there were a number of small

13  pieces of paper at the time.  This is one of them.  This is a

14  copy of one of the pieces of paper.

15  Q.   Where were those pieces of paper?

16  A.   This was one of the pieces of paper in the lining of the

17  suitcase.

18  Q.   Is that a fair and accurate copy of what the paper

19  looked like on the day that you searched the bag?

20  A.   Yes, sir.

21          MR. BLY:  Your Honor, I move for the admission of

22  Government's Exhibit 88.

23          THE COURT:  Any objection?

24          MR. MARTIN:  With regard to each of the exhibits

25  found in Mr. Sadequee's luggage, just because something is in

a co-conspirator's possession doesn't automatically make it

admissible.

So I would object to its admission until it's been

tied to any particular relevant evidence as to my client.

MR. BLY:  Your Honor, other witnesses that the

government will call in this case will speak as to the

relevancy of these items.  I think some of them are -- for

instance, the map, I think the relevance is obvious without

the need for any further testimony.

But at least as to the scrap of paper and the

address book that we will get to, the relevance of those will

be brought in through other agents.  We are simply getting

them in here because this is the agent who found them.

MR. MARTIN:  I have no problem with them being

identified at this point, but I object to their

admission.  If he's going to connect it later, they might be

admissible.

MR. BLY:  Your Honor, previously we did some

conditional admissions.  We are fine to have these admitted

conditionally subject to the relevance being tied in by other

witnesses.

MR. MARTIN:  Once they are relevant, then we can --

I don't know what that means, conditional at this

point.  It's identified, that's where they found them.  If

they can make them later relevant, fine.

1          I don't think they should be admitted for any

2     purpose at this point.

3          THE COURT:  Of course, I have no idea what's on

4     that piece of paper since no one showed it to me.

5          It seems to me that the Washington, D.C., map and

6     I'm assuming the videos are the videos that we have looked

7     at?

8          MR. MARTIN:  Okay.  I will concede on the map.  But

9     the other two I think are not shown to be relevant.

10          THE COURT:  Why don't you introduce them and remind

11     me later after we have a fuller picture of the conspiracy

12     that you intend to allege and that you believe the facts

13     show, I will reconsider the actual admission of them at that

14     time.

15          MR. BLY:  Okay.  Thank you, Your Honor.

16     BY MR. BLY:

17     Q.   Agent Rabinowitz, if we could look at what's been marked

18     as Government's Exhibit 90?

19          Do you recognize Government's Exhibit 90?

20     A.   I do, yes.

21     Q.   How do you recognize it?

22     A.   These are photocopies of the address book that were

23     hidden inside the lining of the suitcase.

24     Q.   Is that a fair and accurate copy of what the address

25     book looked like on the day you found it?

1    A.    Yes, sir.

2          MR. BLY:  Your Honor, we would identify

3    Government's Exhibit 90, subject to relevance being tied in

4    by another witness.

5          THE COURT:  All right.  Thank you.

6    BY MR. BLY:

7    Q.    And, Agent Rabinowitz, I would ask you to look at what

8    has been marked as Government's Exhibit 91, and ask if you

9    recognize that?

10   A.    I do.

11   Q.    And how do you recognize that?

12   A.    This is a photocopy of the map of the Washington, D.C.,

13   area.

14   Q.    Is that a fair and accurate copy of what the map looked

15   like on August 18th, 2005?

16   A.    Yes, sir.

17         MR. BLY:  Your Honor, we would move for the

18   admission of Government's Exhibit 91.

19         THE COURT:  Any objection to the map?

20         MR. MARTIN:  Not as to the map.

21         THE COURT:  It's admitted.

22   BY MR. BLY:

23   Q.    Agent Rabinowitz, you mentioned that you found two CDs

24   in the lining and that those were copied at the FBI

25   office.  Is there anything unique about those CDs?

A.   It was my understanding --

MR. MARTIN:  We would object to these CDs.  I don't think they can show any relevance to this case.

THE COURT:  I don't know what's on the CDs.

MR. BLY:  And, Your Honor, we are not moving the admission of the CDs into evidence.  I'm simply asking him about what it was they found in the luggage.  We are not moving them into evidence.

MR. MARTIN:  I don't think he should describe them.  What I understand they are, they are totally irrelevant to this case.

THE COURT:  What are you trying to elicit as far as -- are they -- I think the question was --

MR. MARTIN:  Your Honor, could we approach the bench and I will tell you what my concern is.

(At sidebar:)

MR. MARTIN:  One of them is a disk of some pornographic material.  But why do we have to describe it?

MR. BLY:  What we are trying to elicit is that the CDs were encrypted.

THE COURT:  Why is that relevant?

