1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   UNITED STATES OF AMERICA         )
                                     )
4               Plaintiff,           )    CRIMINAL ACTION FILE
                                     )    NO. 1:06-CR-147-WSD-1
5   v.                               )
                                     )    ATLANTA, GEORGIA
6   SYED HARIS AHMED (1)             )
                                     )
7               Defendant.           )
    _____)

8
                    TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
                 UNITED STATES DISTRICT JUDGE
10
                         VOLUME 2
11                  Tuesday, June 2, 2009

12


13

    APPEARANCES OF COUNSEL:
14
    For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
15                              (By:  David E. Nahmias
                                      Robert C. McBurney
16                                    Christopher Bly)

17                              DEPARTMENT OF JUSTICE
                                (By:  Alexis L. Collins)
18
    For Defendant Ahmed (1):    MARTIN BROTHERS
19                              (By:  John Richard Martin)

20


21
           *Proceedings recorded by mechanical stenography*
22          *and computer-aided transcript produced by*
                 NICHOLAS A. MARRONE, RMR, CRR
23                  1714 U. S. Courthouse
                    75 Spring Street, S.W.
24                  Atlanta, GA  30303
                      (404) 215-1486
25

1                        I N D E X

2    *Witness*                                *Page*

3    MELISSA HARPER

         Direct (By Ms. Collins)              262
4        Cross (By Mr. Martin)                272

5    JAMES ALLEN
         Direct (By Mr. McBurney)             279
6        Cross (By Mr. Martin)                325
         Redirect (By Mr. McBurney)           363
7
     STACEY COHEN
8        Direct (By Mr. Bly)                  367

9    WILLIAM PULLER
         Direct (By Mr. Bly)                  380
10       Cross (By Mr. Martin)                391

11   ZUBAIR AHMED
         Direct (By Mr. McBurney)             396
12       Cross (By Mr. Martin)                480

13   KEITH VERRALLS
         Direct (By Ms. Collins)              508
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Tuesday Morning Session

 2                        June 2, 2009

 3                         9:03 a.m.

 4                         -- -- --

 5                  P R O C E E D I N G S

 6                         -- -- --

 7                    (In open court:)

 8           THE COURT:  All right.  Good morning,

 9    everybody.  I hope you had a good evening.

10           We are still in the government's case.  Would you

11    please call your next witness?

12           MS. COLLINS:  Yes, Your Honor.  The government

13    calls Melissa Harper.

14                         -- -- --

15                    MELISSA HARPER

16    being first duly sworn by the Courtroom Deputy, testifies and

17                    says as follows:

18                         -- -- --

19                  DIRECT EXAMINATION

20    BY MS. COLLINS:

21    Q.  Good morning.

22    A.  Good morning.

23    Q.  Where do you work?

24    A.  Currently I work for Immigration and Customs

25    Enforcement.
```

1  Q.   And what is your job with them?

2  A.   Currently I'm a deportation officer.  I work in the

3  prosecutions unit.

4  Q.   How long have you been with Immigration and Customs

5  Enforcement, or I will call it ICE just for short?

6  A.   Since July 2007.

7  Q.   July when?

8  A.   2007?

9  Q.   Is that the term that you have been with ICE -- is that

10  how long you have worked with ICE in total?

11  A.   Prior to working for ICE, I worked for Customs and

12  Border Protection at the airport.

13  Q.   Were you working with Customs and Border Protection in

14  2005?

15  A.   Yes, I was.

16  Q.   And what was your job with Customs and Border

17  Protection?

18  A.   I inspected passengers arriving into the United States

19  for admissibility issues.

20  Q.   How long had you been doing that as of August 2005?

21  A.   At that time four years.

22  Q.   And were you working on August 19, 2005?

23  A.   Yes, I was.

24  Q.   And where were you working then?

25  A.   At that time I was working primarily in a secondary

inspection area called orange secondary.

Q.   And what is that, what is orange secondary?

A.   Orange secondary is when somebody goes through the
primary passport control, when they need further questioning
or additional inspection, they get referred to a secondary
inspection area where we have more time to conduct interviews
and checks.

Q.   Now, on August 19, 2005, did you have occasion to
interview someone named Syed Haris Ahmed?

A.   Yes, I did.

Q.   Was that by chance or planned?

A.   That was a planned interview.

Q.   And how did you know you were going to interview him?

A.   I received a call earlier in the day from the FBI saying
that I needed to participate in an interview with him.

Q.   And what flight did Mr. Ahmed arrive from?

A.   He arrived on KLM 621 from Amsterdam.

Q.   Was Amsterdam his originating location where he traveled
from, or was that an intermediary stop?

A.   No.  He originated in Karachi, stopped in Bahrain,
Amsterdam, then Atlanta.

Q.   When did you first encounter Mr. Ahmed?

A.   In the secondary inspection area.

Q.   And what did you do when you first encountered him?

A.   When I first encountered him, he had all of his papers

in a folder, which is standard procedure, carrying them into

a secondary, put them in a rack.

So I picked up the folder, looked to make sure I had all

the necessary documents, and then I called out his name, and

he came up to the counter.

Q.   Did you verify his identity?

A.   Yes, I did.

Q.   Now, where did you conduct the interview?

A.   I conducted the interview in a separate office.  It's

within the secondary inspection area but there is two offices

there.

Q.   Can you give us an idea of what the interview room

looked like?

A.   Sure.  It looks like a standard business office.  It's

probably twelve-by-twelve feet.  Has a door, a desk, and

probably a five-by-five window that looks out onto the

general inspection area.

Q.   And was there anyone else in the room with you when you

were interviewing him?

A.   Yes.  Initially FBI Agent Williamson was in the room and

ICE Agent Heerlein was in the room.

Q.   Now, when you were talking to Mr. Ahmed, did he appear

to have any issues understanding you?

A.   No.

Q.   You didn't have an interpreter with you?

1   A.   No.

2   Q.   Now, what types of questions did you ask Mr. Ahmed

3   during the interview?

4   A.   I asked him where he was coming from, the purpose of his

5   travel to Pakistan, kinds of activities he did over there,

6   about his previous travel, his family, what he does in the

7   United States.  Those kinds of questions.

8   Q.   Did he -- when he was talking about his previous trip to

9   Pakistan, did he tell you when he originally left Atlanta for

10  Pakistan?

11  A.   Yeah, July 17th, I believe.

12  Q.   Of the same year, 2005?

13  A.   Yes, 2005.

14  Q.   And did he tell you where he stayed when he was in

15  Pakistan?

16  A.   He told me that he stayed in Karachi the whole time with

17  his -- I think his uncles, his family members.

18  Q.   And what was the purpose of his trip to Pakistan that he

19  told you?

20  A.   He said he was seeking religious training.

21  Q.   Did he explain what that meant?

22  A.   Yeah.  He said religious training, and then immediately

23  said that religious training had a bad connotation, and he

24  was actually seeking more spiritual guidance with Islam.

25  Q.   And did he provide you with any names of schools or

1    institutions?

2    A.   Yes, two.

3    Q.   And did he mention anyone who he met in connection with

4    looking for schools?

5    A.   He said he met a man named Oman.

6    Q.   And did he say whether he actually obtained religious

7    training that he was looking for?

8    A.   He said that he was not accepted at either of the

9    schools that he and I talked about.

10   Q.   Did he tell you why?

11   A.   He said that they would prefer somebody with a

12   Bachelor's degree and a little more knowledge or spiritual

13   awareness in Islam.

14   Q.   Now, you mentioned that you asked about his previous

15   travel?

16   A.   Yes.

17   Q.   Did he tell you about a trip to Canada that he made?

18   A.   He said he went to Canada with a friend of his named

19   Shifa.

20   Q.   Did he say when that trip was?

21   A.   He did.  I think in March.  I don't have my report.

22   Q.   Was it of the same year?

23   A.   Yes, it was.

24   Q.   And where in Canada did he say he went?

25   A.   He said he went to Toronto.

```
 1   Q.   Did he explain the reason for his travel to Canada?

 2   A.   He said to see some family members.

 3   Q.   And did he give you the names of any of those family

 4   members?

 5   A.   Yes, he did.

 6   Q.   What was the name he gave you?

 7   A.   I can't really remember.

 8   Q.   Would something help refresh your recollection?

 9   A.   Yes.

10   Q.   What is that that would help?

11   A.   A copy of my written report.

12             MS. COLLINS:  May I approach the witness?

13             THE COURT:  You may.

14   BY MS. COLLINS:

15   Q.   Just for the record, what did I just hand you?

16   A.   This is a copy of the written report that I made

17   immediately after speaking with him.

18        Hold on one second.

19   Q.   Sure, take your time.

20   A.   He said he met with his uncle, Azdee Omani.

21   Q.   Does that refresh your recollection?

22   A.   Yes.

23   Q.   What was the name he give you?

24   A.   Azdee Omani.

25   Q.   How long in total did you talk with Mr. Ahmed?
```

1    A.   It was about an hour and a half I believe to two hours

2    maybe.

3    Q.   Did he answer all your questions?

4    A.   Yes, he did.

5    Q.   Now, when Mr. Ahmed came into the interview room, did he

6    have any bags with him?

7    A.   Yes, he had a backpack.

8    Q.   Now, when somebody enters secondary, do they have their

9    checked baggage as well or just their carry-on?

10   A.   Just their carry-on.

11   Q.   And do you recall what bag Mr. Ahmed had?

12   A.   It was like a backpack.

13   Q.   And what did you do -- what, if anything, did you do

14   with that bag?

15   A.   I emptied out the backpack and searched, looked through

16   all of his belongings, his wallet, identification, that kind

17   of thing.

18   Q.   And what types of items did you find in his carry-on

19   bag?

20   A.   I found books, an address book, personal written essays,

21   what he called essays, personal writings of his, his

22   identification, information in his wallet.  That kind of

23   thing.

24   Q.   And you mentioned that you found an address book.  What

25   did you do with the address book?

```
1   A.   I photocopied the address book.

2   Q.   And what did you do with the original?

3   A.   I returned it to him.

4   Q.   And the photocopies?

5   A.   Photocopies were turned over to the JTTF.

6   Q.   Did you find travel records in his backpack as well?

7   A.   Yes.

8   Q.   And what did you do with them?

9   A.   I photocopied them.

10  Q.   Now, on the table should be marked two exhibits.  One is

11  Exhibit 87, the other Exhibit 89.

12       Do you have both of those?

13  A.   Yes, I do.

14  Q.   Taking a look at Exhibit 87, what is that?

15  A.   This is a receipt for a ticket that he purchased.

16  Q.   Are those items that you found in his carry-on bag?

17  A.   Yes, they are.

18  Q.   Are those the photocopies that you made?

19  A.   Yes, they are.

20       MS. COLLINS:  Your Honor, we would like to admit

21  Exhibit 87.

22       THE COURT:  Any objection?

23       MR. MARTIN:  None other than what we objected to

24  earlier about the process of copying these items.

25       THE COURT:  Then it's admitted.
```

1          MS. COLLINS:  Thank you, Your Honor.

2     BY MS. COLLINS:

3     Q.   Can we show on the screen Exhibit 87?   Can we move to

4     page three?

5          Do you see that Delta item there?  What is that?

6     A.   That's part of the boarding pass for his flight from

7     Atlanta to Houston.

8     Q.   And what's the date of that?

9     A.   July 17, 2005.

10    Q.   Okay.  And then turning to page four, what is the stub

11    on the bottom right-hand side?

12    A.   That's a part of the boarding pass that passengers often

13    retain when they get on an airplane.

14    Q.   And what does this show?

15    A.   It shows he traveled from Houston to Karachi July 17th.

16    Q.   Now, you also mentioned the address book?

17    A.   Yes.

18    Q.   Can you take a look at Exhibit 89?

19         What is that?

20    A.   These are copies -- this is the copy of the address book

21    that I made.

22    Q.   And is that a fair and accurate -- is that a

23    reproduction of the photocopy that you made?

24    A.   Yes, it is.

25              MS. COLLINS:  Your Honor, at this time we would

1   like to admit Exhibit 89.

2              THE COURT:  Any objection?

3              MR. MARTIN:  None other than the objection we

4   raised pretrial.

5              THE COURT:  Then it's admitted.

6              MS. COLLINS:  Thank you, Your Honor.

7   BY MS. COLLINS:

8   Q.   Take a look back at Exhibit 87.  On page four, at the

9   top there, the document that is shown at the top, what is

10  that?

11  A.   That's a scale end ticket originating in Karachi and

12  ending in Atlanta.

13  Q.   Can you tell if that's one way or round trip?

14  A.   That's a one-way ticket.

15             MS. COLLINS:  No further questions, Your Honor.

16             THE COURT:  Mr. Martin?

17             MR. MARTIN:  Just one second.

18                         --  --  --

19                    CROSS-EXAMINATION

20  BY MR. MARTIN:

21  Q.   Good morning, Ms. Harper.  How are you doing?

22  A.   Good morning.

23  Q.   You were shown a document to refresh your

24  recollection.  I want to make sure I have the same document.

25             MR. MARTIN:  May I approach?

BY MR. MARTIN:

Q.   Are these notes or a report that you made?

A.   Yes, it is.

Q.   And let me show you another document.

Was there a special agent with the FBI that was also present during this interview?

A.   Yes, there was.

Q.   Special Agent Williamson?

A.   Yes.

Q.   Have you reviewed his what's called a 302 or his summary?

A.   Yes, I have seen this.

Q.   You stated that you asked Mr. Ahmed -- he answered your questions about why he had gone to Pakistan, did he not?

A.   Yes, he did.

Q.   He said he went to get -- to study Islam and get religious training, did he not?

A.   Yes, he did.

Q.   And he mentioned at least in your recollection two schools that he visited, one was called Dar Uloom?

A.   Yes.

Q.   Showing you what's been previously -- did you do anything to verify that these were real schools that he said he had gone to see?

A.   I don't remember if at that time we verified those

1   references.

2   Q.   Showing you what's been previously marked as Defendant's

3   Exhibit 18, did you check, for example, a website of one of

4   those schools to see whether or not it was a religious school

5   in Karachi?

6   A.   I don't remember that day if I checked or not.

7           MR. MARTIN:  Your Honor, I would move into evidence

8   Defendant's Exhibit 18, which is a website report of that

9   school, Dar Uloom, in Karachi.

10          THE COURT:  Any objection?

11          MS. COLLINS:  No objection.

12          THE COURT:  It's admitted.

13  BY MR. MARTIN:

14  Q.   He also mentioned another school, excuse me if I

15  mispronounce it, Ashraf Ul Madris.  Do you remember that?

16  A.   Yes.

17  Q.   And do you also remember he may have mentioned a third

18  school that he wanted to go to or had looked into, a better

19  way of putting it, Farooq Azam?

20  A.   Yes.

21  Q.   And he told you that he was told by the people at these

22  schools that they would prefer that he complete his

23  undergraduate education; correct?

24  A.   First two schools.

25  Q.   First two schools, right.

1      And the other school, he didn't particularly like the

2   philosophy of the school after he had talked to somebody

3   about the school.  Is that correct?

4   A.   That's what he said.

5   Q.   And did you understand that he was an undergraduate

6   student at Georgia Tech at the time?

7   A.   I understood that he was transferring into Georgia Tech,

8   yes.

9   Q.   And they said we prefer that you finish that, and you

10  would need to be someone who had done more study of your

11  religion; correct?

12  A.   That's what he said.

13  Q.   Did he not say that he had not taken any type of

14  organized religious training in Islam?

15  A.   That's right.

16  Q.   And that he attended the mosque, but he did not have any

17  particular imam or mentor in his religion; correct?

18  A.   Yes.

19  Q.   And he wanted to learn more about his religion because

20  he had no mentor or imam to help him learn his religion;

21  correct?

22  A.   I'm not sure that's the reason why he wanted to learn

23  more, but that is what he said.

24  Q.   That's what he said, yes.

25       He also mentioned that he had family in Karachi, did he

1   not?

2   A.    Yes, he did.

3   Q.    He mentioned that he had traveled to Karachi the summer

4   before, in 2004, did he not?

5   A.    Yes.

6   Q.    And that was because his sister Mariam had been married

7   that summer; correct?

8   A.    That's right.

9   Q.    He usually traveled there every other year, but he had

10  gone both years this time because of these two purposes, one

11  to visit with family, seek religious training, and because of

12  his sister's wedding the year before; correct?

13  A.    That's correct.

14  Q.    With regards to the one-way flight, did he not tell

15  you -- by the way, in trying to arrange the cheapest fair on

16  international flights, sometimes you have to do something

17  odd, like fly from Atlanta to Houston and then to Pakistan.

18  Are you familiar with unusual flight patterns because you

19  could get a cheaper ticket by doing that?

20  A.    I wouldn't say it's common, but I'm aware it happened

21  before.

22  Q.    Did he tell you his one-way ticket cost him fourteen

23  hundred dollars?

24  A.    I believe he did say that.

25  Q.    And the reason he got the one-way ticket was because at

1  that time, he didn't have enough money to buy a round trip,

2  did he not?

3  A.    That's what he said.

4  Q.    And when he arrived in the United States, he only had a

5  small amount of cash on him, did he not?

6  A.    Yes.

7  Q.    He said his father had sent him four hundred dollars,

8  and he had just a hundred Pakistani rupees on him when he

9  arrived.  Is that correct?

10  A.    I think he said his father gave him four hundred dollars

11  to take with him.

12  Q.    To take with him, and he only had a hundred rupees when

13  he got back?

14  A.    That's correct.

15  Q.    Indeed, do you recall that his father was waiting for

16  him to pick him up at the airport?

17  A.    That's what he said, yes.

18  Q.    And this was delaying things, and he said, I need to

19  hurry on, my father is waiting for me, can we contact him or

20  something?  Correct?

21  A.    Right.

22  Q.    You mentioned some personal writings that you saw in his

23  backpack?

24  A.    That's right.

25  Q.    These were in English?

1  A.   Yes.

2  Q.   You read them?

3  A.   I did.

4  Q.   And they appeared to be about his frustration with the

5  current status of Islam in Pakistan?

6  A.   Right.

7  Q.   And there appeared to be sort of a fervent tone to

8  these, did there not?

9  A.   Yes.

10  Q.   That was your word; right?

11  A.   That's the word I used.

12  Q.   Just one final area.  He mentioned that he had a number

13  of relatives in Pakistan, did he not?

14  A.   Yes, he did.

15  Q.   A number of uncles and aunts and cousins that all lived

16  in the Karachi area?

17  A.   That's what he said.

18  Q.   He actually gave you the names of some of these people,

19  did he not?

20  A.   Yes, he did.

21  Q.   Qudsai Khan, Naheed Siddiqui, Birjees Hashmi.  I will

22  give the Court Reporter spellings of those names.  Is that

23  true?

24  A.   I don't remember exactly all the names, but they are in

25  my report.

```
1              MR. MARTIN:  Thank you.  That's all I have.

2              THE COURT:  Any redirect?

3              MS. COLLINS:  No, Your Honor.

4              THE COURT:  Would anybody like Ms. Harper subject

5   to recall?

6              MS. COLLINS:  No, Your Honor.

7              MR. MARTIN:  No.

8              THE COURT:  All right.  We appreciate your

9   testimony.  You are released, but you should not discuss your

10  testimony until you hear that the case has been concluded,

11  and we thank you for being with us.

12             Call your next witness, please.

13             MR. McBURNEY:  James Allen.

14                       --  --  --

15                       JAMES ALLEN

16  being first duly sworn by the Courtroom Deputy, testifies and

17                     says as follows:

18                       --  --  --

19                    DIRECT EXAMINATION

20  BY MR. McBURNEY:

21  Q.   Good morning, sir.

22  A.   Good morning.

23  Q.   Where do you work?

24  A.   Federal Bureau of Investigation, Atlanta Division.

25  Q.   Can you bend the microphone up a little bit closer to
```

1   you?

2   A.   Is that better?

3   Q.   Yes.

4        How long have you worked at the FBI?

5   A.   I worked at the FBI for 13 years.

6   Q.   Were you part of the Atlanta FBI's office investigation,

7   counter-terrorism investigation into Defendant Ahmed and

8   Ehsanul Sadequee?

9   A.   Yes, I was.

10  Q.   What was your particular focus on that investigation?

11  A.   I was assigned to investigate the activities related to

12  Canada.

13  Q.   Did you participate in any of the interviews of

14  Defendant Ahmed in March of 2006?

15  A.   Yes, I did.

16  Q.   There were five interviews.  The first started on March

17  10 and the last was on March 18.  Which of the five?  Not by

18  date, but by ordinal number, fourth, fifth, third?

19  A.   I was involved in the second half of the fourth

20  interview, and I was involved in the fifth interview.

21  Q.   Was there a particular focus to your line of

22  questioning -- or focuses, foci, to your line of questioning

23  of Defendant Ahmed during those two -- or one and a half

24  interviews?

25  A.   We did cover a variety of topics, but primarily I was

1    asking about Canada.

2    Q.    Did you also discuss with Defendant Ahmed the purpose of

3    his travel to Pakistan?

4    A.    Yes, I did.

5    Q.    The Court has already heard that at the end of several

6    of the interviews a written statement was prepared by an

7    agent and then presented to Defendant Ahmed to sign if he

8    chose to and edit if he chose to.

9         Did you prepare any of those -- there are three written

10   statements already in evidence.  Did you prepare any of

11   them?

12   A.    Yes, I did.

13   Q.    After which of the two interviews you described, fourth

14   and fifth, did you prepare one?

15   A.    It would have to be the fifth interview.

16   Q.    Did you give Defendant Ahmed an opportunity to edit or

17   change or remove or alter in any way what you prepared?

18   A.    I did.

19   Q.    Did he end up signing the statement that you wrote?

20   A.    Yes, he did.

21   Q.    Did he initial each paragraph?

22   A.    I can't recall whether he initialed each paragraph.  I

23   do recall his initials multiple places on the page.

24   Q.    More importantly, did you give him a chance to read over

25   the statement before he signed it?

1   A.   I did.

2   Q.   Did you read it to him in case he couldn't read your

3   handwriting?

4   A.   I did read it to him.

5   Q.   At any point did Defendant Ahmed ask you to change

6   something and you refused to do so?

7   A.   No.

8   Q.   The interviews were recorded.  The Court has already

9   heard all of the interviews.  Was there a point when you

10  turned the recording off to deal with some objection that

11  Defendant Ahmed had to the written statement?

12  A.   No, I did not.

13  Q.   Did you ever stop the recording device other than at the

14  end of the interview after Defendant Ahmed left?

15  A.   No, I did not.

16  Q.   What I would like to discuss with you today is what the

17  investigation, FBI investigation revealed as to

18  Defendant Ahmed's various purposes for his travel to Pakistan

19  in the summer of 2005.

20       Do you know what day Defendant Ahmed left for Pakistan?

21  A.   July 17.

22  Q.   Of?

23  A.   2005.

24  Q.   Do you know if he traveled on one-way ticket or

25  round-trip ticket?

1    A.    It was a one-way ticket.

2    Q.    I am going to show -- you should have in front of you a

3    number of exhibits.  I want to start going through some of

4    those.

5         Let's do 82 as a stand-alone exhibit, and then we will

6    try to tender a series of exhibits after that.

7         Before talking about the content of Government's Exhibit

8    82, do you recognize that?

9    A.    Yes, I do.

10   Q.    What is it?

11   A.    It's an e-mail between --

12   Q.    It's an e-mail, okay.  Is this one of the e-mails that

13   was acquired from what we will call the Brynbrooke hard

14   drive, a computer that was imaged that was in the defendant's

15   family home in Dawsonville?

16   A.    That's correct.

17        MR. McBURNEY:  At this time, Judge, the government

18   tenders Exhibit 82.

19        THE COURT:  Any objection?

20        MR. MARTIN:  No objection.

21        THE COURT:  It's admitted.

22   BY MR. McBURNEY:

23   Q.    Agent Allen, did you discuss with Defendant Ahmed during

24   the interview and a half in which you participated the

25   defendant going to Pakistan for the purpose of receiving

1  further religious education, religious learning?

2  A.   Yes.

3  Q.   If we could put 82 on the screen?  If you could magnify

4  the bottom part?

5      So this is an e-mail chain between two individuals.  Who

6  is the sender of the portion of the e-mail we are looking at

7  here?

8  A.   That is Defendant Ahmed.

9  Q.   Okay.  The recipient it says Faraz.  Is that anyone you

10  know in particular?

11  A.   No, not fully identified.

12  Q.   Okay.  From the context of this e-mail exchange that's

13  now in evidence, did it appear that Faraz was connected with

14  some educational institution in Pakistan?

15  A.   Yes.

16  Q.   Defendant Ahmed says what in the first couple sentences

17  of this e-mail, April 29, 2005, to Faraz?

18  A.   He says:  Remember me?   We had some conversations with

19  e-mail about my intention to come for Islamic studies.  I'm

20  planning to come this summer, insha'Allah.  So if you can

21  enlighten me on the details about admission.

22  Q.   Okay.  If we could then show Faraz's response?

23      So this individual Faraz says what in the first couple

24  lines?

25  A.   Yes, I do remember you.  It's good that you are

1  coming.  Our university admissions will be opened July 15th

2  to August 1st.

3  Q.    Agent Allen, did the FBI recover similar e-mails from

4  Defendant Ahmed to either Faraz or other people associated

5  with one or more religious institutions based in Pakistan?

6  A.    Not that I'm aware of.

7  Q.    But it's possible?

8  A.    It's possible.

9  Q.    Okay.  You may not have seen them?

10  A.    Correct.

11  Q.    You should have in front of you Government's Exhibit 73,

12  74, 76, 77, 78 and 79.  There was one interspersed in there

13  that's 41, but let's do the 70s.

14  A.    Okay.

15  Q.    Do you see all those 70s that I mentioned?

16  A.    Yes.

17  Q.    These all are similar-looking documents.  What are

18  these?

19  A.    These are chats.

20  Q.    They are chats that were recovered from where?

21  A.    These were recovered -- Aabid Khan was arrested by

22  British authorities in 2006 on terrorism charges, and at the

23  time of his arrest he had certain digital media on his

24  person.  Contained in that digital media were these chats.

25  Q.    And is Defendant Ahmed a participant in one or more of

1  the chats that are contained in the exhibit numbers I just

2  shared with you?

3  A.   Yes, he is.

4  Q.   Is the topic in these various chats connected to

5  Defendant Ahmed, if he's not involved in that specific chat?

6  A.   Yes, it is.

7  Q.   And the date range for these chats -- it's a narrow

8  range.  What are the dates from the oldest to the most recent

9  of these communications?  They should be in chronological

10  order.

11  A.   Of these, April 16th is the earliest, and going through

12  April 22nd of 2005.

13  Q.   Okay.

14         MR. McBURNEY:  Judge, at this time the government

15  tenders 73, 74, 75, 76, 77, 78, 79.

16         MR. MARTIN:  No objection.

17         THE COURT:  They are admitted.

18  BY MR. McBURNEY:

19  Q.   Let's start with 73.  If you could put just the first

20  page up, please?  If you could magnify just a couple, top two

21  lines?

22         Agent Allen, I'm going to ask you about the monikers

23  that are shown here.  And if you are not familiar with them,

24  there is already in evidence a moniker list that could help

25  answer the question if you don't know.

1      These are chats.  The date of the chat is -- it just

2   disappeared, but what is the date of this chat?

3   A.    April 16, 2005.

4   Q.    Okay.  We have got a time column and then a from that

5   would be whoever is typing the text that one then sees to the

6   right?

7   A.    Correct.

8   Q.    And to would be the other participants in the chat?

9   A.    Correct.

10  Q.    Okay.  The first few lines the typist appears to be

11  someone Aboo Khubayb al-Muwahhid.  Who is that?

12  A.    That's Sadequee.

13  Q.    One of the two focuses of the investigation here in

14  Atlanta?

15  A.    Defendant, correct.

16  Q.    Sadequee is communicating with Abu Umar?

17  A.    Correct, known to us as Khan.

18  Q.    The individual on whose hard drive all these chats were

19  found?

20  A.    Right.

21  Q.    There is one other participant at this point, a J with

22  some punctuation around it.  Who is that?

23  A.    Azdee Omani.

24  Q.    If we jump to page seven, the third line down at

25  6:52:56, someone joins this communication.  Who joins?

1   A.    Deenin@gawab, known as Fahim Ahmed.

2   Q.    Does he have another nickname that he goes by on these

3   chats?  His moniker is Deenin?

4   A.    Sometimes referred to as James.

5   Q.    If we could jump to page ten now, please.

6         This is a particularly long chat, it's 76 pages long.

7   We are not going to go through every page.  I want to

8   highlight a couple of areas.

9         We have Aboo Khubayb we have identified as Sadequee

10  saying something about an apartment.  What does he say?

11  A.    He says, Who else is going to live in the apartment?

12  Q.    What have the participants in this chat been discussing?

13  What's this apartment?

14  A.    In essence, it has been to get an apartment they

15  referred as to a basement in Toronto so they can all come

16  together and plan their travels to Pakistan.

17  Q.    Jump to page 28.  Who is it of the participants in the

18  chat who is out looking for the apartment from the context of

19  the chat, if you can tell?

20        If you -- it's not on page 28.  I'm just asking that

21  question, if you can recall?

22  A.    Yes.  I recall that Azdee Omani and Fahim Ahmed were

23  searching for the apartment.

24  Q.    Okay.  On page 28, the fourth line down, again Sadequee

25  is the typist.  What is it that he says?

A.   He starts:  Insha'Allah I come and maybe Turab too, but
he wants to go to Pak directly from here.  And if the plan
seems flowing smoothly by then, then I stay.  But if it seems
low still, I come back next month.

Q.   Turab is who?

A.   Turab is Defendant Ahmed.

Q.   And Sadequee writes, Turab wants to go to Pak directly
from here, meaning where Sadequee is.  Where is Sadequee in
April of 2005?

A.   Here in Georgia.

Q.   Let's look at page 30.  There is an exchange between
Sadequee and Deenin, Fahim Ahmed or James.  If you would read
those four or five lines starting at 7:19:55, and identify
who the typist is?

A.   Defendant Sadequee writes, But how would my being in TO,
known as Toronto, help get us to Pak faster?

     And Fahim Ahmed responds, Planning, man.  We can't talk
this stuff on the net.

     Defendant Sadequee responds, Okay, then, insha'Allah,
I agree.

Q.   Let's jump to page 41.

     Well, let's go to page 42.  Okay, at the top of the
page, Deenin, Fahim Ahmed, James, says what?

A.   Deenin speaking to Defendant Sadequee says, First of
all, Khubz, you and Turab, Turab is pointless staying there.

1   Q.   Then he's interrupted, but he continues?

2   A.   Cuz that money is useless for going, you know that.

3   Q.   Before you get to Sadequee's response, Deenin says,

4   First of all, Khubz -- what is that shorthand for?

5   A.   The moniker that Defendant Sadequee uses, Khubayb.

6   Q.   Now, Sadequee interrupts Deenin and says what?

7   A.   Sadequee interrupts at that point and says, Turab wants

8   to go directly to Pak.

9   Q.   Deenin's response?

10  A.   With what, five hundred U.S.?

11  Q.   And keep going with the exchange.  We may need to change

12  pages.

13  A.   The response then from Defendant Sadequee, LOL, I don't

14  know.

15       Fahim Ahmed responds, Seriously, so both come.

16  Q.   Then Sadequee?

17  A.   Sadequee responds, I think he can.

18       Fahim Ahmed says, You can't stay in the basement alone.

19  Q.   The basement being a reference to what, based on the

20  context of this chat?

21  A.   The apartment they were all going to have together.

22  Q.   Okay.  Then Sadequee continues with a line, I think he

23  can?

24  A.   Sadequee responds, I think he can.

25       Fahim Ahmed responds, You can't stay in the basement

1    alone.

2    Q.   But Sadequee says, I think he can.  What's the

3    continuation of his line?

4    A.   Oh.  I think he can get it from his family since they

5    are all Pakis.  But, yeah, I will talk to him.

6    Q.   All right.  Go to page 44.

7         Deenin at 7:35:34 says what to Sadequee?

8    A.   So tell the man get over here, we have to plan, plan,

9    plan everything perfectly.

10        And Sadequee responds, Okay, I'll tell him, yeah.

11   Q.   And Deenin's response to that, which would be on the

12   next page?

13   A.   Coordinated since we are going different dates.

14   Q.   The travel that the participants in this chat have been

15   discussing, the ultimate travel is to where?

16   A.   Into Pakistan.

17   Q.   Okay.  Let's look at 74, Exhibit 74, please.  We are on

18   a different date now.  What date is this chat?

19   A.   April 18th, 2005.

20   Q.   We have a new participant in the chat, an Aboo Turab

21   al-Qurashee.  Who is that?

22   A.   That is Defendant Ahmed.

23   Q.   Also in the chat is Aboo Khubayb al-Muwahhid?

24   A.   Correct, Defendant Sadequee.

25   Q.   And Abu Umar?

1    A.    Khan.

2    Q.    And J?

3    A.    Azdee Omani.

4    Q.    What is it that Sadequee says starting at 1:10:04 on the

5    18th of April?

6    A.    He says, Azdee, tell this guy.

7          And Azdee says, Yes.

8          Sadequee continuing says, The deal.

9    Q.    So what's the deal?  What does Azdee say?

10   A.    Azdee says, Yeah, so Ameer, Leader, Turab, we need you

11   here on the 15th with Khubz.

12   Q.    Let's stop for a second.  You said leader, and there is

13   text that's in brackets.  Is that in the original or is that

14   text that was added by a government translator?

15   A.    That is a translation added by the government

16   translator.

17   Q.    So the actual text that J, Azdee Omani, would have typed

18   was, So Ameer Turab, we need you here?

19   A.    Correct.

20   Q.    With Khubz being Sadequee?

21   A.    Correct.

22   Q.    Aboo Turab, the defendant, responds what?

23   A.    Man, I was planning to go to Pak land.

24   Q.    Can we go to page two?

25         Aboo Turab reveals his plan at 1:10:46 continuing down

1    at 1:11:06.  What does he say?

2    A.   It says, My plan was to study in authentic madrassa

3    until you guys joined.

4    Q.   Page three, Turab, pressing the point, says what?

5    A.   The top of the page says, Well, man, the madrassa is

6    free.

7    Q.   And what does Azdee, J, say in response?

8    A.   He says, Brother, or Akhee, we need to organize here.

9    Khubz can't stay by himself.

10   Q.   All right.  Page 23 -- page 24, Abu Umar at 1:41:32

11   says -- and just read the actual text, not the translation?

12   A.   Says, Akhee Turab is ameer, na'am?

13   Q.   And Sadequee's response is?

14   A.   Sadequee's response is, I don't know.

15   Q.   If we go to the next page, Sadequee explains a little

16   bit more at 1:42:26 about the I don't know.  What does he

17   say?

18   A.   Because he is too death-seeking.

19   Q.   And then at 1:42:33?

20   A.   He could be a hazard.

21   Q.   What does Abu Umar, Khan, say in response to that?

22   A.   He says, Na'am, yes.

23   Q.   Then at 1:42:56?

24   A.   May Allah grant him shahadaah and jannah without a

25   single reckoning.

1   Q.   Let's go to 75.  Before we get into that, the evidence

2   before the Court is Defendant Ahmed had been to Washington,

3   D.C., with Defendant Sadequee on April 10th and 11th of

4   2005.  All these chats that we are covering, are they before

5   or after that trip to D.C.?

6   A.   After.

7   Q.   Are they before or after the trip that Defendant Ahmed

8   and Sadequee took to Canada?

9   A.   After.

10   Q.   Government's Exhibit 75, in this communication we have

11   Aboo Khubayb al-Muwahhid, who is?

12   A.   Defendant Sadequee.

13   Q.   Abu Umar?

14   A.   Khan.

15   Q.   And then J?

16   A.   Azdee Omani.

17   Q.   More discussions about who is going to be ameer.  If we

18   turn to page two, now page three, what does J, Azdee, say

19   about Turab?

20   A.   Which one?

21   Q.   The top of the page.

22   A.   At the top of the page, he says, Turab is a mastermind.

23   Q.   And then Sadequee responds with three lines?

24   A.   Thing about Turab is he is too bait and he is too soft

25   with those who would disobey, like with Falook.

1    Q.   In the context of these communications, the term bait

2    means what?

3    A.   Tends to attract attention from law enforcement or other

4    unwanted attention.

5    Q.   Let's go to page eight.  Abu Umar, Khan, is describing

6    what he would like for a leader, an ameer, of this group.

7    What does he say at the bottom of the page, 2:03:04?

8    A.   He says, I would like to have a good brother who is not

9    too extreme nor too lenient in his judgment, no one who will

10   shun someone because he follows a view on certain things,

11   which I find off-putting.

12   Q.   Page 12 -- page 13, Sadequee in discussing Turab says

13   what at 2:06:57?

14   A.   The only two things I would complain about Turab is

15   this, baitness and too lenient.

16   Q.   Then Azdee responds with a series of lines starting at

17   2:07:04 going all the way to 2:07:17.  What does he say?

18   A.   He says, I think Turab can be harsh if he wanted to be,

19   i.e., with tablighis.  I seen the lion come out.

20   Q.   If we go to the next page, Khan at 2:07:50 says what?

21   A.   He writes, Turab, open parentheses, capital Y, closed

22   parentheses.

23   Q.   Are you familiar with emoticons?  The colon and a

24   bracket or parentheses is a smiley face?

25   A.   Yes.

1   Q.   What is in online chatting open parentheses, capital Y,

2   closed parentheses?

3   A.   That's approval, agreement, yes.

4   Q.   So Khan, Turab thumbs up, and then goes on to say at

5   2:08:21?

6   A.   I have no problem with Turab.  I agree with his ideas

7   and thoughts and humor.

8   Q.   Let's move to Government's Exhibit 76, new date.  What's

9   the date of this communication?

10  A.   This is April 21, 2005.

11  Q.   Let's not do 76 yet.

12       Would you please look at Government's Exhibit 41 not yet

13  in evidence.

14       Do you recognize Government's Exhibit 41?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   This is an e-mail.

18  Q.   Okay.  Have you seen this e-mail before?

19  A.   Yes, I have.

20  Q.   It's an e-mail FBI acquired during the course of the

21  investigation?

22  A.   Yes, it is.

23       MR. McBURNEY:  Government tenders Exhibit 41.

24       THE COURT:  Any objection?

25       MR. MARTIN:  No objection.

1    THE COURT:  It's admitted.

2  BY MR. McBURNEY:

3  Q.   If we could put 41 up, please, and do just the header

4  and pass it on.

5       All right.  An e-mail from?

6  A.   Al-Muwahhid.

7  Q.   What's the e-mail -- well, do you know who the from is?

8  A.   Yes.

9  Q.   Did the investigation reveal who al-Muwahhid with a

10  hyphen is?

11  A.   Yes.  That is Defendant Ahmed.

12  Q.   There is a very similar or identical recipient,

13  alMuwahhid with no hyphen.  Who is that?

14  A.   Defendant Sadequee.

15  Q.   What is the date of the e-mail?

16  A.   Wednesday, April 20, 2005.

17  Q.   What does Defendant Ahmed say at the outset of the

18  e-mail?

19  A.   Pass it on to everyone who is coming for the celebration

20  on Mother's Day.

21  Q.   If we could now go back to the main document, let's go

22  paragraph by paragraph.  This is a message regarding --

23  magnify that one.

24       Please read the first sentence?

25  A.   This is a message regarding the Mother's Day celebration

1   that we are planning in the Curry place and beyond

2   restaurant.

3   Q.   During the interviews with Defendant Ahmed, was he asked

4   what Curry place stood for?

5   A.   Yes.

6   Q.   What did he say?

7   A.   Pakistan.

8   Q.   Do you have Exhibit 7 up there?  It's already in

9   evidence.  It's the written statement that you did.

10  A.   Yes, here it is.

11  Q.   You do.  Does that have in it any of these terms

12  translated?

13  A.   Yes, it does.

14  Q.   This is the written statement you wrote and

15  Defendant Ahmed signed off on?

16  A.   Correct.

17  Q.   And Exhibit 7, what does it say Curry place is?

18  A.   Pakistan.

19  Q.   Okay.  Celebration we are planning in the Curry place,

20  Pakistan, and beyond restaurant.  Restaurant stood for what

21  based on what Defendant Ahmed told you in his interviews?

22  A.   It's not detailed in this statement.  Restaurant was

23  their meeting.

24  Q.   Okay.  Let's go to the next paragraph, the I have the

25  membership.

1       Read the first sentence, please?

2   A.   I have the membership of the Curry place restaurant, so

3   does AO, so we can get there without any prior reservations.

4   Q.   Stop for a second.  Curry place restaurant, Pakistan.

5   The author of the e-mail is Mr. Ahmed.

6       What was membership?

7   A.   His Pakistani citizenship.

8   Q.   And AO is who?

9   A.   That's Abu Umar, also known as Khan.

10  Q.   Was Mr. Khan also someone with a Pakistani passport?

11  A.   Yes, he was.

12  Q.   So Khan and Turab can get there without prior

13  reservations.  Keep reading the sentence?

14  A.   But Khubz, James and AZ need to have reservation from

15  the reservation staff.

16  Q.   Khubz being?

17  A.   Defendant Sadequee.

18  Q.   James?

19  A.   Fahim Ahmed.

20  Q.   The Deenin that we saw in these chats?

21  A.   Yes.

22  Q.   And then AZ?

23  A.   Azdee Omani.

24  Q.   Reservation from the reservation staff.  Did you discuss

25  that with Defendant Ahmed?

1  A.   Yes, we did.

2  Q.   What did that mean?

3  A.   That was the visas for travel.

4  Q.   Let's skip a few sentences down.  Read the sentence that

5  starts with, We know that how much?

6  A.   We know that how much Curry place restaurant has respect

7  for the Towers restaurant, and since Khubz has the membership

8  of the Towers, it should be relatively easier for him, but he

9  still needs to find out the information.

10  Q.   Curry place restaurant you just said is Pakistan, has

11  respect for -- what did Defendant Ahmed tell you the Towers

12  restaurant was?

13  A.   The United States.

14  Q.   Towers being?

15  A.   World Trade Towers.

16  Q.   Khubz is Sadequee, he has what type of passport?

17  A.   A United States.

18  Q.   James, let's skip a couple sentences to James

19  probably.  What does that say?

20  A.   James probably has some relatives with the membership of

21  Curry place, so he might be able to get there easily too.

22  Q.   Let's do the next paragraph, please.  Read the first two

23  sentences?

24  A.   Also the get-together at the basement is not as

25  important as this Mother's Day celebration.  The Curry place

is our main area for picnic, and then to spend the night at

the mountain hills national park.

Q.   We already talked about the basement.  What's the

basement?

A.   The basement is the apartment.

Q.   Curry place is Pakistan, main area for picnic.

     And then spend the night at the mountain hills national

park.  What did Defendant Ahmed tell you mountain hills

national park was code for?

A.   That was a training camp in northern Pakistan.

Q.   Training for what?

A.   For terrorism.

Q.   Two sentences later, Khubz's membership for the Towers

is being renewed.  What did that refer to?

A.   Defendant Sadequee was in the process of getting his

passport renewed.

Q.   Is that something that came up in some of these chats

that we have gone through already?

A.   Yes.

Q.   Then Defendant Ahmed talks about how people might get

into the restaurant, Pakistan.  What does he say?  I think it

is not --

A.   I think it is not a good idea to walk in the restaurant

in group.  They might say that we already have too many

guests and might not let us in.  So it is advisable to go in

1    by whatever means possible.  Individuals --

2    Q.    I'm sorry, keep reading.

3    A.    -- individuals or couples, it's up to the person, but it

4    must be done quick.

5    Q.    All right.  Let's go to the second page of this

6    e-mail.  What does Defendant Ahmed write there, starting at

7    the clause that starts with if?

8    A.    If some people can't come to the restaurant, they should

9    choose any other restaurant, such as Rivers front to go.

10   Q.    Rivers front stands for what?

11   A.    Iraq.

12   Q.    Now let's do Exhibit 76, please.

13         The date of this chat is what?

14   A.    April 21, 2005.

15   Q.    Is that before or after the Mother's Day e-mail that we

16   just went through?

17   A.    It's the following day.

18   Q.    The participants in this chat, we have al-Muwahhid with

19   a hyphen, that is?

20   A.    Al-Muwahhid is -- that is Defendant Ahmed.

21   Q.    Also in the chat, Aboo Khubayb?

22   A.    That is Defendant Sadequee.

23   Q.    And we have Abu Umar again?

24   A.    Correct, Khan.

25   Q.    Skip the first few pages, they are talking about -- at

page 14 at 4:37:42, Aboo Khubayb, Sadequee, says what?

Well, let's move back a little bit.  At 4:37:09, what

does Sadequee say?

A.   Azdee has the flu, and still he is going everywhere

looking for basements for us.  Man, Turab, you tell them.

Q.   What does Turab, the defendant, say?

A.   Man, we -- I wrote in the message that basement is not

as important as Curry place.

Q.   Did Defendant Ahmed in fact write in the Mother's Day

e-mail that basement is not as important as Curry place or

Mother's Day celebration?

A.   Yes, he did.

Q.   At 4:38:15, what does Sadequee say to Ahmed?

A.   Turab, it's your obligation as ameer to rectify AZD and

James.

Q.   Let's go to the next -- well, let's start at the bottom

of this page, 14.  What does Sadequee say?

A.   Sadequee says, Also I was thinking we should be with LT

due to them being same Aqeedah and they fighting against

Hindus, so the Murtaddeen shouldn't bother us.

Q.   Let's see the next page.

LT is what?

A.   Lashkar-e-Tayyiba.

Q.   A few more lines than that.  Go all the way -- there,

that's great.

