1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3   UNITED STATES OF AMERICA          )
                                      )
4                Plaintiff,           )    CRIMINAL ACTION FILE
                                      )    NO. 1:06-CR-147-WSD-1
5   v.                                )
                                      )    ATLANTA, GEORGIA
6   SYED HARIS AHMED (1)              )
                                      )
7                Defendant.           )
   _____)

8                  TRANSCRIPT OF PROCEEDINGS
9       BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
                UNITED STATES DISTRICT JUDGE
10
                        VOLUME 3
11               Wednesday, June 3, 2009

12


13
    APPEARANCES OF COUNSEL:
14
    For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
15                            (By:  David E. Nahmias
                                    Robert C. McBurney
16                                  Christopher Bly)

17                            DEPARTMENT OF JUSTICE
                              (By:  Alexis L. Collins)
18
    For Defendant Ahmed (1):  MARTIN BROTHERS
19                            (By:  John Richard Martin)

20

21
            *Proceedings recorded by mechanical stenography*
22          *and computer-aided transcript produced by*
                 NICHOLAS A. MARRONE, RMR, CRR
23                  1714 U. S. Courthouse
                    75 Spring Street, S.W.
24                   Atlanta, GA  30303
                      (404) 215-1486
25

1                           I N D E X

2       *Witness*                                    *Page*

3       MICHAEL SCHERCK
            Direct (By Ms. Collins)               532
4            Cross (By Mr. Martin)                 572

5       APARNA BHATTACHARYYA
            Direct (By Mr. McBurney)              579
6

7       GEORGE McGEE
            Direct (By Mr. McBurney)              584
            Cross (By Mr. Martin)                 604
8

9       AMIMUL SADEQUEE
            Direct (By Mr. McBurney)              609
            Cross (By Mr. Martin)                 621
10

11      MATTHEW ACKER
            Direct (By Mr. Bly)                   623
            Cross (By Mr. Martin)                 634
12

13      KATHERINE WILZ
            Direct (By Ms. Collins)               635
            Cross (By Mr. Martin)                 670
14

15      EVAN F. KOHLMANN
            Direct (By Ms. Collins)               691
            Cross (By Mr. Martin)                 730

16

17

18

19

20

21

22

23

24

25

1      Wednesday Morning Session

2          June 3, 2009

3           9:05 a.m.

4            -- -- --

5        P R O C E E D I N G S

6            -- -- --

7         (In open court:)

8          THE COURT:  All right.  Good morning,

9    everybody.  We are still in the government's case.  Would you

10   please call your next witness.

11         MS. COLLINS:  Yes, Your Honor, we call

12   Michael Scherck.

13            -- -- --

14           MICHAEL SCHERCK

15   being first duly sworn by the Courtroom Deputy, testifies and

16           says as follows:

17            -- -- --

18         DIRECT EXAMINATION

19   BY MS. COLLINS:

20   Q.   Good morning.  Can you state your name and spell your

21   last name for the record?

22   A.   Michael Scherck, S-c-h-e-r-c-k.

23   Q.   Thank you.  Now, Mr. Scherck, where do you work?

24   A.   The FBI, Federal Bureau of Investigation.

25   Q.   Which field office?

```
1    A.   The Atlanta division.

2    Q.   How long -- what's your position there?

3    A.   I'm a special agent.

4    Q.   How long have you been an agent?

5    A.   Five years.

6    Q.   What has your involvement been in this case?

7    A.   I have been the primary case agent for Ehsanul Sadequee.

8    Q.   Now, did you have occasion to interview Mr. Sadequee --

9    A.   Yes, I did.

10   Q.   -- during this case?

11   A.   Yes, ma'am.

12   Q.   When was that?

13   A.   On the first occasion was August 18, 2005, at JFK

14   airport in New York.

15   Q.   And you said that was at JFK Airport in New York?

16   A.   Yes, ma'am.

17   Q.   Where was he going?

18   A.   He was en route from Atlanta to New York, then from

19   New York to Dubai, and then from Dubai to Dhaka, Bangledesh.

20   Q.   So what was his final destination?

21   A.   Dhaka, Bangledesh.

22   Q.   Had he been living in Atlanta before he left on that

23   trip?

24   A.   Yes, ma'am.

25   Q.   Did you interview him alone or was someone else with
```

1   you?

2   A.   I interviewed him with someone else.  A

3   New York\New Jersey Port Authority detective.

4   Q.   How were you dressed for the interview?

5   A.   A suit with a shirt and tie.

6   Q.   So you were in plain clothes?

7   A.   Yes, ma'am.

8   Q.   Were you visibly armed?

9   A.   I was armed, but not visibly.

10  Q.   Where at JFK did you encounter Mr. Sadequee?

11  A.   We encountered Mr. Sadequee when he was coming off the

12  airport at the exit ramp.

13  Q.   How did you recognize him?

14  A.   I had seen photographs of Mr. Sadequee before.

15  Q.   How did you approach him for the interview?

16  A.   Myself and the Port Authority detective, we approached

17  Mr. Sadequee.  The Port Authority detective and myself, we

18  stated that we need to speak with him for a couple of

19  minutes.  We had some complaints about his activity on the

20  plane having to do with his physical appearance.  That was

21  probably the reason he was stopped, some people said he was

22  doing some unusual stuff on the plane, getting up and getting

23  down, you know, quite bit and had some unusual movements.  So

24  we just wanted to talk to him for a couple of minutes to

25  clear those allegations up.

```
 1   Q.   And were those complaints true?
 2   A.   No, they were not.
 3   Q.   That was something that you made up so that you could
 4   approach him?
 5   A.   Yes, they were.
 6   Q.   And did Mr. Sadequee agree to talk to you?
 7   A.   Yes, he did.
 8   Q.   Where did you go to speak with him?
 9   A.   Delta provided us a little -- I'm not going to say it's
10   a conference room, but like a little room off to the side off
11   of the main concourse area where we could go into.
12        We went into the room and stayed in there for a little
13   bit and spoke with Mr. Sadequee.
14   Q.   How long did the interview last?
15   A.   Approximately thirty minutes.
16   Q.   While you were speaking with him, did Mr. Sadequee have
17   any difficulty understanding English?
18   A.   No, he spoke very clear English.
19   Q.   Now, what kinds of things did you ask him during this
20   interview?
21   A.   We asked him several questions.  We asked him, first of
22   all, about his activity on the plane, did he notice anyone
23   looking at him.
24        Then we asked him for his basic biographical
25   information, you know, name, date of birth, where were you
```

1   born, Social Security number, phone numbers, where he was

2   employed.

3       The obvious questions as to, you know, where are you

4   going, who are you going to stay with over there.  Questions

5   such as that.

6   Q.   And did you ask him about any previous foreign travel?

7   A.   Yes, we did.

8   Q.   And did he provide any information about his previous

9   travel?

10  A.   He advised us that he had traveled to Canada in January

11  of 2005 by himself.

12  Q.   And did he say what his purpose was --

13          MR. MARTIN:  Your Honor, just for the record, this

14  is obviously hearsay.  I know it's related to what issue we

15  talked earlier about.

16          I assume it's being offered under co-conspirator

17  hearsay; is that correct?

18          MS. COLLINS:  Yes, Your Honor.

19          MR. MARTIN:  I just want to raise that we are

20  objecting to it, and understand the Court is going to make

21  the ultimate determination about it.

22          THE COURT:  Yes, thank you.

23  BY MS. COLLINS:

24  Q.   I believe my last question was did he say what the

25  purpose of the trip was?

A.    To visit his aunt.

Q.    Now, was the information that he gave you about this trip consistent with what you later learned about the Canada trip from Mr. Ahmed and through your investigation?

A.    No, it was not.

Q.    Did he tell you during the interview that he had stayed at a mosque in Canada for several days?

A.    No, he did not.

Q.    Did he tell you that he went on a trip with Mr. Ahmed?

A.    No, he did not.

Q.    Did he tell you that he met with an individual named Azdee Omani?

A.    No, he did not.

Q.    What happened when you finished the interview?  What did Mr. Sadequee do next?

A.    We thanked Mr. Sadequee for his time.  Mr. Sadequee left the room.  We left the room.

     As myself and the Port Authority detective walked to his car, we passed again, we passed Mr. Sadequee right out in front of the airport, and Mr. Sadequee asked for directions, and the Port Authority officer gave him directions.

Q.    Did he leave for Bangladesh?

A.    He left for Bangladesh later that night.

Q.    Now, during the course of your investigation, did the FBI receive computer media that had been seized from

1  Mr. Younis Tsouli and Waseem Mughal?

2  A.   Yes, we did.

3  Q.   And did the FBI forensically examine that computer

4  media?

5  A.   Yes, we did.

6  Q.   Now, during that examination, did you locate any

7  communications in which Mr. Sadequee discusses the

8  consequences of Mr. Ahmed's interview at the Atlanta airport

9  when he was returning from Pakistan?

10  A.   Yes, we did.

11  Q.   On your table should be Exhibit 111.

12        THE COURT:   While you are looking for that,

13  Mr. Martin, my understanding is that your last comment

14  related to the statements of Mr. Sadequee and does not relate

15  to whatever was discovered during any seizure of materials;

16  is that right?

17        MR. MARTIN:   That would be true.

18        THE COURT:   Thank you.

19  BY MS. COLLINS:

20  Q.   What type of document is that item?

21  A.   This is a chat communication.

22  Q.   And who is it between?

23  A.   It's between mustadrak@gawab.com, Sleeping Beauty, and

24  that is it in the communication.

25  Q.   And who is Mustadrak -- who is the user of

1  mustadrak@gawab.com?

2  A.    Ehsanul Sadequee.

3  Q.    Who is the user of Sleeping Beauty?

4  A.    Waseem Mughal.

5  Q.    What's the date of that document?

6  A.    August 23, 2005.

7  Q.    How many days is that after Mr. Ahmed was questioned at

8  the airport returning from Pakistan?

9  A.    Four days.

10 Q.    And how many days is that after Mr. Sadequee left for

11 Bangladesh?

12 A.    Five days.

13 Q.    And in that document do they discuss Mr. Ahmed's

14 interview?

15 A.    Yes, they do.

16 Q.    Is Sadequee in Bangladesh at the time, or had he already

17 left for Bangladesh?

18 A.    Yes, he had.  He should have been in Dhaka, Bangladesh.

19       MS. COLLINS:  Your Honor, at this point we would

20 like to admit Exhibit 111.

21       THE COURT:  Any objection?

22       MR. MARTIN:  I would object to 111, not for its

23 authenticity.  It is a communication that does not involve my

24 client.  It's not a chat with my client.

25       So I'm going to make the same objection I would

make earlier that unless they can prove it's otherwise

admissible hearsay, I would object.

THE COURT:  What's the government's position?

MS. COLLINS:  Our position is this is admissible

under the co-conspirator hearsay exception.

We believe that at this point in the case, there is

enough evidence for the Court to make a preliminary finding

under a preponderance standard that Mr. Sadequee and

Mr. Ahmed were co-conspirators.

And this communication is discussing the

concealment of the conspiracy and the exposure of the

conspiracy to law enforcement.

MR. MARTIN:  This is a communication between

Mr. Sadequee and another person, which I don't know if they

have actually proved that he's part of this conspiracy.

MS. COLLINS:  In this communication, Mr. Sadequee

is asking Mr. Mughal to pass information to Aabid Khan about

the fact that there was information revealed during

Mr. Ahmed's interview with CBP about Mr. Khan.

THE COURT:  I do make a preliminary determination

that the government has proved by a preponderance of the

evidence a conspiracy between Mr. Sadequee and Mr. Ahmed, and

therefore I'm overruling the objection.

MS. COLLINS:  Thank you, Your Honor.

At this point we would like to admit Exhibit 111.

```
 1            MR. MARTIN:  No further objection.

 2            THE COURT:  It's admitted.

 3            MS. COLLINS:  Thank you.

 4            If we could put it up on the screen?  If we could

 5      zero in there at the top of the screen just for the header

 6      information?

 7      BY MS. COLLINS:

 8      Q.    What is the date of this communication?

 9      A.    August 23, 2005.

10      Q.    And who is the first person that we see speaking in this

11      chat?

12      A.    Ehsanul Sadequee.

13      Q.    And then further down, who is also a participant?

14            If you can exit out of this and just go down a little

15      farther to the blue?

16      A.    Sleeping Beauty is identified as Waseem Mughal.

17      Q.    Okay.  If we could go to page three of this document

18      starting at the third line going down to about two-thirds

19      down the page?

20            THE COURT:  Can I interrupt you for a second?

21            There are actually three findings that have to be

22      made.  You didn't articulate the three findings in order for

23      a specific document that is allowed to be offered with

24      respect to a conspiracy that is in fact shown by

25      preponderance of the evidence.
```

1          So I guess before we go further into this, may

2     I please see that so I can make those other findings that are

3     required by the circuit authority?

4          MS. COLLINS:  Yes, Your Honor.  This is a marked-up

5     copy.

6          MR. McBURNEY:  We have one.

7          THE COURT:  What are the statements you are

8     offering?

9          MS. COLLINS:  Your Honor, we are offering page

10    three where Mr. Sadequee is asking him to pass a message to

11    Abu U about Aboo Turab, Aboo T.

12          And then on page four --

13          THE COURT:  When you say Mr. Sadequee, I don't know

14    all of his monikers.  Can you help me?

15          MS. COLLINS:  I apologize, mustadrak@gawab.com,

16    it's from time stamp 06:39:59 through 06:40:47.

17          And there is three parts of this communication that

18    we are offering, but that's the first part.

19          THE COURT:  All right.  The first part ends at what

20    time stamp?

21          MS. COLLINS:  The first part ends at 06:40:47.

22          THE COURT:  All right.  What's the next one?

23          MS. COLLINS:  The next part is 06:43 -- on the same

24    page, page three, 06:43:02 where mustadrak@gawab.com starts

25    Just tell, and then moving on to page four through 06:43:18.

 1          And actually this is a continuation of the first

 2   part.  I apologize.

 3          THE COURT:  All right.  Anything else?

 4          MS. COLLINS:  Yes, lower down on page four,

 5   06:51:35 mustadrak@gawab.com starts out speaking, through

 6   06:52:27.  Mustadrak@Gawab.com:  That T went north.

 7          THE COURT:  Okay.

 8          MS. COLLINS:  Then page six, 07:03:19 where

 9   mustadrak@gawab.com says, Tell Bond, then down to 07:04:01

10   mustadrak@gawab.com says, Bugged.

11          THE COURT:  All right.  I have reviewed the

12   offered -- or the statements that are sought to be offered,

13   and guided by the Eleventh Circuit's authority in the

14   *United States v. Dickerson,* which is a 2001 decision of the

15   Eleventh Circuit that requires a finding that, one, a

16   conspiracy existed -- and these all have to be proved by a

17   preponderance -- two, the conspiracy included the declarant

18   and the defendant against whom the statement is offered, and

19   three, that the statement to be introduced was made during

20   the course and in furtherance of the conspiracy.

21          I find that it meets all three of those

22   qualifications, and it's allowed.

23          MS. COLLINS:  Thank you, Your Honor.  May

24   I continue to publish?

25          THE COURT:  You may.  I have actually read all of

1    those.

2            MS. COLLINS:  Yes, Your Honor, I just want to ask

3    Agent Scherck a couple of questions.

4    BY MS. COLLINS:

5    Q.   The Court has read them, so let's -- so just looking at

6    line 6:40:09 where mustadrak@gawab.com says Abu U?  Who is

7    Abu U?

8    A.   Abu U has been identified as Abu Umar, or his real name

9    is Aabid Hussein Khan.

10   Q.   And is that the individual who Mr. Ahmed during his

11   interviews with the FBI indicated that he met with in

12   Pakistan?

13   A.   Yes, it is.

14   Q.   Skipping down to 06:30:41, musstadrak@gawab.com's next

15   line, Mr. Sadequee's next line, that Aboo T was visited by

16   the doctors and doctors got Abu U's cell's number.  Who is

17   Aboo T?

18   A.   Aboo T is Aboo Turab, or as we have identified as

19   Syed Haris Ahmed, the defendant.

20   Q.   And the next line, what does Mr. Sadequee instruct?

21   A.   So throw it away.

22   Q.   Skipping down to 06:43:02, yet again can you read what

23   Mr. Sadequee says?

24   A.   Just tell Mu'Aath to tell Abu U.

25   Q.   Continue?

1    A.   He's on the radar, tell him to throw away.

2    Q.   And then you have the transcript in front of you.  What

3    does he say starting on the next page?

4    A.   The old cell.

5    Q.   And again who is Abu U?

6    A.   Aabid Hussein Khan.

7    Q.   Going on to page four, if you can highlight 06:51:35

8    through the bottom of the page?

9         Agent Scherck, can you read starting at 6:51:35, the

10   second 6:51:35?

11            THE COURT:  Of course, I have read this.

12            MS. COLLINS:  I'm sorry, Your Honor.

13   BY MS. COLLINS:

14   Q.   Looking down at the next line, it says, Tell AZD?  Who

15   is AZD?

16   A.   AZD was identified as Azdee Omani.

17   Q.   And in the next line it says, The dogs found out about

18   the trip north to him?  What is the trip north?

19   A.   Trip north is the trip to Canada.

20   Q.   And moving on to page six, starting at 7:03:19 down to

21   7:04:01, first line where Mr. Sadequee says, Tell Bond, who

22   is Bond?

23   A.   Bond has been identified as Younis Tsouli.

24   Q.   And skipping down to 7:03:55, it says T's messages, who

25   is T?

1   A.    Aboo Turab or Syed Haris Ahmed, the defendant.

2   Q.    Now, when was the first time Mr. Ahmed told law

3   enforcement about the Canada trip?

4   A.    August 19, 2005.

5   Q.    And how many days was that before this chat?

6   A.    Four.

7   Q.    Now, did you obtain -- here Mr. Sadequee is asking

8   Mr. Mughal to pass a message to Azdee.  Did you obtain any

9   evidence that Mr. Sadequee had Azdee's telephone number at

10  the time?

11  A.    Yes, we did.

12  Q.    And where was that information?

13  A.    When Mr. Sadequee departed Atlanta en route to

14  Bangladesh, during a search of his luggage an address book

15  was obtained.  Copies of his address book were made, and

16  there was a telephone number for Azdee within the telephone

17  book.

18  Q.    If you take a look up there, there should be an

19  Exhibit 90?

20  A.    Okay.

21  Q.    And is this -- what is this?

22  A.    This was the address book that was found in

23  Mr. Sadequee's luggage when he departed the States.

24  Q.    Is this the address book that contains a telephone entry

25  for Azdee?

```
 1   A.   Yes, it is.
 2          MS. COLLINS:  Your Honor, at this time we would
 3   like to admit Exhibit 90.
 4          THE COURT:  Any objection?
 5          MR. MARTIN:  Just I think we previously objected
 6   to this on the basis of the lack of foundation under
 7   801 (d) (2) (E).  You ruled against us on that,
 8   co-conspirator hearsay, so I guess it's admissible.  But we
 9   persist in our objection.
10          THE COURT:  Admitted.
11          MS. COLLINS:  Thank you, Your Honor.
12   BY MS. COLLINS:
13   Q.   If we could put it up on the screen, please?
14        Is this the front page of the address book?
15   A.   Yes, it is.
16   Q.   And what is the name that's written on the front page
17   there?
18   A.   Shifa Sadequee.
19   Q.   And turning to page two, in the upper left-hand corner
20   there?
21   A.   Ehsanul Sadequee.
22   Q.   Is that entered under -- what entry is that entered
23   under?
24   A.   Personal information.
25   Q.   Is that the personal information for the owner of the
```

1  address book?

2  A.   Yes, it is.

3  Q.   Turning to page four of this exhibit, do you see here an

4  entry for Azdee?

5  A.   Yes, I do.

6  Q.   And is it in the lower right-hand corner?

7  A.   Yes, it is.

8  Q.   And is there a telephone number attached to that entry?

9  A.   Yes, there is.

10  Q.   And 416, where is the area -- where does that area code

11  go to?

12  A.   Toronto, Canada.

13  Q.   Okay.  Now, you mentioned -- you testified earlier that

14  the FBI received hard drives from Mr. Tsouli.  Did these hard

15  drives contain videos that were filmed here in Washington,

16  D.C., by Mr. Ahmed and Mr. Sadequee?

17  A.   Yes, they did.

18  Q.   And when did you receive those videos?

19  A.   We received those in the fall of 2005.

20  Q.   And how many videos did you receive?

21  A.   Six videos.

22  Q.   Now, Exhibit 32, which I believe is already in evidence,

23  was identified as containing the videos from D.C. that were

24  found on Mr. Tsouli's computer.

25       Have you reviewed the videos that were with Mr. Tsouli?

1    A.    Yes, I have.

2    Q.    There was some confusion earlier.  Just to clear up on

3    the record which videos were sent to Mr. Tsouli, I would like

4    to just open that and show the opening screen and have you

5    identify the videos so that the record is clear.

6          Can we just play the opening shot of the first one?  You

7    can pause it.

8          What is this?

9    A.    It's the U.S. Capitol.

10   Q.    In this video, does either Mr. Ahmed or Mr. Sadequee

11   appear?

12   A.    No, they do not.

13   Q.    You can go on to the next one.  Pause it.

14         What is this?

15   A.    That's the Masonic Temple in Old Town, Alexandria.

16   Q.    You can go on to the next one.

17         Where are we here?

18   A.    It's a guard shack at the U.S. Capitol.

19   Q.    Is that still the Capitol?

20   A.    Yes, it is.  It's the HAZMAT truck.

21   Q.    What is this?

22   A.    It's the World Bank in Washington, D.C.

23   Q.    And the last one?

24   A.    It's the tank farm located in Newington, Virginia.

25   Q.    Now, in any of the videos --

1    THE COURT:  Could I make a suggestion?  I mean,
2  when this becomes part -- well, it's part of the record.
3  Could we just read the PEG I guess is what you would call it
4  entries, so that somebody going back sometime from now can
5  say, oh, those were the six video clips that he talked
6  about?
7    MS. COLLINS:  Yes.
8    THE COURT:  Rather than trying to do this, well,
9  somebody saying they look the same, but what exactly is it
10  that he testified about, which is not clear.
11    MS. COLLINS:  Yes, Your Honor, absolutely.
12  BY MS. COLLINS:
13  Q.   This is Exhibit 32, and on this disk can you read the
14  file names that are listed?
15    THE COURT:  I will actually let you read the file
16  names.
17    MS. COLLINS:  Okay, I will read the file names,
18  sure.
19    On this disk, Exhibit 32, are MVI_0082.avi,
20  MVI_0095.avi, MVI_0104.avi, MVI_0108.avi, MVI_0144.avi and
21  the last one is MVI_0147.avi.
22    THE COURT:  Agent Scherck, are those the four video
23  clips that you just testified about?
24    THE WITNESS:  Six, yes, sir.
25    THE COURT:  I'm sorry, six.  Thank you.

```
 1              MS. COLLINS:  Thank you.

 2              THE COURT:  Would you agree, Mr. Martin, that those

 3   are the six video clips?

 4              MR. MARTIN:  That's correct.

 5              MS. COLLINS:  Thank you, Your Honor.

 6   BY MS. COLLINS:

 7   Q.   Now, in the review of Mr. Tsouli's hard drives, did you

 8   locate any videos of a more violent nature?

 9   A.   Yes, we did.

10   Q.   And did you review some of those?

11   A.   Yes, I did.

12   Q.   And what types of things did they depict?

13   A.   There is clips from 9/11, there is beheading videos,

14   there is IUD improvised explosive devices, on how to make

15   those types of devices, and there is basically videos from

16   jihadist camps.

17   Q.   And when you were talking just now about IUDs, were they

18   clips of IUDs or did you say there was some instructional

19   value?

20   A.   There was both, there was pictures of IUDs being

21   detonated, and there was also instructional videos on how to

22   create those devices as well.

23   Q.   On your table should be Exhibit 110?

24   A.   Yes.

25   Q.   Do you recognize that?
```

```
1   A.   Yes, I do.

2   Q.   And what is it?

3   A.   It's the items from Tsouli, Younis Tsouli's hard drive.

4   Q.   That you just described?

5   A.   Yes, ma'am.

6        MS. COLLINS:  Your Honor, we would like to admit

7   Exhibit 110.

8        THE COURT:  Any objection?

9        MR. MARTIN:  This has everything that's on Tsouli's

10  hard drive?

11       MS. COLLINS:  No, Your Honor.  It has just a

12  selected number of videos that are of the nature that

13  Agent Scherck just testified about.

14       MR. MARTIN:  Given the fact that this is nonjury,

15  I don't have an objection to it being admitted.  I do believe

16  that it has marginal relevance that he's collected other

17  things that cannot be tied directly to my client.

18       But just for the purpose of this, I don't object to

19  its admission, but I wonder about its weight.

20       THE COURT:  It's admitted.

21       MS. COLLINS:  Your Honor, because of the graphic

22  nature, we will not play it.  But they are available for the

23  Court's review as fact finder.

24       THE COURT:  So the Court gets to see the graphic

25  nature of it, but everybody else is --
```

```
 1              MS. COLLINS:  If the Court wishes --
 2              THE COURT:  No, I will look at them myself.
 3    BY MS. COLLINS:
 4    Q.   Now, on Mr. Tsouli's hard drive, did you locate any of
 5    Mr. Sadequee's e-mail addresses?
 6    A.   Yes, we did.  On a buddy list.
 7    Q.   What e-mail address did you look at?
 8    A.   Mustadrak@gawab.com.
 9    Q.   And you just said it was on a buddy list.  What's a
10    buddy list?
11    A.   A buddy list is for people who chat to one another
12    online.  If they speak to some people frequently, they
13    usually add that person to their buddy list so when they want
14    to speak with them, they can just click on that moniker or
15    e-mail address.
16    Q.   And what accounts are this buddy list for, do you
17    recall?
18    A.   JohnBlack05@hotmail.com.
19    Q.   Are they accounts that are associated with Mr. Tsouli?
20    A.   Yes, they are.
21    Q.   Take a look at Exhibit 182.
22         Do you recognize that?
23    A.   Yes, I do.
24    Q.   And where was it obtained?
25    A.   From the United Kingdom from the hard drive belonging to
```

1  Younis Tsouli.

2  Q.   What is it?

3  A.   It's a buddy list.

4  Q.   Is that the buddy list you were just describing?

5  A.   Yes.  I believe within Exhibit 182 there is two buddy

6  lists, one for TheDude7_2005@hotmail.com, there is also one

7  for JohnBlack05@hotmail.com.

8  Q.   Agent Scherck, could you repeat the e-mail addresses

9  slowly for the Court Reporter?

10  A.   Yes, ma'am.  TheDude7_2005@hotmail.com, and the other

11  one is JohnBlack05@hotmail.com.

12  Q.   And on those buddy lists, does Mr. Sadequee's e-mail

13  address appear?

14  A.   Yes, it does.

15          MS. COLLINS:  At this time we would like to admit

16  Exhibit 182.

17          THE COURT:  Any objection?

18          MR. MARTIN:  No objection.

19          THE COURT:  It's admitted.

20          MS. COLLINS:  Thank you.

21          If we can put it up on the screen?  Thank you.

22  BY MS. COLLINS:

23  Q.   Just going up to that first entry so you can explain

24  what's on here, where it says buddy account, what does that

25  mean?

 1   A.   That's the person whose computer it is, so all that

 2   information contained here is the buddy list of

 3   TheDude7_2005@hotmail.com.

 4   Q.   And underneath there is a name field.  What does that

 5   name field represent?

 6   A.   That is the buddy of TheDude7_2005@hotmail.com.

 7   Q.   Going to page two, what is the last entry on page two?

 8   What does that show?

 9   A.   That the buddy listed here with the name column is

10   mustadrak@gawab.com.

11   Q.   And it's a buddy to TheDude7_2005@hotmail.com?

12   A.   Yes.

13   Q.   And the top account is associated with who?

14   A.   Younis Tsouli.

15   Q.   And the mustadrak@gawab?

16   A.   Ehsanul Sadequee.

17   Q.   Going on to page four, we have the fourth entry down,

18   what does this show?

19   A.   This is another e-mail address that's been associated

20   with Younis Tsouli, the JohnBlack05@hotmail.com.

21   Q.   And who is the buddy associated with that?

22   A.   On the name column, it's mustadrak@gawab.com.

23   Q.   Now, did you also locate any communications involving

24   Mr. Sadequee discussing the Ansar Forum with Mr. Tsouli?

25   A.   Yes, we did.

1   Q.  Take a look at Exhibit 122.

2      What type of document is this?

3   A.  It's a chat communication.

4   Q.  And who is it between?

5   A.  Between mustadrak@gawab.com and

6  JohnBlack05@hotmail.com.

7   Q.  What's the date?

8   A.  October 19, 2005.

9   Q.  And in this communication, is Ansar discussed?

10  A.  Yes, it is.

11       MS. COLLINS:  Your Honor, at this time we would

12  like to admit Exhibit 122.

13       THE COURT:  Any objection?

14       MR. MARTIN:  We don't object for authenticity.

15  I object on the hearsay ground.

16       If I could have a continuing objection to the

17  communications between Mr. Sadequee and Mr. Tsouli?

18       THE COURT:  You may.  It's admitted.

19       MS. COLLINS:  Thank you, Your Honor.

20  BY MS. COLLINS:

21   Q.  If we can show Exhibit 122?

22      Just looking at the very top two lines, what's the date

23  that's stated here?

24   A.  October 19, 2005.

25   Q.  And who is the top user?

1   A.   Ehsanul Sadequee.

2   Q.   And underneath, the second user?

3   A.   Younis Tsouli.

4   Q.   Okay.  If we can go down to the bottom of page one,

5   starting at 6:28:51, what does Mr. Sadequee say?

