1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3    UNITED STATES OF AMERICA        )
                                     )
4              Plaintiff,            )    CRIMINAL ACTION FILE
                                     )    NO. 1:06-CR-147-WSD-1
5    v.                              )
                                     )    ATLANTA, GEORGIA
6    SYED HARIS AHMED (1)            )
                                     )
7              Defendant.            )
     _____)

8                TRANSCRIPT OF PROCEEDINGS
9    BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
              UNITED STATES DISTRICT JUDGE
10
                    VOLUME 4
11             Thursday, June 4, 2009

12


13
     APPEARANCES OF COUNSEL:
14
     For the Plaintiff:         OFFICE OF THE U.S. ATTORNEY
15                              (By:  David E. Nahmias
                                      Robert C. McBurney
16                                    Christopher Bly)

17                              DEPARTMENT OF JUSTICE
                                (By:  Alexis L. Collins)
18
     For Defendant Ahmed (1):   MARTIN BROTHERS
19                              (By:  John Richard Martin)

20


21
          *Proceedings recorded by mechanical stenography*
22         *and computer-aided transcript produced by*
              NICHOLAS A. MARRONE, RMR, CRR
23               1714 U. S. Courthouse
                 75 Spring Street, S.W.
24               Atlanta, GA  30303
                   (404) 215-1486
25

1                        I N D E X

2  *Witness*                                    *Page*

3  KATHERINE WILZ
        Direct (By Mr. Martin)                757
4
   MARIAM AHMED
5       Direct (By Mr. Martin)                760
        Cross (By Mr. McBurney)               779
6       Redirect (By Mr. Martin)              783

7  SYED RIAZ AHMED
        Direct (By Mr. Martin)                785
8       Cross (By Mr. McBurney)               821
        Redirect (By Mr. Martin)              830

9

10      *Charge Conference*                     *850*
        *Closing by Mr. McBurney*               *878*
11      *Closinb by Syed Haris Ahmed*           *910*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         Thursday Morning Session

2                            June 4, 2009

3                              9:05 a.m.

4                              -- -- --

5                       P R O C E E D I N G S

6                              -- -- --

7                        (In open court:)

8           THE COURT:  So what have we worked out with respect

9    to the telephone call?

10          MR. McBURNEY:  Judge, my understanding is that the

11   government will remain in the posture of having rested, and

12   Mr. Martin will call as his first witness Agent Wilz who we

13   have made available for the defense to call.

14          She will simply indicate when this call occurred,

15   identify that it was a call between the defendant and his

16   mother, and then we will listen.

17          MR. MARTIN:  That's what we have in mind.

18          And they have of course a translation that

19   goes with the -- it's mostly in Urdu, so you are going to

20   have to be reading it unless you are familiar with that

21   language.

22          THE COURT:  It's not one of my secondary

23   languages.

24          MR. MARTIN:  Nor tertiary.  So that's how we are

25   ready to proceed, if you are ready?

1          THE COURT:  I am ready.

2          Can I just -- this is a bench trial.  I don't know

3   if technically motions were required to be made at the end of

4   the government's case, and I want to make sure that your

5   rights are protected.

6          MR. MARTIN:  And I meant to remind you of that.

7          I will move just formally right now for a motion

8   for directed verdict as to all -- well, the one only count on

9   the basis that the government has failed to prove all

10  necessary elements of the crime.

11         What I was hoping to do, quite frankly, is at the

12  close of all the evidence, which I would have the opportunity

13  to renew that, I might give the Court a little more specific

14  argument at that time.

15         THE COURT:  So let me reserve on your motion then.

16         MR. MARTIN:  That would be fine.

17                        --   --   --

18                     KATHERINE WILZ

19     being previously duly sworn by the Courtroom Deputy,

20                 testifies and says as follows:

21                        --   --   --

22                    DIRECT EXAMINATION

23  BY MR. MARTIN:

24  Q.   Agent, please state for the record your full name

25  again?

1   A.   Katherine Wilz.

2   Q.   Ms. Wilz, you previously testified in this matter;

3   correct?

4   A.   Yes.

5   Q.   And you are one of the case agents in this case?

6   A.   Correct.

7          THE COURT:  And you of course know you are still

8   under oath.

9          THE WITNESS:  Yes, sir.

10  BY MR. MARTIN:

11  Q.   Was there an occasion during the investigation in this

12  case that there was an opportunity to record a telephone

13  conversation between the defendant and his mother?

14  A.   Yes, there was.

15  Q.   Showing you what's been identified now as Defendant's

16  Exhibits 32 and 32-A, can you identify those for us, please?

17  A.   Yes, I can.

18  Q.   What are they?

19  A.   32 is a CD of the audio of a telephone call between the

20  defendant and his mother.  And 32-A is the verbatim

21  translation of that telephone call.

22  Q.   You all had an expert in Urdu translate the

23  conversation?

24  A.   Correct.

25  Q.   Most of the conversation is in Urdu, is it not?

1   A.    That is true.

2   Q.    And that recording records the complete conversation

3   that was recorded on that day?

4   A.    Correct.

5   Q.    There is no edits or additions one way or another?

6   A.    Right.

7         MR. MARTIN:  Your Honor, at this time I would like

8   to publish 32 and 32-A for the Court's consideration.

9         THE COURT:  Is there any objection to the admission

10  of these exhibits?

11        MS. COLLINS:  No, Your Honor.

12        THE COURT:  They are admitted.

13        MR. MARTIN:  First I needed to offer them, okay.

14        (And audio file, Exhibit 32, is presented in its

15  entirety in open court.)

16        THE COURT:  All right.  Call your next witness.

17        MR. MARTIN:  I call Mariam Ahmed, please.

18        MR. McBURNEY:  You didn't establish when that was.

19        MR. MARTIN:  Excuse me.

20  BY MR. MARTIN:

21  Q.    I think it's on the document.  Can you tell us exactly

22  what date that conversation we just heard, what date that

23  occurred?

24  A.    It's January 9, 2006, at approximately 12:33 p.m.

25        MR. MARTIN:  Thank you.  I have nothing further.

```
 1              THE COURT:  Is -- I guess Exhibit 32-A, is that a
 2      disk?
 3              MR. MARTIN:  Yes, sir.  32-A is the recording --
 4      no, excuse me, 32 is the recording, and 32-A is the
 5      transcript.
 6              THE COURT:  So that can be printed out as a paper
 7      transcript if I wanted to review it?
 8              MR. MARTIN:  It's already printed out.  This is
 9      just the recording.
10              THE COURT:  Okay.  Thank you.
11                        --  --  --
12                      MARIAM AHMED
13      being first duly sworn by the Courtroom Deputy, testifies and
14                      says as follows:
15                        --  --  --
16                    DIRECT EXAMINATION
17      BY MR. MARTIN:
18      Q.   Please state for the Court your full name, please?
19      A.   Mariam Ahmed, M-a-r-i-a-m  A-h-m-e-d.
20      Q.   And are you related to Haris, Syed Haris Ahmed?
21      A.   Yes.
22      Q.   How are you related to him?
23      A.   I'm his oldest sister.
24      Q.   Are you married?
25      A.   Yes.
```

```
1    Q.    When did you get married?

2    A.    July 2004.

3    Q.    Where do you presently live?

4    A.    I live in Pakistan.

5    Q.    Where in Pakistan?

6    A.    Karachi.

7    Q.    And what does your husband do there?

8    A.    He works for Proctor & Gamble.  He's a finance manager.

9    Q.    And in July of 2004, tell us a little bit about your

10   family coming to Pakistan for that wedding?

11   A.    Me and my mom and my sisters went two months before, and

12   I think Haris came in June, and my dad came just before the

13   wedding in July.

14   Q.    Okay.  So what date was the wedding?

15   A.    9 July.

16   Q.    And when Haris was there in 2004, did he visit -- what

17   did he do in connection with the wedding and family events?

18   A.    Yeah, he was there for the wedding.  He prepared for

19   provisions and everything.

20         And we have a lot of family who were there, uncles,

21   aunts, cousins, distant cousins, so he visited everybody.

22   Q.    Tell us, where were you born?

23   A.    Pakistan.

24   Q.    And when were you born?

25   A.    1981.
```

1  Q.   And did you originally go to -- your first early years

2  were in Pakistan?

3  A.   Yes.

4  Q.   Your father, who is your father?

5  A.   Syed Riaz Ahmed.

6  Q.   Who is your mother?

7  A.   Faiqa Ahmed.

8  Q.   When you were just a baby, what type of work did he do

9  in Pakistan?

10  A.   I can't recall, but he worked for an oil company for a

11  year -- I don't know about after that.

12  Q.   I understand.  Did there come a time, however, when you

13  were just a real small toddler that he left for the

14  United States to go to school?

15  A.   Yes.

16  Q.   How old were you at that time?

17  A.   I think I was about six years old.

18  Q.   Okay.  And how much older are you than Haris?

19  A.   Three and a half years.

20  Q.   So he was approximately three at the time; correct?

21  A.   Yeah.

22  Q.   And how long was your father in the United States

23  studying at that time when you all were small?

24  A.   He was doing his Master's, he did for two years -- he

25  went for two years.

```
1   Q.   Did you all miss him?

2   A.   Yes, we missed him.  And actually me and my brother

3   would sit outside, and whenever the plane would go by, Haris

4   would say, Maybe it's dad, and we would wave.  We really

5   missed him.

6   Q.   Thinking maybe he was on that plane?

7   A.   Yeah.

8   Q.   Now, you have some younger sisters?

9   A.   Yes, I have two sisters.

10  Q.   Tell us who they are and what their ages relative to

11  your age and Haris's age is?

12  A.   Samia -- I'm the oldest one, then my brother Haris.  And

13  then Samia, she's three years younger than Haris, and then

14  Tamima, who is four years younger than Samia.

15  Q.   Now, did there come a time when -- well, first of all,

16  did your father return from the United States after his

17  studies?

18  A.   Yes, he did.

19  Q.   After his studies, was there a period of time where he

20  worked in --

21  A.   Yes, he did.  He worked in --

22  Q.   -- Pakistan?

23  A.   -- Pakistan.

24  Q.   But did there come a time when he and the family moved

25  to the United States?
```

```
 1   A.   Yes.

 2   Q.   When was that?

 3   A.   In 1997.

 4   Q.   Okay.  And did you have -- I know you have lots of aunts

 5   and uncles, cousins in Karachi, Pakistan?

 6   A.   Uh-huh.

 7   Q.   Did you also have family in the United States?

 8   A.   Yes, we do.

 9   Q.   What type of family do you have?

10   A.   We have my dad's cousins in Georgia.

11   Q.   Okay.  And is that why you came to Georgia, because of

12   his family here?

13   A.   Yes.

14   Q.   And how old were you when you first came to the

15   United States?

16   A.   I was going to be 16 later in the year.  We came in

17   April, I became 16 in August.

18   Q.   And so how old was Haris at that time?

19   A.   He was twelve and a half.  Yeah, twelve.

20   Q.   And where did you all first move to in the Atlanta

21   area?

22   A.   Well, first we stayed in an uncle's house for a month.

23   Q.   And where was that?

24   A.   Fayetteville.

25   Q.   Fayetteville?
```

1   A.   Yes.

2   Q.   Okay.  Go ahead.

3   A.   Then we moved to Marietta.  We stayed there for one

4  year.

5   Q.   Were you renting an apartment there in Marietta?

6   A.   Yes, we did.

7   Q.   And did you go to high school there?

8   A.   In Marietta, yes.

9   Q.   What high school?

10   A.   Wheeler High School.

11   Q.   Now, where was Haris going to school?

12   A.   He was going to middle school, I think it was

13  Cobb County Middle School.  I can't remember the name

14  exactly.  I think so.

15   Q.   Later where did he go to high school?

16   A.   Centennial.

17   Q.   And did you know him -- I mean, he was three years

18  younger, but did you all stay --

19   A.   Yeah, we used to fight all the time, arguments.  But we

20  played together, talked about things.  He's always been a

21  fun-loving, caring brother that I always had.

22   Q.   Is it, and still is -- was it and still is a very

23  close family --

24   A.   Sorry?

25   Q.   Is your family very close, your brothers and your

1  sisters and your father and your mother?

2  A.   Yes.

3        THE COURT:  For the purposes of the record, can we

4  slow down a little bit, and make sure that he's done with his

5  question before you provide your answer.  I know that you

6  might be nervous, but if we slow down, it might be easier.

7        THE WITNESS:  Yes.

8  BY MR. MARTIN:

9  Q.   What type of student was Haris in high school?

10 A.   He was a very good student.  He had good grades and his

11 teachers really liked him.

12 Q.   Was he a discipline problem?

13 A.   No, never.

14 Q.   Did he -- was there a way, though, that he was different

15 from the other students?

16 A.   Yes.  We had a different religion and he -- we talked a

17 little fast, I guess.

18 Q.   Did he get picked on from time to time?

19 A.   At times, you know.  People call him maybe a name or

20 just talk fast, little things.

21 Q.   If there was like a fire alarm or a fire drill or a bomb

22 drill, would people make fun of him, maybe you put the bomb

23 there or something like that?

24 A.   Yeah, maybe.  I really don't remember much, but yeah.

25 Q.   You don't remember, okay.

1      Was he -- did he have a particular interest or

2  fascination in military things, Army things, stuff like

3  that?

4  A.   How any kid would like the uniforms, how discipline and

5  smart they look.

6  Q.   Do you have relatives, aunts and uncles and cousins,

7  that are in the military in Pakistan?

8  A.   Yes, we have a lot of them actually.

9  Q.   Right.  And would he salute them?

10 A.   Yeah, when he was a little kid, yeah.

11 Q.   Was he shy?

12 A.   Yeah, he was a bit shy.

13 Q.   Your father teaches computer science; is that correct?

14 A.   Yes.

15 Q.   Have there been computers in your house since you can

16 remember?

17 A.   Yeah.

18 Q.   Let me get to that.  First of all, your father first

19 taught where when he was -- well, what job did he take when

20 he came to the United States?

21 A.   He was teaching at Kennesaw for a couple of months as a

22 part-time professor, and then he got a job at North Georgia

23 College.

24 Q.   And what was he teaching at North Georgia College?

25 A.   Computer science.

1  Q.  And did you yourself attend North Georgia College?

2  A.  Yes.

3  Q.  Did you graduate from North Georgia College?

4  A.  Yes.

5  Q.  What did you graduate in?

6  A.  Business Management.

7  Q.  The family was living in Marietta, you were going to

8  North Georgia College, he was teaching North Georgia

9  College.  Did there come a time when you moved closer to the

10  college?

11  A.  Actually we moved to Roswell before.

12  Q.  I understand.

13  A.  Yes.

14  Q.  You moved to Roswell.  Haris was still going to

15  Centennial High School?

16  A.  Yes.

17  Q.  And then did there come a time you moved to

18  Dawsonville?

19  A.  Yes.

20  Q.  Let me ask you this about religion in your family.  Did

21  you have a lot of religious books and so forth in the house?

22  A.  No.

23  Q.  Did your father, was he -- I don't know how to say this

24  exactly -- was religion very important, was it a dominating

25  thing in his life?

```
 1   A.   No.

 2   Q.   Did he give much religious training to the children?

 3   A.   Not at all.

 4   Q.   Did you all attend jumah services from week to week?

 5   A.   No.

 6   Q.   What is the jumah service, for the Court?

 7   A.   It's just a prayer, it's a very important prayer on

 8   Friday afternoon.

 9   Q.   It's sort of the weekly get-together for most Muslims?

10   A.   Yes.

11   Q.   People pray all the time --

12   A.   Yes.

13   Q.   -- but there is a jumah service every Friday; correct?

14   A.   Yes.

15   Q.   While I'm thinking about it, is hajj one of the

16   important obligations of every Muslim to try to do?

17   A.   Yes.

18   Q.   And hajj means to travel to Mecca to see the Holy Kaaba

19   and worship there; correct?

20   A.   Yes.

21   Q.   And every Muslim, if they can, has an obligation to do

22   that, do they not?

23   A.   Yes.

24   Q.   You heard the recording of the conversation between your

25   mother and your brother talking about hajj.  Was that
```

1   something that the family wanted to do as a family at some

2   point?

3   A.   Yeah, my mom always wanted to go for hajj, and Haris

4   wanted to go for hajj.  And I think that time I was married.

5   Q.   You were already married at that time?

6   A.   Yeah.

7   Q.   And with respect to that, there is talk on the tape

8   about a house needing to be sold.  Do you know what that's

9   about, a piece of property that was being sold?

10  A.   Yeah, it was our house.  We just couldn't keep up with

11  the gardening and all that, my dad.  It was too much for

12  him.

13  Q.   So if you could sell the house, then you would have some

14  extra money?

15  A.   Yeah.

16  Q.   Getting back to Haris, was he, as you knew him -- you

17  were with Haris until you left to get married in 2004;

18  correct?

19  A.   Yes.

20  Q.   And of course, he was in college at North Georgia at

21  some point?

22  A.   Yeah.

23  Q.   At the same time you were there; right?

24  A.   Yes.

25  Q.   Tell us a little bit about him, about his being

1  inquisitive or that type of thing with regards to world

2  events and religion and so forth?

3  A.   He's always been very inquisitive about

4  everything.  It's like he likes history a lot.  In high

5  school he took U.S. history, AP U.S. history and AP human

6  science, and he got both 5, the highest score you could

7  get.

8       He liked history, physics he liked.  He used to read my

9  physics book just as a reading thing.  And he liked

10  discovery, and he's always been a very nature person, what

11  goes on in the environment.

12      And so he is a very -- he's a person that cares about

13  the people, the environment, and just the world in general.

14  Q.   What about religion?  Was he particularly inquisitive

15  about his religion?

16  A.   Yes.

17  Q.   Tell us about that?

18  A.   He just wanted to live his life according to the Quran

19  and the Sunnahis, which are the sayings of the Prophet

20  Mohammed (SAAW)*.  He just wanted to live his life and make

21  sure that he does everything that is right according to the

22  Quran.

23  Q.   Did he have here in the United States scholars or

24  _____

25  * Spoken softly, *Sallalahu aleyhi wasallam*.

1  mentors that could help him with that journey?

2  A.   No.

3  Q.   Was your father someone who could help him with that

4  journey?

5  A.   No.

6  Q.   What did he turn to?

7  A.   Internet, computer.

8  Q.   Did he spend a lot of time on the computer studying

9  world events and other things, his inquisitive nature, but

10 also his religion?

11 A.   Yes.

12 Q.   Would he watch the History Channel and Discovery

13 Channel?

14 A.   All the time.

15 Q.   Did you observe him personally becoming emotionally

16 upset about events he saw in the world regarding the Muslim

17 countries?

18 A.   He was -- he's always been a very passionate person,

19 compassionate about what goes on in the world, and he always

20 watched the news.  And if there is any injustice done in the

21 world to the people, he would get upset a little bit, like

22 emotional in the sense that he cared about the people.

23 Q.   With regard to -- well, you were there in Dawsonville,

24 Georgia.  Were there neighbors, people in the neighborhood,

25 friends, that were Muslim?

1  A.   No, not at all.

2  Q.   But did he -- would he associate with the neighbors and

3  so forth?  Was he friendly with the neighbors?

4  A.   Yes.  In fact, one time he was like we don't do anything

5  for the neighbors.  So he brought cake and he gave our

6  neighbors cake, and they really liked it and they really

7  appreciated that.

8       And we also had one young guy who was I think a little

9  bit older than Haris, and he would just come to our house all

10 the time and talk to him, and Haris would ask my mom to make

11 food that he liked, because he really liked my mom's

12 cooking.  So he would ask my mom to cook something nice for

13 him so he could eat and be happy, just as a way of, you know,

14 being nice and courteous to the guest.

15 Q.   So in 2004, July -- well, you said you left earlier, but

16 from about May, June and July of 2004 when you got married,

17 you were living in Pakistan; correct?

18 A.   Yes.

19 Q.   Would you come to visit the United States from time to

20 time?

21 A.   Yeah, I did.

22 Q.   But pretty much you were married, starting to raise a

23 family.

24      By the way, do you have any children?

25 A.   Yes, I do.

1   Q.   Tell us about your children?

2   A.   I have two children, one daughter, she's four, and I

3   have a son who is just two months old.

4   Q.   Brand new baby?

5   A.   Yes.

6   Q.   And the -- so in July of 2005, let's fast forward to

7   July of 2005.  At this time -- well, you knew that Haris had

8   transferred from North Georgia College to Georgia Tech; is

9   that correct?

10  A.   Yes.

11  Q.   And did he come and visit in July of 2005?

12  A.   Yes, he did.

13  Q.   Did he come to see you?

14  A.   Yes.

15  Q.   Who picked him up at the airport?

16  A.   In fact, my husband picked him up from the airport.

17  Q.   And did you have discussions with him while he was

18  there?

19  A.   Yes.  He told me that he was there to study Islamic

20  education, and research which universities are the best in

21  education, whoever have really knowledgeable scholars and

22  really authentic scholars.  He was going to search those

23  things, yeah.

24  Q.   And did you observe him trying to reach out to family

25  members and others trying to find the best school that might

1  be --

2  A.    Yes, he did.

3  Q.    By the way, does he have cousins there that he's

4  particularly close to?

5  A.    Yeah, one of our cousins is like an older brother named

6  Kamran.  And he always talks to him about, you know -- so he

7  talked to him too.

8  Q.    With regards to religious studies, what types of

9  religious studies would be available to him there in

10 Pakistan?

11 A.    There are a lot.  Like the memorizing of the Quran and

12 the translation and the Hadith, the Sunnahis you have, and

13 similar -- like Arabic, you learn Arabic.

14 Q.    Memorizing the Quran, that is, if someone is trying to

15 memorize the Quran, that is considered to be really an

16 example of great devotion to your religion, is it not?

17 A.    Yes.

18 Q.    A lot of people try to do that?

19 A.    Yes.

20 Q.    It's not an odd thing someone would do?

21 A.    No.  We have a lot of family members who actually have

22 done it.

23 Q.    It's like passage, memorizing Quran proves your

24 seriousness about your religion?

25 A.    Yes.

1  Q.   Do you know about a person named Shuja that Kamran

2  introduced him to?

3  A.   Yes.

4  Q.   Who is that?

5  A.   He is my cousin's friend who also teaches Quran and

6  everything.  And he told him -- he talked to him, Haris.

7  Q.   When you saw him in the summer of 2005, can you just

8  describe for the Court what he appeared to be searching for?

9  Tell me what he --

10  A.   He wanted the answer to what are his duties as a Muslim,

11  as a son, as a brother, as a member of the community, and

12  what he needed to do to fulfill all those duties.

13  Q.   And was he perplexed about it?  Was he searching for an

14  answer?

15  A.   Yes.  That's why he was looking for scholars to give him

16  some explanation.

17  Q.   Better understanding --

18  A.   Better understanding, yes.

19  Q.   With regard to his -- well, in your discussions with him

20  in the summer of 2005, was he -- was it a possibility that he

21  might stay in Pakistan and go to a religious school?

22  A.   Yes.

23  Q.   Would you have allowed him to stay with you in that

24  process of moving?