MR. BLY:  To show what he was traveling with something that might have been encrypted.

THE COURT:  It would be important if it was information that was relevant to the case, but if it's not

1    important to the case.  What was on the other CD?

2            MR. BLY:  We don't know.  We have not been able

3    to -- I don't know that information because we don't know the

4    exact classification.

5            THE COURT:  Well, if it was something that was

6    related to the case and it was encrypted, I do believe that

7    that would be relevant.  But if, one, you don't know what it

8    is, or second, it is in fact pornography, I understand why

9    somebody might want to hide that especially going to a Muslim

10   country.

11           MR. BLY:  I understand.

12           THE COURT:  I'm going to sustain the objection.

13           (In open court:)

14   BY MR. BLY:

15   Q.   Agent Rabinowitz, what did you do with the luggage after

16   you repacked it?

17   A.   After it was repacked with the assistance of a Delta

18   representative, we put it on a later flight to JFK so that it

19   could meet up with the outbound flight to Dubai from JFK.

20           MR. BLY:  Nothing further, Your Honor.

21           MR. MARTIN:  I have no questions, Your Honor.

22           THE COURT:  Would anybody like Agent Rabinowitz

23   subject to recall?

24           MR. MARTIN:  Don't you have to bring him back?

25           No, I have no reason for him to be recalled.

THE COURT:  All right.  We appreciate your testimony.  You are being released, but you shouldn't discuss your testimony with anybody until you hear the case is over.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you for being with us.

It is -- I told you my trial days go to 5:00.  We are a little past 5:00, so let's break for the evening.

Tomorrow we will begin at 9:00 promptly and we will begin the testimony at 9:00.  Can you tell me what the order of witnesses is tomorrow and give me a short estimate of their direct examination?

MR. McBURNEY:  I will be better at the former than the latter, but I will do my best.

Agent Allen will testify.  He will be an hour and half maybe, maybe a little less.

Then we will hear from Melissa Harper, the Customs and Border Patrol.  I suspect that her direct will be ten, fifteen minutes.

I think the cross-examination of Agent Allen will take a while.  He's going to go over a number of communications as well.  It will be a mini-version of Agent Richards.

And after Melissa Harper, I believe Zubair Ahmed.  He also will be going over a fair number of communications.  He could be an hour and a half, two hours.

1          Assuming we get through him, we have then two very

2     quick witnesses, Ms. Cohen and Mr. Puller or Puller.  They

3     should be fifteen minutes each on direct.

4          Do you want me to keep going?

5          THE COURT:  No, that gets us started.

6          I just wanted to remind everybody about the

7     obligation I have over lunch tomorrow.  I have made

8     arrangements, but it shouldn't take much more than an hour

9     and fifteen minutes.  But that's a commitment that I made

10    that I want to keep.

11         And I'm happy to stay later tomorrow so we can get

12    in the trial time, but let's just see how things go

13    tomorrow.

14         I know that Agent Richards was a witness that got

15    us started, and there is a lot that came in through him.  But

16    the more efficient we can be on the direct examinations and

17    the cross, the better.

18         MR. MARTIN:  I will tell the Court that now that I

19    have the actual renumbered transcripts, that will make it

20    much easier for me to deal with Agent Allen.  I was a little

21    handicapped today because my numbering system was off.

22         And on Agent Allen and Mr. Zubair, we won't have

23    any significant cross-examination.

24         THE COURT:  Is there anything else we need to

25    discuss before we break for the evening?

1          MR. McBURNEY:  Not at this time.

2          I will report to the Court, I believe we have made

3    available to the media the items that were subject to the

4    first issue, the first motion, the items from the suppression

5    hearing.

6          THE COURT:  Thank you.

7          Mr. Martin, anything else from you?

8          MR. MARTIN:  No, sir.

9          THE COURT:  We will see you tomorrow morning at

10   9:00.

11              (A recess is taken at 5:07 p.m.)

12                        --   --   --

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA        :
                                     :
4   NORTHERN DISTRICT OF GEORGIA     :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

7   Reporter of the United States District Court for the Northern

    District of Georgia, do hereby certify that the foregoing 259

8   pages constitute a true transcript of proceedings had before

9   the said Court, held in the city of Atlanta, Georgia, in the

10  matter therein stated.

11          In testimony whereof, I hereunto set my hand on

12  this, the 17th day of June, 2009.

13

14

15

16                      /s/ Nicholas A. Marrone
17                      _____
                        NICHOLAS A. MARRONE, RMR, CRR
18                      Registered Merit Reporter
                        Certified Realtime Reporter
19                      Official Court Reporter
                        Northern District of Georgia
20

21

22

23

24

25