```
 1        Khan in response to they should go with LT says what?

 2   A.   Khan says, But LT --

 3   Q.   No, two lines up, at 4:39:50?

 4   A.   Khan writes, I so some Arabs with Jaysh EM.

 5   Q.   And goes on to say?

 6   A.   But LT, if we can get on good terms with some ikhwaan,

 7   insha'Allah.

 8   Q.   What does Ahmed say in response?

 9   A.   I think that will be decided on the ground.

10   Q.   Keep going?

11   A.   When we get there and see who is available.

12   Q.   If we could go back to the full page, Sadequee at

13   4:40:39 says what?

14   A.   And also our main last goal is to get with the

15   students.  Man, the students are back with full force.

16   Q.   And he closes by saying?

17   A.   May Allah bless them.

18   Q.   The students is what?

19   A.   The Taliban.

20   Q.   They have been having this exchange.  What does Khan

21   tell them at 4:41:06?

22   A.   To be more safer in the decisions we make on the net,

23   it's neither wiser nor practically good.

24   Q.   He sounds a little bit like Yoda there, but what does he

25   say?
```

A.   He's concerned about how much they are typing on their

chats.

Q.   Okay.  Let's jump to page 31 at 5:12:12.  What does

Sadequee say?

A.   Sadequee says, And I think Ismiyy also wants to come to

the restaurant with us.

Q.   Is Ismiyy a moniker for anyone associated with the

investigation?

A.   Yes, it is.  I need to look at the list.

Q.   All right.  Take a look at Government's Exhibit 3 or 22.

A.   Yeah.  Ismiyy is Waseem Mughal.

Q.   We will learn a little bit about him later.

     If we go to -- what does Khan say at 5:12:54?

A.   Khan says, Ismiyy et cetera I talked to.

Q.   And his next line actually spills over to page 32?

A.   He is ready.  The apartment's put on hold for now until

we give the go-ahead.  We have the money for them, but for

now hold, let's get the foundations done instead of building

the roof.

Q.   Finally let's go to I think it would be page 33, a

paragraph that looks pretty similar that been popping up

again and again, and I want you to read the one that's at

5:15:17.

     But what is this text?

A.   Starting back in the beginning where you had me read

1     earlier that it was Turab's responsibility to rectify with

2     Azdee and James, it was his responsibility to tell them to

3     stop looking for the apartment in Canada.

4          And so repeatedly they decide exactly what they are

5     going to say.  And these paragraphs are the final text that

6     they then send to Azdee and Fahim Ahmed.

7     Q.   So read what's at 5:15:17.  This is written by whom?

8     A.   This is written by Defendant Ahmed.

9     Q.   Okay.

10    A.   It says:

11              The trip to TO has been rearranged by me and

12              Abu Umar, and instead we are going to spend that

13              time and money getting some experience in cooking

14              in the Curry place restaurant, and also clearing

15              and finalizing accommodation for you and James

16              until you come to the Curry place restaurant.

17              In the meantime you hold off on the apartment

18              search until we give the go ahead unless it is

19              needed for other bros.

20    Q.   Let's look at Government's Exhibit 77, another one of

21    the Khan chats.  What day are we on now?

22    A.   April 22, 2005.

23    Q.   And participating in this chat, we have Abu Umar, Khan,

24    al-Muwahhid with a hyphen is?

25    A.   Defendant Ahmed.

1    Q.   And Aboo Khubayb?

2    A.   Defendant Sadequee.

3    Q.   Let's go to page three at 3:41:25, al-Muwahhid,

4    Defendant Ahmed, asks Sadequee what?

5    A.   Can you go to TO?

6    Q.   TO being?

7    A.   Toronto.

8    Q.   Sadequee responds?

9    A.   Insha'Allah, yeah.  For how long?

10   Q.   Khan says?

11   A.   I think until -- I think until maybe until Turab gets

12   back.

13   Q.   And what does Turab, Defendant Ahmed, say?

14   A.   As long as it takes to convince them that we are not

15   abandoning them and this is for the good of the group,

16   insha'Allah.

17   Q.   Let's go back to the regular page.  At the bottom of the

18   page, 3:42:18, the defendant, Defendant Ahmed, starts

19   something.  What does he say there, and then we will scroll

20   to the next page?

21   A.   He says, We might be back in a while.  I don't think

22   they can wait that long.

23   Q.   What does Sadequee say at 3:42:23?

24   A.   Man, look, I want to go to Curry land by July at the

25   latest.

1  Q.   And in response, Ahmed says?

2  A.   Azdee and James should not suffer the ordeal of waiting

3  away from the Curry place hotel.

4  Q.   Jump to 3:43:29 on that page.  Sadequee brings in

5  another name.  What does he say?

6  A.   He says, Okay.  Another thing, ikhwaan, Mr. Bond --

7  Q.   Goes on to stay?

8  A.   -- wants to meet, and I think me and Azdee should

9  go.  He is in Urubbaa.

10  Q.   Okay, let's go back to the large page.  And then at the

11  bottom of the page Sadequee says at 3:44:35?

12  A.   Here is what I am thinking.  Turab and you go to Curry

13  land.  I go up to TO, meet with Azdee and James, and then me

14  and Azdee go to Urubbaa to meet Bond.

15  Q.   Khan interjects back at 3:44:45.  What does he say as

16  Sadequee is saying, Me and Azdee should go get Bond?

17  A.   Khan interrupts and says, Akhee, I live there.

18  Q.   Bond is who?  That's a moniker for what individual that

19  you learned about during the course of the investigation?

20  A.   Younis Tsouli.

21  Q.   Younis Tsouli lived where?

22  A.   In the U.K.

23  Q.   And Khan was arrested where?

24  A.   In the U.K.

25  Q.   Did he have a house in the U.K.?

```
1    A.    Yes.

2    Q.    At any point in this chat, 4:22:05, did Defendant Ahmed,

3    al-Muwahhid, say, Who is Bond?

4    A.    No.

5    Q.    Object to the notion of traveling to get Bond to

6    ultimately join up --

7    A.    No.

8    Q.    -- in Curry place?

9          Finally for these -- almost finally -- No. 78.  If we

10   could jump to page two, please?

11         The date of this chat?

12   A.    April 22, 2005.

13   Q.    Same date as the previous one?

14   A.    Yes.

15   Q.    And we have got Aboo Khubayb still?

16   A.    Defendant Sadequee.

17   Q.    And al-Muwahhid with a hyphen?

18   A.    Defendant Ahmed.

19   Q.    So what is it that Sadequee says starting at 4:15:31?

20   A.    Sadequee says, I am thinking, akhee, we could meet Bond,

21   et cetera, and even if it means going to Two Rivers, but we

22   can keep the final goal of Meelaad in mind, and we would go

23   there only to practice cooking and learning.

24   Q.    Two Rivers is what again?

25   A.    Iraq.
```

1    Q.    Now, finally for the chats, Government's Exhibit 79.

2          The date of this chat?

3    A.    April 22, 2005.

4    Q.    All right.  The three we just looked at, are they in

5    chronological order?  In other words, was 77, also on this

6    date, earlier in time than 78, and then in turn 79?

7    A.    Yes, they are.

8    Q.    Okay.  Only two participants in this chat.  Who are the

9    two?

10   A.    Abu Umar, known as Khan, and al-Muwahhid with a hyphen,

11   Defendant Ahmed.

12   Q.    At 4:39:58, what does Defendant Ahmed ask Mr. Khan?

13   A.              How much money is required to go to J lands?

14               He thinks we need five thousand each.

15   Q.    What does Khan say in response?  You don't need to

16   magnify it.

17   A.              Khan says, I went two years ago, and I had

18               about spent and costs et cetera when I was in Pak

19               I think no more than nine hundred, one thousand

20               pounds.  The training itself is free.

21   Q.    Next page?

22   A.              Khan continues:  We will need about -- and

23               he's interrupted by Defendant Ahmed.  What is the

24               main cost?

25               Khan continues:  The main costs are plane

 1                  tickets and traveling costs.  That's all the main

 2                  costs are.  The food is free.

 3                      Defendant Ahmed responds:  Yeah, that's what

 4                  I thought.

 5                      Khan continues:  Boarding free, you only pay

 6                  for extra food you buy and for your boots or

 7                  similar clothing for training.

 8                      Defendant Ahmed then asks:  Then after that

 9                  J land?

10                      Khan responds:  On the way back you mean?

11                      Defendant Ahmed clarifies, says:  No, after

12                  camps is going to J land cost anything?

13                      And Khan responds:  If anything, not

14                  much.  But they launch you into Kashmir or

15                  bordering and you will need money there for food,

16                  traveling by buses and accommodation if not

17                  provided.

18   Q.   Then Ahmed asks?

19   A.                Don't Mujahideen also take ghaneemah so it

20                  helps pay for it?

21                      Khan responds:  Yes they take ghaneemah from

22                  the battles, radios, guns, et cetera, even

23                  sometimes the money itself from killed enemy.

24   Q.   Thank you, Agent Allen.

25        Do you have Exhibit 81 in front of you?

```
1    A.    I do.

2    Q.    This is a chain of e-mails.  Have you seen this before?

3    A.    Yes, I have.

4    Q.    Is this another item from Defendant Ahmed's family

5    computer, the Brynbrooke hard drive?

6    A.    Yes, it is.

7              MR. McBURNEY:  Government tenders Exhibit 81.

8              THE COURT:  Any objection?

9              MR. MARTIN:  No objection.

10             THE COURT:  It's admitted.

11   BY MR. McBURNEY:

12   Q.    If we could put it up and go to the very last page?

13         The chain starts with an e-mail dated April 16, 2005,

14   from --

15   A.    This is from Defendant Ahmed?

16   Q.    To?

17   A.    Safiullah Hussaini.

18   Q.    Mr. Hussaini is located in what country?

19   A.    Pakistan.

20   Q.    Defendant Ahmed says, Life is good, and then goes on to

21   say what?

22   A.    Life is good, but planning to improve.  Soon I will

23   upgrade from second to third, insha'Allah.  It will be better

24   than everything in the world combined.  What about you?

25   Q.    That's good, thank you.
```

1       This date, April 16th, that's after the trip to Canada?

2   A.    Yes.

3   Q.    And after the trip to D.C.?

4   A.    Correct.

5   Q.    If we go to page five, forward one page?  At the bottom

6   of that page but you don't need to magnify, Safiullah has

7   responded.  And what I would like to look at is then the

8   April 21st response from Defendant Ahmed, the top half of the

9   page.

10       All right.  And so we are clear, the author of these

11  words we are looking at is whom?

12  A.    You are on page five?

13  Q.    Yes.  It's a carryover e-mail that starts on page four

14  which we will look at in a second, but we are now going

15  forward in time.  We are starting at the oldest e-mail, which

16  is the last in the chain.

17  A.    Correct.  The author of this is Defendant Ahmed.

18  Q.    And he says what?  I might be coming soon -- read that

19  section?

20  A.    I might be coming soon, insha'Allah, but it might not be

21  in your city.  So if you can meet me, plan on meeting me in

22  some other city and I will explain to you the deal if you

23  want to join.  You can otherwise -- we can pray to Allah to

24  grant us opportunity in His path.

25  Q.    Okay.  Again Hussaini is in what country?

1    A.    Pakistan.

2    Q.    If we go forward a page to page four?

3          At the beginning of the e-mail that you just shared

4    from, the April 21st, there are a list of websites that

5    Defendant Ahmed recommends to Mr. Hussaini.  What's the first

6    one?

7    A.    Tibyan.com.

8    Q.    The second one?

9    A.    AlJihad.tk.

10   Q.    There is a third one, Salafi Publications, what does he

11   tell Hussaini to do at that site?

12   A.    He says, Ignore their antijihad material, but their

13   basic aqeedah is correct.

14   Q.    All right.  If we could go to page three?

15         Before you magnify anything, the bottom part of page

16   three is the start of an e-mail from Hussaini to

17   Defendant Ahmed.  The top part of the page is the end of

18   what?

19   A.    It is the end of an e-mail from Defendant Ahmed to

20   Hussaini.

21   Q.    Dated when?

22   A.    Saturday, April 23rd, 2005.

23   Q.    And Saturday, April 23, falls where in the range of all

24   of these chats we just discussed from the Khan hard drive?

25   A.    This is just after all of the chats.

Q.   Okay.  So we are on page three, and at the -- if you
could magnify the middle third of the page, a few lines down
beyond that?  Great.

     So Defendant Ahmed counsels Hussaini to do what?  Start
with the dedicate.

A.   I'm trying to see where you are talking about.

Q.   I'm about halfway down the page, there is a sentence
uncapitalized that begins, Dedicate your time.

     We are on page three.  It's highlighted on the screen
too.

A.   There you go.

               Dedicate your time to preparing for hijrah and
          the next step, because there can be no third
          without hijrah.  It's the essential part of
          Islam.  Hijrah is obligatory, and the best part of
          hijrah is jihad.

               Start giving hints to your parents that you
          might be going away.  You can say to study Islamic
          madrassa, but somehow prepare them for your
          departure.  If you are serious, jihad is fard ayn
          on every able-bodied Muslim man in this era.

Q.   What was one of the reasons Defendant Ahmed gave to you
for his trip to Pakistan?

A.   To study in an Islamic madrassa.

Q.   At this time I would like to play a few of the excerpts

 1   from the interviews in which you participated.

 2        We could start with 508, and we are going -- do you have

 3   the transcript in front of you?  Great.

 4        If we start at just before the six minute mark.

 5   A.   This is March 17 or March 18?

 6   Q.   March 17th, I'm sorry.  Yeah, March 17th.

 7        This is the March 17th interview.  Just before the six

 8   minute mark.

 9             (By audio:)*

10                  SHA:  You know, I had no idea.

11                  KS:  If . . . if you had your preference when

12             you went to the camps, which camp would you . . .

13                  SHA:  I didn't go to camp.

14                  KS:  I know . . . I know . . . I know you

15             didn't go to camp, but who would you . . . which

16             camp would you wanna go to?  Is there one that you

17             liked?

18                  SHA:  I didn't go to any camps or whatever

19             that means.

20                  KS:  I know, but which group would you wanna

21             go with, afterwards?

22                  SHA:  In Kashmir there was a group

23             Lashkar-e-Tayyiba.

24        _____

25   * Appears here as transcribed in the exhibit.

```
1              KS:  L-J-T, Lashkar-e-Tayyiba, L-T?

2              SHA:  L-T.

3              KS:  In Kashmir.  Well let's say you went to

4       Afghanistan, which group would you wanna fight

5       with?

6              SHA:  I don't know about the Muslim groups.

7       But I heard . . . the Taliban, I knew, but,

8       uh . . .

9              KS:  The Taliban's not really a group, though,

10      they're a government, so it wouldn't be . . . how

11      about if . . . say you stayed in Pakistan, would

12      you . . . would you . . .would you wanna stay in

13      Pakistan and fight?  Like . . .

14             SHA:  No.

15             KS:  Where would you . . . you'd rather go

16      outside?

17             SHA:  Uh, I don't know because . . .

18             KS:  I'm not sayin' you did.  I'm just sayin'

19      which . . . I'm just tryin' to figure out where

20      you'd wanna go?  A personal question.

21             SHA:  Yeah.

22             KS:  Once you went to camp . . .

23             SHA:  Uh-huh.

24             KS:  . . . you got trained and they say,

25      Haris. . .
```

1    SHA:  I saw . . . I met someone from

2    Lashkar-e-Tayyiba at masjid just once.

3         KS:  Lashkar-e-Tayyiba?

4    SHA:  Yeah.

5         KS:  Over here or over there?

6         SHA:  In Pakistan.  So, and he . . .

7         MR:  How did you know that he was in that

8    group?

9         SHA:  He told me that.

10        MR:  Oh, he told you.

11        KS:  Now this guy with L-T that . . . was it

12   Ibn Umar . . . was he L-T?  The guy?

13        SHA:  No.

14        KS:  What did he belong to?

15        SHA:  Uh, I don't know, but, uh, the guy in

16   Pakistan, I . . . I saw him for two summers.

17        KS:  OK.

18        SHA:  Like last summer. . . the last summer

19   before that I went there.

20        MR:  What's his name?

21        SHA:  He told me his moniker.  Like, Sosiana

22   [PH] I think.

23        KS:  Sosiana [PH]?

24        SHA:  Sosiana [PH]

25        KS:  What chat . . . what . . . was that used

for his email or chat room?

SHA:  No.  He has no chat room or email, but I met him at masjid.

KS:  Sosiana [PH].

SHA:  I went to masjid since I was going to . . . I was staying with my counsin.

KS:  What . . . what did you like about him?  Why did you wanna join his group?  What did you like about him?

SHA:  He came to me, like, you know, "Hey brother you're new here, so what's going on."  I was like, you know, "I'm here visiting from America."  "Oh," he said, "very cool."

KS:  Right.

SHA:  And then we started talking . . . talking.

KS:  So is that some . . . is that a group you think you would've liked to join?

SHA:  I had intentions and so I put [UI].

KS:  The L- . . . the L-T group?  How about the [UI] Mujahdeen, would you wanna join them?

SHA:  I don't . . . I don't know anyone from them, probably.

KS:  You don't know?

SHA:  No.

1          MR:  Did you see that individual in the masjid

2          over there when you went to Pakistan last

3          time. . . in August?

4          SHA:  August, yeah.

5          MR:  You saw him.  What was your discussion

6          with him?

7          SHA:  This time I didn't have much time to

8          discuss cause I didn't stay at that aunt's place

9          for a long time.  But, uh, I . . . I did not

10          discuss much.  It was not . . . not this time, but

11          the last trip, that I like . . . that he told me

12          that I'm, you know, I'm L-T.  But I didn't tell him

13          send me to a training camp if you want over there.

14          (Audio ends.)

15    BY MR. McBURNEY:

16    Q.    Agent Allen, during this exchange we just heard, someone

17    brought up LET.  Who brought up LET?

18    A.    Defendant Ahmed.

19          MR. MARTIN:  Your Honor, I think the recording

20    speaks for itself who brought something up.

21          And to say that was the first time it was brought

22    up ever in these conversations is just not accurate.  So

23    I object to that question.  It's just an opinion and it

24    doesn't help the Court.

25          THE COURT:  Well, you will have a chance to

1  cross-examine him.

2          MR. MARTIN:  Yes, sir.

3  BY MR. McBURNEY:

4  Q.   Let's play an excerpt from the interview on March 18th,

5  Exhibit 509.  If you could start at the -- close to a little

6  bit the six minute mark.

7          (By audio:)

8              KS:  . . . you don't speak Pashto?

9              SHA:  No.

10             KS:  Now the group you were talking about

11         wanting to join, um . . . what was the name of the

12         group?

13             SHA:  Lashkar-e-Tayyiba.

14             KS:  Lashkar-e-Tayyiba.  Oh, OK.  And their

15         goal . . . their whole, um, their jihad is in . . .

16             SHA:  Kashmir.

17             KS:  Kashmir.  Do you think Om . . . was

18         Abu Umar a member of L-J or L-T?

19             SHA:  I don't . . . I don't know about that.

20             (Audio ends.)

21  BY MR. McBURNEY:

22  Q.   I'm going to ask the same question, who is it who

23  brought up Lashkar-e-Tayyiba in this interview?

24  A.   Defendant Ahmed.

25  Q.   What was the specific question that was asked of him

1  before he said Lashkar-e-Tayyiba?

2  A.   He's asked, you know, which group was it you wanted to

3  join.

4  Q.   Did you at any point in the interviews discuss with

5  Defendant Ahmed whether he would be willing, if requested by

6  whatever group he joined, to engage in an attack in the

7  United States?

8  A.   Yes, I did.

9  Q.   Let's go back to Exhibit 508, and if we can start as

10  close to 43:55 as you can get.

11              (By audio:)

12                  (KS:)  And you're telling me you don't have

13                  any intentions, so I'm gonna believe twelve people

14                  who tell me what your intentions were.  So

15                  please . . .

16                  SHA:  OK, yes . . . I was, you know, my

17                  intentions were to do something in America,

18                  yes . . . attack . . . I know . . . something . . .

19                  I don't know.

20                  KS:  Not something.  What would you've wanted

21                  to . . . done?

22                  SHA:  OK.  Uh, personally, I would like oil

23                  refinery, or something like that.

24                  KS:  You wanted to attack an oil refinery?

25                  SHA:  Yeah, personally that's . . .

```
 1                    KS:  Where?

 2                    SHA:  Huh?

 3                    KS:  Where would you have done it?

 4                    SHA:  I think there are some oil refineries in

 5              Texas.  That's what I have read then because, I've

 6              read that, you know, like oil is being stolen from

 7              Saudi Arabia. . . from Arabians.

 8                    KS:  Sure.

 9                    SHA:  That's what I read, and that's what I

10              thought and, uh, it would be better, if I . . .

11                    (Audio ends.)

12   BY MR. McBURNEY:

13   Q.  Thank you.

14        Did the defendant's discussions of what he might do in

15   the U.S. ever become more detailed than that?

16   A.  Yes.

17   Q.  In what way?

18   A.  Just talked about other -- possibly an attack at

19   Dobbins, and again there were multiple references to

20   attacking an oil refinery.