6   A.   So Ansar is back?

7   Q.   Does he continue?

8   A.   What's this sit-e?

9   Q.   Going on page two at the top down until 6:30:07, how

10  does Mr. Tsouli respond?

11  A.   Got no servers, Ansar.org, Ansarnet.org.

12  Q.   How does he describe it just below?

13  A.   Is just temporary.

14  Q.   And continuing on?

15  A.   LOOOL, vestige from glory times.

16  Q.   Now, Agent Scherck, were you present for some of the

17  interviews with Mr. Ahmed?

18  A.   Yes, I was.

19  Q.   How many of the interviews were you present for?

20  A.   Approximately three.

21  Q.   And have you -- since then have you refreshed your

22  recollection and reviewed the transcripts from those

23  interviews?

24  A.   Yes, I have.

25  Q.   Now, during those interviews, did Mr. Ahmed say that he

1    knew Mr. Sadequee was sending the videos that they had filmed

2    in Washington, D.C., to people overseas?

3    A.    Yes, he did.

4    Q.    And how did he describe those people?

5    A.    As the brothers overseas.

6    Q.    Can we put up Exhibit 508-A, page 27?

7              MS. COLLINS:   Bear will me, Your Honor,

8    I apologize.

9    BY MS. COLLINS:

10   Q.    Here at line 00:24:41, what does -- is that

11   Agent Sediqi?

12   A.    Yes, it is.

13   Q.    What does he say?

14   A.    Well, he just says it's gonna -- he said they would be

15   sent overseas for -- to help the brothers.

16   Q.    How does Mr. Ahmed respond just below?

17   A.    To the brothers, to prove that, you know, that we are

18   something.

19   Q.    Now, did you obtain communications in which Mr. Sadequee

20   discusses with people oversees releasing the videos in order

21   to obtain credibility?

22   A.    Yes.

23   Q.    And did those communications take place before or after

24   Mr. Sadequee left for Bangladesh?

25   A.    After he left for Bangladesh.

1   Q.   Did he take any items related to Washington, D.C., with

2   him to Bangladesh?

3   A.   Yes, he did.

4   Q.   And what was that item?

5   A.   There was a map of Washington, D.C., which he took with

6   him.

7   Q.   And is that -- can you just put up quickly Exhibit 91?

8        What is this a map of?

9   A.   That right there is a map of Fairfax County, Virginia.

10  Q.   And page two?

11  A.   That's a map of Washington, D.C.

12  Q.   Now, on these two maps combined, do these include the

13  areas that are shown in the Washington, D.C., videos that

14  were found in Mr. Tsouli's computer?

15  A.   Yes, they do.

16  Q.   Now, on your desk should be Exhibit 118.

17  A.   Yes.

18  Q.   And what is that document?

19  A.   It's a chat communication.

20  Q.   What's the date?

21  A.   September 21, 2005.

22  Q.   And who are the participants?

23  A.   The first participant is as-sandzakee@hotmail.com.

24  Q.   And who is that -- who is that?  Who is the user of that

25  account?

1   A.   The user of that account has been identified as

2   Mirsad Bektasevic.

3   Q.   Are there other participants?

4   A.   Yes.

5   Q.   Who are they?

6   A.   The next one is mustadrak@gawab.com which has been

7   identified as Ehsanul Sadequee.

8        And the next user is TheDude7_2005@hotmail.com, and

9   that's been identified as Younis Tsouli.

10  Q.   And in this communication, do they discuss the use of

11  the Washington, D.C., videos?

12  A.   Yes, they do.

13        MS. COLLINS:  Your Honor, at this time we would

14  like to admit Exhibit 119.

15        THE COURT:  Any objection?

16        MR. MARTIN:  We have an objection to this one.

17        This is what I generally call the Bektasevic side

18  venture of Mr. Sadequee that was occurring when Mr. Sadequee

19  was in Bangladesh.  Mr. Ahmed was in Georgia.

20        It is a notion that Mr. Sadequee had about using

21  these videos.  I think you cannot tie it to any conspiracy

22  that Mr. Ahmed had.  So I would object to its admission.

23        And all of these chats that do not -- none of these

24  chats involve Mr. Ahmed, and I don't think they are in

25  furtherance of any conspiracy that he was a party to.  So I

1  would object.

2      THE COURT:  Well, Mr. Martin, the evidence is that

3  Mr. Ahmed stated that, one, he went with Mr. Sadequee to make

4  these videos; two, that it was his idea to make the videos;

5  three, that it was made with a camera that he procured;

6  fourth, that they were found in Mr. -- and they did it by

7  traveling together with Mr. Sadequee to Washington, D.C.;

8  fifth, that they were together when the videotapes were made;

9  sixth, they were found in Mr. Sadequee's luggage; and

10  seventh, these are -- that when he was interviewed, he

11  understood that Mr. Sadequee was going to use them to

12  establish their credibility by delivering them to the

13  brothers.

14      And now we have a communication where the

15  understanding that was reached between Mr. Sadequee and your

16  client was being followed on by Mr. Sadequee by making an

17  effort to get them in the hands of the brothers, which is

18  what Mr. Ahmed understood was going to happen to the

19  videotapes.

20      So I overrule the objection.

21      MR. MARTIN:  Your Honor, just before you rule,

22  I just would say one thing about that.

23      That's true, but, you know, the next line that they

24  didn't add here is that:  I don't think it was the truth

25  because that -- because I wanted to prove to them that, oh,

1    you know, I am -- I can take photos.

2         That's what Mr. Ahmed said that the purpose was to

3    send those overseas, that we are serious people, we could

4    take photos.

5         I don't think that is sufficient to say that any

6    use they make of those down the road then becomes part of his

7    conspiracy.  He just wanted to prove his credibility or his

8    stature in the community.

9         I would just say that that would not also mean that

10   he agreed, though, they could use those photos for some

11   purpose well beyond any expectation that he would

12   have.  That's my objection.

13       THE COURT:  Well, isn't it true that a

14   co-conspirator is held accountable even for conduct in which

15   he is not aware that a co-conspirator engages?  Isn't that

16   the law, Mr. Martin?

17       MR. MARTIN:  That's true, but it has to be

18   reasonably foreseeable, it has to be within the context of

19   the conspiratorial agreement.

20       THE COURT:  And you think this is not reasonably

21   foreseeable?

22       MR. MARTIN:  Not when I see what they tried to do

23   with these videos as I understand how this goes forward, and

24   to tie him to some plot that Mr. Bektasevic had.

25       So that's my objection, Your Honor.

1    I understand --

2              THE COURT:  Your objection is overruled.

3              MS. COLLINS:  Thank you, Your Honor.

4    BY MS. COLLINS:

5    Q.   So moving in Exhibit 118, if we could show it on the

6    screen to start with the first page to establish the headers,

7    just at the top there.

8         What's the date?

9    A.   September 21, 2005.

10   Q.   And who is the first user that's shown?

11   A.   Younis Tsouli.

12   Q.   Okay.  Now, backing out of that and moving down, you

13   don't have to blow it up --

14             THE COURT:  Can I clarify one thing for

15   Mr. Martin?

16             Mr. Martin, just because this comes into evidence

17   doesn't mean that as I evaluate all the evidence, that -- I

18   have got to evaluate it in its totality to determine whether

19   or not the government has proved beyond a reasonable doubt

20   each and every element of the offense, which would include

21   the scope of the conspiracy and that for which he is held

22   responsible.

23             And I'm not making any judgment about that.  I am

24   simply trying to determine what evidence is permitted to be

25   admitted into evidence, and then I will have to determine

1  later weight.

2  　　　　　MR. MARTIN:  I fully appreciate that, Your Honor.

3  　　　　　THE COURT:  All right.  Go ahead.

4  　　　　　MS. COLLINS:  Thank you, Your Honor.

5  BY MS. COLLINS:

6  Q.  Going down to the third entry there, who is the user

7  that is listed?

8  A.  Mirsad Bektasevic.

9  Q.  Do you see mustadrak@gawab.com appear?

10  A.  Yes, we do.

11  Q.  Going to page 20, the line at 2:42:04, what does

12  Mr. Sadequee say?

13  A.  What about the Pharaoh vids?

14  Q.  What is Pharaoh?

15  A.  Pharaoh we determined is a code word for the

16  United States.

17  Q.  Going on to page 21, at the top of the page, you can

18  highlight the first third of the page.

19  　　　　Starting at 2:43:33, what does Mr. Tsouli say?

20  A.  Upload them, akhee.  Yeah, send them over.

21  Q.  And then continuing on to page 22, from 2:44:58 down

22  through 2:45:28, what does Mr. Sadequee say?

23  A.  Bro, listen, I know a shaykh, a friend of Shaykh

24  al-Maqdisee.  He's a shaykh and a businessman, he is on the

25  'Aqeedah and Manhaj.  I know him personally.  He's 100

1   percent thiqqah now.

2   Q.   And this conversation continues on the next page, page

3   23.  You can start at the top going down to approximately the

4   middle of the page?

5   A.   Right now he thinks we are just kids, me and another

6   bro, and just overexcited.  But if we can get this into the

7   news in this bayaan, I want to mention him as the head of the

8   Shar'eee Committee, because if we do that, he will know that

9   we are real, and in the game, and he will give us funding.

10  And he might have links too.

11  Q.   Moving on to page 28, at the very bottom of the page,

12  what does Mr. Sadequee say?

13  A.   Bro, Maximus, me and a few bros filmed some pornos in

14  the house where Pharaoh lives.

15  Q.   Who is Maximus?

16  A.   That has been identified as Mirsad Bektasevic.

17  Q.   Is that the same user as as-sandzakee@hotmail.com?

18  A.   Yes, it is.

19  Q.   He talks about the pornos in the house where Pharaoh

20  lives.  What is Pharaoh again?

21  A.   We determined that to be the United States.

22  Q.   Okay.  And continuing on to page 29 at the very top of

23  the page, what does Mr. Sadequee say?

24  A.   I am talking about releasing those with a bayaan saying,

25  Aqua in the Land of the Two Towers.

1    Q.    Now, during Mr. Ahmed's interview, did he identify to

2    you what Towers is?

3    A.    The World Trade Center in New York.

4    Q.    So the Land of the Two Towers would be?

5    A.    Land of the United States.

6    Q.    And Aqua, is that a term that you have seen during the

7    course of your investigation?

8    A.    Yes, we have.

9    Q.    And what is that?

10   A.    It's a term that has been used for Al-Qaeda.

11   Q.    Now, do they discuss -- on page 30, at the very bottom

12   of the page -- and this continues on to the next page, but

13   this is the beginning -- what does Mr. Tsouli say in

14   response?

15   A.    Akhee, if we send vid of phiraawn, we don't give any

16   name, just --

17   Q.    Continue on to the next page?

18   A.    -- Aqua, drink some water, fresh mineral water, no need

19   specify.

20   Q.    And on page 32, does Mr. Tsouli continue to explain what

21   he means at the bottom there, the bottom half of the page?

22   A.    Yes, he does.

23   Q.    What does he say?

24   A.    The vids if we release them, it be Aqua, no burjayn, not

25   firaawn, nothing, just Aqua, okay?

1  Q.   And continuing on the next page, line 3:03:14 down --

2  I'm sorry, actually can we go back to page 32?

3  I apologize.

4     At the very -- oh, no, on page 33.  My copy is a little

5  different.  There we go, at the top part of the page.

6     Does he continue on?

7  A.   Because, one, it will sound more credible; two, it will

8  be more easily understood by all.

9  Q.   Continuing on page 37, at the bottom of the page, what

10  does Mr. Bektasevic say?

11  A.   Guys, wait, wait.  I gonna have a small training, you

12  know, in Botswana.  I gonna train some guys.  I can record

13  that.

14  Q.   What is Mr. Bektasevic's nationality?

15  A.   Bosnian.

16  Q.   Did you determine approximately where he was?  At some

17  point, did he go to Bosnia?

18  A.   Yes, he did.  At the time of the communication, he was

19  in Sweden.

20  Q.   And then at a later point did he go to Bosnia?

21  A.   Yes, he did.

22  Q.   Now, on the next page, 38, down at the bottom third of

23  the page, what does Mr. Sadequee say he should do?

24  A.   I do the bayaan normally, and then we show these bros

25  training, with their faces covered, and them making kabooms,

1    and then show clips from the porns, et cetera.

2    Q.   Now, moving towards the end of this chat on page 48, the

3    bottom third of the page -- actually start a couple of lines

4    above that, please?  Thank you.

5         What does Mr. Sadequee say?

6    A.   Akhee, idea:  Can you get as-Sahaab to release this?

7    Q.   Do you know what as-Sahaab is?

8    A.   It's been identified as a media wing for Al-Qaeda.

9    Q.   Is it on the glossary sheet that I believe is Exhibit 3?

10   A.   Yes, it is.

11   Q.   And what does it have as defined as-Sahaab?

12   A.   As-Sahaab Media Foundation, an organization that

13   disseminates propaganda materials on behalf of Al-Qaeda.

14   Q.   Now, did you acquire any other communications in

15   which Mr. Sadequee discusses the purpose of releasing this

16   video?

17   A.   Yes, we did.

18   Q.   Can you take a look at Exhibit 123?

19        What is that document?

20   A.   It's a chat communication.

21   Q.   What's the date?

22   A.   October 19, 2005.

23   Q.   And who is it between?

24   A.   Mustadrak@gawab.com and sbualy@gmail.com.

25   Q.   And looking at -- referring you to the moniker list,

1    Exhibit 22, I think, who is sbualy@gmail.com?

2    A.   That has been identified as Azdee Omani.

3    Q.   And in this communication, does Mr. Sadequee talk about

4    the purpose of releasing the Washington, D.C., videos?

5    A.   Yes, he does.

6              MS. COLLINS:  We would like to admit Exhibit 123.

7              THE COURT:  Any objection?

8              MR. MARTIN:  Same objection as before regarding

9    hearsay, not authenticity.

10             THE COURT:  And for the same reasons I rule it's

11   admissible.

12             MS. COLLINS:  We can show Exhibit 123.

13   BY MS. COLLINS:

14   Q.   Just looking at the top of the page, what is the date?

15   A.   October 19, 2005.

16   Q.   And who is the user that's listed at the top there?

17   A.   Mustadrak@gawab.com is Ehsanul Sadequee.

18   Q.   And the user below?

19   A.   Sbualy@gmail.com, which has been identified as Azdee

20   Omani.

21   Q.   Turning to page 28, and if you could highlight -- yeah,

22   the whole middle of the page starting at 8:48:57 through

23   8:49:40, what does Mr. Azdee Omani start by saying?

24   A.   Did Bond tell you he was going to release your things

25   publicly, LOL, the vids?

1  Q.   And how does Mr. Sadequee respond?

2  A.   Akhee, we are, insha'Allah.  Man, I thought you didn't

3  know so I wasn't going to tell you, LOL, but we are soon.

4  Q.   Turn to page 29.  Does Mr. Sadequee continue on?

5  A.   Yes, he does.

6  Q.   What does he say?

7  A.   Akhee, it's going to make them piss.  Yeah, it will

8  awaken then.  Yeah, but the thing is we aren't going to show

9  those clips, just some random buildings from the area.  It

10 won't be bait, trust me, insha'Allah.

11 Q.   And page 30, starting at the bottom half of the page,

12 what does Mr. Sadequee say they want to do?

13 A.   Which line?

14 Q.   I'm sorry, starting at 8:52:06?

15 A.   But thing is we want to do it before 'Eed, so that is

16 like a glad tidings, LOL.

17 Q.   And the next page, what does Mr. Sadequee continue on?

18 A.   But, you know, a good thing about it is nothing,

19 insha'Allah, is going to happen there for at least another

20 good year.  So if they increase their security, they are only

21 tiring their resources, losing money, people getting bored of

22 high alerts, et cetera, and they become accustomed to it and

23 start joking about the alerts, right?

24 Q.   Could we go back a page or two to page 29?  Just

25 before Mr. Sadequee is describing the buildings that they are

1  going to show in the clips, what does Mr. -- what does Azdee

2  say?

3  A.   Where it says, They can catch on?

4  Q.   Yeah, where, They can catch on?

5  A.   They can catch on your time of that thing.  Remember the

6  Chinese guy?

7  Q.   What does the Chinese guy refer to?

8  A.   The Chinese guy was the subject who was arrested in

9  Washington D.C.  It was an explosives call.  I believe the

10 guy said he had a bomb with him.

11 Q.   And in some of the video clips that were retrieved,

12 were there clips of emergency vehicles and responding to the

13 incident at the Capitol involving the Chinese guy?

14 A.   Yes, there was.  There was a HAZMAT vehicle.

15 Q.   But were there also clips of different buildings from

16 around the Washington, D.C., area?

17 A.   Yes, there were.

18 Q.   Such as the World Bank?

19 A.   Yes.

20 Q.   And the Masonic Temple?

21 A.   Yes.

22          MS. COLLINS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Martin?

24          MR. MARTIN:  Yes, sir.

25                       --  --  --

CROSS-EXAMINATION

BY MR. MARTIN:

Q.   Agent Scherck, do you have the transcript with you of
the -- I will just approach you briefly.

When you were asking Mr. Ahmed about the photos, I will
refer you to the line -- page 27, line 23, of the -- of
Government's Exhibit 508-A, the question was whether or not
these were for preparation of any type of terrorist
activity.

Did not Mr. Ahmed say:  That's -- actually, I said it.
I don't think it was the truth -- he earlier said it might be
for some terrorist activity -- because I wanted to prove to
them that, oh, you know, I am -- I can take photos.

Is that what he said?

A.   That is what he said.

Q.   Indeed throughout the interviews, he said he didn't know
exactly to whom Mr. Sadequee had sent the photos overseas; is
that correct?

A.   Not specific people, no.

Q.   Just the brothers overseas are the words he used several
times; is that correct?

A.   Yes, it is.

Q.   And when you reviewed Mr. Tsouli's computer and all the
material that was found in England, you found connections
with Mr. Sadequee, but not with Mr. Ahmed; is that correct?

1    A.    That's correct.

2    Q.    Could you put up that exhibit -- excuse me, specifically

3    page 22?  The September 21, 2005, page 22.

4          First of all, this is September 21, 2005; that's

5    correct?  And at this time, Mr. Sadequee was in Bangladesh;

6    is that correct?

7    A.    Yes, sir.

8    Q.    So his communications on the internet is him somewhere

9    in Bangladesh on a computer; correct?

10   A.    Yes.

11   Q.    And Mr. Ahmed is in Atlanta or in the Atlanta, Georgia,

12   area?

13   A.    Yes, he is.

14   Q.    Going to school at Georgia Tech at that time; correct?

15   A.    Yes, he is.

16   Q.    And in many of these communications that you reviewed,

17   these chats with Mr. -- how do you pronounce it, Bektasevic?

18   A.    Bektasevic.

19   Q.    -- Bektasevic, Mr. Ahmed never appears in any of these

20   chats; is that correct?

21   A.    He does not appear as a participant.

22   Q.    As a participant, that's what I mean.

23   A.    Correct.

24   Q.    Though Mr. Sadequee is often in them; is that correct?

25   A.    He is in this one.

1   Q.   And just to summarize, generally they seem to be talking

2   about using some of the video clips that were taken in

3   Washington to create some sort of video that would be put on

4   the news to frighten people.  Is that correct?

5   A.   That's one interpretation.

6   Q.   All right.  What other interpretation do you have?

7   A.   There is a number of interpretations, but my

8   interpretation is that the videos are going to be used for,

9   one, as told us, to gain credibility, it was going to be used

10  for some of these jihadist websites as well.

11  Q.   It would be something that would give them stature,

12  Mr. Bektasevic and Mr. Sadequee, on the -- in these websites;

13  is that correct?

14  A.   Yes.

15  Q.   Let me, just so I can understand this a little bit

16  better, go up to September 21, 2005, at 2:45, and just --

17  excuse me, go to 2:44, just go up one more block.  Can you go

18  up one more thing where it says, Bro, listen?

19       That's Mr. Sadequee saying:  Bro, listen, I know a

20  shaykh, a friend of al-Maqdisee.  I can't pronounce the name.

21  A.   Al-Maqdisee.

22  Q.   And The Dude, who is The Dude who responds?

23  A.   That's Younis Tsouli.

24  Q.   Tsouli says, Dude, Max is funny.  Is he talking about

25  this shaykh, or do you know?

A.    Where?  Younis Tsouli said, Dude, Max is funny?

Q.    Right.  Or is he talking about Bektasevic, because one of his monikers is Maximus?

A.    Right.  I believe Mr. Younis Tsouli is saying Maximus is funny.

Q.    He is a shaykh and a businessman.  Somebody with money; correct?

A.    Correct.

Q.    And al-sandzakee, that's Maximus or, excuse me, Bektasevic?

A.    Yes.

Q.    Laugh out loud.

      Then Shifa says, He is on the 'aqeedah, faith, and manhaj, you say that's task.  Does that not really have, that word, manhaj, have more of a religious connotation to it, a religious task, or do you know?

A.    I don't know.

Q.    I know him personally.  He is 100 percent trustful now.

      Then Bektasevic says, Get to the point; correct?

      Can you go to the next section?

      Tsouli says, Thank God, like we are getting to the point; right?   Laugh out loud, Max.

      Then there is sort of a joke there, Feel the Max power; is that correct?  They would be talking about Bektasevic; right?

1    A.    That's correct.

2    Q.    Oh, yeah.

3          Can we go on to the next?

4          Right now -- this is Sadequee:  Right now, he thinks we

5    are just kids, me and another brother, and just

6    overexcited.

7          Who is he referring to when he says he, the shaykh?

8    A.    I believe he's referring to the shaykh.

9    Q.    The money man?

10   A.    The money man.

11   Q.    He thinks we are just kids, me and another bro.  Me and

12   another bro, you think that's Mr. Ahmed?

13   A.    Yes.

14   Q.    Just overexcited.

15         And then Tsouli says, responds, well, he's right;

16   correct?

17   A.    That's what he says.

18   Q.    And then Bektasevic says laugh out loud.

19         But then Sadequee says:  But if we can get this into the

20   news, in this announcement, I want to mention him as the head

21   of the Shar'ee -- that's a type of Islamic law -- Committee.

22   Because if we do that, he will know that we are real, and in

23   the game, and he will give us funding.  Give us money?

24   A.    Correct.

25   Q.    So what Sadequee is saying, if we can get this out and I

1  can attribute it to the shaykh, he's the money man, we will

2  be in the game and we will get some money; correct?

3  A.   Correct.

4  Q.   And he might have links too.  Not his real name, just

5  his nickname.

6       What's that about, do you know?

7  A.   Mustadrak@gawab is saying if they can get this going,

8  they might have links, he might know people.

9  Q.   We will go on to this next one.  Do you know who that

10  means, Shaykh 'Abdus-Salaam Ash-Shaamee?

11  A.   No, I do not.

12  Q.   Okay.  Just go down to September 21, and this is

13  Tsouli:  I mean, like he is going to get all over the news;

14  right?

15       And then Mr. Bektasevic:  Then we get this connection;

16  correct?

17  A.   That's what it says.

18  Q.   Just go onto the next one at the very top.  Bektasevic:

19  Laugh out loud, surprise.

20       And Tsouli:  He be like, shoot, they talking about

21  me.  That means the shaykh, right, the money man?

22            THE COURT:  I guess that was a question.

23            MR. MARTIN:  There was a question mark at the end

24  of it in my inflection supposedly, but I will say:  Is that

25  correct?

```
 1              THE COURT:  At least in your mind there was.

 2              MR. MARTIN:  At least in my mind.  A lot of things

 3    are in my mind that aren't coming out.

 4    A.   Can I have a couple seconds to read over this?

 5    Q.   Is that your interpretation?  It is or is not?  If you

 6    just don't know, we can leave it to the Court.

 7    A.   I don't know.

 8    Q.   Okay, fair enough.

 9         But at least there is one interpretation of this

10    interchange here:  They are talking about using these videos

11    to create some sort of video that will be impressive to the

12    shaykh, who is the money man, who will give them money and

13    credibility in the community.  Is that not correct?

14    A.   Correct.

15              MR. MARTIN:  That's all I have, Your Honor.

16              THE COURT:  Any redirect?

17              MS. COLLINS:  No, Your Honor.

18              THE COURT:  Agent, we appreciate your testimony.

19              Does anyone want him subject to recall?

20              MR. MARTIN:  I don't think we will call him.

21              MR. McBURNEY:  Not for the government.

22              THE COURT:  Again, we appreciate you being with

23    us.  You are being released.  You should not discuss the case

24    until you hear that it is over.  Thank you for being with us.

25              All right.  Call your next witness.
```

1      MR. McBURNEY:  Government calls Ms. Bhattacharyya.

2                    --   --   --

3                 APARNA BHATTACHARYYA

4    being first duly sworn by the Courtroom Deputy, testifies and

5                   says as follows:

6                    --   --   --

7                 DIRECT EXAMINATION

8    BY MR. McBURNEY:

9    Q.   Good morning.

10   A.   Good morning.

11   Q.   Could you please spell your last name for the Court

12   Reporter?

13   A.   Okay.  B-h-a-t-t-a-c-h-a-r-y-y-a.

14   Q.   Now do you say that?

15   A.   Bhattacharyya.

16   Q.   Good morning, Ms. Bhattacharyya.

17   A.   Good morning.

18   Q.   Where do you work?

19   A.   At Raksha.

20   Q.   Tell the Court what Raksha is?

21   A.   Raksha is a local nonprofit that serves the South Asian

22   community.  A lot of our workers focus on providing

23   counseling, supportive services to survivors of domestic

24   violence and sexual assault specifically for the South Asian

25   community.

1   Q.   Understood.  You may need to talk a little more slowly.

2   The Court Reporter kept up with you, but that was pretty

3   rapid-fire.

4        What is your position at Raksha?

5   A.   I'm the executive director.

6   Q.   Is Raksha -- you mentioned the Atlanta area.  Is there

7   Raksha elsewhere in the U.S., or the Raksha is here in the

8   Atlanta area?

9   A.   It's in the Atlanta area.

10  Q.   At some -- how long have you been with Raksha?

11  A.   I have been an employee for eleven years, and then a

12  volunteer for another three years before that.

13  Q.   How long have you been the executive director?

14  A.   Since 1998.

15  Q.   At some point, did you have an employee at Raksha by the

16  name of Ehsanul, Shifa nickname, Sadequee?

17  A.   Yes, I did.

18  Q.   Do you recall when it was that Mr. Sadequee worked at

19  Raksha?

20  A.   August 2004 to I believe August 2005.

21  Q.   About a year?

22  A.   About a year.

23  Q.   Did any other members of Mr. Sadequee's family work or

24  volunteer for Raksha?

25  A.   Yes.

Q.   Who else?

A.   His brother Amimul, his sister Sonali Sadequee, and his mother volunteered.

Q.   So Sonali, the sister, was employed at some point by Raksha?

A.   She had a fellowship to be an employee at Raksha.

Q.   Is she still there?

A.   No, she is not.

Q.   Amimul, the brother of Mr. Sadequee, was an employee or a volunteer?

A.   He helped temporarily when Shifa was visiting, yeah, on a vacation or something.  So while he was gone, Shifa helped out.

Q.   Shifa being Ehsanul Sadequee?

A.   Yes.

Q.   And then all these three individuals, Sonali, Amimul and Shifa -- you used the name, you did -- their mother volunteered at times for Raksha?

A.   Uh-huh.  Yes.

Q.   What was Ehsanul Sadequee's position at Raksha?

A.   He helped me with administrative tasks, so he was just there to kind of assist me.

Q.   But he was paid?

A.   He was paid.

Q.   Did he have to keep time sheets so you knew the hours he

1    worked each week?

2    A.   Yes, so I could record his payroll.

3    Q.   If he needed to take time off, he needed to put in for

4    leave, let you know?

5    A.   Yes.

6    Q.   Did you have any problems with Mr. Sadequee as an

7    employee during that year or so that he worked there?

8    A.   No, I did not.

9    Q.   Did Raksha in the August '04 through August '05 window

10   when Ehsanul Sadequee was working there, did it have

11   computers in the office space?

12   A.   Yes, we did.

13   Q.   Were they internet-connected?

14   A.   Yes, they were.

15   Q.   High-speed internet connection, as in cable or DSL, or

16   dial-up?

17   A.   DSL.

18   Q.   Did Mr. Sadequee have access to the computers at

19   Raksha?

20   A.   He had access to probably two computers at Raksha.

21   Q.   How many computers back then, August '04 to August '05,

22   were there?

23   A.   I believe there were about eight computers.

24   Q.   You are familiar with the two you think that he had

25   access to, why?

A.   Because those were in the office that he worked in that
we both shared space in.

Q.   So you and he shared a common cubical or an office with
a door?

A.   An office with a door.

Q.   And there are two computers in there?

A.   Yes.

Q.   He was allowed to use either one of them?

A.   He was, but he predominantly used one of them.

Q.   Did you monitor his computer use every time he was on
it?

A.   No, not really.

Q.   That wasn't your job as executive director?

A.   No.

Q.   Were there times when Ehsanul Sadequee was using the
computer and you weren't even in what you are describing as
your office?

A.   Yes, there were times.

Q.   Did Ehsanul Sadequee have access to Raksha after hours?

A.   Not that I know of, unless he was there with his sister.

Q.   His sister Sonali, the one with the fellowship, had an
ability to get into Raksha after hours?

A.   Yes.

Q.   You have no idea if she ever would have given
Ehsanul Sadequee the key or card key or whatever it was that

1   would get her into the building?