25  A.   Well, yeah, I would have, yeah.

Q.   But the other option was -- one other option would be to
go back and study in the United States, finish his studies at
Georgia Tech?

A.   Yes.

Q.   Did you have discussions about what he should do, what
his --

A.   Yeah.  I mean, I asked him, and he said I'm looking
until I find the right school to study Islamic education to
have.  He was looking for it.

Q.   And did you all come -- did he come to a resolution of
what he should do?

A.   Yeah, he did.

Q.   Tell us about that?

A.   He said he would go back and resume his studies, and
then come back and study Islamic education in detail.

Q.   Important question:  Did he ever at any time tell you
that I was also thinking about the possibility of joining a
training camp for jihad?

A.   No, never.

Q.   Did you know anything about that at all?

A.   No.

Q.   None of your discussions?

A.   No.

Q.   At some point -- showing you what has been marked as
Defendant's Exhibit 32, just do you recognize that?

1    A.    Yes.

2    Q.    And is Defendant's Exhibit 32 a letter that Mr. Ahmed

3    sent to his family?

4    A.    Yes.

5    Q.    Does -- after you received that letter, did that make

6    you change your mind about any of your thoughts about his

7    background, what he was searching for?

8    A.    No, not really.

9    Q.    Did he -- have you -- you heard the conversation between

10   he and his mother?

11   A.    Yes.

12   Q.    From your experience as a family member, did Haris and

13   his mom sometimes get in these sort of arguments like that?

14   A.    All the time.

15   Q.    Fussing and fighting -- not fussing and fighting,

16   mother-and-son types of arguments?

17        Was it important in the family that he complete his

18   education at Georgia Tech?

19   A.    Yes.  It was important for the family, yes.

20   Q.    For the family.

21        And was it important that he -- you know, she's fussing

22   at him about not taking enough courses and stuff like

23   that.  You heard that?

24   A.    Yes.

25   Q.    Is that something that the family wanted to make sure he

1    continued to make progress toward and graduated from Georgia

2    Tech?

3    A.   Yes.

4    Q.   Nothing unusual about that?

5    A.   Nothing.

6    Q.   But was your mother also someone who understood that he

7    would have to make his own way in life ultimately, Haris?

8    A.   Yeah.

9    Q.   And that it wasn't going to be that she was going to

10   stand in his way, but that she wanted the best for him to

11   finish his education?

12   A.   Yes.

13          MR. MARTIN:  That's all I have, Your Honor.

14          THE COURT:  Any cross?

15                -- -- --

16                CROSS-EXAMINATION

17   BY MR. McBURNEY:

18   Q.   Good morning, Ms. Ahmed.

19   A.   Good morning.

20   Q.   We have agreed to let some of your brother's family

21   members be in court during the course of the

22   trial.  I haven't been keeping track.  Have you observed any

23   of the trial before today?

24   A.   Yes.

25   Q.   Would you agree with me that you have been seeing up on

the screen and hearing when we played things, maybe other
than the phone call with your mother, a side of your brother
with which you were not familiar?

A.   I'm sorry, can you repeat the question?

Q.   Sure.  Since you have been in here, you have seen that
there have been e-mails from your brother?

A.   Yes.

Q.   Chats, online chats where he talks in somewhat coded
language but clearly enough about wanting to engage in
violent jihad.  Not an internal struggle, but going over and
fighting.

     Is that a side of your brother that you knew about
before coming into court and seeing these things?

A.   Never.

Q.   Had he ever told you about his friend in Canada,
Azdee Omani?

A.   No.

Q.   You don't -- so we are clear, you don't have an uncle in
Canada named Azdee Omani?

A.   No.

Q.   Did he ever tell you about his friend Fahim Ahmed or
James up in Canada that he met with?

A.   No.

Q.   Did he ever tell you about his friend Abu Umar that he
talked to via the computer?

1   A.   No.

2   Q.   When your brother came the summer after you were

3   married, the summer of 2005, he was there for about a month.

4   How many of those days, of the 30 some days he was in

5   Pakistan, did he stay with you, your husband and your

6   family?

7   A.   Well, since we live as an extended family where like my

8   in-laws live, so we really didn't have a room for him, so he

9   stayed a couple of days with me.  But he stayed right close

10  at my uncle's a block or two away from my house.  That's

11  where he stayed most of the time.

12       And then I have two -- three aunts and two more uncles,

13  so he stayed with them.

14  Q.   He was with family the whole time --

15  A.   Yes.

16  Q.   -- when he was having meals, praying, et cetera?

17  A.   Yes.

18  Q.   But you weren't aware of his daily comings and goings,

19  he didn't check in with you to say, sister, I'm going to go

20  do X today?

21  A.   He would call me now and then and tell me where I am at

22  at my uncle's house or some aunt's house, or I'm coming to

23  see you.  So I pretty much kept in touch with him fairly good

24  I think, I would say.

25  Q.   But you would agree that you didn't keep tabs on him

1   twenty-four hours a day?

2   A.   No.

3   Q.   So that you could share with us I know on this day he

4   did this?

5   A.   No.

6   Q.   So you are not aware that he in fact met in Karachi with

7   this Abu Umar gentleman that he met online and discussed

8   violent jihad with?

9   A.   No.

10  Q.   He never told you about that?

11  A.   No.

12  Q.   He, meaning your brother never told you about that?

13  A.   Yes, he never did.

14  Q.   You moved to Pakistan when in 2004?

15  A.   I went in May 2004.

16  Q.   2004.  And you have been back a few times to visit

17  family, but your home since May of 2004 has been in

18  Pakistan?

19  A.   Yes.

20  Q.   So you weren't around the home on Brynbrooke Drive to

21  see what exactly your brother may have been doing when using

22  computers?

23  A.   No.

24  Q.   Did your brother ever talk to you about a website called

25  Tibyan Publications?

1     A.   No.

2     Q.   Do you even know what that is, other than what you may

3     have heard in court?

4     A.   No.

5     Q.   Nothing to do with you?

6     A.   No.

7               MR. McBURNEY:   One second.

8               Thank you for your time.

9                         -- -- --

10                   REDIRECT EXAMINATION

11    BY MR. MARTIN:

12    Q.   Mr. McBurney asked you that you didn't really know a lot

13    about him from the time that -- or you didn't know about his

14    daily activities from the time you left to get married in

15    2004.

16         Were you always as a child, a teenager until the time

17    you left to get married in 2004 very close to Haris?

18    A.   Yes.

19    Q.   And when he was in Karachi both in 2004 and 2005 -- of

20    course I know you were busy with the wedding, but was he

21    someone that you stayed in chose contact with?

22    A.   Yeah.

23    Q.   And is he someone that -- you heard him say on the tape

24    to his mother that I'm easily led, easily -- was he like

25    that?

A.   Yes.  He's a very courteous and -- he's a very courteous
person and he just cannot say no.

Q.   He says that, I cannot say no --

A.   Yeah.

Q.   -- to his mom?

A.   Yeah.

Q.   And would you describe him as immature a little bit for
his age?

A.   Yeah.

Q.   Naive?

A.   Yeah.

          MR. MARTIN:  That's all I have, Your Honor.

          THE COURT:  All right.  Does anybody want this
witness subject to recall?

          MR. MARTIN:  No.

          MR. McBURNEY:  No, sir.

          THE COURT:  Ms. Ahmed, we appreciate your being
with us.

          The case is not over.  You should not discuss your
testimony with anybody until you hear that the case is
concluded.  Thank you for being with us.

          THE WITNESS:  Thank you.

          THE COURT:  Call your next witness, please.

          MR. MARTIN:  I call Riaz Ahmed.

                         --   --   --

SYED RIAZ AHMED

being first duly sworn by the Courtroom Deputy, testifies and

says as follows:

-- -- --

DIRECT EXAMINATION

BY MR. MARTIN:

Q.    Mr. Ahmed, please state for the Court your full name?

A.    My name is Syed Riaz Ahmed, S-y-e-d  R-i-a-z  A-h-m-e-d.

Q.    And, Mr. Ahmed, how are you related to the defendant

Syed Haris Ahmed?

A.    I'm his father.

Q.    Where do you live?

A.    Now in Dawsonville.

Q.    And what do you do there?

A.    I teach at North Georgia College as a professor of

computer science.

Q.    How long have you taught there?

A.    Twelve and half years.

Q.    And what do you teach?

A.    Computer science.

Q.    That's right, you just said that.  And you teach

undergraduate computer science?

A.    Yes.

Q.    Where were you born?

A.    Karachi, Pakistan.

Q.   When were you born?

A.   '51.

Q.   And were you raised as -- up to a teenager and so forth,
as a young adult in Pakistan?

A.   Yes.

Q.   Are you married?

A.   Yes.

Q.   When did you get married?

A.   1980.

Q.   And where were you married?

A.   Karachi.

Q.   And do you have any children?  Tell us about your
children, the ages?

A.   Yes.  Four children.  Eldest is Mariam, 28.

Q.   All right.

A.   Son, Haris, 25.  Daughter, Samia, 21.  Daughter, Tamima,
18.

Q.   Okay.  And do your two youngest daughters still live
with you?

A.   Yes.

Q.   Now, did you go to university in Pakistan?

A.   Yes, for my undergraduate.

Q.   What university did you go to?

A.   University of Karachi.

Q.   And what did you study there?

A.   Engineering.

Q.   Okay.  And did there come an occasion when you wanted to get advanced education in the United States?

A.   Yes.

Q.   And why did you want to do that?

A.   Because the degree from a foreign country is better paid in Pakistan.

Q.   So a degree from the United States country would give you some standing in Pakistan?

A.   Yes.

Q.   And where did you go to get your Master's degree?

A.   University of Evansville, Indiana.

Q.   Evansville, Indiana?

A.   Yes.

Q.   What degree did you get there?

A.   Computer science.

Q.   When did you get that?

A.   1988.

Q.   Now, did you bring the family with you when you came in 1988, or did you come by yourself?

A.   No, I came by myself.

Q.   So your family stayed in Karachi with your wife?

A.   Yes.

Q.   Now, after you returned to Pakistan, what did you do?

A.   I joined the computer institute as a teacher instructor.

Q.   And did there come a time when you wanted to try to come back to the United States?

A.   Yes.

Q.   Tell us why?

A.   To give my family a better life-style and better education.

Q.   Is education something very important in your family?

A.   Yes.

Q.   Now, when did you -- well, first of all, how did you arrange being able to come, you and your family, to the United States?

A.   I had learned about a program in U.S.A. at that time that Pakistan was one of the countries that they could apply for a visa, which was a random selection from the number of applicants they received.  I tried twice.  The second time I got lucky.

Q.   It was a lottery?

A.   Lottery.

Q.   And you won the lottery and came to the United States?

A.   Yes.

Q.   And where did you come to in the United States?

A.   I first came to New York to stay with my -- one of my friends, then I was going to Florida to look for a job because I had a place to live there.

     So in going there I stopped in Georgia where my cousins

1    were.  So they said, Well, if we offer you the same living

2    space, will you stay here?

3         And I said, Why not?

4    Q.   So you came first without the family; correct?

5    A.   Yes.

6    Q.   To find a place and work; correct?

7    A.   (Nods head.)

8    Q.   And you settled originally in what, Fayetteville?

9    A.   No, I stayed for one month in Fayetteville with my

10   cousin, and then in Marietta for about a year.

11   Q.   And what type of work were you looking for?

12   A.   I had a feeling that I may be better in commercial

13   programming, so I tried one or two places, send in an

14   application.  They said no, you have teaching experience, you

15   would be better off in teaching.  So I went back to teaching.

16   Q.   You taught for a while in Pakistan before you came to

17   the United States?

18   A.   Yeah, about eight years.

19   Q.   So where was the first teaching job you were able to

20   get?

21   A.   I got a part-time teaching job at Kennesaw State

22   University for teaching one course for two quarters, and then

23   I was applying for another job, full-time job.  And North

24   Georgia was the first one to offer me.

25   Q.   And did you take that job?

1    A.    Yes.

2    Q.    Now, when did the family come over?

3    A.    About two months later.

4    Q.    Two months after you first came here looking for a place

5    to settle down and a place to work?

6    A.    Yes.

7    Q.    And where did the family originally settle then?

8    A.    In Marietta.

9    Q.    Marietta.  Did you all rent an apartment?

10   A.    Yes.

11   Q.    And then did you later move to Roswell?

12   A.    Roswell, yes.

13   Q.    Where did Haris go to school?

14   A.    First, one year in Marietta in the middle school, then

15   in Roswell in the Centennial High School.

16   Q.    Was he a good student?

17   A.    Yes.

18   Q.    Was he particularly good at math and history?

19   A.    Yes.

20   Q.    Showing you what's been previously marked as Defendant's

21   Exhibits 34 and 36, did you keep a folder in your house of

22   documents regarding school records and so forth, important

23   records of your family or your children?

24   A.    Yes.

25   Q.    And did you keep school records from high school, for

1    example?

2    A.    Yes.

3    Q.    What are 34 and 36?

4    A.    These are school records.

5    Q.    All right.  For whom?

6    A.    For Syed Haris, my son.

7              MR. MARTIN:  Your Honor, I would move into evidence

8    Defendant's Exhibits 34 and 36.

9              THE COURT:  Any objection?

10             MR. McBURNEY:  No objection.

11             THE COURT:  They are admitted.

12   BY MR. MARTIN:

13   Q.    Did he achieve advanced placement in high school?

14   A.    Yes.

15   Q.    Advanced placement courses, history, math, science?

16   A.    Yes.

17   Q.    So he goes to Centennial High School, and that's in the

18   Roswell area; correct?

19   A.    Yes.

20   Q.    Did there come a time when the family moved again to

21   further north in Georgia?

22   A.    Yes.

23   Q.    Where did you move to?

24   A.    Dawsonville.

25   Q.    And why did you do that?

1   A.   To reduce the commute time.

2   Q.   Because you were teaching in North Georgia College?

3   A.   And Gainesville College.

4   Q.   And Gainesville College?

5   A.   Yes.

6   Q.   And your daughter, the eldest daughter --

7   A.   Yeah, she also was in college, and she didn't want to

8   drive that long also.

9   Q.   So you moved to Dawsonville, Georgia?

10  A.   Yes.

11  Q.   It's a small -- what's the name of the little

12  development you live in?

13  A.   Brynbrooke.

14  Q.   And is that a suburban type of a little small

15  development --

16  A.   Yes.

17  Q.   -- outside of Dawsonville?

18  A.   Yes.

19  Q.   Do you still live there?

20  A.   Yes.

21  Q.   Haris, after you all moved to Dawsonville, did he

22  complete his high school education?

23  A.   He was in the Dawson High School just as a virtual

24  student because he was also --

25  Q.   You said virtual student?

A.   Virtual, because he was also a student in North Georgia
College, we call it joint enrollment, so he could complete
his schedule from the high school and also get into college.

Q.   So he's actually taking courses at North Georgia where
you are teaching to finish his high school degree?

A.   Yes.

Q.   And did he ultimately get a high school degree from --

A.   Yes.

Q.   -- Dawson High School --

A.   Yes.

Q.   -- though he never was actually present?

A.   He was not there.

Q.   When they called out his name at graduation, everybody
wondered who that was?

A.   They were saying, Who is this guy?

Q.   Then did he go -- where did he go to school next?

A.   After North Georgia, he went to Georgia Tech.

Q.   Well, he graduates from high school?

A.   Yes.

Q.   Where does he start college?

A.   North Georgia.

Q.   And how long was he at North Georgia College?

A.   I think for two years.

Q.   Showing you what's marked as Defendant's Exhibit 39, can
you identify what that is?

A.    Yes.  It's a North Georgia unofficial transcript.

Q.    That's a transcript of his grades at North Georgia College?

A.    Yes.

        MR. MARTIN:  Move into evidence Defendant's Exhibit 39.

        THE COURT:  Any objection?

        MR. McBURNEY:  No, sir.

        MR. MARTIN:  It's admitted.

BY MR. MARTIN:

Q.    Did there come a time when he transferred from North Georgia College to Georgia Tech?

A.    Yes.

Q.    Why?

A.    Because we don't have good engineering program, and he wanted to go into engineering.  So he went there.

Q.    And he wanted to study mechanical engineering?

A.    Yes.

Q.    He was eligible for the Hope Scholarship, was he not?

A.    Yes.

Q.    So he had a Hope Scholarship both at North Georgia --

A.    Yes.

Q.    -- and at Georgia Tech?

A.    Yes.

Q.    When he was going to North Georgia College, he was still

1  living at home?

2  A.   Yes.

3  Q.   However when he started going to school at Georgia Tech,

4  he had to find a place to live in Atlanta; correct?

5  A.   Yes.

6  Q.   When he went to Georgia Tech, showing you what's

7  Defendant's Exhibits 28, which is already in evidence as the

8  transcript of his grades at Georgia Tech, as a new student,

9  as he began, was he a good student?

10 A.   Yes.

11 Q.   Did he make a 4.0 in calculus?

12 A.   Yes.

13 Q.   Did he always have an affinity for math --

14 A.   Yes.

15 Q.   -- and science?

16 A.   Yes.

17 Q.   However, in the spring of 2005, his grades go down, do

18 they not?

19 A.   Yes.

20 Q.   Ultimately he was placed on academic probation?

21 A.   Yes.

22 Q.   But when he returned from Pakistan after the summer of

23 2005, he reenrolled -- not reenrolled -- yeah, he reenrolled,

24 and his grades started to improve again, did they not?

25 A.   Yes.

Q.   The conversation, the recorded conversation between
Haris and his mother in July of 2006 over a number of courses
that he had enrolled for for the spring semester, was that a
concern of the family, that he wasn't taking enough courses?

A.   Yes.

Q.   Tell us about that a little bit?

A.   I was not actually aware that he was not taking enough
courses, but then my wife told me that he was not taking
enough courses.  So I said, well, he should take more courses
to complete his education as early as possible.

Q.   Now, are you a United States citizen?

A.   Yes.

Q.   When did you become a United States citizen?

A.   2003.

Q.   Okay.  And did you go through the naturalization
process?

A.   Yes.

Q.   Did Haris also become a U.S. citizen?

A.   Yes.

Q.   What year did Haris become a U.S. citizen?

     I will show you Defendant's Exhibit 37.  Can you
identify that?

A.   Yes.

Q.   What is that?

A.   Certificate of Naturalization.

1   Q.   Okay.  Did he go through the application process as --

2   how old would he have been at that time?

3   A.   2004 he became that, so --

4   Q.   In August of 2004 he became a U.S. citizen?

5   A.   So about 20.

6   Q.   18 or 19?

7   A.   Yeah, 18 or 19.

8   Q.   His birthday is December of '84, so he would have been

9   19 years old?

10  A.   Yes.

11  Q.   So did he go through the whole process of becoming a

12  U.S. citizen?

13  A.   The whole process.

14          MR. MARTIN:  Your Honor, I move into evidence

15  Defendant's Exhibit 37.

16          MR. McBURNEY:  No objection.

17          THE COURT:  They are admitted.

18  BY MR. MARTIN:

19  Q.   At the same time did he also fulfill his obligation to

20  register with the Selective Services?

21  A.   Yes.

22  Q.   I show you what has been marked as Defendant's Exhibit

23  38.  Is that his registration with Selective Services?

24  A.   Yes.

25          MR. MARTIN:  Move into evidence Exhibit 38.

1          THE COURT:  Any objection?

2          MR. McBURNEY:  No, sir.

3          THE COURT:  Admitted.

4   BY MR. MARTIN:

5   Q.   It's important for you to be as honest with us as you

6   can, Mr. Ahmed.  Are you a very religious man?

7   A.   No.

8   Q.   I'm not saying that you don't subscribe to your faith,

9   but it's not something that is a key part of your life.  Is

10  that not a fair statement?

11  A.   Yes.

12  Q.   Did you all have much religious books in the house?

13  A.   Not much.

14  Q.   Did you leave that part of the family upbringing to your

15  wife a little bit?

16  A.   In a way.

17  Q.   And you were busy getting on with your career in

18  teaching, were you not?

19  A.   Yes.

20  Q.   Did you ever give Haris much instruction about Islam,

21  his obligations and duties and so forth under Islam?

22  A.   No, except that he should become a good member of the

23  family and the community and try to help others.

24  Q.   Did he have any scholars or mentors in the areas where

25  you were living that could help him understand his religion

1   and put in context his religion?

2   A.   No.

3   Q.   Islam is a religion of moderation, is it not?

4   A.   Yes.

5   Q.   Did he -- did you regularly attend jumah services?

6   A.   As often as I could.

7   Q.   When you were in Dawsonville, where was the nearest

8   masjid or mosque?

9   A.   Alpharetta.

10  Q.   So about 20, 30 miles away?

11  A.   About that.

12  Q.   I know you are a professor in computer science.  Did you

13  help your son or work with your son about developing skills

14  with the computer?

15  A.   I tried to induce him to join the commercial department,

16  but he said no, I'm not interested.

17  Q.   But at the home he never was quite as skilled as you,

18  but he was on the computer a lot, was he not?

19  A.   Just chatting, e-mails.

20  Q.   Yeah, e-mail.  And at the home there were long periods

21  of time when Haris would be on the computer and you wouldn't

22  know exactly what he was doing on the computer?

23  A.   No.

24  Q.   Let me get some water.

25       Do you know whether or not he turned to the computer as

1 a place to learn about his religion and the obligations of

2 his faith?

3 A.  I have no idea.

4 Q.  You what?

5 A.  I have no idea.

6 Q.  You have no idea.

7 In 2004, your daughter, the eldest daughter, got married

8 in Pakistan; isn't that correct?

9 A.  Yes.

10 Q.  And you traveled to Pakistan with the rest of the family

11 to celebrate her marriage, did you not?

12 A.  Not with them, later on.

13 Q.  They went --

14 A.  Yeah.

15 Q.  The mother and sisters went first?

16 A.  Then Haris, then me.

17 Q.  And you, the person paying the bills, came later;

18 correct?

19 A.  Yes.

20 Q.  Do you have lot of family in Pakistan?

21 A.  Yes.

22 Q.  And do you have a number of brothers and sisters, aunts

23 and uncles, and nephews and nieces there?

24 A.  Yes.

25 Q.  Is Haris close to them?

1    A.    Yes.

2    Q.    When -- would the family on occasion, on summer breaks,

3    often visit Pakistan and visit family?

4    A.    Yes.

5    Q.    Is that typically where you would spend your summer

6    break, on a vacation in Pakistan?

7    A.    Yes.

8    Q.    And did Haris go into Pakistan, Karachi, in 2004 for the

9    wedding of your eldest daughter?

10   A.    Yes.

11   Q.    Now, in 2005, Haris again traveled to -- the summer of

12   2005 to Pakistan; correct?

13   A.    Yes.

14   Q.    First of all, did you assist him in buying his plane

15   ticket to go in 2005?

16   A.    Only making the booking and paying from my checking

17   account.  The money was his.

18   Q.    So he brought you the money.  And how much was it, do

19   you remember?

20   A.    Around nine hundred dollars.

21   Q.    And you actually then purchased the ticket?

22   A.    Yes.

23   Q.    Did you understand it was a one-way ticket?

24   A.    Yes.

25   Q.    And why was it a one-way ticket?

1   A.   Because he was going for education, and that may extend

2   for more than one year.  And you cannot buy a return ticket

3   for more than a year.