21   Q.  Okay.  I understand that, but -- I need to ask the

22   question a different way.  It's somewhat of an unformed idea,

23   oil refinery maybe in Texas.  Was the defendant ever able to

24   give you something more specific than that, a date, a

25   location, anything like that, or was it this general?
```

1    A.    It was general in these terms.

2    Q.    Government's Exhibit 7, if we could put that up?

3          If you would read -- Government's Exhibit 7, this is the

4    written statement that you prepared that Defendant Ahmed

5    signed; is that right?

6    A.    Yes.

7    Q.    You don't need to read it from the screen if it's easier

8    to read from what's in front of you.  If you would read the

9    first substantive paragraph beginning, indicates no threats

10   or promises, et cetera, it's a summary of what I told you

11   guys?  What does this first full paragraph say?

12   A.    It states:

13                When I went to Pakistan to receive military

14                training in a jihad camp, I hoped to join

15                Lashkar-e-Tayyiba.  Shifa made arrangements online

16                for me to meet Abu Umar, who I met with in front of

17                the post office in Karachi.  Shifa gave me

18                Abu Umar's telephone number.

19                When I met with Abu Umar in Karachi he told me

20                that when I was ready, I could take the train to

21                Peshawar, and Abu Umar would pick me up and take me

22                to the military training camp.

23                One of my goals was to become a martyr in the

24                fight against India in Kashmir or wherever else the

25                brothers needed me.  During that time if the

1          brothers had asked me to come to the United States

2          to fight against those that oppress Muslims I would

3          have.

4               Since that time I changed my mind about my

5          duty as a Muslim to be engaged in violent jihad.

6   Q.   Thank you.

7          MR. McBURNEY:  Thank you, Agent Allen.

8          That's all I have, Judge.

9          THE COURT:  All right.  Mr. Martin?

10                    --  --  --

11                    CROSS-EXAMINATION

12  BY MR. MARTIN:

13  Q.   Agent Allen, do you have up there the e-mail from

14  Safiullah Hussaini that Mr. McBurney was asking you about,

15  about tell your parents you are going to go to school first

16  and when you are really going to jihad?  Do you remember that

17  one?

18  A.   Yes, I have that.

19  Q.   What number is that?

20  A.   That is labeled Exhibit 81.

21  Q.   And what's the date of that communication?

22  A.   It's a chain of e-mails.

23  Q.   Yeah.  What's the last date?

24  A.   The last e-mail is dated Tuesday, April 26, 2005.

25  Q.   April 26?

1    A.    26, 2005.

2    Q.    Showing you what's been previously marked as Defendant's

3    Exhibit 17, this is -- can you identify that, first of all?

4    A.    This would be my first time seeing this.

5    Q.    You were not familiar with any additional e-mails after

6    that e-mail from Mr. Ahmed to Mr. Hussaini?

7    A.    I am not.

8          MR. MARTIN:  Your Honor, I would move into evidence

9    Defendant's Exhibit 17.

10         THE COURT:  Any objection?

11         MR. McBURNEY:  No, sir.

12         THE COURT:  It's admitted.

13   BY MR. MARTIN:

14   Q.    Doesn't that e-mail -- you can keep it with you.

15   A.    Thank you.

16   Q.    Doesn't that e-mail indicate that there is specific

17   discussions after the April date between Mr. Hussaini and

18   Mr. Ahmed about specific schools he wants to attend in

19   Pakistan?

20   A.    Before I answer you, I would like to take a minute to at

21   least look it over.

22   Q.    Sure.

23   A.    I don't see the specific schools.

24   Q.    Well, let's talk about the bottom part of it first.

25   A.    Okay.

1  Q.   This is an e-mail from Syed Ahmed to Safiullah Hussaini.

2  Do you know whether or not that's a cousin of his in

3  Karachi?

4  A.   I do not know for certain.

5  Q.   Just look here at the very bottom:  Can you find out

6  about Dar ul Hadith Tahmania, it's in Karachi.  Please find

7  out about it, if you can.

8       Do you know anything about what Dar ul Hadith is?

9  A.   No.

10  Q.   Do you know what a Dar ul Hadith -- or Dar ul is in Urdu

11  or in Arabic?

12  A.   I have heard the term.  I don't know what it is.

13  Q.   Dar usually means a school of a particular person;

14  right?

15       Look here at the top.  This is the response from

16  Mr. Hussaini:  I will let you know.  So when you are coming,

17  besides that, why don't you try Dar ul Uloom Karachi and some

18  other places.

19       Do you now see that there are some references to schools

20  on that e-mail, after the e-mail that you just talked about

21  with Mr. McBurney?

22  A.   Based on your interpretation, yeah.

23  Q.   Let me ask you about your role in this.  You mentioned

24  that you were shown that e-mail, but you weren't shown or

25  were not familiar about the subsequent e-mails.

1      You are not the case agent in this case, are you?

2  A.   No, I am not.

3  Q.   And how did you come to know that particular e-mail as

4  opposed to any other e-mail that might be relevant to the

5  question of whether he was going there for schools?

6  A.   Well, after you gave me an opportunity to review it a

7  little further, I do recall at some point in the

8  investigation seeing these e-mails.

9  Q.   Okay.  Your focus in this has been primarily what

10  happened in Canada?

11  A.   Correct.

12  Q.   From the many of the communications that you have talked

13  about, including the -- I will just call it for short the

14  Mother's Day e-mail --

15  A.   Correct.

16  Q.   -- you would think from all that that Mr. Ahmed was the

17  leader, the ameer of all this; is that not correct?

18  A.   Correct.

19  Q.   That's the point you were making, is it not, from your

20  conclusions?

21  A.   Correct.

22  Q.   Ameer means a leader; correct?

23  A.   Correct.

24  Q.   However there never was anybody that arranged for a

25  basement apartment in Canada, did they?

A.   I do not think final arrangements were made.

Q.   All the people that you were talking about going to
Pakistan with Mr. Ahmed as their leader never got to
Pakistan, did they?

A.   I do not know.

Q.   The only person that ever went to Pakistan is Mr. Ahmed;
correct?

A.   I believe Khan.

Q.   Khan, Khan went to Pakistan.  Khan was supposed to be
the person who was going to help everybody get into a
terrorist camp based on the Mother's Day plan; correct?

A.   Correct.

Q.   That plan never came to fruition, did it?

A.   I can't tell you if any of those other individuals ever
traveled to Pakistan or not.

Q.   This ameer didn't bring that plan to fruition I guess is
the best way to say it?

A.   No, Defendant Ahmed did not take the others to
Pakistan.

Q.   Are you familiar with an e-mail chain or e-mail or chat
room that's Government's Exhibit 117, and I will show you my
copy of it and see if it -- it is of September 19, 2005.

A.   Again I would have to take some time to review this to
tell you whether or not I have ever seen it.

Q.   Well, let me ask you a question.  Subsequent to

1  Mr. Ahmed going to Pakistan and then coming back to the

2  United States, never joining any training camp; correct?

3  A.   Not that I'm aware of, no.

4  Q.   There was continued surveillance; correct?

5  A.   Correct.

6  Q.   And at times in your investigation, you have continued

7  to get documents from hard drives and other places that

8  documented communications that occurred afterwards; correct?

9  A.   Others involved in the case, yes.

10  Q.   Yes, sir.  And without going into any more than that,

11  there was -- you gained access to certain communications like

12  chats between a number of different people that occurred in

13  2005, September of 2005.  Is that not correct?

14  A.   I don't know that -- I don't know what my involvement

15  would have been in gathering additional chats at that time.

16  Q.   Let me just mark this as Defendant's Exhibit 27 for the

17  time being.

18        MR. MARTIN:  I think it's identical to Government's

19  Exhibit 117, unless we want to use your exhibit?

20        MR. McBURNEY:  We should use yours, but can we just

21  see it?

22        No, 117 is not that.  It's 116.

23        MR. MARTIN:  Excuse me, 116.

24  BY MR. MARTIN:

25  Q.   This is a copy of 116.

```
 1   A.   Okay.

 2   Q.   And let me --

 3              MR. MARTIN:  Do you mind me publishing portions of

 4   this now?

 5              MR. McBURNEY:  It's your exhibit.

 6              MR. MARTIN:  I will make this Defendant's Exhibit

 7   27 and move its admission.

 8              THE COURT:  Any objection?

 9              MR. McBURNEY:  No, sir.

10              THE COURT:  It's admitted.

11   BY MR. MARTIN:

12   Q.   One of the people that was involved in some of the

13   communications that you talked about was Mr. Ehsanul

14   Sadequee; correct?

15   A.   Correct.

16   Q.   Sometimes known as Shifa; correct?

17   A.   Correct.

18   Q.   Let me show you -- just one second.

19              MR. McBURNEY:  Do you want to put it on the

20   screen?

21              MR. MARTIN:  Yeah, can you just go to page four?

22   BY MR. MARTIN:

23   Q.   If you would start there at the bottom of the page at

24   7:04:19 and blow that up:  What happened?  Do you see that?

25        First of all, do you know who -- do you know who
```

1   mustadrak@gawab.com is?

2   A.   Let me review the list.

3   Q.   It's Shifa, is it not, or Sadequee?

4   A.   Yes, Ehsanul Sadequee.

5   Q.   All right.  And he says -- this is what I would call a

6   chat.  A number of different people are coming in and out of

7   the conversation.

8        What happened?

9        This is September 19, 2005, so this is after the trip to

10  Pakistan; correct?

11  A.   Correct.

12  Q.   What happened?  You all chickened out or something,

13  something to that meaning?  LOL, laugh out loud.

14       Who is Sbualy@gmail?

15  A.   That's Azdee Omani.

16  Q.   Did Mr. T -- now, Mr. T is Turab, that would be

17  Mr. Ahmed; correct?

18  A.   Correct.

19  Q.   Did he meet with -- can you go to the next page,

20  please?  Thank you, just that part would be good.

21       -- meet with him --

22       That would be Abu Umar or Mr. Khan; correct?

23  A.   Correct.

24  Q.   -- there?

25       This is Shifa:  Yeah, he did, only once.  Laugh out

1   loud.

2       Then who is aht48?

3   A.   That's Waseem Mughal.

4   Q.   And what?  Right?

5       Would that be sort of -- WTJ, what would that mean, do

6   you know?

7   A.   I do not know.

8   Q.   All right, let's leave it at that.

9       Why only once?

10       Then Mr. Shifa:  Because T was in the capi.  Would that

11   be the capital, Karachi, which is not really the capital?

12   Okay, you don't know.

13       Should he -- he should have been camping outside his

14   door.

15       Let's back up, why don't you do that for me, please?

16   Okay.

17       This is again the same person:  He should have been

18   camping outside his door.  They were just -- then blow up the

19   whole next section for me, please?

20       Shifa here, AU, that would be Abu Umar?

21   A.   Correct.

22   Q.   Went to the capi -- capi may be Karachi, we don't

23   know -- to meet Turab; correct?

24   A.   Correct.

25   Q.   And then the next person, who is this again?

1    A.    Waseem Mughal.

2    Q.    Mughal, that's correct.  My God, if I ever see him

3    again, I want to ask 1Q, one question:  Why?

4          All right.  Would you blow up just the next section for

5    me?

6          Why?   And the -- please, the next?

7          The plan was that T was going to soon go to Waanaa.

8          Do you know what that means?  Is that an area in

9    Pakistan?

10   A.    I'm not sure.

11   Q.    But then T started wearing white camo in Kara, Karachi?

12   A.    Correct.

13   Q.    Wearing white camouflage.

14         Then Mughal has WTH, would that be what the hell?

15   A.    Could be.

16   Q.    So he got F'ed.  We all know what that means.  Laugh out

17   loud.  Up the behind; correct?

18   A.    Correct.

19   Q.    Move on to the next section.

20         What the hell, Mughal.

21         Then this is from Shifa -- no, who is this one again?

22   A.    Sbualy?

23   Q.    Sbualy, that's right.  God is our support.  Laugh out

24   loud.  YYYY.  Wondering why.  Akhee, brother, why do you

25   people have no brains is what he says, does he not?

1   A.   Correct.

2   Q.   Laugh out loud.

3        Then here is Shifa:  Yeah, man, Abu Umar sent me a PM.

4   What would be a PM?

5   A.   Private message.

6   Q.   Private message in TB?

7   A.   Tibyan Publications.

8   Q.   A long time ago, saying tell T to stop wearing Chechen

9   clothing.  Camo, he's all dressed up in camo in Pakistan.

10  Laugh out loud.  This is not a picnic, dude.  T was messed

11  up.  That would be Mr. Ahmed; right?

12  A.   Correct.

13  Q.   From the beginning, no offense.

14       Can you move up the next section?  Maybe we should

15  have -- did we miss something?  Can we go back to a page?

16       When I -- then next to the top of the next page, thank

17  you -- heard his stories, he thought it was all fun and

18  games.  Right?

19       Then the next response, this is by Shifa:  Akhee, man, T

20  is like a macho man.  He got the body, but not the brains.

21            MR. McBURNEY:  I'm going to interpose an objection

22  at this time.  We haven't had a question in a while.

23  BY MR. MARTIN:

24  Q.   Is that not true?

25            MR. MARTIN:  You are right.  There is no

1    question.  I don't need to ask a question, do I?

2              MR. McBURNEY:  You don't need to read it either.

3              MR. MARTIN:  You are right, fair enough.

4              THE COURT:  Well, I mean, the government has the

5    reading done.  I'm going to have to read this anyway.  It's

6    helpful.

7              MR. MARTIN:  I mean, the government has been doing

8    a little bit of reading.

9              MR. McBURNEY:  There needs to be question at some

10   point as opposed to reading this and then sitting down and

11   saying isn't it true this document says that.  The document

12   says what it says, and the Court will --

13             THE COURT:  Accept that I understand that.

14             MR. MARTIN:  All right.

15   BY MR. MARTIN:

16   Q.   We talked about -- you were asked in the e-mails, we

17   were talking about picnic being a symbol for a particular

18   thing, a meeting in Pakistan; correct?

19   A.   Correct.

20   Q.   And just to ask -- I hope he gets -- this is Shifa --

21   no, excuse me, that's Mughal:  I hope he gets smart, laugh

22   out loud.  Insha'Allah -- insha'Allah, that's a phrase we see

23   all the time, God willing.

24        Move up to the next line.  Actually I want to go

25   back.  Can you go back -- we don't need to go -- go back to

1   line at 7:07:35, please.

2       7:35.  I'll show you where I'm talking about.

3       This is not a picnic.  That means something else in that

4   phrase, don't they?

5   A.   The word picnic?

6   Q.   Yes, sir.

7   A.   I feel like I'm looking at this in isolation.  Without

8   reviewing the whole thing and without looking at the

9   context --

10  Q.   From the context, doesn't it fairly appear that these

11  people were saying, wait a second, this is not some fun and

12  games, that this ameer supposedly had to direct this group to

13  become jihadi warriors?

14  A.   In the portions I have seen, yes.

15          MR. MARTIN:  Your Honor, I don't know if you want

16  to take a morning break.  This would be a good time for me to

17  break because I'm turning to another subject.

18          THE COURT:  Let's do that.  If we can, let's break

19  for just until a little past 11:00, because then I will have

20  to adjourn for lunch at quarter till twelve.  That will give

21  us a full forty-five minutes before I have to leave.

22          MR. MARTIN:  Okay.  So do you want me to

23  continue --

24          THE COURT:  No, we are going to break for about ten

25  minutes --

1          MR. MARTIN:  Okay, that would be fine.

2          THE COURT:  -- rather than fifteen.  We will be in

3    recess until a little after eleven.

4          We will be in recess.

5          (A recess is taken at 10:51 a.m.)

6                         --  --  --

7          (In open court at 11:06 a.m.:)

8          THE COURT:  Continue, Mr. Martin.

9    BY MR. MARTIN:

10   Q.   Agent Allen, you testified that during the course of the

11   time that you were with Mr. Ahmed during the interrogations,

12   in your opinion, he's the one that brought up LET first;

13   correct?

14   A.   That's correct.

15   Q.   Now, you came in at the very end, so there had been

16   hours and hours of interrogation before you even got

17   involved; is that correct?

18   A.   That's correct.

19   Q.   Plus you weren't even aware of what type of promises,

20   threats or anything that had been made to him earlier than

21   you taking on the interrogation; correct?

22   A.   I have no knowledge of anything that took place before I

23   got there.

24   Q.   Sure.  Turning to the -- I think it's Government's

25   Exhibit 76, the e-mails of the chat between Abu Umar, Haris

and others, page 15, you would agree with me that at least in

that e-mail which predated the trip to Pakistan, that

Mr. Ahmed said that it will be decided on the ground?  There

is talk about LT, but that will be decided on the ground; is

that not correct?

A.   Yes.  Defendant Ahmed says:  I think that will be

decided on the ground.

Q.   When we gather and see who is available; correct?

A.   Correct.

Q.   And also you mentioned earlier that Abu Umar tended to

be a little bit concerned about the group he was dealing with

because of all of this chatter on the internet; correct?

A.   I know that to be a fact.  Where on this page I don't

see it.

Q.   Well, to be safer in decisions we make on the net, it's

neither wiser nor practically good.  Remember you commented

on that earlier?

A.   Correct.

Q.   All right.  Thank you.

     With regard to the statement in LeT for a second, during

your interviews, could you -- let's go to 508 at 8:16 --

18:15, I'm sorry.

          (By audio:)

               KS:  Really?  So you think you . . . but did

          he . . . you still think he was Pakistani?

1          SHA:  I think he was Pakistani.

2          KS:  Which group do you think he was more or

3     less . . . was he . . . do you think he was a

4     Lashkar-e-Tayyiba, or no?

5          SHA:  Uh, I did not know about his groups and

6     stuff.

7          KS:  He didn't tell you which group that he

8     wants . . .

9          SHA:  No.

10         KS:  . . . to recruit you into . . .

11         SHA:  No.

12         KS:  . . . or anything?

13         SHA:  No.  But he told me all the general

14    things when I spoke to him, like, where I live;

15    where my village is.

16         KS:  Where'd you live . . . where's . . .

17    where's his village in?  Hyderabad or . . .

18         SHA:  I don't know.  I . . . I think in

19    N-W-S-B.

20         (End of audio.)

21    BY MR. MARTIN:

22    Q.   So he told you in the interview that with regards to

23    Abu Umar, he didn't know whether he had any connections with

24    LeT or not?

25    A.   I do not believe I was present for this portion of this

1  interview.

2  Q.   Did this precede you coming in?

3  A.   I believe so.

4  Q.   So you didn't know about that exchange?

5  A.   No.

6  Q.   Okay, fair enough.

7       Let's talk a little bit about -- well, on that, let's

8  stay with that subject.  Let's go to 509, March 18.

9       By the way, you could tell from the tapes, Mr. Ahmed

10  talks really fast sometimes, and sometimes you have to ask

11  him to slow down to ready understand him; is that correct?

12  A.   That's correct.

13  Q.   Let's please go to 28:25.

14       And JA would be you; is that not correct?  Well, you

15  were there for the entire interview on March 18th; correct?

16  A.   Correct.

17            (By audio:)

18            JA:  A training camp.  And did you . . . did

19       you have a particular training camp in mind?

20            SHA:  I don't know any training camps, so

21       I don't have one in mind.

22       (Audio ends.)

23       MR. MARTIN:  That's all.

24  BY MR. MARTIN:

25  Q.   So when you talked about training camps, he admitted

1  that he didn't have a particular one in mind, did he?

2  A.  At this particular portion.

3  Q.  Yes, sir.  And you were asking him at that point,

4  I think you all were discussing the -- I call it the Mother's

5  Day e-mail that you talked about before; correct?

6  A.  Correct.

7  Q.  All right, fair enough.

8  Let's -- let me approach for a second so I get the right

9  number.

10  In Government's Exhibit 7, which is the handwritten

11  statement that you wrote out, that describes what you -- it

12  was written by you to summarize generally what he had said

13  about the possibility of various different attacks; correct?

14  A.  Correct.

15  Q.  But even in the written statement, it doesn't say that

16  he actually ever planned any of those, does it?

17  A.  I --

18  Q.  He uses the word mentions, does he not?

19  A.  He said we should attack oil storage facilities and

20  refineries.

21  Q.  Let me stay with you -- let me show you what I'm talking

22  about.

23  In March of 2005 in Canada I met with Azdee and James

24  and other brothers -- good, let's do it up here -- other

25  brothers while waiting -- go on to the next page, right

1   there.

2        Doesn't it say, I mentioned that we should attack oil

3   storage facilities and refineries; right?

4   A.   Yes.

5   Q.   Then he said, I wanted to attack these places because

6   the oil is being stolen from the Muslims and an attack would

7   cause the price of oil to increase.

8        And then he says, I also mentioned to Azdee and James

9   and Shifa that we should attack a military base; correct?

10  A.   Correct.

11  Q.   But on another occasion I discussed attacking Dobbins

12  Air Force Base; correct?

13  A.   Correct.

14  Q.   Move it up a little bit more, if you would, please?

15       And it also says that, Azdee and James, we -- mentioned

16  that they should attack the satellite system that controls

17  lasers and so forth; correct?

18  A.   Correct.

19  Q.   He actually told you that this was sort of a session

20  when people were just throwing out momentary random thoughts

21  about things we might want to do?

22  A.   I don't know if he used the word momentary or random.

23  Q.   Well, let's look at 46 -- excuse me, on 508, 46:30?

24  A.   508?

25  Q.   You may not have been on this particular point but you

1    may have been.

2    A.   46:30.

3              (By audio:)

4              SHA:  OK.  Uh . . . uh, not really.  I mean,

5         of course there are other . . . you see more . . .

6         more momentary . . . like ideas, but that's about

7         it.

8              KS:  Like what would the momentary ideas be?

9              SHA:  [UI] There could be an attack on a base,

10        a military base or whatever.

11             (Audio ends.)

12   BY MR. MARTIN:

13   Q.   That's enough.  He said himself that these were

14   momentary ideas that were being thrown out about attacks on

15   this, that and the other.  That's what we just saw.  Do you

16   need to look it up?

17   A.   Yes.  I was just trying to see if I was present for that

18   portion.

19   Q.   Okay.  Let's go to -- let's go to a fuller description

20   of that, if we may, so we don't just rely upon the written

21   statement.

22        Can we go to 14:21 on 509?

23        That's you, you are there?

24   A.   Yes.

25             (By audio:)

          JA:  Um, you said . . . you mentioned
yesterday, at one point you shared with them an
idea that you had . . .

          SHA:  Uh-huh.

          JA:  . . . uh, for making an attack on the oil
refineries in Texas.

          SHA:  OK.

          JA:  OK?  Did you discuss how you were gonna
do that?

          SHA:  Uh, it was just like idea:  "Oh, like
let's do this."  But nothing specific was
discussed.  Nothing or . . .

          JA:  OK.

          SHA:  . . . nothing in particular.

          JA:  What was . . . what . . .what were your
thoughts?  Why . . . why was . . .why were the oil
refineries a good target?

          SHA:  What do you mean?

          KS:  Well, we talked about it yesterday.  You
said you were talking about, you know. . . we're
not talking about this is how you feel right now.
But dur . . . during that time, when you were upset
at everything, that little window you said "oil
refineries, military bases and . . . and then D.C.,
Masonic Temple."  But while you were in Canada,

1    you . . . uh, did you talk [UI]?  We had some

2    confusion.  When you were in Canada did you talk

3    about the refineries in Texas, the mili . . .

4    Dobbins . . .

5         SHA:  No.  We . . . Dobbins, I did not.

6         KS:  What . . . what did you discuss while you

7    were in Canada, with these guys?

8         SHA:  Uh, the . . . first of all, yeah, I

9    said, you know, that oil refineries was not

10    specific oil refineries.  But I was like, "OK,

11    let's . . . how about oil . . . oil . . . oil

12    installations?

13         KS:  Oiling installations?

14         SHA:  Yeah.

15         KS:  In Texas though.  So we . . . because you

16    said Texas yesterday.

17         SHA:  Texas I had thought maybe they are from

18    [UI].  I don't think I mentioned the state of Texas

19    with them.

20         KS:  Right.

21         SHA:  Yeah, maybe I . . . I had Texas in mind.

22         KS:  Right.

23         SHA:  But I don't think I mentioned Texas to

24    them.  But oil . . . oil installations [UI] now.

25         KS:  And the reason for that was?

1      SHA:  Well, I thought that . . . I thought

2      that, you know, all the oil in the Middle East,

3      and, like, it's Muslim property and it's being

4      stolen.  That's what we . . . that's what we think.

5      So . . .

6          KS:  Kinda payback.  So it's . . .

7          SHA:  So, yeah, it is, you know, raise the oil

8      prices . . . price of oil, so that, you know. . .

9          JA:  Oh, so like, uh, to have an economic

10     impact on the United States.  I mean, if you . . .

11     if you take away the oil supply.

12         SHA:  Not take it away.  Like raise the prices

13     so that people over there get more money.

14         JA:  Right, OK.

15         KS:  It's already up.  Price's expensive

16     already in oil, man.

17         JA:  Very expensive.  Now how . . . did you

18     all discuss how it could be done?  You know, a

19     truck bomb?  Any . . . any details, like blow up a

20     pipeline?  Anything like that?

21         SHA:  Nothing specific was ever discussed.

22     Like, we were all just like, "Hey, I'm going . . ."

23     Like let me give you an example of how stupid it

24     was.  Like one of the guys mentioned can we disable

25     GPS satellites.

```
1              JA:  Satellites?

2              SHA:  It was just random ideas being thrown at

3          people.

4              (Audio ends.)

5    BY MR. MARTIN:

6    Q.   Stop there a second.

7         He does say random ideas being thrown out, does he not?

8    A.   Yes, he does.

9              MR. MARTIN:  All right.  Go on.

10             (By audio:)

11             JA:  Well, let's talk about that.  You

12         mentioned the oil refineries.

13             SHA:  Yeah.

14             JA:  You thought that would be a good idea.

15             SHA:  Yeah.

16             JA:  OK.  Now whose idea . . . did you

17         mention . . . you didn't say Dobbins, but did you

18         mention the military bases?  That it would be a

19         good idea to . . .

20             SHA:  Not to them, no.

21             KS:  Who. . . who did you discuss that with?

22             SHA:  Only with Shifa.

23             JA:  Just with Shifa?

24             SHA:  Yeah.

25             KS:  Up there or . . .
```

1    SHA:  No, here.  OK, we used to like meet

2    pretty often, so . . .

3    KS:  When you were . . . when you were meeting

4    with Shifa, what other things did you discuss

5    about . . . what other . . . even if it was stupid

6    or silly and you didn't mean it at the time or you

7    don't mean it now . . . what other, like, you know,

8    attacks or actions did you guys talk about?

9    SHA:  Masonic Temple.  But normally we were

10   discussing about [UI].  Mainly our issue was . . .

11   KS:  Going to training.

12   SHA:  . . . was going to training.

13   KS:  Go to training there and . . .

14   SHA:  Yeah, however, yeah, sometime I

15   am . . . Masonic Temple because I was like Masons.

16   We . . . we had been told they worship the devil or

17   whatever.

18   KS:  Tell me a little bit more about that.

19   Tell us about the Masonic Temple.  What . . . what

20   was your thoughts on them?

21   SHA:  Man [UI] . . . I didn't even know it

22   existed.

23   KS:  Right.

24   SHA:  But I remember, on King Street or

25   something . . .

1          KS:  Right.

2          SHA:  . . . so that . . ."What was that?"  And

3       there was a board that said "Masonic Temple."

4          KS:  And you're like, this is bull's-eye.

5       This is it and we gotta take a picture.

6       (Audio ends.)

7       MR. MARTIN:  Stop it again.

8  BY MR. MARTIN:

9  Q.   Are you familiar with the video of the Masonic Temple in

10  Alexandria near King Street?

11  A.   Yes.

12  Q.   He's here saying, Oh, there it was, bull's-eye.  I guess

13  that's Sadiqi's word, bull's-eye.  It just happened to be

14  there and they took a picture of it; correct?

15  A.   Correct.

16  Q.   He had some talk about the Masons before, and that's why

17  they took a picture; correct?  It was there, let's take a

18  picture of it?

19  A.   I don't know why he took the picture.  I mean, he goes

20  on to talk about his feelings about the Masons.

21  Q.   Right.  He says elsewhere that he's been told that they

22  are devil -- from the devil, for lack of a better word?

23  A.   Yes, sir.

24       MR. MARTIN:  Let's go on.

25       (By audio:)

```
 1              (KS:) What is it about the Masonic Temple

 2         again?

 3              SHA:  What?

 4              KS:  You were told that . . .

 5              SHA:  I mean on the . . . if you read all the

 6         conspiracy documents or whatever, there's a, you

 7         know, they portray that . . . that Masons are

 8         like . . . I don't know, conspiritists or whatever.

 9              KS:  What conspiracy were they talking about?

10              SHA:  Like, I don't know the . . . the . . .

11         it looks as if they control the entire, like,

12         economy or that the world or whatever.  And, you

13         know, they . . . like they are devils . . .

14         associated with the Devil.  That's . . . that's

15         what, you know, people think.

16         (Audio ends.)

17              MR. MARTIN:  Stop there a second.

18    BY MR. MARTIN:

19    Q.   You did know that Mr. Ahmed was someone who spent a lot

20    of time on the internet looking through websites --

21    A.   Yes.

22    Q.   -- on all sorts of chats on all sorts of subjects.

23         Okay, go ahead.

24              MR. MARTIN:  All right.  Go ahead.

25              (By audio:)
```

KS:  Right.  Now, it's . . . Jimmy wanted to focus a little bit more on the refineries in, uh, in Texas.  So, when you . . .

SHA:  Texas?

KS:  Oil refine . . . or were you talkin' like pipelines or refineries?  With them.  What did you talk about?

SHA:  With them?  Well, I just said oil installations, whatever.  I mean I do not know the exact words I mentioned.

KS:  Right.  And then they . . . and then did anybody go, "Let's do," this would be oil refineries.  "Let's do this to the refinery," or you said, "Let's do this" like, you know . . . You don't just say oil refineries.  You say:  "I wanna blow up oil refineries; I wanna go shoot people at the oil refinery; or, I wanna go . . ."  You know. . . what . . . what was the plan even though you didn't do it?

SHA:  There was no plan.  I'm telling you it was just:  "Oh let's do this.  Oh . . . well, no man it's no good."

(Audio ends.)

MR. MARTIN:  Stop it there.

He repeatedly said there was never any plan for any

of these items that you listed in the written statement;

correct?

A.   Regarding the oil installations.

     But you know, during the course of the interviews

asking him over and over and over questions, sometimes we

would get more information.

Q.   All right.  I will ask you -- maybe counsel on the other

side can find that for us, but let's stay here right now.

          MR. MARTIN:  Go on.

          (By audio:)

               (SHA:) So then the satellite issue was

          mentioned.

               KS:  Right.

               SHA:  And then we started having fun, like,

          OK, how to do satellites.

          (Audio ends.)

          MR. MARTIN:  Let's stop there.

BY MR. MARTIN:

Q.   Then we started having fun.  Did he not say that, it was

fun; right?

A.   Yeah, he says we started having fun.

          MR. MARTIN:  All right, go on.

          (By audio:)

               KS:  How was it?

               SHA:  Like we were, OK, can we send like, uh,

1    what is it . . . so hard to pronounce, lasers . . .

2    lasers?  Laser beam designators?

3         KS:  Laser beam designators?

4         SHA:  Yeah, laser beams or whatever.  But, I

5    don't think we, uh, can get that.  You know?

6         KS:  Those things are movin' pretty fast.

7         SHA:  So the . . . the laser . . . the . . .

8    we started having fun about this laser thing.  OK.

9    Laser . . . how to . . . how to make it; how to get

10   it.  Stu . . . you know, stupid things.

11        KS:  What kind of laser that . . . were you

12   talkin' about getting or were they talking about

13   getting?

14        SHA:  We have no idea what, like, what kind of

15   lasers are there.

16        KS:  Did you do. . . did you ever do any

17   research?

18        SHA:  No.

19        KS:  Look on eBay or anything like that for

20   "laser"?

21        SHA:  Nope.

22        KS:  Well . . . because you said you looked

23   for night-vision on eBay, so I have . . .

24        SHA:  Night-vision's sold on eBay, ultimately.

25   I don't think lasers are sold on eBay.

KS:  Ha, you might be surprised.  You can get
a lot of stuff on eBay.  [UI] So nothing else
is . . . not to keep harping on the refineries,
but . . . or the oil facilities . . . but it was
just you mentioned . . . what did you . . . what
did you specifically say?  If you can remember,
what did you say about it?

SHA:  I can't really remember exactly what I
said.  You know, oil . . . oil . . . oil is a good
target.

KS:  OK.

JA:  But you told . . . did you tell them
where there was . . .

SHA:  I . . . I . . .

JA:  . . . where there were good targets?

SHA:  . . . I had, I mean, yes, I know there
are refineries in Texas, but I have . . . I don't
even know the names or any locations of specific
things.  So, uh, just randon, general . . .

JA:  So you just generally said it?

SHA:  Generally said it.

JA:  There's . . . there's, you know, oil
refineries in Texas.

SHA:  I did not say Texas to them.

KS:  OK.

JA:  You did not say Texas to them?

SHA:  Yeah.

JA:  So you just mentioned oil refineries?
But you . . .

SHA:  That's all [UI].

JA:  . . . but your thought was that there
were oil refineries in Texas?

SHA:  Then again we had nothing specific in
mind, so it was . . . I mean. . .

KS:  No . . . no. [UI]

SHA:  [UI].

KS:  Yesterday, we also talked about, you
know, you looked for some brothers online that were
maybe in Texas . . . but you couldn't find any.

SHA:  I did not look on . . . I didn't look.

KS:  You didn't get . . . did you try to look
for anybody online?

SHA:  No.

KS:  Did you chat to anybody . . .

SHA:  No.

KS:  . . . to see if you can find anybody in
Texas?

SHA:  No.

KS:  No?  Just . . . just thought about it?
OK, how many, um, and this is good that we're

1        talkin' about this.

2            SHA:  I don't think I even said that.

3            KS:  Alright, we're clarifying things

4        that . . . we wanna make sure we . . . we don't

5        wanna put words in your mouth . . .

6            SHA:  Yeah.

7            KS:  . . . but we wanna get the details about

8        everything that you're tryin' to tell us.  The, um,

9        when you talked to Shifa about military bases, did

10       you spec . . . did you specifically say Dobbins?

11       Marietta?  What . . . what is he gonna say?

12           SHA:  I said Dobbins like, yeah, or whatever.

13           KS:  Like what . . . what did you say?

14           SHA:  I said, you know, "I, like, Dobbins is a

15       good . . . good idea."

16           KS:  Good target?

17           SHA:  Yeah.

18           JA:  What sort of attack would you wanna do on

19       Dobbins?

20           SHA:  What sort of attack?  We . . . again,

21       there's nothing specific that we just ever

22       discussed like, "OK, I just wanna attack it."  I

23       don't . . . I . . . it could be anything, I don't

24       know.

25           KS:  What did ya have in mind?  What were ya

1    thinking?  Like, I know laser beams for the

2    satellites.  []But what would make sense for

3    Dobbins or oil facilities?

4         SHA:  I don't know.  You know?  I mean,

5    this . . . I can't recall what I had in mind at

6    that time, but I just said, "Yeah, attack Dobbins."

7    Whatever.

8         KS:  Take out Dobbins.  So Dobbins was only

9    discussed with Shifa, but not in Canada?

10        SHA:  No, no.

11        KS:  The only thought . . . the only attacks

12   that were discussed in Canada . . . and . . . and

13   we're gonna find this out, Haris, when we . . .

14   when we go talk to these guys.  So I wanna make

15   sure that we get everything from you . . .

16        SHA:  OK.

17        KS:  . . . before we get it from them.  So was

18   there anything else discussed in Canada with . . .

19        JA:  So, you . . . you were the one who

20   brought up the idea for oil refineries?

21        SHA:  Uh-huh.

22        JA:  Attacks on the oil refineries.  You

23   mentioned that someone brought up the idea for

24   messing up the satellites that control the GPS.

25        SHA:  Mm-huh.