2   A.    I have no idea.

3   Q.    Okay.

4              MR. McBURNEY:  One second?

5              Thank you.

6              MR. MARTIN:  No questions.

7              THE COURT:  All right.  I'm just assuming that

8   nobody wants her subject to recall?

9              MR. MARTIN:  You are right.

10             MR. McBURNEY:  Correct.

11             THE COURT:  Okay.  We appreciate very much you

12  being with us.  You should not discuss your testimony until

13  you hear the case is over.

14             THE WITNESS:  All right.  Thank you.

15             THE COURT:  Call your next witness, please.

16             MR. McBURNEY:  Government calls George McGee.

17                        --  --  --

18                      GEORGE McGEE

19  being first duly sworn by the Courtroom Deputy, testifies and

20                    says as follows:

21                        --  --  --

22                    DIRECT EXAMINATION

23  BY MR. McBURNEY:

24  Q.    Good morning, sir.

25  A.    Good morning.

1   Q.   Would you please state your name, spelling your last

2   name for the record?

3   A.   George Douglas McGee, M-c-G-e-e.

4   Q.   Where do you work?

5   A.   I work for the FBI in Atlanta.

6   Q.   What's your position with the FBI in Atlanta?

7   A.   I'm a computer forensic examiner with the Computer

8   Analysis Response Team.

9   Q.   What does that mean you do?

10  A.   That means that I identify, preserve, examine and

11  present digital evidence in accordance with criminal

12  procedure.

13  Q.   In connection with the FBI's investigation into

14  Syed Haris Ahmed and Ehsanul Islam Sadequee, did you perform

15  any analyses on hard drives?

16  A.   I did.

17  Q.   Hard drives from virtually all over the world?

18  A.   Yes, sir.

19  Q.   I would like you to focus on -- we are going to focus on

20  hard drives from here in the United States.

21       Did you perform any analyses on a hard drive or digital

22  media, disks, hard drives, whatever, that were imaged, copied

23  in a location known as Nowata Drive?

24  A.   I did.

25  Q.   Did you -- were you able to determine from analyzing

that which was copied at Nowata Drive what type of internet

connection, if any, that computer or those computers had?

A.   When you speak of internet connection, you are talking

about type of connectivity to the internet as far as modem or

DSL or something along those lines?

Q.   Yes.  I'm going to struggle with the terms, but that's

exactly what I mean.

A.   To the best of our knowledge, it appeared there was only

dial-up or old-fashioned modem connectivity to the internet

at that location.

Q.   Does that mean it would be slower or faster than DSL or

cable?

A.   That means it would be significantly slower.

Q.   Does that make it easier or more difficult to download

or upload or transfer a large file?

A.   It makes it extremely more difficult.

Q.   In your analysis of the digital media taken from the

Nowata Drive location, copied there, did you determine if

the -- someone who had used those computers had had e-mail

contact with any e-mail addresses provided to you by case

agents?

A.   I would have to refer to my notes, but --

Q.   Does that make sense?

A.   -- yes, there were a few e-mail addresses that were

present on Nowata.

Q.   When you say refer to your notes, you faxed to me
yesterday a two-page document that I provided to
Mr. Martin.  We are talking about the same thing, your
notes?

A.   Yes, sir.

Q.   I just want to make sure that you don't have something
that Mr. Martin doesn't have?

A.   No, sir.

Q.   Okay.  I'm going to ask a question hopefully more
coherently this time.  Were you given a list of e-mail
addresses by case agents in this case and asked to see if
those e-mail addresses appeared in some way, shape or form on
the Nowata hard drives?

A.   Yes, sir.

Q.   You should have in front of you over to the side two
exhibits that are already in evidence.  One is Exhibit 3 and
one is 22?

A.   I have those.

Q.   One of them is a list of monikers.  That's Exhibit 3 or
22?

A.   That is Exhibit 22.

Q.   Exhibit 22.

     Number two on Government's Exhibit 22, what is that
moniker?

A.   That moniker is abeumar@thadiq.com.

Q.   Did you find evidence of connectivity, someone using the
Nowata computer had at some point been in contact with
someone using that moniker?

A.   Yes, sir.

Q.   Let's go to six and nine, those are related ones.  Did
you find any evidence that anyone using the Nowata computer
had been in contact with this Abadujannah e-mail address?

A.   I did.  But as discussed with you yesterday, number
nine, the evidence that I found was spelled with one N
instead of two Ns.

Q.   So you found, so we're clear, abudujannah85@hotmail with
only one N on the Nowata computer?

A.   That is correct.

Q.   So either we have a typo in Government's Exhibit 22, or
there is another guy floating around out there with a very
similar moniker, one fewer Ns?

A.   Yes, sir.

Q.   All right.  Number ten on Government's Exhibit 22,
Aht48, et cetera, did you find evidence that a user of the
Nowata computer had been in contact with the user of that
moniker?

A.   Yes, sir.

Q.   Number thirteen, al-Muwahid, hyphen, did you find any
evidence the user of the Nowata hard drive had been in
contact with the user of the al-Muwahid, hyphen, moniker?

1   A.   Yes, sir.

2   Q.   Finally if you go to No. 35, second page of Exhibit 22,

3   Sbualy, S-b-u-a-l-y, same question:  Any evidence of

4   connectivity between the Nowata Drive computer and and

5   Sbualy?

6   A.   Yes, sir.

7   Q.   In your examination of the Nowata materials, did you

8   find any evidence that someone using the Nowata computer had

9   accessed the Tibyan Publications website?

10  A.   Yes, sir.

11  Q.   How about Clear Guidance?

12  A.   Yes, sir, but there was only one reference found in the

13  ENS logs on the computer.

14  Q.   Explain what that means?

15  A.   This particular computer had firewall software installed

16  on it which would protect it from other, you know, nefarious

17  connections coming in from the internet.  That firewall

18  logged the domain name.

19       When you connect to Google, for instance, it would show

20  connectivity to Google.  Every time that computer made a

21  connection to the internet, it had to resolve that domain

22  name.

23  Q.   Make sure it was safe?

24  A.   Yeah, that's what the firewall was doing.

25  Q.   In the eyes of the user, this is an acceptable or safe

1  site?

2  A.   Yes, sir.

3  Q.   Was Clear Guidance one that was stopped by the firewall

4  and let through?

5  A.   No, sir.  It just showed up as being a domain name

6  resolved and let through and connected to.

7  Q.   Okay.  Was there any evidence that a user of the Nowata

8  computer had accessed any websites that contained the word or

9  phrase Ansar in it?

10  A.   Yes, there were two sites that had A-n-s-a-r in the

11  domain name.

12  Q.   What are those two sites?

13  A.   Www.al-Ansar.biz and www.ansarnet.ws.

14  Q.   And .biz is b-i-z?

15  A.   Yes, sir.

16  Q.   Were you given a list of file names, video file names,

17  .avi file names, by the case agents in this case?

18  A.   I was.

19  Q.   Asked to look for those on any number of the hard drives

20  from again all around the world?

21  A.   Yes, sir.

22  Q.   Did you find any evidence of those file names, the video

23  file, .avi, on the Nowata hard drives?

24  A.   No, I did not.

25  Q.   Were you also given the names of two -- what's a .rar,

1    dot r-a-r?

2    A.    That is a compressed archive.  Generally when you are

3    sending large files such as video files over the internet,

4    most users tend to compress those files so that they are

5    smaller and allow for a shorter time to be sent over the

6    internet.

7    Q.    Is that like a zip file?

8    A.    Very much like a zip file.

9    Q.    Were you given two names, Jimmy's 13th birthday and

10   volleyball contest.rar --

11   A.    Yes, sir.

12   Q.    -- to search for on these various computers?

13   A.    Yes.

14   Q.    Any evidence that either of those was on the Nowata hard

15   drive?

16   A.    No, sir.

17   Q.    At some point during the investigation, were you tasked

18   with examining the digital evidence, computers, et cetera,

19   that were copied from the Brynbrooke address in this case?

20   A.    I'm sorry, could you repeat the question?

21   Q.    Did you ever examine computers or hard drives,

22   et cetera, that had been seized from an address known as

23   Brynbrooke?

24   A.    Yes.

25   Q.    Can you share with the Court, if you remember, what that

1  corpus of evidence consisted of?  Was it ten computers, was

2  it one computer?

3  A.    I seem to recall five computers.  I may not be correct

4  about that number, but I believe it was five computers at

5  that site.

6  Q.    It was more than one, whatever the number is?

7  A.    Yes.

8  Q.    Same sets of questions.  We will start with the

9  monikers.

10      If you look at moniker three from Government's

11  Exhibit 22, Aboo Khubaybal al-Muwahhid, did you find any

12  evidence that user of one of these Brynbrooke computers had

13  been in contact with the user of that moniker?

14  A.    What I found on the Brynbrooke computer was there

15  appeared to be evidence of a user actually logging in to some

16  of these sites using that moniker.

17  Q.    So someone had been sitting at one of these computers

18  and identified him or herself as Aboo Khubayb al-Muwahhid?

19  A.    Yes, sir.

20  Q.    And we have talked about this one already in context of

21  Nowata, No. 35 from Government's Exhibit 22, the Sbualy, was

22  there any evidence that the user -- a user of a Brynbrooke

23  computer had been in contact with Sbualy?

24  A.    Yes, sir.

25  Q.    Not that Sbualy had logged on, but the typical --

1    A.    Yes, sir.

2    Q.    Someone had communicated with Sbualy?

3    A.    Okay.

4    Q.    The website questions.  Tibyan Publications, any

5    evidence that someone using a Brynbrooke computer had been to

6    Tibyan?

7    A.    Yes, sir.  There were -- the site was actually

8    bookmarked in Mozilla Firefox, which is an equivalent web

9    browser to Internet Explorer.  And that bookmark was found in

10   the bookmarks for the user Haris that was found on that

11   computer.

12   Q.    Let's talk a minute about users.  The main computer that

13   you analyzed from Brynbrooke, did it have Windows XP on it?

14   A.    Yes, it did.

15   Q.    Does that enable individuals to set up their own

16   accounts?

17   A.    Yes, sir.

18   Q.    So that all the files stored under that account could be

19   traced back to the file directory to Doug or Robert or

20   Haris?

21   A.    Yes, sir.

22   Q.    So the bookmark for Tibyan Publications was found within

23   the Haris set of files?

24   A.    Yes, sir.

25   Q.    Okay.  Was there also evidence that someone using that

1  computer had actually gone to Tibyan beside bookmarking?

2  A.   Yes, sir.

3  Q.   Clear Guidance, was there any evidence that someone

4  using the computer we are talking about right now where you

5  saw Tibyan, did anyone use that computer to access Clear

6  Guidance?

7  A.   Yes, sir.  There were recovered deleted files that were

8  found in the temporary internet folder again for user Haris

9  that were basically cached versions or stored versions of the

10  web pages at that site.

11  Q.   Cached, c-a-c-h-e-d?

12  A.   Yes, sir.

13  Q.   Okay.  Did you find evidence of accessing the Clear

14  Guidance website on more than one computer that was taken

15  from the Brynbrooke location?

16  A.   Yes, sir.

17  Q.   The videos, you were given 62 .avi file names to look

18  for; is that right?

19  A.   Yes, sir.

20  Q.   Did you find all 62 on the Brynbrooke hard drive?

21  A.   I did.

22  Q.   Were they in the -- what do they call it, the trash

23  can?  Had they been deleted, but because you have the powers,

24  you could find it somewhere on the computer?

25  A.   No, sir.

1    Q.   Where were they found?

2    A.   If I can refer back to my notes, sir?

3         Those videos were found in the user -- My Documents, My

4    Pictures, directory for user Riaz.

5    Q.   Can you spell Riaz?

6    A.   R-i-a-z.

7    Q.   Okay.

8    A.   In that My Pictures directory were two subdirectories.

9    The first subdirectory was named 2005_04_10, and the second

10   directory was named 2005_04_11.

11   Q.   Does that mean that all 62 were saved there twice, or

12   they were spread across those two locations?

13   A.   They were spread across those two locations.

14   Q.   There are 62 unique files?

15   A.   Yes, sir.

16   Q.   In the Riaz user account on that computer?

17   A.   Yes, sir.

18   Q.   Did you find any evidence that the files at one point

19   had been stored under the Haris user directory?

20   A.   There were indications on the drive that at one point

21   those files, or at least files with those file names were

22   stored under the Haris user directory, yes.

23   Q.   What was the name of the subdirectory in which they were

24   stored on that Haris user account?

25   A.   They were stored in -- according to the evidence I found

on the computer, they were stored in My Documents, My Videos

in the tourist directory, and again in a directory with that

same 2005_04_11.

Q.   Tourist was the word you said?

A.   Yes, sir.

Q.   Were you able to determine the creation date for these

62 files?

A.   Yes, I was.

Q.   What does creation date mean?

A.   The creation date -- the creation date can be created by

a computer when a file is first moved to that computer or if

in fact it's actually created on that computer itself.

Q.   A video file like we are discussing, these 62 .avi

files, are they created on the computer like you would create

a word processing document?

A.   They could be, but in this case the embedded data inside

those files indicated they came from some sort of Canon

digital camera.

Q.   And were at some point transferred to the computer?

A.   Based upon that file information, it appeared they came

from a camera and were downloaded onto that computer, yes.

Q.   So would the creation date be the date the videos

were made in the camera or the date they were put on the

computer?

A.   In this case, the date that they were put on the

1    computer.

2    Q.   What was the creation date for all 62 files?

3    A.   The creation date was April 22, 2005.

4    Q.   Were you able to ascertain an access date for the 62

5    video files?

6    A.   Yes, sir, I was.

7    Q.   Tell the Court what an access date means in context of

8    your line of work?

9    A.   In the context of computer forensics, access dates

10   basically indicate that some activity or some attempt to open

11   that file occurred on that date.

12   Q.   That could range from clicking on and viewing it like we

13   have done in court?

14   A.   Yes, sir.

15   Q.   A virus protection software could touch it to make sure

16   it's not corrupt?

17   A.   Yes, sir.

18   Q.   That could create an access date?

19   A.   Yes, sir.

20   Q.   If a virus program had scanned all the files, would they

21   all have then the same access date?

22   A.   Yes, sir.

23   Q.   It might differ by a few seconds, but the date would be

24   the same?

25   A.   That is correct.

1    Q.   What did your investigation reveal as to the access

2    dates?   And I'm not asking what was each one for each of the

3    62, but describe what you found?

4    A.   Sure.  The access dates vary for all 62 of those video

5    files, and the dates indicated were April 22, 2005,

6    July 27th, 2005, August 21st, 2005, and September 3rd, 2005.

7    Q.   Defendant -- there has been evidence presented

8    already that Defendant Ahmed returned from a trip to

9    Pakistan on August 19th, 2005.  Is there any evidence based

10   on what you just shared that the files were -- some of the

11   files were accessed after Defendant Ahmed returned from

12   Pakistan?

13   A.   Yes, sir.

14   Q.   Were you able to determine the nature of any of this

15   access, by which I mean Windows Media Player could tell you

16   some of these videos were actually played, or Quick Time

17   could tell you some of these videos had been viewed at some

18   point on the Brynbrooke computer?

19   A.   Yes.  But unfortunately, Windows Media Player nor Quick

20   Time really gave me an accurate date upon which those files

21   were accessed.

22   Q.   So let's distill what you can say.  Not when they were

23   viewed, but they were viewed --

24   A.   Yes, sir.

25   Q.   -- by one or both of those viewing programs?

1    A.   Yes, sir.

2    Q.   Did you uncover any evidence that someone had made a

3    copy of the videos onto some type of removable media?

4    A.   Yes, sir.  There were two references that those files

5    and file names with those file names were placed onto some

6    type of removable media, whether that be a CD or DVD.

7    Q.   A disk of some sort?

8    A.   Yes, sir.

9    Q.   Finally, did you have the opportunity or were you

10   ordered to examine copies of hard drives that were acquired

11   from a location known as Raksha?

12   A.   Yes, sir.

13   Q.   Were you part of the team that went in and actually

14   copied the hard drives?

15   A.   Yes, sir.

16   Q.   Did you perform the same type of analysis on the Raksha

17   hard drives?

18   A.   We did.

19   Q.   Start out with the e-mail monikers.

20        Number two from Government's Exhibit 22, Abu Umar.  Did

21   you find any evidence that someone using a Raksha computer

22   had been in contact with Abu Umar?

23   A.   That moniker does appear.  However I'm not able to

24   determine context or how that moniker appears.  It does

25   appear in drive free space on that drive.

```
 1    Q.   Somehow that computer did something with Abu Umar?

 2    A.   Yes, sir.

 3    Q.   Just don't know what it is.

 4         How about Aboo Khubayb, number three from Government's

 5    22?

 6    A.   Yes, sir, the same scenario.  I was not able to

 7    determine context.

 8    Q.   Abudujannah, number six and number nine from

 9    Government's Exhibit 22?

10    A.   Yes, sir.

11    Q.   Same situation?

12    A.   Yes, sir.

13    Q.   You can just say yes, and if you have more context

14    provide it.  Otherwise yes will mean it was on there, I can't

15    tell you how or why.

16    A.   Yes, sir.

17    Q.   Aht48, number ten from Government's Exhibit 22?

18    A.   Again that was found, yes.

19    Q.   Al-Muwahhid, number thirteen from Government's Exhibit

20    22?

21    A.   Yes, sir.

22    Q.   A new one for us, No. 32, riyad_us_saliheen?  No. 32 of

23    Government's Exhibit 22, any evidence of that moniker on the

24    computer?

25    A.   Yes, sir.
```

1  Q.   And finally Sbualy, No. 35 from Government's Exhibit

2  22?

3  A.   Yes, sir, that was found also.

4  Q.   All seven of these were on the Raksha hard drive in some

5  way, shape or form?

6  A.   Yes, sir.

7  Q.   Websites.   Tibyan Publications, any evidence that a user

8  of the Raksha computer had accessed the Tibyan Publications

9  website?

10  A.   Yes, sir.

11  Q.   Let's talk volume here.   You were appropriately vague

12  about these e-mail connections because it sounds like they

13  were in unallocated space on the hard drive.

14       What were you able to determine about the frequency or

15  the volume of hits for Tibyan Publications?

16  A.   Tibyanpubs.com actually appeared on the Raksha evidence

17  over 2,300 times.

18  Q.   Two thousand three hundred?

19  A.   Yes, sir.

20  Q.   Does that include evidence of visits to the site?

21  A.   Yes, sir.

22  Q.   Clear Guidance, any evidence that someone using the

23  Raksha computer had gone to Clear Guidance?

24  A.   Yes, sir.

25  Q.   We talked about these videos and all 62 being on the

1    Brynbrooke hard drive.  I neglected to ask if you found on

2    the Brynbrooke hard drive those two .rar files,

3    volleyball contest and Jimmy's 13th birthday?  Any evidence

4    of those on Brynbrooke?

5    A.   No, I did not.

6    Q.   How about the Raksha computer?  Any evidence that at

7    some point on the Raksha computer there had been the file

8    volleyball contest.rar and Jimmy's 13th birthday.rar?

9    A.   Yes, sir, both of those file names appear.

10   Q.   Did you find somewhere on the hard drive allocated or

11   unallocated space any of the .avi file names from that

12   universe of 62?

13   A.   Yes, sir.  And as a matter of fact, the Jimmy's 13th

14   birthday.rar and the volleyball contest.rar were determined

15   on another piece of evidence to contain two particular .avi

16   files.  Those .avi files in question were MVI_0095 and

17   MVI_0144.avi, and those file names were also found on the

18   Raksha evidence.

19   Q.   Let me try to digest that.  If I double-clicked, opened

20   up volleyball contest, it would have in it if it expanded its

21   contents either 0095 or 0144?

22   A.   Yes, sir.

23   Q.   One of those was smushed in there?

24   A.   0095 was compressed inside volleyball contest.rar.

25   Q.   And similarly with Jimmy's 13th birthday, it had the

1   other one?

2   A.   Yes, sir.

3   Q.   What you are saying is on the Raksha computer, you found

4   evidence of the two rather distinct file names,

5   volleyball contest and Jimmy's 13th birthday, as well as the

6   more generic MVI underscore, et cetera?

7   A.   Yes, sir.

8   Q.   Did you find any forensic evidence on the Raksha

9   computer that this CD or DVD, the disk that had been made at

10  Brynbrooke, had been inserted or used at Raksha?

11  A.   To the best of my ability, it appears that in page file

12  again on the Raksha evidence, there was references to the

13  D drive on the Raksha computer, which is the CD-ROM drive,

14  and the tourist directory, and again the 2005_04_11 directory

15  which also contained an MVI file.

16  Q.   The tourist directory is the one that was under the

17  Haris user name on the Brynbrooke hard drive?

18  A.   Yes, sir, that same file path information was indicated

19  on the Brynbrooke evidence again on the CD-ROM drive.

20  Q.   Okay.

21          MR. McBURNEY:  One second.

22          Thank you, Mr. McGee.

23          THE COURT:  Mr. Martin?

24          MR. MARTIN:  Just a second, Judge.

25                      --  --  --

```
1                      CROSS-EXAMINATION
2   BY MR. MARTIN:
3   Q.   Are you a special agent?
4   A.   No, sir.
5   Q.   Just a regular agent?
6   A.   Professional support, sir.
7   Q.   This document that we were provided this morning, I'm
8   just trying to understand one line here.
9        In the Brynbrooke computers there was a computer that
10  had different -- there was a Haris part and a Riaz part to
11  the same computer?
12  A.   Yes, sir.
13  Q.   And you found some of these videos in the Riaz part?
14  A.   I found all of the videos in there.
15  Q.   All of them?
16  A.   Yes, sir.
17  Q.   And you found them also in the Haris part?
18  A.   I did not find the actual videos in the Haris
19  part.  I found references to those file names in that path in
20  the Haris part.
21  Q.   So as I read this, though you said they are no longer
22  present, does that mean that they had been deleted from the
23  Haris part?
24  A.   That's what it appears, yes, sir.
25  Q.   So in the Haris account on the computer, Haris
```

1    account -- is that good word to use?

2    A.   Yes, that's fine.

3    Q.   Haris account on the computer, they had been deleted?

4    A.   That's what it appears, yes, sir.

5    Q.   But somehow they were also in the Riaz account, and

6    that's where you found them?

7    A.   Yes, sir.

8    Q.   I understand.

9         And this is a family home with lots of different people

10   with access to this one computer?

11   A.   Yes, sir.

12            MR. MARTIN:  All right.  That's all.  Thank you.

13            THE COURT:  I have a question.  You were

14   talking about the Jimmy's 13th birthday file and the

15   volleyball file?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Then you said that there was I think

18   the term you used embeded in the volleyball file a file that

19   was designated as an MVI_009 file?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Okay.  Is the MVI_009 file different

22   than Jimmy's 13th birthday content?  Is the content

23   different?

24            THE WITNESS:  Yes, sir.  Those two .rar files, the

25   volleyball contest and the Jimmy's 13th birthday, they are

two separate compressed -- think of them as suitcases.  So if you were going to travel somewhere, in this case send the file, you would pack up these video files inside those containers, inside those suitcases.

So Jimmy's 13th birthday and volleyball contest.rar are more or less containers for those video files contained therein.  And they are two separate containers, with each one of those containers containing its own unique video file inside that.

THE COURT:  All right.  Well in the Jimmy's 13th birthday suitcase, was there anything -- any content other than the content that was found on the MVI_0144 content?

THE WITNESS:  I did not look for any additional content.  What we did was we basically searched specifically for those videos on some of the -- this evidence actually originated on the Khan -- these two container files originated on the Khan evidence.

THE COURT:  You mean the two suitcases?

THE WITNESS:  Yes, sir, the two suitcases originated on the Khan evidence.  And we found those video files contained therein by performing what's known as a known file folder analysis.

So when we found the 62 video files on the Brynbrooke evidence, we basically created a database of fingerprints for all 62 of those video files.  We were then

1  able to automate the process of looking through those files

2  where evidence was found.

3       Using that database, we were able to find those two

4  video files on the Khan evidence.  And again we were

5  specifically looking for those video files.  I did not have

6  to determine whether or not those containers contained

7  additional files.  They did not contain additional video

8  files from Brynbrooke.

9       THE COURT:  Okay.  So I'm still not sure I'm quite

10 clear, but when you found the volleyball suitcase and found

11 in it this MVI_0095, you are saying that you knew that you

12 found that there, whatever the content is of MVI_0095, but

13 you are not expressing any opinion on whether there is any

14 other content in the volleyball suitcase?

15      THE WITNESS:  No, sir.  But I could determine that

16 if I were to go back and look at the Khan evidence.

17      THE COURT:  What was the MVI_0095?  What was that

18 content?

19      THE WITNESS:  It was one of the casing videos found

20 on Brynbrooke.

21      THE COURT:  And that would be the same thing for

22 the MVI_0144 content that was found in the Jimmy's 13th

23 birthday suitcase?

24      THE WITNESS:  Yes, sir.  They are exact file

25 matches for the video files found on Brynbrooke.

THE COURT:  Thank you.  That's all I have.

Anything else?

MR. MARTIN:  No, sir.

MR. McBURNEY:  No, sir.

THE COURT:  Can we release this witness?

MR. MARTIN:  Yes.

MR. McBURNEY:  Yes.

THE COURT:  We appreciate your testimony.  Please don't discuss it with anybody until you hear the case is over.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you for being with us.

Tell you what, let's take a break.  It's almost eleven.  Let's break until 11:05.  We will be in recess until then.

(A recess is taken at 10:52 a.m.)

-- -- --

(In open court at 11:09 a.m.:)

THE COURT:  Please call your next witness.

MR. McBURNEY:  Government calls Amimul Sadequee.

-- -- --

AMIMUL SADEQUEE

being first duly affirmed by the Courtroom Deputy, testifies and says as follows:

-- -- --

DIRECT EXAMINATION

BY MR. McBURNEY:

Q.   Good morning, sir.

A.   Good morning.

Q.   Could you please state your name, spelling your first and last name?

A.   Amimul Sadequee, A-m-i-m-u-l S-a-d-e-q-u-e-e.

Q.   Good use of the microphone, but you are going to need to speak slowly when you respond to my questions; okay?  Thank you.

     Are you related to Ehsanul Sadequee?

A.   Yes, I am.

Q.   How so?

A.   I'm his elder brother.

Q.   Have you testified before about this matter, the case involving Defendant Ahmed and your brother?

A.   Yes, I have.

Q.   In front of a grand jury?

A.   Yes.

Q.   Were you granted immunity prior to that testimony?

A.   Yes.

Q.   Do you know Syed Haris Ahmed?

A.   Yes.

Q.   You have met him before?

A.   Yes.

```
1    Q.   Not a friend of yours?

2    A.   No.

3    Q.   Not an enemy of yours, but he was a friend of your

4    brother's?

5    A.   Yes.

6    Q.   Do you see him in court today?

7    A.   Yes.

8    Q.   Can you describe briefly what he's wearing?

9    A.   He has the white skull cap and the black jacket.

10   Q.   Thank you.

11        Do you know how Defendant Ahmed and your brother met?

12   A.   I have heard they met in the mosque.

13   Q.   A mosque in Atlanta?

14   A.   Yes.

15   Q.   A mosque you have been to?

16   A.   Yes.

17   Q.   What mosque is that?

18   A.   Al-Farooq.

19   Q.   Also known as the 14th Street mosque?

20   A.   Yes.

21   Q.   Do you know if your brother and Defendant Ahmed worked

22   together at one time?

23   A.   Yes.

24   Q.   Where was that?

25   A.   At a Marietta perfume shop.
```

1   Q.   Do you know the name of the gentleman who owned or ran

2   that shop?

3   A.   No, I don't.

4   Q.   Did you ever work there?

5   A.   No.

6   Q.   Do you know if Defendant Ahmed and your brother ever

7   traveled together anywhere?

8   A.   Yes.

9   Q.   Where?

10   A.   Canada and D.C.

11   Q.   Washington, D.C.?

12   A.   Yes.

13   Q.   Did you go on either of those two trips?

14   A.   No.

15   Q.   Did you get either your brother or Defendant Ahmed to

16   the bus or from the bus on the trip to Canada?

17   A.   Yes.  I dropped off my brother to the Greyhound

18   station.

19   Q.   For his trip up to Toronto?

20   A.   Toronto.

21   Q.   At some point your brother traveled to Bangladesh,

22   Dhaka, Bangladesh?

23   A.   Yes.

24   Q.   Do you have family over there still?

25   A.   Yes.

1    Q.   Who lives there still?

2    A.   My brother -- my father.

3    Q.   Your mother is here in the United States?

4    A.   Yes.

5    Q.   What month and year did your brother travel to

6    Bangladesh, if you recall?

7    A.   2005, I believe.  March or April.

8    Q.   Summertime?

9    A.   Summertime, yes.

10   Q.   Summer '05?

11   A.   Yes.

12   Q.   After your brother went to Bangladesh, did you see much

13   of Defendant Ahmed?

14   A.   Yeah, a couple times.

15   Q.   Okay.  Did you see him more frequently or less

16   frequently after your brother went to Bangladesh?

17   A.   Less.

18   Q.   Before your brother went to Bangladesh, had

19   Defendant Ahmed been to your house because he was visiting

20   with your brother?

21   A.   Yes.

22   Q.   In March of 2006, did Defendant Ahmed come to your home

23   where you lived?

24   A.   Yes.

25   Q.   At that time, the home was on Nowata Drive?

1  A.   Yes.

2  Q.   Who else lived there besides you?

3  A.   My mother, my wife, my sister.

4  Q.   Your sister Sonali?

5  A.   Yes.

6  Q.   That's where your brother had been living prior to going

7  to Bangladesh?

8  A.   Yes.

9  Q.   Your brother leaves in the summer of '05, and in March

10  of '06 Defendant Ahmed comes to your house.