4   Q.   So if you buy a two-way ticket, you have to complete the

5   travel within one year?

6   A.   Yes.

7   Q.   And it would be a waste of money to buy a two-way ticket

8   if he's actually going to stay in Pakistan?

9   A.   Exactly.

10  Q.   Did you know why he was going to Pakistan?

11  A.   To get Islamic education.

12  Q.   Is that what he told you?

13  A.   Yes.

14  Q.   Is that what you understood?

15  A.   Yes.

16  Q.   Had at that time Haris become very serious about his

17  religion?

18  A.   Yes.

19  Q.   He didn't talk to you much about it though, did he?

20  A.   No.

21  Q.   But he was obviously wanting to get religious education

22  in Pakistan.  Obviously that was a focus of where he was at

23  that time?

24  A.   He told me a number of times that I want to get Islamic

25  education, and there was no way in U.S.A. I can do that along

with my studies.

Although I wanted to convince him that getting the degree from Georgia Tech is much better, easier and quicker, then starting the Islamic education, but he was insistent.

So I said, Well, okay, if you want to break and then come back, it's up to you.

Q.   Obviously you would prefer that he come back and finish at Georgia Tech?

A.   Exactly.

Q.   And he knew that?

A.   Yes.

Q.   Did he ever talk about thinking about joining jihad or a training camp with you or any other of the family members?

Let's start with you.

A.   No.

Q.   Only you would know that.

And did you believe or understand that he might be talking to somebody about that possibility when he went to Pakistan in 2005?

A.   When he mentioned that jihad is important and the duty of all Muslims, that raised some red flags.  That if he's thinking, he might be led to believe and act.

Q.   Is Haris an easily influenced person?

A.   Yes.

Q.   Someone who it's hard to say no?

1  A.  Yes.

2  Q.  Is he someone who is always constantly searching for an

3  answer, especially about his religion --

4  A.  Yes.

5  Q.  -- if you can say?

6  A.  Yes.

7  Q.  Let me show you some e-mails.

8      MR. MARTIN:  Your Honor, so we can just go through

9  this quickly, I'm going to offer into evidence some e-mails,

10  Defendant's Exhibits 6, 9, 10, 12, 13, 14, 16, 19, 20, 21, 22

11  and 23.

12      Any objection?

13      MR. McBURNEY:  No.

14      THE COURT:  They are admitted.

15  BY MR. MARTIN:

16  Q.  This I'm showing on the screen Defendant's Exhibit 9.

17      First of all, at the very top of this header, there is a

18  name Tahir, do you see that?

19  A.  Yes.

20  Q.  This is an e-mail from Syed Ahmed to Tahir in December

21  of 2004.

22      Who is Tahir?

23  A.  My nephew.

24  Q.  And where does Tahir live?

25  A.  Pakistan.

1  Q.   And this e-mail talks about -- I will go to the second

2  page.  It's actually -- he talks about the Muslim Student

3  Association, and just to summarize it, they are discussing

4  certain websites that might be helpful in regards to studying

5  Islam.  At the very top, the main site is StudyIslam.com;

6  correct?

7  A.   Yes.

8  Q.   Did Haris communicate with his cousins and so forth in

9  his quest to understand his religion better, websites and so

10  forth, if you know?

11  A.   I think, but I'm not sure.

12  Q.   Okay.  Here is Defendant's Exhibit 10, which is also an

13  e-mail with Mr. Tahir and Mr. Ahmed.  And I just want to

14  suggest you look at the second part there, talking about

15  Mr. Ahmed talking about there being a large Muslim

16  community.

17       And then he says at the very end there when they are

18  discussing various websites about his religion, these sites,

19  especially the first one, and, insha'Allah, it will be

20  beneficial; correct?

21  A.   Yes.

22  Q.   Did you know about them discussing websites on the

23  internet?

24  A.   No.

25  Q.   March of 2005, is there -- can you help us understand

this a little bit?  This is an e-mail from Faraz to Haris

about admission requirements, and he says, There is a

madrassa in Shehdad Puur.  What would that be about?

A.   What line?

Q.   Right here.  That's a great madrassa.

A.   Where?

Q.   You can look at your screen.

A.   Oh, okay.

          THE COURT:  What exhibit number is this?

          MR. MARTIN:  Excuse me, this is Defendant's Exhibit

12.

A.   Shehdad Puur?

Q.   Yes.

A.   That's in Hyderabad.

Q.   And where is that?

A.   About a 150 kilometers from Karachi.

Q.   Right.  He's talking about various different madrassas.

What is a madrassa?

A.   It's an Islamic school.

Q.   Are there a number of schools like that in Karachi or

the surrounding areas?

A.   Yes.

Q.   That was March 11.

     Showing you Defendant's Exhibit 13, and this is another

e-mail with Faraz a week or so later.  And look toward the

1   middle there where Haris responds, I am sorry to reply late,

2   but, insha'Allah, you will forgive me.  I am interested in

3   learning about the Dar ul Hadith Rahmania in Karachi.

4        What is that?

5   A.   That's also an Islamic school.

6   Q.   In Karachi?

7   A.   In Karachi.

8   Q.   So he's making inquiries about that school as well;

9   right?

10  A.   Yes.

11  Q.   Then at the top, the response from Mr. Faraz is, I know

12  about that madrassa.  That's a good salafi madrassa.  But it

13  depends on you that you are interested in learning in Arabic

14  or Urdu?

15       Are some schools in Urdu and some schools in Arabic?

16  A.   Yes.

17  Q.   The madrassa is in Urdu under the -- well, that person's

18  name -- Nasir Rehmani; right?

19  A.   Yes.

20  Q.   He's a very, very well-known great scholar?

21  A.   Yes.

22  Q.   Showing you Defendant's Exhibit 14, again, is this an

23  e-mail from Haris in March of 2005 to his cousin Tahir in

24  Pakistan?

25  A.   Yes.

Q.   And without going into all the details of it, they are again talking about online learning websites, Pakistanlearning.com and other websites about religion, and he mentions, One is Tibyan.com; does he not?

A.   Yes.

Q.   Moving along, in that same -- springtime, this is when Haris's records, his transcript from Georgia Tech indicates his grades are not doing so well; correct?

A.   Yes.

Q.   And then let's start at the bottom.  This is Defendant's Exhibit 16 from Syed to Faraz:  Remember me?   I had some conversation with e-mail about my intention to come for Islamic studies.  I am planning to come this summer, insha'Allah.

     Insha'Allah is a phrase used often, God willing essentially?

A.   Yes.

Q.   So if you can enlighten me on the details about admission.  I am a Pakistani national, so I don't think I will have a problem getting government approval or NOC.

     What would NOC mean?

A.   No objection to certification.

Q.   So no objection from the government for him to come in?

A.   Yes.

Q.   Please let me know when the admission begins and what

kind of studies can I do to prepare myself for the studies

there. And also you mentioned different madrassas like one

in Hyderabad.

Where is that, do you know?

A. Same city, about 150 kilometers from Karachi.

Q. What are my options with regards to the location?

Please reply.

Then Mr. Faraz replies, Walaikumussalam, I do remember

you. Well, it is good that you are coming. In our

university, the admissions will be opening from July 15th to

August 1. So while you have got the Paki nationality, so you

don't need any especial requirement or anything, just come to

Karachi --

KHI would be Karachi; right?

A. Yes.

Q. -- and contact me, I will tell you about the basic

requirements.

He says, But if you want to memorize the Quran, so for

that I mentioned you one good madrassa in -- the one we

mentioned before, Shehdad Puur; right?

A. Yes.

Q. That's a hot place. What would be -- again, I don't

force you for Abu Bakar University.

That's the one he's sort of trying to promote; is that

not correct?

A.   Yes.

Q.   It's on you what you want to do, so just plan; correct?

A.   Yes.

        MR. McBURNEY:  That was 16?

        MR. MARTIN:  That was 16.

BY MR. MARTIN:

Q.   That last one was April 30th.  Now we are getting into

the summer.  This is Defendant's Exhibit 19, which is June 8,

again between Mr. Haris Ahmed and Faraz.

        Let's start at the bottom:  Brother, I am e-mailing you

to tell you that I have confirmed my ticket for July 17,

insha'Allah.  I want to see what should I do in order to get

admission in Abu Bakur University.  I have Pakistani

passport, but I do need ID card.

        What type of ID card would you need in Pakistan?

A.   A national ID card.

Q.   A little bit like a Social Security number?

A.   Yes.

Q.   Can you please tell me the full details of the whole

issue?  Also if you could tell me about Dar ul Hadith

Rahmania in Karachi.

        They talked about that before.

        I am not interested in an actual B.A. or M.A.  I just

want to get Islamic knowledge to benefit me personally.

        Is that what he says?

1    A.    Yes.

2    Q.    Like the scholars of old times, they did not get M.A. or

3    Ph.Ds. but got ilm --

4          What is ilm?

5    A.    Ilm.

6    Q.    That's just knowledge, isn't it?

7    A.    Education, but no certification.

8    Q.    -- for their benefit and benefit of Islam.  Insha'Allah,

9    I will meet you when I get there, but do tell me what I need

10   so I do not end up not getting admission due to some minor

11   issue.

12         Such as not having an NIC card; correct?

13   A.    Yes.

14   Q.    Showing you what has been previously marked as

15   Defendant's Exhibit 20, this is an e-mail from you to -- to

16   your son Haris; correct?

17   A.    Yes.

18   Q.    July 21, 2005.  You communicated -- when he was in

19   Karachi, Pakistan, the primary way of communicating with him

20   was by e-mail; is that correct?

21   A.    Yes.

22   Q.    And you said you are glad he's gotten there.  I have

23   sent copies of my and your, what's that, ammi's NIC by fax?

24   A.    That's the same as the national ID card.

25   Q.    So you were helping him with getting the requirements he

1   might have to get into school?

2   A.   Yes.

3   Q.   You talk about the drive.

4        You mentioned that if you get a chance, buy books from

5   the list that I gave you.  Do you remember what that was?

6   A.   The books?

7   Q.   Yeah, do you remember?

8   A.   I wanted to get some books from Pakistan.

9   Q.   Right.  Then I want to ask you about this:  I will mail

10  you the payment receipts for my plot in the Engineers Society

11  by weekend.

12       What is that about?

13  A.   That is a society that got some real estate, and then

14  they were giving this to the members on payment.

15  Q.   Showing you what's been previously marked as Defendant's

16  Exhibits 40, 41 and 42, can you identify what those are?

17  A.   Yes.  This is is my membership, a copy.

18            MR. MARTIN:  Move into evidence 40, 41 and 42.

19            THE COURT:  Any objection?

20            MR. McBURNEY:  No, sir.

21            THE COURT:  They are admitted.

22  BY MR. MARTIN:

23  Q.   That's a younger version of you; right?

24  A.   Yes.

25  Q.   That's Exhibit 40.  What is Defendant's Exhibit 40?

A.   It is a receipt with key documentation of how much money

you have paid for your land.

Q.   And this was done some years ago when you made this down

payment on the land; correct?

A.   A long time ago.

Q.   And 41, what is that?

A.   That is the allotment, just like real estate, you know,

you got a piece of paper that you own this land.

Q.   And 42, what is that?

A.   This is the balance payment on the same land.

Q.   So it shows how much you paid on this piece of

property?

A.   Yes.

Q.   Explain to us a little bit how this works?

A.   You get a piece of property, and then you can buy --

build your own house that you want.  So the land cost is

naturally, it is 10 percent of the total house.  You can buy

land, and then you can build your house.

Q.   So you had paid money toward this plot many years ago;

correct?

A.   Yes.

Q.   And you were asking Haris to investigate the current

status of it; correct?

A.   Yes.

Q.   What did you finally ultimately understand the status

was of that down payment you made years before?

A.    I was reading the newspaper that maybe they have sold

that property to some other developers and maybe I would not

be able to get real possession of the land.

Q.    Going back to Defendant's Exhibit 20, let's go to the

very bottom of the page.

Well, two things.  I'm checking the Dawn Classified.

What is the Dawn Classified?

A.    It's a newspaper they publish details about new pieces

of land that you can buy.

Q.    It's a major newspaper?

A.    Yes.

Q.    It's actually called the Dawn and Jang?

A.    Yes.

Q.    And you have been investigating what the prices would

be.  You say if it's too costly, then I will do something

else?

A.    Yes.

Q.    So you are asking Haris while he's there to investigate

this real estate transaction you had started years ago?

A.    Yes.

Q.    Let's go to the bottom.  What is the progress about your

main mission of going there?  What information have you

gathered and from what sources so far?  What will you do

now?  What are the suggestions and recommended options from

1  your cousins?  So forth.

2  　　Were these options regarding schools?

3  A.　Yes.

4  Q.　And you are recommending that he talk with aunts,

5  uncles, cousins there about what is best; right?

6  A.　Yes.

7  Q.　Get all the information, do all the survey, visit as

8  many universities and madrassas, talk to as many people as

9  you can, write down their suggestions, and then sit down and

10  think very carefully before you make the next move.

11  　　That was fatherly advice, was it not?

12  A.　Yes.

13  Q.　Keep us posted.  We miss you so much.

14  　　Defendant's Exhibit 21 is just sort of a continuation of

15  the conversation.  This is July 27.  The last one is July

16  21.

17  　　I have mailed photocopies of the payments

18  receipts.  Those are the documents we just talked about?

19  A.　Yes.

20  Q.　Do not waste too much time on that plot.  The plot is

21  the piece of land; correct?

22  A.　Yes.

23  Q.　Only rupees nine thousand.  That's not a lot of money,

24  is it?

25  A.　No.

1  Q.   Mail me the complete Dawn and Jang, but send it by book

2  post airmail because it's cheaper; right?

3  A.   Yes.

4  Q.   If you can find a good plot in, what's this, Malir

5  Defence of more than 240 square yards, on which we can build

6  a house in the next five years, tell us what the price is.

7  A.   Yes.

8  Q.   Were you thinking about possibly building a house in

9  Pakistan and moving back?

10  A.   Yes.

11  Q.   So you are just asking him to help you keep looking for

12  a possible piece of property, what the prices are, and so

13  forth while he's there?

14  A.   Yes.

15  Q.   That was July 27, 2005.

16       The next document is Defendant's Exhibit 22, which is

17  August 2, 2005.  Haris has been in Pakistan only from July 17

18  through August 2.  Is that right?

19  A.   Yes.

20  Q.   We are extremely happy to learn that you are in the

21  process of finally making a decision to return here soon.

22       So you had learned by that time that he had decided to

23  come back?

24  A.   Yes.

25  Q.   We will accept your decision with an open heart and let

1    you do what you want to do here if you decide to come back.

2        Then you ask him questions about the paperwork that you

3    were talking about, your piece of property.  If you have not

4    mailed from the Dawn and Jang, please do so.

5        When will you be getting your NIC?  That is the identity

6    card there in Pakistan?

7    A.    Yes.

8    Q.    This person was helping you handle some matters, you

9    appreciated the time he spent on it.

10        The final one I wanted to ask you about is Defendant's

11    Exhibit 23, which is another e-mail, August 10, to him saying

12    that you had helped him out by getting registered again at

13    Georgia Tech essentially.  Is that right?

14    A.    Yes.

15    Q.    What about booking your flight?  You should do the

16    booking immediately if you can.  If you have any problems

17    with money, let me know immediately by calling or sending an

18    e-mail.

19        So you were willing to help him come back?

20    A.    Come back.

21    Q.    Do you know if the family members there at Pakistan also

22    helped put together some money to get him back to the

23    United States?

24    A.    Yes.

25    Q.    Did you and other family members weigh in to try to

1  convince him to finish his studies in the United States

2  before he goes to Pakistan to do Islamic studies?

3  A.   Yes.

4  Q.   Tell us why?

5  A.   Because it is much easier to finish one type of study

6  and then concentrate on the other one.  Otherwise if you

7  leave in between, you forget and then you have to put more

8  effort on getting back on track.

9  Q.   And did Haris discuss with you possibilities of using

10  his mechanical engineering degree for commercial and any

11  other type of profession that it might help him with?

12  A.   He said he doesn't like a nine-to-five job.

13  Q.   Right.

14  A.   So he may try to use it in some kind of business.

15  Q.   Right.  Entrepreneurs?

16  A.   Yes.

17  Q.   While I'm on that subject, did there come a time when

18  you traveled to Chicago with Haris to meet with a fellow

19  named Mohammed Ahmed and his son Zubair Ahmed?

20  A.   Yes.

21  Q.   That was in 2004?

22  A.   Yes.

23  Q.   First of all, why did you go?

24  A.   I just wanted to meet his friend Zubair.

25  Q.   Let me interrupt you.  Did you understand he only met

1   this person on the internet?

2   A.   Online, yes.

3   Q.   Okay.  Go ahead.

4   A.   So because Haris is young and may not be able to go

5   there independently and maybe get lost somewhere, so I said,

6   well, I will go with you and see how the family is, how the

7   guy is.  And so I went there.

8   Q.   You were being a good father?

9   A.   Yes.

10  Q.   And Haris had just -- was still -- I guess he was still

11  19, still a teenager?

12  A.   Yes.

13  Q.   Although he was in college.

14       Did you meet with Mohammed Ahmed, the father?

15  A.   Yes.

16  Q.   Was there times when Zubair Ahmed and Haris Ahmed talked

17  privately?

18  A.   Yes.

19  Q.   Did you understand Mohammed Ahmed to be a substantial

20  person with a good job and a good family there?

21  A.   Yeah.  He had a good business.

22  Q.   Good business, well respected in that community?

23  A.   Yes.

24  Q.   And you returned home?

25  A.   Yes.

1    Q.   Now, I know it's difficult for you as a father, but at

2    any time did you have any notion -- well, you said you had

3    some suspicion, but did you ever know specifically that your

4    son was talking to people about jihad and the obligations of

5    jihad and perhaps joining a training camp in Pakistan?  Did

6    you know anything about any of that?

7    A.   No.

8             MR. MARTIN:  Just one second.

9    BY MR. MARTIN:

10   Q.   As a father, did you understand or learn that your son

11   was a very inquisitive person?

12   A.   Yes.

13   Q.   Constantly seeking out the news in the world and so

14   forth?

15   A.   Yes.

16   Q.   And became at time to time very upset about things that

17   were going on in Muslim countries?

18   A.   Yes.

19   Q.   And would react emotionally to that?

20   A.   Yes.

21   Q.   But he was also getting on with his studies; correct?

22   A.   Yes.

23   Q.   He was helpful to people in the neighborhood and

24   friends?

25   A.   Yes.

1  Q.   Worked, tried to hold down a job to help him pay for his

2  school?

3  A.   Yes.

4  Q.   By the way, when Haris's grades went down in the spring

5  of 2005, he lost his Hope Scholarship, did he not?

6  A.   Yes.

7  Q.   So when he comes back in 2005, there was a financial

8  strain both on Haris and on you to start paying for tuition;

9  correct?

10 A.   Yes.

11 Q.   And he was working; correct?

12 A.   Yes.

13 Q.   And that placed -- and you and your mother -- not your

14 mother, his mother were insisting that he take as many

15 courses as possible; correct?

16 A.   Yes.

17 Q.   And that was a strain on him as well, was it not?

18 A.   Yes.

19          MR. MARTIN:  Your Honor, that's all I have.

20          THE COURT:  All right.  Any cross?

21          MR. McBURNEY:  Yes, sir.

22                    --  --  --

23                  CROSS-EXAMINATION

24 BY MR. McBURNEY:

25 Q.   Good morning, Mr. Ahmed.

1   A.   Good morning.

2   Q.   We have met before?

3   A.   Yes.

4   Q.   You testified before the grand jury several years ago?

5   A.   Yes.

6   Q.   You received a grant of immunity so that whatever you

7   said wouldn't be used against you in any way?

8   A.   Yes.

9   Q.   Do you remember that?

10  A.   Yes.

11  Q.   Your son told you that he met Zubair online.  Is that

12  right?

13  A.   Yes.

14  Q.   Your son did not tell you that he met Zubair on a

15  website known as Clear Guidance, did he?

16  A.   No.

17  Q.   Your son did not tell you that Clear Guidance was a

18  pro-jihadist, by which I mean violent jihadist forum, did

19  he?

20  A.   No.

21  Q.   All you knew is that he had met someone online, chatted

22  or e-mailed, and now wanted to meet him in person?

23  A.   Yes.

24  Q.   Your son kept from you the fact that while he met with

25  Zubair in Chicago, while you were with Zubair's father, they

1  discussed violent jihad and the three levels of violent

2  jihad?

3  A.   I have no idea.

4  Q.   He didn't tell you that he did that, did he?

5  A.   No.

6  Q.   You have sat through much of the trial, correct, this

7  trial here?

8  A.   Yes.

9  Q.   You weren't able to be here yesterday, but you were here

10  for Monday, Tuesday?

11  A.   Yes.

12  Q.   You heard Zubair's testimony?

13  A.   Yes.

14  Q.   That's the same individual that your son and you

15  traveled to meet in Chicago?

16  A.   Yes.

17  Q.   Your son went to Canada in March of 2005.  You were

18  aware of that trip?

19  A.   Yes.

20  Q.   He told you that he was going there with his friend

21  Shifa to visit Shifa's family?

22  A.   Yes.

23  Q.   You don't have any relatives in Canada, do you?

24  A.   We have, but we don't have so much communication with

25  them, and he was not going to visit them.

1    Q.   Your son doesn't have an uncle named Azdee Omani in

2    Toronto?

3    A.   No.

4    Q.   Meaning you don't have a brother or your wife doesn't

5    have a brother in Toronto named Azdee Omani?

6    A.   No.

7    Q.   Or brother-in-law, I guess?

8    A.   No.

9    Q.   Your son never told you that in fact in Canada he didn't

10   meet -- spend all that much time with Shifa's relatives, but

11   met with people he met online, like Zubair?

12   A.   No.

13   Q.   Did you take him -- they took Greyhound.  Did you take

14   him down to the bus station when it was time to leave for

15   Toronto?

16   A.   No.

17   Q.   Did you pick him up from the bus station after they got

18   back?

19   A.   Yes.

20   Q.   Did you pick up -- did you give Shifa a ride as well?

21   A.   He didn't come on the same bus.

22   Q.   They came back from Canada in different buses?

23   A.   I don't know, because I didn't see him.

24   Q.   And when I say Shifa, that's Ehsanul Sadequee?

25   A.   Yes.

Q.   That's a friend -- he was at one time a friend of your

son's?

A.   Yes.

Q.   You met Ehsanul Sadequee before?

A.   Yes.

Q.   He's been to your house before?

A.   Yes.

Q.   He's used your computers in your house before?

A.   When he was with my son, he might have.

Q.   You don't know?

A.   I don't know.

Q.   At some point, your son went to Washington, D.C., with

Shifa, with Ehsanul Sadequee, April of 2005?

A.   Yes.

Q.   Did he tell you about the trip before he went?

A.   He said he was just going for sightseeing.

Q.   He ended up taking the family's digital camera, but you

didn't realize that until after he got back; correct?

A.   Yes.

Q.   His story to you was that it was a sightseeing trip with

his friend Shifa?