```
1              JA:  Who brought up that idea?  I . . . want
2         you to just think about it.
3              SHA:  OK.  I can't really recall who brought
4         up the idea.  I mean . . .
5              JA:  Well . . .
6              SHA:  . . . it's like someone. . .
7              JA:  You know it wasn't your idea . . .
8              SHA:  Yeah.
9              JA:  . . . and you know it wasn't Shifa's
10        idea?
11             SHA:  No.  Like, and, uh . . . I mean at that
12        time there were Azdee and James and, I think it's
13        one more person.  But I don't know.
14        (Audio ends.)
15             MR. MARTIN:  Let's stop there.
16   BY MR. MARTIN:
17   Q.   He goes on to start talking about the different people
18   in the groups there.
19        You would agree with me that throughout that
20   interchange, there was no evidence of a specific plan that he
21   talked about to do any particular terrorist attack in the
22   United States.  I want to be clear about that, in the
23   United States.  There was talk about stuff, but no specific
24   plan ever to do anything; correct?
25   A.   He did not share a specific plan, yes.
```

1    Q.   Do you recall, it may not have been during your session,

2    but if you recall that the Dobbins Air Force Base was near

3    the place where Sami Ayoub's shop was?  Do you remember

4    that?

5    A.   I don't recall it from the interviews, but I know that

6    to be true.

7    Q.   And that Mr. Ahmed worked at that perfume shop?

8    A.   That's correct.

9    Q.   One final area.  He did tell you that when he went to

10   Pakistan, he never went to a camp, and he talked to his

11   family and others, and they talked some sense into him and he

12   came home; correct?

13   A.   In summary, you know, that --

14   Q.   Well, let's go to that exactly then.  Let's go to, same

15   interview, 29:57.

16             (By audio:)

17                  JA:  OK.  Why did you never make it into the

18             camp that you wanted to get into?

19             (Audio ends.)

20             MR. MARTIN:  Let's stop there.

21   BY MR. MARTIN:

22   Q.   You asked the question, you said, So why did you never

23   make it into the camp that you wanted to get into?  That was

24   your question, and this is his response.

25             (By audio:)

SHA:  Actually, my . . . I talked to [SIGH]
my cousins and they, like, put some sense into me.
"Well, you know you're stupid; you were, uh,
basically brainwashed" or whatever.  And, uh, that
was a really big thing to . . . it destroyed my
whole foundation.  Like . . . I was like:  "Oh my
God.  I came, you know, drop my college; gave pain
to my family.  You know what?  I'm leaving.
Whatever."  And now my whole foundation is
disrupted.  It was just that, you . . . what you
believe is that, oh, everyone has to go and fight
jihad?  Actually this is not.  This is false.  This
is like, uh, what did he say?  This . . . this
is . . . it is misinterpretation, so . . . and then
I went and talked to some people at the school I
went to -- like the Islamic school and I . . .

JA:  In Pakistan?

SHA:  Yeah.  And I mentioned my . . . I
said . . . I said, "Is that true?"  And they said,
"No, not really, you know, no one is . . . there's
no obligation for everyone to go."  So it destroyed
my whole foundation the why I went there.

JA:  So you . . . I'm sorry, Khaled.

KS:  That's OK.  So you said you were
brainwashed.  Where . . . where did that

brainwashing . . . how did that occur?  From . . .

through . . . through people here?

    SHA:  Through like reading online.  There's a

lot of literature online.

    KS:  Did anybody support that brainwashing?

You would know they were, you know, like, uh, did

anybody encourage you to do that?

    SHA:  Shifa was . . . yeah, we were there.  We

both actually were brainwashed from the reading

online.  There's many websites and they translate

things in English and stuff like that.  And then

you read it and you just, you know, become . . .

(Audio ends.)

    MR. MARTIN:  Stop there.

BY MR. MARTIN:

Q.    Mr. Ahmed has a tendency sometimes to sort of break off

at the end of his sentences, like here where he just says

because and he does not continue, is that not correct, sort

of swallows the last words?

A.    Sometimes.

Q.    And that was his response to why he didn't go to the

training camp?

A.    Correct.

    MR. MARTIN:  That's all I have.

    THE COURT:  Any redirect?

```
 1          MR. McBURNEY:  Judge, I would like to play one

 2    excerpt immediately after what Mr. Martin was discussing.

 3                          -- -- --

 4                    REDIRECT EXAMINATION

 5    BY MR. McBURNEY:

 6    Q.   So we are in Government's Exhibit 509, and Mr. Martin

 7    just asked you -- defendant has been explaining his

 8    foundation was destroyed, he came back and et cetera.

 9    And there are questions about what his intention was when he

10    went over to Pakistan.

11         If you could start at 32:20, as close to 32:20 as you

12    could get.  That's page 32 of the transcript.

13          (By audio:)

14              KS:  Hopefully if you did you'd be able

15          to . . .

16              SHA:  Huh?

17              KS:  . . . hopefully if they did, you'd be

18          able to set em straight.  Right?  Tell em, "Look I

19          went; it's . . ."

20              SHA:  Yeah.  I mean, I went and I went

21          basically with the intention that I would never see

22          my family again.

23              KS:  What did you think you were going to do

24          when you got over there?

25              SHA:  I was just thinking maybe I was, you
```

know, go and fight and never see my family ever

again and it was pretty tough.

    KS:  Get killed in battle or something?

    SHA:  Yeah.

    KS:  Is that what you wanted to do?

    SHA:  Yeah.

    KS:  You wanted to be a martyr?

    SHA:  Yeah.  So, it was pretty tough.

    KS:  Yeah it's . . to . . . to say goodbye to

your family.

    SHA:  Yeah.

    KS:  Your sister . . .

    SHA/KS:  Mother and father.

    SHA:  Yeah it was.  But then, you know,

thankfully, for a whole month, like, I . . . I

talked to my cousin and stuff like that.  To calm

down and that's [UI]

    JA:  So you had this inner struggle.  Your

faith was very, very strong and you felt like it

was the right thing to do at the time.

    SHA:  Yeah.

    JA:  Since then, did you . . . you changed

your mind; you decided that you weren't gonna do

it.

    SHA:  Uh-huh.

```
1              (Audio ends.)

2              MR. McBURNEY:  Thank you.

3              MR. MARTIN:  I have nothing further.

4              THE COURT:  All right.  Does anybody want

5     Agent Allen subject to recall?

6              MR. McBURNEY:  Not from the government.

7              MR. MARTIN:  No.

8              THE COURT:  Agent Allen, you are excused.  We

9     appreciate you being with us, but don't discuss your

10    testimony until you hear that the case is over.  Thank you

11    for being with us.

12             Do you have a short witness?

13             MR. McBURNEY:  We attempted to get one here.  We

14    have a witness.  It will be a witness that will definitely

15    spill into the afternoon.

16             We did try to get a 15-minute witness here.  We

17    weren't able to track him down.

18             But we are ready to go with another witness.  I'm

19    happy to start, if Your Honor wants to do that.  Otherwise we

20    will be ready to go with a short or long witness after the

21    lunch break.

22             THE COURT:  Who would you call now and how far

23    would you get into their direct?

24             MR. McBURNEY:  We would call Zubair Ahmed, and I

25    would go until you stop us.  And that will get me --
```

1          THE COURT:  Not very far.

2          MR. McBURNEY:  Exactly.  We did try to get the

3   brief witness here when we figured out Mr. Martin's

4   schedule.  It didn't happen.

5          THE COURT:  Let's take our break.  I don't want to

6   start this particular witness and only go fifteen minutes or

7   so.

8          We will break.  I expect to be back shortly after

9   1:00.  And if you would just be around around the 1:00 time,

10  then as soon as I get back we can reconvene.

11         MR. McBURNEY:  We will be back here by 1:00.  We

12  will start, assuming the brief witness gets here, we will

13  deal with him first so he can go on with his business, and

14  then proceed with Mr. Ahmed.

15         THE COURT:  All right.  We will be in recess until

16  a little after one.

17                 (A recess is taken at 11:33 a.m.)

18                            --  --  --

19

20

21

22

23

24

25

```
1                    Tuesday Afternoon Session

2                        June 2, 2009

3                         1:51 p.m.

4                         -- -- --

5           (In open court:)

6           THE COURT:  Thank you for accommodating my

7   schedule.  There are no more interruptions in the week.

8           We are still in the government's case.  Please call

9   your first witness.

10          MR. BLY:  Your Honor, the government calls

11  Stacey Cohen.

12          Your Honor, we are going to go out of order, call

13  two fairly short witnesses.

14          THE COURT:  Thank you.

15                        -- -- --

16                      STACEY COHEN

17  being first duly sworn by the Courtroom Deputy, testifies and

18                    says as follows:

19                        -- -- --

20                   DIRECT EXAMINATION

21  BY MR. BLY:

22  Q.  Good afternoon, Ms. Cohen.  How are you currently

23  employed?

24  A.  Yes, I am.

25  Q.  I'm sorry?
```

1  A.   I'm sorry, what did you ask?

2  Q.   How are you currently employed?

3  A.   I work for the Federal Bureau of Investigation.

4  Q.   What's your position with the FBI?

5  A.   I currently work as a staff operations specialist.

6  Q.   What does a staff operations specialist do?

7  A.   I do analysis of case work.

8  Q.   What was your position prior to when you were a staff

9  operations specialist?

10  A.   I was a supervisory investigative specialist team

11  coordinator.

12  Q.   What does that mean?

13  A.   I was a team leader for a specialized surveillance

14  team.

15  Q.   And how long did you do that for?

16  A.   I was with the -- for twelve years.

17  Q.   How long have you been with the FBI all together?

18  A.   Thirteen years.

19  Q.   I would like to direct your attention to September 13,

20  2005.  Were you employed as a supervisory investigative

21  specialist team coordinator on that date?

22  A.   Yes, I was.

23  Q.   Were you working on that date?

24  A.   Yes, I was.

25  Q.   What was your task on September 13, 2005?

A.   We were tasked to conduct surveillance on Syed Ahmed

Haris.

Q.   Is this someone that you were familiar with on that

day?

A.   Yes, I was.

Q.   Had you seen him before?

A.   Yes.

Q.   On September 13, 2005, you didn't need someone to show

you a picture of what he looked like.  You knew what he

looked like?

A.   That's correct.

Q.   Tell us about September 13, 2005.  When did your shift

or when did your surveillance begin?

A.   Our shift started at about 6:45 that morning.

Q.   And where was that?

A.   At a house located behind the 14th Street mosque, 441

Ethel Street.

Q.   What was that house location?

A.   It was the location that Mr. Haris was residing at at

the time.

Q.   When was the first time that you -- tell me about that

day.  What did you see when you first got to 441 Ethel

Street?

A.   We relieved another surveillance team who had told us

that Mr. Haris was at the residence that morning.

Q.   Okay.  And what did you -- what did you do after you
relieved the other team?

A.   We sat there until 9:30, at which time we knew Mr. Haris
had a class.  I sent one unit over to see if he had made it
to his class.  He had.

     So I reinstituted the surveillance in the vicinity of
the building that he was at.

Q.   What did you personally do?

A.   I parked my vehicle and I got out on leg.

Q.   Was that over on Georgia Tech's campus?

A.   Yes, that's correct.

Q.   Where did you go on the campus?

A.   I went to the building of the classroom that Mr. Haris
was attending.

Q.   Okay.  Did you see Mr. Haris at some point?

A.   Yes, I did.

Q.   Where did you see him?

A.   When he departed the building and walked towards the
Georgia Tech library.

Q.   What did you do?

A.   I followed him into the library.

Q.   What happened after he entered the library?

A.   He went and stood in line, a line that was for using one
of the computers that was located on the first floor of the
library.

1   Q.   Tell us a little -- give the Court an idea what the

2   library is like?  What do you see when you walk in there?

3   A.   When you walk in, to the right is the check-in area.

4   Immediately to the left is a small bank of computers that

5   were specific to students, for the students at Georgia

6   Tech.  And then a little farther in and to the left was a

7   large pool of computers that had internet access.

8   Q.   And is that where Mr. Harris went, to this larger pool

9   of computers in the library?

10  A.   That is correct.

11  Q.   What did you do?

12  A.   I went in and watched him wait in line for a

13  computer.  When his turn came up, he went and sat at a

14  computer.

15       And at that time I repositioned myself to a second floor

16  balcony that overlooked the pool of computers.

17  Q.   Okay.  So tell me a little bit about -- you said you

18  went up to the second floor balcony.  How is it that you were

19  able to still see the computers?

20  A.   The way the pool of computers were situated was in the

21  center and probably went up two stories, but there was on the

22  second story a balcony that went around the perimeter of the

23  computers, and therefore if you were on the balcony you could

24  look down onto the computers.

25  Q.   So this balcony was just a second floor of the library,

1    there were books up there?

2    A.    Yes, that's correct.

3    Q.    What did you see when you got up to the second floor

4    balcony?

5    A.    From the second floor balcony, I was able to look

6    directly over the computer that Mr. Haris was accessing.

7    Q.    Any idea of about how far away you were?

8    A.    It was one story up, so twelve to fifteen feet up.  But

9    probably within three feet if I were to come down on the

10   first floor where he was at.

11   Q.    So understanding that you were a floor above him, but if

12   you had been in that same position one floor below, you would

13   have been within two to three feet of him?

14   A.    That's correct.

15   Q.    Could you see anything on the actual computer screen

16   that he was sitting at?

17   A.    Yes, I could.

18   Q.    What did you see?

19   A.    Initially I saw the Hotmail, what looked like a Hotmail

20   e-mail account.

21   Q.    Okay.  What did you do after that?

22   A.    Well, once I saw that, I decided to use a video camera

23   that I had to videotape the activities that Mr. Haris was

24   doing on the computer.

25   Q.    Why did you decide --

          THE COURT:  Could I interrupt for a second?  Are we
talking about Mr. Haris or are we talking about Mr. Ahmed?
BY MR. BLY:
Q.  I'm sorry, when you say Mr. Haris, who are you referring
to?
A.  Syed Ahmed Haris.
          THE COURT:  I thought it was Syed Haris Ahmed.
          MR. BLY:  I'm sorry, Your Honor?
          THE COURT:  I thought his last name is Ahmed.
Well, we need to make sure we are talking about the right
person.
BY MR. BLY:
Q.  And just to be clear, when you say Mr. Haris, you are
talking about Syed Haris Ahmed?
A.  That's correct.
Q.  All right.  You were indicating that you set up a video;
is that right?
A.  That's correct.
Q.  Why did you decide to do that?
A.  Understanding that sometimes computers in libraries are
used to use either blogs or e-mail accounts, unknown e-mail
accounts for communications that can't be tracked, I thought
it was a good opportunity to be able to get maybe some
internet communications that we weren't aware of.
Q.  Okay.  How were you able to -- how did you set up the

1   video camera?

2   A.    I positioned the video camera in a sleeve of a jacket or

3   a shirt that I had, and was able to position it so it was

4   facing down onto the computer.

5   Q.    Okay.  What did you -- what did you do after you set up

6   the video camera?

7   A.    I proceeded to look like I was using a library book or a

8   notebook or something.  I was attempting not to pay attention

9   to the video camera.

10  Q.    Okay.  What happened next?

11  A.    I was able to see that he accessed a web page called

12  Totse.com.  I was able to --

13  Q.    Let's not get there right yet.

14  A.    Okay.

15  Q.    While you were watching and while you had the video

16  camera set up, did anybody else -- did you see anybody else

17  come up to the computer?  Was Mr. Haris alone the whole

18  time?

19  A.    No.  There was one individual, an unidentified

20  Middle Eastern male that approached him, that spoke with

21  Mr. Haris for about ten minutes.

22  Q.    Okay.  What happened?  Did that person -- you said they

23  stayed about ten minutes?

24  A.    Yes, that's correct.

25  Q.    Could you overhear anything they were saying?

1    A.   No, I could not.

2    Q.   What happened after that person left?  Did Mr. Ahmed

3    stay on that computer?

4    A.   Yes, he did.

5    Q.   And what did you do after that person left?

6    A.   The one unit, the other surveillance unit that was with

7    me, I tasked him to go follow the unidentified Middle Eastern

8    male in an attempt to identify him.  And then I believe I

9    repositioned myself to the first floor of the library to

10    watch Mr. Haris if he would exit the library.

11    Q.   Did you have -- were you able to see Mr. Ahmed the

12    entire time that you were up on that second floor balcony?

13    A.   Yes, I was.

14    Q.   Did anybody else use that computer while you were up

15    there?

16    A.   No.

17    Q.   What happened after you went down to the first floor?

18    A.   He remained on the computer for I think about another

19    hour, hour and half, and then he departed the library.

20    Q.   During that time did you see anybody else come up to him

21    or come up to the computer?

22    A.   No, I did not.

23    Q.   And were you still videotaping during that time that you

24    were down on the first floor?

25    A.   No, I was not.

1  Q.   Were you -- in fact, were you even videotaping the
2  entire time you were up on the balcony?
3  A.   No, I was not.
4  Q.   What happened after Mr. Ahmed left the library?
5  A.   He departed the library, and I had another surveillance
6  unit pick him up outside the library.
7  Q.   So you didn't follow him?
8  A.   No, I did not.
9  Q.   What did you do after he left?
10 A.   Once he departed the area, I also departed the vicinity
11 of Georgia Tech where I could get a view of what was
12 videotaped.
13 Q.   Where did you go?
14 A.   I went to a parking lot of a CVS that was located just
15 off of the campus.
16 Q.   And what did you do when you got there?
17 A.   I proceeded to look at the videotape.
18 Q.   Were you able to see anything on the videotape?
19 A.   Yes, I was.
20 Q.   What were you able to see?
21 A.   I was able to see Mr. Haris typing in a Google web page
22 for shape charges.
23 Q.   Were you able to see any of the pages that he went to
24 after typing in that Google search?
25 A.   Yes, I was.

1    Q.   What were those pages?

2    A.   Some of the pages had geometric shapes to them that I

3    was not able to identify at that time.

4    Q.   Were you able to see the specific addresses of those

5    pages?

6    A.   No, I was not.

7    Q.   Did you see anything else on the video, any other web

8    addresses?  You mentioned the Google site that he went

9    to.  Were you able to see any other addresses that Mr. Ahmed

10   went to?

11   A.   The Totse.com.

12   Q.   Can you spell that for me?

13   A.   T-o-t-s-e.

14   Q.   Were you able to see any of the pages or articles or

15   anything like that that he accessed from that website?

16   A.   No, not at that website.

17   Q.   What did you do after -- well, any other pages that you

18   were able to see from the video?

19   A.   No.

20   Q.   What did you do after that?

21   A.   When I looked at the video, I conferred with some of my

22   team members and realized the significance of shape charges,

23   and called our office.

24   Q.   Do you know what a shape charge is?

25   A.   Yes.  It's a military explosive.

Q.   Did you have occasion to watch that video again?

A.   Yes, I did.

Q.   Where was that?

A.   I took the video to our headquarters office, where it was watched in the supervisor's office.

Q.   Was that -- tell me a little bit about the camera.  Is this like a big media camera type thing or is this --

A.   It's a miniature, it's a miniature cassette recorder.

Q.   So when you watched it the first time in the car in the CVS lot, you watched it on kind of a small screen; is that right?

A.   That's correct.

Q.   When you watched it back at the FBI office, how were you viewing it?

A.   It was attached to a TV, and we were able to view it on a larger screen.

Q.   Did you observe the same web pages, the Google, the Totse that you observed the first time?

A.   Yes, that's correct.

Q.   Did you observe anything additional?

A.   No.

Q.   What did you do with the tape after that?

A.   I handed it over to one of our tech agents.

Q.   And what was the purpose of giving it to the tech agent?

1    A.    They were going to transfer it to a disk.

2    Q.    Did that happen?

3    A.    No, that did not.

4    Q.    Are you aware of what happened to the cassette or the

5    tape that you gave to the tech?

6    A.    From my understanding, there was a mechanical issue that

7    destroyed the tape.

8    Q.    Ms. Cohen, do you see the person that you were

9    surveilling on September 13th, 2005, in the courtroom today?

10   A.    Yes, I do.

11   Q.    Could you point out what he's wearing or where he's

12   sitting?

13   A.    Yes, he's sitting at the defense table.

14             MR. BLY:  No further questions, Your Honor.

15             THE COURT:  Mr. Martin?

16             MR. MARTIN:  I have no questions.

17             THE COURT:  Does anybody want this witness subject

18   to recall?

19             MR. BLY:  No, Your Honor.

20             MR. MARTIN:  We won't need her.

21             THE COURT:  We appreciate your testimony.  You

22   should not discuss it with anybody until you hear the case

23   has been concluded.  Thank you for being with us.

24             All right.  Call your next witness, please.

25             MR. BLY:  Your Honor, we call William Puller.

```
1                        --  --  --

2                     WILLIAM PULLER

3    being first duly sworn by the Courtroom Deputy, testifies and

4                      says as follows:

5                        --  --  --

6                    DIRECT EXAMINATION

7    BY MR. BLY:

8    Q.   Good afternoon, Mr. Puller.

9    A.   Good afternoon, sir.

10   Q.   How are you currently employed?

11   A.   I'm an investigative specialist with the Federal Bureau

12   of Investigation.

13   Q.   How long have you been employed by the FBI?

14   A.   About six and a half years, sir.

15   Q.   What does an investigative specialist do?

16   A.   We work as part of a covert surveillance team.

17   Q.   I would like to direct your attention to September 19th

18   of 2005.  Were you employed as an investigative specialist by

19   the FBI on that date?

20   A.   Yes, sir.

21   Q.   And were you working that day?

22   A.   Yes, sir.

23   Q.   What was your task on September 19th, 2005?

24   A.   We were observing the daily activities of Mr. Ahmed.

25   Q.   Is this somebody that you had -- that you were familiar
```

1   with on September 19, 2005?  Had you observed him prior to
2   that date?
3   A.   Yes, sir.
4   Q.   So you were familiar with what he looked like?
5   A.   Yes, sir.
6   Q.   What time did your surveillance start on September 19,
7   2005?
8   A.   It would have been a 6:00 a.m. shift.  It would have
9   been at 6:00 a.m. or shortly thereafter.
10  Q.   Where did that begin?
11  A.   In the vicinity of Mr. Ahmed's residence.
12  Q.   Where was that?
13  A.   On Ethel Street.
14  Q.   Is that a location you had been to before?
15  A.   Yes, sir.
16  Q.   What happened when you got to the location on Ethel
17  Street?
18  A.   There was not much activity until about 8:15 or 8:20,
19  and then Mr. Ahmed and another individual left the
20  residence.  Mr. Ahmed drove that person to a midtown MARTA
21  station, and then returned to the area of his residence in
22  the vicinity of the campus, Georgia Tech campus.
23  Q.   What happened after he got back into the area of his
24  house on the campus?
25  A.   He parked his vehicle and then walked onto the Georgia

1    Tech campus.

2    Q.    What did you do at that point?

3    A.    I also parked in the vicinity, exited my vehicle, and

4    also walked onto the Georgia Tech campus.

5    Q.    Did you follow Mr. Ahmed onto the campus or did you go

6    somewhere else?

7    A.    Actually I just went to a different location on campus.

8    Q.    What happened next during your surveillance?

9    A.    I was outside of the manufacturing-related disciplines

10   complex, which is one of the buildings at Georgia

11   Tech.  I received a phone call from one of the other team

12   members asking me to come inside, because she was witnessing

13   Mr. Ahmed using one of computers that were in one of the

14   common areas of that building.

15   Q.    What building was she in?

16   A.    She was also in the manufacturing-related disciplines

17   complex, the Woodruff Engineering Building on campus.

18   Q.    What did you do after you had this contact with the

19   other agent?

20   A.    I left my position outside and went ahead and entered

21   the building and sat down at a table that was also in the

22   common area of that building.

23   Q.    Tell me a little bit about the building.  What kind of a

24   building is this?

25   A.    It's just a standard building on a campus.  It has

1   classrooms, computer labs, there are some laboratories, and

2   also some industrial arts types workshops in there.

3   Q.   So when you go in the door that you went in, what do you

4   see?

5   A.   The door I went in I think was on the northeast corner.

6   I walked in, and it's a short hallway, you make a right and

7   you enter -- it's a common area, there are some tables for

8   students to sit and read and talk.  There is some soft drink

9   machines.

10       And then back against one of the far walls, there is a

11  set of computers there, three computers.

12  Q.   When you went in the building, did you see Mr. Ahmed?

13  A.   Yes.

14  Q.   Where was he?

15  A.   He was standing at one of the computers that were

16  against that far wall in the common area.

17  Q.   How many computers are there?  You may have said this,

18  but how many computers were there?

19  A.   There were three at that point, but only two of them

20  really worked at any given time.  Usually the one on the left

21  and in the center were in operation.

22  Q.   What did you do after you entered and seen Mr. Ahmed on

23  the computer?

24  A.   I took a seat at one of the tables and started looking

25  through a book that I had with me.

Q.   Were you able to see Mr. Ahmed from where you were
sitting?

A.   Yes, sir.  I had a direct line of sight.

Q.   Did you -- while you were seated there, did you keep --
did you keep that line of sight on Mr. Ahmed?

A.   Yes, sir.

Q.   Did you see anybody else come up and use that computer?

A.   No, sir.

Q.   Did you see anybody else come up and talk to him or
anything like that?

A.   No, sir.

Q.   How long was Mr. Ahmed on that computer while you were
in the building?

A.   While I was there, probably about ten minutes.  Then he
exited the building.

Q.   What time of day is this?

A.   Roughly about between 10:40 and 10:50.  I entered the
building at about 10:40ish.

Q.   You said he was on the computer about ten minutes.  What
happened after he was finished using the computer?

A.   He exited.  There is a door that's kind of adjacent to
those computers.  He exited the building.  I immediately go
up and walked over to the computer that he was using.

Q.   Were you able to see the computer the whole time that
you were walking over to it?

1    A.   Yes, sir.

2    Q.   Did anybody else come up and use that computer before

3    you got to it?

4    A.   No, sir.  It's not that far of a distance from where I

5    was sitting to the computer.

6    Q.   How far -- that's a good point.  How far were you from

7    the computer where you were sitting?

8    A.   Maybe fifteen or twenty feet at the most.

9    Q.   What did you do when you got up to the computer?

10   A.   I opened up one of the web browsers.  Those computers

11   only have limited applications that are available.  I think

12   they are there for students to just check e-mail and surf the

13   web a little bit.

14       I opened up one of the web browsers, and opened up the

15   history function on that web browser to see what sites were

16   accessed using it.

17   Q.   Do you remember which browser that was?

18   A.   I believe it was the Firefox browser, Internet

19   Explorer.  There are two browsers available, Internet

20   Explorer and Firefox were the two that were available.  I

21   believe I opened up Firefox first.

22   Q.   You said you accessed the history.  What do you mean by

23   that?

24   A.   Most web browsers, they still have them, but back then

25   you could either hit a button that's on the toolbar that says

history on it, or you could hit a key stroke combination of
control and H, that will open up a separate window, and that
will list all the website that have been accessed on the
browser over a given period of time so long as that hasn't
been cleared out.

Q.   How did you do that in this case?  You said you could
either hit a button up on the browser or use a keystroke
combination.  How did you do it here?

A.   I probably used a control H key.

Q.   What did you see after you hit the control H key in the
Firefox browser?

A.   I didn't see any activity with the exception of the home
page that opens up when you open the web browser.  I didn't
see any other activity listed for that day, although there
were activity noted in the previous days, but not for that
particular day there wasn't any activity.

Q.   You say you didn't see anything for that day.  How do
you -- does the history display give you some indication of
when the sites were visited?  How does that look?

A.   Yes, sir.  If you open up a history on a web browser,
back then in that version, it would open up a little sidebar
and it would show a series of folders, and there would be one
that's listed today, yesterday, and then they would start
being listed by date chronologically.

     So if you had done a search or been to a website

1   previously but you couldn't remember what it was, you could

2   go back and look through those folders and find the website

3   that you were at if you needed to.

4   Q.   So for the Firefox, were there any sites indicated for

5   that day?

6   A.   No, sir.  Just the home page that opens up when you open

7   that particular browser.

8   Q.   What did you do after you checked the Firefox?

9   A.   Once I didn't see any activity for that day, I closed

10  that browser and opened up the Internet Explorer and did the

11  same thing, hit the history function on it.

12  Q.   Did you do it the same way, hit the control H?

13  A.   Yes, sir.

14  Q.   What happened after you did that for Internet Explorer?

15  A.   I did see that there were several websites accessed for

16  that particular day.  Again, they are listed in different

17  folders to note different days.  For that particular day,

18  there was some website activity.

19  Q.   What websites had been visited on Internet Explorer that

20  day?

21  A.   There was a Hotmail account, which is a web-based

22  e-mail, there was Gmail, which is another web-based e-mail,

23  Drudge Report, which is a new site, the Blackwater U.S.A.,

24  which is a security firm that operated in Iraq at that time.

25       Several other sites.  Just normal -- I think there were

1  some automobile sites listed as well, related sites that were

2  listed.

3  Q.   Were there any others listed?

4  A.   Yes.  There was one site, Totse.com, T-o-t-s-e.com, was

5  also one of the sites listed there.

6  Q.   The history function, as I understand it, gives you

7  these web sites.  Does it give you any way of determining

8  where the user went on those web sites, those specific pages

9  that they might have viewed on Blackwater or Totse or that

10  kind of thing?

11  A.   Yes, sir.  In the folder structure, the main domain is

12  listed.  So if it was CNN.com, for instance, you would see a

13  folder that says CNN.com.  If you clicked on that folder, any

14  pages that you accessed say on CNN.com, whether it was about

15  weather or sports, would be listed individually.  You can see

16  the web address and also the page title of each page that are

17  listed there.  If you hover over that for a second, you would

18  see the title of the page.

19  Q.   So in this case did you make any effort to determine

20  which sites or links were actually visited at the pages that

21  were listed in the history?

22  A.   I did check a few of the sites.  The automotive sites

23  I checked, some of those were related to the undercarriage of

24  vehicles, some of them were about just auto parts.

25       Again, there were normal web-based e-mail sites, things

1  like that.

2  Q.   You mentioned Totse.com.  Were you able to determine

3  whether or not any specific pages were viewed at Totse.com?

4  A.   Yes, sir.  There were three pages specifically accessed

5  on that site that day.

6  Q.   What were those pages?

7  A.   The first one was titled Ten Great High-Explosive

8  Mixtures.  The second one was How to Defeat Special

9  Operations, S.W.A.T. Teams and Special Operations Groups.

10  And the third one was a page about introduction to

11  steganography, which is a method of clandestine

12  communication.

13  Q.   Did you go and actually visit those pages?

14  A.   I did not access those sites.  I didn't want to mess up

15  any time stamps that may be related to accessing the sites at

16  that time.  Once I saw the titles, I stopped looking.

17  Q.   You mentioned some e-mail sites also.  Were you able to

18  determine any accounts or anything like that that had been

19  visited from those sites?

20  A.   Not on that particular day, sir, no.

21  Q.   What did you do after looking at the history on that

22  through the Internet Explorer?

23  A.   As soon as I saw the title of the three pages on Totse,

24  I immediately notified my team leader and recommended that we

25  get somebody down to retrieve that hard drive for further

1    analysis.

2    Q.    Did that happen?

3    A.    Yes, sir.  We maintained control of that computer

4    through a series of people standing there and maintained

5    positive control until one of the agents came down and

6    retrieved it.

7    Q.    After the agents came down, do you know whether any

8    subsequent analysis was done to determine when exactly on

9    that day the pages were accessed, specifically the ones you

10   mentioned at Totse.com?

11   A.    Yes, sir.  I did have some informal contact with a

12   member of the computer analysis response team, our CART team,

13   and I just wanted to verify that the site was accessed during

14   the time that Mr. Ahmed was using the computer, and he

15   confirmed that.

16   Q.    Mr. Puller, do you see the person that you were

17   surveilling on September 19, 2005, in court today?

18   A.    Yes, sir.

19   Q.    If you could, point him out for me, please?

20   A.    Sitting right over there, sir.

21   Q.    If you could identify maybe something he's wearing?

22   A.    The gentleman wearing the white cap today.

23           MR. BLY:  Nothing further, Your Honor.

24           THE COURT:  Mr. Martin?

25                           --  --  --

1          CROSS-EXAMINATION

2    BY MR. MARTIN:

3    Q.    Now, you understood that Mr. Ahmed was a Georgia Tech

4    student at the time; correct?

5    A.    Yes, sir.

6    Q.    And these were common area computers that students are

7    allowed to use there doing their work at Georgia Tech; is

8    that correct?

9    A.    Just about anybody could use them.  You could walk off

10   the streets.  Those buildings are unsecured.

11   Q.    But Georgia Tech students may have an account on those

12   computers and they can keep their materials necessary for

13   their course work.  Is that not correct?

14   A.    I believe they could on certain computers, but those

15   were not required.  There was no log-on for those particular

16   computers.

17   Q.    Okay.  With regards -- to get your testimony complete or

18   to understand it, you said he was only on the computer just a

19   matter of minutes?

20   A.    He was on there for ten minutes when I was actually in

21   there.  Other team members had witnessed him there longer.

22   Q.    So how long was he on the computer then?

23   A.    If my recollection is correct, it would have been about

24   45 or 50 minutes, sir.

25   Q.    Showing you this log, see if this helps you.  It

1  indicates he was on the computer at 10:08 a.m. and was

2  leaving at 10:51?

3  A.   Yes, sir, that's --

4  Q.   So within that period of time he was on the computer?

5  A.   Yes, sir.

6  Q.   Were you familiar with his course work at that time?

7  A.   Not specifics about it, no, sir.  Just that he had class

8  that morning in that particular building.

9  Q.   You mentioned that one of the things he was doing --

10  there were a number of websites that were apparently viewed

11  during this 45-minute period; correct?

12  A.   Yes, sir.

13  Q.   You are familiar with the concept of browsing on the

14  computer?

15  A.   Yes, sir.

16  Q.   Have you ever done that yourself?

17  A.   Yes, sir.

18  Q.   So all we know is that he stopped on various different

19  websites.  You don't know how long on each website, do you?

20  A.   No, sir.

21  Q.   With regards to the types of websites, you said he was

22  on a website that's called -- had do with the undercarriage

23  of vehicles?

24  A.   Yes, sir, I remember one of those.

25  Q.   Turbosquid.com?

1   A.   That may have been it, yes, sir.

2   Q.   I will show you the report so it refreshes your

3   recollection.

4        Turbosquid.com, access a diagram drawing of a vehicle

5   frame?

6   A.   Yes, sir.

7   Q.   Looks like -- can you read that one?

8   A.   Mitsubishi Kia Automotive.com.

9   Q.   Which also had information about regarding fuel lines,

10  automotive fuel lines?

11  A.   Yes, sir.

12  Q.   Admer Adhesive Resin?

13  A.   Adhesive resins, yes, sir.

14  Q.   Plastic fuel tanks and filler pipes and so forth for

15  automobile undercarriages.

16  A.   Yes, sir.

17  Q.   You found that suspicious?

18  A.   Not those particular sites.  The dual use of that

19  information seemed important to me, but those sites didn't

20  really ring any alarm bells in my head as much as the other

21  ones did.

22  Q.   Showing you Defendant's Exhibit 28.  This is a copy of

23  his Georgia Tech transcript.

24       Did you know what courses he was taking at that time?

25  A.   No, sir, I don't.

1          MR. MARTIN:  I move into evidence Defendant's

2    Exhibit 28.

3          MR. BLY:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5    BY MR. MARTIN:

6    Q.   This would indicate in the fall of 2005 he was taking a

7    lab course on Creative Design -- Decisions and Design.  Do

8    you see that?

9    A.   Yes, sir.

10   Q.   Did you know what type of lab courses he had in that

11   course, lab requirements?

12   A.   No, sir.

13         MR. MARTIN:  I move into evidence Defendant's

14   Exhibit 29 and Defendant's Exhibit 30, which are documents

15   from Georgia Tech Institute and one document from the

16   computer of Mr. Ahmed.

17         Any objections?

18         MR. BLY:  No objection, Your Honor.

19         THE COURT:  They are admitted.

20   BY MR. MARTIN:

21   Q.   Fall 2005, Creative Decisions and Designs, do you see

22   that document, Defendant's Exhibit 30?

23   A.   Yes, sir, I do.

24   Q.   Did he not have a course requirement to come up with a

25   design for an automobile for a braking system that would be a

1   security device?

2   A.   According to this information, yes, sir.

3   Q.   Showing you Defendant's Exhibit 29, does that not appear

4   to be Mr. Ahmed's submission in conjunction with that lab

5   project that he had to do at Georgia Tech about automobile

6   designs and a braking system -- excuse me, a security system

7   based on the braking system of the automobile?

8   A.   That appears to be what this is, yes, sir.

9   Q.   Nothing unusual about a student at Georgia Tech

10  researching on the computer projects that might be or

11  websites that might be helpful in completing an assignment;

12  correct?

13  A.   No, sir.

14  Q.   And there is nothing unusual about a student surfing the

15  web with regards to all sorts of matters, is there?

16  A.   I wouldn't think so, no, sir.

17          MR. MARTIN:  Nothing further.

18          THE COURT:  Any redirect?

19          MR. BLY:  No, Your Honor.

20          THE COURT:  Does anybody want Mr. Puller subject to

21  recall?

22          MR. BLY:  Not from the government.

23          MR. MARTIN:  No.

24          THE COURT:  All right.  You are being excused.  You

25  should not discuss your testimony until you hear the case is

1   over.  Thank you for being with us.

2               THE WITNESS:  Thank you, sir.

3               THE COURT:  Call your next witness, please.

4               MR. McBURNEY:  Zubair Ahmed.

5                       --  --  --

6                     ZUBAIR AHMED

7   being first duly affirmed by the Courtroom Deputy, testifies

8                   and says as follows:

9                       --  --  --

10                  DIRECT EXAMINATION

11  BY MR. McBURNEY:

12  Q.   Good afternoon, Mr. Ahmed.  I need you to make sure you

13  talk into that microphone, so we will check it out.  How old

14  are you, Mr. Ahmed?

15  A.   How old am I?

16  Q.   Yes.

17  A.   30.

18  Q.   Okay, get a little closer to the microphone.  The Court

19  needs to be able to hear you.

20       What city do you live in?

21  A.   Chicago.

22  Q.   Mr. Ahmed, have you recently entered a guilty plea to a

23  federal terrorism prosecution out of the Northern District of

24  Ohio?

25  A.   Yes.

1    Q.    How many counts did you plead guilty to?

2    A.    One.

3    Q.    Describe what it was you pled guilty to?  What was the

4    charge?

5    A.    I pled guilty to material support.

6    Q.    Material support for what?

7    A.    Terrorism.

8    Q.    Is there a plea agreement or did you just enter what we

9    call a straight-up plea?

10   A.    There was a plea agreement.

11   Q.    Did you agree to cooperate as part of that plea

12   agreement?

13   A.    Yes, sir.

14   Q.    Are you expecting or hoping some consideration, a

15   benefit, a lower sentence as a result of cooperation?

16   A.    Yes.

17   Q.    What is your understanding as to the penalty you would

18   have faced absent cooperation given this plea?  You pled to

19   this count.  What would you have faced?

20   A.    Are you talking about the original charge or the one

21   that changed due to the plea agreement?

22   Q.    One you pled to.

23   A.    I believe it was fifteen years.

24   Q.    And if your cooperation is deemed substantial by whoever

25   makes that decision in the Northern District of Ohio, what is

1  your understanding of the range you might face instead of

2  fifteen?

3  A.    Eight to ten.

4  Q.    Is your testimony today in the case of the United States

5  v. Syed Haris Ahmed part of that cooperation?

6  A.    Can you repeat the question?

7  Q.    Are you here today as part of that cooperation

8  agreement?

9  A.    Yeah.

10  Q.    In your case, Mr. Ahmed, were you interviewed by law

11  enforcement?

12  A.    Yes.

13  Q.    Before you were arrested?

14  A.    Yes.

15  Q.    After you were arrested?

16  A.    Yes.

17  Q.    Interviewed by the FBI?

18  A.    Yes.

19  Q.    ICE, Immigration and Customs Enforcement?

20  A.    Yes.

21  Q.    During those interviews, were you truthful at each

22  stage?

23  A.    No.

24  Q.    Initially did you tell the whole story of the material

25  support for terrorism in which you were involved?

1  A.   No, I didn't.

2  Q.   Ultimately did you tell the FBI, the lead investigative

3  agency, your case?

4  A.   Regarding me?

5  Q.   Yes.

6  A.   Yes.

7  Q.   In the summer of 2004, where was it you planned to go?

8  A.   I planned to go to either Iraq or Afghanistan.

9  Q.   How were you planning on getting there, meaning what

10  were the steps?  You were flying straight from Chicago?

11  A.   No.  I stopped in Cairo, Egypt.

12  Q.   Did you travel alone?

13  A.   I traveled with my cousin.

14  Q.   This trip that we are going to talk about for a moment,

15  is it the subject of the case to which you pled guilty?

16  A.   Yes, it is.

17  Q.   You and your cousin traveled to Egypt in the summer of

18  2004.  What was the next stop?

19  A.   The next stop was Pakistan.

20  Q.   What was the purpose of going to Pakistan?  You

21  mentioned Iraq or Afghanistan as your final

22  destination.  What was the purpose of Pakistan?

23  A.   The purpose of Pakistan was to ultimately go and hook up

24  with any of the groups that are fighting jihad against the

25  United States.