11       Had he been to your house at any time in between summer

12  of '05 when your brother left and that visit in March of

13  2006?

14  A.   No.

15  Q.   Do you remember if it was daytime or nighttime when he

16  came by?

17  A.   Nighttime.

18  Q.   Did Defendant Ahmed call in advance to let you know he

19  was dropping by?

20  A.   No.

21  Q.   Who else was home besides you when Defendant Ahmed came?

22  A.   My mother and my wife.

23  Q.   Did any of them have any interaction with him?

24  A.   Yeah, they met him.

25  Q.   Said hi?

1  A.    Yes.

2  Q.    Of the three of you -- you, your mother and your wife --

3  who dealt with Defendant Ahmed primarily that night in March

4  of 2006?

5  A.    I did.

6  Q.    Do you remember the specific date in March?

7  A.    No.

8  Q.    What did Defendant Ahmed tell you was the purpose for

9  this nighttime visit?

10  A.    He was convinced that my brother had been arrested, told

11  us that he was being interrogated by the FBI agents, and the

12  agents told him that Shifa, my brother, had been

13  arrested.  So he was there to confirm it.

14  Q.    Defendant Ahmed said that he, Defendant Ahmed, had been

15  speaking with the FBI, or that your brother had been speaking

16  with the FBI?

17  A.    Defendant Ahmed.

18  Q.    And he told you he was concerned that your brother had

19  been arrested --

20  A.    Yes.

21  Q.    -- over in Bangladesh?

22  A.    Yes.

23  Q.    Had your brother been arrested in Bangladesh that day in

24  March 2006?

25  A.    No.

Q.   Did you tell that to Defendant Ahmed?

A.   Yes.

Q.   What did he do after you told him, no, Shifa, your brother, he's not in custody?

A.   He found it hard to believe.

Q.   Did he ask you to help him contact your brother?

A.   Yes.

Q.   Did you help him do that?

A.   Yes.

Q.   Did Defendant Ahmed tell you why it was he wanted to talk to your brother?

A.   No.

Q.   Did you go inside the house and call your brother?

A.   No.

Q.   Do you have phone service in your house?

A.   Yes.

Q.   Why didn't you go inside the house to call your brother?

A.   I was under the assumption that I was under investigation by the FBI and most likely our phone was tapped.  So I offered him to go to the nextdoor gas station and make the call from there.

Q.   What was it that Defendant Ahmed wanted to discuss with your brother that needed to be kept from law enforcement if in fact your home phone was being monitored?

A.   I don't know.  Since he was being interrogated by the

1    FBI, I figured we might as well go do that nextdoor.

2    Q.   You say nextdoor.  Do you walk from your house to a gas

3    station?

4    A.   We could have walked, but since he had a car, we just

5    drove.

6    Q.   Who went to the gas station?

7    A.   Defendant Ahmed and I.

8    Q.   You drove in his car or your car?

9    A.   His car.

10   Q.   Do you remember what kind of gas station, Shell,

11   Chevron, BP?

12   A.   Shell.

13   Q.   What happened when you and Defendant Ahmed got to the

14   gas station?

15   A.   I dialed the number to my father's phone, and I talked

16   to my brother.

17   Q.   Did you use a calling card or just punch in the numbers

18   right there on the pay phone?

19   A.   Swipe card.

20   Q.   And you dialed your father's number in Dhaka?

21   A.   Yes.

22   Q.   Did you reach your father?

23   A.   Yes.

24   Q.   Did you end up speaking with your brother?

25   A.   Yes.

1   Q.   What did you say to your brother?

2   A.   That Ahmed is here, he wanted to speak with him.

3   Q.   Did you know Defendant Ahmed as Ahmed or by some other

4   name?

5   A.   Haris we used to call him.

6   Q.   That's what you told your brother, Haris is here?

7   A.   Yes.

8   Q.   Did you then let Defendant Ahmed speak with your

9   brother?

10  A.   Yes.

11  Q.   What did he tell your brother?

12  A.   He wanted to confirm that he was not arrested, and that

13  he was being interrogated by the FBI.  And he told him that

14  it's nothing to worry about, they are just making a big deal

15  out of it, and that's about it.

16  Q.   That's all you remember Defendant Ahmed saying to your

17  brother over the phone?

18  A.   Yeah.

19  Q.   Do you recall testifying in front of the grand jury?

20  That was in June of 2006?

21  A.   Yes.

22  Q.   Three months after Defendant Ahmed had visited your

23  house?

24  A.   Yes.

25  Q.   Would reviewing your testimony to the grand jury help

1    refresh your recollection as to what you heard

2    Defendant Ahmed say to your brother on the pay phone at the

3    Shell station?

4    A.   Yes.

5    Q.   I will show you what's been marked for identification

6    purposes as Government's Exhibit 131.

7         If you would read to yourself page 21?

8    A.   Can you tell the grand jury --

9    Q.   No, no, to yourself, not outloud.  Read it to yourself,

10   and then I will have a question for you.  Let me know when

11   you have read it.

12        You got through the first ten lines or so?

13   A.   Yes.

14   Q.   You had an answer from line three to line six.  Do you

15   see that answer there?

16   A.   Yes.

17   Q.   Does that refresh your recollection as to what else

18   Defendant Ahmed said to your brother besides the fact that he

19   had been interrogated by the FBI?

20   A.   Yeah.  This is what I clarified in the pretrial, in

21   Defendant Ahmed's pretrial.

22   Q.   I don't want you to read aloud from that.  You can put

23   the document down.

24        Reviewing what you told the grand jury under oath just

25   three months after you were with Defendant Ahmed at the gas

station, does that refresh your recollection as to what you

heard Defendant Ahmed tell your brother on the pay phone?

A.   Yes, it does.

Q.   Okay.  What else then did Defendant Ahmed say to your

brother besides the FBI has been asking me some questions?

What did he tell your brother to do?

A.   No, I think you are asking me about whether

Defendant Ahmed instructed my brother to stay in Bangladesh,

but that's something I clarified in the pretrial.  I think I

had my facts mixed up.

     In the pretrial I clarified when Defendant Ahmed

actually told me after he hung up the phone since my brother

got married, it would be best for him to stay in Bangladesh

for the time being until all this is clarified with the FBI.

Q.   That's your testimony now?

A.   Yes.

Q.   Do you agree that you told the grand jury under oath,

line eight, he, Defendant Ahmed, told him, your brother, to

stay there, Bangladesh, as long as possible?

A.   Yes, and this is what I clarified in the pretrial, that

I got mixed up.  I had my facts mixed up.  That's something

Defendant Ahmed told me, not over the phone to my brother.

Q.   Okay.  Now, you were given a chance at the end of your

grand jury testimony, were you not, to correct any answers,

and in fact even after your testimony to get back in touch

1    with us through a lawyer, however you wanted to do it, and

2    say, hey, I made a mistake, I want to change that.  You never

3    did that, did you?

4    A.    No.  I also clarified this in the pretrial as well.  Our

5    lawyer that we hired was charging us a lot of money, which we

6    still, the family, my family still has not been able to pay

7    the bills yet.  So I didn't want to add on to that bill by

8    getting in touch with my lawyer and having this simple fact

9    corrected.

10          Since it never came up again, I just didn't worry about

11   it.

12   Q.    Okay.  After Defendant Ahmed was done speaking with your

13   brother on the pay phone at the Shell station that night,

14   what did you and Defendant Ahmed do?

15   A.    I tried to ask him, What is this all about, did you guys

16   do anything wrong, did you guys -- what's all this about?

17          He said -- he told me, It's nothing to worry about, that

18   they are just making a big deal out of it, he trying to

19   clarify things for the agents.  Basically he told me not to

20   worry about it.

21   Q.    Defendant Ahmed told you not to worry about it?

22   A.    Yes.

23   Q.    Did he go into any detail at all other than don't worry

24   about it?

25   A.    No.

```
 1   Q.   Okay.  And your testimony today is that your
 2   recollection is Defendant Ahmed told you that your brother
 3   should stay away, not that he told your brother that he
 4   should stay away?
 5   A.   As far as I can remember, yes.
 6   Q.   Okay.  Then you guys got back in Defendant Ahmed's car?
 7   A.   Yes.
 8   Q.   Where did you go?
 9   A.   He dropped me off back at my home.
10   Q.   Did he come back inside?
11   A.   No.
12   Q.   Did you see Defendant Ahmed again after that, other than
13   in court?
14   A.   No.
15              MR. McBURNEY:  One second.
16              Thank you.
17              THE COURT:  Mr. Martin?
18                          --  --  --
19                      CROSS-EXAMINATION
20   BY MR. MARTIN:
21   Q.   Mr. Sadequee, you -- let me put it this way.  You did
22   ask -- it's your recollection, you did ask Mr. Ahmed was
23   there anything to worry about; correct?
24   A.   Yes.
25   Q.   And he said to you the words, he said, There is nothing
```

1   to worry about, they are just doing their routine

2   investigation, that there is nothing to worry about.

3   A.   Yes.

4   Q.   Is that what he said?

5   A.   Yes.

6   Q.   And that's what you told the grand jury; is that not

7   true?

8   A.   Yes.

9   Q.   That Mr. Ahmed said to you?

10  A.   Yes.

11  Q.   He wouldn't go into any further detail about it?

12  A.   Yeah.  I didn't really push him, yeah.

13           MR. MARTIN:  That's all I have.

14           THE COURT:  Redirect?

15           MR. McBURNEY:  No, sir.

16           THE COURT:  Does anybody want Mr. Sadequee subject

17  to recall?

18           MR. McBURNEY:  No.

19           MR. MARTIN:  No.

20           THE COURT:  Okay.  Mr. Sadequee, you are

21  excused.  You should not discuss your testimony with anybody

22  until you hear that the case is over.  We appreciate you

23  being with us.

24           Call your next witness, please.

25           MR. BLY:  We call Matthew Acker.

1                          --  --  --

2                       MATTHEW ACKER

3    being first duly sworn by the Courtroom Deputy, testifies and

4                       says as follows:

5                          --  --  --

6                     DIRECT EXAMINATION

7    BY MR. BLY:

8    Q.   Good morning, sir.

9    A.   Good morning.

10   Q.   If you could state your name and spell your last name

11   for the record?

12   A.   Matthew Acker, A-c-k-e-r.

13   Q.   And, Mr. Acker, how are you currently employed?

14   A.   I'm a special agent with the FBI.

15   Q.   How long have you been an FBI agent?

16   A.   Including training, approximately nine months.

17   Q.   What did you do before you became an FBI agent?

18   A.   I was an investigative specialist with the FBI from

19   approximately July 2003 to September of 2008.

20   Q.   What does an investigative specialist do?

21   A.   The primary job function is physical surveillance.

22   Q.   I direct your attention to March 21st of 2006.  Were you

23   working as an investigative specialist with the FBI on that

24   date?

25   A.   Yes, I was.

1  Q.    What was your task for that day?

2  A.    To provide physical surveillance of Mr. Ahmed.

3  Q.    Is Mr. Ahmed somebody that you had seen before, seen

4  prior to March 21, 2006?

5  A.    Yes, on multiple occasions.

6  Q.    How did your surveillance on March 21, 2006, how did it

7  begin?

8  A.    It began at a residence, his parents' residence in

9  Dawsonville, Georgia.

10  Q.    Is that what's been referred as to the Brynbrooke Drive

11  address?

12  A.    That's correct.

13  Q.    What time did you begin surveillance up there?

14  A.    The surveillance shift was approximately 7:00 a.m. to

15  3:00 p.m.  It would have been in the range of 6:30 to

16  7:00 a.m. that we arrived on the scene.

17  Q.    Did you see Defendant Ahmed on that day?

18  A.    Yes, I did.

19  Q.    Approximately what time?

20  A.    It was in the early afternoon hours, I think.  I believe

21  just prior to 2:00 p.m. he departed the residence on

22  Brynbrooke Drive in Dawsonville.

23  Q.    What did you do when he departed the residence?

24  A.    Followed him to the Dawsonville public library.

25  Q.    That's the public library in Dawson County?

1   A.   Yes, sir.

2   Q.   Did Mr. Ahmed drive there, did he walk there?  How did

3   he get there?

4   A.   He drove there.

5   Q.   What -- and you were following, you were also in a

6   vehicle?

7   A.   Yes.

8   Q.   What happened when he and you arrived at the library?

9   A.   He arrived at the library, exited his vehicle, and

10  entered the library.  And shortly thereafter, I parked at the

11  same library and entered.

12  Q.   If you could, give the Court a little context, what the

13  library looks like.  What do you see when you enter the

14  library?

15  A.   You would first walk in through the doorway, and there

16  is a hallway ahead, and the main library is off to the

17  right.

18       And I entered the main library off to the right.  Once

19  you enter that room, the librarian's desk is directly in

20  front of you, and to the right they have a number of

21  computers spread out, and there is also the bookshelves are

22  there.

23  Q.   Did you see Mr. Ahmed when you entered the library?

24  A.   Yes, I did.

25  Q.   Where was he?

```
1   A.   Standing in the vicinity of some of the computers.

2   Q.   What did he do -- what did you do at that point?

3   A.   Noted what he was doing and I maintained a position in

4   the library where I could observe him while he was there.

5   Q.   What did you see him do?

6   A.   Eventually he made his way to the front desk and spoke

7   with somebody who was working at the library.

8        I then got a computer where I had a direct line of sight

9   of his activities at the front desk.

10  Q.   Did you overhear what he was saying to the person who

11  was at the front desk?

12  A.   No, I couldn't hear anything, but what was going on was

13  as if he was taking out a membership at the library or

14  activities consistent with that.

15  Q.   What did he do after the encounter with the person at

16  the circulation desk?

17  A.   The person handed him a document, I'm not exactly

18  certain what it was.  He then proceeded directly to a

19  computer.

20  Q.   You said he went over to computer.  Describe a little

21  bit, is it one computer, is it a bank of computers?  What's

22  the area like where he goes to?

23  A.   I would say it's an L-shaped area with probably four to

24  six computers in that L area.

25  Q.   Where were you in relation to the computer that
```

1   Mr. Ahmed went to?

2   A.   I was -- if I was facing this direction, Mr. Ahmed would

3   have been off to my right behind him.

4   Q.   About how far away were you from him?

5   A.   About the distance between the two of us, ten, fifteen

6   feet maybe.

7   Q.   And tell the Court again, you were sitting at another

8   computer, like a card catalogue --

9   A.   It was a computer that I believe was limited only to the

10  card catalogue of the books that they had available at the

11  Dawson County Library.

12  Q.   And from where you were sitting, could you see the

13  screen that Mr. Ahmed was looking at?  Could you see the

14  screen of the computer he was using?

15  A.   When I turned my head and had a direct line of sight at

16  him, yes, I could.

17  Q.   But that was not a continual thing?

18  A.   No.

19  Q.   You were not continuously looking right at Mr. Ahmed's

20  screen?

21  A.   No, I was not.

22  Q.   What did you do after Mr. Ahmed sat down at the

23  computer?

24  A.   I stayed at that computer for the majority of the

25  time.  At one point, probably three to five minutes, I exited

the main area of the library and notified my supervisor as to

what was going on.  And I also was in contact with the next

surveillance team that was en route to the area.

Q.    How long were you -- how long were you out of sight of

Mr. Ahmed for?

A.    Approximately three to five minutes.

Q.    When you left -- you said you went outside to speak to

the supervisor.  When you left, was Mr. Ahmed sitting at the

computer you saw him sit down at?

A.    Yes, he was.

Q.    And where was he when you returned?

A.    At the same computer.

Q.    Did you ever see anybody else over at that computer?

A.    No, I did not.

Q.    Anybody using that computer?

A.    No.

Q.    Or talking to Mr. Ahmed?

A.    No.

Q.    What did you do when you came back in the library?

A.    I maintained a position that I had previously and

continued to occasionally monitor what he was doing.

       And I was able to see that he was on Internet Explorer

and it appeared he was toggling back and forth between what

would have been an MSN Hotmail account and another web page.

Q.    This is -- when did you see this?    When were you able

1  to make the assessment that he was on an Internet Explorer

2  type page?

3  A.   When I was walking back in the library, I walked up

4  behind him close to the same area that I was, and I could

5  tell what was on the screen.

6  Q.   Could you see -- could you see what he was doing, did

7  you see anything he was typing or reading or anything like

8  that?

9  A.   I wasn't able to read any of the text on the screen, but

10  I could tell from the page layouts what it was.  And at

11  another point when I turned around, I could also see that he

12  was in a word processing program.  I don't know what

13  specifically, but he had typed a rather lengthy paragraph.

14  Q.   So you could tell he was typing something?

15  A.   Yes.

16  Q.   What -- so you come back to the library.  What did you

17  do at that point?

18  A.   I continued to watch him and, as I said, I saw those

19  internet pages and the typing.

20       And eventually another person had arrived at the library

21  and he entered the library.  We walked off to the side and

22  quickly discussed what was going on, and shortly thereafter

23  I left.

24  Q.   You said another person entered the library.  Is this

25  another --

1    A.    Another investigative specialist, yes.

2    Q.    Who was that that came in?

3    A.    Terrance Marcell.

4    Q.    And why did he come in the library?

5    A.    He was part of the team that was there to relieve my

6    team.

7    Q.    Did you talk to Mr. Marcell when he came in?

8    A.    Yes.

9    Q.    What did you talk to him about?

10   A.    Basically just pointed out what had gone on earlier in

11   the day and, you know, to see if, after I left and after

12   Mr. Ahmed departed, if he was able to find any information

13   that may have been in the internet history on that particular

14   computer.

15   Q.    How long did you speak to Mr. Marcell for?

16   A.    Two minutes, two to three minutes.

17   Q.    Okay.  When you were speaking to him, did you still have

18   a line of sight on Mr. Ahmed and the computer he was using?

19   A.    I do not recall if I had direct line of sight, but had

20   he moved or someone come over in that vicinity, I would have

21   been able to see another person come in.

22   Q.    What did you do after Mr. Marcell arrived and you had

23   the conversation that you just described?

24   A.    I departed the library, returned to my vehicle, and

25   drove to a parking lot across the street.  At that time the

1 rest of my team departed the area, Terrance's team had

2 already established a perimeter, and I waited a few minutes

3 there.

4  And a few minutes after that, Mr. Ahmed returned to his

5 vehicle and departrd the library.

6 Q. When you left the library, was Mr. Ahmed still on the

7 computer that you had observed him on throughout your time

8 there?

9 A. Yes, he was.

10 Q. How long were you out -- I think you said you went to a

11 parking lot across the street.  How long did you wait before

12 Mr. Ahmed left the library?

13 A. I would say approximately five to ten minutes.

14 Q. What did you do then?

15 A. I returned to the library, drove back across the street,

16 parked my vehicle, and entered the library.

17 Q. What did you see when you went in the library?

18 A. At that time I could see that there was a male seated at

19 the computer Mr. Ahmed was at.  And as I approached

20 I recognized that person was Terrance Marcell.

21 Q. So you didn't see Mr. Ahmed still in the library, it was

22 Mr. Marcell now sitting at that same computer?

23 A. Yes, that's correct.

24 Q. And this is the computer that Mr. Ahmed was using when

25 you were in the library conducting your surveillance

1    previously?

2    A.    Yes.

3    Q.    What did you do?

4    A.    I spoke to Mr. Marcell.  He had already pulled up

5    Internet Explorer and had the internet history displayed on

6    the left side of the window.

7        After a quick discussion, I told him that I would

8    compile a list of the internet history and that he could join

9    his team in the surveillance of Mr. Ahmed when he departed

10   the library.

11   Q.    You said that he had the internet history up.  Explain

12   that a little for the Court.  What did the screen look like

13   that Mr. Marcell was looking at?

14   A.    In the general screen it had the home page, and on the

15   left side there was a narrow column that listed the web pages

16   that had been visited by that computer.

17   Q.    Did Mr. Marcell stay, did you both stay, or did one of

18   you leave at that point?

19   A.    Shortly after that, after we had spoken, he departed the

20   library, and then I sat down at that computer.

21   Q.    The internet sites that you said were displayed on one

22   side, the history, were those arranged in any sort of order

23   as far as you knew?

24   A.    I wasn't certain when I first sat down, but the first

25   thing that I did was selected the sort by order visited

1    today, which would display the last web page as the top line,

2    and that would just go down on in the order that they had

3    been visited.

4    Q.   What websites starting from the top and moving down, as

5    you said, what websites were displayed then at the top of

6    that history?

7    A.   There was an MSN Hotmail, there was some Yahoo --

8            MR. MARTIN:  Your Honor, just for the record, we

9    objected to this procedure as a violation of my client's

10   Fourth Amendment rights.  I just wanted to renew that

11   objection.

12           I know the Court has overruled it.  I just want to

13   renew it.

14           THE COURT:  Yes, I have ruled on that, and

15   I overrule it again.

16           MR. MARTIN:  Yes.

17   A.   There was a Yahoo.fr e-mail address in there.  There was

18   also a Google search.  I believe there was some sort of CNN

19   web browser that was done.

20   Q.   You said a Yahoo.fr address.  Do you know what website

21   that was from?

22   A.   Yes.  It was dannymoore1126@yahoo.fr,

23   D-a-n-n-y-m-o-r-r-e 1126@yahoo.com.

24   Q.   So this is a specific e-mail address that you were

25   able -- that was displayed in that history; is that right?

1    A.   Yes, that's correct.  The history displayed the entire

2    e-mail address as part of the Yahoo! web browsing history.

3    Q.   Agent Acker, do you see the person that you were

4    observing that day in the library up in Dawson County, do you

5    see him in court today?

6    A.   Yes, I do.

7    Q.   Could you point out something he is wearing?

8    A.   He has a white kufi on.

9         MR. BLY:  Your Honor, I have no further questions.

10        THE COURT:  Mr. Martin

11                   --  --  --

12                   CROSS-EXAMINATION

13   BY MR. MARTIN:

14   Q.   Your surveillance was occurring on Tuesday -- the whole

15   day of Tuesday, March 21, 2006; is that correct?

16   A.   My specific hours of my shift were 7:00 a.m. to

17   3:00 p.m.

18   Q.   And without going into details, but the FBI was

19   monitoring Mr. Ahmed twenty-four hours a day at that time,

20   surveilling him?

21   A.   Yes.  It was continuous surveillance.

22   Q.   And did you know that three days earlier, on March 18,

23   2006, he had been told by Detective Sediqi that this was the

24   end of our interviews, we didn't think we need to talk to you

25   any more about any of this?

1   A.   No, I was not aware of that.

2            MR. MARTIN:  Okay.  That's all.

3            THE COURT:  Anything else?

4            MR. BLY:  No, Your Honor.

5            THE COURT:  Does anybody want Mr. Acker subject to

6   recall?

7            MR. MARTIN:  No.

8            MR. BLY:  No, Your Honor.

9            THE COURT:  Mr. Acker, you are released.  You

10  should not discuss the case until you hear that it is

11  over.  We appreciate you being with us.

12           THE WITNESS:  Thank you, sir.

13           THE COURT:  Call your next witness, please.

14           MS. COLLINS:  Your Honor, the government calls

15  Kathy Wilz.

16                       --   --   --

17                      KATHERINE WILZ

18  being first duly sworn by the Courtroom Deputy, testifies and

19                     says as follows:

20                       --   --   --

21                    DIRECT EXAMINATION

22  BY MS. COLLINS:

23  Q.   Would you state your name and spell your last name for

24  the record, please?

25  A.   Katherine Wilz, W-i-l-z.

1    Q.    Where do you work?

2    A.    I work at the FBI Joint Terrorism Task Force.

3    Q.    And what is your home agency?

4    A.    I'm employed with the Department of Defense, Defense

5    Criminal Investigative Service.

6    Q.    And what is the function of the Defense Criminal

7    Investigative Service?

8    A.    We conduct criminal investigations involving the

9    Department of Defense.

10   Q.    And how long have you been an agent with DOD which I

11   will call the Department of Defense?

12   A.    I've been an agent for twelve years.

13   Q.    When were you detailed to the FBI to the JTTF?

14   A.    August 2004.

15   Q.    What field office have you been working out of?

16   A.    The Atlanta.

17   Q.    What is your involvement in this case?

18   A.    I'm the co-case agent for Syed Haris Ahmed.

19   Q.    Now, we have heard testimony today from Mr. Sadequee

20   that Mr. Ahmed traveled to his house to make a call to

21   Mr. Ehsanul Sadequee?

22   A.    Yes.

23   Q.    Do you know the date that that happened on?

24   A.    August -- I'm sorry, April 19, 2006.

25         Can you repeat the question?

```
 1    Q.    Sure.  What was the day on which Mr. Ahmed went to
 2    Mr. Amimul Sadequee's house to make a call --
 3    A.    I'm sorry, March 19th, 2006.
 4    Q.    And then we just heard testimony that Mr. Ahmed was
 5    observed in the library logging into an e-mail account
 6    dannymoore1126@Yahoo.france?
 7    A.    Right.
 8    Q.    And that date was what?
 9    A.    March 21, 2006.
10    Q.    Now, before that date, had the FBI seen the phrase
11    Danny Moore in anything else connected to Mr. Ahmed?
12    A.    Yes.
13    Q.    And what -- where had you seen that phrase?
14    A.    Two different places.  One was in the address book of
15    Defendant Ahmed when he returned from Pakistan, and one had
16    been in other e-mail communications.
17                MR. MARTIN:  Your Honor, they did not put actually
18    that book in.  I want to just renew my objection.  They
19    copied that book.  I don't know if the book actually came
20    in.
21                Maybe I made that objection earlier.
22                THE COURT:  This is I think Defendant Ahmed's book
23    is what she testified about.
24                MR. MARTIN:  Yeah, I don't think that's come in.
25                THE COURT:  I don't think that's in evidence.
```

                    MS. COLLINS:  Your Honor, I believe it was admitted
1
    on June 2nd through Melissa Harper, which was the CBP agent
2
    who testified about her photocopying it.
3
                    MR. MARTIN:  I think I just forgot.  I may
4
    have made my objection earlier.  We objected to that
5
    being copied, but it was a motion you denied.  I just
6
    want to make clear that we are still persisting in that
7
    objection.
8
                    THE COURT:  Jessica, was that admitted?
9
                    THE CLERK:  What's the number?
10
                    MS. COLLINS:  I'm sorry, Exhibit No. 89.
11
                    THE COURT:  Was it published?
12
                    MS. COLLINS:  I don't think so, Your Honor.
13
                    THE CLERK:  It was admitted.
14
                    THE COURT:  Okay.
15
                    MR. MARTIN:  I probably said something at that
16
    time.  If I didn't, I would now.
17
                    THE COURT:  It's probably too late now, but --
18
                    MR. MARTIN:  It probably doesn't need to be said
19
    because I made the pretrial motion, but I always want to be
20
    careful.
21
                    THE COURT:  I understand.
22
    BY MS. COLLINS:
23
    Q.   Since it's in evidence, could we put up Exhibit 89?  Can
24
    we turn to page four, please?
25

          Do you see on here an entry called Danny More?

A.   Yes, I do.

Q.   What is that?

A.   It says Danny More, and it has e-mail at

DannyMore@gawab.com.

Q.   And that's a different e-mail account than the

dannymoore1126@yahoo.france?

A.   Correct.

Q.   But both have Danny Moore in them?

A.   Right.

Q.   Now, on your table there should be Exhibit 144?

A.   Yes.

Q.   What is that?

A.   That is an e-mail between -- it's an e-mail.

Q.   And who is it from?

A.   Aboo Turab, piddikashorba@yahoo.com.

Q.   Who is the user of that account?

A.   Defendant Ahmed.

Q.   And who is it to?

A.   Al-Muwahhid@hotmail.com.

Q.   And who has that user been identified as?

A.   Also Defendant Ahmed.

Q.   What's the date?

A.   August 20, 2005.

Q.   And what's the subject line?

1  A.   Danny Moore.

2        MS. COLLINS:  Your Honor, at this point we would

3  like to admit Exhibit 144.

4        THE COURT:  Any objection?

5        MR. MARTIN:  I just want to make sure.

6        No objection.

7        THE COURT:  It's admitted.

8        MS. COLLINS:  Thank you.  If we could put that up

9  on the screen?

10 BY MS. COLLINS:

11 Q.   Is this the e-mail that you just read the particulars

12 of?

13 A.   Yes.

14 Q.   What does the body say?

15 A.   Danny Moore wants to talk to you.

16 Q.   Now, during Mr. Ahmed's interviews with the FBI, was he

17 told not to contact Mr. Sadequee?

18 A.   Yes, he was.

19 Q.   Was he told that once or several times?

20 A.   Several times.

21 Q.   Can we pull up Exhibit 504, the recording?  And just go

22 to time stamp 01:43:57?

23        MR. MARTIN:  What's the date of this?

24        MS. COLLINS:  I'm sorry, before we play it, this is

25 a recording that occurred on March 10, 2006.

1          (By audio:)*

2          MR:  And you don't go near that folder until

3      we let you . . .

4          SHA:  Uh-huh.

5          MR:  . . . when . . . and until you're with

6      us.

7          SHA:  OK.

8          MR:  OK?  You don't talk to, uh, Shifa until

9      you're with us.

10         SHA:  OK.

11         MR:  OK?  Uh, this is very important.

12         SHA:  Yeah.

13         MR:  Alright, I . . . I'm stressing that.

14         (Audio ends.)

15         MS. COLLINS:  Stop there.

16    BY MS. COLLINS:

17    Q.   Now, in addition, did the FBI repeatedly ask Mr. Ahmed

18    to disclose all of the e-mail addresses that he used to

19    communicate with Mr. Sadequee?