A.   Yes.

Q.   During the evidence that was presented on Monday and

Tuesday while you were here, there were any number of e-mails

and chats in which your son was a participant and in which

the topic was supporting or pursuing violent jihad.

Is that a side of your son that you experienced while you lived with him?

A.   No.

Q.   When he left for Pakistan -- I think you just testified to this -- you understood his main purpose to be pursuing ilm, further Islamic education; right?

A.   Yes.

Q.   But you had a suspicion, a concern -- you can use your word -- that perhaps it was going to be more than that or it might lead to more than that?

A.   Yes.

Q.   What was the basis for that concern?

A.   Because he was talking sometime about jihad, and jihad could be linked to that kind of jihad also.

Q.   He would talk with you about this?

A.   That jihad is a part of Muslim obligation, and I said, well, jihad is against -- taking steps to protect yourself from bad ideas, bad things, so that is what was in my mind.

But I thought that jihad can be misinterpreted, that could also mean violent jihad.

Q.   It was a discussion you and your son had, or this is a --

A.   My own.

Q.   -- thought you had?

A.    Yeah.

Q.    Okay.  After your son left to Pakistan in the summer of
2005, did you ever discover anything in his room, the room
that he had in your family home, not down -- maybe he didn't
have the Ethel Street apartment yet, but did you discover
anything in his bedroom in your house that increased your
concern or suspicion that somewhere down the road while in
Pakistan, that might be the way your son is headed, toward a
violent form of jihad?

A.    No.

Q.    You don't recall anything?

A.    No.

Q.    Could you put up Exhibit 74, please?  You can see it on
the screen right there.  If you would go to the next page,
please.

      Now, this is already in evidence, Mr. Ahmed, and your
son has been identified as the person who is typing when the
from column says Aboo Turab.

      First, have you ever called your son Turab?

A.    Never.

Q.    Is that a moniker or a nickname you ever heard anyone
you know call your son?

A.    No.

Q.    What does the person, Aboo Turab, type at the line
1:11:06, can you read that?  My plan?

1   A.   Was to study in authentic madrassa.

2   Q.   Until you guys joined?

3   A.   Until you guys joined.

4   Q.   What was the date of that communication?  It would be

5   the left-most column.

6   A.   18 April.

7   Q.   What month, what day, what year?

8   A.   August 4.

9   Q.   Can you magnify the date, please?

10  A.   April.

11  Q.   April?

12  A.   18.

13  Q.   200 --

14  A.   Five.

15  Q.   Exhibit 16 should be in front of you.

16           MR. McBURNEY:  Does he have all of the e-mails?

17           MR. MARTIN:  No.

18           MR. McBURNEY:  They are over here.

19           THE CLERK:  They are in order.

20           MR. McBURNEY:  Thank you.

21  BY MR. McBURNEY:

22  Q.   Exhibit 16 -- Defendant's Exhibit 18 I'm going to hand

23  to you?

24           THE COURT:  Is it 18 or 16?

25  A.   16.

Q.   16.   It's an e-mail Mr. Martin asked you some questions
about between this Faraz individual.

     You don't know Faraz?

A.   No.

Q.   And you never met him?

A.   Never met, never heard about him.

Q.   Before today you hadn't seen that e-mail?

A.   No.

Q.   But it's your son who is communicating with whoever
Faraz is?

A.   Yeah, he was.

Q.   And talking about?

A.   Admission.

Q.   To a madrassa or a university?

A.   Yes.

Q.   What's the date of that communication?

A.   30 April 2005.

Q.   Is that before or after what we just saw on the screen?

A.   After.

Q.   Mr. Martin showed you a couple of e-mails -- I know one
was Exhibit 14 and one was before, it may have been 12, but
it's in the e-mail -- where your son was encouraging first
Talha Khan.   Talah is who?

A.   Talha Khan?

Q.   T-a-l-h-a?

1    A.    My nephew.

2    Q.    Okay, your nephew, and then another relative to visit a

3    website called Tibyan.  Have you ever been to that website?

4    A.    Never heard about it.

5    Q.    Had your son ever talked to you about Tibyan?

6    A.    No.

7    Q.    So if your son spent any time on Tibyan, that would be

8    again part of his situation he didn't share with you?

9    A.    Yes.

10                MR. McBURNEY:  One second.

11                Thank you, sir.

12                            -- -- --

13                    REDIRECT EXAMINATION

14   BY MR. MARTIN:

15   Q.    Talking about what you and your son may or may not have

16   talked about, he fussed at you from time to time about --

17   maybe not in public, about your failure to provide him the

18   type of religious training he needed, did he not?

19   A.    Yes.

20   Q.    And he fussed at you because he thought that he wasn't

21   given the ability to separate what might be authentic or

22   inauthentic interpretations of the Quran and his religion;

23   correct?

24   A.    Yes.

25   Q.    And he said that it left him adrift, that he couldn't

1   really --

2           MR. McBURNEY:  Objection.

3           MR. MARTIN:  Objection?  What's the objection?

4           MR. McBURNEY:  Well, right now Mr. Martin is

5   reading from an exhibit that's not in evidence and I told him

6   I would object to.

7           MR. MARTIN:  I'm not reading.

8           MR. McBURNEY:  Okay.

9           MR. MARTIN:  I was refreshing my recollection, but

10  I'm not reading from anything.

11          MR. McBURNEY:  Okay.

12          MR. MARTIN:  If you want to hold it?

13          MR. McBURNEY:  You can leave it on your table.

14          THE COURT:  Well, I guess refreshing recollection

15  is usually done with witnesses.

16          MR. MARTIN:  No, Your Honor, I've been refreshing

17  my recollection throughout this trial, I will tell you.  But

18  I hear you.

19          I'm sure I can use a document to ask something in

20  good faith, but it's not the point.

21  BY MR. MARTIN:

22  Q.   The point is in your discussions with him over the

23  years, he complained about the fact that he was left adrift

24  in his religion?  That's all I'm asking.

25  A.   Yes.

Q.   And he fussed at you -- that's a southern word, but he complained to you about why didn't you help me understand my religion better.  Is that right?

A.   Yes.

Q.   Including the obligations of jihad; correct?

A.   Yes.

MR. MARTIN:  That's all I have.

THE COURT:  Mr. McBurney, anything you want to refresh your recollection on?

MR. McBURNEY:  I will need that in a little while, but not with this witness.  Thank you.

THE COURT:  Does anybody want Mr. Ahmed subject to recall?

MR. MARTIN:  No.

MR. McBURNEY:  No, sir.

THE COURT:  Sir, we thank you for being with us.  You are excused, but don't discuss your testimony with anybody.  Thank you.

MR. MARTIN:  Just one second.

Your Honor, we have no additional evidence.

THE COURT:  All right.  Then the defense rests?

MR. MARTIN:  Yes, sir.

THE COURT:  Is there any rebuttal?

MR. McBURNEY:  No, sir.

THE COURT:  I think you said, Mr. Martin, that

1  sometime you wanted to say more about a possible Rule 29

2  motion?

3            MR. MARTIN:  Yes, sir.  Can we take a break before

4  we do that?

5            THE COURT:  I think that's a good idea.  Let me

6  just get the schedule down.

7            MR. MARTIN:  Yes.

8            THE COURT:  We will take a break.  How long do you

9  think that will take?

10            MR. MARTIN:  Probably ten or fifteen minutes, if

11  that.

12            THE COURT:  Then my thought would be after we have

13  done the motion, we still need to have the charge

14  conference.  Are we going to do that in chambers where I have

15  all my materials laid out?

16            MR. MARTIN:  We could, but you understand that my

17  client may be giving the closing statement, so he probably

18  needs to be present.

19            THE DEFENDANT:  No.

20            MR. MARTIN:  He says he doesn't care, and I can

21  advise him what --

22            THE COURT:  Well, I will give you plenty of time to

23  go over what we agree upon would be the charge.

24            MR. MARTIN:  That would be fine.

25            THE COURT:  Then, Mr. Ahmed, are you okay with us

 1    having the charge conference without you present?

 2              THE DEFENDANT:  Yeah, I'm okay.

 3              THE COURT:  All right.  So the plan would be we

 4    will take -- I think we are going to take a 20-minute break

 5    because we have been going a long time, so we will come back

 6    at 20 till.

 7              That means hopefully that we can conclude the

 8    argument on the motion at noon, then we will break for the

 9    charge conference, and a period of time for you after the

10    charge conference to get ready to make your closings.  And so

11    that when we come back after the charge conference, we will

12    go right into the closings.

13              Does that make sense to everybody?

14              MR. MARTIN:  That's fine.

15              THE COURT:  All right.  Then we will be in recess

16    for twenty minutes.

17              (A recess is taken at 11:21 a.m.)

18                           --  --  --

19              (In open court 11:43 a.m.:)

20              THE COURT:  Mr. Martin, I was reading back through

21    Rule 29 again.  It actually is a rule for a motion before

22    submitting a case to the jury.

23              MR. MARTIN:  Right.

24              THE COURT:  There isn't a jury in this case, and in

25    fact there has been a waiver of a jury trial.

So I guess theoretically what we are doing is you are making a motion for a judgment of acquittal saying that the government has not presented enough facts upon which a verdict could be based, which while I could do that in my deliberations, I don't see any problem with allowing that to also be made now.  It would seem to make sense to me.

Does the government agree?

MR. MARTIN:  It's sort of odd in a way because you really don't have to -- you ultimately have to make a much stricter standard than that, but let's do it anyway.

I did want to correct one thing for the record.  I incorrectly identified a document which was never put in evidence as Defendant's Exhibit 32.  There was already a 32 in evidence.

But the document I was talking about when I was referring to Defendant's Exhibit 32 is an item that was never put into evidence and was not the 32 that was in evidence.

THE COURT:  And 32 was the conversation recordings, as I recall?

MR. MARTIN:  Yes.

I do move for a judgment of acquittal under Rule 29 (a) of the Federal Rules of Criminal Procedure.

I would remind the Court, as the Court has already noted earlier yesterday, that the conspiracy that's alleged in here is a conspiracy to do two things:  A conspiracy to

violate 956, which is a conspiracy to -- it's conspiracy to

provide material support to that by providing personnel and

property, and the government's written response to motions,

the bill of particulars and otherwise, have always said

personnel in that Mr. Ahmed himself, and property is the

videos, for the purpose of supporting -- as material support

knowing and intending that this will be material support to

be used in preparation for in carrying out violation of

18 U.S.C. 956 (a), which is conspiracy to kill or maim

overseas, or Section 2332 (b), which is acts of terrorism

transcending national borders, which is something in the

United States.

I will point out this, and I do understand that a

conspiracy could have more than one object, and if the

government proves one object, they prove a conspiracy.  But

in the Court's thinking about this in a Rule 29 posture and

also in its ultimate deliberations, the evidence of the

second violation of any acts of violence in the United States

is particularly thin.

As I understand, especially relating to the video

or to Mr. Haris as a personnel, the sum of that evidence

really about any acts in the United States is the discussions

in Toronto and perhaps the conversation that Mr. Haris Ahmed

and Mr. Sadequee had in Atlanta when they were driving by

Dobbins Air Force Base or sometime in the United States about

Dobbins Air Force Base, the sum of that evidence especially from the interrogations is that those are random thoughts, no plans, just thoughts, essentially a bull session about what could we do if we really wanted to do something.

I don't think the video is ever tied to any attack to the United States because the sum of that evidence, as I understand it, is that the video was sent by Sadequee overseas to Tsouli, it somehow got into Mr. Khan's computer either from Mr. Tsouli or Mr. Sadequee, but never was directly tied to Mr. Ahmed sending it to Mr. Khan, and that the whole purpose of that was merely to get stature in the internet community, not as he called it a casing video -- you used quotation marks around it at times -- or a scoping video.

It was never intended -- at least, there is very thin evidence, not evidence I think a reasonable fact-finder could find doubt beyond a reasonable doubt, that that video was going to be used for any purpose to actually commit any act.

At worse, in the Bektasevic conversation with Sadequee, it was going to be used to make some sort of video that was going to be given some sort of credibility or stature in that community, maybe get some money from this guy, this shaykh they were talking about, but not to commit any actual acts of terrorism, of doing any violent act in the

1    United States.

2          So the sum total of the evidence of any violation,

3    any material support to 2332 (b) is the discussions about

4    possibly doing something that were in this random momentary

5    thoughts that were described by -- in the section I played

6    for the Court and elsewhere in those.  You've heard all those

7    tapes.

8          I know there is -- it sounds more like a plan in

9    the written statement, but even in the written statement he

10   says simply we mentioned, we mentioned that, and, you know,

11   the agent didn't even remember that it says mentioned.  It

12   doesn't say we planned anything.  It says we mentioned these

13   things.

14         So it seems to me that the evidence is very, very

15   thin on any type of attack in the United States, the key to

16   the government's -- or any type of plan, any type of material

17   support that Mr. Ahmed ever agreed to do anything in the

18   United States as himself as material support for such a

19   conspiracy or such a violation.

20         The harder part of the case from the defense is the

21   trip to Pakistan and the conversation with Abu Umar,

22   Mr. Khan, or Mr. Khan, whatever name you are going to use for

23   him, about possibly joining a military training camp.

24         As I said in my opening statement, I think when you

25   look at the totality of the evidence, it becomes also

difficult to find.  You might be able to find sufficient
evidence which some reasonable -- some juror, some
fact-finder beyond a reasonable doubt can find there really
was an intent to join a conspiracy to actually provide him as
personnel in support of a violation of 956 (a), but these are
the problems.

One, it is quite clear from all the evidence that
Mr. Ahmed was someone who was searching, thinking about doing
things, who was from the very beginning even in his
conversations with Zubair, in the conversation that he talks
about on his interrogations, never had a specific plan to
actually do that.

The closest they get to it -- and I will have to
concede the worst piece of evidence, which is the Mother's
Day e-mail which they talk about, well, I will get a
basement, we will do this, we will do that and we will do
this.

And if that was all the evidence in the case, it
would be difficult to say that that wasn't some sort of
conspiratorial agreement.  But it's not all the evidence in
the case.

Because we know actually from the materials
I showed you afterwards that that plan never went anywhere.
We also know that there was a lot of big talk on these
internet chat rooms about stuff that no one ever intended

really to do.

And we also know, as the other e-mail exchange I showed you, that Mr. Ahmed was ridiculed by the other team members as to this Mother's Day plan that he had come up with on his own, that they never took him seriously, that he was concerned as someone with no brains.

So you start -- as I talked earlier, you start in 2004, you know that Mr. Ahmed is someone searching for understanding his religion, we know from his father who candidly conceded to you today and from his sister that he had very little direction, no mentors, no scholars in Atlanta to help him, so he gets on the internet.

He admits he's someone easily influenced, he admits he's someone that can be led around, and he starts trying to learn about this, gets into chat rooms trying to explore this possibility.

He meets some people. He goes all the way to Toronto on a bus to meet them to sort of explore this thing. They had this bull session about what they need to do. No specific plans were ever made.

He comes back. He says maybe what I should do is do this video, maybe that will make people take me seriously.

And, Your Honor, I don't mean to minimize the video, but we have to all agree that it's very amateurish and

would not be something of any use to anybody in committing

any type of attack.  You would be better off getting

postcards from Washington than those videos.

And the fact that the HAZMAT truck happened to be

taken a picture of was simply as a result of the fact that

they were there and this incident occurred and they just

said, okay, let's take a picture of this.

So we then come in to -- so he makes those videos,

he doesn't send them overseas, Sadequee does, in order to get

standing in the community.

And then at the exact same time, as e-mails we

showed today, he is communicating with people in Pakistan,

his family and the fellow Faraz about joining a school, an

Islamic school.

THE DEFENDANT:  Can I object?  He's giving a

closing argument.  I thought I was going to give the closing

argument.

THE COURT:  Mr. Ahmed, you do have somewhat of a --

MR. MARTIN:  He has a point.

THE COURT:  There is a different standard.  I think

that is a point well taken.  I was about to jump in

myself.  Thank you for doing it for me.

MR. MARTIN:  I understand, Your Honor.

THE COURT:  There is a whole different standard.

We do have an agreement.  My understanding was that

1    Mr. Ahmed wanted to make a statement, and he has provided

2    that statement to me, and that will happen.

3            But I think on the overall view of whether or not

4    there is conduct upon which I in my deliberations would find

5    the defendant guilty or not guilty, that that's a -- that as

6    you admitted in the beginning, that's different standard,

7    that's as beyond a reasonable doubt.

8            The standard under Rule 29, which arguably doesn't

9    even apply here, is whether or not there is evidence

10   insufficient to sustain a conviction.  So let's skip to that

11   standard.

12           MR. MARTIN:  I will stay with that standard.

13           And the reason I was saying, as I understand the

14   standard for sufficiency of evidence is whether a reasonable

15   fact-finder could find guilt beyond a reasonable doubt giving

16   the state's evidence -- the government's evidence every

17   benefit, every reasonable inference that can be drawn from

18   it.

19           And I understand Mr. Ahmed wants to give his

20   closing statement, and he's going to do that, and we are

21   prepared for that.

22           I thought I had explained to him what the nature of

23   this motion was, it was essentially a motion to dismiss the

24   charges.  I tried to explain that, and it is based upon the

25   facts.  Maybe he didn't fully understand that.  But I will

finish up quickly.

I will say that that evidence, the sum of the evidence -- and you have heard it all, there is no reason for me to go through it all -- including everything he did in Pakistan, conversations he had with his family, seeking out schools, indicated that what was likely to happen, if anything, was he was there to explore the possibility of something, and it wasn't the type of evidence upon which the Court could find beyond a reasonable doubt, using that standard, even giving the government's evidence every reasonable inference, that he in fact committed himself to a specific conspiracy to do a violation of 956.

Explore it, think about it, the possibilities of it, but never, ever crossed the lined. And that's a tough line for the Court to have to decide ultimately in this case.

I appreciate Mr. Ahmed's feelings about this. I tried to do the best job I could for him in presenting the evidence I think the Court needs to hear, and I will leave it to the Court to decide that.

I know the Court has been very attentive throughout this, and I know the Court understands our position, which is that there was an inchoate thought about it, there was a possibility, there was evidence upon which you could find perhaps an agreement. But when you look at the totality of

the evidence, a reasonable fact-finder wouldn't find guilt beyond a reasonable doubt.

THE COURT:  All right.  Thank you, Mr. Martin.

MR. McBURNEY:  Your Honor, you will shortly hold the government to a much higher standard than we are dealing with right now.  Right now, as Mr. Martin or as you noted, the question is whether when viewing all of the evidence in the light most favorable to the government, a reasonable fact-finder could find beyond a reasonable doubt that Defendant Ahmed is guilty of what he's charged.

I think we need look no further than Government's Exhibit 7, which is the written statement that concluded the interviews that occurred.  As you have heard, Defendant Ahmed was subsequently arrested because he engaged in obstructive conduct after the fifth interview.  But at the end of that fifth interview, he signed a statement, after having read it, after having said -- you have seen the transcript -- read it, read to him, saying it's cool, I will sign this, and he signed it, his words.

In that statement, Defendant Ahmed admitted to every element of the crime, whether you look at 2332 (b) or 956 (a).

And a reasonable fact finder could choose to disregard the argument that the defendant was childish, that he was misguided, could choose to subscribe to the evidence,

the government's perspective that in fact he was the ameer,

the leader of this conspiracy that was formed, that

substantive steps were taken after the conspiracy was formed,

and that in fact he did know and intend to -- he did provide

support that he knew or intended would assist those in

preparing for or carrying out an attack overseas, to murder

and/or kidnap, or an act within the United States.

I'm not going to get into the relative merits of

the 956 versus the 2332 (b).  In Exhibit 7 alone is

sufficient admission by the defendant that he did all those

things.

Similarly a reasonable fact-finder would be

entitled to reject the defense position that it's not a

reliable admission for all the reasons that Dr. Ofshe shared

with the Court, reasons why perhaps one should view the

defendant's admissions with concern.  It's something the jury

can consider and reasonably disregard and follow the

government's position and the defendant's own statement that

he subscribed to that he in fact did commit the crimes that

were charged.

That alone I believe was enough to get the

government past the phase we are in right now:  Could a

reasonable fact-finder determine, looking at the government's

evidence in the light most favorable to the government, that

the defendant is guilty beyond a reasonable doubt.

1          THE COURT:  Any response to that, Mr. Martin?

2          MR. MARTIN:  No, Your Honor.

3          THE COURT:  All right.  The purpose I think of

4    Rule 29 is to make sure that a case doesn't go to the trier

5    of fact, and to have this discussion as the rule by its terms

6    requires outside the presence of the jury.

7          But it is a very low standard which in a case where

8    you don't have jury and applying Rule 29 in this peculiar

9    circumstance, I view Rule 29 as is the evidence so failing on

10   any element of the charged offense that it would not be

11   appropriate or just for me to consider the evidence in a

12   fact-finding function.

13         So what I have done is I have applied the Rule 29

14   standard by its terms, assuming that it does apply, to see

15   whether or not I ought to go to the additional step of

16   deliberating on the case.

17         And so all I'm doing at this point is determining

18   whether the evidence, when considered in the light most

19   favorable to the government in this case, is insufficient to

20   sustain a conviction; that is, that no interpretation of the

21   evidence and any inferences that can be drawn from it,

22   whether the evidence is direct or circumstantial, could not

23   sustain a conviction because it would fail with respect to

24   one or more of the elements of the offense.

25         And I find that the evidence, applying the Rule 29

1   standard, is evidence which would be -- could be sufficient

2   to sustain a conviction, or certainly is not insufficient to

3   sustain a conviction.

4        And for those purposes and under using that

5   standard, I'm going to deny the motion.

6        But understand in my deliberations, I do have a

7   weightier standard and will have a chance to consider all of

8   the evidence and its inferences, and determine which of those

9   should or should not be allowed, and which of the evidence,

10  direct or circumstantial, should be considered in reaching a

11  global decision on whether the government has met its burden

12  to prove the offense and each of its elements beyond a

13  reasonable doubt.

14       In a way, whatever I do subsumes what happens under

15  Rule 29.  Because if there is a conviction, obviously I found

16  that Rule 29 doesn't apply.  And if I find that there is an

17  acquittal, then I obviously found that there wasn't

18  sufficient evidence to sustain a conviction and that a

19  reasonable fact-finder, assuming that's what I am --

20       MR. McBURNEY:  We danced around that.

21       THE COURT:  -- and I believe I am, I have listened

22  carefully to the evidence and tried very hard as I have gone

23  through this to not make any judgment -- as I tell jurors all

24  the time, not to make any judgment about the case until all

25  the evidence is in, and I have done that.

1       I have sequestered myself, I haven't listened to

2   any of the press reports, and therefore -- and every time I

3   have thought about the instructions I give to the jury,

4   I say, well, those really should apply to me because I am in

5   fact a fact-finder, and I have done that dutifully.

6       So I'm going to deny the motion, which means that

7   we will move on to the charge conference.

8       It is 12:00.  I don't know how long the charge

9   conference will take.  I don't -- I would like to set a

10  specific time for us to have the closings, because I don't

11  think it's fair to the people that are here observing the

12  trial to have to come back and have to hang around because we

13  are not done with the time that you need to prepare or the

14  time we take with the charge conference.