```
1    Q.   What types of groups did you have in mind hooking up

2    with, to use your term, when you were in Pakistan?

3    A.   I didn't have any specific group in mind.

4    Q.   You were going to meet people on the ground?

5    A.   Yes.

6    Q.   Did you have any specific contacts in Pakistan that you

7    knew you would meet with in an effort to achieve your goal?

8    A.   No.

9    Q.   Your cousin that you mentioned, was he also charged in

10   your case?

11   A.   Yes, he was.

12   Q.   Has he entered a guilty plea?

13   A.   Yes.

14   Q.   What did you bring with you in terms of supplies or

15   belongings when you went to Egypt?

16   A.   I brought clothes, food, protein powder, an XBox.

17   Q.   An XBox is what?

18   A.   It's a video game console.

19   Q.   Did you expect you would be able to use the XBox when

20   you were in Iraq or Afghanistan fighting?

21   A.   No.

22   Q.   Just entertainment while you were in Cairo?

23   A.   Yeah.  I just put it in there, it was a last-minute

24   thing.  I didn't plan on like in an advance, oh, I'm going to

25   bring an XBox with me.  I just threw it in there.
```

1   Q.   Okay.  How far did you get?  You mentioned you got to

2   Egypt.

3   A.   That's it.

4   Q.   What happened in Egypt?

5   A.   My dad came and got me.

6   Q.   You returned to the U.S.?

7   A.   Yeah.

8   Q.   After the trip to Egypt, did you end up taking any

9   further steps, planning, thinking, training, meeting people

10  to achieve this same goal?

11  A.   Yes, I did.

12  Q.   Have you ever met the defendant in this case, Syed Haris

13  Ahmed?

14  A.   In person?

15  Q.   In person.

16  A.   Yes.

17  Q.   How many times?

18  A.   Once.

19  Q.   How did you first meet him?  Not in person, but how did

20  you first have any contact with Syed Haris Ahmed?

21  A.   I met him through a website, an internet forum.

22  Q.   What was the name of the website?

23  A.   Clear Guidance.

24  Q.   Describe for the Court what Clear Guidance is all

25  about?

A.   It's a website where people discuss issues that are

Islamic, and among those topics are jihad.

Q.   When you say jihad, are you describing an internal

struggle to do the right thing, or violent jihad, engaging in

battle against the forces of oppression?

A.   Violent jihad.

Q.   That's the type of jihad that was discussed on Clear

Guidance?

A.   Yeah.

Q.   And you met Defendant Ahmed online on Clear Guidance?

A.   Yes.

Q.   Describe to the Court how that works.  I mean, do you

have a picture of you on Clear Guidance and there was a

picture of Defendant Ahmed and you click on it and that's how

you communicated?

A.   No, it's a general forum, and you speak with whoever you

want to speak with.  You post messages.

Q.   Is there a way through Clear Guidance to do what you

call private messages that wouldn't be viewable to just

anyone that came to Clear Guidance?

A.   Yeah.

Q.   Did you and Defendant Ahmed eventually exchange private

messages?

A.   Yes, we did.

Q.   You mentioned that you met him at some point

1    face-to-face.  Where was that?

2    A.   That was at my house.

3    Q.   Your house?

4    A.   In Chicago, Illinois.

5    Q.   Okay.  How was it that Defendant Ahmed came to know

6    where you lived?

7    A.   I told him.

8    Q.   Through these private messages?

9    A.   Yeah.

10   Q.   Do you remember what year or range of years you can come

11   up with it was that Defendant Ahmed came to Chicago?

12   A.   I think, I think it was 2002.

13   Q.   Did he come alone?

14   A.   He came -- no.  He came with his father.

15   Q.   Was there something else going on in the Chicago area

16   that brought Defendant Ahmed and his father?

17   A.   I believe there was an ISNA convention.

18   Q.   ISNA is what?

19   A.   Islamic Society of North America, just a general

20   convention.

21   Q.   Nothing to do with violent jihad?

22   A.   Nothing to do -- yeah.

23   Q.   Did Defendant Ahmed and his father stay at your home in

24   Chicago?

25   A.   No.  I put them in a hotel.

1  Q.   When you say you put them in a hotel, you paid for the

2  hotel?

3  A.   Yeah, I took care of expenses.

4  Q.   Did Defendant Ahmed and his father at some point come to

5  your home in Chicago?

6  A.   Yes.

7  Q.   Was there a time that you and Defendant Ahmed were able

8  to meet, just the two of you, at your house out of the

9  presence of his father and your parents or whoever else lived

10 in your house?

11 A.   Yes.

12 Q.   During that time, did you and Defendant Ahmed talk about

13 any shared interests?

14 A.   We talked about -- we met each other and then we briefly

15 discussed jihad.

16 Q.   And again jihad, when you say that, you mean violent

17 jihad?

18 A.   Yeah.

19 Q.   When you say you briefly discussed it, what did you talk

20 about?

21 A.   We didn't go into details about anything in

22 specific.  We just agreed that -- we shared the same

23 opinion.

24 Q.   Okay.  Did the two of you come up with any way you might

25 describe going to get -- pursue violent jihad and get

1    training when you are communicating online so it wouldn't be

2    obvious to an outside observer?

3    A.    Yes.

4    Q.    Tell the Court what you came up with?

5    A.    Well, we used three numbers, one, two and three.  One is

6    ideological support for jihad, two would be logistical

7    support, and three would be the actual fighting.

8    Q.    This is something you and Defendant Ahmed discussed

9    face-to-face in Chicago?

10    A.    Yes.

11    Q.    After that date, did you and Defendant Ahmed actually

12    use those terms, first, second and third, one, two, and

13    three, in your communications?

14    A.    Yes, we did.

15    Q.    Did you share those with others with whom you shared

16    e-mails or chats?

17    A.    I shared them with my cousin.

18    Q.    We will be looking at in a minute some communications,

19    e-mails involving someone named Safiullah Hussaini, yourself

20    and Defendant Ahmed.  Is he someone with whom the first,

21    second, third concept was shared?

22    A.    I believe it was.

23    Q.    You should have Government's Exhibits 12 and 13 in front

24    of you.  Those are already in evidence.  It should be in

25    numerical order, all those exhibits.

1   A.   This in front of me right here?

2   Q.   There should be a yellow sticker and should have a 12 on

3   it.

4        Do you see anything?

5   A.   Yes, 12, yeah.

6   Q.   Got it?

7   A.   Yeah.

8   Q.   We will put 12 up.

9        What is Government's Exhibit 12?

10  A.   It's an e-mail.

11  Q.   Is it a series of e-mails --

12  A.   Yeah.

13  Q.   -- or a chain?

14       Are you one of the participants in the chain?

15  A.   Yes, I am.

16  Q.   Ibnahmed460@hotmail.com, who is that?

17  A.   That's me.

18  Q.   Thandymazaq@hotmail, who is that?

19  A.   That's Haris.

20  Q.   This chain starts on page two of the document that you

21  have at the bottom.  It's an e-mail from Thandymazaq to --

22  you can see the three addresses that are up on the screen

23  there, a Shafaat, Vampire818, then you, Ibnahmed, and

24  Safiullah.

25       Do you know who was Shafaat Mehboob Ali Khan, or

1 Vampire818 is?

2 A.   No.

3 Q.   You know who you are.  Do you know Safiullah Hussaini?

4 Who is that?

5 A.   He's a friend of mine or ours.

6 Q.   Someone you met in person or through some of these same

7 things you described, Clear Guidance or --

8 A.   Through the internet.

9 Q.   Do you remember how you met Safiullah Hussaini?

10 A.   I don't remember exactly how I met him online.

11 Q.   So Defendant Ahmed sends you an article about the fourth

12 generation.  Sounds like something you have seen before.

13       Let's look at the e-mail that starts on the first page

14 from Defendant Ahmed to you dated September 4th.

15       He starts out saying, Brother, I know I was planning on

16 coming down for ISNA.

17       Is ISNA what you just described, the conference?

18 A.   Yes.

19 Q.   So was ISNA typically in the Chicago area?

20 A.   No, it's all over.

21 Q.   It says he can't come for ISNA.  Defendant goes on and

22 starts -- there is a line, in Russia and French, what does he

23 say?

24 A.            I see the total war on Islam starting to

25            forment exactly as prophesied by the Rasul, SAAW,

```
 1              and here our families are in the middle of kafir
 2              land.
 3   Q.   Kafir land, when you and defendant Ahmed were
 4   communicating online, what does that mean?
 5   A.   Any state that doesn't abide by Islamic law.
 6   Q.   He goes on to say what?  What is the next sentence?
 7   A.              I just hope we survive to safely get back to
 8              Islamic lands when the full-fledged war starts,
 9              insha'Allah.  We should not be alarmists and say
10              the war begins tomorrow, but we can't deny the
11              signs and, insha'Allah --
12   Q.   That's fine.
13        So Defendant Ahmed is hoping that we survive to safely
14   get back to Islamic lands.  What are the Islamic lands when
15   you and he are discussing them?
16   A.   Any lands that have a high Muslim population.
17   Q.   The full-fledged war, what does that refer to?
18   A.   That's in the Hadith of the Prophet, there is a bunch of
19   wars that are going to happen.  He's referring to one of
20   those wars.
21   Q.   The Hadith of the Prophet, what do you mean by that?
22   A.   Hadith of the Prophet?
23   Q.   Yeah, what's Hadith?
24   A.   Hadith is the tradition or saying of the Prophet,
25   something that he has told us.
```

1    Q.    Then he goes on to say at the bottom of the page and

2    carries over to the next page, I don't want to miss the

3    opportunity of the lifetime, as you know that the shaheeds in

4    the final war of Islam will be the best shaheeds.

5        What does that mean?

6    A.    That means those who die as martyrs will be the best

7    from beginning of time to the end, those who partake in that.

8    Q.    Let's go on to Government's Exhibit 13.  On the second

9    page -- this is an e-mail that's already in evidence, an

10   e-mail exchange involving you.

11       On the second page, the start of the chain, it's an

12   e-mail from Defendant Ahmed on October 18, 2004.  We have

13   already talked about Safiullah and yourself.

14       Assad Khan also known as Bhonday Mazaq, who is that?

15   A.    I believe that's Haris's relative, but I'm not sure if

16   he's a relative or a friend.

17   Q.    Someone you have communicated with online?

18   A.    Yes.

19   Q.    But you met through Defendant Ahmed?

20   A.    Yes.

21   Q.    Defendant Ahmed writes towards the bottom sentence that

22   starts with, I see this month of ramadhan.  Please read that

23   sentence?

24   A.            I see this month of ramadhan to be a good

25          opportunity to explore ourselves and see if we

1          really are committed to what we planned for, even

2          if the eventual graduation to the third is far off,

3          but, insha'Allah, the commitment should be there.

4     Q.   Graduation to the third.  When you and he were

5     discussing your intentions, your plans, what does that mean?

6     A.   The third means jihad.

7     Q.   Engaging in it?

8     A.   Engaging in it, fighting in it.

9     Q.   Let's go to the first page of the document.  This is an

10    e-mail from you, a response that same day.  You start out,

11    Well, me and my cuz made it very close to third degree.  What

12    is that a reference to?

13    A.   Jihad.

14    Q.   But specifically what was it that you and your cuz did?

15    A.   We made it to Egypt, Cairo, Egypt.

16    Q.   You have a line in there, I have to talk to Thandy when

17    I get a chance in person.  Thandy is who?

18    A.   Thandy is Haris.

19    Q.   What would you need to talk about in person as opposed

20    to online?

21    A.   I wanted to tell him how my trip to jihad failed.

22    Q.   Okay.  At the bottom of your e-mail you have a P.S.,

23    what is it, the first sentence?

24    A.   The biggest problem everyone will face for third is our

25    stupid parents.  I already faced --

1   Q.   That's fine, that's fine.  What do you mean -- what did

2   you mean --

3   A.   I'm talking about my parents.

4   Q.   Understood.  But you said, The biggest problem everyone

5   will face for third is our stupid parents.  What is the issue

6   that you perceived as to parents?

7   A.   I didn't tell my father, I just left, and that created a

8   lot of problems.

9   Q.   All right.  If you would look at -- you should have in

10  front of you Government's Exhibit 93, Government's Exhibit

11  19, Government's Exhibit 28 should all be in that order, and

12  then 20 --

13  A.   Okay.

14  Q.   -- 84, 42.  Do you see all those?

15  A.   Yeah.

16  Q.   Are those all e-mails that involve you and

17  Defendant Ahmed?

18  A.   Yeah.

19          MR. McBURNEY:  Government tenders 93, 19, 28, 20,

20  84, and 42.

21          THE COURT:  Any objection?

22          MR. MARTIN:  No objection.

23          THE COURT:  They are admitted.

24  A.   You said 94, 95?

25  Q.   We didn't get to those yet.

```
1    A.    Oh, okay.  28.

2          Are we done with this?

3    Q.    I don't know, what's that?

4    A.    19.

5    Q.    Yes.  We are on 93 now.  Do you see 93?

6    A.    Yes.

7    Q.    All right.  If we could put that up, please?

8               MR. MARTIN:  Which number?

9               MR. McBURNEY:  93.  Okay.

10              MR. MARTIN:  Yeah.

11   BY MR. McBURNEY:

12   Q.    We moved out of 2004, and what are the dates of this,

13   start and the finish of this e-mail exchange?

14   A.    You are asking me?   January 23rd, 2005.

15   Q.    So it starts out with an e-mail from you to

16   Thandymazaq.  Thandymazaq is who?

17   A.    Haris.

18   Q.    Then there is a response from Haris January 22nd,

19   2005.  What does he say in the middle of the page?

20   A.    Asalam o alykum.

21   Q.    There's the greeting.

22   A.              Our studies are fine now, mashallah.  We are

23           turning the pages of book for preparation for exam

24           for entering the third level of expertise.

25   Q.    Third level of expertise is the same reference to
```

```
1   third?

2   A.    Yeah.

3   Q.    Now, you at the top say, Keep doing your thing, I found

4   a tutor for third degree also.  What are you describing?

5   A.    I am describing a person that would train me in

6   firearms.

7   Q.    Had you in fact met someone who purported to be able to

8   do that?

9   A.    Yes.

10  Q.    And why were you going to spend time with that person?

11  A.    To learn how to operate a firearm.

12  Q.    Let's look at 19?

13  A.    Okay.

14  Q.    An e-mail exchange between you and Defendant Ahmed late

15  February on into the very beginning of March.

16        The middle e-mail is from Haris to you March 1 --

17  defendant Ahmed to you March 1, 2005.  At the bottom he

18  invites you down here.  What does he say?

19  A.           Man, I thought you were the big businessman or

20               something, ha ha.  You need saving money?  Laugh

21               out loud.  Just kidding.  Let me know when you will

22               be coming.  Make it after 13 of this month.  I will

23               be free then, insha'Allah.

24               I attend Georgia Tech, lots of technical guys,

25               so if you need hook-ups with engineers, just let me
```

```
 1              know.  Laugh out loud.  Come with walking shoes and
 2              clothes, we will show you the mountainside of
 3              Georgia which shall be beneficial, if you know what
 4              I mean.
 5    Q.   The mountainside of Georgia, did that have any
 6    significance to you?
 7    A.   I understood it as it would simulate somewhat the
 8    conditions in Afghanistan.  That's what I understood.
 9    Q.   Was it typical in communications between you and
10    Defendant Ahmed not to state in plain English or plain Urdu
11    or whatever language you would exchange in your true
12    intentions?  In other words --
13    A.   You have to rephrase that question.
14    Q.   To use terms like third or come see the mountainside of
15    Georgia, it will be beneficial, if you know what I mean?
16    A.   Yeah.
17    Q.   I just mentioned Urdu a moment ago.  Do you speak Urdu?
18    A.   Yes.
19    Q.   Can you write Urdu?
20    A.   In Arabic script, no.
21    Q.   But in -- using the Roman alphabet?
22    A.   Yes.
23    Q.   And at times is there Urdu in your e-mails and chats
24    with Defendant Ahmed?
25    A.   Yes.
```

Q.   Did you ever speak with him on the phone?

A.   Yeah.

Q.   When you would speak on the phone, some English, some Urdu?

A.   Yeah.

Q.   Government's Exhibit 28.

A.   We are on 28?

Q.   We are on 28.  Let's look at page two at the bottom. There is an e-mail from Defendant Ahmed to you.  What's the date of that e-mail?

A.   Sunday, March 13, 2005.

Q.   And read the whole thing that Defendant Ahmed writes?

A.        Bhonday is down, Fallen is falling, laugh out loud.  I have been trying to get him to be up and ready, but he can't seem to get the courage.

     Man, things have changed, insha'Allah, now. Went to some place don't wanna mention online and hooked up with people.

     Just come any time.  I am free.  Colg is no problem.  I am broke too.  Ever think about fay?

     We will talk when you come.

Q.   Bhonday is down, and Fallen is falling.  What's that a reference to?

A.   To my understanding, that meant that they are not willing to take part in jihad in any form.

Q.   But Bhonday, that's a person?

A.   Yeah.  That's Bhonday.

Q.   Who is Bhonday?

A.   Him, that's how he says it.

Q.   However one says it, have you been corresponding with a Bhonday Mazaq as opposed to Thandy Mazaq as well?

A.   Yes.

Q.   And Fallen is yet another person?

A.   Yes.  Fallen is Safiullah.

Q.   You respond in the middle of the page.  And then also on March 13th, 2005, in this brief e-mail up here, right above that one, Defendant Ahmed writes back to you and asks you something about loans.  What does he ask?

A.   Right here?

Q.   Yeah, it's going to be on the screen in just a second.  You can see it on the screen to your left as well.

A.   Oh, yeah.

Q.   What does he say?

A.   He said that -- I mentioned that I could take out loans and then run away from the banks, just take the loan out and not pay it back.

Q.   Read what he says?

A.   Hey, man, you mentioned a long time ago that we can take loans and then run away from these banks.  Update me on that.

Q.   Had you and Defendant Ahmed in fact prior to March 13,

1   2005, talked about that concept?  Not necessarily endorsed

2   it, but talked about it?

3   A.   Yes.

4   Q.   What is it that you told him?

5   A.   I told him that I believe you can't do it based on

6   Hadith of the Prophet.

7   Q.   Can or cannot?

8   A.   Cannot do it.

9   Q.   Let's go to the first page of Government's Exhibit

10  28.  You had responded, I don't want to be wrong, I'm not

11  sure, you could be held accountable.

12       And then Defendant Ahmed writes back to you and says

13  what?

14  A.             Because I have heard that brothers in U.K. do

15                 this scheme and they have ulamas who have called it

16                 legitimate, wallah o alam, especially if it helps

17                 us make hijrah.

18                 I'm working on my family, but if they remain

19                 hesitant, I will still make hijrah.  You gotta come

20                 to hear our plans.

21  Q.   In the context of the discussions you had with defendant

22  Ahmed about third, what does hijrah mean?

23  A.   Hijrah means you migrate from lands that do not abide by

24  Islamic law and then you go to a land that may abide by

25  Islamic law.

Q.   I understand now that that's what the word means.   In
the context of your conversations with Defendant Ahmed, what
did hijrah mean?

A.   Hijrah means we would leave from the United States and
go to a place to engage in violent jihad.

Q.   Defendant Ahmed references his family.  I'm working on
my family, but if they remain hesitant -- is that a theme of
conversation that you and Defendant Ahmed had in '04, '05?

A.   Yes.

Q.   What's the issue?

A.   With in regards to me?

Q.   With parents in general.

A.   Well, I can speak of my situation.  Obviously they are
going to remain hesitant on me fighting jihad.

Q.   Now, you finally at the top of Government's Exhibit 28,
you respond, going back and forth.  Read what you say about
the Hadith?

A.   I say:  When I heard that Hadith about the muj don't go
to jannah unless their debt is paid, I got hesitant.  So I
decided one day I'll ask a really learned scholar that knows
his Islamic financing.

Q.   Okay.  Explain to the Court what you mean by I heard
that Hadith about the muj don't go to -- that part, what does
that mean?

A.   That means that basically any Mujahideen, when they die

1   shaheed, which is martyrdom, they go straight to paradise.

2   Q.   Typically?

3   A.   Typically.

4   Q.   But?

5   A.   There was one instance during the time of the Prophet

6   where a man died shaheed, and then the Prophet knew that his

7   debt wasn't paid.  So He said, Who will pay his debt?  That

8   needs to get paid, otherwise that person would be in, in a

9   sense, Purgatory.

10  Q.   Exhibit 20, an e-mail exchange between you and

11  Thandymazaq.  Let's just look at the middle one, please.

12       On March 17, 2005, what website did Defendant Ahmed

13  encourage you to join?

14  A.   Tibyanpubs.com.

15  Q.   Prior to Defendant Ahmed referring you to that website,

16  had you ever been there?

17  A.   No.

18  Q.   Did you go there on his recommendation?

19  A.   Yes.

20  Q.   Contrast or compare Tibyanpubs with Clear Guidance,

21  which is a site you already described to the Court?

22  A.   Tibyanpubs had more content, more downloadable content

23  in the forms of PDFs and videos.

24  Q.   Okay, so it had more content.  What about in terms of

25  the slant or tilt of the site?

1    A.    It was more pro-jihad.

2    Q.    Government's Exhibit 84?

3    A.    Okay.

4    Q.    It's two e-mails.  Defendant Ahmed starts the chain so

5    we will look at that one first.

6          What does he tell you he's doing in July?  You can just

7    read the first sentence.

8    A.              I am going to end of July -- I'm going in end

9                of July, 17 to be exact.  The problem is that I'm

10               going not for some fun and games, but to see if I

11               can get some business done, if you know what I

12               mean.  So I think it is important we meet before

13               that.

14   Q.    Okay.  When you and Defendant Ahmed were talking about

15   ISNA and things like that, what does the phrase, See if I can

16   get some business done mean?

17   A.    From the way I understood it, I assumed that it meant he

18   was going to go and make connections with jihad.

19   Q.    At the bottom of Defendant Ahmed's e-mail to you, he

20   apparently attacks something:  And here is the advice of

21   Khattab to his son.  Is that something you asked from

22   Defendant Ahmed at some point?

23   A.    Yes, I did.

24   Q.    Tell the Court what that is?

25   A.    Khattab is person in Chechnya that was a commander and

he was martyred there, and he wrote a letter to his unborn

son.

Q.   Is that letter, the letter of Khattab to his son,

prominent in violent jihadi circles?

A.   You have to rephrase the question.

Q.   Okay.

A.   When you mean prominent, is it all over the place?  I

don't know.

      But is it something that I would be interested in

reading for inspiration?  Yes.

Q.   Had you already found it before Defendant Ahmed got it

to you?

A.   No.

Q.   Well, let's look at your response at the top.

A.   Obviously I did get it before.

Q.   Where might you find the Khattab thing, as you put it?

A.   I could have found it at Tibyanpubs, but that I don't

remember exactly where I found it.

Q.   This Khattab thing, the letter of Khattab to his son, is

it a document that you would expect to find in a place like

Tibyan as opposed to Amazon.com?

A.   Yes.

Q.   You respond to Defendant Ahmed's request to meet with

you before he leaves to get some business done July 17th with

a bunch of Urdu which is translated here.  Read what you said

1   and then explain for the Court?

2   A.   It helps me when I read in Urdu.

3   Q.   Please read it in Urdu.

4   A.   Wohee hamara tora kaam bana ney ke leeya aur doosrey

5   cheez key leeyah.  The same one to help us out and for the

6   second thing.

7   Q.   I don't understand either part, Urdu or English.  What

8   are you talking about?

9   A.   What I'm talking about is meeting with the tutor that

10  I mentioned earlier.

11  Q.   The gentleman who is going to help you with the firearms

12  training?

13  A.   Yes.

14  Q.   That's why you can't meet with Defendant Ahmed?

15  A.   Yes.

16  Q.   Government's Exhibit 42?

17  A.   Okay.

18  Q.   Let's again start at the back when the chain

19  started.  If you go to page three, if we enlarge -- that's

20  perfect.

21       So on August 21, 2005, Haris-ahmed@hotmail.com, who is

22  that?

23  A.   That's Haris.

24  Q.   The defendant in this case?

25  A.   Yes.

Q.   He sends an e-mail to you.  What does he say?

A.              It's me, Haris.  I came back now.  The
                situation was that I met some teachers and they
                told me to go back and help my parents for
                now.  Being the only son has some responsibilities,
                you should know too.
                    Well, I hope those teachers are right,
                otherwise I'm screwed that I turned back on my
                heels.  Try meeting now.  Man, wanna talk to
                you.  Rest is okay.

Q.   Mr. Ahmed, the phrase, I turned back on my heels, does
that have significance in the Quran or in religious texts
that you are familiar with?

A.   Yes.

Q.   What is that?

A.   There is a verse in the Quran that states that if you
turn back on your heels and run, you go to hell, unless it be
a stratagem of war.

Q.   Defendant Ahmed tells you, I came back now.  Where had
he been based on what he had told you?

A.   In this, Pakistan.

Q.   You respond at the bottom of page two.  What is your
view as to whether the teachers are correct or
incorrect.  What do you say?

A.   I say they are wrong.

Q.   Why is it that they are wrong?

A.   Well, the reason they are wrong is because jihad now is
fardh-'ain.

Q.   What does that mean?

A.   You have to do it.

Q.   Mandatory or obligatory?

A.   Yes.

Q.   Let's look at page one.  You guys continue to discuss
this topic, the defendant's return, parents and whatnot.
Let's look at the e-mail in the center here from Haris Ahmed
to you on August 22nd.

     After the phone call with you, had the two of you talked
on the phone in between a couple of these e-mails?

A.   We could have.

Q.   Okay.  Looks like it, but you don't recall?

A.   I don't remember the exact chronology.

Q.   Read what defendant says?

A.              After the phone call with you I am more
          depressed.  You said third is 'ain, and if it is,
          then didn't I turn back on my heels?  Cuz the
          scholars said it is Kifaya.  Scary stuff.  May
          Allah guide us all.

Q.   You mentioned in response to a question just a moment
ago about why you thought that scholars were wrong, something
about third is 'ain.  Is that the same thing that

1  Defendant Ahmed is writing here?

2  A.   Yes.

3  Q.   Mr. Ahmed said, You said third is 'ain, obligatory, so

4  that he did turn his back on his heels.  What does kifaya

5  mean?

6  A.   It's not mandatory.  Kifaya would mean like -- an

7  example would be like if you are trying to expand the borders

8  of an Islamic country, and 'ain would be basically what you

9  guys are doing now with invading Iraq and Pakistan.

10 Q.   You guys referring to?

11 A.   Meaning your government.

12 Q.   The U.S. government?

13 A.   The United States government.

14 Q.   In contrast with the kifaya, which would be an Islamic

15 war of aggression, their expanding as opposed to defending?

16 A.   Yeah, if there was an Islamic state.

17 Q.   If you would please look at 94, 95 and 96.  Do you have

18 all three in front of you?

19 A.   Yes, I do.

20 Q.   Do you recognize what these are?

21 A.   These are phone conversations.

22 Q.   94, 95 and 96?

23 A.   Yes.

24 Q.   This appears to you to be a telephone conversation?

25 A.   Yeah.

Q.   Are you sure we are looking at the same thing?  I'm
going to approach you with 94?

A.   That's 94.  No, this is a -- I believe it's MSN
messenger.

Q.   Chat?

A.   Chat.

Q.   Are there not e-mail addresses, the monikers and time
and date stamp for each entry on it?

A.   Yes.

Q.   So we are clear, you think this is a phone call -- these
are phone calls or chat sessions?

A.   These are chat sessions.

Q.   Are you involved in each of these three chat sessions?

A.   Yes, I am.

Q.   Have you seen these before?

A.   Yes.

        MR. McBURNEY:  Government tenders 94, 95 and 96.

        THE COURT:  Any objection?

        MR. MARTIN:  No objection.

        THE COURT:  They are admitted.

BY MR. McBURNEY:

Q.   Start with 94.  You can put up the first page just so we
can get oriented.  Just highlight the first third, please.

        A couple of just formatting questions here.  So we have
got the date, this chat happened when?

1    A.    October 24, 2005.

2    Q.    So we are now a few months past this exchange about was

3    it fardh-'ain or not to do jihad?

4    A.    Yes.

5    Q.    Ibnahmed460 is?

6    A.    Me.

7    Q.    Haris-Ahmed is?

8    A.    Haris.

9    Q.    There are some points in this chat that you will see

10   text in brackets as italicized that's a translation.  You

11   didn't type in -- here, you didn't type al bidaya wa nihaya

12   and translate it for Defendant Ahmed, did you?

13   A.    No, I didn't.

14   Q.    Let's jump to page three of Government's Exhibit

15   94.  And we are really going to go through most of this

16   page.  It's big text, so let's leave it.

17         Defendant Ahmed at 10:00:11 says what?

18   A.    Can you repeat that again?

19   Q.    Yes.  What is it that Defendant Ahmed says at 10:00:11?

20   A.    Yo, so what's up with Thanksgiving?

21   Q.    You typed that.  And then the very same second

22   Defendant Ahmed types something?  What does he type?

23   A.    I got hold of the video of Taliban Burning.

24   Q.    Are you familiar with the video of Taliban Burning?

25   A.    Yes.

```
1   Q.   What is it?