20    A.   Yes, they did.

21    Q.   And did he ever disclose this dannymoore1126@yahoo.fr?

22    A.   No.

23    Q.   Now, after Mr. Ahmed was seen in the library on March

24    _____

25    * Appears here as transcribed in the exhibit.

21, 2006, did the FBI obtain any communications from this

Yahoo.fr account?

A.   Yes, we did.

Q.   And did you acquire the communication that was sent on

March 21, 2006?

A.   Yes, we did.

Q.   Was that the first communication that that account had

been used for?

A.   No.

Q.   So there were earlier ones?

A.   There were earlier ones.

Q.   Take a look at Exhibit 147.

A.   Okay.

Q.   What is that?

A.   It's an e-mail.

Q.   And what's the date?

A.   January 17, 2006.

Q.   And who is it from?

A.   Dannymoore1126@yahoo.france, Yahoo.fr, France.

       MS. COLLINS:  We would like to admit Exhibit 147.

       THE COURT:  Any objection?

       MR. MARTIN:  No additional objections.

       THE COURT:  It's admitted.

BY MS. COLLINS:

Q.   If we could just pull it up on the screen?  And just

1   magnify the first couple of lines -- well, the header and

2   first couple lines, please?

3        Now, can you read the first two sentences of this

4   document?

5   A.   Peace be on you.  I read this someplace that FR is a

6   little more safer than normal one.  So precaution was taken,

7   and God is the ultimate in charge of affairs.

8   Q.   Okay.  Now you should have up there as well

9   Exhibit 148.

10  A.   Yes.

11  Q.   And what is that?

12  A.   It's an e-mail.

13  Q.   And who is it from?

14  A.   Dannymoore1126@yahoo.fr.

15  Q.   What's the date?

16  A.   21 March 2006.

17  Q.   So is this the same date Mr. Ahmed was seen in the

18  library?

19  A.   Yes, it is.

20            MS. COLLINS:  Your Honor, at this point we would

21  like to admit Exhibit 148.

22            THE COURT:  Any objection?

23            MR. MARTIN:  No objection -- same objections noted.

24            THE COURT:  It's admitted.

25  BY MS. COLLINS:

```
1    Q.   Now, could you go ahead and read for us this first
2    paragraph?
3    A.              Peace be on you.  The dogs came to me, this
4                    time they were not usual.  They had done their
5                    homework.  They even had info regarding both of our
6                    trips.
7                    Well, when they brought up the thing about
8                    our second trip, they got me.  I was not prepared
9                    for that due to my own shortcomings in faith.  So
10                   in the first meeting I slipped, FD.
11   Q.   Then going back, it says the dogs.  Is that a term that
12   you have seen in other communications used by Mr. Haris?
13   A.   Yes.
14   Q.   Mr. Ahmed, excuse me.
15        And what does that term mean?
16   A.   Law enforcement.
17   Q.   Further down it says, Regarding both of our trips, they
18   had info regarding both of our trips.  How many trips with
19   Mr. Sadequee had Mr. Ahmed been asked about during the
20   interviews with the FBI?
21   A.   Two.
22   Q.   And where were they to?
23   A.   One to Canada and one to Washington, D.C.
24   Q.   Okay.  Going on, can you read the next paragraph -- or
25   starting with the next paragraph?
```

A.              And then after I prayed to God and slowly
I regained my confidence, then it was all damage
control after that.

Basically I told them, which is true to best
of my knowledge, that we were kids who got just
excited.

They asked what you meant by saying T has a
great idea in one of our conversations.  They had
all conversations between us.

So I told them the truth, that it was the idea
of mine to by make some cool video, and I took my
car and my camera for that purpose, and you just
hopped on the chance for a free trip.

Then they asked what is Mother's Day and
picnic.  I told them the truth, that we wanted to
go to Curry place, and picnic and Mother's Day
meant our meeting there.  It was called picnic
because we would go there and be together, so it
would be sort of a picnic.

Then they asked we know that you are into the
J, so you must have talked about ideas.  I was like
yes, I hated the Free Masons, so I wanted to meet
them one day.  And at some point in my life I hated
the Yanks too.

But basically it was all childish stuff, but I

1    am over it now.  And that since I knew they were

2    after me, since I came here, I told you to come by

3    the Maricustus route, which meant by sea.

4 Q.   Okay.  Now, going up, he says they asked what you meant

5 by saying T has a great idea in one of our

6 conversations.  Who is T?

7 A.   Turab, Defendant Sadequee -- I mean, Defendant Ahmed.

8 Q.   And he says, I told them that it was the idea of mine by

9 make some cool video.  I took my car and my camera for that

10 purpose.

11    Now, what is he referring -- what is Mr. Ahmed referring

12 to here?

13 A.   That their trip to Washington, D.C., they made some

14 videos.

15 Q.   And further down it says, Then they asked what is

16 Mother's Day and picnic.  To what is that Mother's Day and

17 picnic referring to?

18 A.   An earlier e-mail.

19 Q.   And can we put up actually Exhibit 41 just for a second?

20    Is this the e-mail that you are referring to?

21 A.   Yes, it is.

22 Q.   Okay.  And if we could just zero in on the top third of

23 the screen?

24    And that's an e-mail from who to whom?

25 A.   Al-Muwahhid -- it has al-Muwahhid, dashed, that would be

1   Defendant Ahmed, to alMuwahhid, all one word, which is
2   Defendant Sadequee.

3   Q.   And what's the date of that e-mail?

4   A.   I'm sorry, I didn't hear you.

5   Q.   I'm sorry, what's the date of that e-mail?

6   A.   April 20, 2005.

7   Q.   And in it does it talk about Mother's Day celebration?

8   A.   Yes.

9   Q.   And further down does it talk about picnics?

10  A.   Yes, it does.

11  Q.   And those terms Mr. Ahmed revealed in his interviews
12  refer to what?

13  A.   Mother's Day was a meeting in -- it was basically to go
14  to Pakistan and meet with others.

15  Q.   Okay.  Going back to Exhibit 148, please, and if we
16  could highlight the second paragraph again?  I'm sorry.

17       Going further -- a little further down, it says, Then
18  they ask we know you are into the J, so you must have talked
19  about ideas.

20       Did the FBI ask about Mr. Ahmed's interest in jihad?

21  A.   Yes, they did.

22  Q.   Violent jihad I should say.

23  A.   Correct.

24  Q.   Now, going down to the next paragraph, towards the end,
25  can you go ahead and read the third paragraph?

A.              I could have denied the last trip, but fear
                overcame me and I accepted it.

                But after that in all my meetings with them,
                it was damage control, to tell them that we were
                kids who got overexcited.

                In the beginning, they seemed mostly
                interested in you.  But if I am not mistaken, they
                seem a little less interested now.  I just pray to
                God that my initial mistake of accepting that we
                took those videos could be overcome by my telling
                them how we were kids.

                And that's why I think for two days they
                haven't called me.  Otherwise it used to be almost
                every day they call me to their offices and keep me
                for hours.

                To prove to them how childish we were, I told
                them how once we joked about disabling GPS and we
                then went on the Star Trek stuff about lasers and
                all.

                Yes, I made a lot of mistakes.  But after my
                initial blunder, all of my intention was damage
                control.  So if they come after you, be prepared to
                be asked a lot of questions.  Try not to come to
                Pharaoh land for some time.

                Peace be on you.

1    Q.    Okay.  Going back to the top of that paragraph, he said,

2    I could have denied the last trip, but fear overcame me and

3    I accepted it.

4         What was the last trip that Mr. Ahmed told the FBI

5    agents about during his interviews?

6    A.    The last trip that Defendant Ahmed took was to

7    Pakistan.

8    Q.    And then further down he says, That's why I think for

9    two days they haven't called me.

10        What was the date of the last interview with the FBI

11   agents?

12   A.    March 18th.

13   Q.    And then in the last paragraph after he says, After my

14   initial blunder, all my intention was damage control.  He

15   tells Sadequee, Try not to come to Pharaoh land for some

16   time.

17        What is Pharaoh?

18   A.    Pharaoh land is the United States.

19   Q.    Did you also obtain an e-mail and response to

20   Mr. Ahmed's -- this e-mail, Exhibit 148, to Mr. Sadequee?

21   A.    Yes, we did.

22   Q.    And can you take a look at Exhibit 149, please?

23   A.    Yes.

24   Q.    And what is that?

25   A.    That's the response e-mail.

```
1    Q.   And what's the date?

2    A.   March 23rd, 2006.

3    Q.   And who is it to?

4    A.   It is to dannymoore1126@yahoo.fr.

5    Q.   Who is it from?   Who did the FBI access it to be from?

6    A.   Ehsanul Sadequee.

7    Q.   Can we --

8              MS. COLLINS:  At this point, Your Honor, the

9    government would admit Exhibit 149.

10             THE COURT:  Any objection?

11             MR. MARTIN:  No.

12             THE COURT:  Is that no?

13             MR. MARTIN:  No additional objections, excuse me.

14             THE COURT:  It's admitted.

15             MS. COLLINS:  Thank you, Your Honor.

16             If we could show it on the screen?

17   BY MS. COLLINS:

18   Q.   Can you read this to us starting with the Hmm?

19   A.              What are you talking about?  I don't get any

20               of it.  Hmm, anyways, do they know about the true

21               preaching that I do?   Please respond to that

22               question.

23                  And I need you to send me a detailed account

24               of what you were asked and what you answered and

25               how much they know about me.  Be as much detailed
```

```
 1              as possible.

 2                   Download a program and then encrypt the word

 3              doc and then upload it, and then give me the link

 4              here.  I need this ASAP.

 5                   Peace.

 6   Q.   He talks there about download a program and then encrypt

 7   the word doc.  What is encryption?

 8   A.   Encryption is where you secure the file so that it's not

 9   easily accessible or easily -- like if you were afraid you

10   were being monitored, if you encrypt it, then whoever is

11   monitoring you would have to have the encryption key or

12   password to get into the file.

13   Q.   So if someone else obtained the document, they clicked

14   on it --

15   A.   Nothing would happen.

16   Q.   Thank you.

17        Now, when Mr. Ahmed returned from Pakistan, he started

18   school at Georgia Tech; is that right?

19   A.   Right.

20   Q.   And while at Georgia Tech, did he have access to their

21   computer system?

22   A.   Yes, he did.

23   Q.   Was there any place on that computer system where

24   Mr. Ahmed could store files?

25   A.   Right.  There was a Y drive on the computer network
```

where he would have a user ID and a password to access.

Q.   And that user ID and password would get him access to what?

A.   To the portion of the Y drive that was attributable -- that he was authorized to use to store like his school papers or projects or whatever it is.

Q.   So did he -- I'm sorry, I didn't mean to interrupt you.

A.   That no one else unless like you were an administrator or whatever would have access to.

Q.   So did he have his own folder basically on the Y drive?

A.   Right.

Q.   At some point during the investigation, did the FBI obtain the contents of Mr. Haris's folder on the Georgia Tech shared drive?

A.   Yes, we did.

Q.   And what -- did you receive a copy of the entire folder?

A.   We received the Y drive --

Q.   Oh, the Y --

A.   -- for Haris Ahmed.

Q.   Okay.  Take look at Exhibits 137, 138, 139 and 140?

A.   Can you repeat them?

Q.   137, 138, 139 and 140?

A.   Okay.

Q.   What are those?

A.   139 is a piece of paper, but 136 --

Q.   Just talking about 137 through 140.

A.   Oh, I'm sorry.  They are CDs.

Q.   Okay.  And where were those -- the items that are on those CDs in that piece of paper, where were those found?

A.   I'm sorry, repeat the question.

Q.   The files that are on those CDs and then the paper, the file that --

A.   These are from Georgia Tech.

THE COURT:  You are speaking over each other and I can't understand it.

You asked her to look at 137, 138, 139 and 140, then she said that 139 was a piece of paper, and you told her I only want you to look at 137 through 140, and she was doing that.

So this is all very confused.  Could you start over?

MS. COLLINS:  I apologize.  I will start over.

BY MS. COLLINS:

Q.   Exhibits 137, 138, 139 and 140?

A.   What was the first one?

Q.   137?

A.   Okay.  137, 138.

Q.   139 and 140?

THE COURT:  Yes, this is not hard.

THE WITNESS:  I'm sorry.

1          MS. COLLINS:  I apologize.

2  BY MS. COLLINS:

3  Q.   Exhibit 137, 138 and 140, what are they?

4  A.   CDs.

5  Q.   And where did the files that are on the CDs come from?

6  A.   The Georgia Tech Y drive.

7  Q.   And Exhibit 139?

8  A.   Is a piece of paper.

9  Q.   Where did that come from?

10  A.   That print out from here.

11  Q.   From?

12  A.   The Y drive.

13  Q.   Mr. Ahmed's folder?

14  A.   Correct.

15          MS. COLLINS:  At this point we would like to admit

16  Exhibit 137, 138, 139 and 140.

17          THE COURT:  Any objection?

18          MR. MARTIN:  Just one second.  Can I see what this

19  piece of paper is?

20          No objection, Your Honor.

21          THE COURT:  They are admitted.

22  BY MS. COLLINS:

23  Q.   Now, we have heard testimony throughout this trial about

24  someone named Aabid Hussein Khan?

25  A.   Right.

1   Q.   Was Mr. Khan arrested at some point?

2   A.   Yes.

3   Q.   Where?

4   A.   In the United Kingdom.

5   Q.   When?

6   A.   June 6, 2006.

7   Q.   And when he was arrested, were his belongings searched?

8   A.   Yes.

9   Q.   Who were they searched by?

10  A.   They were searched by the Yorkshire Police.

11  Q.   Is that in the United Kingdom?

12  A.   United Kingdom, yeah.

13  Q.   And during that search, what did they obtain from

14  Mr. Khan?

15  A.   They obtained electronic media, and they obtained some

16  other pieces of paper.

17  Q.   Okay.  Now, did the FBI ever obtain copies of Mr. Khan's

18  computer media?

19  A.   Yes, they did.

20  Q.   And did the FBI look at those?

21  A.   Yes.

22  Q.   And did you locate any videos that were taken in

23  Washington, D.C., by Mr. Ahmed?

24  A.   Yes.  Two of them.

25  Q.   Now, Exhibit 33 was previously identified as the

1   Washington, D.C., taken off Mr. Khan's computer media.  What

2   were the names of the videos originally downloaded onto

3   Mr. Khan's drive?  What were the names of the videos that the

4   FBI found on Mr. Khan's media?

5   A.    Jimmy's 13th birthday and volleyball contest.

6   Q.    Now, how many videos were in each of those files?

7   A.    One.

8   Q.    So Jimmy's 13th birthday had how many video files?

9   A.    One.

10  Q.    And volleyball contest had one?

11  A.    One.

12  Q.    And was there anything else in either of those two

13  files?

14  A.    No.

15  Q.    Where on the hard drive were the Jimmy's 13th birthday

16  file and volleyball file found?

17  A.    In a folder called intelligance.

18  Q.    You said -- can you spell that?

19  A.    I-n-t-e-l-e-g-a-n-c-e.

20  Q.    So intelligence with an A?

21  A.    Correct.

22  Q.    Have you reviewed the directory of that folder?

23  A.    Yes.

24  Q.    Can you take a look at Exhibit 155?  It's not a disk;

25  it's a piece of paper.

1    Is it not up there?

2    A.   155?

3    Q.   Yeah.

4    A.   I found it.

5    Q.   What is that?

6    A.   That's the directory for the intelligence folder.

7    Q.   And do those two filings appear on that directory?

8    A.   Yes, they do.

9         MS. COLLINS:  At this point, Your Honor, we would

10   like to admit Exhibit 155.

11        THE COURT:  Any objection?

12        MR. MARTIN:  No objection.

13        THE COURT:  It's admitted.

14        MS. COLLINS:  Can we put 155 on the screen?

15   BY MS. COLLINS:

16   Q.   And just looking at the top there, that intelligence, is

17   that the name of the file folder where they were located?

18   A.   Right.

19   Q.   And then this has four columns with name, size, type,

20   last modified?

21   A.   Right.

22   Q.   Looking at page four, this exhibit, do you see on there

23   one of the files that was sent?

24   A.   Jimmy's 13th birthday.rar.

25   Q.   And which video is contained in that?

A.    The Masonic Temple.

Q.    And then on page -- can we go to page eight?  Do you
find the other file on here?

A.    Volleyball contest.rar.

Q.    And which video was in that file?

A.    World Bank.

Q.    Now, is there other -- in this folder, did you find
other information about the two sites you just mentioned, the
Masonic Temple and the World Bank?

A.    Yes, we did.

Q.    What did you find with respect to the World Bank?

A.    We found directions on how to get there.

Q.    And what did you find about the Masonic Temple or the
area where it's located?

A.    A website describing a walking tour of the Alexandria
area.

Q.    Can you take a look at Exhibit 184 and 185?

A.    Yes.

Q.    What are they?

A.    184 is directions from Dulles Airport, Reagan National
Airport, and Baltimore Airport to the World Bank.

      And 185 is called a Walking Tour of Old Town Alexandria.

            MS. COLLINS:  Your Honor, we would like to admit
Exhibit 184 and 185, please.

            THE COURT:  Any objection?

1          MR. MARTIN:  No objection.

2          THE COURT:  It's admitted.

3    BY MS. COLLINS:

4    Q.   And did you take a look at the other files in the

5    intelligence folder?

6    A.   Yes, I did.

7    Q.   Was there other information about specific locations in

8    the U.S. in there?

9    A.   Yes, there was.

10   Q.   What types of information did you find?

11   A.   There were maps, there were aerial photos, there were

12   driving directions.

13   Q.   To what types of places?

14   A.   Like truck routes through New York, there were aerial

15   photos of New York and the D.C. area.

16   Q.   Can you take a look at Exhibits 159, 162, 166, 167?

17   167 is probably pretty thick.

18   A.   Okay.  167?

19   Q.   177, I'm sorry.

20   A.   Okay.

21   Q.   Are -- where did those exhibits come from?

22   A.   From the intelligance folder.

23   Q.   Okay.  And what is Exhibit 159?

24   A.   159 is the Brooklyn truck route.

25   Q.   And 162?

1    A.    It's a map of the Capitol complex, Washington D.C.

2    Q.    And Exhibit 166?

3    A.    Is the Manhattan truck route through New York.

4    Q.    And Exhibit 177?

5    A.    It's the traffic rules for New York.

6    Q.    And is this -- was there other information on the

7    intelligence file of which this was a part that also related

8    to New York City and Washington D.C.?

9    A.    Yes.

10                MS. COLLINS:  Your Honor, we would like to admit

11   Exhibits 159, 162, 166 and 177.

12                THE COURT:  Any objection?

13                MR. MARTIN:  These are all found on Mr. Abu Umar's

14   intelligence; right?

15                MS. COLLINS:  Yes.

16                MR. MARTIN:  You know, at some point it seems to me

17   the relevance becomes very extenuated.  Just because

18   something is found on somebody's computer overseas who

19   I understand the Court believes is a co-conspirator, at some

20   point it gets a little too far.

21                I would object at this point.  It seems to me --

22   I'm objecting, but I would ask the Court if it does admit it

23   to give it little weight, because it's just matters that

24   happen to be on somebody's computer overseas.

25                THE COURT:  What is the relevance of the New York

information?  Everything has been centered on Washington,
D.C.

I personally am not sure that New York has any
traffic rules.

MS. COLLINS:  It may not, Your Honor.

The purpose is -- and actually there is another
exhibit that shows -- the purpose is just to show Mr. Khan's
compiling of a very large database of information about the
U.S., about various sites, including the Washington, D.C.,
videos, including some very detailed maps of major locations
within the U.S.

And then the next exhibit actually we are going to
talk about is documents that he had that described -- that
could be used to prepare for violent attacks.

But I can withdraw these exhibits if Your Honor
prefers?

THE COURT:  It's not about my preferences.  It's
about my rulings on the evidence.

MS. COLLINS:  Yes, Your Honor.

THE COURT:  I think I understand how 159 and 162
would be relevant.

I guess it's the New York information that --
I mean, I will admit it.  I'm not sure I will ever consider
it.  And I think I agree with Mr. Martin, it may not be
relevant ultimately or important to whatever decision

1   I make.

2          Other than that, I think it seems to me in and of

3   itself -- it's already I guess -- I think in looking at the

4   index that was admitted, that all of these are described on

5   it.  I don't know why you have selected bits and pieces of

6   the index, now that I know what the index has because there

7   is a description with respect to most of the index entries.

8          Mr. Martin, are you objecting to these, or are you

9   cautioning me whether or not they really mean anything?

10         MR. MARTIN:  I think I am doing both.  I am doing

11  both.  I do think it goes far afield.

12         But if they are going to be admitted, I believe I

13  would caution you they are admitted for what they are worth,

14  as lawyers tend to say.

15         THE COURT:  Well, when they say that, they mean

16  they are worth nothing.

17         MR. MARTIN:  Yeah, they usually add "if anything."

18         THE COURT:  Tell me again what 159 is?

19         MS. COLLINS:  Your Honor, 159 is the detailed map

20  of Brooklyn showing all of the major truck routes throughout

21  that.

22         THE COURT:  I'm going to sustain the objection with

23  respect to the truck routes.

24         What's 162?

25         MS. COLLINS:  Is a map of the Capitol complex.

1          THE COURT:  I will admit 162.

2          166?

3          MS. COLLINS:  We withdraw 166 and 177.

4          THE COURT:  All right.  Let's move on.

5    BY MS. COLLINS:

6    Q.   All right.  On Mr. Khan's hard drive, did you obtain any

7    videos that appear to be related to terrorism?

8    A.   Yes, we did.

9    Q.   And what types of things were those?

10   A.   They were from like Islamic extremists including --

11   Q.   Were there any speeches by Osama Bin Laden on there?

12   A.   Yes.

13   Q.   Other terrorist leaders?

14   A.   Yes.

15   Q.   Did you locate any files that could be helpful to

16   prepare for a violent act, such as manuals or guides?

17   A.   Right.

18   Q.   And did you put together a CD of some of those items?

19   A.   Yes, we did.

20   Q.   Can we look at Exhibit 71 and 71-A?

21   A.   Yes.

22   Q.   What is 71?

23   A.   71 is a CD.

24   Q.   And 71-A?

25   A.   Is directory of that CD.

1          MS. COLLINS:  Your Honor, we would like to admit 71

2     and 71-A.

3          MR. MARTIN:  I do object to those, Your Honor.

4          I mean, we have got similar items that were found

5     on the Georgia Tech computer of Mr. Ahmed, and I understand

6     those are going to be admitted.

7          But just because Mr. Khan is collecting various

8     different items I don't think is going to help the Court in

9     any respect.

10          First of all, I don't think it's relevant.  But

11     even if there is any marginal relevance, is clearly

12     outweighed by the danger of unfair prejudice, cumulative

13     evidence, and just burdening the record.

14          THE COURT:  The government's response?

15          MS. COLLINS:  One of the things, Your Honor, that

16     we have to prove is that the material support was being

17     provided knowing that it could be used in preparation of acts

18     of terrorism in the United States or conspiracy to murder

19     abroad.

20          So the fact that Mr. Khan, who we believe the

21     evidence shows was not only a co-conspirator of Mr. Ahmed's,

22     but also part of the underlying predicate --

23          THE COURT:  What is the evidence that Mr. Khan is a

24     co-conspirator of Mr. Ahmed?

25          MS. COLLINS:  We believe the chats that were

1    admitted earlier between Mr. Sadequee, Mr. Khan and Mr. Ahmed

2    planning --

3              THE COURT:  What exhibits are those?

4              MR. McBURNEY:  The 90s.

5              MS. COLLINS:  I believe Exhibit 73, 74, 75, 76, 77,

6    78 and 79.

7              In particular, Exhibit 79 is between Mr. Khan and

8    Mr. Ahmed, and there they are specifically discussing how

9    much money it takes to get into a Lashkar-e-Tayyiba camp, are

10   we going to need money, do we have to pay for our training or

11   is everything provided.

12             But throughout all of those chats, these

13   individuals are all discussing meeting in Toronto, renting a

14   basement apartment, sending Mr. Ahmed overseas to prepare the

15   way for them to go to Pakistan and get training.

16             THE COURT:  Through whom were those introduced?

17             MS. COLLINS:  Agent James Allen.

18             THE COURT:  I think, Mr. Martin, you said

19   earlier that I have found that Mr. Khan was part of the

20   conspiracy and I found that by a preponderance of the

21   evidence.  My finding was with respect to Mr. Sadequee and

22   Mr. Ahmed.

23             But now based upon the evidence that has been

24   developed to date, I also find by a preponderance of the

25   evidence that the government has proved that a conspiracy

1    existed between the defendant and involving Mr. Khan.

2            So now the question is whether, as somebody who has

3    been shown by a preponderance to be part of the conspiracy,

4    what is the relevance of the Khan materials that are on his

5    digital media?

6            MS. COLLINS:  Your Honor, the finding you just made

7    is that he was part of the conspiracy to provide material

8    support.  The government also believes that Mr. Khan was also

9    part of the predicate conspiracy to murder and maim abroad,

10    as well as potentially in preparation for acts of terrorism

11    in the U.S.

12            And this evidence, the CD, which Agent Wilz just

13    testified contains manuals and guides, as well as videos

14    showing his interest in other -- in terrorism groups and

15    terrorists, we believe that helps show that he was part of

16    the predicate conspiracies as well in preparing for acts of

17    terrorism or the conspiracy to murder abroad.

18            THE COURT:  That's not what the third element

19    is.  It is that the defendant did so knowing or intending the

20    material support or resources were to be used in preparation

21    for carrying out a conspiracy to murder, kidnap or to engage

22    in transnational terrorism.

23            MS. COLLINS:  Yes, this defendant.  But we want to

24    be able to show that Mr. Khan was also part of those

25    predicate crimes.

He was conspiring with this defendant to provide

material support.  He was also part of the underlying crimes

of preparing for acts of terrorism in the U.S. as well as the

conspiracy to murder.

THE COURT:  I want to think about this.  Can we

move on to something else?

MS. COLLINS:  Yes, Your Honor.

BY MS. COLLINS:

Q.  During the course of your investigation, did you

determine whether Mr. Khan had a cellular telephone number?

A.  Yes, we did.

Q.  And did you find that number in Mr. Ahmed's

possessions?

A.  Yes, we did.

Q.  Where?

A.  In his address book from when he returned from Pakistan.

Q.  Is that the one that was photocopied during his

interview at Atlanta airport?

A.  Right.

Q.  Can we show Exhibit 89, which I believe is in evidence?

If we go to page eight, please?

Do you see the number that you determined to be was

Mr. Khan's number?

A.  Yes, I do.

Q.  What entry is it next to?

1  A.   Omar.

2  Q.   Is that the entry that's been highlighted?

3  A.   Yes.

4  Q.   Now, did you -- did the FBI also locate this telephone

5  number, which is 00923005604920, in Mr. Sadequee's

6  possession?

7  A.   Yes, we did.

8  Q.   Where did you find it?

9  A.   It was on a piece of paper in his address book.

10  Q.   And how was that obtained?

11  A.   When they did the -- when they conducted a search of his

12  luggage from Mr. Sadequee's outbound trip from Atlanta

13  eventually to Bangladesh.

14  Q.   And Exhibit 88 was identified but not admitted.  At this

15  point we would like to -- well, take a look at Exhibit 88.

16  A.   Okay.

17  Q.   What is it?

18  A.   It's that piece of paper with the phone number.

19       MS. COLLINS:  At this point we would like to admit

20  Exhibit 88.

21       THE COURT:  I have a pretty good memory, but

22  Exhibit 88 has a phone number of what?

23       MR. COLLINS:  I apologize.

24  BY MS. COLLINS:

25  Q.   Whose phone number is on Exhibit 88?

1    A.    Aabid Hussein Khan.

2    Q.    And in whose possession was that scrap of paper

3    photocopied from?

4    A.    Ehsanul Sadequee.

5              THE COURT:  What's your objection?

6              MR. MARTIN:  No additional objection other than

7    co-conspirator hearsay objection.

8              THE COURT:  So what's your theory of admissibility

9    on this?

10             MS. COLLINS:  Your Honor has found that Mr. Khan

11   and Mr. Ahmed and Mr. Sadequee were part of the conspiracy to

12   provide material support.

13             THE COURT:  I'm going to think about that some more

14   too.  So I'm going to reserve on that as well.

15             MS. COLLINS:  Can we admit this provisionally based

16   on Your Honor's ruling?

17             THE COURT:  I think it's already admitted

18   provisionally, but I am going to decide whether or not I will

19   consider it after I think about your theory of admissibility

20   on a conspiracy.

21             MS. COLLINS:  Then that's all I have, Your Honor.

22             THE COURT:  All right.  Mr. Martin?

23             MR. MARTIN:  Will you put up 509-A on page 53 at

24   the very end, the text?

25                              --   --   --

CROSS-EXAMINATION

BY MR. MARTIN:

Q.   Just scroll down a little bit more.  Right there at 14, just blow that up.  That's fine.

    This is the -- the very last interrogation of Mr. Ahmed was on March 18, 2006.  Is that not correct?

A.   Right.

Q.   And you have reviewed those transcripts?

A.   Yes.

Q.   At the very end of it, this is Special Agent Allen, he says:

            Thanks, Haris.

            Detective Sediqi:  Thanks for coming in again, man.

            Mr. Ahmed:  Bye.

            Mr. Allen:  Bye.

            And Detective Sediqi:  And we shouldn't . . . at least I hope we're not going to bother you anymore.  You know?

            Mr. Allen:  This concludes the interview.

    That was the very last thing told to Mr. Ahmed, was it not?

A.   As far as I know.

Q.   We hope we are not going to bother you anymore; correct?

1  A.    As far as I know.

2  Q.    Can you put up 148?

3       And first March 21, this is like three days later;

4  correct?