15      So it's 12:00 now, and I'm actually even

16  considering giving counsel some time to have something to

17  eat, so I'm going to calculate that in as well.

18      I'm going to suggest we do the charge conference

19  right now.  And let's just assume it takes forty-five

20  minutes, which I don't think it will.  But let's just assume

21  that.  Then I would want to give you at least half an hour to

22  prepare for your closings, maybe forty-five minutes.  That

23  would take us to 1:30.

24      It seems safe that we could get everything done,

25  you could have enough time to collect your thoughts and to

have something to eat if we had the closings at 2:00.  That's

probably more than we really need, but it means that

everybody else that's interested in the trial can manage

their schedule, and I know we can in fact start at 2:00.

I know that's a little longer than I would

ordinarily give, but does that make sense to the government?

MR. McBURNEY:  It does.  Mr. Martin and I discussed

3:00.  We weren't sure how long the charge conference would

go, but in terms of eating and I guess Mr. Ahmed getting

prepared and the government, with only 45 minutes for each of

the closings, if we started at 3:00, we would still end

before the normal end of court.

THE COURT:  Lawyers always want more time.

MR. McBURNEY:  I want to be able to chew the food,

not just --

THE COURT:  Well, that's an unreasonable request.

How about 2:30?

MR. McBURNEY:  That's a compromise.  Accepted.

THE COURT:  Well, it just shows I'm being generous

and you are being reasonable, which is what should happen.

All right.  Let's set it for 2:30.

Let's meet in chambers in about five minutes and we

will start the charge conference.  So we will be in recess.

(A recess is taken at 12:04 p.m.)

-- -- --

1          (In chambers at 12:13 p.m.:)

2          THE COURT:  This is the charge conference in the

3     United States v. Ahmed.

4          What I thought I would do, although this is still

5     an unusual process, although I have read something this

6     morning that said that 33 percent of all the cases in the

7     United States are to courts and not to juries, which

8     I thought was surprisingly high.

9          MR. MARTIN:  Criminal cases?

10         THE COURT:  Yes.

11         MR. MARTIN:  Really?

12         THE COURT:  So maybe it's not as unusual as I

13     thought.  Maybe it's more often in the state system than the

14     federal system.

15         MR. MARTIN:  I know in Georgia it is.

16         THE COURT:  It is?

17         MR. MARTIN:  It happens a fair amount in Georgia.

18         THE COURT:  Then that probably counts for the

19     number.

20         MR. MARTIN:  That high, though, I -- it would be

21     unusual.  Sorry.

22         THE COURT:  Even though I guess you can presume a

23     lot of things about what I would do, I thought we ought all

24     be clear about what I'm going to do for the purpose of the

25     record.

1              So what I thought I would do is what I would

2    normally do, is go through what my standard instructions

3    would be so that everybody understands what I'm going to

4    apply and how I'm going to evaluate witnesses and the like.

5              And if you want, I have gone ahead and copied -- in

6    fact, I have some extra copies you could share?

7              MR. McBURNEY:  You had provided us a copy of this

8    several weeks ago, but it wasn't tailored.  It's the general

9    standard charges.

10             Is this the same thing, or have you now tailored it

11   to this case?

12             THE COURT:  No, this is the standard charge, and

13   now we will tailor it to the case now that I know what to

14   tailor.

15             But I have gone through this last night based upon

16   what the case is, so I will tell you what I would follow.

17             On page one, I will -- I have read this and

18   understand my duty to apply the rules of law and decide the

19   issues in the case.

20             On page two, I intend to apply the presumption of

21   innocence, and have reminded myself of those matters that are

22   set forth on page two.

23             On page three is the presumption of innocence as it

24   applies to when a defendant does not testify.  And since the

25   defendant does not testify, that is the specific iteration of

the presumption of innocence that I will apply.

On page four, definition of reasonable doubt, I will apply that definition unless somebody thinks that definition is not the appropriate one.  This comes out of the pattern instructions.

When I say I am going to do this, if you object, let me know; otherwise, I am going to assume there is no objection.

The next is on the difference between direct and circumstantial evidence and the arguments of counsel and comments that the Court would make.  I intend to follow those instructions as they are set forth on five and six.

On page six, I will evaluate the credibility of witnesses in accordance with that instruction.

Page seven, there has been a little bit of inconsistent statement, impeachment, so I will consider that.

There is no felony -- there is a felony conviction of Mr. Zubair --

MR. McBURNEY:  Zubair Ahmed.

THE COURT:  Zubair Ahmed.  So I will consider that in connection with his testimony.  But I think he's the only one; is that right?

MR. McBURNEY:  It's the only one for which you have any evidence.

1          THE COURT:  The defendant doesn't testify, so those

2    provisions on page eight do not apply.

3          I don't recall there being any bad reputation or

4    opinion evidence concerning truthfulness in the case that

5    would be impeaching, but refresh my memory if there was.  I

6    don't think so.

7          MR. MARTIN:  No.

8          MR. McBURNEY:  No.

9          THE COURT:  So I would not apply that

10   instruction.

11         I will apply the expert witness instruction to

12   Mr. Kohlmann.

13         MR. MARTIN:  And Dr. Ofshe.

14         THE COURT:  And Dr. Ofshe, that's right.

15         I did take notes, but I know what I'm supposed to

16   do with the notes.

17         Now we get to the charges for the case.

18         What I did last night with Sarah was to work

19   through where all of the language came, because there is no

20   pattern instruction for this offense other than the standard

21   conspiracy pattern instruction.

22         So let me tell you what I have done and then I will

23   hear your comments on it.

24         We went through each line of the elements for --

25   beginning with the Request to Charge No. 2, which is the core

1 charge, and now have worked through the statute to see why

2 various things are in each of the iterations of the elements

3 of the offense, and I'm satisfied that I know where all of

4 the language came from.

5 And as far as Charge 2, I couldn't think of any

6 better way of stating the charge or the elements than is put

7 forth in this charge. But I wanted to see if we could all

8 agree that that's the charge that I should use.

9 MR. MARTIN: Okay.

10 THE COURT: What are your thoughts, Mr. Martin?

11 MR. MARTIN: You are going to use No. 2?

12 THE COURT: Well, I'm going to take them one at a

13 time.

14 MR. MARTIN: That's fine.

15 THE COURT: We are starting with No. 2. Any

16 objection to No. 2?

17 MR. MARTIN: Not really. I mean, I think -- no.

18 THE COURT: Then No. 3 is the existence of the

19 conspiracy. Almost all of that comes directly from the

20 pattern jury instruction, although there is I guess some

21 additional language, although I didn't see much from the

22 *Hassan* case.

23 Is there any objection to Request to Charge of the

24 Government's No. 3?

25 MR. MARTIN: No.

1          THE COURT:  All right.

2          MR. MARTIN:  Keeping in mind I don't think -- my

3     request should be added to it, but --

4          THE COURT:  We will get to that in a second.

5          MR. MARTIN:  Yes, sir.

6          THE COURT:  The next is Request to Charge No. 4,

7     membership in a conspiracy.  That's from the pattern

8     instructions, so I believe that that applies.

9          Any objection to Request to Charge No. 4?

10         MR. MARTIN:  No.

11         THE COURT:  Request to Charge No. 5.  Any objection

12    to Request to Charge No. 5?

13         MR. MARTIN:  No.

14         THE COURT:  Request to Charge No. -- wait one

15    second.

16         Request to Charge No. 6, multiple objects of

17    conspiracy, comes from the pattern instruction.

18         Any objection to the Request to Charge No. 6?

19         MR. MARTIN:  No, I think that's standard law.

20         THE COURT:  Okay.  Request to Charge No. 7, I guess

21    that applies to Zubair Ahmed.  Is that right?

22         MR. McBURNEY:  That's why we included it.

23         THE COURT:  In the charge it says:  In this case

24    the government called one of its witnesses, a person named as

25    co-conspirator in the indictment.

1          Is he named in the indictment?

2          MR. McBURNEY:  He is in the indictment.

3          THE COURT:  Is he named as an unidentified or

4    specifically?

5          MR. McBURNEY:  I believe -- I have it here.

6          Yes, when he's first referenced -- like

7    Paragraph 40 on page eleven, his name is in there.  We

8    typically don't --

9          THE COURT:  Actually at Paragraph 14, Zubair Ahmed

10   is specifically named as a co-conspirator.

11         MR. McBURNEY:  We don't typically include the

12   names, but, yes.

13         THE COURT:  I'm sorry, I missed that when I went

14   through it last night.

15         Then any objection to Request to Charge No. 7?

16         MR. MARTIN:  No.

17         THE COURT:  Request to Charge No. 8 is confession,

18   statement.

19         Any objection to Request to Charge No. 8 by the

20   Government?

21         MR. MARTIN:  No.

22         THE COURT:  Government's Request to Charge No. 1 is

23   a supplement to knowing or willfully.

24         I'm not quite sure why you want that.  Words, acts

25   and omissions are evidence.  Of course, I consider all of the

1    evidence, so I like the pattern instruction.

2         MR. McBURNEY:  With the Court, this is probably

3    less necessary than helping the jury understand it.  That is

4    something that they are allowed to consider.

5         THE COURT:  Okay.  So will you withdraw Request to

6    Charge No. 1?

7         MR. McBURNEY:  Not a problem, yes.

8         THE COURT:  That's withdrawn.

9         Then there is Supplemental Request to Charge No. 1,

10   reasonably foreseeable consequences of a conspiracy.

11        Is there any objection to that instruction?

12        MR. MARTIN:  No.

13        THE COURT:  Supplemental Request to Charge No. 2,

14   explanatory instruction regarding the transcript of

15   tape-recorded conversations.

16        MR. MARTIN:  No.

17        THE COURT:  Then we have Mr. Martin's existence of

18   a conspiracy charge based upon O'Malley Grenig and Lee, which

19   is a different kind of statement I think of the same thing.

20        But is there any objection to me considering this

21   additional amplification on the existence of an agreement to

22   prove a conspiracy?

23        MR. McBURNEY:  Yes.  I think the Eleventh Circuit

24   pattern charge is applicable here and appropriate, and there

25   is not a need to import what Messrs. O'Malley Grenig and Lee

1    have to say about it.

2              It differs somewhat as well.

3              THE COURT:  How so?

4              MR. McBURNEY:  The finding the Court is to make for

5    the first element under Government's Request to Charge No. 3

6    is that there is an agreement or an understanding.

7              The -- we are into semantics, I want to be clear.

8    There is not a substantive difference.  But Mr. Martin's

9    proposal requires a finding that it was deliberately arrived

10   at, conscious understanding, deliberate agreement.

11             I think the concern again would be more in the

12   setting of a jury trial, but there is no concept of conscious

13   understanding in any of the Eleventh Circuit charges.

14             THE COURT:  Well, you can't have an unconscious

15   understanding, can you?

16             MR. McBURNEY:  You don't need the word conscious

17   then.  If there is an understanding, it must be a conscious

18   one.

19             I'm not quite sure what kind of agreement wouldn't

20   be deliberate.  An accidental agreement wouldn't be an

21   agreement.

22             It's the type of adjectives that we find distract

23   jurors unnecessarily.  You are the Court, it's different.  So

24   that's why I'm flagging this.

25             MR. MARTIN:  You know, this is -- I felt that the

1    Eleventh Circuit instruction was a little short on this

2    subject.

3            I think this is -- you know, it is O'Malley Grenig

4    and Lee, this type of instruction is given in other circuits,

5    and it basically comes from the U.S. Supreme Court like

6    *Falcone* and others about general conspiracy law, that the

7    essence of a conspiracy is an agreement.

8            And the purpose of this was, I think especially

9    considering what the defense is in this case is there is a

10   lot of activity, but was there ever any specific conscious

11   agreement to do what is charged in the indictment.

12           To me it's not -- how do I put it?  We might all

13   use different words to express the same thing, but I think it

14   helps the Court a little bit in focusing on what the defense

15   is, which is that specific deliberate conscious agreement.

16           THE COURT:  What if we just took that language and

17   put it in the government's proposed charge to get that

18   concept, which I don't think any of us disagree that you have

19   to have something that people entered into knowingly.

20           MR. McBURNEY:  As long as we are not importing the

21   meaning that every contour and potential outcome is what we

22   mean by specific.

23           I mean, the way Mr. Martin reads this -- and it's

24   more so in the second charge -- that it could be read to

25   suggest that if someone joining the conspiracy doesn't fully

appreciate the extent of the conspiracy, then either he

didn't join or isn't liable, and that's not the law, that's

not what the Eleventh Circuit says.

So when we get in -- the words Mr. Martin just

used -- I don't actually see "specific" in the charge --

there was this specific agreement, that's not what is charged

and it's not the government's obligation to show that Haris

Ahmed knew that Younis Tsouli would end up with the videos,

as an example.

MR. MARTIN:  I think the Eleventh Circuit's charge

covers that, that you don't have to know every detail of the

agreement or every -- and you are responsible for things that

are foreseeable.

But still the essence of conspiracy is an

agreement.  It has to be -- one person can't agree to one

thing and another person agree to something else.  There has

to be an actual agreement on what the goal is, and the

agreement is to do what is charged in this indictment, to

provide personnel and property, specifically Haris as someone

in a training camp, and the property being the video, for the

purpose knowingly and intending for it to be for the purpose

of violating these two statutes.

MR. McBURNEY:  Terrorism abroad or terrorism in the

United States.

MR. MARTIN:  So knowing that you don't have to know

every detail of the plan, or maybe a better way of putting

it, every detail of what everybody is doing, there still has

to be an essential agreement.  I think that's all this is

pointing to.

And that's our whole defense, at least my defense

to this, which is that, you know, there never was a meeting

of the minds on this.

MR. McBURNEY:  Well, I will close the government's

perspective just by quoting from the Eleventh Circuit pattern

charge:  An agreement or mutual understanding between two or

more people to try to accomplish a common or an unlawful

plan.

That says what you just said.  I don't see why we

need to stray from the pattern charge or supplement it in

this case or any other conspiracy case.  That's the

agreement.

MR. MARTIN:  I don't see any harm in it.

THE COURT:  I find that in the Request to Charge

Conspiracy, Existence of an Agreement, now having read it

carefully and compared it to the agreed-upon Request to

Charge No. 2, that all of the concepts and all of the

specific requirements of the proof of a conspiracy are

contained in Request to Charge No. 2.

I think it would be confusing to add this entire

additional charge because it is -- it provides different

1  language, and therefore somebody could interpret this as

2  requiring me to make a finding other than those that are set

3  forth in Request to Charge No. 2.

4       I think it is semantical.  I think by adding it

5  that it could create more confusion as I deliberate than

6  clarity, and therefore I'm not going to give it.

7       MR. MARTIN:  Just so I make a clear record, when we

8  talked about No. 2, I wasn't objecting to it in light of the

9  fact that I thought my additional language would be use.

10       So in light of that, I would object to the failure

11  of No. 2 to include that language, for what it's worth.

12       THE COURT:  Well, with all due respect, Mr. Martin,

13  some of this is a complete reiteration.

14       Tell me specifically the language in your proposed

15  charge that you think needs to be added to Request to Charge

16  No. 2?

17       MR. MARTIN:  In particular, it is the last sentence

18  of the existence of an agreement on the third paragraph is

19  proof of this conscious understanding and deliberate

20  agreement by the alleged members that should be central to

21  your consideration of the charge of conspiracy.

22       THE COURT:  I find that the Eleventh Circuit does

23  not use that language and hasn't adopted it in a conspiracy

24  charge.

25       So that the record is clear that that's what you

1  would like included in Request to Charge No. 2 of the

2  Government's, that's the language that I'm ruling is

3  superfluous, unnecessary, and that's the language I rule that

4  I will not include.

5          MR. MARTIN:  All right.

6          THE COURT:  Then the next is Conspiracy, Membership

7  in an Agreement.

8          MR. McBURNEY:  The government has a similar

9  objection.  This mirrors to a certain extent Government's

10 Request to Charge No. 4.

11         THE COURT:  What is it, Mr. Martin, in this request

12 to charge that is not in the charge upon which we have

13 already agreed that you think is required by the circuit

14 law?

15         MR. MARTIN:  Let me have a second here.

16         THE COURT:  Okay.

17         MR. MARTIN:  Well, I just think, for what it's

18 worth, that it would be a better instruction and a more

19 complete instruction as to what the Court should be doing if

20 it included the language that the defendant must know that

21 the purpose or goal of the agreement or understanding and

22 then deliberately enter into the agreement intending in some

23 way to accomplish the goal or purpose by this common plan.

24         The language of the Eleventh Circuit says if a

25 defendant has a general understanding of the unlawful purpose

1    of the plan and knowingly and willfully joins in that plan on

2    one occasion, that is sufficient to convict for conspiracy.

3           I just think that that does not focus the

4    decision-maker sufficiently on the need to prove that the

5    heart of the crime is the agreement, and that this is helpful

6    to the fact-finder to say that the understanding -- the

7    purpose of the goal and understanding, he must have known of

8    it and deliberately entered into it.

9           So that's what -- I just think it improves the

10   consideration that the Court will be giving the evidence to

11   have that thought in there.

12          THE COURT:  So you are looking at the language that

13   said that Defendant Ahmed knew the purpose or goal -- this is

14   language in the first paragraph.

15          MR. MARTIN:  Yes, sir.

16          THE COURT:  You would ask that the agreed-upon

17   charges include the language beginning with Defendant Ahmed

18   in the first paragraph and ending with common plan or joint

19   action?

20          MR. MARTIN:  Yes, sir.

21          THE COURT:  I think looking at what we have

22   discussed so far as to what would be given, that in looking

23   at the charges in the totality, that it in fact addresses the

24   matters that that language addresses in your proposed

25   agreement.

1       I don't think it's necessary.  I think it would be

2  redundant.  I don't think there is any authority in the

3  circuit for these adjectives or adverbs.

4       And I understand my responsibility in finding a

5  conspiracy and who is a member of it and what has to be

6  shown.

7       So I understand that you think it's a better way of

8  looking at it, but I'm going to stick with the circuit

9  authority and not include that.

10       MR. MARTIN:  Okay.

11       THE COURT:  All right.  I think that's everybody's

12  proposed charges on the specific conduct.  Is that right?

13       MR. McBURNEY:  Yes, sir.

14       MR. MARTIN:  This being such an odd setting, since

15  there won't be like jury instructions actually given, I'm

16  just for purposes of whatever appeal, if any --

17       THE COURT:  We are going to do that.

18       MR. MARTIN:  -- I would note my exceptions.

19       THE COURT:  Okay.  Let me finish with my

20  instructions.

21       There is a caution against considering punishment

22  that will not be part of my deliberations.  I understand that

23  that is a totally separate issue, so I will caution myself as

24  set forth at the top of 13, the bottom of 13, 14 --

25       MR. McBURNEY:  I'm sorry, I didn't hear the Court's

1 decision on page 12?  We jumped to the offense charges, and

2 then the next I have at least is the on or about, knowingly,

3 willfully.

4          THE COURT:  Oh, here it is.

5          No, I will give the on or about, knowingly and

6 willfully.  That comes from the pattern instruction on page

7 twelve.

8          Is there any objection to that?

9          MR. McBURNEY:  No.

10          MR. MARTIN:  No.

11          THE COURT:  And now going on page 13, I will

12 caution myself about punishment, will not consider punishment

13 in my deliberations.

14          I will not consider, of course, the bottom part of

15 page 13, page 14, or page 15.

16          Page 16, I will consider everything that I tell

17 myself, regardless of what I tell myself and how I tell

18 myself.

19          MR. MARTIN:  And you will have to be unanimous

20 about it.

21          THE COURT:  I will be unanimous.  And I am going to

22 reexamine my own opinion and change my mind if I tell myself

23 something that convinces me other than what I initially

24 thought I was convinced of.

25          Certainly I do have an open mind and tend to look

1  at the evidence carefully and reach what I think is the right

2  decision based upon the law.

3         So that's the instruction.

4         Then I will consider -- now, why don't you, if

5  there are any objections, why don't you state those now.  We

6  don't have to do those once we get back.

7         MR. MARTIN:  I would object to the failure to

8  include language I had in my two proposals, one called the

9  Existence of an Agreement, and in particular the language:

10  It is proof of this conscious understanding and deliberate

11  agreement by alleged members that should be central to your

12  consideration of the charge of conspiracy.

13         And I also would make an exception to the failure

14  of the Court to include the language in my other request to

15  charge called Membership in an Agreement in which it says:

16  Defendant Ahmed -- that you must find beyond a reasonable

17  doubt that Defendant Ahmed knew the purpose or goal of the

18  agreement or understanding, and then deliberately entered

19  into the agreement intending in some way to accomplish the

20  goal or purpose by this common plan or action.

21         THE COURT:  And I will just say, I think those

22  concepts are already embedded in the charge, and I intend to

23  do those things.

24         MR. MARTIN:  Okay.

25         MR. McBURNEY:  We have no objections.  We withdraw

1  Charge 1, and otherwise no objection.

2  THE COURT: One other matter. I should have done

3  this, and was reminded that I didn't do this, is that when we

4  go back, I'm going to have to tell Mr. Ahmed that he has the

5  right to testify if he wants, that he also has the right not

6  to testify, and ask what his election is, and ask if he's

7  discussed that with you.

8  But I thought that you might want to cover that,

9  the fact that I am going to go over that before.

10  MR. MARTIN: I will make sure.

11  One thing I just wanted to alert the Court to, he

12  wants to give the closing argument, and he's going to give

13  the entire closing. He doesn't want me to say anything at

14  all or even request the opportunity to.

15  It will be essentially what he wrote before, but

16  he's been working on it, so it won't be identical.

17  THE COURT: I understand.

18  MR. MARTIN: So don't be looking for him to be

19  reading exactly what he said before, but it will be in

20  essence that.

21  THE COURT: Is he going to take forty-five minutes

22  to do that?

23  MR. MARTIN: No, he says twenty minutes probably.

24  But, you know, he speaks real fast, so I've told

25  him to slow down.

1        And I will say one other thing.  There are

2   occasions when he gets real nervous that he starts to

3   stutter, so we just need to let him pause and get through

4   that.

5        THE COURT:  And where -- I'm assuming he's doing

6   this in English.

7        MR. MARTIN:  I haven't specifically asked that

8   question, but -- yes, this will be in English.

9        Now, I know the Court Reporter asked about the

10  possibility -- I mean, there may be a few phrases that are

11  Arabic, but they are well known, about praise to Allah and

12  the Prophet being the messenger of Allah, that might be in

13  Arabic.  But other than that.

14       THE COURT:  Okay.

15       MR. MARTIN:  Every time he says Allah, he has that

16  phrase, or Mohammed, they always include that little tribute.

17       MR. McBURNEY:  Peace be upon him.

18       THE COURT:  And from what position does he intend

19  to give it?

20       MR. MARTIN:  From the podium I told him.  I assume

21  that's where he's going to give it from.

22       THE COURT:  The marshals get a little nervous about

23  that.

24       MR. MARTIN:  I know.

25       THE COURT:  I'm just predicting, I don't want there

1  to be some -- if he starts walking up there, because

2  everything he's ever said to me has been from the table, and

3  I thought that because the microphones are so good and we

4  have got -- you know, they are comfortable with that

5  arrangement.