2   A.   It's a video of Taliban Burning.

3   Q.   A building is burning?

4   A.   No.  The people.

5   Q.   Bodies are burning?

6   A.   Bodies, human beings.

7   Q.   Taliban bodies?

8   A.   Possibly.

9   Q.   That's what the video --

10  A.   That's what the video says.  I didn't take the video or

11  anything, so I wouldn't know for sure.

12  Q.   Understood.  So you say what when -- at 10:00:22 in

13  response to Defendant Ahmed saying, hey, I got this video?

14  A.   I don't want to see that.

15  Q.   And Defendant Ahmed says?

16  A.   So, insha'Allah, I will try to get some video out.

17  Q.   Try to get some video out.  What does that mean?

18  A.   That means spread the video across the internet.

19  Q.   You, continuing the discussion, say, I hear now -- read

20  the few lines that you entered there?

21  A.   After get the video out?

22  Q.   At 10:00:42 Defendant Ahmed says insha'Allah.  After

23  that what do you say?

24  A.   I hear now from Taliban that munafiqs are getting

25  pissed.
```

1    Q.    What does that mean?

2    A.    Northern alliance, people that are not pro-Taliban, they

3    are anti-Taliban, now they are getting mad that there is

4    Taliban Burning.  So they want to join the insurgency.

5    Q.    And fight against the U.S.?

6    A.    Yes.

7    Q.    What does Defendant Ahmed say after you describe that?

8    A.    Man, we got to use that for propaganda.

9          Then I say, Let's hope the munafiqs repent and turn to

10   the right side.

11   Q.    The right side being?

12   A.    Attacking U.S. troops.

13   Q.    Let's jump to page nine and if you could magnify the

14   bottom third of the page -- more than that.  Start with, Hey,

15   man.

16         So Defendant Ahmed is typing.  What does he say?

17   A.    He says, Hey, man, when you come to Thanksgiving, come

18   driving.

19         Yeah, I will.  Why?

20         And if you have it, your toy, laugh out loud.

21   Q.    What is your toy?

22   A.    I was trying -- I was buying a gun.

23   Q.    A gun?

24   A.    Yeah.

25   Q.    A paintball gun?

1    A.    No, a Glock or Smith and Wesson.

2    Q.    An actual firearm?

3    A.    Yes.

4    Q.    Let's look at page ten.  Let's just keep the page like

5    this.

6          So you guys do a little joke or laugh about you bringing

7    your gun, and then Defendant Ahmed says what?

8    A.    But seriously, no record.

9          That I can't -- I don't have it.

10          Flying gives em a proof.

11    Q.    Let's read just Defendant Ahmed's lines, because you

12    guys are sort of typing over.

13          Defendant Ahmed says, But seriously, no record.

14          And then skip down three lines.  He says?

15    A.    Flying gives em a proof.

16    Q.    All right.  And then skip down three more lines, and he

17    says?

18    A.    Well, I will try to get this bro to come.  He showed

19    interest.

20          In third or just support?  That's what I'm asking.

21    Q.    Follow the red light.  All right.  Defendant Ahmed says?

22    A.    But seriously no record.

23    Q.    And then he goes on to say?

24    A.    Flying gives em a proof.

25    Q.    And down here?

1   A.   Driving is hard to follow.

2   Q.   What's he getting at?

3   A.   He wants me to fly on a plane.

4   Q.   He wants you to fly because it gives them proof, or

5   drive because it's hard to follow?

6   A.   Both.

7   Q.   He wants you to drive and fly?

8   A.   No, no.  He wants me to fly because -- he doesn't want

9   me to fly because it gives them proof, and then he wants me

10   to drive because it's easier -- it's harder to follow.

11        I was zoning out, sorry.

12   Q.   I need you to stay focused.

13   A.   Yeah.

14   Q.   Do you need water?

15   A.   No, I'm good.

16   Q.   You are saying something over him.  While he's saying

17   don't fly, drive, you are talking about your toy.  What is it

18   you are saying about the firearm?

19   A.   Well, at this point I was living in Michigan, and I had

20   a FOID card for Illinois, firearm owner's ID, and in Michigan

21   all you need to buy a gun is a Michigan license.  So I was

22   contemplating on whether I should just get the Michigan

23   license and buy the gun.  It's easier.

24   Q.   Defendant Ahmed then tells you if you come on down here

25   at 10:09:28, what does he say?

1    A.    Well, I will try to get this bro to come.  He showed

2    interest.

3    Q.    He showed interest.  And you asked what?

4    A.    In third or just support?

5    Q.    Then he, Defendant Ahmed, responds?

6    A.    Well, that's the Q, everyone is one.

7    Q.    Everyone is one?  What does that mean?

8    A.    Every Muslim is ideologically supportive of jihad.

9    Q.    That's the first you described to the Court earlier?

10   A.    Yes.

11   Q.    And then Defendant Ahmed says?

12   A.    He will find out if he can be second or not.

13   Q.    Let's jump to page eleven.  If you would magnify the

14   second half of the page?

15        You at 10:11:21 say what?

16   A.    Second thing is hijrah-minded people.

17   Q.    You go on to say?

18   A.    No one wants to do that.

19   Q.    No one want to do what?

20   A.    Migrate from the United States and go to Muslim lands.

21   Q.    Defendant Ahmed says in response?

22   A.    If they don't do hijrah, the other option is there.

23   Q.    You say, What option?

24   A.    Yeah.

25   Q.    And he says?

```
 1    A.    Man, we will just talk.

 2    Q.    Talk?

 3    A.    In person.

 4    Q.    About this option that involves not leaving the

 5    United States?

 6    A.    Yes.

 7    Q.    Next page, you can leave the whole page up.

 8          Defendant Ahmed asks you if you can bring anyone, and

 9    you respond?

10    A.    Yeah, I'm trying my cuz.

11    Q.    Your cuz is?

12    A.    My cousin that went with me to Egypt.

13    Q.    Defendant Ahmed tells you at 10:13:35 what?

14    A.    It will be awesome.  I did it once.  I went up north

15    across this mulk, country.

16    Q.    And?

17    A.    And we met with some awesome ikhwaan.

18    Q.    Mulk is translated there, but mulk does mean country?

19    A.    Yes.

20    Q.    And they met with awesome what?

21    A.    Ikhwaan means brothers.

22    Q.    Let's look at 95.  We were just talking about a chat you

23    two had in October of 2005.  Now where are we?  What's the

24    date?

25    A.    November 15, 2005.
```

1   Q.   The defendant and you were talking about visiting

2   again.  Let's look at the bottom of page two.  If you could

3   highlight the bottom half of page two?

4   A.   Okay.

5   Q.   You are red, it should be easier to follow, the

6   defendant is blue; okay?

7   A.   Okay.

8   Q.   The defendant asks if you are going to be free on

9   Friday.  What do you say?

10  A.   I'm going to go, and requested the weekends off in

11  advance.  Yeah, it's one day.  We need two or three to hang

12  out.

13  Q.   Defendant says?

14  A.   Yeah, but then one day can be used.

15  Q.   You say, True.

16  A.   True.

17  Q.   And he says what?

18  A.   But there is difference this time.

19  Q.   All right.  Let's look at the top of the next page.

20  There is a difference this time.  Last time we met, was on

21  the previous page.  He says, Remember.

22  A.   Yeah.

23  Q.   What does he go on to say?

24  A.   We were first.

25  Q.   Then he says?

1    A.    Now we both have come back from almost third.

2    Q.    At this point had the defendant come back from his trip

3    to Pakistan?

4    A.    Yes.

5    Q.    All right.  Magnify the second half of this page

6    starting with, And I have some people.

7          So Defendant Ahmed at 2:35:25 a.m. says what?

8    A.    And I have some people who are in touch with third.

9    Q.    You ask a question here, How serious is Usman?  Who is

10   Usman?

11   A.    Usman is one of the people that we were talking to.

12   Q.    Online?

13   A.    Yeah.

14   Q.    Did you ever meet Usman?

15   A.    No.

16   Q.    Where is Usman now, if you know?

17   A.    I don't know.

18   Q.    Was he in the U.S. when you first got to know him?

19   A.    Yes.

20   Q.    Did he leave the country?

21   A.    Yes.

22   Q.    Where did he go?

23   A.    I think he went to Dubai.

24   Q.    Dubai?

25   A.    Yes.

1    Q.   Middle East?

2    A.   Middle East.

3    Q.   But this is the same Usman you are talking about right

4    here?

5    A.   Yes.

6    Q.   When you say you talked to him online, did you talk to

7    him about the Chicago Cubs or first, second, third?

8    A.   First, second, third.

9    Q.   So you ask, How serious is Usman?

10        What does Defendant Ahmed say in response at 2:35:48?

11   A.   I don't know.  I need to check.  I hinted about it.

12   Q.   He said --

13   A.   Said what if the call reaches you?  He is like

14   alhamdullillah.

15   Q.   Let's go to the next page.  You say at 2:36:37 what?

16   A.   Can you blow that up?

17   Q.   Look on the screen -- well, I don't know if any of that

18   will help you.  We will blow it up.  We are going to do the

19   whole page, but we will go right here, that's fine.

20        What does he say at 2:36:37?

21   A.   Seriously if I had real hard-core connect, I wouldn't

22   hesitate.

23   Q.   Wouldn't hesitate to do what?

24   A.   Fight jihad.

25   Q.   On November 15, 2005, at 2:36 in the morning, is that a

1    true statement?

2    A.   Was it --

3    Q.   Was it true when you said that, that if you had real

4    hard-core --

5    A.   At that time?

6    Q.   At that time.

7    A.   Yes.

8    Q.   You indicate that, If you did have a hard-core connect,

9    you wouldn't hesitate, as we just explained, go do violent

10   jihad.

11       Defendant Ahmed immediately following that writes what?

12   A.   I think that too, especially when we had like five to

13   eight bros all damn serious.

14   Q.   Can you magnify it?

15       He indicates we had like five to eight bros.  You ask

16   what at 2:36:55?

17   A.   When did we have that many?

18   Q.   The response?

19   A.   I did.

20   Q.   We can magnifying the bottom half of the page.

21       So he says, I did.  And then he says?

22   A.   Few months ago.

23   Q.   And he goes on to say?

24   A.   It was transcountry, man.

25   Q.   And?

A.   We met in one country people from three countries.

Q.   Next page, if you would magnify the top half of the page?

     What does Defendant Ahmed say to you at 2:38:41?

A.   But anyhow, man, the thing is third is still not broken for me.

Q.   The next page, if you could magnify the middle of the page?  Great.

     So at 2:41:24, Defendant Ahmed says what to you?

A.   Man, that's the thing, I need to talk to you about this.

Q.   He goes on to say?

A.   That the people made a big offer.  Basically after my friend met them, it's real enough that people went to hospital due to it.  It was not news recently -- it was on news recently.

Q.   He corrects -- he, the defendant, corrects himself with an entry with an asterisk?

A.   Yes.

Q.   Did you ever learn who his friend is?

A.   No.

Q.   Page eight, if you could magnify the same portion of that page?

     Defendant is still talking about wanting to meet with you, says what starting at 2:47:45?

A.   That's why we got to meet.  The whole story will delight

1   you, I am sure of that.  But there is a need-to-know basis,

2   so if someone can help, then they will be told.

3   Q.   Go to page ten.  If you could magnify the bottom half of

4   that page?

5       You two have been discussing Safi, Safiullah Hussaini,

6   and the defendant is now talking about something he asked him

7   to do.

8       At 2:51:23 what does he say?

9   A.   I asked him to upload some things online.  It was

10  essential, man.

11  Q.   And he says?

12  A.   But wasn't done.  It was for the people in third.  They

13  wanted it.

14  Q.   Next page, if we could magnify the top half of that

15  page?

16      Defendant Ahmed continues at 2:51:52?

17  A.   I left the files in Pak.  I said can you upload it.

18  Q.   You ask a question?

19  A.   East third or west?

20  Q.   What does that mean?

21  A.   East, Afghanistan, or west, Iraq.

22  Q.   Defendant Ahmed's response?

23  A.   Rivers, man.

24  Q.   Rivers means what?

25  A.   Two rivers, the Tigres and the Euphrates.

1   Q.   It refers to what country?

2   A.   Iraq.

3   Q.   And you respond?

4   A.   Shizmoi, for real?

5   Q.   You say, For real?  Defendant Ahmed says, Hell, yeah.

6        Then you type, Do rivers?  Is that a typo or is do an

7   Urdu word?

8   A.   It's an Urdu word.  It means two.

9   Q.   Okay.  If we could magnify the second half of this

10  page?

11       So Defendant Ahmed at 2:53:06 refers back to this thing

12  that he had asked Safiullah what to do, upload these files.

13  What does he say would happen had that occurred?

14  A.   If it was done, it would be official connection to

15  them.

16  Q.   Then?

17  A.   But since we could not deliver, it is shaky.

18  Q.   He goes on to say?

19  A.   But the offer still stands.  That's the reason I'm

20  traveling.

21  Q.   Let's go to the bottom of page 12, please.

22       At the very bottom, the defendant changes subjects.

23  What does he say at 2:56:08?

24  A.   The dogs are on my trail like crazy.

25  Q.   Now, when you and Defendant Ahmed were discussing third

1  and matters related to that, what did dogs mean?

2  A.   From what I understood, it meant law enforcement.

3  Q.   Not actual blood hounds or Chihuahuas?

4  A.   No.

5  Q.   Next page?  If you could do the top half of the page,

6  please?

7       So Defendant Ahmed is talking about the dogs.  2:56:25,

8  what does he say?

9  A.   Visiting everyone I visited.

10 Q.   You ask him how he knows.  His response?

11 A.   Cuz whom they visited told me some one who told me.

12 Q.   And finally page 14, if you would magnify the bottom

13 half of page 14?

14      Still talking about the dogs.  Defendant Ahmed says at

15 2:59:37 on November 15th?

16 A.   But the point is they are dumb as hell.  I personally

17 pointed out two dogs who were supposed to be undercover.  I

18 could see them a mile away from their damn combat boots.

19 Q.   Let's look at Government's Exhibit 96.  If you could

20 magnifying the second half of that page?  This is the same

21 day as the previous chat, about an hour later.

22      Defendant Ahmed asks you a question at 4:27 a.m.  What's

23 the question?

24 A.   In short, do you know Sheikh Maqdisi?

25 Q.   Who is Sheikh Maqdisi?

```
 1    A.    Sheikh Maqdisi is an Islamic scholar who is in favor of
 2    jihad.
 3    Q.    In favor of?
 4    A.    Yes.
 5    Q.    Defendant Ahmed says what after you say, Yeah?
 6    A.    Well, man, I almost met the guy who translates his books
 7    in Urdu.  I got to this madrassa.  And I forgot the sheikh's
 8    name, so I asked the guy at the office.  I wanna --
 9    Q.    Next page?
10    A.    I wanna meet the sheikh who translated Maqdisi's
11    books.  It was hot those days in Pak, arrests everywhere.
12    Q.    Let's stop for a moment.  Hot those days in Pak.  Hot in
13    temperature, or hot in relation to arrests everywhere?
14    A.    In relation to arrests everywhere.
15    Q.    Okay.  Defendant Ahmed goes on?
16    A.    So he was careful.  He is like give me the name of the
17    sheikh you wanna meet.  Otherwise we can't help you.
18    Q.    All right.  Bottom of page two, the end of this chat?
19    A.    Mashallah -- do you want me to read?
20    Q.    Yes, please.
21    A.    Mashallah.  Man, no wonder so many AQ people found in
22    KHI.  It's full of SJ.  I barely searched and got like tons
23    and tons of them.
24    Q.    Let's do them one line at a time.
25          Man, no wonder so much AQ people found in KHI.  KHI is
```

1   what?

2   A.   Karachi.

3   Q.   That's in Pakistan?

4   A.   Yes.

5   Q.   AQ people.

6   A.   Al-Quaeda.

7   Q.   Al-Quaeda?

8   A.   Yes.

9   Q.   Is full of SJ?

10  A.   Salafi jihadists.

11  Q.   Explain to the Court what a salafi jihadist is?

12  A.   It's a person who wants to wage jihad to establish an

13  Islamic state.

14  Q.   And Defendant Ahmed says what about AQ people and salafi

15  jihadists?

16  A.   I barely searched and got like tons and tons of them.

17  Q.   That chat was, as I mentioned on November 15th, at some

18  point in December of 2005, did Defendant Ahmed call you on

19  the phone?

20  A.   Yes, he did.

21  Q.   You should have in front of you two CDs and two

22  transcripts.  The transcripts should be 502-A and 503-A.

23  A.   Yes.

24  Q.   Do you see those?

25  A.   Yeah.

```
1    Q.   Have you had a chance to look at these transcripts
2    before?  Maybe not that exact copy, but a transcript of the
3    call before?
4    A.   Yeah.
5    Q.   To the best of your understanding, are they fair
6    reproductions of the phone calls with translations of some of
7    the Urdu?
8    A.   Yes.
9         MR. McBURNEY:  The government tenders 502-A and
10   502, 502 being the actual call, 503, the second call, and
11   503-A, the second transcript.
12        THE COURT:  Any objection?
13        MR. MARTIN:  No objection.
14        THE COURT:  They are admitted.
15   BY MR. McBURNEY:
16   Q.   All right.  If we could play 502, please.
17        (By audio:)
18        ZA:  Hello.
19        SHA:  [Peace be upon you].
20        ZA:  [Peace be upon you also].
21        SHA:  Is this Zubair?
22        ZA:  Yeah.
23        SHA:  It's me, Haris, man.
24        ZA:  Oh, Siraj, what's up man?
25        SHA:  What's up?  Hey, ah, I mean, I haven't
```

```
 1              seen you online . . . online for a long time, but I
 2              need to talk to you.  So I am calling you.
 3              (Audio ends.)
 4    BY MR. McBURNEY:
 5    Q.   Can you stop for a second?
 6         Mr. Ahmed you are the ZA on there and the defendant is
 7    the SHA?
 8    A.   Uh-huh.
 9    Q.   Defendant just said, I haven't seen you online for a
10    long time.  Had you in December of 2005 limited your online
11    contact with the defendant?
12    A.   Yes.
13    Q.   Were you not going to the same places, or were you not
14    contacting him?
15    A.   I just wasn't online as much, and plus I wasn't
16    contacting him.
17    Q.   Okay.  Keep going, please.
18              (By audio:)
19              ZA:  Hey, man, ah, last week, ah, my uncle
20              died so I was in Chicago for like most the, ah,
21              last week.
22              SHA:  Oh, yeah, man, I forgot.  Oh, man, yeah,
23              you know, I'm . . . I was really sad because when
24              you told me that he was like friends with wha . . .
25              what's his name, Dr. Israr Ahmed, and all.  He was
```

```
1              like a really big scholar.

2                  ZA:  Yeah.

3                  SHA:  I really wanted to meet him, but, ah, I

4              guess not.

5                  ZA:  Oh, I thought you were somebody else.

6              No, no, no.  This is Haris, right?

7                  SHA:  Yeah.

8                  ZA:  Oh, I thought you were Si . . . I . . . I

9              thought you said Siraj.

10                 SHA:  No, no, no.

11                 ZA:  This is your number, for, ah, for,

12             ah . . .

13                 SHA:  Huh?

14                 ZA:  This is your regular number?  The one

15             you're calling from?

16                 SHA:  I'm calling. . . I'm calling from

17             someone else's cell phone.

18                 (Audio ends.)

19             MR. McBURNEY:  Could you stop for a second?

20   BY MR. McBURNEY:

21   Q.    You didn't recognize the phone number?

22   A.    No.

23   Q.    What did Defendant Ahmed tell you as to what he was

24   using to call you?

25   A.    Someone else's phone.
```

```
 1              MR. McBURNEY:  Okay.  Keep playing.

 2         (By audio:)

 3                   ZA:  Oh.

 4              SHA:  But you . . . you . . . you can save it

 5         if you want, but . . .

 6                   ZA:  No.  Yeah, what's up?

 7              SHA:  Hey man, I need . . . we need to talk

 8         so . . . what . . . meet . . . find a place, find a

 9         time, whatever.

10              ZA:  Yeah, ah, let's see.  December . . . I'm

11         good, ah . . . What is today, the 2nd?

12              SHA:  Huh?

13              ZA:  I'm probably good, ah, man, 14th . . .

14         from 14th til 30th I'm working all the days.

15              SHA:  All . . . every single day?

16              ZA:  But before the 14th. . . huh?

17              SHA:  Every single day on . . . in 14th? [UI]

18              ZA:  After the 14th til January 1st, because

19         this guy is taking vacation.

20              SHA:  Yeah, but every single day?  You won't

21         have any break?

22              ZA:  No, no.

23              SHA:  No?

24              SHA:  No.  Oh, my God.

25              ZA:  But [before] the 14th . . . 14th . . . I
```

1          [have a] final [on the] 14th [and] 15th, but I can

2          probably . . . damn, I have to see.  I have to look

3          at the calendar and stuff, but [what is today?  It

4          is the 2nd, right?]

5               SHA:  Uh-huh.

6               ZA:  Yeah.  Maybe in like [UI].  Like in four

7          or five days I'll be . . . the only time I'll be

8          free until, ah . . . otherwise, we'll have to wait

9          til spring break.

10              SHA:  OK.  Wh . . . when are you gonna be

11         free?  What's your . . . when is . . . when is your

12         last final?

13              ZA:  My last final is on the . . . let's see,

14         the 14th . . . it's a . . . I have to see 'cause

15         he . . . we still didn't decide if he's gonna take

16         a final or not, or give just a paper in the class.

17              (Audio ends.)

18         MR. McBURNEY:  Would you pause, please.

19    BY MR. McBURNEY:

20    Q.   Mr. Ahmed, you are jumping through a lot of hoops here

21    to come up with dates you can or cannot meet him.  At this

22    time were you interested in meeting Defendant Ahmed?

23    A.   Yes.

24    Q.   You are trying to find time when your schedule overlaps

25    with his?

```
1    A.    Yeah.

2              MR. McBURNEY:  Keep playing, please.

3          (By audio:)

4              SHA:  So, OK.

5              ZA:  [UI] If he gives a final, it's probably

6          gonna be like the 14th or something.

7              SHA:  OK, but if he . . . if he doesn't give a

8          final, then so, wh . . . when are you gonna be free

9          then?

10             ZA:  Then, ah, then I'm . . . then I'm good.

11         Then I'm good.  Ah . . .

12             SHA:  Huh?

13             ZA:  Then my last final is like the 13th.

14             SHA:  Man, only one day?  Oh my God.

15             ZA:  Well, what's up man?  Is some . . .

16         everything good?

17             SHA:  Huh?

18             ZA:  Some new stuff you got?  If, ah . . .

19             SHA:  That's the thing.  The . . . the new

20         stuff . . . I mean, which . . . it will . . . it

21         will be good if, like, if we can meet in your

22         ho . . . old place.  Like you . . . like your old

23         city.

24             ZA:  [At my house?]

25             SHA:  Because I wanna do something.  Huh?
```

```
 1                    ZA:  [At my house?]

 2                    SHA:  [No, no, no, the old city.]  Not this

 3              [city, the old city.]

 4                    ZA:  Oh, [the old city]?  Man . . .

 5                    SHA:  Yeah.

 6                    ZA:  [The old city.]  I won't be there for a

 7              while.

 8                    SHA:  'Cause your cousin is there, right?

 9              (Audio ends.)

10                    MR. McBURNEY:  Can you pause, please?

11      BY MR. McBURNEY:

12      Q.    Where are you when this call is happening?  What city in

13      the United States?

14      A.    Southfield, Michigan.

15      Q.    Is that near Detroit or someplace?

16      A.    Yes.

17      Q.    The defendant doesn't say Chicago.  He says what instead

18      of Chicago on this call?

19      A.    Your old place, your old city.

20      Q.    When there is confusion as to what he means by old city,

21      do you two start speaking in Urdu?

22      A.    Yeah.

23      Q.    Does he ever end up saying Chicago, or just old city in

24      either English or Urdu?

25      A.    He just says old city.
```

MR. McBURNEY:  Keep playing, please.

(By audio:)

ZA:  Heah.  [I talked to my] cousin last week.
[We all are still] serious [about that].

SHA:  Really?  'Cause . . .

ZA:  Yeah.

SHA:  I mean . . . I need first of all help, a
little help and . . . and the help can be provided
only if you know what, you know, I need for [UI].
So, and I can tell you only when I meet you.  So
that's the problem.  The whole thing is jammed,
'cause . . .

ZA:  [But we don't have any issues regarding]
time, [right]?

SHA:  Huh?

ZA:  [We don't have any] problem [regarding]
time, [right]?

SHA:  Time is a problem  Yeah, time . . . time
is a problem

ZA:  How?

SHA:  Oh man, ah, it's just . . . I mean, time
is always a problem.  You know?

ZA:  No, I am saying [that we have] time.  [We
do have time, right]?  It's not like, ah, cru . . .
there's no crunch time or nothing, right?

```
 1                SHA:  For me, I think there is a crush

 2         time . . . crunch time.  That's the problem for me.

 3                ZA:  [UI].

 4                SHA:  You know, to go over to . . .

 5                ZA:  Oh, yeah?

 6                SHA:  Yeah, so if . . . if it can be done

 7         quickly . . . because I just wanna meet and get

 8         your say, OK, are you in or not?  Because you know

 9         that guy, what's his name man, online.  Usman or

10         whatever?

11                ZA:  [Yes, yes, yes].

12                SHA:  He promised so good, 'yeah, yeah, we'll

13         come and meet and talk.'  At the end he backs out.

14         And . . .

15                ZA:  [They are all . . . they are like that

16         buddy]

17                SHA:  Huh?

18                ZA:  Everyone's like that.

19         (Audio ends.)

20                MR. McBURNEY:  Could you pause, please?

21   BY MR. McBURNEY:

22   Q.   The two of you are talking about who?

23   A.   Usman.

24   Q.   We have already mentioned him, he was the gentleman who

25   ended up in Dubai?
```

```
1    A.    Yeah.
2    Q.    Could you jump please to as close to 6:55 as you can?
3          We are skipping through this as there continue to be
4    discussions about when you are available and Defendant Ahmed
5    can be there?
6    A.    Okay.
7    Q.    I'm asking you, is that what this call is mostly about?
8    A.    Yes.
9    Q.    Okay.  And at some point you talk about debt you have?
10   A.    Yeah.
11   Q.    What did you have debt from?
12   A.    I maxed out my credit cards and took the money for
13   Egypt.
14   Q.    So we are going to come back in sort of in the middle of
15   that discussion.  That's the debt?
16   A.    Yeah.
17              (By audio:)
18                   ZA:  It's gonna take me like one year, at
19              least.
20                   SHA:  It's gonna take you one year?  How . . .
21              how much did you take?
22                   ZA:  Well, my debt is gone.  I only have three
23              thousand left.
24                   SHA:  Oh, OK, OK.
25                   ZA:  But I gotta become plus now.
```

```
 1              SHA:  But how much did you take though?  How

 2         mu. . . how much like could [PH] you run away with,

 3         man?

 4              ZA:  [UI].

 5              SHA:  Huh?

 6              ZA:  Total?  Total?

 7              SHA:  Yeah, yeah.

 8              ZA:  [My money . . . my savings and that

 9         combined, ten thousand].

10              SHA:  [OK, OK].  Uh-huh.  Well, I mean if you

11         can meet, hey . . . because there are some things

12         that you can help me, only you can help me right

13         now.

14              ZA:  Yeah?

15              SHA:  Ah, because you have employees, like, at

16         you dad's place, right?

17              ZA:  Employees?

18              SHA:  Uh-huh.

19              ZA:  Yeah.

20              SHA:  Some Hindus?

21              ZA:  Yeah, yeah.

22              SHA:  Because, ah, [we have to get that of

23         theirs, buddy].

24              ZA:  [What]?

25              SHA:  Ah, you have their information on file,
```

1       right?

2                   ZA:  Oh, yeah, yeah.

3                   SHA:  So that's . . .

4                   ZA:  [I will have to look for it].

5                   SHA:  Huh?

6              (Audio ends.)

7          MR. McBURNEY:  You can stop there.

8    BY MR. McBURNEY:

9    Q.   What is it that Defendant Ahmed is asking you for here

10   at the end of this conversation?

11   A.   This information on people that work for my dad.

12   Q.   Your father does what?

13   A.   He's an accountant, but he's a businessman as well.  He

14   retired from accounting.

15   Q.   Does he have people who work for him?

16   A.   Yes, he does.

17   Q.   Defendant Ahmed is asking for information about these

18   employees?

19   A.   Yes.

20   Q.   Now, this call ends because it's time for a prayer?

21   A.   Yes.

22   Q.   If we could go to 503, please?   And start as close to

23   3:20, three minutes and twenty seconds as we can.

24        This call is a continuation of the same stream of

25   conversation you had, just post-prayer?

A. Yes.

(By audio:)

SHA: OK.

ZA: Yeah.

SHA: OK, I might then drop . . . if I have a chance, like I might drop by like for one day, even spend the night maybe, talking and stuff.

ZA: What were you talking about ah . . .? What were you . . . I couldn't hear you because I was in the store. What were you talking about ah . . . employees? Something about employees, you were saying.

SHA: This is not on the phone, man.

ZA: [Yes, I know that, but what that] employee . . . [Yes, fine. But what is the connection to that]? That's what I wanted to know.

SHA: Ah, [buddy, there is a lot of connection]. Actually, ah, [sometimes it happens that] . . . like you know. . .

ZA: [UI].

SHA: I want to take a new name.

ZA: [Yes. That . . . it is fine if you don't want to talk about it.]

SHA: [UI]

ZA: [Don't talk about that].

1          (Audio ends.)

2          MR. McBURNEY:  You can stop now for second, please.

3    BY MR. McBURNEY:

4    Q.   What is it that Defendant Ahmed is trying to do?  What

5    does he tell you he's trying to do?

6    A.   He's saying don't talk on the phone?

7    Q.   He's saying don't talk on the phone, but it just

8    scrolled by and you have the transcript in front of you.  On

9    page four of the transcript, if you are looking at the

10   transcript for the second call, which would be 503-A --

11   A.   Oh.

12   Q.   -- at line 17, what does he say?

13   A.   I want to take a new name.

14   Q.   And you respond at four minutes and five seconds in

15   Urdu?

16   A.   Don't talk about that.

17   Q.   Okay.  Keep playing, please?

18          (By audio:)

19          SHA:  The hin . . . the hint is like you want,

20          sometimes you want to take a new name.

21          ZA:  Yeah, yeah.

22          SHA:  So, I mean if something is possible from

23          that, it's cool.  Otherwise I'll just go find

24          someone from here, someone here, random [UI].  But

25          something is needed and, ah, so that's the thing.

```
1          That's the issue.  That's the only thing.  You get

2          it now?

3               ZA:  Yeah, I do but . . .yeah.  [But there is

4          big problem with that].  [There is] a problem [with

5          that].

6               SHA:  [What's the problem]?

7               ZA:  [UI]  [it's that too.  Talk in

8          person. . . we'll have to talk later].

9               SHA:  OK, God willing.

10              ZA:  [These people came at the business.  They

11         were looking at everything].

12              SHA:  [Did those people come at the business]?

13              ZA:  Yeah.  [Those people came after we

14         arrived].  In fact, [those people thoroughly

15         searched the inside of the whole] store.

16              SHA:  [OK, OK].

17              ZA:  [Came inside] . . .

18              SHA:  [This is old news, right]?

19              ZA:  [Yes, but here . . . if we take the name

20         or something from the same place, then they would

21         know already] for sure [PH].

22              SHA:  [OK, OK].

23              ZA:  You know what I'm saying?

24              SHA:  Yeah, I . . . I understand.  [We'll see]

25         if there is a possibility.  So . . .
```

```
 1              ZA:  Yeah.

 2              SHA:  [Because] it's easier from an employer

 3         because they have all the information.   If it's

 4         not possible, then we go somewhere else.  [UI]

 5         There are options there, it's not like completely

 6         dead end, but the options are a little more work,

 7         but it's possible, [God willing].

 8              ZA:  Yeah.

 9              SHA:  So that was the thing.  Not much . . .

10         not much important.  But there's also a guy in your

11         city man, Internet Haganah.

12              ZA:  Yeah.

13         (Audio ends.)

14         MR. McBURNEY:  You can pause, please.

15   BY MR. McBURNEY:

16   Q.   That was more about getting the information about the

17   employees, but in the middle there you said that people came

18   at the business, they were looking at everything.  This would

19   be on page five of the transcript, 4:47, 4:49.  What are you

20   describing?

21   A.   Law enforcement agents came to my dad's place of

22   business, and they were searching the place.  This is after

23   I returned from Egypt.

24         MR. McBURNEY:  Can you jump to seven minutes and

25   fifty seconds, please?
```

1      (By audio:)

2          ZA:  Yeah.

3          SHA:  Alright.  Oh.  Yeah, [God willing],

4      spring then, OK. [UI]

5          ZA:  Can you hear me man?

6          SHA:  Huh?

7          ZA:  Can you hear me?

8          SHA:  [It is very] low, [buddy, the voice is

9      very low].

10         ZA:  You know what?  [This has never happened

11     in life.  Someone is] definitely [listening to our

12     conversation].

13         SHA:  [What]?

14         ZA:  [Such voice . . . this] problem [with the

15     voice, right?  It has never happened before].

16         SHA:  Uh-huh.

17         ZA:  [There is some trouble in this].

18         SHA:  [Really]?  You think so?

19         ZA:  Yeah.

20         SHA:  [UI]

21         ZA:  [UI]

22         SHA:  I . . . I'm calling from a different

23     phone.  It's not . . . I mean, it's not my phone so

24     it should not be a problem.

25     (Audio ends.)

1           MR. McBURNEY:  Could you pause, please?

2    BY MR. McBURNEY:

3    Q.   What is this concern that you and Defendant Ahmed are

4    having right now?

5    A.   I'm concerned that someone is listening in on the

6    conversation.

7    Q.   Defendant Ahmed says -- it's actually still on the

8    screen, the line we just passed, what does he say?

9    A.   I'm calling from a different phone.  It's not -- I mean,

10   it's not my phone, so it should not be a problem.

11          MR. McBURNEY:  Okay.  Keep playing please.

12          (By audio:)

13              ZA:  I know.  That's what I'm trying to tell

14          you.  It's a prob . . . I don't have a problem with

15          this because usually when you . . . when I . . .

16          when you called me earlier and I was in the store,

17          could you hear me fine?

18              SHA:  Yeah, it was fine.

19              ZA:  Oh, yeah?  OK.

20              SHA:  No, I [UI].

21              ZA:  Maybe it's because I'm in the apartment.

22              SHA:  Oh.  This phone, I mean, I don't know.

23          Ah, maybe, ah, your phone probably is man.

24              ZA:  But I've never had . . .

25              SHA:  Get a new phone man.  Huh?

ZA:  I should.  I should.  Yeah.  No, I
didn't . . . I never had a problem with this phone.
This is the first time I'm having a problem with
it.

SHA:  Oh, OK.

ZA:  Maybe it's because I'm in the apartment
or something.

SHA:  But the . . . if the signal is there,
then the sound should not matter, like it should
not go up and down, if the signal is OK.

ZA:  Oh, OK.

SHA:  [UI]

ZA:  Yeah, you're . . . you're breaking apart.

SHA:  Am I?  Oh.  [Oh, buddy], [UI].

ZA:  Yeah, I thought . . . you thought
you . . . you . . . I thought Safi [wasn't going to
do anything.  He was just playing a] game.

SHA:  Ah, Safi, [buddy] . . . what
happened . . . what happened was that, [buddy] he
basically . . . I don't know what to say, but he
like, he got too much into his studies and . . .
and became like, ah, I told. . . I asked him, you
know when I went the last time.  I was like, you
wanna come with me right now?  I have a person with
me.  He's gonna take me to the place, to the . . .