5  A.    Right.

6  Q.    And this is an e-mail -- what we call the

7  dannymoore1126@yahoo.france.  That's an e-mail address that

8  none of the other agents had at that point; is that correct?

9  A.    Correct.

10 Q.    You weren't aware of that e-mail address; right?  That's

11 all I'm asking.

12 A.    Right.

13 Q.    Just listen very carefully to my questions.

14      And this e-mail was sent on this date in a fashion by

15 Mr. Ahmed that he would have every reason to believe it could

16 not be surveilled by the FBI or anybody else.  Is that not

17 correct?

18 A.    Correct.

19 Q.    And this is a communication with Mr. Sadequee; correct?

20 A.    Correct.

21 Q.    But he had every reason to believe that was going to be

22 confidential between he and Mr. Sadequee; correct?

23 A.    Right.

24 Q.    In this -- so you would expect there wouldn't be

25 anything self-serving in this.  It would be honest

1   communications between what you believe are co-conspirators;

2   correct?

3   A.   Not necessarily.

4   Q.   Oh, you wouldn't?  Okay.

5       But it's confidential; correct?  No one is monitoring;

6   correct?   And he's telling what has happened; correct?

7          MR. McBURNEY:  I'm sorry, may we approach, please?

8          THE COURT:  Well -- yes.

9          *(A sidebar conference is held from page 672 line 9*

10  *through page 673 line 3, and is transcribed separately under*

11  *seal.)*

12                 *SEALED*

13                 *SEALED*

14                 *SEALED*

15                 *SEALED*

16                 *SEALED*

17                 *SEALED*

18                 *SEALED*

19                 *SEALED*

20                 *SEALED*

21                 *SEALED*

22                 *SEALED*

23                 *SEALED*

24                 *SEALED*

25                 *SEALED*

*SEALED*

*SEALED*

(In open court:)

BY MR. MARTIN:

Q.   Listen carefully to my question.  If you can answer yes or no, please do.

This was a communication that the parties, the two parties, Mr. Sadequee and Mr. Ahmed, would have every reason to believe was confidential between those two people alone; correct?

A.   Correct.

Q.   All right, fair enough.  And in this he says, The dogs came to me, I hadn't done my homework and so forth.  But let me get to this point.

Then I prayed to God, and slowly I regained my confidence.  Then it was all damage control after that.  That's what he says.

And he explains that, does he not?  He says, Basically I told them, which is true to the best of my knowledge, that we were kids who got just excited.  Does he not?

A.   Yes, he does.

Q.   And there would be no reason, if he's merely trying to tell Mr. Sadequee what he said to try to give him a heads-up if he gets interrogated, for him to add the words, Which is true to the best of my knowledge that we were kids who just

1    got excited, would there be?

2    A.   I don't know that I agree with that.

3    Q.   All right.  You don't agree with it?

4    A.   No.

5    Q.   You think he would put the words, Which is true to the

6    best of my knowledge, even though he's giving him a heads-up

7    as to what they are going to be asking him?

8    A.   Yes.

9    Q.   All right.  You are entitled to your opinion.

10        Go down to the bottom.  He talks about the last trip and

11   that we were kids and got overexcited, and he describes to

12   him what -- generally speaking, what he had told them about

13   the events.

14        And then he says:  To prove to them how childish we

15   were, I told them how we joked about disabling GPS, and then

16   went on the Star Trek stuff about lasers and all; right?

17   A.   Right.

18   Q.   He says:  Yes, I made a lot of mistakes, but my initial

19   blunder was -- after my initial blunder, all my intention was

20   damage control; correct?

21   A.   Right.

22   Q.   Now, he's clearly telling him, yes, I told them it was

23   childish, he gave him examples, correct, but he told him be

24   prepared to answer a lot of questions; correct?

25   A.   Right.

Q.   But he prefaced all that by saying "which is the truth,"
did he not?

A.   Yes, he did.

              MR. MARTIN:  That's all I have.

              THE COURT:  Redirect?

              MS. COLLINS:  No, Your Honor.

              THE COURT:  All right.  Let's take our lunch
break.  It is 12:30.  We will break until 1:30, and we will
see you then.

              MR. McBURNEY:  Judge, a quick point.

              You are taking several things under consideration.
Will we have an opportunity to discuss it with you when you
come back?  We will have a chance to be a little more
organized.

              THE COURT:  Haven't you done that already?

              MR. McBURNEY:  We have.

              THE COURT:  Do you want to do it a different way?

              MR. McBURNEY:  Well, we just want the opportunity
if you have questions to respond to the questions and make
sure -- I believe there are two exhibits that are at issue
right now.

              THE COURT:  71 and 71-A and 88?

              MR. McBURNEY:  Right, a piece of evidence that was
in Defendant Sadequee's possession and then Khan material.

              THE COURT:  I understand.

1          MR. McBURNEY:  Okay.

2          THE COURT:  And if I have some questions, when we

3     come back then I will ask my questions.

4               (A recess is taken at 12:31 p.m.)

5                         --  --  --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Wednesday Afternoon Session

2    June 3, 2009

3    1:33 p.m.

4    -- -- --

5    (In open court:)

6    THE COURT:  Here is the issue for me evidentiarily

7    on these items.

8    The elements of this offense are that there has to

9    be a conspiracy to accomplish a common unlawful plan to

10   provide material support or resources, or to conceal or

11   disguise the nature, location, source or ownership of

12   material support or resources, which is the first

13   element.  There is the intent element.

14   Then there is the element that says that the

15   defendant did so, that is, engaged in a conspiracy to provide

16   material support, that he engaged in that conspiracy knowing

17   or intending that the material support or resources used in

18   preparation for, or of carrying out, one of two things:

19   Either a conspiracy, or an act of terrorism.

20   You don't have to have a separate second conspiracy

21   unless you are traveling on the first part of that

22   conjunctive phrase, which is a conspiracy to murder or

23   kidnap.

24   So the question for me is we will focus on the

25   videos that were found in Mr. Khan's hard drive, if -- did

the defendant engage in a conspiracy in which -- with which

he is charged to provide material support knowing or

intending that that support -- let's just take, for example,

the videos, the casing videos of D.C., that they would be

used to prepare for a conspiracy to murder or an act of

terrorism that's transnational in character.

So what is it that these videos with respect to

this third element, which I think is what Ms. Collins was

arguing, how is that probative of whether he knew or intended

that his conspiracy to provide material support, i.e., the

preparing and sending of the casing videos -- and I'm using

that just for illustrative and analytical purposes -- that he

did so knowing or intending that those videos would be used

to carrying out a conspiracy to murder or a transnational act

of terrorism?

MR. McBURNEY:  When you ask what did he know or

intend, you are referring to Defendant Ahmed or Mr. Khan?

THE COURT:  It has to be what the defendant did so

knowing or intending.  It would be a different question if he

knew what Mr. Khan had, but I don't think there is any

evidence that he did.

MR. McBURNEY:  Well, there is evidence that he was

in close and regular communication with Mr. Khan, at least in

the month of April when the conspiracy had clearly formed,

April 2005.  Those are the exhibits we referred to the

1    Court.

2             THE COURT:  I understand all that.

3             MR. McBURNEY:  The 70s.

4             THE COURT:  The communication between Mr. Khan and

5    Mr. Ahmed in those communications, which I think is

6    Exhibit 79, have to do with money.  They don't really have to

7    do with what are we going to do with the money or what are we

8    going to do specifically.

9             But admittedly there are a number of chats that

10   bring a group of people collectively within the sphere of an

11   agreement to do something.

12            MR. McBURNEY:  We will take the first prong of the

13   third element, the conspiracy to murder or kidnap

14   abroad.  That would be the government's theory the efforts of

15   the defendant and others to get into a training camp and then

16   to join some terrorist organization that is in fact itself a

17   conspiracy to kidnap or murder.

18            And these videos, the defendant has admitted in his

19   interviews, was sort of a ticket that he could present.  And

20   there was testimony from his own interviews that he was aware

21   that Abu Umar, Khan, was aware of the videos.  We know

22   actually Khan had the videos.

23            THE COURT:  I accept all that.  The question is how

24   does -- let's take an even more concrete example.

25            A beheading video on Mr. Khan's hard drive, how

does that show that the defendant knew or intended that his

material support would be used to -- in connection with the

conspiracy to murder?

MR. McBURNEY:  I don't think it shows something

about the defendant's intent.  I think it shows something

about the person to whom he was providing these things, the

videos or himself.

THE COURT:  Doesn't -- that third element is to say

that if you are going to do material support things, you have

to do so intending or knowing that that material support is

going to support a conspiracy or an act of terrorism.

MR. McBURNEY:  And the way we show that who he is

supporting is someone who is capable of -- let's take the

2233.

THE COURT:  But he has to know that.  He has to

know what Mr. Khan has.

And you are saying, Let me show you Mr. Khan is

somebody who is a violent person because he has these

beheading videos, and therefore is likely to behead himself,

as an example.

MR. McBURNEY:  Okay.

THE COURT:  You have to show that he knew that or

intended to provide it to somebody that he knew was going to

engage in that sort of conduct.

MR. McBURNEY:  Okay.  The series of chats that are

1  in I believe established that the defendant knew quite well

2  that there was a common purpose.

3          The goal of all of these individuals --

4          THE COURT:  I accept all that.  All I'm saying is

5  that on what issue in the third element are the videos

6  probative?  And I think they have to be probative on the

7  issue of whether the defendant knew or intended.

8          It's not probative on whether Mr. Khan was, because

9  if he was or not is irrelevant unless Mr. Ahmed knew or

10  intended that his material support was going to enable or

11  support, allow a conspiracy to murder or engage in

12  transnational terrorism.

13          MR. McBURNEY:  I think the Court is constricting a

14  bit the flexibility the government has in showing

15  Defendant Ahmed's knowledge.  I think that what the

16  government would need to show is that the --

17          THE COURT:  If I'm constricting it, it is because

18  I think I am legally required to do so.

19          MR. McBURNEY:  Okay.  I think that the

20  government --

21          THE COURT:  Your comment was that I was not

22  constricting it in a permissible way.  And this is -- I guess

23  what I would say is this is obviously an important issue to

24  you.  Why don't we have some cases to support your theory at

25  this point?

1          MR. McBURNEY:  I don't know that there are many

2     cases in this area.

3          THE COURT:  Well, all I need is one.

4          MR. McBURNEY:  All you need is one.  I'm pretty

5     sure there wouldn't be an Eleventh Circuit case on the issue,

6     but --

7          THE COURT:  I'm not sure of that.

8          MR. McBURNEY:  Well, if you have them, you don't

9     need to hide them from me.

10          THE COURT:  But you know, this is the way the

11     system is supposed to work:  The lawyers give to me their

12     authorities on important legal issues.

13          And this is clearly an important legal issue; we

14     have touched on it a couple of days ago.  And all I'm looking

15     for is what I think I am entitled to expect from both sides,

16     are the authorities that would help me guide through a

17     statute that is new, that has elements that are different

18     than any other statute that I have dealt with either as a

19     lawyer or as a judge, and I don't think it's unreasonable to

20     ask for that help.

21          MR. McBURNEY:  It is not unreasonable to ask for

22     it, and we will provide -- I don't have those cases with me

23     right now.  I didn't foresee that's where we would be going

24     with this conversation.

25          When we left before lunch, I misinterpreted where

we were as to an issue of is this in furtherance of the
conspiracy, et cetera.

We started talking about two conspiracies, the
second one being either the 956 or --

THE COURT:  Well, that's because your colleague
said there were two conspiracies and you were traveling on
that.  You don't have to have two conspiracies.

MR. McBURNEY:  You don't.

THE COURT:  So now that I have gone back and
carefully read the statute, I realize that that's an
overstatement of what the third element is.

I'm not sure exactly what your theory is under the
third element, whether it's a conspiracy to murder or kidnap,
or it's an act of terrorism, or it's both.

I mean, the argument was that it was a conspiracy
to murder, so -- but I'm not sure that you are committed to
that.  In fact, I get from you that you probably are not.

MR. McBURNEY:  No.

THE COURT:  Here is what I'm going to do.  I mean,
I need the authorities and I need better research from the
parties.

I don't have to decide this now.  I'm not going to
look at this evidence.  I'm going to give you each
twenty-four hours after the closing statements to make
simultaneous submissions on this evidentiary issue as to the

1    admissibility of the materials on Mr. Khan's hard drive.

2          And frankly, I'm less -- I'm less looking for your

3    analysis of the rule, which I can do.  I'm more interested on

4    the authorities.

5          And if you would copy those and highlight what you

6    think are the relevant parts, that would help me.

7          MR. McBURNEY:  Certainly.  Not cites, actually

8    cases, we will point you to where we think the language

9    supports the government's position.

10         THE COURT:  Or in this case there might be some

11   treaties that would help me work through and do what I think

12   is the rigor that is required under this statute to make

13   these sort of evidentiary rulings.

14         But I think that while you think I'm constraining

15   you, I'm not sure I am.  I am framing the issue by saying I

16   think that if it's your position, which Ms. Collins said it

17   was, is that the admissibility of the material on the

18   electronic media relates to a third element, and the question

19   is not because all of the three tests for conspiracy, was

20   there a conspiracy, reasonably foreseeable, and all that, is

21   a hearsay issue under 803 (e) (2) something, and that that

22   doesn't apply here.

23         I think this is purely a 402 question on

24   probativeness.

25         MR. McBURNEY:  I agree, and we will supply

authority.

I just want to, if I may, briefly articulate the government's view, and I will stop using the word constricted.

I think we need to show -- and if the authorities support it, it will support it -- that it was reasonably foreseeable to Defendant Ahmed that these videos or his support, his personnel, would support one of these two; not that he specifically knew I'm going to join this camp or this person.

Because it's a foreseeability, I think it is the government's burden to show that where it ended up --

THE COURT: You know, I agree with that. But usually it's the reasonably foreseeable test is with respect to conduct. So then you will have to drill down and say what is the conduct that's reasonably foreseeable.

If he had done something -- you know, most conspiracies somebody does something. The question is can a co-conspirator be held accountable for that act.

So, example: If Mr. Khan had done something violent, then I think that's a more traditional reasonably foreseeable argument that, yeah, I was part of that -- or taking a drug case and if you had a conspiracy, then somebody said, I never expected him to sell heroin, I thought we were just doing marijuana, we would say, I don't care what you

expected or what you believed or what he told you.  It was
reasonably foreseeable that he would deal in other drug
material and, therefore, you are going to be held responsible
for that within the conspiracy.

But here we are not talking about the conduct
where -- you are actually talking about predicate conduct;
that is, the collection of information, which is what
Ms. Collins said.

MR. McBURNEY:  Sir, yes, but an example -- and we
will put it in the brief -- after Mr. Khan received the video
about the World Bank, he went online and acquired information
about how to get to the World Bank from Dulles, from Reagan
National, et cetera.  We will put that in there.

But I think that there was conduct as well.

I understand the assignment.  Twenty-four hours
after the closings.

THE COURT:  That's the same assignment that --

MR. MARTIN:  Yes.

THE COURT:  You can view it as an assignment.  I
would rather say that you have twenty-four hours to provide
aid to the Court and try to fairly and correctly address an
evidentiary issue.

MR. McBURNEY:  Understood.

There was a second piece of evidence, the piece of
paper --

THE COURT:  Exhibit 88, which was the piece of paper with a phone number found in the lining of the suitcase that was searched during Mr. Sadequee's detention or questioning in New York.

I do think that that is probative of the issue of who are the members of the conspiracy, and that's admitted.

MR. McBURNEY:  Thank you.

MR. MARTIN:  Your Honor, before we begin, I want -- one scheduling matter.

THE COURT:  Yes.

MR. MARTIN:  I talked to Mr. McBurney, and he may finish before 5:00 today.  My witnesses are not going to be available.  I was planning on them first thing in the morning.

So I just want to alert the Court that we might not be able to start my case until first thing in the morning if he finishes a little early.

THE COURT:  That's fine with me.

MR. MARTIN:  Okay.

THE COURT:  But what I could do is I could start -- say we get done at 4:30 today, we could start 8:30 tomorrow, if you would like to do that?

MR. MARTIN:  No, I have no interest in that.

Our case is going to be over -- it's just in the morning.  Just two witnesses.

1    THE COURT:  You can't predict all this.  I think it

2  actually makes sense to go ahead and if he gets done a little

3  early today, let's stop at the end of the government's case

4  and then go on to the defense case in the morning.  That

5  makes a lot of sense to me.

6    All right.  Call your next witness, please.

7    MR. McBURNEY:  Judge, if we may, just before -- and

8  our witness is here.  But while we are on the topic of

9  provisionally admitted or exhibits that are on the cusp,

10  directly related to this, Exhibit 80, which was a chat

11  communication between Defendant Sadequee and Mr. Khan -- it's

12  the one with the Jimmy's 13th birthday and volleyball -- that

13  was -- you were requiring that we tie this back up to show

14  that in fact at this time -- it came in through

15  Agent Richards, it was before the Court had seen all of the

16  70 series, the chats from the Khan hard drive.

17    So while we are on this topic, I just wanted to

18  remind the Court that that is still out there.  This is our

19  last witness coming up and he's not going to be discussing

20  Exhibit 80.

21    THE COURT:  As I recall, that was seized from

22  Mr. Khan's hard drive, it was a chat between Sadequee and

23  Khan.  There was some reference to inciting the football

24  team, and there -- wasn't there a reference to one or more of

25  the casing videos by the nomination that we found them,

1    either Jimmy's birthday or volleyball contest?

2           MR. McBURNEY:  It actually shows the transmission,

3    the entry in the chat, you have received -- Aboo Khubayb has

4    transmitted Jimmy's 13th birthday, and then there is a

5    discussion about what's inside those files in coded language.

6           THE COURT:  I think that's probative on the issue

7    of who are the members of the conspiracy, and therefore it's

8    admitted.

9           MR. McBURNEY:  Thank you.

10          MS. COLLINS:  Your Honor, the government would call

11    Evan Kohlmann.

12          Your Honor, before I begin with this witness, at

13    the May 20th *Daubert* hearing, the government requested and

14    the defense counsel agreed -- and I believe the Court agreed

15    as well -- that the transcript from that *Daubert* hearing

16    would be considered as part of the trial record so that we

17    would not have to take up the Court's time going back through

18    Mr. Kohlmann's qualifications and his methodology.

19          THE COURT:  Is that okay with you?

20          MR. MARTIN:  That's okay, except there are some

21    portions of that that may not be admissible under your order

22    regarding Mr. Khan's testimony.

23          THE COURT:  Right.

24          MR. MARTIN:  So with the exclusion of that portion,

25    that would be acceptable.

THE COURT:  My intention was -- I thought our
agreement was that with respect to that transcript, that I
would consider it solely for the purpose of his
qualifications upon which he is allowed to offer his expert
opinion.

There was other discussion about other matters.  My
understanding is he comes here qualified, and now he
expresses his opinions and gives his testimony supporting
them.

MS. COLLINS:  Yes, sir.  Then should I -- we have
that marked as a government's exhibit.  Should I tender that
as an exhibit, or should we take out the portions that don't
deal with his qualifications and methodology?  How would
Your Honor like us to proceed?

MR. MARTIN:  I'm okay with it just going in
*en masse* and the Court sorting it out, that's fine with me.

THE COURT:  Thanks a lot.

MR. MARTIN:  I mean.

THE COURT:  Here is what you are really
saying.  You are saying --

MR. MARTIN:  Yeah, tell me what I'm really saying.

THE COURT:  That you would agree that the Court is
capable pursuant to what it just said of disregarding those
matters that are unrelated to his qualifications.

MR. MARTIN:  That's right.

1          THE COURT:  And therefore as a matter of

2    convenience to the Court Reporter and Clerk of Court, that

3    they will simply file the entire transcript for my

4    consideration of those parts that I deem relevant.

5          MR. MARTIN:  Thank you, yes.

6          MS. COLLINS:  Thank you, Your Honor.

7          Then we would tender Government's Exhibit 135,

8    which is what the transcript is marked as.

9          THE COURT:  All right.  It's admitted.

10                    --  --  --

11                  EVAN F. KOHLMANN

12   being first duly sworn by the Courtroom Deputy, testifies and

13                  says as follows:

14                    --  --  --

15                  DIRECT EXAMINATION

16   BY MS. COLLINS:

17   Q.   Now, Mr. Kohlmann, since we have already discussed your

18   qualifications and background, I would like to just dive

19   right into your substantive testimony in this matter.

20        And first I would like to start with a brief discussion

21   of some of the terms in various communications and

22   attachments sent to and received by Mr. Ahmed.

23        On your table -- and if we can also call up -- there

24   should be Exhibit 14 and 14-A, it should be the top exhibit

25   in that pile?

1    A.   14 and 14-A?

2    Q.   14-A, that's fine.

3         And this was an attachment in an e-mail sent from

4    Mr. Sadequee to Mr. Ahmed.  Just taking a look at this, what

5    is the title of this document?

6    A.   The title of this document is Millat Ibrahim, which

7    means The Religion of Abraham.

8    Q.   Who is the author?

9    A.   The author of this book is identified as Abi Muhammad

10   al-Maqdisi, whose real name is Asam al-Barqawi.

11   Q.   And who is Mr. Al-Maqdisi?

12   A.   Abi Muhammad al-Maqdisi is arguably the most prominent

13   salafi jihadi cleric in the country of Jordan.  He was a

14   spiritual mentor and a former cellmate of Abu Musab

15   al-Zarqawi, that being the founder of Al-Qaeda in Iraq.

16        He had a tremendous influence on Zarqawi.  And even

17   after he criticized some of Zarqawi's methods in Iraq,

18   Zarqawi issued a statement saying that, No matter what he

19   says, we will always treat him as being out -- basically our

20   father, as being our shaykh.

21   Q.   Now, going on to Exhibit 16-A?

22   A.   Yes.

23   Q.   If we can pull that up on the screen?  Thank you.

24        What is the title of this document?

25   A.   The title of this document is Fundamental Concepts

1    Regarding al-Jihad.

2    Q.    And at the bottom there, it says At-Tibyan

3    Publications?

4    A.    That's correct.

5    Q.    What is At-Tibyan Publications?

6    A.    At-Tibyan Publications is a virtual organization.

7    In other words, there is no bricks and mortar mailing

8    address.

9         It's a virtual organization on the internet consisting

10   of a group of individuals spread across various countries who

11   have endeavored to take jihadi texts written by senior

12   members of Al-Qaeda factions in Saudia Arabia, in Iraq and

13   elsewhere, video recordings, audio recordings, you name it,

14   and essentially transcribe these documents or translate them

15   into English, the idea being to make the realm of jihadi

16   multimedia and propaganda available to an English-speaking

17   audience despite the fact that many of these materials were

18   originally written or published or spoken in other languages,

19   Arabic, Urdu, Pashto, et cetera.

20   Q.    What is the website that's associated with At-Tibyan

21   Publications?

22   A.    Tibyan Publications actually had two websites.  They had

23   Attibyan.com, and they also had Tibyanpubs.

24        The reason that they had two separate websites instead

25   of one was because one website was a static website, didn't

1    really change very often, which was purely an open place

2    where people could come and get the materials that Tibyan was

3    publishing.

4        In other words, if you wanted the latest copy of this

5    book, you could go to their main static website and download

6    it.

7        However, Tibyan also operated a discussion forum.  That

8    discussion forum was locked; in other words, new users were

9    not allowed on unless you had another user or users from the

10   forum to recommend you, and they had to know you personally

11   in order to recommend you.

12       The purpose of this forum was for individuals who are

13   supportive of the ideas of the salafi jihadi platform to

14   discuss these ideas, to share their ideas, to propose new

15   ideas that Tibyan should pursue, and also to help coordinate

16   distributing this material to as wide an audience as

17   possible.

18   Q.   If we can pull up Exhibit 81?

19           MR. MARTIN:  May I just clarify the exhibit for a

20   second?

21           MS. COLLINS:  Here you go.

22           MR. MARTIN:  Terrific.

23   BY MS. COLLINS:

24   Q.   To page four.  Can you go up the middle of the page?

25   Thank you.

1        So in this e-mail from Mr. Ahmed to Mr. Hussaini, it

2  says check out Tibyan.com?

3  A.    That's correct.

4  Q.    Is that website associated with At-Tibyan Publications?

5  A.    Yes, it was.

6  Q.    And which part of At-Tibyan Publications that you just

7  described corresponds to that website?

8  A.    This would have been the static website for downloading

9  materials published and written and created by At-Tibyan

10 Publications.

11 Q.    Now, while we are here, before we move on to a different

12 exhibit, I will ask you, underneath it says for Urdu books,

13 Aljihad.tk.  What is Aljihad.tk?

14 A.    That web site was originally inaugurated as something

15 known as Taliban Online.  By 2005 it had morphed into a

16 center on the internet for distributing books about jihad

17 written in Urdu.

18       In other words, most of the material about jihad and

19 about the Mujahideen, the holy warriors, was written in

20 Arabic.  This site specialized in distributing Tibyan-like

21 material, but specifically in Urdu.

22 Q.    And when you talked about At-Tibyan Publications,

23 Tibyan.com and aljihad.tk, you said that they were intending

24 to promulgate publications about jihad.  Are you talking

25 about violent jihad or jihad as an inner struggle for

1   religion?

2   A.   No, I'm talking about violent jihad.

3       These documents made very clear that according to the

4   people responsible for Tibyan, that the spiritual idea of

5   jihad or the spiritual notion of jihad was of secondary

6   importance, if of any importance at all, and that Tibyan more

7   or less exclusively focused on the meaning of jihad in a

8   physical way.

9   Q.   Going to Exhibit 21?  It will show up on your screen.

10  A.   Okay.

11  Q.   Here this is an e-mail from admin@tibyanpubs.com.  What

12  is Tibyanpubs.com?

13  A.   Tibyanpubs was the other Tibyan Publications website

14  which I was referring to, which is a discussion forum.

15      The discussion forum ran particular software where again

16  you can register, you can create log-ins.

17      But see, the problem is that by the date of this

18  e-mail -- long before actually -- Tibyanpubs was locked.  In

19  other words, you couldn't register as a new user unless you

20  already knew people on the forum.  It was locked as of -- at

21  least as of April of 2004.

22  Q.   And when you say locked, what would you need then to

23  access the Tibyanpubs.com website?

24  A.   You would need a log-in and a password even in order to

25  see the messages.

1     Because some forums are designed where you can see the

2     messages but you can't post unless you have a user name and

3     password. That was not what Tibyan Publications was.

4     Their website was designed that you couldn't even see

5     anything on the site unless you had a user name and a

6     password which were assigned to you by the administrator.

7     And I think if you look at this, this is obviously --

8     the password has been reset to a random number.

9     Yeah, it's an automated message sent if you forget your

10    password or if you need a new password.

11   Q. If you can pull up Exhibit 17, down at the

12   bottom. Well, that whole bottom half of the page, please.

13     This is an e-mail from Mr. Ahmed to two other

14   parties. In the highlighted part, I'm reading the classic --

15   I won't try to pronounce that -- Ilhaq bil Qaafilah by Shaykh

16   Abdullah Azzam, Join the Caravan.

17     Who is Shaykh Azzam?

18   A. Shaykh Abdullah Azzam is widely known as the godfather

19   of jihad in the Twentieth Century. He reinvigorated the

20   concept of military jihad during the 1970s and '80s,

21   primarily through recruiting young men from around the world

22   to fight in Afghanistan.

23     He saw the war, the jihad against the Soviets in

24   Afghanistan as being part of a larger struggle which would

25   see Mujahideen, or Islamic forces, liberate by force the

1    higher Middle East and Muslim world and establish a greater

2    Islamic state.

3        His philosophy was there are no more super powers, there

4    are no more mini powers, there is only the power that springs

5    from our religious belief, and there can be no negotiations,

6    there can be no dialogues, there can be no conferences.

7        His philosophy was, and verbatim, jihad and the rightful

8    alone.

9    Q.    Now, was Shaykh Azzam considered a mentor to any

10   individuals who went on to establish terrorist

11   organizations?

12   A.    Yes, Shaykh Azzam is cited by both Al-Qaeda and Hamas as

13   being their primary spiritual mentors.  But particularly with

14   regards to Al-Qaeda, Shaykh Azzam when he was in Afghanistan

15   during the 1980s, he created something known as the

16   Mujahideen Services Office which later became Al-Qaeda.  This

17   is the predecessor organization of Al-Qaeda.

18       Azzam is featured in many, many Al-Qaeda propaganda

19   films, perhaps most famously in the video The Destruction of

20   the *U.S.S. COLE,* otherwise known State of the Ulma.

21   Q.    Now, this time in front of you on the desk should be

22   three CDs.  One is Exhibit 137?

23   A.    Yes, I have three CDs.  137, yes.

24   Q.    138?

25   A.    Yes.

1    Q.    And 140?

2    A.    Yes.

3    Q.    Taking a look at Exhibit 137, have you reviewed that?

4    A.    I believe I have, yes.

5    Q.    And did you determine -- I should say first,

6    Exhibit 137, 138 and 140 all were obtained from a folder

7    assigned to Mr. Ahmed on the Georgia Tech shared drive.

8          Exhibit 137, what is it?

9    A.    Exhibit 137 is a Real Media file that is titled

10   Dr-Rethaa.rm.

11         I recognize this file name and I recognize this video

12   as being a video recording of or audio recording -- excuse

13   me, an audio recording of Dr. Ayman al-Zawahiri, the deputy

14   commander of Al-Qaeda, which was released by Al-Qaeda's

15   official media wing in approximately January of 2006.

16   Q.    Okay.  And Exhibit 138?

17   A.    Yes.  Exhibit 138 contains another Real Media file,

18   which the file name is Suri.ram.