6      MR. MARTIN:  I understand, but I think he's

7  expecting to give it from the podium, as he would if he was

8  his own lawyer.

9      THE COURT:  I think the marshals are going to want

10  to move people in proximity to him.

11      MR. MARTIN:  That's fine.  I mean, the truth of the

12  matter, I know they have security concerns and they don't

13  judge things, but he's no threat to anybody.

14      MR. NAHMIAS:  Without a jury, there is less concern

15  about where they are.

16      THE COURT:  What's that?

17      MR. NAHMIAS:  Without a jury, there is less concern

18  about where the marshals might be.

19      THE COURT:  Right.  Well, I'm also sensitive, what

20  I didn't want -- I'm sensitive to the fact that we have a

21  number of people from the community, and I have tried very

22  hard to make sure that they respect the system that we have,

23  and I'm afraid -- what I don't want to happen is for him to

24  stand and walk forward and have this commotion.

25      So I'm going to tell the marshals that that's where

1    he's going to give a statement, and if they want to position
2    a chair nearer to him, they will do that before that
3    happens.
4                    MR. MARTIN:  That's fine.
5                    THE COURT:  Okay.  Now, how much time do you want
6    to reserve?
7                    MR. McBURNEY:  In light of what I expect Mr. Ahmed
8    will say, I will try to include everything at the
9    beginning.  I don't know that he would say something to which
10   rebuttal necessarily would be appropriate.
11                   If there is time left and he says something that
12   I think there is proper rebuttal, then we will provide
13   that.
14                   But I will try to keep remarks on point, but would
15   like to keep the forty-five minutes as --
16                   THE COURT:  No, I'm not saying that.  What I'm
17   saying is almost everybody says I want to reserve ten
18   minutes, and we will give you a heads-up if you want
19   that.  That's the simple question.
20                   MR. McBURNEY:  No, the clock is on the wall, so I
21   will keep track of that.
22                   And I think we will talk amongst ourselves, but
23   based on my understanding of what Mr. Ahmed has to say, I
24   don't know that there would be appropriate rebuttal to that.
25                   THE COURT:  Okay.  Anything else we need to

1    discuss?

2           MR. NAHMIAS:  While we are together, I don't know

3    if you want to do this at the end of the closings, but just

4    the logistics on your verdict and the defendant having to be

5    here and the public and media, who were asking.

6           THE COURT:  Well, I don't know how long it's going

7    to take me.

8           MR. NAHMIAS:  Right.  At the point you have --

9           THE COURT:  I have gone through the

10   cases.  I haven't had a lot of guidance on what findings

11   are.

12          MR. McBURNEY:  Right.

13          THE COURT:  So --

14          MR. MARTIN:  I was just assuming we were all just

15   going to wait and then you would tell us you reached a

16   conclusion and we would all come over here.

17          MR. NAHMIAS:  The question is whether -- I'm sorry,

18   go ahead.

19          MR. McBURNEY:  Insofar as you decide on Date X, if

20   your staff could alert us and we could have it the next day,

21   we could have Defendant Ahmed produced.  The day will be

22   whenever it is.

23          THE COURT:  It will not be this week.  I cannot

24   prepare this between now and tomorrow.

25          So my plan was going to be that once I decided that

1   I was in a position to announce my verdict, I would give -- I

2   would call everybody and get an idea of what would be

3   reasonable, and then we would allow the U.S. Attorney's

4   Office to do whatever they wanted to do to announce it to the

5   public.

6           MR. NAHMIAS:  I think Ms. Collins is going to

7   return to Washington, and if we could at least allow an

8   overnight so she could come down?

9           MR. McBURNEY:  And to get the defendant here.

10          MR. NAHMIAS:  Get the defendant here.

11          THE COURT:  Like I say, no promises, but it's --

12  because I don't want this -- I don't want to lose a day just

13  because we are waiting for somebody to travel.

14          I mean, I will try to do that, but I have no idea

15  on the timing.  I'm totally --

16          MR. McBURNEY:  If you will let us know when you

17  know, we will do what we can.

18          THE COURT:  And to the extent that I can give you a

19  heads-up when I think we are getting close.

20          The other question I have is do I then read my

21  findings, or do I just --

22          MR. NAHMIAS:  I was looking at the rule yesterday,

23  and it seems to allow either alternative, read them in open

24  court or file findings.

25          THE COURT:  Well, there is actually -- it seems to

me that you have got two options.  You can do it in writing

and file it or you can do it orally, in which case you don't

have to do anything in writing.

My question is if I do something in writing, should

I deliver it orally?

And I'm probably not inclined to do that, because

I think it will be long.  It might be -- I don't know,

because I don't know what they are going to look like.

So I don't know.  I will let you know what I'm

going to do.

MR. McBURNEY:  We may poll you, just so you know.

THE COURT:  Okay.

MR. McBURNEY:  Be prepared.

THE COURT:  I have multiple personalities, that may

take some time.

I was just reminded we haven't talked about Ofshe's

testimony being in this transcript, but we did talk about

that before that we were going to consider his testimony and

that it would be included as part of the transcript.

MR. MARTIN:  Right.

THE COURT:  And I think all I'm going to do is make

that a separate exhibit and I'm not going to try to place it

anywhere in the transcript.  I will say the transcript

includes the testimony of Mr. Ofshe which is attached as an

attachment to the official transcript of the trial

1    proceedings.

2          And then everybody agrees that that's part of the

3    trial proceedings?

4          MR. McBURNEY:  That was our understanding from the

5    end of the *Daubert* hearing, so, yes.

6          MR. MARTIN:  Yes.

7          THE COURT:  As well as -- I don't know for

8    Mr. Kohlmann, I guess we have to include that part.  I think

9    we already addressed that part of his testimony that relates

10   to his qualifications.

11         MR. McBURNEY:  We did.  The transcript is coming

12   in, and then Mr. Martin said you can deal with sorting out

13   the relevant parts.

14         THE COURT:  Yes, I do remember that.

15         MR. MARTIN:  I do recall that most of the

16   qualifications part was on the front end, of course.  So

17   I think that can be easily figured out.

18         MR. McBURNEY:  For the record, I believe this was

19   communicated to Your Honor, we have withdrawn the two

20   exhibits that led to the discussion yesterday and the request

21   that we do some research.

22         We heard back from Ms. Birnbaum as to the status of

23   what had been admitted and what hadn't, and based on that I

24   believe there were two exhibits --

25         MR. BLY:  71 and 71-A.

          MR. McBURNEY:  Correct, but those have been

withdrawn.  So they are not part of the record.

          THE COURT:  So I don't have to rule on those?

          MR. McBURNEY:  Correct.

          THE COURT:  Nor do you have to make a submission to

me.

          MR. McBURNEY:  Although we are ready to do so.

          THE COURT:  Which was the real reason why they were

withdrawn.

          MR. McBURNEY:  We actually prepared the submission.

We thought about it more.

          MR. MARTIN:  Could I see that?

          MR. McBURNEY:  We are going to give it to

Mr. Samuel.

          THE COURT:  Anything else?

          MR. McBURNEY:  Thank you.

          THE COURT:  Thank you.

                (A recess is taken at 12:48 p.m.)

                          --  --  --

1          Thursday Afternoon Session

2              June 4, 2009

3               2:42 p.m.

4      (In open court:)

5      THE COURT:  Before we start, I want to make sure

6   that counsel have gone through all of the exhibits and that

7   everything that was admited is present here in front of

8   Jessica for my consideration during my deliberations.

9      Have you done that, Mr. McBurney?

10     MR. McBURNEY:  Yes, sir, we have.

11     THE COURT:  Mr. Martin?

12     MR. MARTIN:  We are satisfied.

13     THE COURT:  Mr. Ahmed, before we begin, I just

14  wanted to make sure that you understand before we begin the

15  closings that you have the right to testify.  This is your

16  trial, you have requested the trial.

17     I just want to make sure that you understand that

18  you have the right to testify, but you also have the right

19  not to testify.  Do you understand that?

20     THE DEFENDANT:  I do.

21     THE COURT:  And have you discussed that with

22  Mr. Martin?

23     THE DEFENDANT:  Yes, I have.

24     THE COURT:  And do you understand the right that

25  you have to testify or not to testify?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And is it your election not to testify

3     in this case?

4          THE DEFENDANT:  It is.

5          THE COURT:  And do you understand that by not

6     testifying, that you will not present any evidence as far as

7     your own testimony, and the statement that you are going to

8     give will not be evidence and that I cannot consider it in

9     connection with my deliberations?  Do you understand that?

10         THE DEFENDANT:  I fully understand that, Judge.

11         THE COURT:  The fact that you have not testified,

12    of course, will not affect in any way my consideration of the

13    evidence and whether the government has met its burden of

14    proof on each of the elements of the offense.

15         All right.  With that, then we are at closing

16    statements beginning with the government.

17         MR. McBURNEY:  Thank you, Judge.

18         As I said at the outset of this trial, the case

19    before you is not about throwing bombs and shooting

20    soldiers.  It's about providing support for those

21    activities.

22         This case is about an agreement that

23    Defendant Ahmed entered into with several others that you

24    have come to know through chats and e-mails and even some

25    telephone recordings, an agreement between Defendant Ahmed

and Ehsanul Sadequee and Azdee Omani and Fahim Ahmed, also
known as James, and Abu Umar, Aabid Hussein Khan being that
person arrested in June of 2006 and charged with terrorism
offenses.

A conspiracy that reaches all the way up to
Younis Tsouli or Irhabi 007 or Bond referenced in some of the
chats in which Defendant Ahmed participated.

It's an agreement that Defendant Ahmed entered to
provide support for terrorism.

It may well have been, and I think there is ample
evidence to show that Defendant Ahmed himself hoped to get to
that final phase, to be the terrorist himself.  But that's
not what the government has charged, that's not what the
government is required to prove in this case.

Merely that the defendant entered into an agreement
with others to provide himself and others -- not just
Defendant Ahmed, but all those in those Khan chats who said,
yes, we are going to Pakistan, all those people to whom
Ameer Turab, Defendant Ahmed, directed his Mother's Day
e-mail.

Here is the plan:

I have the passport, the papers to get into
Pakistan.  So does AO, Abu Omar, Shifa, Khubz,
Khubz is renewing his papers.  In six weeks, he
will have that American passport, he should be able

1          to get to Pakistan.  James should be able to get

2          there because of relatives.

3               But AZD, Azdee, how are you going to get to

4          Pakistan for picnic -- training -- and ultimately

5          the trip to the mountain hills national park, a

6          term that Defendant Ahmed defined in the interviews

7          with the FBI as actually engaging in violent

8          jihad?

9               That's the conspiracy in this case that these

10    people agreed to provide, Defendant Ahmed agreed to provide

11    himself and others, as well as some property, the videos.

12    And you have seen a number of the videos that Defendant Ahmed

13    and his co-conspirator Mr. Sadequee took when they were in

14    Washington, D.C.

15              These videos also form a type of material support

16    that Defendant Ahmed conspired with others to provide in

17    support of terrorism, terrorism either abroad, that's the 956

18    angle, or here in the United States.

19              And you have heard evidence that that was an

20    ultimate objective.  Both of those were ultimate objectives

21    of Defendant Ahmed and his co-conspirators.  And I will touch

22    upon both during this closing.

23              Now, typically in a conspiracy case, the

24    fact-finder is left to divine or determine from such a

25    circumstantial evidence the intent of the defendant.  But

here we have the defendant's own statements, his own thoughts expressed to others, whether it's Zubair Ahmed or his mother or the folks who are up in Canada.

And his intent was clear. His intent was to do something about this crisis in the Muslim lands, the fact that Islam was under attack and that in Defendant Ahmed's mind he needed to join the fight, that it was obligatory for all young able-bodied Muslim males to go to where Islam was under attack and engage in violent acts to repel those who were oppressing and repressing Muslims.

I said at the outset the defendant's motives don't matter, they don't justify his conduct, and they certainly did not motivate his prosecution, but they have become a part of this case because they were so clearly expressed in a number of the communications that this Court has seen.

While the conspiracy ran for many, many, many months, there are three key pieces to the conspiracy.

There was the travel to Canada in March of 2005 when Defendant Ahmed and Mr. Sadequee got on a Greyhound bus to drive up to Toronto where they met with Azdee Omani, Fahim Ahmed, James, and the other name that Defendant Ahmed provided during his interviews with the FBI was a Jamal. They met there and we know what they discussed through what the defendant told the FBI as well as communications this Court has seen.

The second main event after the conspiracy had been formed up in Canada was the trip in April of 2005 to Washington, D.C., again taken by Defendant Ahmed and Mr. Sadequee, where they made the 62 videos, a sampling of which the Court has found, six of which ended up on Younis Tsouli, Irhabi 007, part of the media wing of Al-Qaeda in Iraq, ended up on his computer, and two of which ended up on Aabid Hussein Khan's hard drive, the facilitator who had corresponded with both LeT and JeM to arrange for people that he knew abroad to gain access to their training camps.

And finally in July of 2005, Ameer Turab, the defendant, Syed Haris Ahmed, did exactly what he told the members of the conspiracy he was going to do. He would go first to Pakistan, he would be in the vanguard. He might wait for them while studying at a madrassa, but he would be over there until they joined him.

Before Canada, we have learned a fair amount as to the defendant's state of mind. As I said, it's not an element of the case, but it has become relevant based on the evidence.

We know that the defendant was angry about the war on Islam and convinced that something must be done, and that he had concluded with others that the answer was to go to the third, get to the third level, engage in violent jihad.

What the Court has seen is that rather than being

malleable and impressionable and being a follower,

Defendant Ahmed was someone who actually took it upon himself

to convince others of the same.

The Court has seen any number of e-mails between

Defendant Ahmed and Safiullah Hussaini, a friend in Pakistan,

where again and again and again Defendant Ahmed is

encouraging Safiullah to take the next step. Start to let

your parents know you may be going away for a while, spend

more time on Tibyan Publications, you need to prepare

yourself for the final struggle.

The Court saw the frustration of the defendant when

Usman, a friend of both Zubair Ahmed and the defendant's,

backed out on the agreement.

There was a discussion in a phone call about how

Safiullah backed out, how Usman said my intentions are there,

but he didn't follow through.

We have a defendant who was not a follower, but in

fact a leader in this conspiracy.

But beyond my words, you have the defendant's own

words.

As far back as September of 2004 -- this is

Government's Exhibit 12 -- we had the defendant seeing the

total war on Islam starting to forment and his hope that he

may get back to the Islamic lands when the full-fledged war

starts.

The following month defendant is writing to
Ibn Ahmed, Zubair Ahmed, convicted terrorist, the one who
made the same attempts to get abroad and get to a training
camp, and Safiullah, a gentleman I mentioned, someone that
the defendant was trying to convince to join in his cause.

Defendant Ahmed tells them in November of 2004,
months before he goes to Canada, I have lost all interest in
studies and see no purpose in this pathetic life.

What is he reading these days?  Not his school
books, but the classic Join the Caravan by Shaykh Abdullah
Azzam, the Court has heard the spiritual and intellectual
mentor of Al-Qaeda, of Osama Bin Laden.  It's a book that
brought tears to hearts, and had shaken Defendant Ahmed's
heart, in his own words.

He says it's time to reassess our priorities.  Can
we afford to delay our goal of third?

And you heard what third is.  Zubair Ahmed took the
stand and explained how Defendant Ahmed and he had
established a code, so that should these communications ever
fall in the wrong hands, law enforcement hands, it wouldn't
be immediately obvious that third meant let's go fight
against coalition forces, U.S. forces, let's plant an IUD.

It might be an exam, and indeed the Court has seen
repeatedly this reference to an exam, or I'm coming over to
where you are, the school is there, we are doing this

training. Always the consciousness of guilt prompting the

defendant and his co-conspirators to cover their tracks and

not be overt.

In fact, when someone got too overt, there would be

a word of caution from some other co-conspirator. You may

recall from I believe it was Government's Exhibit 114, the

chat that was attached to an e-mail from Defendant Sadequee

to Defendant Ahmed. Defendant Sadequee said, Read this all

urgently.

And during the chat Mr. Sadequee said, Turab has

this great idea.

And the response from one of the participants was,

Wait, is it safe to talk about this on MSN?

If they were talking about a party they were going

to have, a get-together, or even something he figured out how

to hack into a website on Amazon and get a free book, there

is not going to be the concern about talking about this on

MSN. The plans they were discussing were the types of things

that they often felt could only be discussed face-to-face,

the most secure way possible.

And finally in this, to use the terms that

Defendant Ahmed and Zubair Ahmed came up with, in this first

level, when one who seeks ultimately to join violent jihad

engages in ideological support, the Court has seen the types

of documents that one finds on Tibyan Publications and that

1  Mr. Sadequee was sending to Defendant Ahmed.

2        Exhibits 14, 15 and 16 were a series of e-mails

3  from Sadequee to Ahmed, each of which had an attachment much

4  like this.  This is a several hundred page book, Fundamental

5  Concepts Regarding al-Jihad, a book about jihad.

6        This is from the same website that Defendant Ahmed

7  was encouraging his relatives in Pakistan, Talha and the

8  other gentleman in the e-mails that Mr. Martin introduced

9  through his two witnesses today, the type of website that

10  Mr. Ahmed was spending his time on.

11        And we heard the Raksha computer where

12  Defendant Sadequee worked had over two thousand hits to

13  Tibyan Publications.  This is all part of the development of

14  level one, the ideological background and the support for

15  jihad.

16        The second level soon followed.  The Court has

17  heard testimony and the defendant has admitted that in the

18  winter of 2004 and on to early 2005, Defendant Ahmed along

19  with Sadequee and joined once by a friend Omar Kamal went up

20  into the north Georgia mountains and did some paintball

21  shooting.

22        An otherwise innocent activity, but when put in the

23  context of this case and as described by Defendant Ahmed had

24  an ulterior purpose.  They are not going to run around in the

25  woods with an M16 and shoot.  They do the next best thing.

In their minds, it was preparation for what they might find themselves in if they made it to a training camp. So that when they get to the training camp and they are handed a rifle, they understand which end the bullet comes out of and how to run around and this and that.

Not my words, the defendant's words as he described the purpose for the paintballing that he and Defendant Sadequee and Mr. Kamal engaged in.

The next phase is the trip to Canada.

Now, arguably the crime with which Mr. Ahmed is charged was completed on February 26th, 2005. That's the date as is shown in Exhibits 23 and 24 that Defendant Ahmed and Defendant Sadequee purchased their tickets to go to Toronto, Canada.

We know the purpose for that trip. They left on March 6th and they met with the individuals I mentioned at the outset of closing argument. And while there, we know from Defendant Ahmed's admissions to the FBI as well as a number of chats this Court has seen, mostly from the Khan hard drive, that Defendant Ahmed, Mr. Sadequee, Azdee Omani, and everyone else who was there, named and unnamed, had an agreement. They agreed to go to Pakistan to pursue violent jihad.

They also began their conspiracy for attacks in the United States. That conspiracy ended up being less

well-developed than Defendant Ahmed's final travel to
Pakistan, but both prongs that were charged in the indictment
had their genesis in that meeting in Canada in March of
2005.

I mentioned the crime is complete.  This conspiracy
requires no overt acts.  There were plenty in this
case.  There were substantial steps taken after the agreement
was reached in March of 2005.  But it's the entry into the
agreement, the understanding, and the knowledge of the
purpose of the agreement that is the crime here.

And there is little doubt that had Mr. Ahmed and
Mr. Sadequee when crossing back into the United States on
March 12th at the Peace Bridge in Buffalo, had they been
honest with the Customs and Border Patrol officer, had that
officer said, What were you just doing in Canada, Oh, we were
visiting relatives, whatever may have been said, had they
been candid and said, Actually we just met with three other
extremists and we talked about how we are going to go to
Pakistan and get training, that they would have been arrested
there.  The crime was complete.

But the crime continued.

Now, we know the nefarious purpose of this trip to
Canada, not because I am telling you or because an agent said
this is what I think it was.  The day Defendant Ahmed
returns -- it's a two-day bus ride, they leave Toronto on the

12th, they get back on the 13th of March, 2005, this is

Government's Exhibit 28 -- the day Defendant Ahmed returns,

he's e-mailing Zubair.

March 13, 2005:  Man, things have changed.  I went

to some place don't want to mention online -- there again is

that consciousness of guilty, I'm not going to tell you about

it because someone may find this communication -- and hooked

up with some people.

Well, we now know exactly where he had been:

Canada.  We know with whom he met:  Azdee Omani, James,

Jamal, et cetera.  This is so important to him that he's

already begun thinking about making it real.

And so in the same chain of e-mails several hours

later, still Exhibit 28, Defendant Ahmed e-mails Zubair again

bringing up the topic they had discussed a while ago about a

way to get some easy money, taking out a loan, a western

loan, if you will, one that charges interest, and running

with the money.

The Court heard about the ultimate exchange and

that Zubair cautioned Defendant Ahmed because he had heard

the story about a mujahideen, an actual holy warrior, who

when killed in battle actually did not ascend to Heaven, was

not a martyr, but was stuck in Purgatory because when he was

killed, he had an outstanding debt.  So there was an exchange

about whether this would be a good way to get some money.

1          For some reason now, out of the blue, having

2   returned from Canada, Defendant Ahmed is already trying to

3   figure out how can I get a quick few thousand dollars to do

4   something.  We know what that something is:  It's to get to

5   Pakistan.

6          This is from Government's Exhibit 508-A, the

7   transcript that goes along with the interview that's

8   508.  This is the interview from March 17, 2006.

9   Agent Richards asks at line twelve at 59:03:  Why is the

10  Canada trip all about going to Pakistan?

11         Defendant Ahmed:  Because I knew -- I knew, I knew

12  before I went -- I knew that those people were interested in

13  going to Pakistan to -- not go to a madrassa, not buy real

14  estate -- to get training or whatever.

15         Agent Richards asks:  What kind of training?

16         Defendant Ahmed:  To me there was -- I thought it

17  was military.

18         And the theme that the Court will see throughout

19  the interviews with Defendant Ahmed:  I'm not going to say

20  anything about anyone else, I don't know about their

21  intention, doesn't want to inculpate others, but very clear

22  about what he thought.  It wasn't training to memorize the

23  Quran or calculus.

24         Military training in Pakistan, that was the purpose

25  of the trip to Canada.  That was the crime, that's when the

1     agreement was formed.

2          The next step is the trip to Washington, D.C.  We

3     know this was planned several weeks in advance because the

4     Court has seen again I believe it was Government's Exhibit

5     114, that chat that was attached to an e-mail, Sadequee to

6     the defendant.

7          And in that chat Sadequee reveals that Turab has

8     this great plan that blows everything else away.  It's one of

9     the first times we see the co-conspirators say Turab should

10    be the ameer, because he has these great ideas.

11         And at the end of the chat Sadequee reveals the

12    plan.  We are going up to the Virgin Mary and scoop the

13    place.

14         And lo and behold about two weeks after that chat,

15    Defendant Ahmed and Defendant Sadequee drive up to the

16    Virginia, Maryland, area in Defendant Ahmed's truck.  They

17    sleep in the truck, no paper trail, no receipts.  We managed

18    to get some cell phone records, but nothing else.