```
 1              to the kitchen.  So . . .

 2              (Audio ends.)

 3              MR. McBURNEY:  Can you pause it, please?

 4    BY MR. McBURNEY:

 5    Q.   Mr. Ahmed, you asked -- we are on page nine of the

 6    transcript.  You asked at about nine minutes and sixteen

 7    seconds what we listened to, that you thought Safi, and then

 8    the translation of Urdu is wasn't going to do anything, he

 9    was just playing a game.

10         Who are you talking about when you say Safi?

11    A.   Safiullah.

12    Q.   One of the individuals we have seen in these e-mail

13    exchanges?

14    A.   Yes.

15    Q.   Was he privy to the code first, second, third?

16    A.   Yeah.

17    Q.   You said he was just playing a game or you thought he

18    was just playing a game.  What do you mean by that, or what

19    did you mean?

20    A.   I thought he wasn't serious about jihad.

21    Q.   Defendant Ahmed responds, and though it's not on that

22    screen anymore, but you have it in front of you at 9:41.

23    What does he say?

24    A.   I asked him, you know, when I went the last time.  I was

25    like you wanna come with me right now?
```

```
 1    Q.   Let me stop you for a second.  When I went the last time

 2    is a reference to going where?

 3    A.   Pakistan.

 4    Q.   Where was Safi?

 5    A.   Pakistan.

 6    Q.   Okay.  And he says?

 7    A.   I have a person with me, he's going to take me to a

 8    place, to the -- to the kitchen.  So --

 9    Q.   Let's jump to 16:04, sixteen minutes, if you can get

10    there?  That's great.

11         (By audio:)

12              SHA:  Like hardcore, like [Arabic], like you

13              will start reading in, um, with grammar and all

14              those things.

15              ZA:  Yeah.  How's your dad doing?

16              SHA:  Huh?

17              ZA:  How's you dad doing?

18              SHA:  [God be praised], he's OK, but, you

19              know, normal as [native] parents are.  Just like

20              that.  He was so, like, scared when I left 'cause

21              they found some of my books in the room, but he

22              told my mom, 'oh, is that what he meant?  Is that

23              why he went there?  Oh my God,' this and that.

24              ZA:  Same shit.

25         (Audio ends.)
```

1          MR. McBURNEY:  Can you pause for a second, please?

2     BY MR. McBURNEY:

3     Q.   The defendant is talking about his father's reaction

4     when -- I think he said, He was scared when I left.  You two

5     are talking about what travel that Defendant Ahmed made?

6     A.   The trip to Pakistan.

7          MR. McBURNEY:  Keep playing please.

8          (By audio:)

9          SHA:  But, ah, but he didn't . . . he didn't

10         talk to me about it.  Like when I came back, he

11         didn't mention it.

12         ZA:  Yeah.

13         SHA:  He's . . . he's . . . he's just normal

14         guy.  He's like, ah, 'I don't wanna get in danger,

15         you know.'

16         ZA:  I know.

17         SHA:  Life is all . . . life is all, just live

18         and die peacefully.  OK.

19         ZA:  I know man.  I have the same problem.

20         SHA:  Yeah, yeah.  I mean, ah, most [native]

21         parents are like that.

22         ZA:  All [native] parents are like that.

23         SHA:  I mean, no, there are some that

24         are . . . I've been told that some [native] parents

25         are, oh my God.  They are like, ooh, extreme.

1          ZA:  Mine are crazy.

2          SHA:  Even in America.  Huh?

3          ZA:  Mine are crazy.

4     (Audio ends.)

5     MR. McBURNEY:  Could you pause, please?

6     Let's jump to 22 -- as close to 22:19 as you can

7  get.

8     (By audio:)

9          ZA:  So, you know, [us] . . . we, our

10         generation has to take advantage of that.

11         SHA:  Yeah.  Hey man, you know what happened

12         in, ah [you know the country that split from]

13         Pakistan, [right]?

14         ZA:  [Yes].

15         (Audio ends.)

16    MR. McBURNEY:  Can you pause, please?

17 BY MR. McBURNEY:

18 Q.   Mr. Ahmed, Defendant Ahmed is asking you if you know

19 what happened in -- and then there is this reference to the

20 country that split from Pakistan.  What is the country that

21 split from Pakistan?

22 A.   Bangladesh.

23 Q.   Keep playing, please?

24         (By audio:)

25         SHA:  [Have you heard what all happened

```
 1             there]?

 2                  ZA:  [What happened there]?

 3                  SHA:  [You didn't hear]?

 4                  ZA:  [What happened]?  Earth . . .

 5                  SHA:  It's on . . . it's on the news, man.

 6             [UI].  You know . . . you know the country, right?

 7                  ZA:  It's on the news?

 8                  SHA:  [The one that split from] Pakistan.  [Do

 9             you know that]?

10                  ZA:  [What happened in] Pakistan?

11                  SHA:  [A country came into being after

12             splitting from] Pakistan, [right]?

13                  ZA:  [Yes, yes, yes, yes, yes].

14                  SHA:  [That country.]

15                  ZA:  Yeah.

16                  SHA:  You know what . . . you know what

17             happened there?

18                  ZA:  Yeah.  [About that], I just saw it, but I

19             didn't investigate what happened.

20                  SHA:  Man, it was like pretty cool, like some,

21             ah, brothers. . .

22                  ZA:  Yeah.

23                  SHA:  [UI]

24                  ZA:  I gotta check it out [UI].  I didn't have

25             time to see what's going on.
```

1    SHA:  And there is something about that too

2    that I need to talk to you.  I mean, not talk to

3    you.  I mean like I just, not need to, but like

4    you, I would like . . . I would like to talk to you

5    about that something, something about that.

6    ZA:  Yeah.

7    SHA:  Man, so many things, that's the thing.

8    I mean you say, 'Oh, what's the hurry?'  The hurry

9    is . . . I mean, I just wanna talk.  Ah, and then

10   you might see, oh, what's the hurry.  But. . .

11   (Audio ends.)

12   MR. McBURNEY:  Can you pause, please?

13   And let's go to 32 -- as close to 32:08 as you can

14   get.

15   (By audio:)

16   SHA:  Yeah man, but . . . but . . . just

17   damn . . . forget your five year plan, dude.

18   That's why we gotta meet.

19   ZA:  I'm not gonna wait for the five year

20   plan, man.  I need the better . . . [I need better]

21   connections, [that's all].

22   SHA:  That's the problem, man.  Look, I . . .

23   I don't know how . . . how I'm gonna convince you,

24   but look, [buddy], once you . . . like because

25   sometimes you need to prove yourself, and then the

1    connections come.  You cannot get connections

2    without . . . because now it's not possible for

3    everyone to be perfect.  But I had this op . . . I

4    have this option.  Someone said that, 'if you can

5    prove yourself, you are in.'

6            ZA:  Yeah?

7            SHA:  OK?

8            ZA:  So [you have] connections?

9            SHA:  Not . . . I told you, I have an option.

10           ZA:  Yeah, yeah.

11           SHA:  You know?  If you can prove yourself,

12   you're in.

13           ZA:  Damn dude.

14           SHA:  [UI]

15           ZA:  Yeah.  Alright man.  Man, now you're

16   getting me too excited.

17           SHA:  Because . . . I don't . . . [I don't

18   know, buddy], your phone is most likely, most

19   likely, you know, dogs tagged, whatever.

20           ZA:  [UI]

21           SHA:  Huh?

22           ZA:  Well, [mine] is definitely tagged.

23   [Yours is also] tagged.

24           SHA:  I know.  No, this . . . this is not my

25   phone.

```
1              ZA:  Yours . . . yours . . . oh, this is not
2         yours?  Yeah, [mine] . . .
3              SHA:  No, it's not mine.  But that's why I
4         don't wanna talk too much because . . .
5              ZA:  [No, no] [UI].
6              SHA:  Did you read . . . did you . . . did you
7         read the . . . did you read the indictment of, ah,
8         of the guy?  Of . . . of Padilla?
9              ZA:  [No], I didn't.  I didn't.
10             SHA:  Read it man.  It's . . . it tells you
11        like . . .
12             ZA:  [UI]
13             SHA:  It tells you like where . . . huh?
14             ZA:  I need the link.
15        (Audio ends.)
16        MR. McBURNEY:  Would you pause for a second,
17   please?
18   BY MR. McBURNEY:
19   Q.   The Defendant Ahmed has just recommended that you read
20   the indictment of whom?
21   A.   Jose Padilla.
22   Q.   To your knowledge, who is Jose Padilla?
23   A.   Jose Padilla is a person that was caught with -- is
24   convicted of terrorism.
25             MR. McBURNEY:  Keep playing.
```

```
 1              (By audio:)
 2                   SHA:  Oh, it's . . . it's . . . go on
 3              Findlaw.org, and like search Padilla.
 4                   ZA:  Yeah, uh-huh.
 5                   SHA:  Jose Padilla.  Or go on CNN, find his
 6              story, and they have the link there.
 7                   ZA:  OK.
 8                   SHA:  It . . . it tells you how . . .
 9              how . . . how deep they are, how deep they know.
10              And so it gives you insight of the . . . how
11              much . . . like I mean, how to take precaution.
12              (Audio ends.)
13                   MR. McBURNEY:  Let's pause.
14     BY MR. McBURNEY:
15     Q.   Defendant Ahmed is telling you why to look at the
16     Padilla indictment?  What does he say here?
17     A.   It tells you how deep they are, how deep they know, and
18     so it gives you insight of how much -- like, I mean, how to
19     take precaution.
20                   MR. McBURNEY:  Keep going, please.
21              (By audio:)
22                   ZA:  OK.  Yeah, I'm trying.
23                   SHA:  Are you . . . are you online now?
24                   ZA:  No.
25                   SHA:  Oh, OK, OK.  Yeah, try to find it.  So
```

that's the problem, man. [UI]  You keep asking me
what's the time for the time, but this is the time.
I mean, that's why I wanna hurry it up.  But of
course I know . . . I know that, you know, haste is
waste.  So . . .

    ZA:  Yeah.

    SHA:  It needs to take time but however I need
to get the message across.  That's the [UI].  I
need to get some help.  And I had a person over
here, but he backed out like crazy.  He doesn't
even pick up my phone now.  Like I called him, he
hung up.

    ZA:  Who?

    SHA:  This guy I knew.  I knew him like, you
know, we talked all . . . 24 hours, 24/7 about
this, right?  But at the end, he basically ran away
like crazy.  And there is . . . after that I was
like whatever, you know.  Then I found out this guy
online.

    ZA:  From the begi . . . no, listen.  [There
is no more] manpower [left in this country].

    SHA:  No, man, that's not the point.  [Even if
there is at least one person]. . .

(Audio ends.)

MR. McBURNEY:  Pause for a second, please.

BY MR. McBURNEY:

Q.   You tell Defendant Ahmed, Listen, there is no more

manpower left in this country.  What did you mean by that?

A.   I meant that you can't recruit fighters in this

country.

Q.   This country being?

A.   United States.

Q.   Okay.

          MR. McBURNEY:  Keep going.

          (By audio:)

                ZA:  [There is no [UI] either].

                SHA:  Whatever, [buddy, I thought I] [UI].

                ZA:  How many times have I [UI] since a

          teenager?

                SHA:  Huh?

                ZA:  Since teenage years, I've tried, man.

                SHA:  Uh-huh.  But the point is . . .

                ZA:  Only . . . only guy I have is me and my

          cousin, man.

                SHA:  The point is, you know, I found this

          one, I'm like, OK, my God I found someone, at least

          something cool, but at the end he's like, 'oh, I'm

          sorry, man.  Don't come.'  I'm like, 'What the

          hell?'

                ZA:  You gotta forget about online.  Man, I

```
 1           must have ate something, and I have like problems
 2           in my stomach.
 3                SHA:  OK.  So, [God willing], I'll talk to you
 4           later, man.
 5                ZA:  Oh, no.
 6                SHA:  [UI]
 7                ZA:  I'm not saying hang up.
 8                SHA:  OK.  But I . . . we . . . I think we
 9           have said too much.  You always say too much on the
10           phone.
11                ZA:  Yeah, [have talked a lot over the] phone.
12                SHA:  Huh?  Huh?
13                ZA:  [Have talked a lot over the] phone.
14                SHA:  I know.  It's just . . . [have talked a
15           lot, and even about a dangerous matter], but
16           you . . . you don't get the thing.  That's why I
17           have to say it, man.  You're like, 'Oh, OK, what's
18           the hurry?  What's the hurry?  This is the hurry.
19           Understand?
20                ZA:  Hey, [God willing, we will] hook up.
21           Just have to make [prayer] for the right reason
22           [PH].
23                SHA:  OK.  [The first things is] get a new
24           phone.
25                ZA:  Huh?
```

```
1                    SHA:  Get a new phone.

2                    ZA:  OK.

3                    SHA:  [Alright]?  You know, just whatever.

4              Get a new . . . new SIM card.  Ah, do something, or

5              I'll . . . or maybe take a ph . . . ph . . . a

6              phone of your friend.  Borrow it from him.

7                    ZA:  OK.

8              (Audio ends.)

9              MR. McBURNEY:  You can stop it.

10   BY MR. McBURNEY:

11   Q.   The rest of the call, what is it that Defendant Ahmed is

12   telling you you need to do?

13   A.   Get a phone.

14   Q.   All right.  Last two items.

15        If you would look at Government's Exhibits 97 and 98?

16   A.   Okay.

17   Q.   Do you recognize what those are, what form of

18   communication?

19   A.   They are MSN messages.

20   Q.   The chats or instant messaging sessions?

21   A.   Yes.

22   Q.   Between you and?

23   A.   Me and Haris.

24   Q.   Defendant Ahmed?

25   A.   Yes.
```

1    MR. McBURNEY:  Government tenders Exhibit 97 and
2  98.
3    THE COURT:  Any objection?
4    MR. MARTIN:  No objection.
5    THE COURT:  They are admitted.
6    MR. McBURNEY:  If we could put 97 up, please?  You
7  don't need to magnify any of it.
8  BY MR. McBURNEY:
9  Q.   At 9:13 -- well, first of all, what's the date?
10 A.   Date is June 9, 2006.
11 Q.   Well, why don't we magnify --
12 A.   January 9, 2006.
13 Q.   Okay.  We are into 2006 now?
14 A.   Yes.
15 Q.   Those phone calls were in December of what year?
16 A.   December of '05.
17 Q.   Okay.  So about a month before this?
18 A.   Yeah.
19 Q.   January 9, 2006, at 9:13:11, what does Defendant Ahmed
20 tell you?
21 A.   My mom gave me permission now man, laugh out loud.
22 Q.   And what did you say in response?
23 A.   What, you bastard.
24 Q.   Keep going.
25 A.   But be careful, mines tricked me.

```
1   Q.    What do you mean by mines tricked me?

2   A.    When I came back from -- well, while I was in Egypt, my

3   dad, he basically said he would become a better Muslim and he

4   understands why I did what I did.

5   Q.    What did --

6   A.    And he supports it, but, you know, he doesn't want me to

7   fight.

8   Q.    In response to your caution, what does Defendant Ahmed

9   say at 09:13:41?

10  A.    Well, it don't matter now.

11  Q.    You say, Why?

12  A.    He said, I have it and then I don't have to worry about

13  the claim you got to get parents' permission.

14        And I say, You don't.

15  Q.    Okay.  Let's look at Government's Exhibit 98.  It's

16  another chat.  What's the date of this chat?

17  A.    January 17, 2006.

18  Q.    Between you and?

19  A.    Haris.

20  Q.    Let's jump to somewhere -- page 13.  At 1:03:35 a.m.,

21  what do you say to Defendant Ahmed?

22  A.    Tell me about your mom.

23  Q.    And then you say?

24  A.    Your mom is not tricking you?

25  Q.    And?
```

A.   They tricked me at some point when I was way younger and
more naive.

Q.   Your question to Defendant Ahmed about his mom, is this
in connection to him earlier telling you he got permission?

A.   Yes.

Q.   What does Defendant Ahmed say in response at 9:04:19?

A.   Hmm, I don't know.  She seemed serious.

Q.   You say in response?

A.   I hope it's legit.  Your mom would get huge sawab.

Q.   What does that mean?

A.   They are like points you cash in on the day of judgment
to get in.

Q.   Defendant Ahmed at 1:04:51 tells you what about his
mother?

A.   And she is the one who showed me a news clipping of a
suicide bomber in Palestine in '96 or something and said read
and learn, laugh out loud, laugh out loud.

Q.   Page 14, if you would magnify the bottom half?

     At 1:06:52 a.m., you say what about Defendant Ahmed's
mother?

A.   Your mom is cool.

Q.   Then you ask?

A.   What about your dad?

Q.   And he says at 1:07:06?

A.   He is like Desi dad's.

Q.   Desi means what?

A.   India, Pakistan and Bangladesh.

Q.   A father from that region?

A.   Yes.

Q.   So Defendant Ahmed says he is like Desi dads, which you
explained.

     If we go to page 15, at the top Defendant Ahmed says
what about his mother?

A.   But my mom understands now.

Q.   Then the topic changes.  At 1:08:17, what does
Defendant Ahmed ask you?

A.   You got news of attack in Pakistan?

Q.   And you said in response?

A.   Yeah.  I heard on the radio that --

Q.   You said yeah.  Who then carries on the communication?

A.   Haris does.  He says, I heard on radio that maybe Ayman
Z is dead.

Q.   Who is Ayman Z?

A.   Ayman al-Zawahiri.

Q.   Who is that?

A.   Second in command of Al-Qaeda.

Q.   Al-Qaeda?

A.   Yeah.

Q.   So Defendant Ahmed says that, and he goes on to say?

A.   I was like, oh, Allah, make that news false.

1      But didn't follow it.  That's what I said.

2  Q.   And what does Defendant Ahmed say?

3  A.   And subhanallah, it was false.

4          MR. McBURNEY:  That's all I have, Judge.

5          THE COURT:  All right.  We have been going a long

6  time.  I think we need to take a break.  Let's take a

7  15-minute break, be back here at 4:10.  We will be in recess

8  until then.

9          (A recess is taken at 3:56 p.m.)

10                      -- -- --

11         (In open court 4:15 p.m.:)

12         THE COURT:  Mr. Martin?

13                      -- -- --

14                  CROSS-EXAMINATION

15 BY MR. MARTIN:

16 Q.   Mr. Ahmed, you were originally interviewed by the agents

17 for the Federal Bureau of Investigation in March of 2006; is

18 that true?

19 A.   Yes.

20 Q.   And as you testified on your direct, you didn't tell

21 them the truth then; is that correct?

22 A.   Yes, I did not.

23 Q.   Then you were reinterviewed again on April 18, 2006?

24 A.   Yes.

25 Q.   Again, you didn't tell them the truth; correct?

1    A.    No.

2    Q.    And you were subsequently indicted.  Is that not

3    correct?

4    A.    Yes.

5    Q.    Originally you were indicted with a number of

6    defendants; correct?

7    A.    You said a number different acts?

8    Q.    A number of different defendants, individuals?

9    A.    Yes.

10   Q.    And you retained counsel; correct?

11   A.    Uh-huh.

12   Q.    And you were allowed to be released on bond; is that

13   correct?

14   A.    Yes.

15   Q.    And you worked with your counsel; correct?

16   A.    Yes.

17   Q.    And there was a superseding indictment that just listed

18   you and your cousin; correct?

19   A.    Yes.

20   Q.    And that indictment charged you with a violation of

21   18 U.S. Code 956 (a); correct?

22   A.    Yes.

23   Q.    Conspiracy to maim or murder people overseas?

24   A.    Yes.

25   Q.    And that carried a potential sentence of a life

1  sentence?

2  A.   Yes.

3  Q.   So you were facing the possibility of a life sentence;

4  correct?

5  A.   Yes.

6  Q.   And you had gone over with -- you never killed anybody;

7  correct?

8  A.   No, I haven't.

9  Q.   Or maimed anybody?

10  A.   No.

11  Q.   But you were facing that charge for conspiracy to do

12  that; correct?

13  A.   Yes, I was.

14  Q.   And one of the major problems that was facing you was

15  that trip that you had taken to Egypt with your cousin;

16  correct?

17  A.   Yes.

18  Q.   You also discussed with your attorney the Sentencing

19  Guidelines; correct?

20  A.   Yeah.

21  Q.   And you computed those.  You knew that the judge wasn't

22  bound by them, but that would be something that the judge

23  would look very carefully at in your case; correct?

24  A.   Yes.

25  Q.   And that those guidelines, using the terrorism

1   enhancement, you were facing a possible sentence of 30 years

2   to life; correct?

3   A.   Yes.

4   Q.   So you knew you were facing some real trouble; correct?

5   A.   Yeah.

6   Q.   So at some point you and your attorneys decided it was

7   in your best interest to cut a deal; correct?

8   A.   Yes.

9   Q.   And beginning in -- first of all, it started out with

10  some proffer sessions, did it not?

11  A.   Yes.

12  Q.   So the prosecutors wanted to know what it is you could

13  do to help them with their investigation and prosecution of

14  others; correct?

15  A.   Yes.

16  Q.   Including Mr. Haris Ahmed; correct?

17  A.   Yes.

18  Q.   So in April of 2006, you began making various statements

19  to the FBI or the prosecutors in the case; is that correct?

20  A.   Yes.

21  Q.   And at that time you started to tell the truth;

22  correct?

23  A.   This is '06, before I got arrested?

24  Q.   No.  April --

25  A.   Is that before I got arrested?

Q.    Excuse me, let me make sure I got the right date.

A.    Because I forgot when I got arrested.  It was

February sometime --

Q.    Yes, there was an interview of April of 2006, but let's

go directly to where you are really starting to cooperate.

And that would have been in December of 2008; is that

correct?

A.    Yeah.

Q.    Let's stay with that.

      And at that point, all the various different

interrogations that you went through or interviews, proffer

sessions and so forth, they were all the truth, were they

not?

A.    Before?

Q.    No, beginning December of 2008?

A.    They were true.

Q.    True.  And your testimony today is based upon what you

told those prosecutors and so forth beginning December of

2008, not the original story that you told in 2006; correct?

A.    Yes.

Q.    Now let me -- let me ask you just few questions about

your trip to Egypt in May and June of 2004.

      As I understand your testimony, you and your cousin --

what's your cousin's name?

A.    Khaleel Ahmed.

1   Q.   Khaleel.  You and your cousin left to go to Egypt

2   without even telling your parents you were leaving; correct?

3   A.   Yeah.

4   Q.   And you had hooked up at that point or made some contact

5   with a woman named Beverly, who is with Jihad Unspun.  Is

6   that correct?

7   A.   That's true.

8   Q.   And she had created a website that was -- the purpose of

9   this website was in part to try to maybe be a response for

10   those people who were saying that Islamic extremists were

11   wrong or bad; correct?

12   A.   Yes.

13   Q.   Thus the name Jihad Unspun, to respin that; correct?

14   A.   Yes.

15   Q.   And you had communicated with her; correct?

16   A.   Yes.

17   Q.   And she had announced that she was going to go to

18   Pakistan and do a documentary.  Is that correct?

19   A.   That's true.

20   Q.   So you thought this might be a good occasion for you to

21   tag along with her and maybe get to Pakistan and join a

22   terrorist group; correct?

23   A.   I wouldn't call them a terrorist group.

24   Q.   Some sort of jihadist group?

25   A.   Yes.

```
1   Q.   No specific group you ever had in mind?

2   A.   No specific group.

3   Q.   While I'm thinking about it, did any time when you were

4   in your discussions with Haris Ahmed, did you ever talk about

5   any specific groups, such as LeT or JeM or anybody else?

6   A.   Can you rephrase it again?

7   Q.   In your discussions with Mr. Haris Ahmed, the idea of

8   joining particularly LeT, for example, that never was

9   discussed, was it?

10  A.   No.

11  Q.   Now, LeT is Lashkar-e-Tayyiba you understand?

12       Now, you and your cousin leave to go to Egypt hoping to

13  hook up with this -- what's Beverly's last name?

14  A.   Geisbrecht.

15  Q.   Geisbrecht.  And she also had a Muslim name, but let's

16  just call her Beverly for the time being, if that's okay with

17  you?

18  A.   Uh-huh.

19  Q.   And you were going to meet her in Egypt; correct?

20  A.   Yes.

21  Q.   Had you even met her before you got to Egypt?

22  A.   No.

23  Q.   And you had hoped, though, however -- first of all, you

24  don't have a Pakistani passport; correct?

25  A.   No.
```

1    Q.   Nor a Pakistani visa?

2    A.   No.

3    Q.   So the only way you were going to get to Pakistan from

4    Egypt at that point was with her help; is that correct?

5    A.   Yes.

6    Q.   That was your thought at least?

7    A.   Yeah.

8    Q.   You and your cousin hadn't planned it any more than

9    that.

10        Did you know how she was going to get you -- was she

11   going to smuggle you into the country somehow?

12   A.   No, we were going to go in with visas.

13   Q.   So she was going to get a visa to do a documentary, is

14   that your thought?

15   A.   Exactly.

16   Q.   You were going to Egypt.  Now, had you raised some money

17   to go to Egypt?

18   A.   I saved -- I had my own personal savings.

19   Q.   And was some of that money you had created from selling

20   steroids?

21   A.   Yeah.

22   Q.   That's something you have done over the years, sell

23   illegal steroids; correct?

24   A.   Yes.

25   Q.   You are into body building; correct?

1   A.   Yes.

2   Q.   Did you also have a website that you called yourself

3   Anabolic Warrior or words to that effect?

4   A.   Yeah.

5   Q.   So you raised some money from steroids and other things,

6   and you travel -- other things, you used your credit cards?

7   A.   Yeah.

8   Q.   And how much money did you raise?

9   A.   Approximately ten thousand.

10  Q.   Ten thousand dollars.

11       You and your cousin go to Egypt --

12  A.   Uh-huh.

13  Q.   -- thinking you are going to hook up with Beverly and

14  get to Pakistan; correct?

15  A.   Yes.

16  Q.   That's as much planning as you really had put into it;

17  correct?

18  A.   Yes.

19  Q.   And Beverly shows up, and she turns out to be a

20  disappointment, does she not?

21  A.   To me?

22  Q.   Yeah, to you.

23  A.   Oh, yeah.

24  Q.   She didn't appear to be really devout?

25  A.   No, she was devout.

1  Q.   But she didn't dress the way you would expect a devout

2  Muslim to dress?

3  A.   No, she dressed in traditional Islamic shalwar.

4  Q.   Do you remember an occasion when she was sitting around,

5  and you told the agent that she was sitting around

6  cross-legged, and you felt that was inappropriate?

7  A.   Yeah.

8  Q.   There were things that she did that you felt were

9  inappropriate for somebody who was a devout Muslim, did you

10  not?

11  A.   Yes, and that was because she didn't have enough

12  knowledge of her uprooting and background.  It wasn't that

13  she was trying to be bad.

14  Q.   I understand.  Fair enough.

15       So you are there and you take fifty dollars.  First of

16  all, were you going to stay in an apartment with her at

17  first?

18  A.   We met at her apartment.  Then I moved to a hotel, which

19  one of the local shifs, he gave it to us -- recommended to

20  us.

21  Q.   Right.  And that was the fifty dollars -- you gave him

22  fifty dollars, it was going to be five dollars a night, or

23  something like that?

24  A.   Yeah.

25  Q.   And you and your cousin were there, but all of the

1   sudden you heard that there were some people downstairs that

2   wanted to talk to you; correct?

3   A.   Yeah.

4   Q.   And you first suspected that it might be the Egyptian

5   police; correct?

6   A.   Yes.

7   Q.   Did the Egyptian police have any reason to believe that

8   you were a dangerous character at that point?

9   A.   No.

10   Q.   But you thought that might be what's going on; correct?

11   A.   Yeah.

12   Q.   And it turned out it wasn't the police at all.  It was

13   your father Mohammed Ahmed, Marwan and Yousef al-Hindi;

14   correct?

15   A.   That's true?

16   Q.   Who were friends of yours, or you knew them, right?

17   A.   I didn't Yousef al-Hindi.  I met Marwan once, but

18   I recognized them.

19   Q.   Marwan -- Marwan is from the United States, right, and

20   the other one is from somewhere in --

21   A.   Budapest.

22   Q.   Budapest, correct.

23        You had actually communicated with your sister Yasmen;

24   is that correct?

25   A.   Yasmen.

Q.   And she had told your dad where you went; right?

A.   Yeah.

Q.   And your dad got Marwan and Yousef al-Hindi together,
and they went to go get you.

A.   Yeah.

Q.   And they did?

A.   Yes.

Q.   They showed up -- and he had spent a lot of money to do
that, did he not, your dad?

A.   To come and get me?

Q.   Yeah.

A.   Yeah.

Q.   $25,000?

A.   I don't think so.

Q.   That's what he said; right?

A.   Yeah, that's what he told me.

Q.   And your dad is -- he's an entrepreneur, is he not?

A.   Yes, he is.

Q.   He's an accountant, and he also owns a number of --
fifteen or so filling stations, gas stations?

A.   Not fifteen, but a number of gas stations.

Q.   Gas stations and convenience stores?

A.   Real estate, yeah.

Q.   And you have worked in those?

A.   Yes.

Q.   And so he says, what the hell -- I am using that word --

why are you here, in strong language, and yanked you by the

neck and brought you home, did he not?

A.   Yes.

Q.   And that's something that you in some of the e-mails and

stuff here you talked about that you felt a little bit

ashamed about; correct?

A.   Yeah.

Q.   You mentioned that you took some clothes and you took a

Gameboy with you; right?

A.   XBox.

Q.   XBox.  And the reason you brought the XBox is you felt

on the travels to jihad, you might get bored; correct?

A.   Yes.

Q.   So you wanted to have an XBox with you; correct?

A.   Uh-huh.

Q.   Now, let me ask you a few questions about a few of the

e-mails.

     Could you put up Government's Exhibit 17, please, and in

particular the bottom half?

     This is an e-mail.  Were you -- is that you up there,

one of the people it was sent to?

A.   Ibnahmed, yes.

Q.   This is an e-mail from Syed Haris to you and to

Safiullah Hussaini; correct?

1    A.    Yes.

2    Q.    And he talks there about horrible vengeance and

3    blood-thirty dragon and what was going on in Fallujah;

4    correct?

5    A.    Yes.

6    Q.    That's something that you and Haris in your

7    communications and conversations when you met him talked

8    about, the types of injustices and violence that you saw that

9    was being committed against Muslims; is that correct?

10   A.    Yes.

11   Q.    And Haris was real emotional about this, was he not?

12   A.    Yes.

13   Q.    He would get very upset about the things he saw;

14   correct?

15   A.    Yes.

16   Q.    You mentioned there was a video of the Taliban

17   Burning.  That was something that was upsetting; correct?

18   A.    It was.

19   Q.    And the whole notion that innocents, women and children

20   and others, were being killed in these Muslim lands such as

21   Iraq, Afghanistan, Palestine, some other places, was

22   something that upset you; correct?

23   A.    It did.

24   Q.    And upset Haris Ahmed; correct?

25   A.    Yes.

Q.   And it made you want to do something as a young man;
correct?

A.   Yes.

Q.   That was what was urging you to go to jihad; correct?

A.   Yes.

Q.   But you were also trying to search to find out what your
religion commanded you to do in this situation; correct?

A.   Yes.

Q.   Your father -- you talked a lot about your father and
Haris's father, his mother and your mother, but they seem to
have a different view of all this; correct?

A.   All of them?

Q.   Well, not all of them, but some of them?

A.   Yes.

Q.   Yeah, some of the more established people or people from
Pakistan who came to the United States were more -- were not
into the notion of some sort of violent jihad; correct?

A.   Yes.

Q.   It is not that they weren't upset about what was going
on, but that didn't seem to be the response that was needed;
correct?

A.   That's true.

Q.   But you thought that maybe what you should do -- what
your religion required you to do was to go overseas and
fight; correct?

A.    Yes.

Q.    And you talked with Haris and others, your cousin

Khaleel about these things; correct?

A.    Yes, I did.

Q.    Now, at the same time that you were having these

concerns about what was going on in Muslim lands and your

obligation as a Muslim, you were also completing your

education, were you not?

A.    Yes.

Q.    You -- you didn't actually graduate from the University

of Illinois in Chicago, but you were studying there;

correct?

A.    Yes.

Q.    And you were thinking about getting a Master's degree;

correct?

A.    Yeah.

Q.    And have you ultimately applied to get your Master's

degree?

A.    Yes, I did.  I was working on an M.B.A. before.

Q.    M.B.A.  Where would you get that?

A.    UI University.

Q.    And you and Haris also talked about employment; right?

A.    Yes.

Q.    Getting jobs.

      Could you put up Government's Exhibit 42 for me for a

second, and let's go toward the second page, right after

there was -- well, let's go all the way to the third page so

we put it in context.

     This is in August of 2005, and you talked about this

e-mail from Haris Ahmed in which he said, I have returned

back.  The teachers told me to go back and help my parents

for now, so forth, and he had turned back on his heels;

correct?  Do you remember that e-mail?

A.   Yes.

Q.   And let's go to your response to that one.  At the

top -- yeah, let's begin there.

     I know it fucking sucks -- we are all adults here --

well, my thing was worse.  I think the teachers are wrong.

     Now, you and Haris Ahmed had an ongoing conversation as

to what Islam required or didn't require in regards to jihad,

respect for your family, respect for your father's wishes and

so forth.  There was an ongoing conversation that you all

had; correct?

A.   Yes, it was.

Q.   At this time you are telling Haris I think the teachers

are wrong; right?

A.   Yeah.

Q.   You are saying maybe you should go back; right?

A.   Yeah.

Q.   Then you go on to say, I'm working on getting Al Maghrib

1   in Chicago?  What do you mean by that?

2   A.   Al Maghrib literally translates into the west, but what

3   Al Maghrib is it is an institute which does religious

4   seminars, double weekend seminars, all throughout Chicago and

5   Canada.

6   Q.   Right.  So you are studying in Chicago, and you are

7   telling Haris what you think about what his obligations are;

8   correct?

9   A.   Yeah.

10  Q.   Go on to the next page.

11       You say I have valid reasons why the teachers are wrong,

12  the teachers being those who Haris believed at that time had

13  told him he needed to go home and turn away from jihad;

14  correct?

15  A.   Yeah.

16  Q.   There is nothing we can do.  Don't feel bad, just keep

17  on going.  Pray -- what's that word mean?

18  A.   Tahajuud.

19  Q.   What's that mean?

20  A.   It's a prayer.

21  Q.   It's a late night prayer?

22  A.   A late night prayer.  It's not obligatory.

23  Q.   And go on, we can move on with our livelihood, that way

24  no one can say anything, all responsibilities are fulfilled;

25  correct?