19         I recognize this as an audio file, a song.  The title of

20   that song is Qatil ya Mujahid, which means, Fight, Oh,

21   Mujahid, or Kill, Oh, Mujahid.

22         And the song became famous because of the fact that it

23   was included in the soundtrack of the Al-Qaeda propaganda

24   film Destruction of the *U.S.S. COLE,* otherwise known as State

25   of the Ulma.  This song itself plays during a section of the

film when there are scenes being shown of the al-Farouq

training camp in Afghanistan of individuals training at

al-Farouq, and the lyrics essentially tell those listening

foori, foori, foori, revolt, revolt, revolt, rebel, kill, oh,

Mujahid.

And that's again played in front of -- not on this CD,

but in the video Destruction of the *U.S.S. COLE* played in

front of the scene for training.

Q.   Now, you mentioned this video, Destruction of the *U.S.S.*

*COLE* a couple times.  Who distributed that?

A.   It was the very first official video recording produced

by Al-Qaeda's official media wing, which is known as the

as-Sahaab Media Foundation.

Q.   And what, very briefly, just a one-line summary, is the

content of that video?

A.   Of the Destruction of the *U.S.S. COLE*?

Q.   Destruction of the *U.S.S. COLE.*

A.   Simply put, it's an explanation of why Al-Qaeda chose to

strike the *U.S.S. COLE* in October of 2000, explaining the

various different crimes that the U.S. has commited in the

Muslim world, and offering individuals a lesson, saying that

if you believe in what we believe in, come to these training

camps, you can get training too and you can join us.

Q.   And what type of attack was committed on the *U.S.S.*

*COLE?*

A.    It was a suicide boat bombing attack.

Q.    And you mentioned the al-Farouk training camp.  Whose training camp is that?

A.    The al-Farouq training camp was Al-Qaeda's primary training camp.  It was also known as the Camp of Shaykh Bin Laden.

Q.    I'm not sure if this is actually in the record, but you referred to Al-Qaeda several times.  What is the goal of Al-Qaeda, and can you just give a two-line summary of what is Al-Qaeda?

A.    Of course.  Al-Qaeda was formed in September of 1988 in order to help liberate parts of the Muslim world from what they viewed as apostate regimes; in other words, nonIslamic regimes.

      However Al-Qaeda's founding philosophy was that it wouldn't simply be possible to overthrow these regimes without first targeting their primary foreign sponsor and the people that Al-Qaeda blames for being responsible for the, quote-unquote, new world order, that being the United States and the United States government.

Q.    Now, you said that Exhibit 138 is a song from this video.  Do songs have any significance in propaganda relating to violate jihad?

A.    Yeah.  Much like any movie you watch, much like anything you watch, a soundtrack can have an integral element in what

1    you see and what your impression is.

2        These songs, which are known as anasheed, are

3    specifically known because of the fact that they are

4    associated with the ideas of death and martyrdom, and that

5    the lyrics of these particular anasheed are tailored to the

6    idea of violent jihad.

7        In other words, encouraging people to follow in the

8    footsteps of the people that they are watching in the videos,

9    to follow -- and these are all recorded fairly recently by

10   people who understand how they are being used.

11   Q.    Now, moving on to Exhibit 140, what is on Exhibit -- do

12   you recognize it?  Have you reviewed that before?

13   A.    Yes.

14   Q.    And what is on Exhibit 140?

15   A.    Exhibit 140 contains an MP3 audio recording which is

16   titled Yebgha ash Shahada.

17   Q.    And what is Yebgha ash Shahada?  What significance does

18   it have?

19   A.    Yebgha ash Shahada is another anasheed song, it

20   literally means Where are the Martyrs?  And it became famous

21   as a result of the fact that it was used over and over again

22   in recordings released by Abu Musab al-Zarqawi and Al-Qaeda

23   in Iraq.

24       In particular it became famous because in October of

25   2005, Al-Qaeda in Iraq published a propaganda film titled

The Battle of Omar Hadid.  That video contained large

sections of suicide bombers prepping themselves for going on

their missions, and then showing them detonating themselves

while playing this song in the background.

When The Battle of Omar Hadid was later translated and

rereleased in English by At-Tibyan Publications, the virtual

organization that I spoke of before, they not only translated

the sayings or the statements of the suicide bombers, but

they actually went through and carefully translated the

lyrics to this particular song, which tell people essentially

that they should follow the examples of the heros of Islam,

and they talk about Tariq Bin Ziyad burning his boats so his

soldiers could not swim back.  In other words, the virtues of

self-sacrifice, the virtues of martyrdom.

Q.    Also in front of you is Exhibit 139, which actually we

can put it on the screen.  It is actually in sections.

Do you recognize this?

A.    Yes.

Q.    What is it?

A.    This is known as the Alliwa flag, A-l-l-i-w-a.  It's

used by the Taliban as their battle standard in combat.

Q.    And what, in a nutshell, is the Taliban?

A.    The Taliban is an Islamic movement in Afghanistan, comes

from the root word talib, which means students or student,

they are the students.

It was formed in approximately 1996. It seized control over most of Afghanistan, it imposed relatively strict Islamic prohibitions against television, against other religions, and it provided safe haven to Osama Bin Laden and Al-Qaeda.

Q.   And in 2005, where was Taliban operating?

A.   In 2005, the Taliban was primarily in Pashto regions of the Afghan-Pakistani border.

Q.   And during 2005, was it engaged in committing violent attacks?

A.   Yes.  During 2005, the Taliban was actively engaged in fighting with coalition forces inside Afghanistan, the Afghan National Army, the Afghan Police, Pakistani Army, Pakistani Police, and various other countries who have peace-keeping forces or civilians in that area.

Q.   And what methods was it using during its fighting?

A.   It used a variety of methods.  It used everything from suicide bombings, the amaliyat istishhadiya, the martyrdom bombings.  It also uses conventional-style attacks, conventional-style guerilla assaults on NATO bases.  And it also engages in assassinations, executions.  You name it, they have done it.

Q.   And in 2005 was the Taliban accepting fighters and members?

A.   Well, they were accepting members to the degree that if

you came there, they were happy to have you.  But they

were -- generally if you are an Afghan, they would take you

in with them.  But if you were Pakistani, they would probably

put you with a group of Pakistani fighters.  If you were an

Arab, they would try to put you with Arab fighters.

The reason is linguistics.  It doesn't make a lot of

sense to have a unit full of mixed people.  The Taliban would

eagerly welcome people to come.  They would just assign them

to the Arab units fighting with Al-Qaeda.

Q.   And were all of those units, the Pakistani, the nonmixed

units, were they all still considered part of the Taliban?

A.   Yes.  They are an essential part of the Taliban.

Q.   We can finish with the screen.

We have heard evidence in this case regarding a

conspiracy to obtain training from Lashkar-e-Tayyiba.  What

is Lashkar-e-Tayyiba?

A.   Lashkar-e-Tayyiba means Army of the Pure.  It's a

designated foreign terrorist organization.  It is an

organization that was founded in approximately 1989 in the

Kunar Province of Afghanistan.

It was initially created in order to help Afghan forces

fight Soviet and communist forces in Afghanistan.  However

because that conflict ended so quickly, Lashkar quickly

changed its perspective or its primary mission to fight

Indian forces in nearby occupied Kashmir.

1      Lashkar-e-Tayyiba itself is built upon a relatively

2  narrow sectarian base.  They are Sunnis, but they follow a

3  particular sect known Ahl-e-Hadith.

4  Q.   And what is their ultimate goal?

5  A.   Their ultimate goal is to establish a Sunni -- a

6  puritanical-style Sunni regime in Pakistan and have those

7  borders expand past just what we see today, but include parts

8  of Pashto Afghanistan, Kashmir, et cetera, a greater

9  Pakistan.

10      Their view of Islam is not exactly the same, but it is

11  similar to, it is analogous to the di-Albani Islam practiced

12  by the Taliban.

13  Q.   You say expanding the borders to include Kashmir, who

14  controls that part of Kashmir today?

15  A.   Well, Kashmir is divided between Azad Kashmir, which is

16  controlled by Pakistan, and Jammu Kashmir, which is

17  controlled by India.  And Jammu Kashmir is the larger

18  section.

19  Q.   Now, in attempting to reach their ultimate goal, do they

20  commit violent attacks?

21  A.   Yes.

22  Q.   And where do those attacks -- where have those attacks

23  taken place?

24  A.   Well, the primary focus of Lashkar activities is in the

25  occupied zone of Kashmir where they engage in what are known

as fedayeen or suicide commando-style raids.  However that's

not to say that Lashkar has not committed acts elsewhere,

because it has.

Lashkar has a fairly strong transnational identity.  It

works very closely with jihadi movements from elsewhere

outside of Pakistan.  It has carried out attacks, identified

attacks inside of Pakistan, inside of India.  It has openly

claimed responsibility for terrorist attacks in both

New Delhi and in the Red Fort complex, the Parliament

Building in Red Fort.

Yeah, I think you could say that it's active both in the

occupied zones, also in India, and also in Pakistan.

Q.   And during these attacks, people have died?

A.   Yes.  Civilians as well.

Q.   Civilians as well as other targets?

A.   Yes.  And Lashkar has also been blamed, although it

hasn't been conclusively proven, that they were responsible

for last year's Mumbai attack.

Q.   Does Lashkar-e-Tayyiba accept members from outside of

Pakistan?

A.   Yes.

Q.   Do they accept members from inside of Pakistan?

A.   Yes.

Q.   And do they have areas where they will train new members

to become part of their fighting?

1   A.   Yes.

2   Q.   Where are those areas?

3   A.   They have several camps, although most of the camps are

4   based in the eastern part of the northwest frontier province,

5   the NWFP of Pakistan.  Most people are familiar with that

6   region as being the Afghan-Pakistani border, but actually it

7   stretches all the way over to the border with Kashmir.

8        Near the town of Muzaffarabad, up farther near Balakot

9   and down near Muridke farther south, all along in this kind

10  of belt, you have four or five different training camps.  And

11  Lashkar used to have its own camp inside the Kunar Province

12  of Afghanistan as well.

13  Q.   Now, do they accept nonlocal Pakistanis and people from

14  outside of Pakistan into these training camps?

15  A.   Yes.

16  Q.   The area where the training camps are located, what's

17  the terrain like there?

18  A.   It's pretty rough.  I mean, it's not exactly urban.

19  Q.   Is it mountainous?

20  A.   It's mountainous.  It's heavily wooded.  It's not that

21  easy to get to.  It's not, you know, 20 hours away, but if

22  you don't know where you are going -- for the most part these

23  kind of camps, you simply can't walk up to the gate.

24       Lashkar's facilities all were carefully enclosed with

25  barbed-wire fences.  They encouraged people to come, but

first you would have to get in contact with them, first you

would have to make the arrangements.  They didn't want people

showing up at their front door without having, you know, done

something first.

Q.   And do they have locations either within Pakistan or

outside of Pakistan where people could try to make that

initial contact?

A.   Both in and outside.  I mean, number one, they had an

internet website.  Number two, they had an e-mail address.

Number three, they had recruitment offices all across

Pakistan.

Basically what it was was just a matter of going to a

major Pakistani city, going to the recruitment office,

speaking with the officer, being vetted, you know, to make

sure you are not a spy.

And if they assume that you are who you say you are and

your interest is genuine, they dispatch you either to the

frontier near Afghanistan or near Pakistan.

Q.   Now, you testified that LET is a designated foreign

terrorist organization.  Take a look at Exhibit 141, which

should be on your table?

A.   Yes.

Q.   Is this the notice designating Lashkar-e-Tayyiba?

A.   Yes.  Public Notice 4561 from the Department of State

identifies Lashkar-e-Tayyiba along with again the alias Army

of the Pure, Army of the Righteous, as being a designated

foreign terrorist organization back at December 23, 2003.

          MS. COLLINS:  Your Honor, earlier in pretrial

proceedings the government filed a motion for judicial notice

of the designation of Lashkar-e-Tayyiba.  So at this point we

would tender Exhibit 141 into evidence.

          THE COURT:  Any objection, Mr. Martin?

          MR. MARTIN:  No objection.

          THE COURT:  It's accepted, and they are so

recognized.

BY MS. COLLINS:

Q.   Now, during this case we have also heard evidence that

there was consideration of training from an organization

called Jaish-e-Mohammed.  What is Jaish-e-Mohammed?

A.   Jaish-e-Mohammed literally means Army of Mohammed.   It

was formed in approximately 2000 by a Pakistani cleric by the

name of Maulana Masood Azhar.

     Maulana Masood Azhar was freed the year previous during

the hijacking of an Indian airliner which was held captive in

the Afghan city of Kandahar until Mr. Azhar was freed.

     Upon his liberation from an Indian prison, he rejoined

his associates inside of Pakistan, and he formed this new

organization known as Jaish-e-Mohammed.

     Jaish-e-Mohammed seeks to establish an Islamic state, a

greater Islamic state inside of Pakistan.  It's very active

1  inside of Afghanistan.  It has an extremely close

2  relationship particularly with the Taliban.

3      Prior to 9/11, the two organizations, Jaish-e-Mohammed

4  and Taliban, actually published a joint newspaper together

5  known as Dharb-e-Mumin.

6  Q.   Now, what types of attacks does -- or does

7  Jaish-e-Mohammed commits attacks in order to accomplish its

8  goal of establishing an Islamic state and uniting Kashmir?

9  A.   Well, Jaish is a little bit different than

10  Lashkar.  Lashkar has this fedayeen, this suicide

11  commando-style tactic, whereas Jaish is more along the lines

12  of kind of typical style of what we would assume from

13  Mujahideen organizations, that being, number one, the

14  standard stuff in the field, Kashmir standard guerilla-style

15  operations.

16      But inside of Pakistan, Jaish members have carried out

17  suicide bombings, which Lashkar does not do.  These suicide

18  bombings have particularly targeted senior members of the

19  Pakistani government, including the former president

20  Pervez Musharraf.

21  Q.   Now, the guerilla operations that you mentioned, who

22  were those typically targeting?

23  A.   They are targeting Indian forces in occupied Kashmir,

24  but it's also -- again, it's important to emphasize that

25  Jaish members have turned up also in Afghanastan fighting

1   coalition forces there.

2       It's never been conclusively proven that they were

3   dispatched by Maulana Masood Azhar personally, but there have

4   been a number, a significant number of Jaish members picked

5   up in both Pakistan and Afghanistan engaging in activities

6   that had nothing to do with Kashmir.

7   Q.   Now, in 2005, was Jaish-e-Mohammed accepting recruits?

8   A.   Yes.

9   Q.   Were they accepting any type of recruit, or did you have

10  to be Pakistani?

11  A.   No, you could be from outside as long as they could vet

12  you.

13      For instance, in their newspaper Dharb-e-Mumin, Jaish

14  actually published an advertisement for their principal

15  training camp in English.  The camp was known as Syed Ahmed

16  Shaheed Camp, which was known located near the city of

17  Balakot.

18      This was openly advertised, and it described the kind of

19  training you would get.  And obviously, this is all written

20  in English, so they weren't necessarily looking to appeal to

21  those who spoke Urdu; they were looking to appeal to

22  others.

23      Between 2001 and 2005, a number of individuals from

24  foreign countries outside of Pakistan traveled there to get

25  training from Jaish-e-Mohammed, particularly at this camp in

1    Balakot.

2    Q.    And when I was asking you questions with respect to LeT,

3    I may not have specified the time period.  In 2005, was LeT

4    also accepting nonPakistani members and members from within

5    Pakistan?

6    A.    Yeah.  At this particular point in time, groups like

7    Lashkar and Jaish were very important for those seeking to

8    get training in Pakistan because of the fact that the Taliban

9    were still a smaller group.  They were still having

10   trouble.  They were still relatively underground.  It was

11   difficult to reach them.

12        If you wanted to receive training and you didn't have

13   prior contact with a jihadi organization, in this particular

14   point in time, groups like Jaish-e-Mohammed and Lashkar were

15   absolutely integral.  They provided a bridge between the era

16   before 9/11 and I guess what you could say we are dealing

17   with right now.

18   Q.    Now, you mentioned that Lashkar and Jaish both required

19   vetting of potential new members.  What do you mean by that,

20   the vetting?

21   A.    Well, these groups are aware that they have been

22   designated as foreign terrorist organizations by the U.S.

23   government, they are aware that there are hostile

24   intelligence agencies, whether it's India, U.S., Pakistan,

25   Afghanistan, wherever.  There is plenty of places that would

1    like to get an eye-in on these groups.

2        So they want to try to make sure that anyone coming in

3    is for real.  The idea behind doing that is that they give

4    you phone numbers or e-mail addresses or contact information,

5    offices, and they encourage people to contact them and if you

6    are interested, let's speak, you know, let's discuss, let's

7    find out a little bit about you, what's the nature of your

8    interest.

9        If they judge that your interest is genuine, you will be

10   given an invite.

11   Q.   Now, in order to kind of satisfy that vetting process,

12   would it help to know someone who already has contacts with

13   those organizations?

14   A.   That's the best kind.  I mean, Ahl-e-Hadith, the

15   movement that's behind Lashkar, is very small.  So most of

16   these, it's all through personal contacts.  But it's

17   exceptionally useful if you know someone.

18        For instance, here in the United States, you have the

19   case of Ismail Royer, otherwise known as Randall Royer, who

20   had made personal contact with both one of the founders of

21   Lashkar and had physically gone to a Lashkar office in

22   Pakistan and spoken with them there.

23        He then basically served as the contact person for

24   others inside the United States seeking to get training, and

25   that he would serve as the person to vet them.  Lashkar would

1  say you know these people, if you know them, if you trust

2  them, if they are your friends, bring them over here.

3  Q.   Now, as part of your research, are you familiar with

4  somebody named Aabid Hussein Khan?

5  A.   Yes.

6  Q.   And did you actually have occasion to review computer

7  media and other things seized from Mr. Khan in June of 2006?

8  A.   Yes.

9  Q.   Now, after reviewing all of that information, were you

10  able to draw any conclusion about whether Mr. Khan was

11  involved or had a relationship with either Jaish-e-Mohammed

12  or Lashkar-e-Tayyiba?

13  A.   Yes.  My assessment was that Mr. Khan had made contact

14  with both Jaish-e-Mohammed and Lashkar-e-Tayyiba.

15  Q.   And can you explain a little bit about why you concluded

16  that?

17  A.   Because of the fact that according to the information

18  that was at my disposal, Mr. Khan on at least one occasion

19  visited a Lashkar-e-Tayyiba recruitment office in Attock in

20  Pakistan, and was sending letters back and forth to these

21  groups attempting to somehow arrange for an arrangement -- to

22  make an arrangement with these individuals so that others

23  could come with him to Pakistan and travel there and get

24  training there, excuse me.

25          MS. COLLINS:  Your Honor, may I have just one

1   second?

2   BY MS. COLLINS:

3   Q.   I would like to move on to another organization that you

4   have mentioned earlier in your testimony but also has been

5   mentioned elsewhere, and that is Al-Qaeda in Iraq.

6        What is Al-Qaeda in Iraq?

7   A.   Al-Qaeda in Iraq began under another name.  It first

8   began in 2003 under the name the Jamaat al Tawheed wal Jihad,

9   which means the Tawheed and Jihad Organization.

10       This organization was founded by a Jordanian, Abu Musab

11  al-Zarqawi, who had fought in Afghanistan and who had become

12  a Mujahid there, but had always seen himself as separate from

13  Bin Laden, Osama Bin Laden and Al-Qaeda in the sense that he

14  felt that Bin Laden didn't have to be the only leader of

15  Al-Qaeda, there could be other people, and he felt he was

16  just as good as Bin Laden.

17       After he entered Iraq in 2003 and began launching

18  operations there, Zarqawi and his Tawheed and Jihad Movement

19  gained the attention of Al-Qaeda senior leadership in

20  Afghanistan.

21       And so in October of 2004, after prolonged discussion

22  with them, they agreed to rename the organization and put it

23  officially under the banner of Al-Qaeda, and they were going

24  to call it Al-Qaeda -- Tamseen Al-Qaida, the Al-Qaeda

25  Network, Bilad al-Rafidayn, which means in the Land of the

1   Two Rivers or in the Land of Mesopatamia.

2       The reason they don't call it Iraq and they call it the

3   Land of the Two Rivers or Mesopotamia, because they view Iraq

4   as being a creation of western powers, and they view the real

5   name of this region as being Mesopotamia, which literally

6   means the Land of the Two Rivers.

7   Q.   Now, once it joined with Al-Qaeda, did its goals

8   change?

9   A.   No, no.  Its goals were pretty much solid to begin

10  with.  Its goals were to attack the United States, to attack

11  apostate regimes, to establish an Islamic government in Iraq,

12  an Islamic state or an Islamic emirate, and eventually allow

13  that emirate to serve as a base to launch jihad in

14  Saudia Arabia and Palestinian territories, in Syria, across

15  the Middle East.

16  Q.   Now, you have mentioned that Al-Qaeda in Iraq commits

17  attacks within Iraq.  What types of attacks do they engage

18  in?

19  A.   Well, I should be clear.  It doesn't just engage in

20  attacks in Iraq.  It has also engaged in attacks elsewhere.

21      But for many, many months, Al-Qaeda in Iraq was most

22  closely associated with two tactics in particular.

23  Number one, beheading executions, such as that of Nick Berg

24  or Olin Eugene Armstrong or a host of other U.S. and other

25  hostages in Iraq.

1    The other tactic which really gained Zarqawi his true

2  fame was as the organizer of suicide bombings, the martyrdom

3  attacks.  Zarqawi was responsible for all of the most

4  devastating suicide bombings that took place in Iraq, the

5  attack on the United Nations in 2003, causing the deaths of

6  hundreds if not thousands of civilians, U.S. military

7  servicemen, humanitarian workers, Iraqis.

8    It's an exceptionally violent movement, exceptionally

9  bloody movement.  And as a result of its tactics and its

10  methodology, it has been rejected by most Iraqi insurgent

11  groups.

12  Q.    Given the suicide bombings that it has conducted, it

13  seems that the membership would be slowly dwindling.  So how

14  does it generate new recruits and how does it generate

15  support for its activities?

16  A.    That was Al-Qaeda's biggest problem always, which is

17  that if you are carrying out suicide bombings, you need a

18  constant spring of people arriving who are willing to carry

19  out these kind of attacks, and you also have to make it seem

20  like this is something that people should look forward to,

21  it's an honor.

22    How do you do that?  Well, Zarqawi did it through

23  media.

24    Zarqawi actually achieved the nickname of the Shaykh of

25  the Slaughterers because of the fact that in his videos,

there was such intense focus on the virtues of sacrifice, of martyrdom, of using your own hands, of getting your own hands bloody.

And Zarqawi started what you might call the cult of the suicide bomber, which is that he began showing these young men speaking to the camera before they would go out on their mission, saying very bluntly:

> I address this message to all the other young men who are watching this CD or this video on the internet or back at home on CDs or whatever, and I want you to know that it's your duty, even if you are watching this on your computer screen back in wherever -- you know, I was not from Iraq, I'm Libyan, so it's just like me.
>
> It's your duty to come here and become part of this, even if you have no prior connection to jihad, even if this is your first experience. It's your duty.
>
> And what you should do when you come here is to carry out the suicide bombings, because they are the most effective operations and they terrify the Americans the most.

Q.   Now, so Al-Qaeda believed that by distributing those, they would attract these new members to then come out and carry out these attacks?

A.    Yeah.  I mean, it was a demonstrated thing.  When
Al-Qaeda began releasing these videos, they were being
released on discussion forums, which allowed, number one, the
videos to be posted, but, number two, for people watching
them to offer their comments.

    And if you read the comments of the people posting their
reactions to these videos, it's quite clear what the impact
was.  And it was a rallying cry and it was a very strong
rallying cry.  And there were a lot of people who began
discussing on these forums about the virtues of becoming
suicide bombers, becoming martyrs.

    And at one point the administrators of the forums began
posting messages announcing when members of the forums would
go off to Iraq to become suicide bombers, and they would talk
about these individuals meeting up with each other in guest
houses in Iraq, Al-Qaeda guest houses.

    And these young men, 22, 23 years old, the only thing
that they had in common, the only thing, was that they were
all members of the same set of online discussion forums where
Zarqawi was distributing his videos.
Q.    And what was -- was there a discussion forum that was
the main vehicle by which these videos were disseminated and
which these individuals who would then go out to commit
bombings had in common?
A.    Yes.  Prior to the end of 2005, prior to December of

1  2005, there was one forum in particular which was the venue,

2  not just because it was one of the, but it was the exclusive

3  venue for Al-Qaeda in Iraq to disseminate their materials

4  through.

5  Q.   And was the URL -- what was the name of that forum?

6  A.   The forum itself was known as Muntada Al-Ansar, which

7  means the Ansar Forum.  Ansar means supporters or partisans.

8  In this context it was referring to supporters or partisans

9  of the concept of jihad.

10      The forum itself, because of the fact that it was a

11  jihadi forum that was disseminating terrorist videos, had

12  problems staying online.  Hosting companies didn't want to

13  host it.  Governments didn't want the website in their

14  internet space.

15      So it constantly was changing its domain name, it was

16  constantly changing its hosting provider, jumping from one to

17  the next in order to stay alive.

18  Q.   Now, would you -- have you actually monitored and seen

19  this forum over the period of time of 2005?

20  A.   Yeah, I started monitoring the Muntada Al-Ansar Forum in

21  approximately April -- February, March, April of 2004.  I was

22  a registered user, and I collected a vast database full of

23  messages, of postings, videos.  I collected most of what was

24  posted on there.

25  Q.   Now, was one of the URLs where the al-Ansar Forum was

1  sponsored ansarnet.org?

2  A.   Yes.

3  Q.   Now, are you familiar with an individual who goes by the

4  name of Irhabi 007?

5  A.   Yes.

6  Q.   And if you take a look at Exhibit 22, at entry -- do you

7  have it in front of you?

8  A.   Yes, I do.

9  Q.   At Entry 21, who does it identify as the moniker -- the

10  user of Irhabi 007 as?

11  A.   It identifies Irhabi 007 as being Younis Tsouli.

12  Q.   Now, through your research, were you able to determine

13  if Mr. Tsouli during the spring and fall of 2005 was involved

14  with the Ansar Forum?

15  A.   Yes.

16  Q.   And what was his role with that forum?

17  A.   Well, in the beginning, in 2004 when he began, he was

18  just an ordinary user.  However, over time, because of the

19  fact that he was so adept at helping other people with

20  internet problems -- in other words, redistributing video,

21  copying video, uploading video, making, you know, fancy

22  advertisements for documents or for video or whatnot -- he

23  caught the attention of other people.

24     So essentially he became a discussion leader by the fall

25  of -- or by the spring of 2005.  Excuse me, spring of 2005 he

became a discussion leader on the Ansar Forum.

As a discussion leader, he had the ability to edit other people's messages, to remove people's posting privileges.  He was on his way to becoming a full-fledged -- the administrator of the Ansar Forum.

In the summer of 2005, the forum went offline for several months.

When it came back online in late July of 2005, it was Mr. Tsouli as Irhabi 007 who was the primary administrator of the forum.  Not just the discussion leader, but the person responsible for the mechanics and everything else.

Q.   And when you say responsible for the mechanics and everything else, would that -- what does that include?

A.   Well, to give you an idea, when he would post a message, it would say next to his name administrator.  And he was responsible for setting up the website, he was responsible for taking it offline, he was responsible for all the housekeeping duties.  He was the guy in charge.  He was the head honcho.

Q.   Now, aside from running the website, this exclusive -- what you said is an exclusive forum for --

A.   I should add, by the way -- I don't know if I mentioned this -- but Muntada al-Ansar was log-in and password protected.  In other words, after May 2004 it was exceptionally difficult to get a log-in and a password, and

1  you could not see anything on that forum without a log-in and

2  password.

3  Q.   But did you have a log-in and password?

4  A.   Yes, I did.

5  Q.   So you were able to review the forum until whenever it

6  went offline?

7  A.   Until it finally went offline in approximately late

8  October of 2005, yes.

9  Q.   Now, in addition to administering and running al-Ansar

10  Forum, were you able to determine whether Mr. Tsouli

11  performed any special or other unique functions for Al-Qaeda

12  in Iraq?

13  A.   Yes.

14  Q.   And what did you determine?

15  A.   I determined -- well, I determined this, but I think it

16  was fairly obvious to anyone who was on the forum that

17  Mr. Tsouli was using his abilities not just in an abstract

18  way to help Al-Qaeda; in other words, Al-Qaeda posts a video

19  and then Mr. Tsouli says, oh, I like that video so he gives

20  it to five other people.

21      What became clear was is that Mr. Tsouli was

22  coordinating his activities directly with Al-Qaeda in Iraq,

23  and that he wasn't just doing things of his own avail, but he

24  was being requested to do things, and he was doing things

25  deliberately.

Now, how do we know that?  Well, first it began with
simply having the representative of Al-Qaeda in Iraq who had
never, ever, ever said anything beyond posting flat
communiques', never put a personal note, never anything like
that, all of the sudden out of nowhere responded to one of
Irhabi 007's postings where he provided stuff for them
saying, We love you, Irhabi 007, you are the greatest.

And this caused a reaction on the forum.  Everyone at
that point saw what was going on and people started saying,
you know, he's migrating, he's graduating on, you know,
hurray for our friend.

Then it became even clearer when Irhabi started posting,
reposting copies of videos within literally milliseconds of
them initially being posted by the representative of Al-Qaeda
in Iraq.  It physically would not have been possible for
someone to have copied this video, uploaded it, taken screen
shots out, you know, for advertising purposes -- within
milliseconds?  Not a chance.  Physically impossible.