19         And they made 62 videos of various Washington,

20    D.C., landmarks, some of which were prominent, some of which

21    were rather obscure.  The Department of Energy, a fuel tank

22    farm.

23         The Court has seen some of these videos.  We are

24    going to play one because it gives a particular flavor of the

25    purpose of the videos and the intention of the makers.

1          (A video file is presented.)

2          MR. McBURNEY:  If there was any question as to what

3     Defendant Ahmed and Sadequee meant when they talked about

4     their brothers and the people that they aspired to emulate

5     and join, that's footage of the Pentagon at night,

6     Mr. Sadequee narrating:  This is where their brothers, our

7     brothers -- their word -- attacked the Pentagon.

8          But these videos were not professional, no question

9     about that.  Mr. Martin liked to bounce a little bit like a

10    bunny with the World Bank one because it was a video that was

11    a bit herky-jerky.  But that wasn't the point.

12         Defendant Ahmed was not applying to film

13    school.  Mr. Sadequee wasn't hoping to get into RISD or some

14    school of art.  These videos had a very clear purpose.

15         The defendant told us in the interviews and it's

16    clear from some of the communications we are going to look at

17    in a minute, these videos were designed to do two things:

18         One, to establish or improve the credentials and

19    credibility of Ahmed and Sadequee as possible terrorists, as

20    people who might try to get into a camp, who might get into a

21    more rarified group online.

22         These are videos that in the wrong hands, in

23    Al-Qaeda in Iraq's hands, the Younis Tsouli conduit, would

24    allow somebody to put together a video that says I didn't

25    download a National Geographic this or that, I didn't go to

the Smithsonian website and download footage of the

Smithsonian. I had someone on the ground who could walk up

to the Capitol and make this video.

Osama Bin Laden can't come into the United States

and make a video. Defendant Ahmed, Mr. Sadequee, are already

here, they have the right papers to come in, they don't draw

that level of suspicion that an operative sent from Pakistan

or Afghanistan would.

The videos say, We are in your backyard and we can

do these things.

These videos ended up with Younis Tsouli, not

coincidental, and they ended up with Aabid Hussein Khan.

Defendant Ahmed in the interview on March 17th,

Government's Exhibit 508 -- and this would be 508-A, the

transcript -- is asked about who told you to make these

videos, whose idea was it, what was the purpose. And his

answer is, They, they didn't tell us to do anything. It was

my idea to prove myself, to show that I can make a video. He

goes on to say, You have to prove to them that, you know, I'm

willing to take some risk.

We heard Mr. Kohlmann talk about getting into

camps. Mr. Martin pressed him, hey, LeT has a phone number,

they have a web page. Mr. Kohlmann said they have all these

things, that doesn't get you in. If you go over there and

say I want to join, you are going to be vetted, they are

going to figure out who you are.

The best way to get in, he said, is if you already have established yourself to be someone, you have a connection, you have an Aabid Hussein Khan and you have a way to convince Aabid Hussein Khan that you are not just some 20-year-old from the United States that is upset about something that went on in Iraq, but you are someone who is willing to do something and, better yet, you are someone who has done something, that you have taken that risk.

And the Court heard the defendant's voice in these videos, he really did believe he was taking a risk. The first video of the Pentagon where Defendant Ahmed is encouraging Sadequee to take the video: Take it, take it, be careful, man, be careful, man.

Whether they were at risk or not isn't the issue. The point is they understood their intent. It was not a tourist video, it was not a sightseeing video. If you are in Washington, D.C., and you are going to film the Capitol, you don't have a family member telling you you better watch out, someone might see you taking that film if your purpose is to make a family video. That was Washington, D.C., and the videos.

Finally in July of 2005, Defendant Ahmed takes the final step. On July 17th, one-way ticket to Karachi. We heard now a lot about the one-way ticket. The point is this,

he wasn't planning on staying for just a few weeks.  Whatever

his purpose, he meant to be there for some time.

The government doesn't disagree that there were

several things that the defendant hoped to do while he was in

Pakistan.

He unquestionably helped his father look at a piece

of real estate.  He unquestionably was interested in

furthering his understanding and the richness of his

understanding of Islam.  He wanted to memorize the

Quran.  There are dozens of e-mails where he corresponded

with people about particular madrassas.

He was in a holding pattern.  He knew that soon --

he believed that soon his co-conspirators would be there, and

his ultimate objective was to get to the training camp and

pursue violent jihad.

This is from Exhibit 74, one of the Khan chats,

April 18, 2005:  My plan -- this is Defendant Ahmed,

Aboo Turab, the ameer.  My plan was to study in authentic

madrassa until you guys joined.  This is what I shared with

the defendant's father.

About a week later he's reaching out to Faraz in an

e-mail where he acknowledges, We haven't spoken for a long

time, but I'm thinking about coming to Pakistan, and I think

I would like to get some religious education.

And in one of those e-mails that the Court saw that

Mr. Martin entered, the defendant said, I don't want to get a degree.  I'm not looking to get a B.A. or M.A.  I want to deepen my understanding of Islam.  Entirely possible.

The ultimate objective is the concern in this case, and the ultimate objective Defendant Ahmed explains again on March 17th:  Why am I interested in jihad?  That's what jihad is all about, trying to go there, to Pakistan.

And finally, the Mother's Day e-mail written by Defendant Ahmed sent to Mr. Sadequee to then disseminate to everyone else, Government's Exhibit 41.

In his own words:  The important thing is to be -- his code word -- in picnic.  Get over there, get involved and fight the fight.  It doesn't matter if you can't come to the restaurant, the Curry place restaurant, Pakistan.  Choose any other restaurant such as Rivers Front, Iraq, pick a battlefield, join the fight.

The purpose of the travel, even if it has the cosmetic shell I'm going to be in a madrassa for a little while, the purpose of the travel was to engage in violent jihad.  That was the conspiracy into which he entered, to provide himself and others as personnel in support of violent jihad.

The conspiracy didn't end when Defendant Ahmed's efforts in Pakistan to get into a camp, his meeting with Aabid Hussein Khan, Abu Umar, didn't result in his hopeful

outcome.  We have heard that within days of returning to
Atlanta, he was online with Zubair Ahmed expressing regret
having, quote, turned on his heels, unquote.

You heard the dialogue, you saw the dialogue, and
Zubair Ahmed described it that they had about the scholars
telling Defendant Ahmed, You need to go back and finish your
studies and be with your family.

And Zubair Ahmed saying, No, jihad is -- I'm going
to mispronounce it -- Ain, A-i-n or A-y-n, it's obligatory,
it's mandatory.  Right now Islam is under attack.  This is a
defensive war.  You need to go back.  I think those scholars
are wrong.

This is a conversation that the defendant is having
within days of having returned.

We also know that he was quickly back in touch with
Defendant Sadequee.  Government's Exhibit 111 is a chat with
Sleeping Beauty, between Ehsanul Sadequee and Waseem Mughal,
one of the individuals mentioned briefly in one of the Khan
chats as wanting to join this trip to Pakistan.

And it was in that chat that Mr. Sadequee revealed
to Waseem Mughal, Hey, Turab, T, Mr. T is back in the U.S.,
and they got his phone, and they have Abu Umar's phone
number.  We have got to let Abu Umar know that the dogs, law
enforcement, they have the phone number.

And the only way that Defendant Sadequee could know

this is if Defendant Ahmed told him.  He's still in the mix.

        We also know that upon returning to Atlanta and going back to Georgia Tech, Defendant Ahmed spent time researching shaped charges on a computer at Georgia Tech, and the Totse website where he looked at methods to defeat special ops, and steganography, the way to hide messages within a seemingly benign message, to hide your true intent, and high-explosive mixtures.

        We heard as well that the defendant in an effort to clear what he perceived to be this last remaining hurdle that prevented him from getting back to Pakistan for his true purpose, he obtained his mother's approval.  You listened to that call.

        Within hours of the call on June 9th of 2006, Defendant Ahmed was online with Zubair Ahmed.  The call is at 500, the chat with Zubair is Exhibit 97, and he's indicating -- the defendant is indicating, My mom said it's okay, my mom gave me permission.

        And he and Zubair discussed, Well, maybe you are being tricked like I was tricked.

        But soon after this heart-wrenching phone call with his mother where she's crying, Why do you have to go do this?  It's not what I want you to do.

        He says, It's difficult for me to say this.

        And his mother says, I know, it's jihad.

1          After that call, who does he get online with?  Not

2    Faraz, the admissions person from Abu Bakar University in

3    Pakistan, but Zubair Ahmed.

4          Those are some of the facts that the Court has

5    heard.  I want to talk briefly about the elements of the

6    defendant's crime.

7          The government is required to show beyond a

8    reasonable doubt that, first, a conspiracy existed to provide

9    or conceal -- we haven't talked much about concealment.  It

10   comes up, all these hiding the videos that Sadequee sent to

11   Aabid Hussein Khan, the casing videos of the World Bank and

12   of the Masonic Temple, hiding those videos inside of Jimmy's

13   13th birthday, volleyball practice.

14         Anyway, the conspiracy to provide or conceal

15   material support, so there has to be this agreement.

16         The defendant has to have joined it, knowing what

17   the agreement is.  Not knowing every contour of it, not

18   knowing that perhaps Sadequee is planning to get those videos

19   to Younis Tsouli in particular, but knowing that the plan is

20   unlawful.

21         He has to willfully join it, not accidentally, and

22   not because his arm was twisted by someone else.  I have

23   already pointed out how Defendant Ahmed was in fact trying to

24   get people to join him and not the other way around.

25         And finally, having joined this conspiracy to

provide or conceal material support, Defendant Ahmed must

have known or intended that the material support would be

used either in preparation for or in carrying out an act of

terror abroad or within the U.S.

It gets more technical than that, the act of terror

abroad needs to be a murder and/or a kidnapping.  The act of

terror within the United States, there has to have been some

activity that transcends national boundaries.

But the essence is the agreement, and the

defendant's understanding that the agreement involves

supporting terrorism here or abroad.  No overt acts required,

and certainly no requirement that the terroristic act ever

occur.

As far as we are aware of, no one died, no one was

injured, no one was kidnapped, no one was pushed or shoved as

a result of the conspiracy into which Defendant Ahmed

entered.  That's not what the government needs to show.

The whole point is to get the would-be terrorist

before he enrolls in flight school and figures out how to fly

a commercial airline.  Once the agreement has been entered

into, the crime has occurred, and the government should

act.

The forms of material support in this case are

two-fold.  I have discussed them already.  I want to talk a

little bit about the evidence that connects to them.

1    The videos were made in D.C. in April of 2005, and

2 from that point onward the two forms of material support

3 diverged a bit.  They interconnect, but they diverged a

4 bit.

5    The personnel is the most clear-cut.  The plan as

6 hatched at latest in March of 2005 in Canada, the defendant

7 and others were going to supply themselves to some terrorist

8 organization.

9    LeT?  Perhaps.  They talked about LeT.  JeM?

10 Maybe.  They talked about that.  They talked about the

11 Taliban.  Sadequee said, remember the end game here is the

12 students, the fight with the students.  They talked about a

13 number of organizations.

14    Their clear intent -- and the evidence is

15 unrebutted on this front -- their clear intent was to join

16 some organization, some entity, some conspiracy, the object

17 of which was to kill, murder and/or kidnap others overseas.

18 U.S. soldiers, coalition forces, it didn't matter.  Whoever

19 was attacking in Kashmir, the Indian soldiers.  In

20 Afghanistan, the coalition troops.

21    This is Exhibit 26, a communication between

22 Abu Umar, Khan, the facilitator, Sadequee, and the

23 defendant.  Khan brings up JeM and LT.  The ameer,

24 Defendant Ahmed, says LeT, JeM, that will be decided on the

25 ground when we get there.

1        And then Sadequee, as I mentioned, at 4:40:39 says,

2   Also our main last goal is to get with the

3   students.  Mr. Kohlmann explained that's what Taliban means,

4   the students.  Man, the students are back with full force,

5   said Defendant Sadequee.

6        Government's Exhibit 79, lest there be any

7   question, any question in the Court's mind as to what it was

8   that Defendant Ahmed wanted to do in Pakistan.  This is a

9   one-on-one chat, Khan, the facilitator, and

10  Defendant Ahmed.

11       Defendant Ahmed had been asking some questions

12  about what it would cost to get the training -- the training,

13  not the actual fighting, but the training.  Then he says,

14  Well, what happens after that?

15       And there is a little bit of confusion.  And at the

16  outset of this excerpt, Defendant Ahmed says, No, no, no,

17  after the camps is going to J land, J land, where we fight

18  jihad, does it cost anything?

19       Khan says, If anything, not much.  They launch you

20  into Kashmir, you need money for the food, traveling by

21  buses.

22       And then Ahmed says, Well, wait, don't the holy

23  warriors, the fighters, what I'm going to become, don't we

24  take loot to help pay for it?

25       And Khan says, Yeah, you are right, they take the

radios and the guns from the people we kill, the soldiers we

kill.

Now, the other form of material support is the

videos.  Defendant Ahmed explained one of the purposes of the

videos in the interview on the 17th.  His idea, go make the

video, but you have to prove yourself, that he's willing to

take a risk, as I mentioned.

But there was another role for these videos as

well.  In two communications in evidence, one is Government's

Exhibit 118, Sadequee explains to Younis Tsouli, who is

TheDude, as well as a gentleman in Bosnia, Mirsad Bektasevic,

Sadequee says, Bro Maximus, me and a few borthers -- they

have grown in numbers now, it's Ahmed and Sadequee -- filmed

some pornos in the house where Pharaoh lives, Pharaoh being

the head of the United States, Washington D.C.  I'm talking

about releasing those with a bayaan, an announcement, saying

Aqua in the Land of the Two Towers.

This is the conspiracy involving a defendant that

we have heard was heartrent, emotional when saw videos about

people being killed in Afghanistan, but their little joke to

talk about the United States is to refer to it as the Land of

the Two Towers, the Twin Towers.  That's how they choose to

signify the United States.

Now, this is Sadequee talking to TheDude,

Younis Tsouli, part of the media wing of al-Quaeda in Iraq,

and these videos ended up with Younis Tsouli.

Defendant Ahmed acknowledged in his interviews that the videos ended up with someone who was active online. And Government's Exhibit 508-A on pages ten and eleven, that Shifa, his friend Sadequee, sent the videos to someone who creates extremist websites and was a very active poster, as in putting up online videos.

In other words, he described Younis Tsouli not by name to the FBI, but the evidence is clear that Defendant Ahmed was well aware of where these videos were going, to Younis Tsouli, as Mr. Kohlmann explained, someone with direct access to Al-Qaeda in Iraq and someone involved in making their videos, editing their videos, and posting their videos.

But there is more. This is Government's Exhibit 123, an exchange between Sadequee and Azdee Omani, the person that the defendant identified as his uncle but whom he met with in Canada.

And Sadequee says part way down the first page there, he's describing what's going on with the videos, and he says, I wasn't going to tell you, I didn't think you know, but we are going to do something here, it's going to make them piss. It will awaken them. The thing is we aren't going to show those clips.

In response to Azdee Omani saying, Whoa, whoa,

whoa, I know about the clips you are talking about, you were

there when that Chinese guy had that situation April 11th,

2005.

No, no, we are not going to show those clips, just

some random buildings from the area.  It won't be bait, it

won't draw attention, they will have no clue when it was

done, it will be released with an announcement, and we've

even thought of a name.

He mentions Bond, Younis Tsouli, Younis Tsouli is

on this.

Bond has told you, halfway down the first page, on

this page.

We want to do it before the holiday, it's glad

tidings.  And you know a great thing about this?  Nothing is

going to happen there, there in the United States, Sadequee

being in Bangladesh at the time, for at least another good

year.

So some plan is afoot for something to happen in

the United States, and these videos are somehow furthering

that.

Those are the two forms of material support,

personnel and videos.

The two final objectives that are supported are

either terrorism abroad or terrorism in the United States.

And how do we know that the defendant was aware of those

objectives?   We know a number of ways.

For terrorism abroad, we have his admissions throughout the interviews, the written statements at the end.  Yes, I knew in the end we were supplying ourselves, we were supplying videos in ways that could help terrorism abroad.  I wanted to get in the camp.  I am in favor of violent jihad.  I sought to join violent jihad.

We know terrorism abroad because he talked about LeT.  It's the defendant who brought up LeT in the interviews.  You have heard them, you will review them.

The agents ask him, What group were you going to join?  They don't give him a list.  He proffers LeT, and his co-conspirators in the chats proffer LeT.

We know they sought in some way to support the Taliban.  Frequent references to the Two Rivers, Iraq, Al-Qaeda in Iraq.  And finally the casing videos were designed to help oversees.

In terms of terrorism in the United States, again the defendant's own admissions:  I would have made an attack in the U.S. if asked by whatever group I joined.  It's in his written statement.

They discussed it in Canada.  Whether they followed up on it or not isn't anything the government has been able to provide any evidence on, but they discussed in Canada after they entered into their agreement oil refineries.  And

what did Defendant Ahmed film while in the Washington, D.C., area? A fuel tank farm. Refineries and storage facilities.

And we have the exhibit the Court just saw, Exhibit 123, where Sadequee said, These videos are involved right now, we are going to try to release them, but we are not doing anything over there, Pharaoh land, the Land of Two Towers, for one year.

Now, through counsel, defendant has made a number of contentions. He said, look, no act of terrorism has been committed. I have addressed that several times. No one is suggesting he built a bomb or shot anyone. That's not what he's charged with, that's not what we need to prove.

Mr. Martin has pointed out, well, maybe there wasn't any specific knowledge of the goal. He didn't know Younis Tsouli. He knew Bond, he didn't know Younis Tsouli. The government is not obligated to show that defendant appreciated every dimension of the ultimate conspiracy, not the agreement to which he entered, but what the 956 (a) or 2332 (b) would be.

Mr. Martin suggested that perhaps Mr. Ahmed was done after he went to Pakistan, that he withdrew. Well, there has been no formal legal withdrawal. He certainly didn't come to law enforcement.

He had a great opportunity when he returned from

1   Pakistan, when he was interviewed by Agent Harper, when

2   instead of coming clean and saying, I went for errant

3   purposes, but I'm back now and I want to tell you, I'm sorry,

4   I met these people, maybe you can do something with this

5   information.

6        He lied.  I went to Canada to see my uncle

7   Azdee Omani.  I went to Pakistan only for these benign

8   reasons.

9        And finally this point about the defendant being

10   childish and searching for something.  We take our defendants

11   as we find them, but it's not a justification for pursuing

12   terrorism.

13        A gang member who comes before this Court who says

14   I joined the Malditos, MS 13, Vatos Lokos, because I didn't

15   have a father or the streets are tough.  I knew when I got in

16   it that we were going to do a drive-by shooting, that that

17   was our ultimate objective.  But you know what, I have had a

18   bad life so far.

19        That doesn't absolve that defendant of

20   responsibility for his choices and his actions, and the same

21   applies here.  The fact that the online Islamic world was

22   particularly enticing to this defendant does not absolve him

23   of his guilt.

24        Judge, today presents the Court with a rather stark

25   juxtaposition.  This morning President Obama was in Egypt

addressing the Muslim world with large, and part of his

speech was targeted to Muslim youth overseas, encouraging

them to shy away from radicalism, from molotov cocktail

throwing, from joining the Intifada or LeT or whatever.

You are considering today someone who didn't heed

that advice, someone who, for whatever reason, decided that

the right thing to do was to support terrorism and ultimately

to participate in it.

Defendant Ahmed is free in this country to believe

anything he wants.  He can hate anyone or anything, he can

love anyone or anything.  He is not entitled to act on those

beliefs in a way that crosses into criminality, and that's

what happened in this case.

The evidence this Court has seen and heard and will

consider in its deliberations demonstrates beyond a

reasonable doubt that Defendant Syed Haris Ahmed entered into

an agreement to provide and conceal material support of

terrorists abroad and attacks here in the United States,

aware of the consequences of his actions.

He went to Canada, he went to D.C., he made the

videos, he assisted Sadequee in getting those videos abroad,

he went to Pakistan with the ultimate goal of becoming a

terrorist himself.

For those reasons, Your Honor, the government

believes that the correct verdict, the right verdict, the

1  only verdict in this case is a verdict of guilty as to

2  Count One and Defendant Ahmed.

3          Thank you for your time.

4          THE COURT:  Thank you, Mr. McBurney.

5          Does defense want to make a closing?

6          THE DEFENDANT:  (Speaks a phrase in Arabic) In the

7  name of Allah (SAAW)*, I testified that there is --

8          THE COURT:  Excuse me, I can't hear you.

9          Could we turn up that microphone or pull it closer

10  to you?

11          Mr. Martin, point it in the direction -- there you

12  go.  See if that helps?

13          THE DEFENDANT:  (Speaks a phrase in Arabic)  In the

14  name of Allah and under the obligations of the law of

15  Mohammed, the Prophet, (SAAW) I testify that there is no

16  other to worship but Allah.  (Speaks a phrase in Arabic.)

17          First, I would begin by saying that I fully

18  understand that the Court has indicated that it will not

19  consider my statement as evidence, and frankly that's the

20  purpose of my speech.

21          Because I consider that I may not get a chance at a

22  public hearing for a long time.  I mean, only Allah knows the

23  future, but realistically I may not get a chance at public

24

_____
25  * Spoken softly, *Sallalahu aleyhi wasallam.*

speaking for a long time.  So I thought that it may be a

sacrifice for me that I forego the right to have a lawyer

speak about me that why I should be found not

guilty.  Instead of that, I should talk about Allah and His

message to mankind.  That's my -- one of my reasons for

that.

I'm not doing it for getting sympathy from the

Judge or from the public or anything like that.  I just want

to convey the message of God.

And there are words in the Quran, I will say the

words in Arabic and then translate it for the people, and

that is . . . (Speaks a phrase in Arabic.)

It says that Allah tells Prophet Mohammed (SAAW)

deliver what has been revealed to you from your Lord, and if

you do not do so, you will not have fulfilled the right of

messengership.  And Allah will protect you from the people

and Allah will not guide disbelievers.

So I hope that if I deliver the message that has

been revealed by Allah, the promise of protection from people

will also apply to me.  So that's one of the reasons that I'm

doing it, protection from Allah may come to me.

It may be in a form that I do not know.  I mean,

I'm not hoping that I may walk out or something, because the

protection of Allah can be in different forms.  But that's my

intention and one of my reasons is that.

1        Another reason is that while I was here ten years

2   in Georgia, the people were, you know, nice to me.  No one

3   harassed me about my religion or about anything actually, and

4   it would be -- I think it would be ungrateful for me to not

5   acknowledge that.

6        And the only way I can do that now is if I tried to

7   preach in a public way and try to get the Georgians to become

8   like my brothers in faith.  I mean, that's the only thing I

9   can do now.

10       So in a form of gratefulness to the people who have

11  been nice to me all these ten years, I just thought that I

12  should do that.

13       And there is one more reason, there is one more,

14  and that is that I came across a verse in the Quran, again I

15  will say it Arabic and then I will translate it.