```
1    A.    Yes.

2    Q.    Can you please go back up to the one right before that?

3          And after this discussion about -- the next one, the

4    complete one there, from Haris.  Thank you.

5          After your discussion about what the obligations are,

6    our religion, he turns to say, Hey, man, my dad said if you

7    don't like engineering, why don't you do B.B.A.

8    A.    Yes.

9    Q.    Have you been studying engineering at that point?

10   A.    No, I hadn't.

11   Q.    So in a lot of the e-mails, not all of them -- the

12   e-mails have been put in evidence.  Not all the e-mails are

13   communications you had with Haris Ahmed over the years, are

14   they?

15   A.    No.

16   Q.    And in many of them, you are talking about getting along

17   in life, getting an education, getting a business together,

18   getting a job; right?

19   A.    Yes.

20   Q.    And he say -- he talks about a B.B.A. or a B.E. or so

21   forth.

22         Then he says, Tell me more about the teachers being

23   wrong thing.  If we can't trust the scholars, then who can we

24   trust?  Want me to call you?  Give me your contact

25   number.
```

So he's still reaching out to you for what did you learn
from the scholars, trying to understand what his obligations
are; correct?
A.   Yeah.
Q.   Let's go to the top of this e-mail, and this is
from -- no, excuse me, next one up.  Thank you.
     What's B.B.A., bro?  I will call you right now.  Did the
scholars do third degree?
     What do you mean by that?
A.   I meant jihad.
Q.   Jihad.  And you mean, wait a second, how could the
scholars be telling us what to do, they never did third
degree; right?
A.   Yeah.
Q.   So you are telling him maybe don't listen to these
scholars.  He's looking for an answer, and you are saying
don't listen to them because they never did third; correct?
A.   Yeah.
Q.   This is a huge topic we can't get into right now,
brother.  Keep your focus, make yourself wealthy,
insha'Allah.  There's much to do.  Right?
A.   Yes.
Q.   So you are saying we need to just continue to talk about
this and understand this and search for our answer.  By the
way, let's just get on with our lives and make some money;

1  correct?

2  A.   Right.

3  Q.   Go to the top one.  All right, it's the next one, excuse

4  me.

5       Did you all have a phone call?

6  A.   Yes.

7  Q.   That's not been -- we don't have a recording of it.  Do

8  you know what you talked about?  This is in August.

9  A.   I think this is the one where we were discussing

10 earlier, the third is 'ain.

11 Q.   This is in August of 2005.  Well, let's just say, after

12 the phone call with you I'm more depressed.  You said third

13 is 'ain.  What does that mean?

14 A.   'Ain.

15      This is from Haris to me; right?

16 Q.   Yes, from Haris to you?

17 A.   Third is 'ain means you have to do it.

18 Q.   Yeah.  And if it is, then didn't I turn back on my

19 heels?  Cuz the scholars said it is kifaya, scary stuff?

20 A.   Yeah.

21 Q.   Even after the phone calls or whatever, this is

22 searching?

23 A.   Yeah.

24 Q.   Let's go to the very top one from you back.  You say,

25 Yeah, bro, but don't get sad because it was out of your

1   hands.  You cite some Quran verses and so forth; correct?

2   A.    Yeah.

3   Q.    And again just more discussion about what's this.

4         At the very end of that you say, Later on, bro, move to

5   Chicago?

6   A.    Yeah.

7   Q.    What was that about at the very end?

8   A.    I thought that if somehow I could help Haris work with

9   my father, I can probably get him started in his business

10  degree and have him have a life for himself.

11  Q.    Yeah.  At that time, you later have some e-mails -- I

12  can show you one or two maybe -- in which you talk about --

13  let me mark this and put it in evidence.

14        Just showing you 31.  This is not at the same time, but

15  a year before, in November of 2004, did you offer to give an

16  idea where he could get a job in Chicago?

17  A.    Yeah.

18              MR. MARTIN:  I will move in Defendant's Exhibit 31.

19              THE COURT:  Any objection?

20              MR. McBURNEY:  No objection.

21              THE COURT:  It's admitted.

22  BY MR. MARTIN:

23  Q.    I'm going to back up to that time.  You originally got

24  to know Mr. Haris Ahmed when you all were connected with the

25  Clear Guidance website; right?

```
1    A.    Yes.

2    Q.    And having communicated with each other, you sort of

3    wanted to meet face-to-face; correct?

4    A.    Yeah.

5    Q.    And so he comes to Chicago with his father?

6    A.    Uh-huh.

7    Q.    He's 19 years old at the time.  How old were you?

8    A.    I don't know, 22, 23.

9    Q.    And the reason he came with his father, was it not, was

10   his father wanted to make sure this was a regular --

11   A.    Regular --

12   Q.    This was a good visit for his son; correct?

13   A.    Yes.

14   Q.    And he met with your father?

15   A.    Yes, he did.

16   Q.    Mohammed?

17   A.    Yes.

18   Q.    And they being older, in business, he of course being in

19   education, they talked together, met each other, and it

20   looked like a good stable family; correct?

21   A.    Yes.

22   Q.    Your father is a respected businessman in the

23   community?

24   A.    Yes.

25   Q.    And the family is well respected in the community, is it
```

1  not?

2  A.   Yes, it is.

3  Q.   You and Haris met privately and talked about some of the

4  things you talked about on direct; is that correct?

5  A.   Yes.

6  Q.   At a later time, you -- oh, by the way, you have been

7  out on bond all these months since your original indictment,

8  and you are planning on getting married, are you not?

9  A.   Yes.

10  Q.   Your wife is in Morocco, your fiancee?

11  A.   Uh-huh.

12  Q.   And you throughout all of this time that you were

13  talking with the things you had with Mr. Ahmed in 2004 and

14  2005, you were also getting on with your life in education,

15  finding a wife, raising a family; correct?

16  A.   Yes.

17  Q.   And at one time Haris one time -- in the telephone

18  conversation it's like Haris is trying to convince you,

19  sounds like, to get -- go back to the third, the telephone

20  conversations you just testified about; correct?

21  A.   Yes.

22  Q.   However that's later in the year of 2005.  However in

23  August and September of 2005 when he comes back, you are

24  trying to assure him that maybe the scholars are wrong and

25  maybe you should go to jihad; correct?

1   A.    Yes.

2   Q.    You said at one time in one of your interviews at the

3   FBI, and I quote you, you said that Haris was, quote, all

4   over the place.  Do you remember saying that in one of your

5   interviews?

6   A.    Yes.

7   Q.    He would be saying one thing one day, another thing

8   another day.  He was searching for an answer; correct?

9   A.    Yes.

10  Q.    And neither of you had solid religious training;

11  correct?  Neither of you had been to Islamic school or

12  studied Islam as a scholar; correct?

13  A.    No.

14  Q.    So in one sense, it was the blind leading the blind, was

15  it not?

16  A.    Oh, yeah.

17  Q.    You would discuss what the Hadith requires, what the

18  Quran requires, and it was just an ongoing discussion;

19  correct?

20  A.    I don't have any ijiza is what it's called.

21  Q.    You don't have any what?

22  A.    Ijiza, it's an Arabic term that means you have gained

23  enough knowledge to comment on religious matters.  You can

24  get a fatwah, f-a-t-w-a.

25  Q.    I understand.  Do you speak either Arabic or Urdu?

1    A.    I speak Urdu only.

2    Q.    Don't speak Pashto?

3    A.    No.

4    Q.    You yourself have been conflicted about all this over

5    the years; is that not true?

6    A.    Conflicted about what?

7    Q.    About the responsibility to go to jihad, to fight

8    violently, or what is your responsibility to your family and

9    so forth in your religion?

10   A.    Yes.

11   Q.    It's something that you have been struggling to

12   understand?

13   A.    Yes.

14   Q.    Indeed you said when your father showed up in Egypt and

15   took you home, you were sort of angry with him a little bit

16   and happy with him; correct?

17   A.    Yeah.

18   Q.    Haris Ahmed was also someone who would from time to time

19   contribute articles, things he had seen, lectures, to Jihad

20   Unspun.  Is that correct?

21   A.    Yes.

22   Q.    Did he do translations for Jihad Unspun, if you know?

23   A.    Yes.

24   Q.    And that's a website that is still up today, is it not?

25   A.    Kind of.

1  Q.   Beverly is missing; is that correct?

2  A.   She has been kidnapped.

3  Q.   Yeah.

4       One final area.  Talking about the entrepreneurial

5  things that you and Mr. Haris Ahmed were talking about during

6  this time, real estate, was that one of the things you were

7  talking about?

8  A.   Yes.

9  Q.   Sometimes you were talking about Islam and the duty to

10  Islam, and you are also saying, hey, there is some good real

11  estate opportunities here; correct?

12  A.   Yes.

13  Q.   In Pakistan, other places?

14  A.   Wherever there is an opportunity.

15  Q.   The entrepreneurial side of all this is something that

16  interested you; correct?

17  A.   Yes.

18  Q.   Indeed you said at one time that you even thought maybe

19  I could sell heroin for the jihad people; correct?

20  A.   I don't remember that.

21  Q.   Do you remember telling that to the FBI agents?

22  A.   Oh, yeah.  I remember telling that to the FBI.

23           MR. MARTIN:  That's all I have, Your Honor.

24           THE COURT:  Any redirect?

25           MR. McBURNEY:  No, sir.

```
 1              THE COURT:  All right.  Does anybody want --

 2              MR. MARTIN:  To go home?

 3              THE COURT:  That wasn't exactly what I was going to

 4    say.

 5              Does anybody want Mr. Ahmed subject to recall?

 6              MR. McBURNEY:  No, sir.

 7              MR. MARTIN:  He can be excused.

 8              THE COURT:  All right.  We are going to release

 9    you.  You should not discuss your testimony with anybody

10    until you hear the case is over.  I appreciate you being with

11    us this afternoon.

12              THE WITNESS:  Okay.

13              THE COURT:  You are dismissed.

14              THE WITNESS:  Thanks.

15              I have a question.  I was going to say, where did

16    Colonel Sanders go?

17              THE COURT:  Oh, the artist?

18              THE WITNESS:  Yeah.

19              THE COURT:  Because it's about time for the press

20    to do their broadcast, and he has to take his drawings down

21    to them.

22              THE WITNESS:  Okay.  That's all?

23              THE COURT:  You can step down.

24              Would somebody from the press make sure that

25    Mr. Miller knows that he was recognized as Colonel Sanders?
```

```
 1              Do you have a short witness?

 2              MS. COLLINS:  Yes, we do, Your Honor.

 3              THE COURT:  Call your next witness, please.

 4              MS. COLLINS:  Your Honor, we call Keith Verralls.

 5                         --  --  --

 6                      KEITH VERRALLS

 7    being first duly sworn by the Courtroom Deputy, testifies and

 8                      says as follows:

 9                         --  --  --

10                      DIRECT EXAMINATION

11    BY MS. COLLINS:

12    Q.   Good afternoon, Mr. Verralls.

13    A.   Good afternoon.

14    Q.   Could you make sure the mike is moved close to you so

15    that everyone can hear?

16    A.   Okay.

17    Q.   Thank you.

18         Mr. Verralls, what country do you live in?

19    A.   I live in England, United Kingdom.

20    Q.   What was that, England?

21    A.   In the United Kingdom.

22    Q.   I will repeat my question.  Where do you work, sir?

23    A.   I work in London in England.

24    Q.   And for what entity do you work?

25    A.   I'm a police officer employed by the Metropolitan
```

Police, and I work on the Counterterrorism Command at New
Scotland Yard.

Q.   And what is your rank within the Metropolitan Police?

A.   I'm a detective inspector.

Q.   And you said you work in the counterterrorism branch?

A.   That's correct.

Q.   Are those the only types of crimes that you
investigate?

A.   For the last five years, that's what I've been
investigating, yes.

Q.   How long have you been with the Metropolitan Police?

A.   Thirty-three years this August.

Q.   A long time.  What are some other positions that you
have held before becoming detective inspector?

A.   Well, you start through the ranks.  You start as a
uniform officer, then I became involved in detective work
after about two years.  I've been involved in a number of
different detective functions, mainly dealing with serious
crimes, such as armed robbery, murder, et cetera.

Q.   And in the Metropolitan Police, are there different
ranks of detectives?

A.   Yes.  I'm sort of the third rank up, and I run a team,
I'm in charge of a team of about fifteen which are
responsible for investigating terrorist matters either in the
U.K. or affecting U.K. citizens abroad.

1    Q.    So you work on both domestic and terrorism matters that

2    affect internationally?

3    A.    That's correct, yes.

4    Q.    Now, are you familiar will an individual named

5    Younis Tsouli?

6    A.    Very familiar, madam, yes.

7    Q.    How are you familiar with him?

8    A.    I'm familiar with him because on the 21st of October

9    2005 I was given the responsibility for an investigation, an

10   operation which we called Operation Mazhar, which involved

11   arresting Younis Tsouli and two other men in the London

12   area.

13   Q.    And who were the other two subjects of that

14   investigation?

15   A.    They were a Waseem Mughal and a Tariq al-Daour.

16   Q.    And where were all three of those men located?

17   A.    Younis Tsouli lived at an address of 7 Richmond Way in

18   Shepherds Bush, which is about four miles from Central

19   London.

20         Tariq al-Daour in the Paddington area of London, 136

21   Queen's Court, Queen's Way, which is a couple miles closer to

22   the center of London.

23         And Waseem Mughal lived at Railway Street in Chatham in

24   Kent, which is a county to the south of London.

25   Q.    Looking first at Younis Tsouli, you just testified that

1    on October 21, 2005 --

2    A.    That's correct.

3    Q.    -- you conducted a search related to Mr. Tsouli?

4    A.    Officers under my command did, yes.

5    Q.    What type of premises did you search?

6    A.    For Mr. Tsouli, it was a top floor flat in a terrace

7    block of Victorian flop houses.

8    Q.    Did you do that according to whatever court process is

9    in effect in the U.K.?

10   A.    Yes, search warrants were obtained from what we call a

11   district judge under the Terrorism Act.

12   Q.    Now, can you just briefly describe the standard

13   procedures that your command uses when you are conducting

14   these types of searches?

15   A.    It can depend on the circumstances.  In these particular

16   circumstances where there is no information as to presence of

17   firearms, et cetera, the officers were unarmed, which might

18   seem a bit strange, but the officers were unarmed.

19        We use a uniform contingent known as a territorial

20   support group who are our closest to a riot unit.  We wear

21   protective clothing and may effect a rapid entry into the

22   premises using a battering-ram.

23        And that's what we used in this particular

24   instance.  They then made initial entry.  They were then

25   followed in by officers from the counterterrorism command who

1    arrested the occupants.

2        What would then happen is identification and exhibits

3    officers who were in charge of the search at the scene and

4    exhibits found in the scene would go in and they would do

5    what's known as a safety search to ensure that there is

6    nothing there which would appear to be explosives,

7    et cetera.  Because if there is, then we may call in an

8    explosives officer to the scene.

9        But if in their view it's safe, the prisoner is removed

10   from the premises, and a systematic search then starts under

11   the control of the exhibits officer carried out by officers

12   from the counterterrorism command, and it's a search that

13   took several days.

14       If there are any computers found on the premises such as

15   in this instance, the computers are secured.  We call

16   officers from our high-tech unit to come to the address and

17   then they then make sure they don't turn off the computer, no

18   data or information is lost, and they take the computers away

19   to be forensically imaged.

20   Q.   And is that the procedure you basically used on the

21   night of this -- on the day of this search?

22   A.   That's correct, yes.

23   Q.   What time did the search begin?  When did the entry team

24   go in?

25   A.   Roughly about 8:45 p.m.

Q.   So in the evening?

A.   In the evening, yes.

Q.   And was anyone home?

A.   Yes.  Younis Tsouli was at home.

Q.   And what happened when the entry team went in?

A.   What happened is that the first officer when he ran up
the stairs and when he got to Tsouli's bedroom, the door was
shut in his face.  He pushed the door open.

     When he got into the bedroom, Tsouli lunged at him,
pushing him against the wall where a mirror broke, and the
unfortunate officer ended up needing a couple stitches in his
buttocks.

Q.   And then at that point, what happened with Mr. Tsouli?

A.   Other officers then assisted that initial officer, and
Tsouli was restrained, arrested.

Q.   Was he convicted?

A.   He was convicted, yes, in July 2007.

Q.   What charge was he convicted of?

A.   He was convicted of two charges.  One was incitement to
commit an act of terrorism, and act of terrorism being
specified as murder wholly or partly overseas, and also
convicted of conspiracy to defraud, which was in relation to
credit cards used to set up websites.

Q.   Now, you mentioned when you were describing the search
protocol that there were computers located at the Tsouli

1    residence.  Where were they located?

2    A.    They were in his bedroom.

3    Q.    And were those items -- were those computers seized?

4    A.    Those computers were seized, yes.  Every item of

5    computer media was seized.  There was a laptop computer, an

6    ordinary stand-alone PC, and then a number of CDs, DVDs,

7    memory sticks, et cetera.

8    Q.    And were they forensically examined by your team?

9    A.    They were.

10   Q.    Did you discover anything on the computer media that

11   were seized from Mr. Tsouli related to Washington, D.C., here

12   in the United States?

13   A.    Yes, we did.  On his actual laptop computer, he had a

14   folder named Washington -- in fact, he had three copies of

15   that folder -- which contained six video clips of different

16   locations in Washington, D.C.

17   Q.    And what did your team do -- or what did you do after

18   you discovered the presence of those videos on Mr. Tsouli's

19   computer?

20   A.    We informed the FBI liaison in London.

21   Q.    And how soon after you discovered the videos did you do

22   that?

23   A.    We are in constant contact with the liaison.  I don't

24   know exactly when, but he would have been in contact with us

25   probably the following day, as soon as it was found he would

1   have been notified.

2   Q.   Why did you feel the need to notify the FBI so quickly?

3   A.   Because there were obvious links to the U.S.

4   Q.   Now, did you eventually provide copies of Mr. Tsouli's

5   computer media to the FBI?

6   A.   We did.

7   Q.   And was that pursuant to the legal process?

8   A.   Yes.  We initially gave them copies on a

9   police-to-police basis, then effectively they were given

10  copies under legal interact process.

11  Q.   Now, when you were forensically examining Mr. Tsouli's

12  computers, were you able to search for traces of different

13  e-mail accounts?

14  A.   We were, yes.

15  Q.   And looking on your desk right in front of you there is

16  something labeled Exhibit 22, which should be a list of

17  monikers that is in evidence.  There are certain users in the

18  right-hand column?

19  A.   Yeah.

20  Q.   And do you see on there some monikers associated with

21  someone named Ehsanul Sadequee?

22  A.   Yeah.

23  Q.   Did you locate any of those monikers that are listed as

24  being used by Mr. Sadequee on Mr. Tsouli's computers?

25  A.   We did, yes.

```
 1    Q.    Which one?

 2    A.    We found evidence of the use of Aboo Khubayb.

 3    Q.    Is that Aboo Khubayb?

 4    A.    Yes, I'm sorry for the pronunciation.

 5          AlMuwahhid at -- the details of the alMuwahhid at the

 6    hotmail account.

 7    Q.    That's almuwahhid@hotmail.com?

 8    A.    Yeah.  I'm not sure off the top of my head about the

 9    Yahoo one.

10          Evidence of the mustadrak@gawab.com.

11    Q.    The mustadrak@gawab.com?

12    A.    Yes.

13          Off memory, I don't recollect the others.

14          THE COURT:  Would you help me by reading the

15    numbers on the moniker list you found?

16          THE WITNESS:  Certainly.  No. 3, No. 11, No. 28.

17          THE COURT:  Those three?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20          MS. COLLINS:  Thank you.

21    BY MS. COLLINS:

22    Q.    And still taking a look at that list, there are a number

23    of monikers associated with Syed Haris Ahmed.  You didn't

24    find any monikers associated with him?

25    A.    Not on Tsouli's computer, no.
```

Q.   Now, did you locate anything on Mr. Tsouli's computer
that would indicate that he was involved in making or editing
videos?

A.   Yes.  He had a couple of different softwares which were
used for editing videos, and he was -- he had been recently
editing a particular video named Jasoos, jasoos meaning spy.

Q.   What was the nature of that video that he was -- that he
recently had been editing?

A.   The video which he had been editing showed an Asian
gentleman, it was Al-Qaeda in Iraq video with Abu Musab
al-Zarqawi in the corner.  This gentleman was accused of
being a spy for the Americans, and he was beheaded at the end
of the video.

Q.   Did you find -- and how did you know that it was in the
process of being edited?

A.   Basically there is evidence of him downloading that
video.  He had a copy entitled within the editing software,
and there was another three to five copies of it which had
been edited into different formats such as Real Media,
Windows Media and for dial-up.

Q.   Now, did you find any other videos on his computer media
that were depicting other types of violent activity?

A.   Yes, plenty.

Q.   And can you give some examples?

A.   There was lots of videos produced by Al-Qaeda in

1    Iraq.  There was videos of attacks on coalition forces.

2    There was other videos of beheadings of western hostages,

3    such as British hostage Kenneth Bigley, American hostages

4    Daniel Pearl, Nick Berg and others.

5         There was lots -- there was also lengthy documentary

6    media productions from the Al-Qaeda media wing featuring

7    Osama Bin Laden showing lengthy videos depicting suicide bomb

8    attacks, attacks on Karachi forces, including Bin Laden

9    urging people to attack disbelievers and attack the west.

10   Q.   Now, through your investigation of Mr. Tsouli, did you

11   become familiar with something called the Al-Ansar Forum?

12   A.   I did, yes.

13   Q.   What is that?

14   A.   The Al-Ansar Forum was a forum used by effective

15   jihadists.  It was a members-only forum.  You had to be

16   recommended to get into it.  It had a closed membership.  And

17   it was rated I think in the top three of the jihadist forums

18   online.

19   Q.   When you say members-only, was there a password or a

20   log-in?

21   A.   There was a password and log-in, yes.

22   Q.   Now, did you locate anything on Mr. Tsouli's computer

23   media that was related to this Al-Ansar Forum?

24   A.   Yes.  There were saved messages from the forum such as

25   the messages with details on how to build a car bomb.  And

there was also backup copies of the forum.  In fact, there was some 13 backups which had been downloaded by Tsouli and kept on his own computer, which had been downloaded and appeared from the 19th of August 2005 through the 19th of September 2005.  Seems he was downloading backups every other day.

There was evidence that he effectively was administering and paying for the host of that forum.  The forum was hosted on a web site called Irhabi007.ca and the hosting company called So Speedy in the U.S.  That forum was being paid for by him using a stolen credit card, the hosting of that forum.

He was effectively the administrator of that forum, and it could be demonstrated that in the four-week period from August till September, he logged in on some fifteen hundred occasions using his IP address which was only for his use.

Q.   Now, when you say there were backup copies of Al-Ansar Forum, what was in those backup copies?

A.   The forum was in two sections.  The public forum -- I will say public, closed public forum, where people would go online and leave messages.  The main things people used to do, such as Tsouli, was post links to latest videos which had come out where they could be downloaded and comment on those videos.

And then there would be the private message section,

which was equally, if not more important, where there would

be the ability for members of the forum to talk together

privately without other members seeing the conversation.

    And within that, for instance, there was contact where

bombers were being -- suicide bombers were being recruited to

go to Iraq, there was explosives recipes, et cetera, within

this closed message part.

Q.   And were both parts of the forum, the public part that

you described and private part, were both parts in the backup

copies?

A.   They were, yes.

Q.   And you said there were thirteen of them?

A.   Thirteen, yes.

Q.   Now you talked a little bit about the website that the

Al-Ansar Forum was hosted on, Irhabi007.ca.  What information

did you find on the computer that linked that computer to

that website?  Was it the web server logs, was there any

other information?

A.   There were a number of links Younis Tsouli had on the

computer and elsewhere to address the administrative

passwords and log-in details.  There was, as I said

previously, evidence of some fifteen hundred log-ins as the

administrator using the IP address which we traced to

Tsouli's use.

    Also I employed a professor of computing to examine our

1   computer.  When the laptop was seized, it was actually --

2   Tsouli was online at that time.  In fact, he was online 24/7

3   most days, but he was actually online when the officers went

4   through the door and arrested him.  He was actually logged on

5   a chat as IRH 007 being short for Irhabi 007, and he was

6   logged in as Irhabi 007 into Irhabi007.ca at that time.

7        And Tsouli was building a website named

8   YouBombIt.ra.org, which he was building using a clone of

9   YouSendIt, which is a service software for uploading and

10  downloading very large files and sending them to each other

11  by e-mail, which normally is a subscription service, but

12  Tsouli got hold of a clone of that and was using it to build

13  his site YouBombIt.  He registered it with a Swedish domain,

14  and he was -- the files he was building, he was building the

15  banner for the site.  It was stored in a file which is

16  created -- folder, rather, which was created under

17  Irhabi007.ca named YouBombIt.

18  Q.   Just so I understand your testimony, when Mr. Tsouli was

19  arrested, the laptop was logged in as Irhabi 007 into what?

20  A.   Into Irhabi007.ca, into the website.

21  Q.   Into the website?

22  A.   Yes.

23  Q.   And he was in the process of building a new site or --

24  new site on the Irhabi007.ca site?

25  A.   Yeah.  Effectively, yes.

1  Q.   And the function of this new site called YouBombIt was

2  to be able to send large files?

3  A.   Yeah, large video files.

4  Q.   Did you locate -- did you determine or find any evidence

5  that Mr. Tsouli used the moniker Irhabi 007 with any other

6  websites or forums other than Al-Ansar and Irhabi007.ca?

7  A.   He also used it in the al-Hesbah Forum, which is another

8  jihadist forum, and also forum -- in an English language

9  forum called Tybian Publications.

10 Q.   Did you through your examination of the media, did you

11 determine whether Mr. Tsouli used other monikers in addition

12 to Irhabi 007?

13 A.   We did, yes.

14 Q.   And was one of them -- did one of them begin with The

15 Dude?

16 A.   It does, yes.

17 Q.   What's that full e-mail address?

18 A.   I think it's thedude@hotmail.com.

19 Q.   Could it be thedude7_2005@hotmail.com?

20 A.   That's correct, yes.

21 Q.   And what about an e-mail address

22 Johnblack05@hotmail.com?

23 A.   That's another one which he uses, yes.

24 Q.   And did he use any monikers associated with Bond?

25 A.   He did, yes, Bond being synonymous with 007.

1    Q.    Now, I would like to talk a little bit next about

2    Mr. Mughal, who you mentioned was another subject of your

3    investigation.

4    A.    Yes.

5    Q.    What was his connection to Mr. Tsouli?

6    A.    His connection to Mr. Tsouli were they were regularly in

7    contact online.  He was also involved in the creation of

8    websites, and he had quite a lot of similar media to which

9    Tsouli had.

10         Mughal was an administrator on the Tibyan Publications

11   Forum, and was -- had files where he was doing translation

12   work similar to Tibyan Publications.  He had a folder called

13   work for TP which included a lot of translations of beheading

14   videos and the like.

15   Q.    Now, you mentioned that you found certain items in his

16   possession.  Was a search conducted of his residence as

17   well?

18   A.    Same as Tsouli's, yes.

19   Q.    Was it on the same day?

20   A.    It was, yes.

21   Q.    And through that, did you obtain computers and computer

22   media?

23   A.    Exactly the same as Tsouli's, yes.

24   Q.    And they were forensically examined as well?

25   A.    They were, yes.

1   Q.   And were they eventually provided to the FBI?

2   A.   They were, yes.

3   Q.   When you were looking through his computer, did you

4   locate any traces of e-mail addresses associated with

5   Mr. Syed Haris Ahmed?

6   A.   You are talking about Mughal?

7   Q.   Yes, Mr. Mughal's.

8   A.   Yes.

9   Q.   Do you recall which one?

10  A.   Yes.  No. 13, the al-muwahid@hotmail.com.

11  Q.   No. 13 on Exhibit 22?

12  A.   That's correct.

13  Q.   And did you locate any e-mail addresses or monikers

14  associated with Mr. Sadequee?

15  A.   I did, yes.

16  Q.   And can you tell us the number off of Exhibit 22?

17  A.   I'm confused between the Hotmails and the Yahoos, but I

18  believe it's No. 11, almuwahhid@hotmail.com, and also the

19  mustadrak@gawab.com.

20  Q.   Mustadrak@gawab.com?

21  A.   That's correct.

22  Q.   Were you able to determine which monikers or e-mail

23  addresses Mr. Mughal used?

24  A.   Yes.

25  Q.   On the moniker list, Exhibit 22, is there one that

```
1    starts out aht48eind0 --

2    A.   That's correct.

3    Q.   -- @hotmail.com?

4    A.   Yes.

5    Q.   Do you recognize that?

6    A.   Yes, I do, yes.

7    Q.   And whose moniker is that, did you determine it to be?

8    A.   We determined that to be Mughal's moniker.

9    Q.   Did he also use a moniker named Ismiyy, I-s-m-i-y-y?

10   A.   He did.

11   Q.   What about Sleeping Beauty?

12   A.   Yes, that's another name he used.

13   Q.   Detective Inspector Verralls, do you know how old

14   Mr. Tsouli was, approximately?   Was he over 18?

15   A.   He was over 18.  He was about 20, I believe.

16   Q.   And what about Mr. Mughal?

17   A.   They were about the same age.  Mughal would have been

18   the older one because he left the university, so he would

19   have been 21, 22.

20   Q.   So Mr. Mughal actually graduated from college, from

21   university?

22   A.   Yes.  He had been studying Biochemistry, and he

23   graduated and was on his way on to a Master's degree in the

24   same subject.

25        MS. COLLINS:  No further questions, Your Honor.
```

```
1                THE COURT:  Mr. Martin?

2                MR. MARTIN:  Nothing, Your Honor.

3                THE COURT:  Does anybody want the Detective

4    Inspector subject to recall?  If you say yes, he's not going

5    to like that.

6                MS. COLLINS:  Not for the government.

7                MR. MARTIN:  No.

8                THE COURT:  We appreciate very much you being with

9    us.  You shouldn't discuss your testimony until the case is

10   over, but we appreciate your trip here?

11               THE WITNESS:  My pleasure, Your Honor.  Thank you.

12               THE COURT:  Now, who was it when I was asking my

13   last question finished my question by saying go home?  Was

14   that --

15               MR. McBURNEY:  It depends if you liked it or not.

16               THE COURT:  I was going to make that person stay.

17   But since I'm older and closer in age to Mr. Martin, I'm

18   going to let him go too.

19               Tell me what tomorrow looks like.

20               MR. McBURNEY:  We will likely get to our final

21   witness.  I don't know that we will finish with our final

22   witness.

23               We have one two, three, four, five, six fairly

24   quick witnesses.

25               THE COURT:  Who are they?
```

1           MR. McBURNEY:  Agent Scherck, then we have

2     Ms. Bhattacharyya, Mr. McGee from the FBI, Mr. Acker from the

3     FBI, Mr. Marcell, Amimul Sadequee.

4           If we get through all that, Ms. Wilz, Agent Wilz

5     from the Department of Defense, and then Mr. Kohlmann, whom

6     you have met before.

7           I don't know that we will get through everyone

8     tomorrow, but we shouldn't have witnesses beyond -- there is

9     a possibility, depending on how one of the witnesses goes, we

10    would call one other witness, not in rebuttal, but to fill

11    out the story if that person was unable or unwilling to

12    complete the story.

13          But it's our expectation that there shouldn't be

14    witnesses whose direct and cross combined is as long as

15    Agent Allen or Agent Richards, other than Kohlmann, although

16    I don't think we will go through the qualifications phase

17    again.

18          So if he don't finish, if the government's case

19    doesn't end tomorrow, it will definitely end Thursday in the

20    morning.

21          THE COURT:  All right, thank you.

22          Mr. Martin, you don't need to make a commitment to

23    me, but only for management purposes --

24          MR. MARTIN:  No, I will tell you.  I told

25    Mr. McBurney.  I have two witnesses, family witnesses.  They

```
1    will be relatively short.  I mean, probably take an hour for
2    both of them.
3              THE COURT:  So we are thinking probably -- well, if
4    you know who the witnesses are, do you expect anything in
5    rebuttal?
6              MR. McBURNEY:  I don't think so, based on the
7    preview Mr. Martin has given.  They are family members, and I
8    don't think we would do much to rebut that.
9              THE COURT:  But of course, if you do, you do.
10             MR. McBURNEY:  Yes, sir.
11             THE COURT:  If I allow it, of course.
12             MR. McBURNEY:  A lot of ifs.
13             THE COURT:  So it looks to me like the evidence
14   probably gets concluded Wednesday -- what's today?  Tuesday.
15             MR. McBURNEY:  Thursday.
16             THE COURT:  Thursday.
17             Anything else we need to discuss then before we
18   adjourn until tomorrow morning at 9:00?
19             MR. McBURNEY:  Nothing from the government.
20             MR. MARTIN:  No, Your Honor.
21             THE COURT:  All right.  We will see you tomorrow
22   morning at 9:00.
23                   (A recess is taken at 5:18 p.m.)
24                          --  --  --
25
```

1                    C E R T I F I C A T E

2

3     UNITED STATES OF AMERICA        :
                                       :
4     NORTHERN DISTRICT OF GEORGIA    :

5

6             I, Nicholas A. Marrone, RMR, CRR, Official Court

7     Reporter of the United States District Court for the Northern

      District of Georgia, do hereby certify that the foregoing 270

8     pages constitute a true transcript of proceedings had before

9     the said Court, held in the city of Atlanta, Georgia, in the

10    matter therein stated.

11            In testimony whereof, I hereunto set my hand on

12    this, the 17th day of June, 2009.

13

14

15

16
                          /s/ Nicholas A. Marrone
17                        _____
                          NICHOLAS A. MARRONE, RMR, CRR
18                        Registered Merit Reporter
                          Certified Realtime Reporter
19                        Official Court Reporter
                          Northern District of Georgia
20

21

22

23

24

25