And then the final confirmation came in the spring of
2005 when Al-Qaeda began posting videos, and at least one of
these videos actually had a signature line at the bottom
which said, thanks or care of Abu Maysarah al-Iraqi, who was
the designated representative of Al-Qaeda in Iraq on the
forum, Irhabi 007, and Moheb al-Shaykayn, who was the other
administrator of the forum.

So in other words, for the posting of an original
Al-Qaeda in Iraq video, special thanks are being offered to
Mr. Tsouli, to the representive of Al-Qaeda in Iraq, and
another administrator of the Ansar Forum.

Q.   Now, in addition to the work that he was doing in
redistributing these videos, which is it your conclusion that
he was actually getting them before they were being posted --

A.   Yes.

Q.   -- so he could post the links at the same time?

A.   Yes.  Not only was that my conclusion, I also saw direct
evidence of that.  Because Mr. Tsouli was uploading these
videos to one particular I should call it file folder on the
internet.

And I started doing a little snooping around inside of
that file folder, because it had a very unusual name,
AQCORPO, which I later discovered stood for AQ Corporation or
Al-Qaeda Corporation.

And inside this file directory where these videos were
being uploaded was an under-construction version of the
Al-Qaeda in Iraq website, which had been promised by Al-Qaeda
in Iraq for months.  But on this partially-constructed
website, there was original AQI materials, posters for videos
and magazines and whatnot, that had never been released
before.

Q.   So let me break that down a little bit.  You said that

this new website had been promised by Al-Qaeda in Iraq for

months.  Where was it being promised?

A.   It was being promised in their communiques'.  As early

as the summer of 2004, Al-Qaeda in Iraq in their communiques'

were saying we know you had problems reaching some of our

stuff, we are on the case, don't worry, we are going to try

to set up a permanent website at some point.

Q.   And then when Mr. Tsouli was posting these videos, the

link to that video went back to his folder --

A.   It was like in a subdirectory, a subfolder on another

site on the internet.

     And you know, you poke around in that folder a little

bit -- it doesn't require hacking, it's just a matter of

looking in there -- and sure enough, there is other things in

there, one of which was a partially-constructed Al-Qaeda in

Iraq website.

Q.   And was there unreleased material in that

partially-constructed website?

A.   There were propaganda advertisements for AQI videos and

AQI magazines that carried the official AQI logo and had

never, ever been released on the internet before.

Q.   Now, in addition to building this website,

redistributing the videos, as well as running the Ansar Forum

itself, did you determine that it was Mr. Tsouli doing

anything else, i.e., as a unique function to help Al-Qaeda in

1    Iraq?

2    A.    Yes.

3    Q.    What was he doing?

4    A.    Well, again, as I stated before, there were messages

5    being posted on the forum by administrators talking about

6    Muntada al-Ansar users who were meeting up in Iraq to become

7    suicide bombers.

8         Later on I reviewed the context of communications

9    involving Mr. Tsouli and involving representatives of

10   Al-Qaeda in Iraq.  From those communications it's fairly

11   evident that Mr. Tsouli was arranging for -- I guess you

12   would call it brokering suicide bombers coming in from

13   outside of Iraq to meet up with Al-Qaeda recruiters in

14   Damascus.

15        These individuals had no prior contact with

16   Al-Qaeda.  They didn't know who to call.  They were simply

17   users on Muntada al-Ansar who really want to go to Iraq to

18   participate in jihad.

19        The only person that they knew that they could get in

20   contact with who seemed to have any connection with Al-Qaeda

21   was Irhabi 007.

22        So literally these people were using Irhabi to make

23   contact with Al-Qaeda, and Irhabi was passing them a phone

24   number saying when you get to Damascus, call this number and

25   someone will come pick you up, or when you get there you give

me your phone number and I will have someone come pick you up there.

There was also other communications involving individuals inside of Iraq where evidently there were accounts that were being created on the Ansar Forum for Al-Qaeda fighters in the field in Iraq where literally at night they would go to a guest house inside of Iraq after fighting on the battlefield, log in on the Ansar Forum, and start sending messages to other -- the fighters in Iraq, people outside of Iraq, discussing things, talking about things.

And that at one point some of these log-ins had to be deleted because of the fact that they were seized in a raid, et cetera, et cetera.

So a lot of coordinated activity, very deliberately, specifically coordinated activity that went far beyond just propaganda.  He was serving as a broker for suicide bombers and he was serving as the AT&T operator for a whole group of Al-Qaeda in Iraq fighters.

MS. COLLINS:  Your Honor, may I have one second?

No further questions, Your Honor.

THE COURT:  Mr. Martin?

MR. MARTIN:  One second.

Do you have 139 up there?

THE WITNESS:  I think I do.  138, 140, 139.  I do,

1  yes.

2          THE COURT:  Mr. Martin, we have been going for

3  while.  Would it help if we took our afternoon break now?

4          MR. MARTIN:  That might be a good idea.

5          THE COURT:  Why don't we take a break until

6  3:00.  We will be in recess until then.

7          (A recess is taken at 2:46 p.m.)

8                          -- -- --

9          (In open court at 3:03 p.m.:)

10         THE COURT:  Mr. Martin?

11         MR. MARTIN:  Thank you, Your Honor

12                         -- -- --

13                     CROSS-EXAMINATION

14  BY MR. MARTIN:

15  Q.   Mr. Kohlmann, in your work, you employ from time to time

16  translators, do you not?

17  A.   I do, yes.

18  Q.   And you do not actually speak Arabic, do you?

19  A.   I don't speak it fluently, but in order to study Islam

20  you have to learn a large quantity of Arabic vocabulary.  And

21  through the context of what I have done, through listening

22  and watching hundreds and thousands of audio recordings and

23  video recordings, I have picked up quite a bit.  But I don't

24  speak it fluently, no.

25  Q.   Do you read it?

A.   A little bit, but not especially, no.  It's mostly oral.

Q.   Can you put up 139, please?

That's one of the exhibits you were asked about earlier.

A.   That's correct, yes.

Q.   Can you translate that?

A.   I believe this is the Shahadah, which is the Testament of Faith.  It literally says la ilaha il-Allah Mohammed-ur-Rasool Allah, which means there is no God but God and Mohammed is His Messenger.

Q.   That is the Testament of Faith of Islam, isn't it?

A.   That's correct, yes.

Q.   Any person who is a devotee of Islam subscribes to that saying?  That's almost like, you know, this is the -- I was about to use a bad word, I was going to say motto, but this is like your Testament of Faith; correct?

A.   Yeah, but not written like this, though.  This is artistically done.  This is done in a very particular format.

The Shahadah when it's written doesn't always look like this.  In fact, most of the time it doesn't look like this. This is a very, very particular way of writing it.

Q.   All right.  But that phrase, the Shahadah, actually that's on the flag of a number of Islamic countries, is it

1  not?

2  A.    It is on the flag of Saudia Arabia.  However, again, I

3  don't think it looks like this.  It's the same general thing,

4  but this is written in script and in cursive, and my

5  understanding is that it doesn't look 100 percent like

6  this.

7       But the Saudi flag is green, not white.

8  Q.    Oh, I know that.  I'm just saying that Arabic phrase is

9  on the Saudi Arabian flag?

10  A.    Yeah, although I don't know if it's written exactly like

11  this, though.  It's the same phrase, though, yes.

12  Q.    It's an artistic version of the Testament of Faith?

13  A.    That's correct.

14  Q.    It's the key to the Shahadah, that there is only one

15  God, Allah, and Mohammed is His Messenger, that's the key to

16  the Islamic faith; is that right?

17  A.    Absolutely, yes.

18  Q.    Now, you can take that down.

19       You have talked about you spend a lot of time looking at

20  what you would call jihadist websites?

21  A.    Yes.

22  Q.    And these websites have a lot of propaganda on them, do

23  they not?

24  A.    Yes.

25  Q.    I mean, as you have testified today, part of what's

1   going on here is the recruitment of people on these

2   websites?

3   A.   That's correct, yes.

4   Q.   And there is a lot of emotional type of stuff?

5   A.   What do you mean?

6   Q.   Let me rephrase that.  Types of stuff that would incite

7   somebody to anger?

8   A.   Yes.

9   Q.   Videos of people in Muslim countries being hurt and

10  tortured, terrorized, whatever.  Those type of things wind up

11  on these websites; right?

12  A.   Yes.

13  Q.   And then there are a lot of religious tracts or essays,

14  lectures from a jihadist point of view on these?

15  A.   That's certainly true, yes.

16  Q.   And there are various different scholars and shaykhs

17  that are mentors to people, and their material gets on these

18  websites; correct?

19  A.   That's correct, yes.

20  Q.   It's an extreme view of Islam often that's being

21  advanced on these websites; correct?

22  A.   Well, I don't want to characterize it, but in my view

23  it's fairly extreme.  It's certainly puritanical.

24  Q.   Puritanical, extreme, fundamental, those types of

25  words?

A.   I don't like that word, but I would say it's a salafi

jihadi perspective.  I think the best way is simply

describing exactly what it is, it's a salafi jihadi

perspective.

Q.   If a young man was not really trained in his religion,

really didn't have a mentor or some person to put him in the

main stream of Islam, this is the type of person who might

fall prey to this type of propaganda; correct?

A.   It could be.  It doesn't have to be.

I mean, there were people -- let's put it this

way.  There were certainly people who were on these forums

who were looking to be schooled in the knowledge or the

classroom of jihad.  There were other people who had already

been with clerics and had already studied under clerics and

they were simply looking -- it wasn't all one kind of

person.

But there were certainly some of the people you

described.

Q.   I didn't mean only those people, but those type of

people are subject to this type of propaganda?

A.   Yeah, sure.

Q.   Just common sense; right?

A.   Yes, I believe so.

Q.   All right.  Now, you were also talking about Irhabi 007

and how he was able to become an outlet for Al-Qaeda in

1    Iraq?

2    A.    That's correct.

3    Q.    And that by becoming such an outlet for that type of

4    material from Al-Qaeda in Iraq, that gave him greater stature

5    in this community of jihadi websites; correct?

6    A.    Yes.  He had a tremendous reputation, particularly after

7    he was singled out for praise by Zarqawi's media

8    representative.

9    Q.    So there were people who participate on these websites

10   who, one way to get more stature, to get more -- to be

11   considered more serious, more important, is to have a

12   connection to present something on these websites that is

13   intriguing to other people?

14   A.    I think that's certainly true.

15   Q.    Now, let's talk a little bit about LeT.

16         First of all, let's back up.  You mentioned that LeT --

17   one of the primary focuses of LeT's operations -- that's

18   Lashkar-e-Tayyiba, but I will use LeT for short, if it's all

19   right with you?

20   A.    Sure.

21   Q.    -- is the conflict between India and Pakistan in

22   Kashmir; correct?

23   A.    That's I would say their primary focus, yes.

24   Q.    And that conflict goes back to the '40s, does it not?

25   A.    It probably goes back farther than that.  But yeah, at

1    least as far as modern India and modern Pakistan, yes.

2    Q.    At least since 1947, Pakistan and India fought several

3    wars over Kashmir; correct?

4    A.    That's correct.

5    Q.    When the British left after being exhausted from

6    World War II, when they left India, the idea was to break up

7    the country into majority Muslim areas and majority Hindu

8    areas; is that not true?

9    A.    That's true, yes.

10   Q.    And one of the problems with Kashmir -- in many places

11   that was fairly easy to do, but some places, since the

12   population was blended, it became more difficult to do;

13   correct?

14   A.    Although lots of parts of India have large populations

15   of Muslims, but Kashmir was certainly one of those parts,

16   yeah.

17   Q.    Mumbai has a very large Muslim population?

18   A.    Yes.

19   Q.    There is a movie --

20   A.    *Slum Dog Millionaire*.

21   Q.    Yeah, is about a Islamic person in Mumbai?

22   A.    That's correct.

23   Q.    But the problem in Kashmir was that they had a Maharaji

24   who was Hindu -- that was a princely state recognized by the

25   British -- he was Hindu, and even though a majority of

1  Kashmir was Muslim, he said -- he signed an accession

2  agreement with India to make it part of India?

3  A.   This is little bit beyond my area of expertise, but I

4  can tell you this.  It's a mixed population of Muslims and

5  Hindus.

6      I didn't do the census back in 1947, and I haven't done

7  a census since, so I can't tell you whether -- you know, I

8  can tell you there is a significant population of Muslims, I

9  would say at least 40 percent, if not more than that.

10      But I think to say that they are a significant minority,

11  if not the majority, in general Kashmir would be 100 percent

12  correct.

13  Q.   And so there was a struggle between Pakistan and India,

14  the Pakistanis saying, Listen, just because you had a Hindu

15  Maharaji doesn't mean you can give that space to India.  This

16  is really a Muslim area and it should be part of Pakistan.

17  Right?

18  A.   Correct.

19  Q.   And they fought wars over this?

20  A.   A number of them, yes.

21  Q.   A number of wars.  And ultimately after long years of

22  conflict, Kashmir was basically divided up on a *de facto*

23  basis along a line of control, what's called a line of

24  control?

25  A.   The LOC, that's correct.

1    Q.   And it's not unlike -- every situation is different, but

2    not unlike what happened to North and South Korea.  There is

3    a demilitarized zone between those two areas over disputed

4    areas, both sides thinking it should be one country, correct,

5    or one province of Kashmir?

6    A.   Yeah.  I mean, you have to be careful with those kind of

7    analogies.  But, yeah, that's correct, there is a

8    demilitarized zone, there is a line of control, and the two

9    sides fight over the line of control.

10   Q.   And LeT was involved in these skirmishes across this

11   line for years.  Is that not correct?

12   A.   Among other things, yes.

13   Q.   Yes.  And LeT -- the Pakistani government's intelligence

14   service is called the Interservices Intelligence; right?

15   A.   The ISI, yes.

16   Q.   Everyone calls it ISI.  And the ISI would be not unlike

17   our CIA; is that correct?

18   A.   Yeah, something along those lines.

19   Q.   And the ISI, for example, was involved in supporting the

20   Mujahideen in its struggle against the Soviets in Afghanistan

21   and its funneling United States money to the Mujahideen?

22   A.   Mujahideen, yes.

23   Q.   And there is no way to prove it for certain because this

24   is a secret organization, but it's well perceived, widely

25   perceived that the ISI has supported LeT over the years;

1    correct?

2    A.    That's correct.

3    Q.    And in part because LeT was useful to the Pakistani

4    position in Kashmir as causing trouble along that line in

5    hopes that maybe some settlement could be reached that would

6    be more favorable to Pakistan?

7    A.    I think the concept is known as strategic debt.  They

8    were hoping that if India were to invade, that a group like

9    Lashkar-e-Tayyiba would make any Indian envision extremely

10   difficult.

11   Q.    And be useful to the Pakistani government?

12   A.    Yes.

13   Q.    One of the things about LeT -- I think you talked about

14   this before -- as opposed to other groups, their training was

15   for to -- I think you said to attack and hold areas?

16   A.    They train -- their tactic is -- I mean, they train with

17   various different tactics.  If you look at their training

18   camps, they talk about everything from rockets to mines,

19   et cetera.

20        But their characteristic style of warfare is known as

21   the fedayeen-style raids, suicide commando raid, where you

22   had ten, fifteen, twenty guys -- maybe it's a little less,

23   maybe it's a little more -- they swarm targets, they take

24   them over, and they hold them for as long as possible while

25   using automatic weapons, grenades and stuff like that.

1   Q.   I mean, it's not -- I guess what I'm trying to

2   differentiate, it's not like a drive-by bombing or something

3   like that.  You really attack and try to hold for a while;

4   correct?

5   A.   Well, again, that's being very generic, because Lashkar

6   has launched lots of attacks, and they have launched

7   everything from mine attacks to improvised explosive devices,

8   rockets.

9        Their characteristic style of warfare is fedayeen-style

10  raids, but I would be careful about assuming that every raid

11  that they launch is -- if you look at what they describe in

12  their own training camp, I mean, they talk about a fairly

13  well-rounded regimen.

14       I think it's just that they know which tactics work best

15  in particular scenarios, and I think the fedayeen raid has

16  proved particularly useful for them.

17  Q.   Did you not testify previously in this matter on May

18  30th, 2009?

19  A.   I believe I did, yeah.

20  Q.   And you intended to tell the truth at that time?

21  A.   Yes, I did.

22  Q.   I'm sure you did.

23       Did you not say at that time LeT camps are mostly

24  focused -- on page 93, excuse me -- mostly focused on

25  training squads of fighters who can take over and hold

1 particular I guess zones?

2 A.   Yeah, that's the fedayeen-style tactic.

3     But again, that's why I said mostly.  If you read the

4 Taiba Bulletin, which is the bulletin put out by Lashkar,

5 back in 2000-2001, they were discussing the kinds of tactics

6 that they were training people at the camps, and they were

7 very specific.  I mean, they talk extensively about

8 fedayeen-style raids.

9     But they say, Look, if you want to learn about land

10 mines, we have a couple of courses on rockets, and anything

11 we don't teach here, we can get you somewhere where you can

12 learn.

13 Q.   All right.  Let's talk a little bit about what you

14 talked about there, LeT.

15     You said there was a newsletter that they put out?

16 A.   The Taiba Bulletin.

17 Q.   LeT, even though it's designated as a foreign terrorist

18 organization by the United States, I think by the United

19 Nations as well --

20 A.   I believe so, yes.

21 Q.   -- is still fairly open in Pakistan itself?  Is that not

22 true?

23 A.   When?

24 Q.   Well, let's talk about 2005, 2004?

25 A.   By open, I think you would have to be a little more

1   specific.  They were not as open as they used to be.

2   Q.   All right.

3   A.   They used to be much more open in the sense that back --

4   there was a particular point in time where they actually had

5   like an office building, where you go in the office building

6   and there is a regular style office where you go in and you

7   sit in a chair and there is a receptionist and stuff like

8   that.

9        But after they were banned by the Pakistanis in 2003,

10  they were still above, you know, more so than Al-Qaeda or the

11  Taliban, but they did have to go underground.  And one aspect

12  of this is the fact that they changed the name of the group

13  from Lashkar-e-Tayyiba to Jamaat ud-Dawa.

14  Q.   Jamaat ud-Dawa has a campus 75 acres or more; is that

15  correct?

16  A.   That's correct.

17  Q.   And that is, as you said before, a front for LeT;

18  correct?

19  A.   One of several, yes.

20  Q.   One of several.  So Jamaat ud-Dawa is LeT renamed with

21  regards to that camp 75 acres near Lahore; is that not

22  correct?

23  A.   The Markaz ud-Dawa, yes.

24  Q.   And that's at where?  How do you pronounce that?

25  A.   Muridke.

Q.   And that's somewhat west of Lahore.  Is that not
correct?

A.   That's correct.

Q.   And that's a large campus that has offices?

A.   It has everything from a seminary, a religious seminary,
it has a children's school, it has offices, it has an Olympic
swimming pool.  It's supposed to be a campus almost.

Q.   Have you ever visited it?

A.   I have not personally visited it, although I interviewed
the official spokesman of Lashkar-e-Tayyiba twice last year.

Q.   That's Abdullah Muntazir?

A.   Abdullah Muntazir, yes.

     And Mr. Muntazir invited us to come to Muridke.  Because
of the fact I was in Pakistan I couldn't go, but we sent my
colleague from Peshawar with a camera, and we recorded the
whole thing.

Q.   It has offices, it has schools, it has a large mosque?

A.   Yes.

Q.   Dormitories?

A.   Yes.  It's an enormous -- again, it's an enormous
complex, it's surrounded by a huge barbed-wire fence.  It's
enormous.  It's a very large complex.

Q.   Stables?

A.   I believe so, yes.

Q.   You said a pool?

1   A.   I think they have some kind of farm there.

2   Q.   Farm?

3   A.   It's supposed to be a self-sustaining complex.

4   Q.   So obviously this 75 acres isn't underground?

5   A.   No.

6   Q.   It's open and notorious there in Pakistan; correct?

7   A.   Well, yes, but again when you say open and notorious,

8   it's not like it used to be.

9       Lashkar used to be right in the middle of Lahore, right

10   in the middle of Islamabad. Now you are talking about a

11   remote area of Muridke which is set away, very far away. And

12   if you watch my colleague record it on his way in there, you

13   know, it's out, it's far out there. And it's surrounded by a

14   big fence, and you can't get anywhere near it without getting

15   through the fence.

16       So I think to say that that's not underground would be

17   like saying the Aryan extremist camps up in Idaho are not

18   underground. We know they exist, but they are pretty far out

19   there and not well known.

20   Q.   Journalists go and there visit it; right?

21   A.   No.

22   Q.   No?

23   A.   The chance that we got to interview was one of the very

24   rare opportunities where Lashkar has actually let anyone

25   inside of their camp with cameras. Most of the time Markaz

ud-Dawa, Jamaat ud-Dawa, they don't allow journalists in.

That's what they told us.

Q.   Steven Cole, do you know him, with *The New Yorker*?

A.   No, not offhand.

Q.   He didn't visit it?

A.   Oh, no, hold on.  I didn't say that nobody gets

in.  I said that it's exceptionally difficult to get in.  And

what they told us is that they rarely open this up for

journalists to come in, and they told us that this would be

one of the few chances.

     And as it turned out, apparently it was, because a few

other people turned up as well that were all invited in,

because this was going to be tried -- for them to try to do

public relations, to open up the camp that they very rarely

open up to outsiders.

Q.   They have a telephone number you can call?

A.   Does Lashkar have a telephone number?

Q.   Yes.

A.   Yes, yes.

Q.   So if you want to get in touch with Lashkar-e-Tayyiba or

LeT, you testified before there is a telephone number you can

call; correct?

A.   There is a telephone number, there is an internet

website -- or there was an internet website, there was an

e-mail address, yes.

Q.   And that is why, as you said before, it's really such a
popular group?
A.   It was popular among certain people.  It was popular
among people who spoke English, it was popular among people
who didn't have any prior connections to other jihadi groups,
and it was preferred by people who appreciated the
transnational connections that Lashkar had.

     Because Lashkar maintained relationships with other
organizations that Jaish-e-Mohammed and certain other groups
did not.  For instance, they maintained active relationships
with Mujahideen in Chechnya and Afghanistan and
Bosnia-Herzegovina.

     And as a result a lot of people who were looking to go
to these kind of front lines and didn't know anywhere else to
go, these guys would be a ladder, a rung in the ladder.
Q.   Let me ask you this.  On page 75 when you testified
before, you were asked a simple question.  The simple
question was:  It doesn't take a lot of secret maneuvers to
get to LeT.  You go to the website or call them on the
phone.

     And your simple one-sentence answer was:  That's why
it's such a popular group.
A.   Yeah.  But again, we have to be very careful about the
time period.  Because right now they don't have a phone
number, they don't have an e-mail address, and they don't

have a website.  It depends particularly what time you are

talking about.

　　　　But again, I would emphasize that of all the groups in

Pakistan, Lashkar was probably the most open, it was the most

aggressive about recruiting outsiders, and was the most

I guess you would call missionary-oriented.

　　　　But again to say that they are above ground, they are

more above ground than Al-Qaeda and the Taliban.  But to say

that they are not somewhat underground, they were banned in

2003 by the Pakistani government.  There was a reason that

they had to be careful.

Q.   The founder of LeT, Hafiz Mohammad Saeed?

A.   That's correct.

Q.   He still preaches openly in Pakistan, does he not?

A.   Not at the moment, no.  At the moment he's in jail.

Q.   All right.  Question, page 144:  Even though that

organization has been declared a terrorist organization by

the United States and the Pakistani government and the UN, he

still peaches openly in Pakistan, does he not?

A.   He --

Q.   One word answer:  Yes.

A.   He preached openly.  He preached openly.  He did until

he was arrested.

Q.   When was he arrested?

A.   He was arrested in I think December 3rd, 2008.

1  Q.   At least in 2004 and 2005, he was preaching?

2  A.   No, he was preaching openly then, yeah, sure.

3  Q.   And LeT was, as you said before, was reputed to be

4  closely tied to ISI; correct?

5  A.   I would say it's reputed to have ties to the ISI.  How

6  close those ties are, because of the fact that they are

7  secretive by their very nature, I wouldn't want to

8  characterize them beyond saying that they exist, and I

9  think -- I would feel fairly confident in saying that they

10  existed.

11 Q.   Good.

12      I wanted to just clarify one thing.  You mentioned a

13  training camp, a JEM training camp in Balakot?

14 A.   That's correct, the Sayed Ahmed Shaheed camp.

15 Q.   Balakot is a district or a large area, like a county in

16  the United States; right?

17 A.   There is also a town.

18 Q.   Balakot is a town, and there is like a county, like

19  Fulton County is where we are in here, or Cobb County, one of

20  the counties here in Atlanta.

21          MR. MARTIN:  Just one second.

22          Your Honor, that is all I have.

23          THE COURT:  Redirect?

24          MS. COLLINS:  No, your Honor.

25          THE COURT:  Does anybody want Mr. Kohlmann subject

1  to recall?

2         MR. MARTIN:  No, Your Honor.

3         MR. McBURNEY:  Not from the government?

4         THE WITNESS:  Thank you very much, Your Honor.

5         THE COURT:  Then you are excused, but you should

6  not discuss your testimony until you hear the case is over.

7         THE WITNESS:  Thank you, Your Honor.  Sure.

8         THE COURT:  Call your next witness.

9         MR. McBURNEY:  Judge, at this point subject to

10 confirming with Ms. Birnbaum that everything has been

11 tendered and that the exhibit list is cleared, your ruling on

12 the one Khan issue, the government rests.

13        MR. MARTIN:  Your Honor --

14        THE COURT:  And I'm okay --

15        MR. MARTIN:  No, there is one thing we could do.

16        Quite frankly I expected that the government was

17 going to play a telephone call that was recorded between my

18 client and his mother in January of 2006.  And if they are

19 not going to play it, I want to play it.

20        And this would be just simply offering that exhibit

21 and renumbering it as a defense exhibit, and I offer it into

22 evidence.  I don't think they would object.  Then we would

23 just play it for the Court.

24        MR. McBURNEY:  Let me confer.  We may need a

25 witness for this.

1          As long as we have a stipulation as to the date and

2     time -- do we know the date and time -- did we confirm the

3     time of the call?

4          THE COURT:  Well, I don't want anybody to rush

5     through anything.  I mean, we are not --

6          MR. MARTIN:  We can do it tomorrow morning.

7          It's about a 40-minute call, and I think it's

8     important in light of the telephone call we heard yesterday

9     with Mr. Zubair and Mr. Ahmed to explain exactly what

10    happened between he and his mother.

11         MR. McBURNEY:  Why don't we confer about the best

12    way to play it.  If we need to reopen for rebuttal purposes

13    our case so that there is the right witness, we will let you

14    know when we start in the morning.

15         MR. MARTIN:  That would be fine.

16         THE COURT:  Why don't you try to work it out.

17         And now that you have all this extra time, you can

18    do the legal research and maybe get it in before we close the

19    case.

20         MR. McBURNEY:  Could we talk structuring about the

21    close of the case for a moment?

22         THE COURT:  We may.

23         MR. McBURNEY:  I understand from Mr. Martin that

24    his case will wrap up tomorrow as well.

25         Will we get a copy of the Court's charge?  When is

1    that going to play out *vis-a-vis* our closings, and when are

2    you envisioning the closings, given that I think all evidence

3    will be done by midday Thursday?

4            THE COURT:  I haven't thought about having a charge

5    conference, because usually I do that for the purpose of

6    making sure that the parties agree as to the charge to be

7    given to the jurors before they deliberate.

8            But I guess it probably makes sense if you want to

9    give closings to decide what it is that is the applicable

10   law.  I don't think you are too far apart from what I have

11   received in your submissions.

12           Why don't we -- how long -- if we have a 40-minute

13   tape, not to hold you to it, how long do you think you need

14   tomorrow to present?

15           MR. MARTIN:  A couple hours.

16           THE COURT:  So we'll be done by noon probably?

17           MR. MARTIN:  Yes, sir.

18           THE COURT:  Why don't we then start at 10:00, have

19   the charge conference at 9:00?

20           Is there any reason why we couldn't have the charge

21   conference before you put your evidence in?

22           MR. MARTIN:  No.

23           THE COURT:  Because what I would like to do is put

24   your evidence in and go directly into closings.

25           Of course, what we could do is get the evidence in,

1    take an extended lunch break, and then do the charge

2    conference after lunch.  Maybe that would make more sense.

3            Okay, let's do that.  We will start at 9:00, put in

4    the defense case, and just assume that that goes until late

5    morning.  And then we will break probably for a couple hours,

6    maybe two and half hours to have lunch and to have the charge

7    conference.

8            When we come back from that, we will go directly to

9    closings.

10            Does that suit everybody?

11            MR. McBURNEY:  Yes, sir.

12            MR. MARTIN:  That's fine.

13            THE COURT:  All right.  So we will be -- it's

14    3:30.  We will be in recess now and commence promptly at 9:00

15    in the morning.

16                    (A recess is taken at 3:29 p.m.)

17                        --  --  --

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA    :

5

6            I, Nicholas A. Marrone, RMR, CRR, Official Court

7    Reporter of the United States District Court for the Northern

     District of Georgia, do hereby certify that the foregoing 224

8    pages constitute a true transcript of proceedings had before

9    the said Court, held in the city of Atlanta, Georgia, in the

10   matter therein stated.

11           In testimony whereof, I hereunto set my hand on

12   this, the 17th day of June, 2009.

13

14

15

16                       /s/ Nicholas A. Marrone

17                       _____
                         NICHOLAS A. MARRONE, RMR, CRR
18                       Registered Merit Reporter
                         Certified Realtime Reporter
19                       Official Court Reporter
                         Northern District of Georgia

20

21

22

23

24

25