16       Am I too fast for you?

17       And it says . . . (Speaks a phrase in Arabic.)

18       Allah tells all who believe, be the ansar of Allah,

19  and actually we heard in the testimony from partisans and

20  supporters where in terms of being ansar of Allah, like

21  Jesus, the son of Mary, had said to his disciples, Who will

22  be my ansar in the way of Allah?

23       And then some of the people of the children of

24  Israel believed in Him and some disbelieved.  And then Allah

25  said that He helped those who believed against their enemies

1 and they became dominant.

2 So in this verse Allah tells us specifically to be

3 like the disciples of Jesus. And in the research of their

4 lives and I saw it, they preached in any way they

5 could. They preached to the kings, to the judges, to slaves,

6 anywhere they had a chance to preach the message that they

7 had to deliver from Jesus.

8 And since this verse tells Muslims to be like them

9 in preaching the message, I also thought that I should preach

10 in this courtroom. Because in jail I only have a chance of

11 preaching at one person at time. Over here, I can do it

12 publicly. So that was one more of my reasons to do it.

13 I will now get to the message, I guess.

14 The first part of the message is the misconception

15 that Allah is somehow a different or separate diety from the

16 God of the Bible. That is not so. And I will try to talk

17 about it, but I will go through the five points that I want

18 to talk about in the direction that I want to go and I will

19 talk about it more.

20 The second point is that Quran is a preserver of

21 the previous messages of God to mankind. It is not a

22 separate revelation somehow. It preserves the message of the

23 Torah of Moses (PBUH)* and the psalms of David and gospels of

24

_____

25 * Spoken softly, *Peace be upon Him.*

Jesus (PBUH), and it preserves it and it handed a message for mankind until the day of deliverment.

So it is again a book that I believe Jews and Christians should also look into and believe to be from God.  And I'll discuss it a little bit.

And the third point I want to talk a little bit is that Prophet Mohammed (SAAW) is the inheritor of the past prophets.  He's not some diety or someone reared in the line of prophets.  He is someone who comes in a line of -- a succession of prophets with the same essential message but different forms of it according to the needs of the people and the time.

And then I will also discuss some prophesies that are in the Bible even now that actually refer to Him, and I will discuss it a little bit also.

And the fourth is that Muslims actually are better followers of Jesus than Christians today.  I will discuss a few points how we follow Jesus more -- a better way than Christians do today.

So that's my four points I want to discuss, and in the end there will be chance we call barah, disavowment, that after I deliver the message as best I can, then I want to declare that, you know, I am free from those who are stubborn and who do not believe after the message has been delivered.

1       So the first point is the misconception by a lot of

2  people that Allah is somehow a different God or He's not a

3  God of the Bible or some people even call Him moon god,

4  something like that.

5       That is not the case at all.  Because Allah --

6  and about those people who call him the moon god, Allah

7  says . . . (speaks a phrase in Arabic) . . . that to Allah

8  belongs the most beautiful of names.  So to call . . .

9  (speaks a phrase in Arabic).  To Allah is the most beautiful

10  of names, so call Him by them, and leave those who act

11  profanely towards His name, such as calling Him the moon god

12  or something like that, they will soon be retributed for what

13  they did.

14       Also in the Bible it says thou shall not take the

15  name of the Lord the God in vain, for the Lord will not hold

16  him guiltness that taketh His name in vain.

17       So it's just a bad thing for people to call Allah

18  moon god or something like that.  Because actually in the

19  Hebrew Bible there are three names of the diety that

20  I mentioned, El, Eloh or Elyon, and Elohim.

21       Now, actually in Hebrew and Arabic, they are very

22  close languages, sister languages, and their grammar is very

23  close to each other, and in them the diacritical marks are

24  not always included in the text.  Actually most of the time

25  they are not included, and the reader is somehow supposed to

1    know it.  I mean, just a native reader knows how to apply the

2    vowels and other diacritical marks on it.

3             So the word Eloh or Elohim actually are Allah

4    without the diacritical marks.  Because Hebrew was a dead

5    language for a long time, and it was revived after the

6    creation of the state of Israel.  So they had the text, but

7    they did not have native speakers for a while.  So they

8    forgot -- or the art of knowing the placement of vowels and

9    diacritical marks was lost with those people.

10            So Elyon actually, if you had the right diacritical

11   marks on them, is Allah, and Elohim actually Allahumma.  When

12   we pray to Allah, we don't say Allah, we call Him Allahumma.

13   And Allahumma and Elohim actually sound close enough that

14   anyone can tell that they are similar words, and if you have

15   the right diacritical marks on Elohim, that's Allahumma.

16            So again to Christians of America, my message to

17   them I guess would be this.  You know, we worship the same

18   God.  It's not like we have a different God or something like

19   that.  So that's the misconception I want to clear up.

20            The second thing on the books is that Allah hadn't

21   made any books throughout the creation of man over and over

22   according to the times and needs of people.  In the

23   beginning, like the first book that we know of is -- maybe

24   Ibrahim, Prophet Ibrahim (SAAW) had a book or something, but

25   he had no idea of what it was.

The first book that we know of by name is the book of Moses (PBUH).  It was basically a set of laws of many different kinds and many different forms.

And that code of life was needed because the children of Israel were about to become a nation, so they needed a set of laws and a set of -- a code of life to live in.

Then God sent the psalms to David (PBUH), and those were basically about praising God and thanking Him and praying to Him.  Because at that time the state was in the best condition, it was the golden era of life.  Like in times of ease, you need to thank Him.  So during the times of David, psalms was revealed so people would thank Allah for the blessings that He had given them.

But then later on due to the fact that there was a lot of ease for the children of Israel, they had wealth and they had money and they had prosperity, corruption came in their hearts and hypocrisy came.  They were already hypocrites even before that, but they became hypocritical towards their religion.

And that is why Allah sent Jesus (PBUH) with the message of the gospel, we call it ingil.  The message of the gospel had a lot of things about purification of the heart, about how people should not be hypocrites, about law and blindly follow the law and not -- and don't look at the

spirit of the law, just look at the text of the law.

So again we see a progression of the books coming according to the need of the people of the time and the place.

But now Quran has come, and it combines all those aspects.  In the Quran we find the law.  It is not as strict as the law of Moses and the other Jewish law that was incorporated into the law of Moses (PBUH).  But it is a law. There are regulations, strict regulations about many affairs, about even foreign policy, from foreign policy to cleansing our body before praying.  I mean, everything in the middle, there are some laws about all these issues.

But it also has things about praising the Lord.  I mean, it's just full of versus all over the place about praising and calling to Him.  So it also has the function of the psalms in it.

And a lot of versus are about hypocrisy and warning against it and how to find out if a person is a hypocrite or not and fight hypocrisy.  So it also has the function of the gospel in it, and also has many parables in it, because Jesus also spoke many parables, many parables.

And for that, there is a verse of the Quran that discusses that topic is that . . . (speaks a phrase in Arabic).

And that means that Allah is saying that We surely

sent messengers from before you -- and He's talking to the

Prophet Mohammed (PBUH) -- and it was told upon their wife

and children, so they were human beings, they were not divine

creatures, and it was not for any messenger to come up with a

verse except by the permission of Allah.  So not even a verse

could -- the prophets could not even come up with a verse

without the permission of Allah.

And Allah says that He abrogates what He desires

and He confronts what He desires because with Him is the

source of all scriptures.  So it's up to Him to send a new

book when He wants and to abrogate an old book when He wants,

because it is His book.  So when He abrogates the past book,

such as the Torah or the gospel, it is not that He's doing

injustice to anyone.  It is His right to do it.

And one more thing I want to say, that Quran has

been preserved the best in terms of any book since it was

basically revealed.

Because during the testimony of Zubair when he

talked about the word ijazah, that is the permission to

teach.  And actually if someone had permission to teach the

Quran, that ijazah has to go back to the Prophet Mohammed

(PBUH) in terms of like I was taught by XYZ, who was taught

by ABC, who was taught by such-and-such by name until he

said, okay, I was taught by XYZ who was taught by Prophet

Mohammed (PBUH) himself.

1    So anyone who was an ijazah, even now, can name --

2    he would have to have a name list leading to the

3    Prophet Mohammed.  This is not in any of the religions that I

4    am aware of.

5    I do not know of any Christian who can say that I

6    was taught by someone, who was taught by someone, until who

7    was taught by the disciple of Jesus who was taught by Jesus

8    himself (PBUH).  Nor can anyone say that in the Jewish -- the

9    Jewish book.

10    So the Quran, no one -- whether people believe in

11    it or not believe in it, that's something else.  But they

12    must see that the rules of evidence according to any court

13    will establish that Quran has more -- is more authentically

14    related to Prophet Mohammed (PBUH) than is the gospel related

15    to Jesus.

16    Because what I have read according to my research

17    is that the earliest gospel that we have that we have found

18    are from the second to third century.  So the gospel that we

19    have, the earliest gospel that we have are two hundred to

20    three hundred years after Jesus.  What happened in the middle

21    we don't know.  Who was the one who wrote those gospels we do

22    not know.  We cannot prove definitely who wrote those

23    things.  There is no chain of custody, I guess.

24    And I think the Judge and the lawyers all here may

25    appreciate that any evidence presented in court, even here,

1   has to have a chain of custody, that they can establish that

2   this evidence was not handled by someone that we do not know

3   or that we cannot trust.

4           I mean, that evidence, since the time of collection

5   to its presentation, must be handled by someone who is

6   trustworthy.  And if that cannot be proven, then the evidence

7   may be considered doubtful at least.

8           Then the third point is that Prophet Mohammed

9   (PBUH) is the successor to all prophets.  He's not something

10  new out of the blue.  His message is the same.  It may be

11  different aspects of it has changed, but the fundamentals are

12  the same, that you shall worship one God, and that is the

13  basic concept.

14          And secondly, he also talked about other aspects,

15  such as he said that a Muslim cannot be a Muslim unless -- if

16  he is full and his neighbor sleeps hungry.  And Jesus said

17  that the first greatest commandment is to love God with all

18  your heart, and the second is to love your neighbor as you

19  love yourself, or something similar.  So these words are

20  accurate in the Quran of Prophet Mohammad (PBUH).

21          In fact, I want to show -- can I use that thing, is

22  it possible?   I mean, with your permission, can I?

23          That's okay.  Actually there is some verses in the

24  Quran -- or in the Bible actually that hint at the Prophet

25  Mohammed, and I would like to read it and discuss it a little

1    bit, is that in Deuteronomy, Chapter 18, Verse 15, says the

2    Lord the God will raise up unto thee a prophet from the midst

3    of thee, of thy brethren, like unto thee, unto him you shall

4    harken.

5            And then a few verses after that it says, I will

6    raise them a prophet from among their brethren like unto thee

7    and will put My words in his mouth, and he shall speak unto

8    them all that I shall command him.  And it shall come to pass

9    that whosoever will not harken unto My words which he shall

10   speak in My name, I will require it of him.

11           Most people just think that it means he's pointing

12   to Jesus.  However, I mean, we do believe that Jesus is the

13   Messiah (PBUH), but we believe these words does not talk

14   about Jesus actually.  It talks about Prophet Mohammed (PBUH)

15   because it says, I will raise a prophet from the midst of thy

16   brethren, and brethren actually implies that they are not

17   them, they are brethren.  And children of Israel are the

18   children of Isaac, and Arabs are the children of Ishmael,

19   peace be upon them both.  So the Arabs and the children of

20   Israel can be considered brother races.

21           So it is more befitting to say that when we say the

22   prophet coming from thy brethren would mean that a prophet

23   coming from the Arab race rather than coming from the

24   children of Israel, because the children from Israel cannot

25   be their own brothers.

And he says that, okay, unto like thee, God is talking to Moses, a prophet like Moses. Well, Jesus and Moses, peace be upon them all, were not very similar. Because Jesus was born without a father, he was born of Virgin Mary (SAAW). Moses and Prophet Mohammed, both of Them, peace be upon Them, were born normally with a father and a mother.

And Jesus (SAAW) came without a new law. He did not come with a specific law for people. His gospel was about the heart and the purification of the heart mostly, while Prophet Mohammed and Prophet Moses, peace be upon Them, came with a specific law. They discussed like physical aspects, not just the hearts.

Then the Prophet Mohammed and Prophet Moses, peace be among Them, actually became somewhat like leaders of the community as They had power to implement punishment, penalties and stuff like that, and Jesus (PBUH), he never got physical power over anyone. He was still the Messiah, we still believe that He's the Messiah, but He did not get physical power over people that He could punish them, sentence them or whatever.

Both Prophet Mohammed and Prophet Moses, peace be upon Them, became powerful figures.

So this prophesy actually fits Prophet Mohammed (PBUH) more than it fits Jesus. And also it is a warning

that whosoever will not harken to My words which he shall

speak in My name.

Now, he shall speak in My name.  Every single

chapter of the Quran except for one begins with the formula

bismi-llahi ar-rahmani ar-rahimi, it says in the name of

Allah, the gracious Lord, the merciful.  So every time He

speaks or every time the Prophet Mohammed (PBUH) spoke, He

began in the name of Allah.  And we know that -- we have

established that Allah is also in Hebrew God, so it also

fulfills that.

And Prophet Mohammed (PBUH) had never read any

Bible before.  He could not even read or write.  So it's not

that someone can say that He read the Bible and tried to, you

know, tried to imitate that prophesy by beginning everything

by bismi-llahi, by saying in the name of Allah.  He never

knew that.  It just came to Him as a revelation.

So this also points to that, that He shall speak in

My name, and all the verses of Quran, all the chapters of

Quran begin with that formula.

And that I shall command Him, meaning He did not

know how to read or write, and God would command Him.  And

the first revelation that came from Prophet Mohammed (PBUH)

was . . . (speaks a phrase in Arabic).

In the first revelation that came to the

Prophet Mohammed (PBUH), He said I do not know how to read.

So again the angels came to Him and pressed Him hard to read.  And He said I do not know how to read.  And pressed him hard again and said read.  He said, Okay, what shall I read?

So it again fulfilled that commandment I shall command Him to read.  In the beginning He did not say, Okay, what?  He said, I don't know how to read.  So it was again a command to read.

So Muslims believe that this prophesy talks about Prophet Mohammed (PBUH), and that Jews and Christians should also consider this prophesy as they read their own books.

Because it says in John, Chapter 1, Verses 20 and 21, that when the priest -- the Jewish authority sent the priest to ask John the Baptist (SAAW) and it says the words and he confessed and he denied not, but confessed I am not the Christ nor the Messiah, and they asked him, What then?  Are thou Ilias?  And he said, I am not.  Are thou that prophet?  And he answered no.

So Jews were expecting three separate prophets, I guess.  So first he said, I am not the Christ, so that's the first one.  Then he said -- then they asked him, Are you Elias?  He said no.  Then they asked him, Are you that prophet?

So it means that that prophet is something different than the Messiah, and we believe that prophet is

what these words in Deuteronomy was talking about, and that is the Prophet Mohammed (PBUH).

And again John 1:35, it says, And they asked him and said unto him, why baptizest thou then if thou be not the Christ, nor Elias, neither that prophet?

So there are three prophets that Jews are expecting. Messiah already came, and we believe he will come back. I don't know about Elias.

But that prophet, so it's a separate prophet that something was expected at that time, and we believe it's Prophet Mohammed (PBUH).

Okay. Now finally a short note that Muslims actually are I believe closer followers of Jesus in many aspects than Christians today.

First of all, one small aspect is I read -- I have gone through the gospels, and any time Jesus greeted his people, it was by, Peace be upon you. That's what he said, that's what I read. He did not say good morning or how are you doing or any other sentence.

And that's how Muslims greet each other, salaam 'alaykum means peace be upon you. So even in a minor aspect we imitate that saying, peace be upon you, rather than any of those things.

Secondly, the way that Jesus prayed. Okay, it says that in Mark, Chapter 1, Verse 35, talks about that He went

the next morning long before daylight, Jesus got up and left

the house and then He prayed, so before the sun came up.

These days I do not know much about Christians, but

I think the church services are normally after the sun

rises.  But Muslims pray five times, and one of our prayers

actually begins before the sun rises.

So again the time for prayer also, you know, we

also pray around that time in which Jesus (PBUH) mentioned He

prayed.

Then in one verse it talks about that He went a

little further -- in Matthew, Chapter 26, it talks about He

went a little further on, threw Himself face downward on the

ground and prayed.

I have seen many -- some Christians pray, normally

sitting up or standing up with a book open, they read.  I

have not seen any Christians -- I do not know, maybe they do,

but no one that I know of Christians prays with their face

down.

Where Muslims do.  In our prayers, we have three

basic postures:  Standing up, bowing down, and the face on

the ground.  And I think anyone who has seen me praying can

say that that's what I do, with the whole face on the

ground.  So even the action of prayer, we do imitate what

Jesus did (PBUH).

And then about fasting, some people asked Jesus,

1  Why is it that the followers of John the Baptist fast, but

2  your followers do not fast?

3          He said that -- I don't have the King James version

4  with me, I have the Good News Bible, so it might seem a

5  little different to you.  He said, Do you expect that guests

6  at a wedding party to be sad as long as the bridegroom is

7  with them?  Of course not.  But the day will come when the

8  bridegroom will be taken way from them, and then they will

9  fast.

10          This obviously means that as long as Jesus was with

11  the disciples, that's what I understand, that as long as

12  Jesus was with the disciples they would not fast, but when He

13  would be taken away, the time of fasting would come for His

14  followers.

15          I do not know about Christians, how much they fast,

16  but Muslims must fast one month, all month, every year, and

17  also in the middle there are optional fasts that they do.

18          So even fasting is something that Muslims do more

19  often -- am I going too fast for you?

20          Even fasting is something that Muslims do more

21  often and imitate Jesus in that too.  So it's just a little

22  background that we also have claim on Jesus, we also love

23  Him, and we actually name our children after Jesus too.  My

24  cousin's son is named -- Jesus is in English, and in Arabic

25  we call him Eeesa.  So we often name our children after

Him.  I have yet to see some Christian named Jesus.  Maybe there are, but I have not seen it.

This is the end of the four points.  I have a few minutes left.

One last reason that I left -- that I did not discuss in the beginning why I chose to do this instead of having a lawyer present and talk about the law and stuff is that I do not -- I believe that sovereignty in this world belongs to God only, and any authority that makes laws or legislates for people and does not derive the authority directly from God actually is in the state of rebellion against God.

And thus I found it against my principles that I shall or my attorneys should try to find myself not guilty according to the laws passed or whatever.  I wanted to defend myself just based on the evidence, okay, this is what I did, this is what I said, and that's it.

It is true that my lawyer has filed in the past motions arguing, using the laws, but all I can say about that is that, I mean, I was misguided.  I did not have the right conviction at that time.

But now a few months ago I got the conviction that I am not going to use the laws passed by any authority.  It's not about America.  Even if I was in Pakistan, I would not use those laws, because any authority that does not rule by

the laws of God and derive its authority from the authority

of God while enjoying the earth of God, enjoying the water

and food from God, is actually in a state of rebellion. And

as a Muslim it would be against my principles to use that --

those laws for my benefit.

And there is a verse actually that talks about this

concept a little bit in the Quran in that when people choose

their own authority, when people derive laws based on their

own whims, they will naturally and unarguably be misguided

from the right way. And that is why choosing, you know,

democracy or any other way will at the end lead to corruption

on earth. And that verse is . . . (speaks a phrase in

Arabic).

It is a statement of Allah -- actually a reminder

to us that what Allah told David when he was the prophet or

King of children of Israel, He said, Oh, David, while we have

placed you as a successor on earth -- successor meaning he's

a viceroy of God on earth, his duty as a viceroy is to

represent God, God's authority on earth -- so judge you

between men in justice and do not follow your desires. Do

not follow -- actually the word says (in Arabic), it just

says do not follow desire, it does not say your desire. Do

not follow desire for it will mislead you from the right

path. And those who are -- okay, mislead you from the right

path. And those who turn from the right path shall have

severe torment because they have forgot the day of the

judgment.

So this verse makes clear that any time people

choose their own whims and desires as the supreme being, as

the supreme deciding factor of right or wrong, sooner or

later they will be misguided from the path of God, and

sooner -- and then they will have punishment waiting for

them.

So to me that's why I did not -- the last reason

was that I did not want any of my defense to be based upon

those laws.  But I'm stuck in this courtroom, so you are

going to decide based on that law, I know that, but I did not

want to present my defense based on that law.

And the last words that I'm going to say and then

I'm going to walk out is that -- or walk to my table -- is

that . . . (speaks a phrase in Arabic)

I'm going to stop here.  Indeed it has been an

excellent example for you and Ibrahim -- Abraham -- and those

with him when they said to the people readily we are free

from you and whatever you worship is like Allah.  We have

rejected and disbelieved in the systems that you choose to

judge or to rule yourself or believe in, and it has become

openly seen between us and you hostility and hatred forever

until you believe in Allah alone.

Because our purpose in this life is to worship

1  Allah according to his laws and according to his dictates,

2  and we shall preach it.  And if someone does not accept it,

3  then -- and they try to stop us, then they know nothing but

4  enmity and hatred for those who try to stop us from following

5  the law of God.

6          That's all we say, that we have no right to judge

7  or legislate on this earth, because God tells us He creates

8  the sky, He sends down the rain, how can we have the right to

9  choose our life when He gives us the life and He takes away

10  the life, and He gives us the food that we eat and He gives

11  everything else.  So how could He cannot decide our lives,

12  yet He gives us everything that we live by?

13          And that's all I have to say.

14          THE COURT:  The evidence is closed and the parties

15  have each had their opportunity to make their presentations

16  to the Court.

17          I will say this, that, Mr. Ahmed, this is somewhat

18  different -- I know you are smiling -- than what you told me

19  you were going to say.  But I want you to recognize that this

20  is a remarkable country, and even when people exercise rights

21  that we grant to people under the Constitution in

22  inappropriate forums, that we still allow those rights to be

23  exercised.  And that is what's happened in this courtroom.

24          This is not a case about your faith, nor is it a

25  case about my faith.  This is a case about your conduct.

1          What is appropriate is that I will not act

2    according to whim nor desire.  I will act according to the

3    laws of the United States, evaluate the evidence that has

4    been presented, and reach a decision that I believe the

5    evidence requires based upon the law that has been given.

6          And so with that we will adjourn, and I will go and

7    do what is appropriate in a court of law and according to the

8    rule of law of the United States.

9          We will be in recess.

10          (A recess is taken at 4:18 p.m.)

11                    --  --  --

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA       :
                                    :
4   NORTHERN DISTRICT OF GEORGIA   :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

7   Reporter of the United States District Court for the Northern

    District of Georgia, do hereby certify that the foregoing 181
8
    pages constitute a true transcript of proceedings had before
9
    the said Court, held in the city of Atlanta, Georgia, in the
10
    matter therein stated.
11
            In testimony whereof, I hereunto set my hand on
12
    this, the 18th day of June, 2009.
13

14

15

16
                          /s/ Nicholas A. Marrone
17
                          _____
                          NICHOLAS A. MARRONE, RMR, CRR
18                        Registered Merit Reporter
                          Certified Realtime Reporter
19                        Official Court Reporter
                          Northern District of Georgia
20

21

22

23

24

25